## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC. DERIVATIVE LITIGATION | Lead Case No. 08-cv-854 (SHS) |
| | (Derivative Action) |
| This Document Relates To: | |
| ALL ACTIONS | |
| | DEMAND FOR JURY TRIAL |

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

RECEIVED
08 JUN 30 PM 1:12
U.S. DISTRICT COURT
S.D.N.Y.

Plaintiffs, derivatively on behalf of Ambac Financial Group, Inc. ("Ambac" and/or the "Company"), upon their personal knowledge as to those allegations concerning themselves and upon information and belief, based on, amongst other things, the investigation made by their attorneys, allege the following:

## SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Ambac Financial Group, Inc. ("Ambac" or the "Company"), on behalf of the Company against certain of its officers and directors (the "Individual Defendants") seeking to remedy their violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act") that occurred between October 2005 and the present (the "Relevant Period") and that have caused substantial losses to Ambac and other damages, such as to its reputation and goodwill.

2.     Ambac is a Delaware corporation with its principal executive offices located at One State Street Plaza, New York, New York. Ambac is a holding company whose subsidiaries provide financial guarantee products and other financial services to clients in both the public and private sectors around the world. The Company and its subsidiaries operate in two segments: financial guarantees and financial services.

3.     Founded in 1971, Ambac is the original monoline insurer. Monolines insure bonds that have been issued by other entities. Ambac purports to leverage its AAA financial strength rating, which it had from 1979 until recently, to guarantee the timely repayment of bond principal and interest of an issuer in the event the issuer defaults, thus allowing the debt issued to get the highest possible rating. Ambac's financial guarantee is designed to protect investors in the event of securities default.

4.     Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading guarantor of public finance and structured finance obligations, had earned triple-A financial strength ratings, the highest ratings available from the three largest rating companies: Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Ratings Services ("S&P's"), and Fitch Inc. ("Fitch"). Ambac's financial strength ratings are an essential part of Ambac Assurance's ability to provide

credit enhancement and any reduction in these ratings will have a materially adverse affect on Ambac Assurance's ability to compete in the financial guarantee business. (For ease of reading, Ambac and Ambac Assurance are referred to as though they are one in the same throughout this Consolidated Complaint).

5.       Historically, Ambac focused its business on conservative municipal bonds. In recent years Ambac expanded beyond its traditional focus of conservative municipal bonds and began writing insurance on collateralized debt obligations ("CDOs"), including CDOs backed by subprime mortgages to higher risk borrowers. By 2005, structured finance obligations, which include CDOs, made up approximately 17% of the Company's total revenue, and 55% percent of the Company's domestic finance obligations. CDOs are a type of asset-backed security and structured credit product. CDOs repackage bonds, mortgages and other assets into new securities and then use the income from the underlying debt to pay investors. CDOs are secured or backed by a pool of bonds, loans or other assets, where investors buy slices classified by varying levels of debt or credit risk. Lured by larger profits and higher growth rates, in recent years, Ambac shifted its focus to writing insurance on CDO's, including CDO's backed by subprime mortgages given to high-risk borrowers.

6.       As the bottom fell out of the subprime mortgage industry following the downturn in the American housing market, CDOs began to lose massive amounts of their value. Ambac's overexposure to the CDO market was kept hidden from the public, however, due to the Individual Defendants causing or allowing the Company to issue improper public statements.

7.       Throughout the real estate and credit market declines of 2007, the Individual Defendants assured Ambac investors that the Company had been very selective in its underwriting standards in the past. The Individual Defendants also assured investors that the Company had maintained an adequate capital cushion to weather the real estate market downturn and the deteriorating credit markets while retaining the Company's vital AAA credit rating. Even as the housing and credit crises deepened, the Individual Defendants continued to downplay the Company's exposure. The Individual Defendants maintained this position through mid-2007 even as the housing and credit crises continued to deteriorate.

8.    By concealing the true nature of Ambac's financial state, Ambac's stock traded at artificially-inflated prices during the Relevant Period. As of May 18, 2007, Ambac's stock traded at an all-time high of $96.08 per share.   During the Relevant Period, the Individual Defendants directed Ambac to repurchase nearly $579 million worth of its own shares at artificially-inflated prices. Even worse, certain of the Individual Defendants sold their personally-held Ambac common stock for gross proceeds approaching $132 million while in possession of material non-public information concerning the true exposure of the Company to subprime expense.

9.    By July 27, 2007, Defendants[1] could no longer hide Ambac's overextension into the CDO market. The Company finally was forced to disclose that Ambac was not prepared for the housing and credit market downturns. Even then, the Individual Defendants refused to cause the Company to disclose the true state of financial disarray at Ambac. Instead, the truth only leaked out piecemeal.

10.    On October 24, 2007, the Company issued a press release which revealed it had lost over $360 million in the third quarter. That loss included a previous unrealized $743 million mark-to-market loss on the Company's CDO portfolio.

11.    In late December 2007, Fitch announced that after a review of Ambac's exposure to CDOs and residential mortgage-backed securities, the Company was $1 billion short of the extra capital required to keep its AAA rating. Fitch warned the Company that it would downgrade its rating if Ambac could not raise the required $1 billion.

12.    On January 18, 2008, Ambac announced that it would not raise the required $1 billion in capital. In response, Fitch cut Ambac's credit rating to AA.

13.    On January 22, 2008, Ambac issued a press release announcing a $3.2 billion loss due primarily to a $5.2 billion loss on the Company's credit derivative exposures. Over $1.1 billion of this loss was due to CDOs backed by subprime mortgages.

---

[1]    "Defendants" refers collectively to the Individual Defendants and nominal defendant Ambac.

14.    Also in January 2008, S&P and Moody's, the other two major ratings companies, announced that they would likely downgrade Ambac's credit rating if it did not raise sufficient capital to counter its exposure to CDO risk. In response, Ambac rushed to raise $1.5 billion in capital through a public offering. In doing so, Ambac completely diluted its investors' holdings by nearly tripling the amount of outstanding shares. Even worse, the public offering was only a temporary fix.

15.    On April 23, 2008, Ambac reported a first quarter net loss of $1.66 billion, or $11.69 per share, in stark contrast to a profit of $213 million, or $2.02 per share, in the same period the year before. The $1.66 billion loss included a $940.4 million credit impairment on CDOs and a $1 billion set aside to pay claims on defaulted mortgage debt. Just weeks later, Ambac announced it was writing down an additional $228 million in CDO exposure.

16.    Then, on June 4, 2008, Moody's announced it was likely to cut the ratings of Ambac from Aaa to Aa. The following day, S&P also downgraded Ambac's rating from AAA to AA. Without a pristine credit rating from at least two of the three-major ratings agencies, Ambac is in serious trouble. As one independent ratings officer put it: "They have no future. They will argue otherwise but as a practical matter they don't have a future."

17.    As of June 27, 2008, Ambac is trading at $1.84, down 98% from its all time high of over $96 a share just over a year earlier.

18.    In addition to essentially killing the business, the Individual Defendants' conduct alleged herein has also resulted in several class action lawsuits, causing further damage to Ambac. Specifically, several such lawsuits have been filed against the Company and certain of its officers for false and misleading statements concerning the Company's business and financial results related to its insurance coverage on CDO contracts, in violation of federal securities laws. These lawsuits have been consolidated and are also pending in the Southern District of New York. Ambac will incur significant damages in defending the litigation.

19.    Plaintiffs are current shareholders of Ambac and were shareholders of Ambac at the time of the transactions complained of herein. Plaintiffs bring this lawsuit in a derivative capacity to redress the harm Defendants have caused Ambac to suffer.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the Plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

22.    This Court retains general jurisdiction over each named defendant who is a resident of New York.  Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Ambac maintains operations in New York and is traded on the New York Stock Exchange, and because the allegations contained herein are brought derivatively on behalf of Ambac, defendants' conduct was purposefully directed at New York.  Defendants' conduct arose out of New York, where Ambac maintains its corporate headquarters.  Finally, exercising jurisdiction over the named non-resident defendants is reasonable.

23.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Ambac occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

24.     Plaintiff Catherine Rubery is, and was at times relevant hereto, an owner and holder of Ambac common stock.  Rubery is a citizen of South Carolina.

25.     Plaintiff Marilyn Clark is, and was at times relevant hereto, an owner and holder of Ambac common stock.  Clark is a citizen of California.

26.     Plaintiff Earl Jordan Yaokasin is, and was at times relevant hereto, an owner and holder of Ambac common stock.  Yaokasin is a citizen of California.

27.     Rubery, Clark, and Yaokasin are referred collectively in this complaint as Plaintiffs.

28.     Nominal defendant Ambac is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at One State Street Plaza, New York, New York 10004.  Nominal defendant Ambac through its subsidiaries, provides financial guarantee products and other financial services to clients in the public and private sectors worldwide.

29.     Defendant Michael A. Callen ("Callen") is Ambac's Chairman of the Board and interim Chief Executive Officer ("CEO") and has been since January 2008.  Callen is also an Ambac director and has been since 1991.  Callen is a member of the Audit and Risk Assessment Committee and has been since 2007.  Callen was also a member of Ambac's Audit and Risk Assessment Committee from at least 2005 to 2006.  Because of his positions, defendant Callen knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac.  During the Relevant Period, Callen participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and Ambac shareholders.  Defendant Callen sold 11,750 shares of Ambac stock for $942,847 in proceeds while in possession of material non-public information.  Callen is a citizen of Maryland.

30.     Defendant John W. Uhlein, III ("Uhlein") is an Ambac Executive Vice President and has been since December 2003.  Uhlein was also Chairman of Ambac Assurance UK Limited from 1996 to April 2005; a Managing Director from January 1996 to December 2003; and a First Vice President from September 1993 to January 1996.  Because of his positions, defendant Uhlein knew,

consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Uhlein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Uhlein sold 58,924 shares of Ambac stock for $4,960,338.40 in proceeds while in possession of material non-public information. Uhlein is a citizen of Connecticut.

31.    Defendant Kevin J. Doyle ("Doyle") is Ambac's Senior Vice President and General Counsel and has been since January 2005. Doyle is also Ambac's Chief Legal Officer and has been since January 2000. Doyle was Ambac's Managing Director and General Counsel from January 2000 to January 2005; Managing Director and General Counsel of the Specialized Finance Division of Ambac Assurance from January 1996 to January 2000; First Vice President and General Counsel of the Specialized Finance Division of Ambac Assurance from January 1995 to January 1996; and Vice President and Assistant General Counsel from 1991 to January 1995. Because of his positions, defendant Doyle knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Doyle participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Doyle sold 50,862 shares of Ambac stock for $4,224,441.75 in proceeds while in possession of material non-public information. Doyle is a citizen of New York.

32.    Defendant Gregg L. Bienstock ("Bienstock") is Ambac's Senior Vice President, Chief Administrative Officer and Employment Counsel and has been since January 2005. Bienstock was also Ambac's Managing Director, Human Resources and Employment Counsel from January 1999 to January 2005 and First Vice President, Director of Human Resources and Employment Counsel from February 1997 to January 1999. Because of his positions, defendant Bienstock knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Bienstock participated in the issuance of improper statements, including the preparation of the

improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Bienstock sold 40,117 shares of Ambac stock for $3,375,650.69 in proceeds while in possession of material non-public information. Bienstock is a citizen of New York.

33.     Defendant Thomas J. Gandolfo ("Gandolfo") was, until recently, an Ambac Senior Managing Director and has been since June 2005. Gandolfo was also Ambac's Senior Vice President and Chief Financial Officer from January 2003 to June 2005; Corporate Controller from July 1998 to January 2003; and Controller of Ambac's Investment Agreement Business from 1994 to July 1998. Because of his positions, defendant Gandolfo knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Gandolfo participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Gandolfo sold 25,287 shares of Ambac stock for $2,212,278.67 in proceeds while in possession of material non-public information. Gandolfo is a citizen of Connecticut.

34.     Defendant Robert G. Shoback ("Shoback") is an Ambac Senior Managing Director and has been since January 2004. Shoback was also an Ambac Managing Director in the Public Finance Division from November 1998 to January 2004. Because of his positions, defendant Shoback knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Shoback participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Shoback sold 26,358 shares of Ambac stock for $2,131,601.70 in proceeds while in possession of material non-public information. Shoback is a citizen of New Jersey.

35.     Defendant Douglas C. Renfield-Miller ("Renfield-Miller") is an Ambac Executive Vice President and has been since July 2006. Renfield-Miller is also Chairman of Ambac Assurance UK Limited and has been since April 2005. Renfield-Miller was an Ambac Senior Managing

Director from January 2004 to July 2006 and a Managing Director from April 2000 to January 2004. Because of his positions, defendant Renfield-Miller knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Renfield-Miller participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Renfield-Miller received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $250,000 | $900,000 | $351,029 | $470,736 | - | $50,535 | $48,356 |
| 2005 | $250,000 | $558,750 | $498,389 | - | 25,000 | - | $20,529 |

Defendant Renfield-Miller sold 23,110 shares of Ambac stock for $1,980,837.97 in proceeds while in possession of material non-public information. Renfield-Miller is a citizen of New York.

36.    Defendant David W. Wallis ("Wallis") is Ambac's Senior Managing Director and Head of Portfolio and Market Risk Management and has been since July 2005. Wallis was also an Ambac Managing Director from July 1999 to June 2005 and a First Vice President from 1996 to July 1999. Because of his positions, defendant Wallis knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Wallis participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Wallis received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2005 | $283,823 | $755,134 | $135,048 | 9,000 | $156,694 |

Defendant Wallis sold 14,216 shares of Ambac stock for $1,200,421.15 in proceeds while in possession of material non-public information. Wallis is a citizen of Kentucky.

37.    Defendant William T. McKinnon ("McKinnon") is Ambac's Senior Managing Director and Chief Risk Officer and has been since January 2004. McKinnon was also Ambac's Managing Director and Chief Risk Officer from February 2000 to January 2004; Managing Director and Head of Credit Risk Management for the Specialized Finance Division from October 1998 to February 2000; First Vice President in the asset-backed securities department from January 1992 to October 1998; and a First Vice President from January 1989 to January 1992. Because of his positions, defendant McKinnon knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, McKinnon participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant McKinnon received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $300,000 | $725,000 | $585,135 | $599,355 | - | $127,892 | $27,000 |
| 2005 | $300,000 | $595,000 | $340,142 | - | 12,500 | - | $22,314 |

Defendant McKinnon sold 12,895 shares of Ambac stock for $1,143,356.36 in proceeds while in possession of material non-public information. McKinnon is a citizen of New York.

38.    Defendant Sean T. Leonard ("Leonard") is Ambac's Senior Vice President and Chief Financial Officer and has been since June 2005. Because of his positions, defendant Leonard knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Leonard participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Leonard received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $350,000 | $575,000 | $166,667 | $145,508 | - | $32,883 | $31,500 |
| 2005 | $199,231 | $625,000 | $125,058 | - | 6,614 | - | $808 |

Leonard is a citizen of New Jersey.

39.      Defendant Jill M. Considine ("Considine") is an Ambac director and has been since 2000.  Considine is also a member of Ambac's Audit and Risk Assessment Committee and has been since at least 2005.  Because of her positions, defendant Considine knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac.  During the Relevant Period, Considine participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders.  Considine is a citizen of New York.

40.      Defendant Laura S. Unger ("Unger") is an Ambac director and has been since 2002.  Unger is also a member of Ambac's Audit and Risk Assessment Committee and has been since at least 2005.  Because of her positions, defendant Unger knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac.  During the Relevant Period, Unger participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders.  Unger is a citizen of New York.

41.      Defendant Thomas C. Theobald ("Theobald") is an Ambac director and has been since 2004.  Theobald is also a member of Ambac's Audit and Risk Assessment Committee and has been since at least 2005.  Because of his positions, defendant Theobald knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac.  During the Relevant Period, Theobald participated in the issuance of improper statements, including the preparation of the improper press

releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Theobald is a citizen of Connecticut.

42.    Defendant Henry D.G. Wallace ("Wallace") is an Ambac director and has been since 2004. Wallace is also Chairman of Ambac's Audit and Risk Assessment Committee and has been since 2007 and a member and has been since at least 2005. Because of his positions, defendant Wallace knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Wallace participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Wallace is a citizen Florida resident.

43.    Defendant Philip Duff ("Duff") is an Ambac director and has been since 2007. Because of his position, defendant Duff knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Duff participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Duff is a citizen of Connecticut.

44.    Defendant Philip B. Lassiter ("Lassiter") was Ambac's Non-Executive Chairman of the Board from January 27, 2004 to July 24, 2006. Lassiter was also Ambac's Chairman of the Board and CEO from 1991 to January 2004. Because of his positions, defendant Lassiter knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Lassiter participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Lassiter sold 941,438 shares of Ambac stock for $77,532,993.23 in proceeds while in possession of material non-public information. Lassiter is a citizen of Florida.

45.     Defendant Robert J. Genader ("Genader") was Ambac's Chairman of the Board from July 2006 to January 2008.  Genader was also Ambac's CEO from January 2004 to January 2008; President from January 2001 to January 2008; a director from 1992 to January 2008; Chief Operating Officer from January 2001 to January 2004; Vice Chairman from January 1998 to January 2001; and Executive Vice President from 1986 to January 1998.  Because of his positions, defendant Genader knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac.  During the Relevant Period, Genader participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders.  Defendant Genader received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $575,000 | $1,650,000 | $3,437,573 | $5,165,600 | - | $335,796 | $71,562 |
| 2005 | $575,000 | $900,000 | $2,000,070 | - | 110,000 | - | $63,304 |

Defendant Genader sold 360,013 shares of Ambac stock for $30,015,291.31 in proceeds while in possession of material non-public information.  Genader is a citizen of Connecticut.

46.     Defendant Kathleen A. McDonough ("McDonough") was an Ambac Senior Managing Director from January 2004 to August 2007.  McDonough was also Ambac's Managing Director in the Public Finance Division from January 1996 to January 2004.  McDonough served Ambac in various capacities since July 1991.  Because of her positions, defendant McDonough knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac.  During the Relevant Period, McDonough participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders.  Defendant McDonough sold 26,437 shares of Ambac stock for $2,239,603.89 in proceeds while in possession of material non-public information. McDonough is a citizen of New York.

47.     Defendant W. Grant Gregory ("Gregory") was an Ambac director from 1991 to January 2008. Gregory was also a member of the Audit and Risk Committee from at least 2005 to 2006. Because of his positions, defendant McDonough knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, McDonough participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Gregory is a citizen of Connecticut.

48.     The defendants identified in ¶¶29-38 and 46 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶39-45, 47 are referred to herein as the "Director Defendants." The defendants identified in ¶¶29-37, 44-46 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors and/or fiduciaries of Ambac and because of their ability to control the business and corporate affairs of Ambac, the Individual Defendants owed Ambac and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Ambac in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ambac and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

50.     Each director and officer of the Company owes to Ambac and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ambac, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Ambac, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Ambac.

52.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ambac, and was at all times acting within the course and scope of such agency.

53.     To discharge their duties, the officers and directors of Ambac were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Ambac were required to, among other things:

         (a)     refrain from acting upon material inside corporate information to benefit themselves;

         (b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

         (c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

         (d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

         (e)     remain informed as to how Ambac conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry

in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

       (f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

54.    Each member of the Audit and Risk Committee, by virtue of the Company's Audit and Risk Committee Charter, had the obligation to monitor the corporate control and risk environment of the Company. Specifically, the Audit and Risk Committee is (among other things) tasked with:

1)     Report regularly to the Board to discuss issues regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the performance and independence of the Company's independent auditors, and the performance of the internal audit function.

2)     Review with management and the independent auditors the Company's annual financial statements prior to the filing of its Form 10- K and its quarterly financial statements prior to the filing of its Form 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations". Also, the Committee shall discuss the results of the independent auditors' annual audits and quarterly reviews and any other matters required to be communicated to the Committee by the independent auditors under the standards of the Public Company Accounting Oversight Board (PCAOB).

3)     Review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditors' report on (1) management's assessment and (2) the effectiveness of internal control over financial reporting.

4)     Discuss the type and presentation of information to be included in the Company's earnings press releases (*paying particular attention to any use of "pro forma" or "adjusted" information not in compliance with GAAP*), as well as review any financial information and earnings guidance provided by the Company to analysts and rating agencies, provided that the Committee need not discuss in advance, in each instance, such disclosures.

5)     Evaluate whether management is setting the appropriate control environment through an annual review of the Company's entity-level controls, including but not limited to their enforcement of a positive business ethics environment, the establishment of fraud monitoring and fraud prevention controls across all business and monitoring the enforcement of the Company's Code of Business Conduct.

6)  Review the Company's disclosure controls and procedures policy and other steps the Company has taken to ensure that all financial and non-financial information required to be disclosed is collected, summarized, evaluated and reported within the time periods specified in the SEC's rules and forms, including receiving a quarterly report regarding any Form 8-Ks filed during the prior quarter.

7)  Review annually with the Company's internal auditors and independent auditors the Company's guidelines and policies relating to risk assessment and risk management, including the identification of potential fraud risk, fraud protection and fraud detection methods.

8)  Review annually with management guidelines and policies of the Company's risk management and underwriting areas, including the Company's insured book of business, derivatives business and investment portfolios and discuss other steps management has taken to monitor and control the Company's major financial risk exposures.

9)  Review quarterly with the Head of the Portfolio and Market Risk Management Group, the Company's current adversely classified credit book, with particular focus on problem credits.

10)  Review with the chief executive officer and chief financial officer, as appropriate, and independent auditors, periodically, the following:

   a)  all significant deficiencies and material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors;

   b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

   c)  any significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses; and

   d)  procedures undertaken in connection with the CEO and CFO certifications for Form lO-K and 10-Q's, including their evaluation of the Company's disclosure controls and procedures and internal controls.

55.  Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ambac, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Ambac's Board during the Relevant Period.

56. The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to improperly state its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

58. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Ambac and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Ambac, regarding the Individual Defendants' management of Ambac's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period; and (iv) allow the Individual Defendants to sell nearly $132 million of their personally held Ambac

stock while is possession of material non-public information. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

59.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time the Individual Defendants caused the Company to conceal the true fact that Ambac was misrepresenting its business prospects and health.

60.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Ambac common stock so they could dispose of over $131 million of their personally held stock.

61.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statement. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

62.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

### Ambac Gets Caught Up In the Subprime and Credit Market Crisis

63.    For most of its history, Ambac only wrote insurance for municipal bonds. Unlike corporate bonds, municipal bonds have a miniscule rate of default making it very safe to insure them. Lured by incredibly high profits, however, in the last few years Ambac ventured outside

municipal bonds and started insuring bonds backed by subprime mortgages and other complex debt securities.

64.    A subprime borrower is someone with a low credit score, higher debt-to-income ratio, or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.    In an environment of appreciating home prices and low interest rates, subprime borrowers are typically able to stay current due to the rising equity in their property.    But in an environment of depreciating home prices, increasing default rates are the norm.    This is exactly what has been occurring since at least mid-2006.

65.    In fact, as early as 2005, bankers and economists alike were expressing concern over the rising delinquency rates in nontraditional mortgages such as subprime mortgages, especially because the risk of delinquency would be heightened by a downturn in the housing market.    For example, on August 24, 2005, *USA Today* reported that economists and bankers were "getting nervous about the wide use of higher-risk financing, such as … subprime mortgages for low-income home buyers."    As chief economist Doug Duncan of the Mortgage Bankers Association stated in the article, easy financing helps people buy homes, but also raises foreclosure risks.

66.    Similarly, at the CPR and CDR's Prepayment and Mortgage Credit Modeling & Strategy Conference in October 2005, Freddie Mac Chief Economist Frank Nothaft stated that subprime delinquency rates remained worrisome, with subprime delinquencies as much as eight to nine times higher than prime loans.

67.    In a December 26, 2005 *Business Week* article, JPMorgan Chase & Co. estimated that risky subprime loans made up close to 9% of mortgage debt—large enough to make a downturn worse if those loans began to fail in large numbers.

68.    Governor Susan Schmidt Bies, a member of the Federal Reserve Board, gave a speech at the Financial Services Institute on February 2, 2006.    In her speech, Bies noted that the Federal Reserve and other banking supervisors were concerned that then-current risk-management techniques did not fully address the level of risk in nontraditional mortgages such as subprime mortgages—a risk that would be heightened by a downturn in the housing market.    Bies also stated

that lenders were increasingly combining nontraditional mortgage loans with weaker mitigating controls on credit exposures.

69.     These concerns rang true in late 2006 and early 2007, as a subprime mortgage crisis erupted. During the first stage of this crisis, several prominent subprime lenders including New Century Financial Corporation declared bankruptcy as liquidity dried up and the lenders found themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

70.     The crash of the subprime market led to the rapid deterioraton in the value of CDOs. CDOs are a type of asset-backed security and structured credit product that repackage bonds, mortgages and other assets into new securities. The CDO then uses the income from the underlying debt to pay investors. CDOs are secured or backed by a pool of bonds, loans or other assets, where investors buy slices classified by varying levels of debt or credit risk. Some CDOs are backed by subprime mortgages to higher-risk buyers. As the subprime market crashed, so did the value of these CDOs.

71.     On October 26, 2007, Moody's cut the ratings on CDOs tied to $33 billion of subprime mortgage securities. In some cases, CDOs with ratings as high as AAA were either cut or put on review for downgrade.

72.     On October 29, 2007, Fitch announced that it had completed a comprehensive review of its CDOs and as a result it was placing 150 transactions tied to $36.8 billion on Ratings Watch Negative, including CDOs with AAA ratings. The following day, Fitch announced that it would be revising its entire methodology for rating CDOs and indicated that it expected to publish the new methodology the following week.

73.     On November 1, 2007, Fitch announced that due to the deterioration in the subprime market the U.S. Corporate bond downgrades hit their highest quarterly level in two years – downgrades totaled $92.1 billion in the third quarter of 2007. According to Fitch, three major ratings companies, Standard & Poor's, Moody's and Fitch, had cut ratings on approximately 7,800 bonds backed by residential mortgage backed securities sold in 2006 and had cut ratings on another 3,700 bonds sold in 2005 and 2007. This is exactly the type of CDO that Ambac insured.

74.    Throughout the Relevant Period, the Individual Defendants recklessly directed Ambac to provide insurance services to CDOs that were backed by subprime loans and to inaccurately report the Company's resulting exposure.

### Ambac Attempts to Hide Its Overexposure to CDOs Through A Series of False and Misleading Statements

75.    On October 19, 2005, the Individual Defendants caused or allowed Ambac to issue a press release detailing its financial results for the third quarter of 2005.   The press release downplayed any negative events and stated that the Company "continuously monitors its insured portfolio activity seeking to mitigate claims."   The press release stated in relevant part:

> Ambac Financial Group, Inc. (Ambac) today announced third quarter 2005 net income of $175.1 million, or $1.61 per diluted share. This represents a 5% decrease from third quarter 2004 net income of $183.5 million, and a 2% decrease in net income per diluted share from $1.65 in the third quarter of 2004. The third quarter 2005 results were negatively impacted by a loss provision amounting to $60.0 million on an after-tax basis, or $0.55 per diluted share, related to its exposure to municipal finance credits impacted by Hurricane Katrina.
>
> Net Income Per Diluted Share
>
> Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.
>
> Earnings measures reported by research analysts typically exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain non-recurring and other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the third quarter 2005, net security gains and losses had the effect of increasing net income by $8.8 million, $0.08 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $28.5 million, or $0.26 per diluted share for the third quarter 2005.
>
> *    *    *
>
> Commenting on the overall results, Ambac President and ***Chief Executive Officer, Robert J. Genader, noted, "Our operating results, excluding the $0.55 per share impact of Hurricane Katrina, were pretty good considering the tight credit spreads and increased competition that have persisted during the past 18 months.*** Domestic top-line production in both public and structured finance was encouraging,

- 22 -

with attractive deals closed in a wide array of sectors. European booked business was sparse despite strong activity and growing pipelines - it remains a lumpy and less predictable business flow with long lead times." Mr. Genader continued, "The story of the quarter was Hurricane Katrina and the physical destruction and human suffering that it wrought. While early in the assessment process, we have completed a detailed loss analysis using the best information we could develop. By its very nature, it will be an evolving situation which will require and get our full attention on surveillance and active remediation. On a positive note, the balance of our risk portfolio showed improvement."

\* \* \*

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $3.7 million quarter of 2005 from $86.6 million at June 30, 2005 to $82.9 million at September 30, 2005.

*Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on insured transactions that are considered adversely classified. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims.* The ACR increased by $79.3 million during the quarter, primarily as a result of municipal exposures to the region impacted by Hurricane Katrina. Ambac's exposure to losses as a result of the hurricane is derived primarily from its guarantees of municipal bonds in the greater New Orleans area and the Gulf-front regions that were most severely impacted by the storm. The company has classified 35 individual obligations in the region with total net par outstanding of approximately $1.1 billion. To date, Ambac has paid three claims on obligations in the region, totaling approximately $2.0 million and has subsequently recovered the full amounts. In determining our loss estimate, our analysis has considered the unprecedented nature of the disaster, including the displacement of the communities' residents, and the unique aspects of each insured bond, such as the nature of the revenue source, the level of debt service reserves, if any, and other transaction protections. Ambac's estimate of losses related to the hurricane was made without regard to any potential federal, state or local government assistance to individual municipalities or institutions. The credit loss estimation process involves the exercise of considerable judgment. Due to the nature of the loss reserve estimate, Ambac's ultimate actual loss associated with the hurricane may be materially different than the current estimate and thereby may affect future operating results. Ambac will continue to assess the impact of Hurricane Katrina on the fourth quarter and subsequent periods as more information becomes available to us. Ambac does not have material exposure to credits adversely affected by Hurricane Rita. Outside of the ACR activity related to the hurricane, the remaining portfolio experienced slightly favorable credit migration during the quarter.

76.    On January 25, 2006, the Individual Defendants caused or allowed Ambac to announce its fourth quarter 2005 financial results in a press release. In the press release defendant Genader touted the Company's "experienced professionals" who "continue to identify new and

attractive opportunities." Also, the press release stated that Ambac actually decreased its reserves for losses due to credit deterioration. The press release stated in relevant part:

> Ambac Financial Group, Inc. (Ambac) today announced fourth quarter 2005 net income of $204.3 million, or $1.90 per diluted share. This represents an 8% increase from fourth quarter 2004 net income of $188.8 million, and a 12% increase in net income per diluted share from $1.69 in the fourth quarter of 2004.

> Net Income Per Diluted Share

> Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

> Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain non-recurring and other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the fourth quarter 2005, net security gains and losses had the effect of increasing net income by $13.2 million, $0.12 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $20.3 million, or $0.19 per diluted share for the fourth quarter 2005.

> * * *

> Commenting on the overall results, Ambac President and Chief Executive Officer, Robert J. Genader, noted, "Our top-line credit enhancement production results are encouraging as we successfully closed a wide array of transactions during the quarter, including a few deals of significant size. Overall, market conditions remain challenging, yet *our experienced professionals continue to identify new and attractive opportunities across a broad spectrum of asset classes and geographic locations.* I remain cautiously optimistic going into 2006 as demand for our core financial guaranty product seems to be on the rise."

> Revenues

> Highlights

> Credit enhancement production in the fourth quarter of 2005 was $395.8 million, up 15% from the fourth quarter of 2004 which came in at $344.2 million. Strong growth in U.S. public finance and U.S. structured finance were partially offset by a decline in international.

> Credit enhancement production for the full year 2005 of $1,249.4 million was 3% lower than credit enhancement production of $1,287.8 million in 2004, driven by

tighter credit spreads across many of the markets Ambac serves and a slow down in transactions in the international market, primarily Europe.

* * *

Net premiums earned and other credit enhancement fees for the fourth quarter of 2005 were $217.5 million, which represented a 14% increase from the $190.4 million earned in the fourth quarter of 2004. Increases in net premiums earned in U.S. public finance and U.S. structured finance were partially offset by decreased net premiums earned in international.

Net premiums earned include accelerated premiums, which result from refundings, calls and other accelerations recognized during the quarter. Accelerated premiums were $35.4 million in the fourth quarter of 2005 (which had a net income per diluted share effect of $0.19), up 179% from $12.7 million ($0.07 per diluted share) in accelerated premiums in the fourth quarter of 2004. The majority of the accelerated premiums relate to the U.S. public finance segment. The current quarter was once again impacted by one large public finance refunded transaction, representing 41% of the total accelerated amount. Long-term interest rates remained relatively low during the year and we experienced extremely high refunding activity in our public finance segment. However, as interest rates rise, the level of accelerated premiums should decline.

* * *

Net investment income for the fourth quarter of 2005 was $109.0 million, representing an increase of 16% from $94.0 million in the comparable period of 2004. Net investment income excluding net investment income from Variable Interest Entities ("VIEs") for the fourth quarter of 2005 was $96.7 million, representing an increase of 6% from $90.9 million in the fourth quarter of 2004. This increase was due primarily to the growth in the investment portfolio driven by ongoing collection of financial guarantee premiums and fees, partially offset by a lower reinvestment rate and use of cash for repurchases of Ambac stock during the second and third quarters of 2005 totaling approximately $300 million. Net investment income from VIEs for the fourth quarter of 2005 was $12.3 million, up from $3.1 million in the fourth quarter of 2004. Investment income from VIEs results from the consolidation of certain trusts that Ambac has insured and consolidated under accounting pronouncement FIN 46. The increase in interest income from VIEs reflects the consolidation of two transactions executed in the fourth quarter of 2004. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

Net investment income (including net investment income from VIEs) for the full year 2005 was $426.1 million, representing an increase of 18% from $361.1 million in the comparable period of 2004, primarily as a result of the reasons provided above.

* * *

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) increased $20.2 million during the fourth quarter of 2005 from $82.9 million at September 30, 2005 to $103.1 million at December 31, 2005. The increase was primarily related to a new case reserve established during the quarter for a public finance infrastructure transaction and an addition to an existing case reserve for a stressed health care transaction.

*Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR decreased by $7.2 million during the quarter*, primarily as a result of net improvement in the classified portfolio and a transfer of ACR reserves to case reserves related to the public finance infrastructure transaction discussed above. At December 31, 2005, the specific Hurricane Katrina-related provision amounted to $91.5 million, down slightly from $92.0 million at September 30 due to amortization and pay downs on effected credits. Approximately $1.1 billion of Katrina-impacted credits are included in Ambac's adversely classified credit portfolio. Ambac did not pay any Katrina-related claims during the quarter and has fully recovered the amounts paid in the third quarter. Ambac's estimate of losses related to the hurricane does not consider any potential, federal, state or local government assistance to individual municipalities or institutions as such assistance still has not been determined. The credit loss estimation process involves the exercise of considerable judgment. Ambac will continue to assess the impact of Hurricane Katrina on subsequent periods as more information becomes available to us and the ultimate actual loss associated with the hurricane may be materially different than the current estimate and thereby may affect future operating results.

77.     On April 26, 2006, the Individual Defendants caused or allowed Ambac to announce its first quarter 2006 financial results in a press release.  In the press release, defendant Genader lauded the Company's diversification.  Also, according to this press release, reserves for credit deterioration decreased.  The press release stated in relevant part:

Ambac Financial Group, Inc. (Ambac) today announced first quarter 2006 net income of $221.1 million, or $2.06 per diluted share. This represents a 19% increase from first quarter 2005 net income of $185.5 million, and a 24% increase in net income per diluted share from $1.66 in the first quarter of 2005.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts

(collectively "net security gains and losses") and certain non-recurring and other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the first quarter 2006, net security gains and losses had the effect of increasing net income by $8.1 million, $0.08 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $12.0 million, or $0.11 per diluted share for the first quarter 2006.

\* \* \*

Commenting on the overall results, Ambac President and Chief Executive Officer, Robert J. Genader, noted, "This was another solid quarter for Ambac in a challenging business environment. *The company's scale, market diversification and capacity continue to be highly valued by our global clients*. These important attributes enable us to participate across a broad spectrum of profitable transactions both domestic and international." Mr. Genader further commented, "Although very large transactions were generally absent during the first quarter, several notable international deals have already closed in April."

\* \* \*

Loss Reserve Activity

• Case basis loss reserves (loss reserves for exposures that have defaulted) increased $18.2 million during the first quarter of 2006 from $103.1 million at December 31, 2005 to $121.3 million at March 31, 2006. The increase was primarily related to additional case reserves for a public finance infrastructure transaction and an MBS transaction, partially offset by $7.8 million in payments during the quarter.

• Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. *The ACR decreased by $25.9 million during the quarter, primarily as a result of net improvements in the classified portfolio and a transfer of ACR reserves to case reserves for the MBS transaction noted above*. At March 31, 2006, the specific Hurricane Katrina-related provision amounts to $91.1 million, down slightly from $91.5 million at December 31, 2005. Approximately $1.1 billion of Katrina-impacted credits remain in Ambac's adversely classified credit portfolio. Ambac did not pay any Katrina-related claims during the quarter.

78.    On July 26, 2006, Individual Defendants caused or allowed Ambac to announce its second quarter 2006 financial results in a press release. According to that press release, the Company again decreased its reserves for credit deterioration. The press release stated in relevant part:

Ambac Financial Group, Inc. (Ambac) today announced second quarter 2006 net income of $238.6 million, or $2.22 per diluted share. This represents a 28% increase

from second quarter 2005 net income of $186.1 million, and a 31% increase in net income per diluted share from $1.69 in the second quarter of 2005.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the second quarter 2006, net security gains and losses had the effect of increasing net income by $32.9 million, $0.31 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $22.8 million, or $0.21 per diluted share for the second quarter 2006....

\* \* \*

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "I am encouraged by the strong credit enhancement production and solid financial results for the quarter. The company's ability to produce record results in this suboptimal business environment is a testament to our people and our strategy. We continue to uncover attractive opportunities to put our capital to work in the short-term and I am confident that the company is well positioned both domestically and internationally for the long-term."

\* \* \*

Loss Reserve Activity

• Case basis loss reserves (loss reserves for exposures that have defaulted) increased $17.4 million during the second quarter of 2006 from $121.3 million at March 31, 2006 to $138.7 million at June 30, 2006. The increase was primarily related to additional case reserves for a healthcare transaction and an addition to loss adjustment expense reserves. Paid claims during the quarter amounting to $20.1 million included a payment on a CDO which had previously been classified within the active credit reserves, paid and terminated during the current quarter.

• *Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR decreased by $24.7 million during the quarter, from*

*$171.7 million at March 31, 2006 to $147.0 million at June 30, 2006.* The decrease was primarily the result of net improvements in the classified portfolio and a transfer of ACR reserves to case reserves for the CDO transaction noted above. At June 30, 2006, the specific Hurricane Katrina-related provision amounts to $90.4 million, down slightly from $91.1 million at March 31, 2006. Approximately $1.1 billion of Katrina-impacted credits remain in Ambac's adversely classified credit portfolio. Ambac did not pay any Katrina-related claims during the quarter.

79.    On October 25, 2006, the Individual Defendants caused or allowed the Company to issue a press release entitled "Ambac Financial Group, Inc. Announces Third Quarter Net Income of $213.5 Million, up 22%." The press release failed to mention the affect the subprime mortgage and credit crises were having on the Company. The press release stated in relevant part:

> Ambac Financial Group, Inc. (Ambac) today announced third quarter 2006 net income of $213.5 million, or $1.98 per diluted share. This represents a 22% increase from third quarter 2005 net income of $175.1 million, and a 23% increase in net income per diluted share from $1.61 in the third quarter of 2005.

> Net Income Per Diluted Share

> Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

> Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the third quarter 2006, net security gains and losses had the effect of increasing net income by $6.5 million, $0.06 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $14.5 million, or $0.13 per diluted share for the third quarter 2006.

> \*  \*  \*

> Revenues

> Highlights

> Credit enhancement production in the third quarter of 2006 was $216.2 million, down 16% from the third quarter of 2005 which came in at $256.6 million. Growth in international was more than offset by declines in U.S. public finance and U.S. structured finance.

Credit enhancement production for the nine months of 2006 of $980.7 million was 15% higher than credit enhancement production of $853.5 million in the same period of 2005, driven by growth in the international and U.S. structured finance markets during the nine-month period.

\* \* \*

Structured finance earned premiums and other credit enhancement fees grew 12%. The rate of growth in structured finance has improved as the recent level of writings in asset classes such as commercial asset-backed securities, auto securitizations and pooled debt obligations has increased. Narrow credit spreads and high prepayment speeds in the mortgage-backed and home equity book of business and early terminations of transactions in other structured finance sectors continue to partially offset the positive effects of new business writings.

International earned premiums and other credit enhancement fees decreased by 6%. The decline was driven primarily by significant paydowns and calls over the past several quarters and the recent business mix which has trended towards long-dated infrastructure transactions that earn premiums over a longer period of time than typical structured finance exposures.

Net investment income (including net investment income from VIEs) for the third quarter of 2006 was $120.2 million, representing an increase of 9% from $110.6 million in the comparable period of 2005. This increase was due primarily to growth in the investment portfolio driven by the ongoing collection of financial guarantee premiums and fees and a $200 million capital contribution from the parent company in the fourth quarter of 2005, partially offset by a $5.3 million net positive adjustment booked in the third quarter 2005 for municipal bonds within the portfolio that had been pre-refunded. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

\* \* \*

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $12.0 million during the third quarter of 2006 from $138.7 million at June 30, 2006 to $126.7 million at September 30, 2006. The decrease was driven primarily by claim payments made during the quarter amounting to $8.9 million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR increased by $0.6 million during the quarter, from $147.0 million at June 30, 2006 to $147.6 million at September 30, 2006. The increase was driven by increased reserves on certain credits within the U.S. public finance and structured finance portfolios, offset by a $35.6 million reduction in the ACR for Hurricane Katrina impacted credits. At September 30, 2006, the specific Hurricane Katrina-related provision amounts to $50.5 million, down from $90.4 million at June 30, 2006. The decrease is primarily due to significant state and federal support recently provided to

the region, particularly the greater New Orleans area. Ambac did not pay any Katrina-related claims during the quarter.

Provision for income taxes for the third quarter of 2006 amounted to $83.6 million, an effective tax rate of 28.1%. This compares to the third quarter of 2005 tax provision of $51.9 million, an effective tax rate of 22.8%. The increased tax rate in 2006 was due to the net release of tax reserves in the third quarter 2005 and higher taxable income resulting from improved financial guarantee underwriting results in the third quarter 2006 relative to the comparable prior period primarily as a result of Hurricane Katrina related loss activity.

Provision for income taxes for the nine months of 2006 amounted to $252.5 million, an effective tax rate of 27.3%. This compares to the nine months of 2005 tax provision of $193.1 million, an effective tax rate of 26.1%. The increased tax rate in 2006 is explained above.

Other Items

Total net securities gains/(losses) for the third quarter of 2006 were $9.9 million, or $0.06 per diluted share; consisting of net realized gains on investment securities of $7.9 million, net mark-to-market gains on credit and total return derivatives of $2.1 million and net mark-to-market losses on non-trading derivative contracts of ($0.1) million. For the third quarter of 2005, net securities gains/(losses) were $14.5 million, or $0.08 per diluted share; consisting of net realized gains on investment securities of $9.5 million, net mark-to-market gains on credit and total return derivatives of $3.9 million and net mark-to-market gains on non-trading derivative contracts of $1.1 million.

Total net securities gains/(losses) for the nine months of 2006 were $74.4 million, or $0.44 per diluted share; consisting of net realized gains on investment securities of $57.5 million, net mark-to-market gains on credit and total return derivatives of $16.5 million and net mark-to-market gains on non-trading derivative contracts of $0.4 million. Approximately $51 million of the net realized gains on investment securities relate to cash recoveries received during the year related to a security in the investment agreement portfolio that had been written down in 2002 and 2003. For the nine months of 2005, net securities gains were $53.1 million, or $0.27 per diluted share; consisting of net realized gains on investment securities of $10.8 million, mark-to-market losses on credit derivatives and total return swaps of ($7.0) million and net mark-to-market gains on non-trading derivative contracts of $49.3 million. The mark-to-market gains on non-trading derivative contracts relate almost entirely to interest rate hedge contracts in Ambac's investment agreement business that were redesignated to meet the technical requirements of FAS 133 as of July 1, 2005.

Balance Sheet

Highlights

- 31 -

Total assets as of September 30, 2006 were $21.09 billion, up 7% from total assets of $19.73 billion at December 31, 2005. The increase was driven by cash generated from operations during the period.

As of September 30, 2006, stockholders' equity was $6.01 billion, a 12% increase from year-end 2005 stockholders' equity of $5.37 billion. The increase was primarily the result of net income during the period.

80.    On January 31, 2007, the Individual Defendants caused or allowed the Company to announce its fourth quarter 2006 financial results in a press release. The press release hardly mentions the negative events occurring in the credit market. Instead defendant Genader stated that "Ambac's full-year top line production is very acceptable." The press release stated in relevant part:

Ambac Financial Group, Inc. (Ambac) today announced fourth quarter 2006 net income of $202.7 million, or $1.88 per diluted share. This represents a 1% decrease from fourth quarter 2005 net income of $204.3 million, or $1.90 per diluted share.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the fourth quarter 2006, net security gains and losses had the effect of increasing net income by $3.6 million, or $0.04 on a per diluted share basis. Other items during the fourth quarter 2006 had a net income effect of ($3.9) million, ($0.04) on a per diluted share basis, and represents the write-off of previously deferred issuance expenses related to debentures that were redeemed in October 2006. Accelerated earnings had the effect of increasing net income by $18.1 million, or $0.17 per diluted share for the fourth quarter 2006....

\* \* \*

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "*I am satisfied with our overall business results for the quarter and for the full year. Despite one of the most difficult business environments the industry has faced in many years, Ambac's full-year top line production is very acceptable. Most gratifyingly, our record-level full-year international production demonstrates our success in expanding our global reach,*

*as our triple-A financial strength and reputation for innovative and efficient execution is now firmly planted across a broad segment of the international markets.*"

Revenues

Highlights

Credit enhancement production in the fourth quarter of 2006 was $314.5 million, down 21% from the fourth quarter of 2005 which came in at $395.8 million. Growth in international was more than offset by declines in U.S. public finance and U.S. structured finance.

Credit enhancement production for the full year of 2006 of $1,295.2 million was 4% higher than credit enhancement production of $1,249.4 million in 2005, as significant growth in international business more than offset the decline in the U.S. public finance business.

\* \* \*

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $84.2 million during the fourth quarter of 2006 from $126.7 million at September 30, 2006 to $42.5 million at December 31, 2006. The decrease was driven by the settlement of several impaired transactions during the quarter including a health care transaction that had been fully-reserved. Total claim payments during the quarter amounted to $68.8 million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR increased by $25.0 million during the quarter, from $147.6 million at September 30, 2006 to $172.6 million at December 31, 2006. The increase was driven primarily by net increases in reserves on certain credits within the U.S. public finance portfolio, most notably within the transportation sector. At December 31, 2006, the specific Hurricane Katrina-related provision amounts to $50.1 million, down slightly from $50.5 million at September 30, 2006. Ambac did not pay any Katrina-related claims during the year.

Other Items

Total net securities gains/(losses) for the fourth quarter of 2006 were $5.8 million, or $0.04 per diluted share; consisting of net realized gains on investment securities of $9.6 million, net mark-to-market losses on credit and total return derivatives of ($4.8) million and net mark-to-market gains on non-trading derivative contracts of $1.0 million. For the fourth quarter of 2005, net securities gains/(losses) were $20.0 million, or $0.12 per diluted share; consisting of net realized losses on investment securities of ($2.2) million, net mark-to-market gains on credit and total return derivatives of $22.0 million and net mark-to-market gains on non-trading derivative contracts of $0.2 million.

Total net securities gains/(losses) for the full year of 2006 were $80.2 million, or $0.48 per diluted share; consisting of net realized gains on investment securities of $67.1 million, net mark-to-market gains on credit and total return derivatives of $11.6 million and net mark-to-market gains on non-trading derivative contracts of $1.5 million. Approximately $56 million of the net realized gains on investment securities in 2006 relate to cash recoveries received during the year related to a security in the investment agreement portfolio that had been written down in 2002 and 2003. For the full year of 2005, net securities gains were $73.1 million, or $0.40 per diluted share; consisting of net realized gains on investment securities of $8.6 million, mark-to-market gains on credit derivatives and total return swaps of $15.0 million and net mark-to-market gains on non-trading derivative contracts of $49.5 million. The mark-to-market gains on non-trading derivative contracts relate almost entirely to interest rate hedge contracts in Ambac's investment agreement business that were redesignated to meet the technical requirements of FAS 133 as of July 1, 2005.

Balance Sheet

Highlights

Total assets as of December 31, 2006 were $20.27 billion, up 9% from total assets of $18.55 billion at December 31, 2005. The increase was driven primarily by cash generated from operations during the period.

As of December 31, 2006, stockholders' equity was $6.18 billion, a 15% increase from year-end 2005 stockholders' equity of $5.38 billion. The increase was primarily the result of net income during the period.

81.    On April 25, 2007, the Individual Defendants caused or allowed the Company to announce its first quarter 2007 financial results in a press release. Defendant Genader, in the press release, insinuates that the credit crisis should actually help the Company stating: "Importantly, recent evidence of credit spread widening in the mortgage related asset classes should lead to increased demand for our core financial guarantee product, provided of course, that wider spreads continue to prevail." The press release stated in relevant part:

Ambac Financial Group, Inc. (Ambac) today announced first quarter 2007 net income of $213.3 million, or $2.02 per diluted share. This represents a 4% decrease from first quarter 2006 net income of $221.1 million, and a 2% decrease in net income per diluted share from $2.06 a year earlier.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the first quarter 2007, net security gains and losses had the effect of increasing net income by $2.5 million, or $0.02 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $24.7 million, or $0.24 per diluted share during the quarter.

\* \* \*

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "The first quarter evidenced improved business production across all major business sectors relative to the 2006 comparable quarter. Debt issuance and capital markets activity continues to be strong. ***Importantly, recent evidence of credit spread widening in the mortgage related asset classes should lead to increased demand for our core financial guarantee product, provided of course, that wider spreads continue to prevail***."

Revenues

Highlights

Credit enhancement production in the first quarter of 2007 was $310.1 million, up 33% from $233.5 million reported in the first quarter of 2006. Growth was achieved in all three sectors, led by the 49% increase in U.S. structured finance.

\* \* \*

Reinsurance Cancellations

During the first quarter 2006, Ambac cancelled its remaining reinsurance contracts with two reinsurers and recaptured $3.9 billion of par outstanding. Included in ceded premiums in our Consolidated Statement of Operations is $37.0 million in returned premiums from the cancellations, of which approximately $29.3 million was deferred. The difference, $7.7 million, included in accelerated premiums, resulted from the difference between the contractual amount of returned premiums and the associated unearned premium remaining on the previously ceded portion of the underlying guarantees. The net income impact of the cancellations, presented in Table I, above, as part of accelerated premiums, amounted to approximately $2.0 million, or $0.02 per diluted share.

\* \* \*

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $4.8 million during the first quarter of 2007 from $42.5 million at December 31, 2006 to $37.7 million at March 31, 2007. The decrease was driven by

improving conditions on certain credits for which we had previously paid claims. Total net claim payments during the quarter amounted to ($0.1) million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. The ACR increased by $16.2 million during the quarter, from $172.6 million at December 31, 2006 to $188.8 million at March 31, 2007. The increase was driven primarily by net increases in reserves on certain credits within the U.S. public finance portfolio.

<u>Other Items</u>

Total net securities gains/(losses) for the first quarter of 2007 were $3.7 million, consisting of net realized gains on investment securities of $6.6 million, net mark-to-market losses on credit and total return derivatives of ($1.9) million and net mark-to-market losses on non-trading derivative contracts of ($1.0) million. Approximately $6.2 million of the net realized gains on investment securities relate to cash recoveries received during the quarter related to a security in the investment agreement portfolio that had recognized impairment losses in prior years. For the first quarter of 2006, net securities gains/(losses) were $13.4 million, consisting of net realized gains on investment securities of $5.1 million, net mark-to-market gains on credit and total return derivatives of $7.2 million and net mark-to-market gains on non-trading derivative contracts of $1.1 million.

<u>Balance Sheet</u>

Highlights

Total assets as of March 31, 2007 were $20.11 billion, down 1% from total assets of $20.27 billion at December 31, 2006. The decrease was primarily driven by a net draw down from our investment agreement portfolio, partially offset by cash generated from operations during the period.

On February 12, 2007, Ambac issued $400 million of Directly-Issued Subordinated Capital Securities (DISCS(SM)). Ambac used the net proceeds from the offering and additional funds to purchase $400 million worth of shares of its common stock. The common stock was purchased through an accelerated share buyback agreement and resulted in 4.26 million shares acquired during the quarter. The total number of additional shares that will ultimately be repurchased under the program will be based on the volume-weighted average share price of the Company's common shares during the term of the accelerated buyback agreement.

As of March 31, 2007, stockholders' equity was $5.99 billion, a 3% decrease from year-end 2006 stockholders' equity of $6.18 billion. The decrease was primarily the result of the $400 million share buyback, partially offset by net income during the period.

82.    The news that Ambac had weathered the deteriorating housing and credit markets

with only a 3% decrease in stockholder equity (explained away as the result of the February share

buyback, not market conditions) while also only decreasing net income only 2% from the previous year was music to the ears of investors. The price per share of Ambac continued to rise from a close of $90.01 per share on April 24, 2007 to an all-time high of $96.08 on May 18, 2007. The above statements were all false and misleading.

83.     The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)     The Company lacked requisite internal controls to ensure that the Company's underwriting standards and its internal rating system for its CDO contracts were adequate, and, as a result, the Company's projections and reported results issued during the Relevant Period were based upon defective assumptions and/or manipulated facts;

(b)     The Company's financial statements were materially misstated due to its failure to properly account for its mark-to-market losses;

(c)     Given the deterioration and the increased volatility in the mortgage market, the Company would be forced to tighten its underwriting standards related to its asset-backed securities, which would have a direct material negative impact on its premium production going forward;

(d)     The Company had far greater exposure to anticipated losses and defaults related to its CDO contracts containing subprime loans, including even highly rated CDOs, than it had previously disclosed;

(e)     The Company had far greater exposure to a potential ratings downgrade from one of the credit ratings agencies than it had previously disclosed; and

(f)     The Individual Defendants' Relevant Period statements about the Company's selective underwriting practices during the 2005 through 2007 time frame related to its CDOs backed by subprime assets were patently false; the Company's underwriting standards were far too aggressive and completely inadequate.

**Defendants Slowly Disclose the Truth**

84.     On July 25, 2007, the Individual Defendants caused Ambac to report its second quarter 2007 financial results in a press release. In this press release, defendant Genader

acknowledges that being rated AAA has key advantages.  Defendant Genader also stated that the Company's business prospects were improving.  The press release attempted to down play the Company's loss due to CDOs, stating that the Company had a $56 million mark-to-market loss due to CDOs.  The press release stated in relevant part:

> Ambac Financial Group, Inc. (Ambac) today announced second quarter 2007 net income of $173.0 million, or $1.67 per diluted share. This represents a 27% decrease from second quarter 2006 net income of $238.6 million, and a 25% decrease in net income per diluted share from $2.22. The decrease is primarily due to unrealized mark-to-market losses amounting to ($56.9) million, or ($0.36) per diluted share, related to credit derivative exposures in the second quarter 2007. The comparable quarter of 2006 included net realized gains on investment securities of $44.4 million, or $0.27 per diluted share, primarily resulting from cash recoveries received related to a security in the investment agreement portfolio that had been written down in prior years. The second quarter 2007 unrealized mark-to-market losses on credit derivative exposures is the result of unfavorable market pricing of collateralized debt obligations with significant amounts of sub-prime residential mortgage collateral. As further described below, net mark-to-market gains and losses on credit derivatives and net gains and losses from sales of investment securities are excluded from the earnings measures used by research analysts.

> Net Income Per Diluted Share

> Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

> Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the second quarter 2007, net security gains and losses had the effect of decreasing net income by ($34.6) million, or ($0.34) on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $25.6 million, or $0.25 per diluted share during the quarter.

> \* \* \*

> Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "We are pleased with the breadth and quality of our business production in the quarter. Our rigorous and proven approach enabled us to deliver positive results despite the turmoil in the sub-prime mortgage market that resulted in a negative mark-to-market adjustment. ***Our triple-A business model offers us key advantages, including our ability to hold insured transactions to***

*maturity; no collateral or margin requirements on transactions insured; and, in the unlikely event of default we pay scheduled principal and interest, thereby minimizing liquidity risk." Mr. Genader added, "Looking ahead, the disciplined execution of our strategy positions us well to benefit from the improving business conditions we see, with wider spreads, enhanced credit terms and increased demand for our valuable financial guarantee products."*

<u>Revenues</u>

Highlights

Credit enhancement production in the second quarter of 2007 was $367.8 million, down 31% from Ambac's record quarterly production of $531.0 million reported in the second quarter of 2006.

* * *

Public finance earned premiums, before accelerations, grew 2% this quarter. Earned premium growth in this sector has been negatively impacted by the high level of refunding activity in Ambac's public finance book in recent years, competitive pricing and the mix of business underwritten in recent periods.

Structured finance earned premiums and other credit enhancement fees grew 10%. The rate of growth in structured finance has improved recently, driven by strong premium production in asset classes such as pooled debt obligations and commercial asset-backed securities over the past several quarters.

International earned premiums and other credit enhancement fees decreased 2%. The decrease has resulted from deal terminations and a slow down in deal closings in 2007 relative to the prior year.

Net investment income for the second quarter of 2007 was $113.2 million, representing an increase of 8% from $104.5 million in the comparable period of 2006. This increase was due primarily to growth in the investment portfolio driven by the ongoing collection of financial guarantee premiums and fees.

Net investment income for the six months of 2007 was $225.3 million, representing an increase of 9% from $206.2 million in the comparable period of 2006, primarily as a result of the reasons provided above.

Financial services revenues. The financial services segment is comprised of the investment agreement business and the derivative products business. Gross interest income less gross interest expense from investment and payment agreements plus results from the derivative products business, excluding net realized investment gains and losses and unrealized gains and losses on total return swaps and non-trading derivative contracts, was $9.2 million in the second quarter of 2007, down 15% from $10.8 million in the second quarter of 2006. The decrease was primarily due to lower revenue from the interest rate swap, total return swap and investment agreement businesses in the second quarter 2007.

Financial services revenues were $19.9 million in the first half of 2007, down 12% from the $22.5 million of revenues in the first half of 2006 primarily due to the reason provided above.

Expenses

Highlights

Financial guarantee expenses of $50.5 million for the second quarter of 2007 increased 13% from $44.7 million of expenses for the second quarter of 2006. Financial guarantee loss and loss expenses were $17.1 million in the second quarter of 2007, up from $12.8 million in the second quarter of 2006. See "Loss Reserve Activity," below, for additional information on losses. Net underwriting and operating expenses of the financial guarantee sector totaled $33.4 million in the second quarter of 2007, up 5% from $31.9 million in the second quarter of 2006 primarily due to increased compensation expense.

Financial guarantee expenses of $98.3 million for the first six months of 2007 increased 19% from $82.7 million of expenses for the same period of 2006. The increase results primarily from higher loss expenses during the period.

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) increased $9.6 million during the second quarter of 2007 from $37.7 million at March 31, 2007 to $47.3 million at June 30, 2007. Included in the March 31, 2007 case reserves balance were offsetting receivables for claims previously paid on a European transportation transaction that were deemed by management to be recoverable upon the anticipated successful restructuring of that transaction. The restructuring was finalized during the quarter and the payments due to Ambac were received. Total net claim payments/(receipts) during the quarter amounted to ($7.5) million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. The ACR increased by $14.9 million during the quarter, from $188.8 million at March 31, 2007 to $203.7 million at June 30, 2007. The increase was driven primarily by increases in reserves on certain credits primarily within the transportation sector of the U.S. public finance portfolio and to a lesser extent within the non-subprime RMBS sector of the structured finance portfolio, partially offset by favorable credit activity throughout both portfolios.

Other Items

Total net securities gains/(losses) for the second quarter of 2007 were ($52.7) million, consisting of net realized gains on investment securities of $1.2 million, net mark-to-market losses on credit and total return derivatives of ($57.9) million and net mark-to-market gains on non-trading derivative contracts of $4.0 million. *During the quarter a net mark-to-market loss amounting to ($56.9) million was recorded related to insured collateralized debt obligations of asset-backed securitizations*

*containing sub-prime mortgage-backed securities as collateral. The negative mark-to-market is driven by current market concerns over the most recent vintages of subprime RMBS and the recent lack of liquidity in the CDO of ABS market resulting in a reduction in market-quoted prices. Ambac's exposure on those transactions all attach at levels senior to the triple-A attachment points as established by the rating agencies.*

For the second quarter of 2006, net securities gains/(losses) were $51.0 million, consisting of net realized gains on investment securities of $44.4 million, net mark-to-market gains on credit and total return derivatives of $7.2 million and net mark-to-market losses on non-trading derivative contracts of ($0.6) million. Approximately $38 million of the second quarter 2006 net realized gains on investment securities related to cash recoveries received from a security in the investment agreement portfolio that had been written down in previous years.

Total net securities gains/(losses) for the first half of 2007 were ($49.0) million, consisting of net realized gains on investment securities of $7.8 million, net mark-to-market losses on credit and total return derivatives of ($59.8) million and net mark-to-market gains on non-trading derivative contracts of $3.0 million. For the first half of 2006 net securities gains were $64.4 million, consisting of net realized gains on investment securities of $49.5 million, net mark-to-market gains on credit and total return derivatives of $14.4 million and net mark-to-market gains on non-trading derivative contracts of $0.5 million.

Balance Sheet

Highlights

Total assets as of June 30, 2007 were $21.06 billion, up 4% from total assets of $20.27 billion at December 31, 2006. The increase was primarily driven by cash generated from operations during the period, partially offset by a decrease in unrealized gains in the investment portfolio due to a rise in long-term interest rates.

As of June 30, 2007, stockholders' equity was $6.04 billion, a 2% decrease from year-end 2006 stockholders' equity of $6.18 billion. The decrease was primarily the result of the $400 million share buyback and lower Accumulated Other Comprehensive Income driven by higher long-term interest rates, partially offset by net income during the period.

During the second quarter 2007, Ambac completed the buyback of $400 million of its common stock under its accelerated share buyback program (originally announced on February 12, 2007). The total number of shares purchased under the agreement amounted to 4.46 million shares. Ambac also bought back 194 thousand shares of its common stock at a total cost of $16.9 million during the second quarter that was unrelated to the accelerated share buyback program.

85.    On October 10, 2007, the Company issued a press release announcing its estimated mark-to-market loss on its credit derivatives portfolio of $743 million. The press release stated in relevant part:

- 41 -

Ambac Financial Group, Inc. (Ambac) today announced the results of its third quarter fair value review of its outstanding credit derivative contracts. ***Ambac's estimate of the fair value or "mark-to-market" adjustment for its credit derivative portfolio at September 30, 2007 amounted to an unrealized loss of $743 million***, pre-tax. The company expects to report a net loss per diluted share up to $3.50 in the third quarter. Earnings measures reported by research analysts are on an operating basis and exclude the net income impact of mark-to-market gains and losses on credit derivative contracts, as well as certain other items. The company expects to report positive operating earnings per diluted share between $1.85 and $1.90 in the third quarter.

Commenting on the estimated result, Ambac Chairman and Chief Executive Officer, Robert J. Genader, stated, "While this unrealized loss is disappointing, it is important to note that Ambac's credit derivative contracts are similar to our insurance policies in that neither is exposed to the liquidity risks that are typically embedded in standard derivative contracts." Mr. Genader added, "While the turmoil in the structured finance markets has resulted in this unfavorable unrealized mark-to-market for the quarter, we have observed significantly improved market conditions for the industry and I am encouraged by the recent increased interest in our core financial guaranty product. Moreover, I remain confident in our underwriting abilities, credit standards and the transactions we have insured."

Ambac Senior Vice President and Chief Financial Officer, Sean Leonard, noted, "Ambac does not view the current adjustments as predictive of future claims. Indeed, the average internal credit rating of our derivative portfolio is AA+ at September 30, 2007 and based on our recent analysis of the portfolio, management believes that the potential for material paid claims is very low. Importantly, the company's claims paying resources, as prescribed by the rating agencies, are not impacted by mark-to-market adjustments."

The company also expects to report the following for the third quarter of 2007: (i) loss provision of approximately $20 million; (ii) estimated accelerated premiums from refundings, calls and other accelerations of approximately $16 million; (iii) credit enhancement production of approximately $430 million; and (iv) Ambac's highly rated investment portfolios, which total to approximately $19 billion, are expected to have net embedded unrealized gains of approximately $100 million as of September 30, 2007.

Ambac is providing this preliminary information about its third quarter results prior to the scheduled earnings announcement date in light of the extreme market events of recent months. Investors should not expect the company to provide information about the results of future quarters in advance of scheduled quarterly earnings announcement dates. In addition, investors should not expect the company to update the information provided in this release in advance of the scheduled announcement date for its third quarter.

86.    On October 24, 2007, Ambac issued a press release, announcing that it lost $360.6 million in the third quarter, which includes the $743 million loss on the credit derivative portfolio previously mentioned.  The press release stated in relevant part:

> Ambac Financial Group, Inc. (Ambac) today announced a third quarter 2007 net loss of ($360.6) million, or ($3.51) per diluted share. This compares to third quarter 2006 net income of $213.5 million, or net income per diluted share of $1.98. The decrease is due to the previously announced unrealized loss on credit derivative exposures amounting to ($743.4) million, or ($5.29) per diluted share in the third quarter 2007. The third quarter 2007 unrealized mark-to-market loss on credit derivative exposures was discussed in a press release dated October 10, 2007, and is primarily the result of unfavorable market pricing of collateralized debt obligations. As further described below, net mark-to-market losses on credit derivatives are excluded from the earnings measures used by research analysts.
>
> Net Income/(Loss) Per Diluted Share
>
> Net income/(loss) and net income/(loss) per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.
>
> Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and unrealized mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the third quarter 2007, net security gains and losses had the effect of decreasing net income by ($553.5) million, or ($5.39) on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $9.6 million, or $0.10 per diluted share during the quarter….
>
>                              *   *   *
>
> Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "We have observed improved overall market conditions in most asset classes of our core financial guaranty product, despite the recent turmoil in the structured finance markets. Business production during the quarter was quite robust, reflective of both a strong pipeline and better overall pricing in the current market." Mr. Genader added, "With regard to the sizable mark-to-market adjustment recorded in the quarter, it is important to note that Ambac's credit derivative contracts, like our insurance policies, are not exposed to the type of liquidity risk that is typically embedded in standard derivative contracts."
>
> Revenues

Highlights

Credit enhancement production in the third quarter of 2007 was $431.1 million, up 99% from Ambac's production of $216.2 million reported in the third quarter of 2006.

Credit enhancement production for the nine months of 2007 of $1,109.1 million was 13% higher than credit enhancement production of $980.7 million in the same period of 2006.

\* \* \*

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) increased $59.8 million during the third quarter of 2007 from $47.3 million at June 30, 2007 to $107.1 million at September 30, 2007. The increased case reserves relate primarily to two RMBS transactions that are underperforming original expectations. Total net claim receipts during the quarter amounted to $3.7 million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. The ACR decreased by $37.0 million during the quarter, from $203.7 million at June 30, 2007 to $166.7 million at September 30, 2007. The reserve decline was driven by net favorable credit activity, primarily within the public finance portfolio, partially offset by increased reserves within the RMBS sector of the structured finance portfolio.

Other Items

Total net securities gains/(losses) for the third quarter of 2007 were ($757.2) million, consisting of net realized gains on investment securities of $4.2 million, *net mark-to-market losses on credit and total return derivatives of ($756.3) million and net mark-to-market losses on non-trading derivative contracts of ($5.1) million. During the quarter a net mark-to-market loss amounting to ($743.4) million was recorded related to contracts executed in credit default format, primarily in our collateralized debt obligation exposures*. The negative mark-to-market is driven by dramatically lower prices in certain structured finance asset classes. The lower prices were driven by uncertainty regarding the ultimate outcome of subprime losses. Reduced demand for certain structured asset classes, a lack of liquidity in the markets, forced selling by structured and/or leveraged investment vehicles, all combined to exacerbate pricing declines across the structured debt capital markets.

For the third quarter of 2006, net securities gains/(losses) were $9.9 million, consisting of net realized gains on investment securities of $7.9 million, net mark-to-market gains on credit and total return derivatives of $2.1 million and net mark-to-market losses on non-trading derivative contracts of ($0.1) million.

Total net securities gains/(losses) for the first nine months of 2007 were ($806.0) million, consisting of net realized gains on investment securities of $12.0 million, net mark-to-market losses on credit and total return derivatives of ($816.0)

million and net mark-to-market losses on non-trading derivative contracts of ($2.0) million. For the first nine months of 2006 net securities gains were $74.4 million, consisting of net realized gains on investment securities of $57.5 million, net mark-to-market gains on credit and total return derivatives of $16.5 million and net mark-to-market gains on non-trading derivative contracts of $0.4 million. Approximately $51 million of the 2006 net realized gains on investment securities related to cash recoveries received during the year related to a security in the investment agreement portfolio that had been written down in previous years.

Balance Sheet

Highlights

Total assets as of September 30, 2007 were $21.97 billion, up 8% from total assets of $20.27 billion at December 31, 2006. The increase was primarily driven by cash generated from operations during the period, partially offset by a decrease in unrealized gains in the investment portfolio due to a rise in long-term interest rates.

As of September 30, 2007, stockholders' equity was $5.65 billion, a 9% decrease from year-end 2006 stockholders' equity of $6.18 billion. The decrease was primarily the result of the $400 million share buyback earlier in the year and lower Accumulated Other Comprehensive Income driven by higher long-term interest rates.

87.    On November 1, 2007, Ambac's bonds were downgraded to "deteriorating" from "stable" by bond research firm Gimme Credit Publications Inc. due to Ambac's exposure to CDOs. The downgrade was based upon the recent ratings cuts made by the credit-ratings companies for the mortgage-backed bonds and CDOs.  As *Bloomberg* reported:

"The sharp drop in the stock price at MBIA and Ambac raises questions about whether the turmoil in the markets is hurting franchise value," said Kathleen Shanley, an analyst [in Chicago] at [bond research firm] Gimme Credit, in an e-mail. ``The financial guaranty business relies heavily on the confidence of investors that the guarantees will be money-good, and if clients begin to doubt this premise, there will be negative implications for the new business outlook going forward."

Ambac has insured about $29 billion of CDOs whose assets are more than a quarter mortgage-backed securities, ``relatively more'' than MBIA, . . . Gimme Credit said in a report today. CDOs are created by packaging bonds, loans or derivatives and using their income to pay investors.

88.    On November 2, 2007, further based upon the slew of downgrades of CDOs by the credit rating agencies and other recent industry news, including the announcement of massive write-downs by companies associated with Ambac, Morgan Stanley lowered the financial guarantee industry to "in-line" from "attractive" and Goldman Sachs cuts its rating on Ambac to "neutral" from

"buy." The Morgan Stanley report raised concerns that additional losses at Ambac could force the Company to raise capital to protect its AAA rating.

89.     On November 5, 2007, Fitch announced its new methodology in assessing financial guarantors CDOs and further announced that it would be reviewing the capital of the monolines, including Ambac, to ensure that they have enough capital to warrant their AAA rating. As a result of the ongoing review, Ambac faced a "moderate" risk of falling beneath the capital requirements necessary to keep its AAA rating, which would result in either a potential ratings downgrade or forcing the Company to raise more capital. The review was expected to last six weeks.

90.     On November 6, 2007, Ambac responded to Morgan Stanley's report in a press release. The response attempted to downplay Morgan Stanley's concerns, emphasizing the Company's rigorous surveillance process. The press release stated in relevant part:

**"Questions Arise on Mark to Market Losses"**

On page 6 the analyst states, "One of the first negative surprises we saw last week stemmed from the large discrepancy between the mark-to-market losses reported by the financial guarantors and Merrill Lynch."

**Management Comment:**

It is difficult for us to comment on the Merrill Lynch mark-to-market loss as we do not have any visibility into their transactions. Without such details on Merrill's book, one can only speculate as to the differences in the portfolios.

Several differences may exist between exposures contained in Ambac's portfolio and an investment bank's portfolio and therefore may influence the estimated mark of the different portfolios. For example, we have noted that later vintage high-grade ABS CDOs (particularly those with 2007 and late 2006 vintage underlying collateral) and high-grade ABS CDOs that have large inner CDO components, have suffered more severe mark-to-market losses. Additionally, as one might expect, the amount of first loss subordination and credit migration triggers present in a structure also can impact the market value of the senior tranche. Finally, the terms of the contract may also impact the estimate of fair value. Ambac's Credit Default Swap ("CDS") contracts are highly modified from a standard CDS used by investment banks. Ambac CDS contracts do not include collateral posting provisions, and are generally limited to payment shortfalls of interest and principal. Ambac's contract terms are significant variations from standard CDS contracts and have significant value, particularly in difficult markets. In fact, certain investment banks will not enter into an Ambac CDS due to the favorable nature (towards Ambac) of its terms.

Some background on Ambac's mark-to-market follows. The mark-to-market unrealized loss is an estimate of our CDS contracts' "fair value". It is an estimate

- 46 -

because our CDS contract does not trade in any market. Under U.S. generally accepted accounting principles, CDS contracts must be recorded at fair value. Fair value is defined broadly as the price that a contract could be settled in a current transaction between willing parties, other than in a forced or liquidation sale.

Because an estimate of fair value of a CDS contract includes many market factors, an unrealized loss may not result in an increased expectation of loss. A good example of this dynamic is a general decline in the level of liquidity (witnessed by fewer buyers in the market) for a particular asset or asset class. Ambac believes that only through rigorous analytics of the actual transaction and its attributes and protections, as well as performance to date and expected future performance of underlying collateral, will one obtain meaningful information on the potential for actual losses.

Most all-major financial institutions are struggling with this issue. Particularly institutions where the process of marking-to-market is a critical part of operations, such as those that need to calculate required collateral postings. We are subject to information that we receive from market participants, which are primarily comprised of major investment banking institutions. Given the lack of liquidity in the market, the potential for CDO downgrading activity by the rating agencies, the potential for forced selling by other investors (due to downgrades), and the overall uncertainty surrounding the ultimate outcome of the sub prime mortgage market, Ambac does expect significant volatility in the mark-to-market of its CDO portfolio for the foreseeable future.

**"CDO Downgrades Have Started"**

On pages 6 and 7, the analyst discusses the recent internal rating downgrades of certain ABS CDOs. He states "If they were to downgrade the securities further, we would be highly disappointed and expect investor confidence in management to be strained."

**Management Comment**:

Ambac has a rigorous surveillance process surrounding its entire book of business. Management has subjected the mortgage and ABS CDO books to more frequent and more detailed reviews in the current environment. We believe this is prudent and responsible given the current stressed credit environment surrounding the mortgage market. While Ambac underwrites its transactions to withstand significant stress, the underlying credit rating is impacted by expected unfavorable collateral performance. To date, the downgrades noted in the subject transactions are within the parameters of Ambac's original stress tests. Ambac's independent Surveillance and Risk Management group determine the deal ratings. The ratings are based on the performance observed to date and a projection of future performance of the underlying collateral. Given the significant stress in the mortgage market, it should not be surprising that there have been downgrades. We are highly confident in our ratings process. Over time, as new information becomes available and as performance data is analyzed, we will adjust ratings up or down accordingly.

**"Increasing Our Expectation of CDO Losses"**

The analyst states, "We are increasing our CDO loss expectations for both Ambac and MBIA to reflect an updated tally of various market opinions about cumulative sub prime losses."

**Management Comment:**

It appears that the "various market opinions" referred to in the analyst's report relate to the 2006 and early 2007 vintage sub prime. It also appears that he is assuming that the Ambac ABS CDO book will reflect the performance of the ABX index of 2006 and 2007 vintage sub prime collateral and ignores the actual vintage diversification and asset quality triggers inherent in Ambac's book. We see wide differences in the market regarding the estimate of ultimate cumulative loss for the 2006 and early 2007 vintage. We typically hear a range from 8% to 17% with a wide dispersion around the mean. We understand the three major rating agencies are projecting a range of 10% to 14%. One of the rating agencies recently reported estimates with significant differences dependent upon vintage. There were notable differences between the first half of 2006 and more recent vintages. We believe this is a critical point that is missed by simply applying a broad 15% estimated cumulative loss across the book of business. It does not compensate for vintage dispersion inherent in our transactions, nor does it factor in different rating and FICO segmentation. Additionally, many of the ABS CDOs contain 2005 vintage mortgages, including Ambac transactions that were underwritten in 2007. That vintage is performing significantly better than 2006 and 2007. This illustrates the over simplification of applying a single cumulative loss across the board.

**"Becoming More Conservative with Capital"**

The analyst states, "We can not help but think that if management truly believed losses are unlikely, they would be willing to make a stronger statement with how they manage their capital (i.e. increased share buybacks)."

**Management Comment:**

As management has stated many times in the past, Ambac manages its capital levels to a triple-A standard. That requires us to be very cautious with capital levels, particularly in times of credit stress. For instance, a transaction rated AA will attract more capital than a similar transaction rated AAA. It is unlikely claims will be paid under either transaction. The global capital markets and virtually all major financial institutions are in the midst of a major credit and liquidity crunch. There is uncertainty regarding the ultimate outcome of losses in the U.S. mortgage market, concerns over leveraged investment vehicles and overall concern that the problems surrounding the mortgage market will adversely impact other sectors of the economy. Such an environment has caused credit spreads in many sectors to widen significantly. This environment provides both opportunities and limitations for Ambac. With regard to opportunities, returns on business written are up sharply in many sectors and we have seen a notable increase in attractive opportunities to put our capital to work for our shareholders. With regard to limitations, the market environment has caused some fixed income investors to have increased concern

about the financial guaranty industry. As a result, all of the major participants in the industry have seen their credit spreads widen significantly. We believe applying capital to high return business and at the same time maintaining a stronger balance sheet by holding off on share repurchases is a responsible course in the current environment and one that meets our objective of managing our capital consistent with a triple-A standard. We believe this prudent strategy is good for both our equity and fixed income investors and will help restore confidence in our industry.

**Summary comments**:

We certainly understand the heightened concerns summarized in the analyst's report. Most all participants in the financial markets, including Ambac have a heightened concern over the ultimate outcome of the U.S. mortgage market. However, we are confident in the quality of our internal credit ratings process. We have been very transparent to the market and our investors by disclosing significant detail on our direct mortgage and CDO exposure in our various public disclosures. We have a rigorous and current review and rating process in place and we will react quickly as projected collateral performance changes.

91.    Despite the above analyst comments, on November 7, 2007, the Company's senior management sought to "correct" misperceptions and incorrect views, including whether (1) mark-to-market losses equaled real losses; (2) that rating agencies were about to downgrade the company; and (3) that the Company was not adequately capitalized. In particular, defendant Leonard assured analysts that the Company had $1.5 billion in excess capital. Defendant Leonard also confirmed that the Company had plenty of capital to deal with any CDOs that might be downgraded.

92.    On November 8, 2007, Moody's announced that it intended to conduct a similar review of the capital of the monolines as Fitch and that as a result Ambac faced a "moderate" risk of falling behind the capital requirements and risked a potential ratings downgrade.

93.    On November 27, 2007, executives from Ambac, including defendant Leonard spoke at a Bank of America Securities bond insurer conference. At the conference, Ambac announced that it was considering raising capital through reinsurance or sales of debt or stock in order to maintain the Company's AAA rating.

94.    On December 21, 2007, the *Associated Press* announced that Fitch completed its review of Ambac. Fitch stated that Ambac's capital cushion was inadequate by $1 billion and would need to raise that amount of capital. If the Company cannot raise that much capital, Fitch said it would downgrade its rating of Ambac.

95.     On January 16, 2008, Ambac announced its plans to raise an excess of $1 billion. The Company announced that it planned on issuing at least $1 billion worth of equity and equity linked securities. Also, the Company announced that defendant Genader retired and was replaced by defendant Callen. The Company also announced that its estimated mark-to-market adjustment for the fourth quarter is a loss of $5.4 billion. The press release stated in relevant part:

> Ambac Financial Group, Inc. today announced that its Board of Directors has approved a plan to strengthen its capital base through the issuance of at least $1 billion of equity and equity-linked securities. This plan may also include additional capital from reinsurance or issuance of debt securities. Ambac said that it is committed to maintaining its triple-A financial strength. By raising at least $1 billion in capital, Ambac is expected to meet or exceed Fitch Ratings' current triple-A capital requirements for the Company. The Company noted that its existing capital position currently meets or exceeds the triple-A capital requirements of both S&P and Moody's. As part of its capital initiative, Ambac also said that it will reduce the quarterly dividend on its common stock from $0.21 per share to $0.07 per share.

> Management Change

> Ambac's Board of Directors announced today that it has named Michael A. Callen as Chairman and Interim Chief Executive Officer. Mr. Callen has been Presiding Director and a member of the Audit and Risk Assessment; Compensation; and Governance committees of Ambac's Board of Directors. He succeeds Robert J. Genader, who will retire from the Company effective today. "Mike has extensive experience in advising and leading companies engaged in sophisticated capital markets transactions, and he will provide valuable leadership to the excellent management team at Ambac," said Jill Considine, Chairman of the Board's Governance Committee. Ms. Considine commented further, "On behalf of the Board and everyone at Ambac, I would like to thank Bob Genader for his more than 20 years of dedication to Ambac. He has served the Company in almost every capacity throughout his long career, and has been a true asset. Indeed, one of the most important testaments to his leadership is the highly-qualified management team currently at Ambac. We wish him well in his retirement."

> Mr. Callen said, "We have great confidence in our plan to enhance Ambac's capital position by over $1 billion within an accelerated time frame. We are optimistic about the long-term business opportunities ahead for Ambac, even as we respond to the volatility in the present credit market. We expect that our experienced management team, significant size and scale, and expertise in growing market sectors such as global infrastructure finance will help us tap the potential of the market today and into the future." Mr. Callen also stated that the Company has been working with Credit Suisse as its financial adviser.

Mark-to-market and Losses

The Company also announced the results of its fourth quarter fair value review of its outstanding credit derivative contracts. ***Ambac's estimate of the fair value or "mark-to-market" adjustment for its credit derivative portfolio for the quarter ended December 31, 2007 amounted to an estimated loss of $5.4 billion, pre-tax, $3.5 billion, after tax. Of the estimated $5.4 billion pre-tax mark-to-market loss, approximately $1.1 billion represents estimated credit impairment related to certain collateralized debt obligations of asset-backed securities transactions. These transactions are backed primarily by mezzanine level subprime residential mortgage-backed securities that have been internally downgraded to below investment grade***. Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims and that, in the absence of further credit impairment, the cumulative marks would be expected to reverse over the remaining life of the insured transactions.

Ambac also expects to report a loss provision amounting to approximately $143 million, pre-tax. The loss provision relates primarily to underperforming home equity line of credit and closed-end second lien RMBS securitizations.

As a result of the aforementioned losses, Ambac expects to report a net loss per share of up to $32.83 for the fourth quarter ended December 31, 2007. Earnings measures reported by research analysts are on an operating basis and exclude the net income impact of mark-to-market gains and losses on credit derivative contracts internally rated investment grade, as well as certain other items. Ambac expects to report operating losses(1) per share of up to $5.80 for the fourth quarter primarily as a result of the aforementioned losses on CDOs and home equity line of credit transactions. In addition, book value per share is expected to be approximately $21.00 per share at December 31, 2007.

Michael A. Callen

Mr. Callen has been a member of the Board since Ambac went public in 1991. He spent more than 25 years at Citigroup and was a director and Sector Executive for Citicorp from 1987 to 1992. Since 1996, Mr. Callen has been President of financial consulting firm, Avalon Argus Associates, LLC. He was Special Advisor to the National Commercial Bank located in Jeddah in the Kingdom of Saudi Arabia from 1993 to 1996. He has been an independent consultant and an Adjunct Professor at Columbia University Business School and at Georgetown's Masters of Science in Foreign Services program. Mr. Callen also serves as a director of Intervest Corporation of New York and Intervest Bancshares Corporation.

Ambac said that, consistent with NYSE requirements and corporate governance best practices, upon assuming his new responsibilities as Chairman of the Board and interim Chief Executive Officer, Mr. Callen will no longer serve as a member of the Audit and Risk Assessment, Compensation and Governance Committees.

96.     On January 18, 2008, Ambac released a press release stating that it would not raise the $1 billion required by Fitch. The press release stated that the Company determined that "raising equity capital is not an attractive option at this time." In response, Fitch downgraded Ambac's rating to "AA" from "AAA." Further, as reported by *Bloomberg*, Fitch downgraded 137,990 municipal bonds and 114 non-municipal issues insured by Ambac.

97.     On January 22, 2008, Ambac released a press release highlighting its results for the fourth quarter 2007. In the press release Ambac announced a net loss of $3.255 billion. According to the press release, the loss "*is primarily due to non-cash, mark-to-market losses on credit derivative exposures amounting to $5,211.0 million.*" Included in this $5 billion loss is a $1.11 billion credit impairment related to CDOs backed my subprime mortgages. The press release stated in relevant part:

> ### Ambac Financial Group, Inc. Announces Fourth Quarter Net Loss of $3,255.6 Million
>
> *Fourth Quarter Net Loss Per Share of $31.85 Reflects Mark-to-Market Losses on Credit Derivatives Portfolio Amounting to $33.14 Per Share Fourth Quarter Credit Enhancement Production(1) $304.5 million, down 3%*
>
> Ambac Financial Group, Inc. (Ambac) today announced a fourth quarter 2007 net loss of $3,255.6 million, or a net loss of $31.85 on a per share basis. This compares to fourth quarter 2006 net income of $202.7 million, or net income per diluted share of $1.88. *The decrease is primarily due to non-cash, mark-to-market losses on credit derivative exposures amounting to $5,211.0 million*, pre-tax, or a net loss of $33.14 per share in the fourth quarter 2007 driven by significant changes in fair value of the exposures during the quarter. The decrease was also caused in part by the current quarter's loss provision which increased to $208.5 million in the fourth quarter 2007 from $9.6 million in the comparable prior year quarter.
>
> Strategy, Ratings and Capital Position
>
> Ambac Chairman and Interim Chief Executive Officer, Michael Callen stated, "We view the current perceptions of Ambac's business by both the market and ratings agencies as underestimating Ambac's strengths and future potential. As of December 31, 2007, the Company had claims-paying ability of $14.5 billion, supported by a high quality investment portfolio. Ambac's liquidity position is similarly strong. Corporate debt service requirements and corporate expenses are significantly lower than current dividend capacity from the operating company. Claim payments in 2007 were negative $2 million and we paid no claims related to our CDO of ABS portfolio." Mr. Callen continued, "Capitalizing on our experienced management team and highly qualified professionals worldwide, significant size and scale, and expertise in many market sectors, we believe that Ambac can realize new

- 52 -

business opportunities in our core markets and through reinsurance while we strengthen our capital position further to maintain our triple-A ratings under S&P and Moody's and seek to regain it under Fitch."

In addition, Mr. Callen noted that the Company is evaluating strategic alternatives with a number of potential parties. "We are exploring the attractiveness of these alternatives as we look for opportunities that will grow shareholder value and enable us to build on Ambac's fundamental strengths. At the same time, we would expect that over the longer-term, as the market normalizes and perceptions correspond more closely to reality, the market will more accurately assess our assets and strengths."

The Company explained that in the fall of 2007, each of the major rating agencies began a review of the capital adequacy of the financial guaranty industry. In late December, following the rating agency reviews, Ambac's triple-A rating was affirmed by both S&P (with "negative outlook") and Moody's; however, Fitch placed Ambac's 'AAA' rating on "rating watch negative" and stated that Ambac had a modeled $1 billion capital shortfall. On January 16, 2008, the Company announced a plan to raise equity capital of $1 billion or more in order to meet or exceed Fitch's 'AAA' rating requirements. Following this announcement, Moody's put its 'Aaa' rating on review for possible downgrade. On January 18, 2008, Ambac announced that it had determined that as a result of market conditions and other factors, including the recent actions of certain ratings agencies, raising equity capital was not an attractive option at that time. On January 18, 2008, Fitch downgraded Ambac's insurance financial strength rating to AA. Moody's and S&P are currently reviewing Ambac's triple-A ratings for a possible reduction as well.

Notwithstanding these actions, management remains confident that Ambac's capital position and claims paying ability remain strong. Management is equally confident in Ambac's insured portfolio and the Company's ability to support policyholder liabilities.

Mark-to-Market Loss

*The $5,211.0 million fourth quarter 2007 mark-to-market loss on credit derivative exposures includes estimated credit impairment of $1,105.7 million related to certain collateralized debt obligations of asset-backed securities backed primarily by mezzanine level subprime residential mortgage-backed securities that have recently been internally downgraded to below investment grade.* An estimate for credit impairment has been established because it is management's expectation that Ambac will have to make claim payments on these exposures in the future. As further described below, earnings measures reported by research analysts are on an operating basis and exclude the net income impact of mark-to-market gains and losses on credit derivative contracts internally rated investment grade, as well as certain other items. Operating earnings in the fourth quarter 2007 includes the impact of the estimated $1,105.7 million credit impairment, which on an after-tax per share basis amounts to a loss of $7.03.

Net Income/(Loss) Per Diluted Share

Net loss per share and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides additional information.

Earnings measures reported by research analysts exclude the net income/(loss) impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts internally rated investment grade (collectively "net security gains and losses") and certain other items. Other items in the fourth quarter 2006 represents the write-off of previously deferred issuance expenses related to debentures that were redeemed in October 2006. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the fourth quarter 2007, net security gains and losses had the effect of decreasing net income by $2,620.6 million, or $25.64 on a per share basis. Accelerated earnings had the effect of increasing net income by $18.4 million, or $0.18 per diluted share during the quarter. Table I provides fourth quarter and full year comparisons of earnings for 2007 and 2006.

98.      In the wake of these devastating disclosures and events, Ambac's value declined from $96.08 to $6.20 per share, a 93% drop and a market capitalization loss of $9.1 billion.

### Things Only Get Worse for Ambac

99.      On January 18, 2008, S&P and Moody's put Ambac's credit rating on review for downgrade. S&P and Moody's indicated that they would downgrade Ambac's credit rating from AAA to AA if Ambac did not raise sufficient capital to cover its CDO-exposure risk.

100.     Wall Street analysts hoped Ambac could broker a bank bailout much like the one Bear Stearns received in order to stay solvent. At a minimum, analysts expected Ambac to raise $2.5 billion in order to save its credit ratings. Ambac disappointed analysts on both accounts.

101.     On March 5, 2008, Ambac announced it would raise only $1.5 billion through a public offering. The following day, Ambac sold 171.1 million shares of new common stock at $6.75 a share for a total of $1.25 billion. It also issued $250 million of equity units. This public offering severely diluted the investments of Ambac's shareholders by nearly tripling the number of outstanding Ambac shares.

102.     As a result of the public offering, Ambac's stock price jumped $2.08, or 28 percent, to $9.50 per share. It also allowed Ambac to maintain its AAA ratings with S&P and Moody's.

Appearing on Bloomberg Television, defendant Callen said "the AAA is now solid." In truth, the public offering was just a band-aid fix.

103.    On April 23, 2008, Ambac announced it lost $1.66 billion in first quarter 2008 after losing $1.73 billion on credit derivatives. According to the press release reporting this loss:

> Ambac Financial Group, Inc. Announces First Quarter Net Loss of $1,660.3 Million
>
> First Quarter Net Loss Per Share of $11.69 Reflects Mortgage-related Losses
>
> NEW YORK, April 23, 2008--Ambac Financial Group, Inc. (NYSE: ABK) (Ambac) today announced a first quarter 2008 net loss of $1,660.3 million, or a net loss of $11.69 on a per share basis. This compares to first quarter 2007 net income of $213.3 million, or net income per diluted share of $2.02. *The decrease is primarily due to non-cash, mark-to-market losses on credit derivative exposures amounting to $1,725.2 million in the first quarter 2008 driven by the continued disruption in the global credit markets impacting the fair value of Ambac's derivatives exposures during the quarter. The decrease was also caused in part by the current quarter's loss provision on Ambac's financial guarantee direct exposures to mortgage-related securities which amounted to $1,042.8 million,* as well as by other than temporary impairment charges on certain investment securities within the financial services investment portfolio.

104.    Despite these poor financial figures, defendant Callen moved to calm investors' nerves, reassuring them that Ambac would come out safely on the other side. Specifically, the April 23, 2008 press release stated:

> Commenting on the financial results, Mr. Callen, noted, "The housing market crisis continues to disrupt the global credit markets and our credit derivatives and direct mortgage portfolios were severely impacted once again. *While we realize that these are disappointing credit results, we continue to believe that the capital raise and strategic business actions taken during the quarter will enable us to get beyond this credit market.* The capital that we raised during the quarter in the midst of a very difficult market plus capital generated from the reduction in net par exposure helped bring our claims-paying resources to approximately $16.0 billion as of March 31, 2008. *We currently exceed S&P's AAA target level of capital by a comfortable margin and we expect to meet our goal of exceeding Moody's Aaa target level of capital in the second quarter.* Importantly, we generated positive operating cash flow during the quarter." Mr. Callen continued, "Our team of professionals is working hard on restoring market faith in the Ambac brand and we have recently started to see some business come our way in the municipal markets. *We feel strongly that our highly qualified professionals worldwide, our significant size and scale, and our expertise in select market sectors will result in new business opportunities.*"

105.    Investors were not buying it though. On this news, Ambac shares sank 42.6% to close at $3.46. Commenting on Ambac's financial results, one analyst told Reuters: "What a disaster."

106.    Just weeks later, Ambac announced even more bad news. On May 28, 2008 Ambac reported $228 million of write downs during April 2008 on derivative-based guarantees the Company sold on CDOs. Ambac's shares again plummeted to a then all time low of $2.22 per share.

107.    As if things were not bad enough, Ambac received crippling news just a few days later. On June 4, 2008, Moody's announced it had placed Ambac on review for a possible downgrade of its Aaa rating. According to Moody's "[t]oday's action reflects Moody's concerns regarding Ambac's overall flexibility, as well as possible increased expected and stress loss projections among its mortgage-related risk exposures. Moody's noted that the most likely outcome of the ratings review would be a downgrade, with Ambac's insurance financial strength rating likely to remain in the Aa rating category.

108.    The next day, S&P announced it was in fact lowering its ratings on Ambac from AAA to AA. It also placed Ambac on credit watch negative, meaning Ambac's rating might be cut again within 90 days.

109.    In response to S&P's and Moody's actions, all defendant Callen could say is "we disagree and are disappointed" by their decisions.

110.    As a result of the downgrades, Ambac is now in "run-off mode." That's where an insurer collects payments and pays claims on existing policies, but writes no new business. According to Sean Egan, chief ratings officer at Egan-Jones Ratings, a rating agency that's paid by investors rather than issuers: "They have no future. They will argue otherwise but as a practical matter they don't have a future."

111.    As of June 26, 2008, Ambac's shares are trading at $1.84, a more than 98% decrease from Ambac's historic high just over a year earlier.

## THE IMPROPER BUYBACK

112.    During the Relevant Period, while Ambac's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $837 million worth of Ambac's shares at an average price of approximately $86.36 per share, which is 47 times higher than Ambac's current share price of less than $1.84 per share, while selling their own Ambac stock holdings at an average price of $82.92 per share during the Relevant Period. On

information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's exposure to the subprime mortgage lending and credit crises. While Ambac was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

113.    The Company has acknowledged since October 2005 that the market for CDOs was tough. For example, in the Company's October 19, 2005 press release detailing its financial results for the third quarter of 2005, Ambac's former CEO, defendant Genader, noted that the Company's operating results were "pretty good considering the tight credit spreads and increased market competition." In a July 26, 2006 press release announcing second quarter 2006 results, defendant Genader again recognized the "suboptimal business environment," a tacit acknowledgment of the beginning of the subprime market meltdown. In a press release for fourth quarter 2006 financial results, defendant Genader noted that the Company's results were acceptable "[d]espite one of the most difficult business environments the industry has faced in many years."

114.    Despite the admittedly tough market, the entire Board authorized and implemented two different stock repurchases. On May 3, 2005, the Board authorized a stock repurchase of up to 6 million shares, bringing the total repurchase authorization at that time to 18 million shares. The Individual Defendants then caused the Company to waste $329 million repurchasing 4.6 million shares. The Board authorized an additional repurchase of 6 million shares in October 2006, despite knowledge of difficulties in the industry leading to the subprime meltdown. The Individual Defendants then caused the Company to repurchase 5.8 million shares over the next eighteen months – as the Company was disintegrating before their very eyes. Most egregiously, Defendants authorized the Company to spend over $355 million repurchasing nearly 4 million shares at an average price of $93.87 in February 2007, the same month that the subprime market crashed with news of bankruptcies and skyrocketing mortgage default rates. The Insider Selling Defendants, particularly defendants Bienstock, Doyle, Gandolfo, Genader, Lassiter, McDonough, McKinnon, Renfield-Miller, Shoback, Uhlein and Wallis fared significantly better, selling over $20 million in personally held stock that same month. Even worse, the Individual Defendants continued to cause the Company to repurchase over $93 million in stock between March and August 2007 at massively inflated prices. During this period, the Insider Selling Defendants dumped another $13 million in

stock. The sellers included director defendant Callen, who sold over $347,000 stock, and defendant Grenader, the former chairman of the Board and CEO, who disposed of nearly $10.2 million in stock. These massive stock repurchases and selling off personal stock took place all while the nation's largest subprime lender, New Century Corporation, filed for bankruptcy, and lender Countrywide Mortgage and hedge funds throughout the country, most notably Bear Stearns, collapsed.

## DAMAGES TO AMBAC CAUSED BY THE INDIVIDUAL DEFENDANTS

115.    As a result of the Individual Defendants' improprieties, Ambac disseminated improper statements concerning its business prospects as alleged above. These improper statements have devastated Ambac's credibility as reflected by the Company's $9.1 billion market capitalization loss.

116.    Further, as a direct and proximate result of the Individual Defendants' action, Ambac has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Ambac;

(b)    costs incurred from the $579 million that the Company spent repurchasing its own stock; and

(c)    costs incurred from defending itself against securities lawsuits filed against the Company.

117.    Moreover, these actions have irreparably damaged Ambac's corporate image and goodwill. For at least the foreseeable future, Ambac will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Ambac's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SELLING

118.    The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect. They also knew that the misstatements would create an

inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth. Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Ambac's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BIENSTOCK | 10/31/2005 | 185 | $70.71 | $13,081.35 |
| | 10/31/2005 | 400 | $70.72 | $28,288.00 |
| | 10/31/2005 | 200 | $70.73 | $14,146.00 |
| | 10/31/2005 | 100 | $70.74 | $7,074.00 |
| | 10/31/2005 | 300 | $70.78 | $21,234.00 |
| | 10/31/2005 | 2,900 | $70.79 | $205,291.00 |
| | 10/31/2005 | 200 | $70.80 | $14,160.00 |
| | 11/15/2005 | 3,015 | $75.75 | $228,386.25 |
| | 11/22/2005 | 1,039 | $76.13 | $79,099.07 |
| | 2/1/2006 | 393 | $76.83 | $30,194.19 |
| | 2/1/2006 | 130 | $76.83 | $9,987.90 |
| | 2/1/2006 | 2 | $76.83 | $153.66 |
| | 3/20/2006 | 2,000 | $81.50 | $163,000.00 |
| | 3/20/2006 | 2,200 | $81.51 | $179,322.00 |
| | 3/20/2006 | 1,500 | $81.52 | $122,280.00 |
| | 3/20/2006 | 793 | $81.54 | $64,661.22 |
| | 3/20/2006 | 400 | $81.55 | $32,620.00 |
| | 8/30/2006 | 100 | $87.19 | $8,719.00 |
| | 8/30/2006 | 5,900 | $87.20 | $514,480.00 |
| | 8/30/2006 | 1,900 | $87.21 | $165,699.00 |
| | 8/30/2006 | 1,000 | $87.22 | $87,220.00 |
| | 8/30/2006 | 900 | $87.23 | $78,507.00 |
| | 8/30/2006 | 200 | $87.24 | $17,448.00 |
| | 12/18/2006 | 500 | $90.03 | $45,015.00 |
| | 12/18/2006 | 800 | $90.05 | $72,040.00 |
| | 12/18/2006 | 500 | $90.06 | $45,030.00 |
| | 12/18/2006 | 500 | $90.07 | $45,035.00 |
| | 12/18/2006 | 1,000 | $90.08 | $90,080.00 |
| | 12/18/2006 | 800 | $90.09 | $72,072.00 |
| | 12/18/2006 | 900 | $90.10 | $81,090.00 |
| | 12/18/2006 | 300 | $90.11 | $27,033.00 |
| | 12/18/2006 | 1,900 | $90.13 | $171,247.00 |
| | 12/18/2006 | 1,500 | $90.15 | $135,225.00 |
| | 12/18/2006 | 400 | $90.17 | $36,068.00 |
| | 12/18/2006 | 1,600 | $90.18 | $144,288.00 |
| | 12/18/2006 | 200 | $90.19 | $18,038.00 |
| | 12/18/2006 | 1,100 | $90.20 | $99,220.00 |
| | 2/2/2007 | 1,406 | $88.53 | $124,473.18 |
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/2/2007 | 284 | $88.53 | $25,142.52 |
| | 2/2/2007 | 95 | $88.53 | $8,410.35 |

| | | | | |
|---|---|---|---|---|
| | 5/31/2007 | 107 | $90.28 | $9,659.96 |
| | | 40,117 | | $3,375,650.69 |
| | | | | |
| CALLEN | 10/21/2005 | 5,000 | $69.12 | $345,600.00 |
| | 5/11/2006 | 3,000 | $83.30 | $249,900.00 |
| | 4/27/2007 | 2,300 | $92.62 | $213,026.00 |
| | 4/27/2007 | 200 | $92.63 | $18,526.00 |
| | 4/27/2007 | 750 | $92.64 | $69,480.00 |
| | 4/27/2007 | 500 | $92.65 | $46,325.00 |
| | | 11,750 | | $942,857.00 |
| | | | | |
| DOYLE | 11/2/2005 | 12,910 | $74.70 | $964,377.00 |
| | 1/27/2006 | 181 | $76.64 | $13,871.84 |
| | 3/16/2006 | 4,900 | $80.50 | $394,450.00 |
| | 3/16/2006 | 500 | $80.51 | $40,255.00 |
| | 3/16/2006 | 100 | $80.53 | $8,053.00 |
| | 3/16/2006 | 100 | $80.55 | $8,055.00 |
| | 3/16/2006 | 2,000 | $80.56 | $161,120.00 |
| | 3/16/2006 | 600 | $80.57 | $48,342.00 |
| | 3/16/2006 | 100 | $80.60 | $8,060.00 |
| | 3/16/2006 | 100 | $80.61 | $8,061.00 |
| | 3/16/2006 | 200 | $80.66 | $16,132.00 |
| | 3/16/2006 | 3,900 | $80.67 | $314,613.00 |
| | 3/16/2006 | 500 | $80.68 | $40,340.00 |
| | 3/16/2006 | 1,208 | $80.69 | $97,473.52 |
| | 3/16/2006 | 900 | $80.71 | $72,639.00 |
| | 3/16/2006 | 2,900 | $80.79 | $234,291.00 |
| | 2/2/2007 | 1,101 | $88.53 | $97,471.53 |
| | 2/2/2007 | 481 | $88.53 | $42,582.93 |
| | 2/2/2007 | 181 | $88.53 | $16,023.93 |
| | 2/16/2007 | 300 | $90.43 | $27,129.00 |
| | 2/16/2007 | 400 | $90.44 | $36,176.00 |
| | 2/16/2007 | 900 | $90.45 | $81,405.00 |
| | 2/16/2007 | 100 | $90.46 | $9,046.00 |
| | 2/16/2007 | 200 | $90.49 | $18,098.00 |
| | 2/16/2007 | 700 | $90.50 | $63,350.00 |
| | 2/16/2007 | 400 | $90.51 | $36,204.00 |
| | 2/16/2007 | 800 | $90.52 | $72,416.00 |
| | 2/16/2007 | 600 | $90.53 | $54,318.00 |
| | 2/16/2007 | 200 | $90.55 | $18,110.00 |
| | 2/16/2007 | 200 | $90.59 | $18,118.00 |
| | 2/16/2007 | 100 | $90.60 | $9,060.00 |
| | 2/16/2007 | 300 | $90.63 | $27,189.00 |
| | 2/16/2007 | 100 | $90.64 | $9,064.00 |
| | 2/16/2007 | 100 | $90.71 | $9,071.00 |
| | 2/16/2007 | 400 | $90.72 | $36,288.00 |
| | 2/16/2007 | 200 | $90.81 | $18,162.00 |
| | 2/16/2007 | 100 | $91.01 | $9,101.00 |
| | 2/16/2007 | 1,000 | $91.02 | $91,020.00 |
| | 2/16/2007 | 300 | $91.03 | $27,309.00 |
| | 2/16/2007 | 300 | $91.04 | $27,312.00 |

| | 2/16/2007 | 400 | $91.05 | $36,420.00 |
|---|---|---|---|---|
| | 2/16/2007 | 500 | $91.06 | $45,530.00 |
| | 2/16/2007 | 400 | $91.08 | $36,432.00 |
| | 2/16/2007 | 300 | $91.09 | $27,327.00 |
| | 2/16/2007 | 200 | $91.10 | $18,220.00 |
| | 2/16/2007 | 300 | $91.11 | $27,333.00 |
| | 2/16/2007 | 100 | $91.12 | $9,112.00 |
| | 2/16/2007 | 100 | $91.13 | $9,113.00 |
| | 2/16/2007 | 200 | $91.15 | $18,230.00 |
| | 2/16/2007 | 200 | $91.17 | $18,234.00 |
| | 2/16/2007 | 200 | $91.18 | $18,236.00 |
| | 2/16/2007 | 200 | $91.19 | $18,238.00 |
| | 2/16/2007 | 700 | $91.20 | $63,840.00 |
| | 2/16/2007 | 400 | $91.21 | $36,484.00 |
| | 2/16/2007 | 700 | $91.22 | $63,854.00 |
| | 2/16/2007 | 300 | $91.23 | $27,369.00 |
| | 2/16/2007 | 300 | $91.24 | $27,372.00 |
| | 2/16/2007 | 1,400 | $91.25 | $127,750.00 |
| | 2/16/2007 | 300 | $91.26 | $27,378.00 |
| | 2/16/2007 | 300 | $91.27 | $27,381.00 |
| | 2/16/2007 | 300 | $91.29 | $27,387.00 |
| | 2/16/2007 | 200 | $91.30 | $18,260.00 |
| | 2/16/2007 | 200 | $91.31 | $18,262.00 |
| | 2/16/2007 | 200 | $91.32 | $18,264.00 |
| | 2/16/2007 | 100 | $91.33 | $9,133.00 |
| | 2/16/2007 | 300 | $91.36 | $27,408.00 |
| | 2/16/2007 | 100 | $91.38 | $9,138.00 |
| | 2/16/2007 | 200 | $91.41 | $18,282.00 |
| | 2/16/2007 | 200 | $91.42 | $18,284.00 |
| | 2/16/2007 | 100 | $91.43 | $9,143.00 |
| | 2/16/2007 | 100 | $91.45 | $9,145.00 |
| | 2/16/2007 | 100 | $91.46 | $9,146.00 |
| | 2/16/2007 | 100 | $91.47 | $9,147.00 |
| | 2/16/2007 | 100 | $91.49 | $9,149.00 |
| | 2/16/2007 | 100 | $91.50 | $9,150.00 |
| | 2/16/2007 | 100 | $91.52 | $9,152.00 |
| | 2/16/2007 | 100 | $91.53 | $9,153.00 |
| | 2/16/2007 | 200 | $94.14 | $18,828.00 |
| | | 50,862 | | $4,224,441.75 |
| | | | | |
| GANDOLFO | 1/27/2006 | 294 | $76.64 | $22,532.16 |
| | 5/3/2006 | 225 | $82.75 | $18,618.75 |
| | 5/3/2006 | 1,700 | $82.76 | $140,692.00 |
| | 5/3/2006 | 1,200 | $82.77 | $99,324.00 |
| | 5/3/2006 | 400 | $82.78 | $33,112.00 |
| | 5/3/2006 | 800 | $82.79 | $66,232.00 |
| | 5/3/2006 | 1,100 | $82.80 | $91,080.00 |
| | 5/3/2006 | 200 | $82.81 | $16,562.00 |
| | 2/2/2007 | 1,977 | $88.53 | $175,023.81 |
| | 2/2/2007 | 1,215 | $88.53 | $107,563.95 |
| | 2/2/2007 | 176 | $88.53 | $15,581.28 |

| | | | | |
|---|---|---|---|---|
| | 2/9/2007 | 2,000 | $89.05 | $178,100.00 |
| | 2/9/2007 | 900 | $89.06 | $80,154.00 |
| | 2/9/2007 | 1,400 | $89.07 | $124,698.00 |
| | 2/9/2007 | 400 | $89.08 | $35,632.00 |
| | 2/9/2007 | 900 | $89.09 | $80,181.00 |
| | 2/9/2007 | 500 | $89.10 | $44,550.00 |
| | 2/9/2007 | 800 | $89.11 | $71,288.00 |
| | 2/9/2007 | 700 | $89.12 | $62,384.00 |
| | 2/9/2007 | 928 | $89.13 | $82,712.64 |
| | 2/9/2007 | 1,472 | $89.14 | $131,214.08 |
| | 2/9/2007 | 1,100 | $89.15 | $98,065.00 |
| | 2/9/2007 | 1,300 | $89.16 | $115,908.00 |
| | 2/9/2007 | 1,800 | $89.17 | $160,506.00 |
| | 2/9/2007 | 700 | $89.18 | $62,426.00 |
| | 2/9/2007 | 100 | $89.19 | $8,919.00 |
| | 2/9/2007 | 300 | $89.20 | $26,760.00 |
| | 2/9/2007 | 200 | $89.21 | $17,842.00 |
| | 2/9/2007 | 100 | $89.22 | $8,922.00 |
| | 2/9/2007 | 100 | $89.23 | $8,923.00 |
| | 2/9/2007 | 300 | $89.24 | $26,772.00 |
| | | **25,287** | | **$2,212,278.67** |
| | | | | |
| **GENADER** | 11/2/2005 | 64,100 | $74.25 | $4,759,425.00 |
| | 11/2/2005 | 1,600 | $74.26 | $118,816.00 |
| | 11/2/2005 | 6,300 | $74.27 | $467,901.00 |
| | 11/2/2005 | 9,300 | $74.50 | $692,850.00 |
| | 11/2/2005 | 2,700 | $74.75 | $201,825.00 |
| | 11/2/2005 | 500 | $74.76 | $37,380.00 |
| | 11/2/2005 | 5,500 | $74.77 | $411,235.00 |
| | 12/12/2005 | 26,952 | $76.87 | $2,071,800.24 |
| | 12/14/2005 | 100 | $77.79 | $7,779.00 |
| | 12/14/2005 | 800 | $77.81 | $62,248.00 |
| | 12/14/2005 | 100 | $77.82 | $7,782.00 |
| | 12/14/2005 | 100 | $77.84 | $7,784.00 |
| | 12/14/2005 | 600 | $77.86 | $46,716.00 |
| | 12/14/2005 | 500 | $77.87 | $38,935.00 |
| | 12/14/2005 | 3,200 | $77.88 | $249,216.00 |
| | 12/14/2005 | 200 | $77.88 | $15,576.00 |
| | 12/14/2005 | 100 | $77.88 | $7,788.00 |
| | 12/14/2005 | 100 | $77.88 | $7,788.00 |
| | 12/14/2005 | 200 | $77.89 | $15,578.00 |
| | 12/14/2005 | 100 | $77.89 | $7,789.00 |
| | 12/14/2005 | 100 | $77.89 | $7,789.00 |
| | 12/14/2005 | 400 | $77.90 | $31,160.00 |
| | 12/14/2005 | 200 | $77.90 | $15,580.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 600 | $77.91 | $46,746.00 |
| | 12/14/2005 | 200 | $77.91 | $15,582.00 |

| | 12/14/2005 | 200 | $77.91 | $15,582.00 |
|---|---|---|---|---|
| | 12/14/2005 | 100 | $77.91 | $7,791.00 |
| | 12/14/2005 | 100 | $77.91 | $7,791.00 |
| | 12/14/2005 | 2,200 | $77.92 | $171,424.00 |
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 100 | $77.92 | $7,792.00 |
| | 12/14/2005 | 100 | $77.92 | $7,792.00 |
| | 12/14/2005 | 300 | $77.93 | $23,379.00 |
| | 12/14/2005 | 700 | $77.94 | $54,558.00 |
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 500 | $77.94 | $38,970.00 |
| | 12/14/2005 | 300 | $77.94 | $23,382.00 |
| | 12/14/2005 | 300 | $77.94 | $23,382.00 |
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 2,100 | $77.95 | $163,695.00 |
| | 12/14/2005 | 100 | $77.95 | $7,795.00 |
| | 12/14/2005 | 400 | $77.95 | $31,180.00 |
| | 12/14/2005 | 100 | $77.95 | $7,795.00 |
| | 12/14/2005 | 200 | $77.96 | $15,592.00 |
| | 12/14/2005 | 400 | $77.97 | $31,188.00 |
| | 12/14/2005 | 100 | $77.97 | $7,797.00 |
| | 12/14/2005 | 2,000 | $77.98 | $155,960.00 |
| | 12/14/2005 | 300 | $77.98 | $23,394.00 |
| | 12/14/2005 | 200 | $77.98 | $15,596.00 |
| | 12/14/2005 | 100 | $77.98 | $7,798.00 |
| | 12/14/2005 | 900 | $77.99 | $70,191.00 |
| | 12/14/2005 | 100 | $77.99 | $7,799.00 |
| | 12/14/2005 | 1,700 | $78.00 | $132,600.00 |
| | 12/14/2005 | 200 | $78.00 | $15,600.00 |
| | 12/14/2005 | 100 | $78.00 | $7,800.00 |
| | 12/14/2005 | 200 | $78.01 | $15,602.00 |
| | 12/14/2005 | 100 | $78.01 | $7,801.00 |
| | 12/14/2005 | 1,500 | $78.02 | $117,030.00 |
| | 12/14/2005 | 500 | $78.02 | $39,010.00 |
| | 12/14/2005 | 300 | $78.02 | $23,406.00 |
| | 12/14/2005 | 100 | $78.02 | $7,802.00 |
| | 12/14/2005 | 200 | $78.03 | $15,606.00 |
| | 12/14/2005 | 100 | $78.04 | $7,804.00 |
| | 12/14/2005 | 500 | $78.05 | $39,025.00 |
| | 12/14/2005 | 400 | $78.05 | $31,220.00 |
| | 12/14/2005 | 100 | $78.05 | $7,805.00 |
| | 12/14/2005 | 100 | $78.05 | $7,805.00 |
| | 12/14/2005 | 900 | $78.06 | $70,254.00 |
| | 12/14/2005 | 100 | $78.06 | $7,806.00 |
| | 12/14/2005 | 300 | $78.07 | $23,421.00 |
| | 12/14/2005 | 100 | $78.07 | $7,807.00 |
| | 12/14/2005 | 400 | $78.08 | $31,232.00 |
| | 12/14/2005 | 300 | $78.09 | $23,427.00 |

| | | | | |
|---|---|---|---|---|
| | 12/14/2005 | 100 | $78.10 | $7,810.00 |
| | 12/14/2005 | 200 | $78.11 | $15,622.00 |
| | 12/14/2005 | 200 | $78.12 | $15,624.00 |
| | 12/14/2005 | 900 | $78.13 | $70,317.00 |
| | 12/14/2005 | 800 | $78.13 | $62,504.00 |
| | 12/14/2005 | 100 | $78.15 | $7,815.00 |
| | 12/14/2005 | 2,538 | $78.18 | $198,420.84 |
| | 12/14/2005 | 100 | $78.19 | $7,819.00 |
| | 12/14/2005 | 800 | $78.20 | $62,560.00 |
| | 12/14/2005 | 700 | $78.21 | $54,747.00 |
| | 12/14/2005 | 300 | $78.23 | $23,469.00 |
| | 1/27/2006 | 578 | $76.64 | $44,297.92 |
| | 1/27/2006 | 540 | $76.64 | $41,385.60 |
| | 1/27/2006 | 531 | $76.64 | $40,695.84 |
| | 3/14/2006 | 1,800 | $79.23 | $142,614.00 |
| | 3/14/2006 | 200 | $79.24 | $15,848.00 |
| | 3/14/2006 | 120 | $79.36 | $9,523.20 |
| | 5/9/2006 | 8,161 | $82.76 | $675,404.36 |
| | 5/9/2006 | 2,477 | $82.76 | $204,996.52 |
| | 5/10/2006 | 1,500 | $83.00 | $124,500.00 |
| | 5/10/2006 | 100 | $83.01 | $8,301.00 |
| | 5/10/2006 | 3,200 | $83.02 | $265,664.00 |
| | 5/10/2006 | 500 | $83.03 | $41,515.00 |
| | 5/10/2006 | 4,000 | $83.04 | $332,160.00 |
| | 5/10/2006 | 800 | $83.05 | $66,440.00 |
| | 5/10/2006 | 2,084 | $83.06 | $173,097.04 |
| | 5/10/2006 | 1,500 | $83.07 | $124,605.00 |
| | 5/10/2006 | 300 | $83.08 | $24,924.00 |
| | 5/10/2006 | 500 | $83.10 | $41,550.00 |
| | 8/23/2006 | 24,600 | $85.40 | $2,100,840.00 |
| | 8/23/2006 | 3,600 | $85.41 | $307,476.00 |
| | 8/23/2006 | 4,000 | $85.42 | $341,680.00 |
| | 8/23/2006 | 2,200 | $85.43 | $187,946.00 |
| | 8/23/2006 | 2,500 | $85.44 | $213,600.00 |
| | 8/23/2006 | 1,700 | $85.45 | $145,265.00 |
| | 8/23/2006 | 2,700 | $85.46 | $230,742.00 |
| | 8/23/2006 | 2,500 | $85.47 | $213,675.00 |
| | 8/23/2006 | 3,100 | $85.48 | $264,988.00 |
| | 8/23/2006 | 2,300 | $85.49 | $196,627.00 |
| | 8/23/2006 | 6,600 | $85.50 | $564,300.00 |
| | 8/23/2006 | 1,800 | $85.51 | $153,918.00 |
| | 8/23/2006 | 500 | $85.53 | $42,765.00 |
| | 8/23/2006 | 358 | $85.55 | $30,626.90 |
| | 2/2/2007 | 1,673 | $88.53 | $148,110.69 |
| | 2/2/2007 | 633 | $88.53 | $56,039.49 |
| | 2/2/2007 | 626 | $88.53 | $55,419.78 |
| | 2/2/2007 | 593 | $88.53 | $52,498.29 |
| | 2/2/2007 | 582 | $88.53 | $51,524.46 |
| | 2/2/2007 | 535 | $88.53 | $47,363.55 |
| | 2/15/2007 | 1,787 | $91.00 | $162,617.00 |
| | 2/15/2007 | 100 | $91.01 | $9,101.00 |

| | | | | |
|---|---|---|---|---|
| | 2/15/2007 | 200 | $91.02 | $18,204.00 |
| | 2/15/2007 | 345 | $91.03 | $31,405.35 |
| | 2/15/2007 | 300 | $91.04 | $27,312.00 |
| | 2/15/2007 | 100 | $91.05 | $9,105.00 |
| | 2/15/2007 | 200 | $91.07 | $18,214.00 |
| | 2/15/2007 | 92 | $91.09 | $8,380.28 |
| | 2/15/2007 | 8 | $91.12 | $728.96 |
| | 2/15/2007 | 200 | $91.13 | $18,226.00 |
| | 2/15/2007 | 400 | $91.16 | $36,464.00 |
| | 2/15/2007 | 100 | $91.17 | $9,117.00 |
| | 2/15/2007 | 200 | $91.20 | $18,240.00 |
| | 2/15/2007 | 100 | $91.23 | $9,123.00 |
| | 2/15/2007 | 100 | $91.24 | $9,124.00 |
| | 2/15/2007 | 400 | $91.25 | $36,500.00 |
| | 2/15/2007 | 200 | $91.28 | $18,256.00 |
| | 2/15/2007 | 100 | $91.30 | $9,130.00 |
| | 2/15/2007 | 200 | $91.31 | $18,262.00 |
| | 2/15/2007 | 200 | $91.34 | $18,268.00 |
| | 4/27/2007 | 10,800 | $92.60 | $1,000,080.00 |
| | 4/27/2007 | 1,500 | $92.61 | $138,915.00 |
| | 4/27/2007 | 4,100 | $92.62 | $379,742.00 |
| | 4/27/2007 | 4,000 | $92.63 | $370,520.00 |
| | 4/27/2007 | 400 | $92.64 | $37,056.00 |
| | 4/27/2007 | 11,600 | $92.65 | $1,074,740.00 |
| | 4/27/2007 | 100 | $92.66 | $9,266.00 |
| | 4/27/2007 | 200 | $92.67 | $18,534.00 |
| | 4/27/2007 | 5,400 | $92.68 | $500,472.00 |
| | 4/27/2007 | 300 | $92.69 | $27,807.00 |
| | 4/27/2007 | 19,500 | $92.70 | $1,807,650.00 |
| | 4/27/2007 | 3,500 | $92.71 | $324,485.00 |
| | 4/27/2007 | 4,400 | $92.72 | $407,968.00 |
| | 4/27/2007 | 7,200 | $92.74 | $667,728.00 |
| | 4/27/2007 | 12,500 | $92.75 | $1,159,375.00 |
| | 4/27/2007 | 200 | $92.76 | $18,552.00 |
| | 4/27/2007 | 100 | $92.77 | $9,277.00 |
| | 4/27/2007 | 2,000 | $92.78 | $185,560.00 |
| | 4/27/2007 | 15,300 | $92.80 | $1,419,840.00 |
| | 4/27/2007 | 6,700 | $92.82 | $621,894.00 |
| | 4/27/2007 | 200 | $92.85 | $18,570.00 |
| | | **360,013** | | **$30,015,291.31** |
| | | | | |
| **LASSITER** | 11/7/2005 | 1,100 | $74.25 | $81,675.00 |
| | 11/7/2005 | 1,100 | $74.26 | $81,686.00 |
| | 11/7/2005 | 700 | $74.28 | $51,996.00 |
| | 11/7/2005 | 1,200 | $74.29 | $89,148.00 |
| | 11/7/2005 | 5,200 | $74.30 | $386,360.00 |
| | 11/7/2005 | 900 | $74.31 | $66,879.00 |
| | 11/7/2005 | 1,500 | $74.32 | $111,480.00 |
| | 11/7/2005 | 600 | $74.33 | $44,598.00 |
| | 11/7/2005 | 2,700 | $74.34 | $200,718.00 |
| | 11/7/2005 | 200 | $74.35 | $14,870.00 |

| | 11/7/2005 | 1,700 | $74.36 | $126,412.00 |
|---|---|---|---|---|
| | 11/7/2005 | 1,500 | $74.37 | $111,555.00 |
| | 11/7/2005 | 3,200 | $74.38 | $238,016.00 |
| | 11/7/2005 | 1,800 | $74.39 | $133,902.00 |
| | 11/7/2005 | 2,400 | $74.40 | $178,560.00 |
| | 11/7/2005 | 2,800 | $74.41 | $208,348.00 |
| | 11/7/2005 | 1,900 | $74.42 | $141,398.00 |
| | 11/7/2005 | 300 | $74.43 | $22,329.00 |
| | 11/7/2005 | 1,322 | $74.44 | $98,409.68 |
| | 11/7/2005 | 500 | $74.45 | $37,225.00 |
| | 11/7/2005 | 3,678 | $74.46 | $273,863.88 |
| | 11/7/2005 | 3,300 | $74.47 | $245,751.00 |
| | 11/7/2005 | 2,800 | $74.48 | $208,544.00 |
| | 11/7/2005 | 700 | $74.49 | $52,143.00 |
| | 11/7/2005 | 6,929 | $74.50 | $516,210.50 |
| | 11/7/2005 | 2,100 | $74.51 | $156,471.00 |
| | 11/7/2005 | 3,772 | $74.52 | $281,089.44 |
| | 11/7/2005 | 1,600 | $74.53 | $119,248.00 |
| | 11/7/2005 | 700 | $74.54 | $52,178.00 |
| | 11/7/2005 | 1,500 | $74.55 | $111,825.00 |
| | 11/7/2005 | 2,900 | $74.56 | $216,224.00 |
| | 11/7/2005 | 500 | $74.57 | $37,285.00 |
| | 11/7/2005 | 1,000 | $74.58 | $74,580.00 |
| | 11/7/2005 | 200 | $74.59 | $14,918.00 |
| | 11/7/2005 | 400 | $74.60 | $29,840.00 |
| | 11/7/2005 | 200 | $74.61 | $14,922.00 |
| | 11/7/2005 | 100 | $74.62 | $7,462.00 |
| | 11/7/2005 | 600 | $74.63 | $44,778.00 |
| | 11/7/2005 | 600 | $74.66 | $44,796.00 |
| | 11/7/2005 | 1,900 | $74.67 | $141,873.00 |
| | 11/7/2005 | 200 | $74.68 | $14,936.00 |
| | 11/7/2005 | 200 | $74.69 | $14,938.00 |
| | 11/7/2005 | 4,700 | $74.70 | $351,090.00 |
| | 11/7/2005 | 700 | $74.71 | $52,297.00 |
| | 11/7/2005 | 1,100 | $74.72 | $82,192.00 |
| | 11/7/2005 | 1,800 | $74.73 | $134,514.00 |
| | 11/7/2005 | 7,800 | $74.74 | $582,972.00 |
| | 11/7/2005 | 7,700 | $74.75 | $575,575.00 |
| | 11/7/2005 | 2,700 | $74.77 | $201,879.00 |
| | 12/19/2005 | 7,000 | $77.90 | $545,300.00 |
| | 12/19/2005 | 4,600 | $77.91 | $358,386.00 |
| | 12/19/2005 | 200 | $77.92 | $15,584.00 |
| | 12/19/2005 | 17,395 | $78.00 | $1,356,810.00 |
| | 12/19/2005 | 400 | $78.01 | $31,204.00 |
| | 12/19/2005 | 1,700 | $78.02 | $132,634.00 |
| | 12/19/2005 | 300 | $78.03 | $23,409.00 |
| | 12/19/2005 | 400 | $78.04 | $31,216.00 |
| | 12/19/2005 | 200 | $78.05 | $15,610.00 |
| | 12/19/2005 | 300 | $78.06 | $23,418.00 |
| | 1/30/2006 | 142,984 | $76.63 | $10,956,863.92 |
| | 7/31/2006 | 177,650 | $82.93 | $14,732,514.50 |

| | 7/31/2006 | 66,005 | $82.93 | $5,473,794.65 |
|---|---|---|---|---|
| | 7/31/2006 | 31,689 | $82.93 | $2,627,968.77 |
| | 7/31/2006 | 5,131 | $82.93 | $425,513.83 |
| | 9/12/2006 | 4,600 | $84.90 | $390,540.00 |
| | 9/12/2006 | 3,100 | $84.91 | $263,221.00 |
| | 9/12/2006 | 500 | $84.92 | $42,460.00 |
| | 9/12/2006 | 900 | $84.93 | $76,437.00 |
| | 9/12/2006 | 100 | $84.95 | $8,495.00 |
| | 9/12/2006 | 3,000 | $84.97 | $254,910.00 |
| | 9/12/2006 | 3,400 | $85.00 | $289,000.00 |
| | 9/12/2006 | 4,000 | $85.01 | $340,040.00 |
| | 9/12/2006 | 200 | $85.03 | $17,006.00 |
| | 9/12/2006 | 500 | $85.04 | $42,520.00 |
| | 9/12/2006 | 6,400 | $85.05 | $544,320.00 |
| | 9/12/2006 | 800 | $85.06 | $68,048.00 |
| | 9/12/2006 | 200 | $85.08 | $17,016.00 |
| | 9/12/2006 | 425 | $85.09 | $36,163.25 |
| | 9/12/2006 | 4,400 | $85.10 | $374,440.00 |
| | 9/12/2006 | 4,175 | $85.11 | $355,334.25 |
| | 9/12/2006 | 1,800 | $85.12 | $153,216.00 |
| | 9/12/2006 | 2,200 | $85.13 | $187,286.00 |
| | 9/12/2006 | 1,600 | $85.14 | $136,224.00 |
| | 9/12/2006 | 200 | $85.15 | $17,030.00 |
| | 9/12/2006 | 3,300 | $85.18 | $281,094.00 |
| | 9/12/2006 | 3,300 | $85.20 | $281,160.00 |
| | 9/12/2006 | 300 | $85.21 | $25,563.00 |
| | 9/13/2006 | 600 | $84.38 | $50,628.00 |
| | 9/13/2006 | 200 | $84.39 | $16,878.00 |
| | 9/13/2006 | 800 | $84.40 | $67,520.00 |
| | 9/13/2006 | 700 | $84.41 | $59,087.00 |
| | 9/13/2006 | 600 | $84.42 | $50,652.00 |
| | 9/13/2006 | 300 | $84.43 | $25,329.00 |
| | 9/13/2006 | 1,100 | $84.44 | $92,884.00 |
| | 9/13/2006 | 200 | $84.45 | $16,890.00 |
| | 9/13/2006 | 400 | $84.46 | $33,784.00 |
| | 9/13/2006 | 3,100 | $84.47 | $261,857.00 |
| | 9/13/2006 | 600 | $84.48 | $50,688.00 |
| | 9/13/2006 | 4,000 | $84.49 | $337,960.00 |
| | 9/13/2006 | 4,100 | $84.50 | $346,450.00 |
| | 9/13/2006 | 4,200 | $84.51 | $354,942.00 |
| | 9/13/2006 | 4,700 | $84.52 | $397,244.00 |
| | 9/13/2006 | 2,600 | $84.53 | $219,778.00 |
| | 9/13/2006 | 1,700 | $84.54 | $143,718.00 |
| | 9/13/2006 | 2,200 | $84.55 | $186,010.00 |
| | 9/13/2006 | 1,400 | $84.56 | $118,384.00 |
| | 9/13/2006 | 300 | $84.57 | $25,371.00 |
| | 9/13/2006 | 1,300 | $84.58 | $109,954.00 |
| | 9/13/2006 | 1,800 | $84.59 | $152,262.00 |
| | 9/13/2006 | 700 | $84.60 | $59,220.00 |
| | 9/13/2006 | 1,200 | $84.61 | $101,532.00 |
| | 9/13/2006 | 1,300 | $84.62 | $110,006.00 |

| | 9/13/2006 | 1,000 | $84.63 | $84,630.00 |
|---|---|---|---|---|
| | 9/13/2006 | 2,100 | $84.64 | $177,744.00 |
| | 9/13/2006 | 800 | $84.65 | $67,720.00 |
| | 9/13/2006 | 1,100 | $84.66 | $93,126.00 |
| | 9/13/2006 | 200 | $84.68 | $16,936.00 |
| | 9/13/2006 | 1,100 | $84.69 | $93,159.00 |
| | 9/13/2006 | 1,800 | $84.70 | $152,460.00 |
| | 9/13/2006 | 500 | $84.71 | $42,355.00 |
| | 9/13/2006 | 800 | $84.72 | $67,776.00 |
| | 9/13/2006 | 300 | $84.73 | $25,419.00 |
| | 9/13/2006 | 800 | $84.74 | $67,792.00 |
| | 9/13/2006 | 900 | $84.80 | $76,320.00 |
| | 9/13/2006 | 300 | $84.81 | $25,443.00 |
| | 9/13/2006 | 300 | $84.82 | $25,446.00 |
| | 9/13/2006 | 900 | $84.83 | $76,347.00 |
| | 9/13/2006 | 300 | $84.88 | $25,464.00 |
| | 9/13/2006 | 600 | $84.90 | $50,940.00 |
| | 9/13/2006 | 300 | $84.92 | $25,476.00 |
| | 9/13/2006 | 300 | $85.01 | $25,503.00 |
| | 9/13/2006 | 300 | $85.02 | $25,506.00 |
| | 9/13/2006 | 300 | $85.06 | $25,518.00 |
| | 9/13/2006 | 300 | $85.07 | $25,521.00 |
| | 9/13/2006 | 300 | $85.10 | $25,530.00 |
| | 9/13/2006 | 300 | $85.11 | $25,533.00 |
| | 9/13/2006 | 300 | $85.12 | $25,536.00 |
| | 9/13/2006 | 900 | $85.13 | $76,617.00 |
| | 9/13/2006 | 300 | $85.14 | $25,542.00 |
| | 9/13/2006 | 200 | $85.15 | $17,030.00 |
| | 9/13/2006 | 100 | $85.15 | $8,515.00 |
| | 9/13/2006 | 300 | $85.18 | $25,554.00 |
| | 9/13/2006 | 300 | $85.20 | $25,560.00 |
| | 9/13/2006 | 300 | $85.21 | $25,563.00 |
| | 9/13/2006 | 1,500 | $85.22 | $127,830.00 |
| | 9/13/2006 | 300 | $85.23 | $25,569.00 |
| | 9/13/2006 | 1,500 | $85.24 | $127,860.00 |
| | 9/13/2006 | 600 | $85.25 | $51,150.00 |
| | 9/13/2006 | 300 | $85.26 | $25,578.00 |
| | 9/13/2006 | 300 | $85.26 | $25,578.00 |
| | 9/13/2006 | 300 | $85.28 | $25,584.00 |
| | 9/13/2006 | 900 | $85.30 | $76,770.00 |
| | 9/13/2006 | 1,500 | $85.31 | $127,965.00 |
| | 9/13/2006 | 900 | $85.33 | $76,797.00 |
| | 9/13/2006 | 600 | $85.34 | $51,204.00 |
| | 9/13/2006 | 1,800 | $85.35 | $153,630.00 |
| | 9/13/2006 | 300 | $85.36 | $25,608.00 |
| | 9/13/2006 | 1,800 | $85.37 | $153,666.00 |
| | 9/13/2006 | 1,500 | $85.38 | $128,070.00 |
| | 9/13/2006 | 600 | $85.39 | $51,234.00 |
| | 9/13/2006 | 1,100 | $85.40 | $93,940.00 |
| | 9/13/2006 | 800 | $85.41 | $68,328.00 |
| | 9/13/2006 | 900 | $85.42 | $76,878.00 |

| | 9/13/2006 | 1,000 | $85.43 | $85,430.00 |
|---|---|---|---|---|
| | 9/13/2006 | 1,400 | $85.44 | $119,616.00 |
| | 9/13/2006 | 300 | $85.45 | $25,635.00 |
| | 9/13/2006 | 1,100 | $85.46 | $94,006.00 |
| | 9/13/2006 | 300 | $85.48 | $25,644.00 |
| | 9/13/2006 | 300 | $85.50 | $25,650.00 |
| | 11/14/2006 | 500 | $83.46 | $41,730.00 |
| | 11/14/2006 | 10,700 | $83.47 | $893,129.00 |
| | 11/14/2006 | 800 | $83.48 | $66,784.00 |
| | 11/14/2006 | 16,100 | $83.49 | $1,344,189.00 |
| | 11/14/2006 | 25,700 | $83.50 | $2,145,950.00 |
| | 11/14/2006 | 1,800 | $83.51 | $150,318.00 |
| | 11/14/2006 | 200 | $83.52 | $16,704.00 |
| | 11/14/2006 | 17,400 | $83.53 | $1,453,422.00 |
| | 11/14/2006 | 2,000 | $83.54 | $167,080.00 |
| | 11/14/2006 | 36,700 | $83.55 | $3,066,285.00 |
| | 11/14/2006 | 200 | $83.56 | $16,712.00 |
| | 11/14/2006 | 7,500 | $83.57 | $626,775.00 |
| | 11/14/2006 | 5,300 | $83.58 | $442,974.00 |
| | 11/14/2006 | 100 | $83.59 | $8,359.00 |
| | 2/2/2007 | 21,320 | $88.53 | $1,887,459.60 |
| | 2/21/2007 | 5,600 | $90.40 | $506,240.00 |
| | 2/21/2007 | 2,500 | $90.40 | $226,000.00 |
| | 2/21/2007 | 2,000 | $90.40 | $180,800.00 |
| | 2/21/2007 | 1,600 | $90.40 | $144,640.00 |
| | 2/21/2007 | 1,600 | $90.40 | $144,640.00 |
| | 2/21/2007 | 800 | $90.40 | $72,320.00 |
| | 2/21/2007 | 700 | $90.40 | $63,280.00 |
| | 2/21/2007 | 700 | $90.40 | $63,280.00 |
| | 2/21/2007 | 600 | $90.40 | $54,240.00 |
| | 2/21/2007 | 450 | $90.40 | $40,680.00 |
| | 2/21/2007 | 300 | $90.40 | $27,120.00 |
| | 2/21/2007 | 100 | $90.40 | $9,040.00 |
| | 2/21/2007 | 600 | $90.41 | $54,246.00 |
| | 2/21/2007 | 300 | $90.41 | $27,123.00 |
| | 2/21/2007 | 200 | $90.41 | $18,082.00 |
| | 2/21/2007 | 200 | $90.41 | $18,082.00 |
| | 2/21/2007 | 100 | $90.41 | $9,041.00 |
| | 2/21/2007 | 1,100 | $90.42 | $99,462.00 |
| | 2/21/2007 | 100 | $90.42 | $9,042.00 |
| | 2/21/2007 | 100 | $90.42 | $9,042.00 |
| | 2/21/2007 | 100 | $90.42 | $9,042.00 |
| | 2/21/2007 | 600 | $90.43 | $54,258.00 |
| | 2/21/2007 | 200 | $90.43 | $18,086.00 |
| | 2/21/2007 | 200 | $90.43 | $18,086.00 |
| | 2/21/2007 | 300 | $90.44 | $27,132.00 |
| | 2/21/2007 | 200 | $90.44 | $18,088.00 |
| | 2/21/2007 | 200 | $90.44 | $18,088.00 |
| | 2/21/2007 | 700 | $90.45 | $63,315.00 |
| | 2/21/2007 | 400 | $90.45 | $36,180.00 |
| | 2/21/2007 | 400 | $90.45 | $36,180.00 |

| | 2/21/2007 | 400 | $90.45 | $36,180.00 |
|---|---|---|---|---|
| | 2/21/2007 | 200 | $90.45 | $18,090.00 |
| | 2/21/2007 | 100 | $90.45 | $9,045.00 |
| | 2/21/2007 | 700 | $90.46 | $63,322.00 |
| | 2/21/2007 | 200 | $90.46 | $18,092.00 |
| | 2/21/2007 | 100 | $90.46 | $9,046.00 |
| | 2/21/2007 | 100 | $90.46 | $9,046.00 |
| | 2/21/2007 | 100 | $90.47 | $9,047.00 |
| | 2/21/2007 | 100 | $90.49 | $9,049.00 |
| | 2/21/2007 | 1,650 | $90.75 | $149,737.50 |
| | 2/21/2007 | 1,400 | $90.75 | $127,050.00 |
| | 2/21/2007 | 600 | $90.75 | $54,450.00 |
| | 2/21/2007 | 500 | $90.75 | $45,375.00 |
| | 2/21/2007 | 400 | $90.75 | $36,300.00 |
| | 2/21/2007 | 345 | $90.75 | $31,308.75 |
| | 2/21/2007 | 300 | $90.75 | $27,225.00 |
| | 2/21/2007 | 200 | $90.75 | $18,150.00 |
| | 2/21/2007 | 100 | $90.75 | $9,075.00 |
| | 2/21/2007 | 600 | $90.76 | $54,456.00 |
| | 2/21/2007 | 600 | $90.76 | $54,456.00 |
| | 2/21/2007 | 300 | $90.77 | $27,231.00 |
| | 2/21/2007 | 100 | $90.77 | $9,077.00 |
| | 2/21/2007 | 100 | $90.77 | $9,077.00 |
| | 2/21/2007 | 100 | $90.77 | $9,077.00 |
| | 2/21/2007 | 700 | $90.78 | $63,546.00 |
| | 2/21/2007 | 600 | $90.78 | $54,468.00 |
| | 2/21/2007 | 400 | $90.78 | $36,312.00 |
| | 2/21/2007 | 300 | $90.78 | $27,234.00 |
| | 2/21/2007 | 200 | $90.78 | $18,156.00 |
| | 2/21/2007 | 100 | $90.78 | $9,078.00 |
| | 2/21/2007 | 200 | $90.79 | $18,158.00 |
| | 2/21/2007 | 100 | $90.79 | $9,079.00 |
| | 2/21/2007 | 500 | $90.81 | $45,405.00 |
| | 2/21/2007 | 755 | $90.82 | $68,569.10 |
| | 2/21/2007 | 100 | $90.84 | $9,084.00 |
| | 2/21/2007 | 100 | $90.86 | $9,086.00 |
| | 2/21/2007 | 300 | $90.87 | $27,261.00 |
| | 2/21/2007 | 100 | $90.89 | $9,089.00 |
| | 2/21/2007 | 400 | $90.90 | $36,360.00 |
| | 2/21/2007 | 300 | $90.90 | $27,270.00 |
| | 2/21/2007 | 100 | $90.91 | $9,091.00 |
| | 2/21/2007 | 100 | $90.91 | $9,091.00 |
| | 2/21/2007 | 600 | $90.92 | $54,552.00 |
| | 2/21/2007 | 200 | $90.92 | $18,184.00 |
| | 2/21/2007 | 500 | $90.93 | $45,465.00 |
| | 2/21/2007 | 200 | $90.93 | $18,186.00 |
| | 2/21/2007 | 200 | $90.94 | $18,188.00 |
| | 2/21/2007 | 400 | $90.95 | $36,380.00 |
| | 2/21/2007 | 200 | $90.95 | $18,190.00 |
| | 2/21/2007 | 400 | $90.97 | $36,388.00 |
| | 2/21/2007 | 200 | $90.98 | $18,196.00 |

| | 2/21/2007 | 200 | $90.98 | $18,196.00 |
|---|---|---|---|---|
| | 2/21/2007 | 100 | $90.98 | $9,098.00 |
| | 2/21/2007 | 100 | $90.98 | $9,098.00 |
| | 2/21/2007 | 3,000 | $91.00 | $273,000.00 |
| | 2/21/2007 | 800 | $91.00 | $72,800.00 |
| | 2/21/2007 | 100 | $91.00 | $9,100.00 |
| | 2/21/2007 | 100 | $91.03 | $9,103.00 |
| | 2/21/2007 | 400 | $91.06 | $36,424.00 |
| | 2/21/2007 | 200 | $91.07 | $18,214.00 |
| | 2/21/2007 | 200 | $91.08 | $18,216.00 |
| | 2/21/2007 | 100 | $91.08 | $9,108.00 |
| | 2/21/2007 | 600 | $91.10 | $54,660.00 |
| | 2/21/2007 | 300 | $91.10 | $27,330.00 |
| | 2/21/2007 | 100 | $91.13 | $9,113.00 |
| | 2/21/2007 | 100 | $91.15 | $9,115.00 |
| | 2/21/2007 | 400 | $91.25 | $36,500.00 |
| | 2/22/2007 | 3,000 | $90.40 | $271,200.00 |
| | 2/22/2007 | 2,800 | $90.40 | $253,120.00 |
| | 2/22/2007 | 2,500 | $90.40 | $226,000.00 |
| | 2/22/2007 | 2,200 | $90.40 | $198,880.00 |
| | 2/22/2007 | 1,900 | $90.40 | $171,760.00 |
| | 2/22/2007 | 1,200 | $90.40 | $108,480.00 |
| | 2/22/2007 | 1,100 | $90.40 | $99,440.00 |
| | 2/22/2007 | 700 | $90.40 | $63,280.00 |
| | 2/22/2007 | 500 | $90.40 | $45,200.00 |
| | 2/22/2007 | 200 | $90.40 | $18,080.00 |
| | 2/22/2007 | 200 | $90.40 | $18,080.00 |
| | 2/22/2007 | 100 | $90.40 | $9,040.00 |
| | 2/22/2007 | 400 | $90.41 | $36,164.00 |
| | 2/22/2007 | 300 | $90.41 | $27,123.00 |
| | 2/22/2007 | 100 | $90.41 | $9,041.00 |
| | 2/22/2007 | 700 | $90.42 | $63,294.00 |
| | 2/22/2007 | 700 | $90.42 | $63,294.00 |
| | 2/22/2007 | 400 | $90.42 | $36,168.00 |
| | 2/22/2007 | 400 | $90.42 | $36,168.00 |
| | 2/22/2007 | 300 | $90.42 | $27,126.00 |
| | 2/22/2007 | 300 | $90.42 | $27,126.00 |
| | 2/22/2007 | 200 | $90.42 | $18,084.00 |
| | 2/22/2007 | 100 | $90.42 | $9,042.00 |
| | 2/22/2007 | 800 | $90.43 | $72,344.00 |
| | 2/22/2007 | 700 | $90.43 | $63,301.00 |
| | 2/22/2007 | 400 | $90.43 | $36,172.00 |
| | 2/22/2007 | 200 | $90.43 | $18,086.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 900 | $90.44 | $81,396.00 |
| | 2/22/2007 | 800 | $90.44 | $72,352.00 |
| | 2/22/2007 | 600 | $90.44 | $54,264.00 |
| | 2/22/2007 | 400 | $90.44 | $36,176.00 |
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |

| | 2/22/2007 | 300 | $90.44 | $27,132.00 |
|---|---|---|---|---|
| | 2/22/2007 | 300 | $90.44 | $27,132.00 |
| | 2/22/2007 | 300 | $90.44 | $27,132.00 |
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 500 | $90.45 | $45,225.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 200 | $90.45 | $18,090.00 |
| | 2/22/2007 | 200 | $90.45 | $18,090.00 |
| | 2/22/2007 | 100 | $90.45 | $9,045.00 |
| | 2/22/2007 | 100 | $90.45 | $9,045.00 |
| | 2/22/2007 | 500 | $90.46 | $45,230.00 |
| | 2/22/2007 | 300 | $90.46 | $27,138.00 |
| | 2/22/2007 | 200 | $90.46 | $18,092.00 |
| | 2/22/2007 | 500 | $90.47 | $45,235.00 |
| | 2/22/2007 | 400 | $90.47 | $36,188.00 |
| | 2/22/2007 | 163 | $90.47 | $14,746.61 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 300 | $90.48 | $27,144.00 |
| | 2/22/2007 | 300 | $90.48 | $27,144.00 |
| | 2/22/2007 | 200 | $90.48 | $18,096.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 900 | $90.49 | $81,441.00 |
| | 2/22/2007 | 800 | $90.49 | $72,392.00 |
| | 2/22/2007 | 800 | $90.49 | $72,392.00 |
| | 2/22/2007 | 700 | $90.49 | $63,343.00 |
| | 2/22/2007 | 500 | $90.49 | $45,245.00 |
| | 2/22/2007 | 300 | $90.49 | $27,147.00 |
| | 2/22/2007 | 300 | $90.49 | $27,147.00 |
| | 2/22/2007 | 200 | $90.49 | $18,098.00 |
| | 2/22/2007 | 200 | $90.49 | $18,098.00 |
| | 2/22/2007 | 100 | $90.49 | $9,049.00 |
| | 2/22/2007 | 1,100 | $90.50 | $99,550.00 |
| | 2/22/2007 | 900 | $90.50 | $81,450.00 |
| | 2/22/2007 | 700 | $90.50 | $63,350.00 |
| | 2/22/2007 | 600 | $90.50 | $54,300.00 |

| | 2/22/2007 | 200 | $90.50 | $18,100.00 |
|---|---|---|---|---|
| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
| | 2/22/2007 | 200 | $90.50 | $18,100.00 |
| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
| | 2/22/2007 | 200 | $90.51 | $18,102.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 400 | $90.52 | $36,208.00 |
| | 2/22/2007 | 200 | $90.52 | $18,104.00 |
| | 2/22/2007 | 200 | $90.52 | $18,104.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 400 | $90.53 | $36,212.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 1,800 | $90.54 | $162,972.00 |
| | 2/22/2007 | 1,100 | $90.54 | $99,594.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 600 | $90.54 | $54,324.00 |
| | 2/22/2007 | 300 | $90.54 | $27,162.00 |
| | 2/22/2007 | 300 | $90.54 | $27,162.00 |
| | 2/22/2007 | 200 | $90.54 | $18,108.00 |
| | 2/22/2007 | 200 | $90.54 | $18,108.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 200 | $90.56 | $18,112.00 |
| | 2/22/2007 | 100 | $90.56 | $9,056.00 |
| | 2/22/2007 | 100 | $90.58 | $9,058.00 |
| | 2/22/2007 | 300 | $90.59 | $27,177.00 |
| | 2/22/2007 | 100 | $90.59 | $9,059.00 |
| | 2/22/2007 | 100 | $90.60 | $9,060.00 |
| | 2/22/2007 | 600 | $90.60 | $54,360.00 |
| | 2/22/2007 | 200 | $90.61 | $18,122.00 |
| | 2/22/2007 | 600 | $90.62 | $54,372.00 |
| | 2/22/2007 | 500 | $90.62 | $45,310.00 |
| | 2/22/2007 | 300 | $90.62 | $27,186.00 |
| | 2/22/2007 | 300 | $90.62 | $27,186.00 |

| | | | | |
|---|---|---|---|---|
| | 2/22/2007 | 200 | $90.62 | $18,124.00 |
| | 2/22/2007 | 200 | $90.62 | $18,124.00 |
| | 2/22/2007 | 100 | $90.62 | $9,062.00 |
| | 2/22/2007 | 500 | $90.63 | $45,315.00 |
| | 2/22/2007 | 400 | $90.63 | $36,252.00 |
| | 2/22/2007 | 300 | $90.63 | $27,189.00 |
| | 2/22/2007 | 200 | $90.63 | $18,126.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 400 | $90.64 | $36,256.00 |
| | 2/22/2007 | 400 | $90.64 | $36,256.00 |
| | 2/22/2007 | 200 | $90.64 | $18,128.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |
| | 2/22/2007 | 500 | $90.65 | $45,325.00 |
| | 2/22/2007 | 300 | $90.65 | $27,195.00 |
| | 2/22/2007 | 200 | $90.65 | $18,130.00 |
| | 2/22/2007 | 100 | $90.65 | $9,065.00 |
| | 2/22/2007 | 300 | $90.65 | $27,195.00 |
| | 2/22/2007 | 100 | $90.65 | $9,065.00 |
| | 2/22/2007 | 300 | $90.66 | $27,198.00 |
| | 2/22/2007 | 200 | $90.66 | $18,132.00 |
| | 2/22/2007 | 100 | $90.66 | $9,066.00 |
| | 2/22/2007 | 1,000 | $90.67 | $90,670.00 |
| | 2/22/2007 | 500 | $90.67 | $45,335.00 |
| | 2/22/2007 | 400 | $90.67 | $36,268.00 |
| | 2/22/2007 | 300 | $90.67 | $27,201.00 |
| | 2/22/2007 | 200 | $90.67 | $18,134.00 |
| | 2/22/2007 | 100 | $90.67 | $9,067.00 |
| | 2/22/2007 | 100 | $90.67 | $9,067.00 |
| | 2/22/2007 | 500 | $90.68 | $45,340.00 |
| | 2/22/2007 | 200 | $90.68 | $18,136.00 |
| | 2/22/2007 | 200 | $90.68 | $18,136.00 |
| | 2/22/2007 | 300 | $90.70 | $27,210.00 |
| | 2/22/2007 | 100 | $90.70 | $9,070.00 |
| | 2/22/2007 | 100 | $90.70 | $9,070.00 |
| | 2/22/2007 | 400 | $90.71 | $36,284.00 |
| | 2/22/2007 | 100 | $90.72 | $9,072.00 |
| | 2/22/2007 | 100 | $90.74 | $9,074.00 |
| | | 941,438 | | $77,532,993.23 |
| | | | | |
| MCDONOUGH | 11/11/2005 | 2,332 | $75.69 | $176,509.08 |
| | 3/23/2006 | 3,100 | $79.36 | $246,016.00 |
| | 3/23/2006 | 300 | $79.37 | $23,811.00 |
| | 3/23/2006 | 1,400 | $79.38 | $111,132.00 |
| | 3/23/2006 | 600 | $79.39 | $47,634.00 |
| | 3/23/2006 | 100 | $79.40 | $7,940.00 |
| | 3/23/2006 | 200 | $79.41 | $15,882.00 |
| | 3/23/2006 | 1,600 | $79.42 | $127,072.00 |

| | | | | |
|---|---|---|---|---|
| | 3/23/2006 | 600 | $79.43 | $47,658.00 |
| | 3/23/2006 | 1,000 | $79.44 | $79,440.00 |
| | 3/23/2006 | 800 | $79.45 | $63,560.00 |
| | 3/23/2006 | 100 | $79.51 | $7,951.00 |
| | 3/23/2006 | 200 | $79.58 | $15,916.00 |
| | 3/23/2006 | 1,100 | $79.62 | $87,582.00 |
| | 3/23/2006 | 100 | $79.61 | $7,961.00 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/16/2007 | 600 | $91.02 | $54,612.00 |
| | 2/16/2007 | 100 | $91.04 | $9,104.00 |
| | 2/16/2007 | 200 | $91.05 | $18,210.00 |
| | 2/16/2007 | 900 | $91.06 | $81,954.00 |
| | 2/16/2007 | 300 | $91.07 | $27,321.00 |
| | 2/16/2007 | 100 | $91.09 | $9,109.00 |
| | 2/16/2007 | 100 | $91.10 | $9,110.00 |
| | 2/16/2007 | 100 | $91.12 | $9,112.00 |
| | 2/16/2007 | 200 | $91.15 | $18,230.00 |
| | 2/16/2007 | 200 | $91.17 | $18,234.00 |
| | 2/16/2007 | 200 | $91.18 | $18,236.00 |
| | 2/16/2007 | 100 | $91.19 | $9,119.00 |
| | 2/16/2007 | 400 | $91.20 | $36,480.00 |
| | 2/16/2007 | 1,000 | $91.22 | $91,220.00 |
| | 2/16/2007 | 200 | $91.23 | $18,246.00 |
| | 2/16/2007 | 200 | $91.24 | $18,248.00 |
| | 2/16/2007 | 584 | $91.25 | $53,290.00 |
| | 2/16/2007 | 216 | $91.26 | $19,712.16 |
| | 2/16/2007 | 1,300 | $91.27 | $118,651.00 |
| | 2/16/2007 | 800 | $91.28 | $73,024.00 |
| | 2/16/2007 | 1,600 | $91.29 | $146,064.00 |
| | 2/16/2007 | 700 | $91.30 | $63,910.00 |
| | 2/16/2007 | 300 | $91.31 | $27,393.00 |
| | 2/16/2007 | 100 | $91.32 | $9,132.00 |
| | 2/16/2007 | 100 | $91.33 | $9,133.00 |
| | 2/16/2007 | 100 | $91.36 | $9,136.00 |
| | 2/16/2007 | 100 | $91.38 | $9,138.00 |
| | 2/16/2007 | 100 | $91.40 | $9,140.00 |
| | 2/16/2007 | 200 | $91.43 | $18,286.00 |
| | 2/16/2007 | 100 | $91.46 | $9,146.00 |
| | 2/16/2007 | 100 | $91.47 | $9,147.00 |
| | 2/16/2007 | 100 | $91.49 | $9,149.00 |
| | 2/16/2007 | 100 | $91.59 | $9,159.00 |
| | | 26,437 | | $2,239,603.89 |
| | | | | |
| **MCKINNON** | 1/27/2006 | 226 | $76.64 | $17,320.64 |
| | 1/27/2006 | 197 | $76.64 | $15,098.08 |
| | 1/27/2006 | 78 | $76.64 | $5,977.92 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 759 | $88.53 | $67,194.27 |
| | 2/2/2007 | 257 | $88.53 | $22,752.21 |
| | 2/2/2007 | 208 | $88.53 | $18,414.24 |

| | | | | |
|---|---|---|---|---|
| | 2/2/2007 | 174 | $88.53 | $15,404.22 |
| | 2/2/2007 | 163 | $88.53 | $14,430.39 |
| | 2/2/2007 | 67 | $88.53 | $5,931.51 |
| | 2/15/2007 | 100 | $91.00 | $9,100.00 |
| | 2/15/2007 | 1,054 | $91.01 | $95,924.54 |
| | 2/15/2007 | 810 | $91.02 | $73,726.20 |
| | 2/15/2007 | 3,386 | $91.03 | $308,227.58 |
| | 2/15/2007 | 1,505 | $91.04 | $137,015.20 |
| | 2/15/2007 | 538 | $91.05 | $48,984.90 |
| | 2/15/2007 | 519 | $91.06 | $47,260.14 |
| | 2/15/2007 | 219 | $91.07 | $19,944.33 |
| | 2/15/2007 | 19 | $91.08 | $1,730.52 |
| | 2/15/2007 | 100 | $91.10 | $9,110.00 |
| | 7/23/2007 | 1,579 | $80.34 | $126,856.86 |
| | | **12,895** | | **$1,143,356.36** |
| | | | | |
| **RENFIELD MILLER** | 3/15/2006 | 5,580 | $79.50 | $443,610.00 |
| | 7/28/2006 | 8,240 | $83.16 | $685,238.40 |
| | 2/2/2007 | 1,232 | $88.53 | $109,068.96 |
| | 2/2/2007 | 609 | $88.53 | $53,914.77 |
| | 5/1/2007 | 500 | $92.22 | $46,110.00 |
| | 5/1/2007 | 100 | $92.23 | $9,223.00 |
| | 5/1/2007 | 400 | $92.24 | $36,896.00 |
| | 5/1/2007 | 200 | $92.27 | $18,454.00 |
| | 5/1/2007 | 700 | $92.30 | $64,610.00 |
| | 5/1/2007 | 100 | $92.38 | $9,238.00 |
| | 5/1/2007 | 100 | $92.39 | $9,239.00 |
| | 5/1/2007 | 200 | $92.44 | $18,488.00 |
| | 5/1/2007 | 1,800 | $92.46 | $166,428.00 |
| | 5/1/2007 | 700 | $92.47 | $64,729.00 |
| | 5/1/2007 | 700 | $92.48 | $64,736.00 |
| | 5/1/2007 | 900 | $92.49 | $83,241.00 |
| | 5/1/2007 | 500 | $92.50 | $46,250.00 |
| | 5/1/2007 | 200 | $92.51 | $18,502.00 |
| | 5/4/2007 | 349 | $94.16 | $32,861.84 |
| | | **23,110** | | **$1,980,837.97** |
| | | | | |
| **SHOBACK** | 11/23/2005 | 545 | $77.40 | $42,183.00 |
| | 11/23/2005 | 5,606 | $77.54 | $434,689.24 |
| | 11/23/2005 | 5,606 | $77.54 | $434,689.24 |
| | 12/16/2005 | 2,000 | $77.58 | $155,160.00 |
| | 12/16/2005 | 1,300 | $77.60 | $100,880.00 |
| | 12/16/2005 | 488 | $77.64 | $37,888.32 |
| | 12/23/2005 | 419 | $78.41 | $32,853.79 |
| | 1/27/2006 | 71 | $76.64 | $5,441.44 |
| | 8/28/2006 | 5,800 | $85.82 | $497,756.00 |
| | 8/28/2006 | 275 | $85.92 | $23,628.00 |
| | 9/7/2006 | 172 | $84.59 | $14,549.48 |
| | 11/27/2006 | 796 | $83.57 | $66,521.72 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 469 | $88.53 | $41,520.57 |

| | | | | |
|---|---|---|---|---|
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/2/2007 | 315 | $88.53 | $27,886.95 |
| | 2/2/2007 | 190 | $88.53 | $16,820.70 |
| | 2/2/2007 | 173 | $88.53 | $15,315.69 |
| | 2/2/2007 | 48 | $88.53 | $4,249.44 |
| | 5/29/2007 | 450 | $91.86 | $41,337.00 |
| | 6/6/2007 | 1 | $88.15 | $88.15 |
| | 9/7/2007 | 229 | $60.08 | $13,758.32 |
| | | 26,358 | | $2,131,601.70 |
| | | | | |
| UHLEIN | 11/11/2005 | 9,482 | $75.50 | $715,891.00 |
| | 12/19/2005 | 6,497 | $77.76 | $505,206.72 |
| | 1/27/2006 | 1,765 | $76.64 | $135,269.60 |
| | 3/20/2006 | 3,800 | $81.90 | $311,220.00 |
| | 3/20/2006 | 200 | $81.92 | $16,384.00 |
| | 8/24/2006 | 3,100 | $85.50 | $265,050.00 |
| | 8/24/2006 | 300 | $85.51 | $25,653.00 |
| | 8/24/2006 | 900 | $85.52 | $76,968.00 |
| | 8/24/2006 | 100 | $85.53 | $8,553.00 |
| | 8/24/2006 | 400 | $85.54 | $34,216.00 |
| | 8/24/2006 | 1,400 | $85.55 | $119,770.00 |
| | 8/24/2006 | 900 | $85.58 | $77,022.00 |
| | 8/24/2006 | 200 | $85.59 | $17,118.00 |
| | 8/24/2006 | 400 | $85.60 | $34,240.00 |
| | 8/24/2006 | 300 | $85.61 | $25,683.00 |
| | 8/24/2006 | 400 | $85.62 | $34,248.00 |
| | 8/24/2006 | 289 | $85.65 | $24,752.85 |
| | 8/25/2006 | 100 | $85.33 | $8,533.00 |
| | 8/25/2006 | 100 | $85.34 | $8,534.00 |
| | 8/25/2006 | 100 | $85.35 | $8,535.00 |
| | 8/25/2006 | 2,100 | $85.36 | $179,256.00 |
| | 8/25/2006 | 500 | $85.38 | $42,690.00 |
| | 8/25/2006 | 200 | $85.40 | $17,080.00 |
| | 8/25/2006 | 100 | $85.43 | $8,543.00 |
| | 8/25/2006 | 1,700 | $85.44 | $145,248.00 |
| | 8/25/2006 | 1,900 | $85.47 | $162,393.00 |
| | 8/25/2006 | 100 | $85.48 | $8,548.00 |
| | 8/25/2006 | 200 | $85.49 | $17,098.00 |
| | 8/25/2006 | 3,400 | $85.50 | $290,700.00 |
| | 8/25/2006 | 300 | $85.51 | $25,653.00 |
| | 8/25/2006 | 200 | $85.52 | $17,104.00 |
| | 8/25/2006 | 100 | $85.53 | $8,553.00 |
| | 8/25/2006 | 200 | $85.54 | $17,108.00 |
| | 2/2/2007 | 4,037 | $88.53 | $357,395.61 |
| | 2/2/2007 | 1,885 | $88.53 | $166,879.05 |
| | 2/2/2007 | 828 | $88.53 | $73,302.84 |
| | 2/2/2007 | 441 | $88.53 | $39,041.73 |
| | 4/27/2007 | 1,000 | $93.05 | $93,050.00 |
| | 4/27/2007 | 800 | $93.06 | $74,448.00 |
| | 4/27/2007 | 700 | $93.07 | $65,149.00 |
| | 4/27/2007 | 400 | $93.08 | $37,232.00 |

| | | | | |
|---|---|---|---|---|
| | 4/27/2007 | 700 | $93.09 | $65,163.00 |
| | 4/27/2007 | 5,600 | $93.10 | $521,360.00 |
| | 4/27/2007 | 800 | $93.12 | $74,496.00 |
| | | **58,924** | | **$4,960,338.40** |
| | | | | |
| **WALLIS** | 11/22/2005 | 5,300 | $75.85 | $402,005.00 |
| | 11/22/2005 | 1,431 | $75.98 | $108,727.38 |
| | 2/2/2007 | 710 | $88.53 | $62,856.30 |
| | 2/2/2007 | 321 | $88.53 | $28,418.13 |
| | 4/27/2007 | 1,300 | $92.70 | $120,510.00 |
| | 4/27/2007 | 1,754 | $92.71 | $162,613.34 |
| | 4/27/2007 | 2,000 | $92.72 | $185,440.00 |
| | 4/27/2007 | 1,300 | $92.75 | $120,575.00 |
| | 4/27/2007 | 100 | $92.76 | $9,276.00 |
| | | **14,216** | | **$1,200,421.15** |
| | | | | |
| **TOTAL:** | | **1,591,407** | | **$131,959,672.12** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

119.    Plaintiffs bring this action derivatively in the right and for the benefit of Ambac to redress injuries suffered, and to be suffered, by Ambac as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by Individual Defendants. Ambac is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiffs will adequately and fairly represent the interests of Ambac in enforcing and prosecuting its rights.

121.    Plaintiffs are and were owners of the stock of Ambac during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

122.    The current Board of Ambac consists of the following six individuals: defendants Callen, Considine, Duff, Theobald, Unger and Wallace.

123.    Defendants Callen, Considine, Theobald, Unger and Wallace as members of the Board during the Relevant Period authorized the repurchases of nearly $579 million worth of the Company's shares at artificially inflated prices. Ambac repurchased these shares under two stock repurchase programs that the Board authorized during May 2005 and October 2006. Since October 2005, the Company has tacitly acknowledged that the subprime market was experiencing severe

declines. These statements include a October 19, 2005 press release noting that the Company's operating results were "pretty good considering the tight credit spreads and increased market competition;" a July 26, 2006 press release recognizing the "suboptimal business environment;" and a press release for fourth quarter 2006 financial results, stating that the Company's results were acceptable "[d]espite one of the most difficult business environments the industry has faced in many years." Thus, the Board's decisions to authorize the stock repurchases were not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider Ambac's exposure to the subprime mortgage credit market crises and continued to authorize the Company to repurchase shares as the mortgage market crumbled around them. Accordingly demand is futile with respect to defendants Callen, Considine, Theobald, Unger and Wallace.

124. The Director Defendants by their fiduciary duties of care, good faith and loyalty owe to Ambac a duty to ensure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

125. Further, the Director Defendants as directors of Ambac had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the improper statements referenced herein to be disseminated by Ambac to the investing public and the Company's shareholders during the Relevant Period.

126. Defendants Callen, Considine, Theobald, Unger and Wallace all served on the Audit and Risk Assessment Committee during the Relevant Period. The Audit and Risk Assessment Committee, by its charter, is to monitor the corporate control and risk environment of Ambac. In the Company's Form 10-K filed with the SEC on March 1, 2007, reporting fiscal year 2006 results, the Company disclosed that a Portfolio Risk Management Committee ("PRMC"), comprised of senior risk professionals and senior Ambac management, employs various procedures and controls to monitor and manage credit risk enterprise-wide. Further, the Company disclosed with relation to

CDOs that, if credit spreads of the underlying obligations change, the market value of the related CDO changes, creating possible mark-to-market gains or losses. The Company then stated that "changes in credit spreads are generally caused by changes in the market's perception of the credit quality of the underlying obligations." The Form 10-K further stated that "[t]he Audit and Risk Committee of the Board of Directors … meets regularly with financial and risk management … to review the work and procedures of each."

127.    Thus defendants Callen, Considine, Theobald, Unger and Wallace had a duty to know and accordingly did know that: (i) Ambac, because of large percentage of its business revenue being comprised of CDO insurance, faced significant exposure to the subprime mortgage and credit crises; and that (ii) the Company's Relevant Period statements did not adequately disclose this exposure. On information and belief, the Audit and Risk Assessment Committee reviewed and discussed Ambac's exposures to the subprime and credit crises, which has been ongoing since at least mid-2006, while performing its duty to review and discuss Ambac's major financial exposures and procedures to manage those exposures. Despite their knowledge of Ambac's exposure to the subprime mortgage and credit crises, these defendants consciously disregarded their fiduciary duties owed to Ambac by causing or allowing the improper statements referenced herein. Thus, Callen, Considine, Theobald, Unger and Wallace face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

128.    As a result of his access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, defendant Callen knew the adverse, non-public information regarding Ambac's true business prospects. While in possession of this material, adverse, non-public information regarding the Company, Callen sold 11,750 shares of Ambac stock for $942,857 in proceeds. Because Callen received a personal financial benefit from the challenged insider trading transactions, Callen is interested. Moreover, Callen faces a sufficiently substantial threat of liability for his breach of fiduciary duties for insider selling. Since Callen breached his fiduciary duties and is interested, any demand upon him is futile.

129.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

130.    The Director Defendants of Ambac, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Ambac's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

131.    The acts complained of constitute violations of fiduciary duties owed by Ambac's officers and directors and these acts are incapable of ratification.

132.    Each of the Director Defendants of Ambac authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

133.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the current Board has failed and refused to seek recovery for Ambac for any of the wrongdoing alleged by Plaintiffs herein.

134.    Plaintiffs have not made any demand on shareholders of Ambac to institute this action since such demand would be a futile and useless act for the following reasons:

(a)      Ambac is a publicly held company with over 100 million shares outstanding, and thousands of shareholders;

(b)      making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      making demand on all shareholders would force Plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Derivatively Against the Director Defendants and Defendants Leonard and Genader for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

135.    Plaintiffs incorporate by reference and reallege each and every allegation contained

above, as though fully set forth herein.

136.    During the Relevant Period, the Director Defendants and defendants Leonard and Genader disseminated or approved public statements that improperly portrayed Ambac's business prospects, growth and margins.  The Director Defendants and defendants Leonard and Genader knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

137.    The Insider Selling Defendants also sold nearly $132 million worth of shares of Ambac's common stock at inflated prices during the Relevant Period while in possession of material non-public information.  These defendants misappropriated Ambac's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold stock without disclosing the information alleged to have been concealed herein.

138.    At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Ambac's business prospects, especially concerning the Company's exposure to the subprime mortgage and credit market crises, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Leonard were causing Ambac to repurchase nearly $579 million worth of its own stock on the open market at an average inflated price of approximately $86.36 per share, which is approximately 47 times higher than its current share price of $1.84 per share.

139.    As such, the Director Defendants and defendants Leonard and Genader violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Ambac and others in connection with their purchases of Ambac common stock during the Relevant Period.

140.    As a result of the Director Defendants' and defendants Leonard's and Genader's

misconduct, Ambac has and will suffer damages in that it paid artificially inflated prices for common stock purchased on the open market. Ambac would not have purchased common stock at the prices it paid, had the market previously been aware that the market price of Ambac's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Ambac suffered damages in connection with its purchases of Ambac common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendants Leonard and Genader are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against All Individual Defendants for Breach of Fiduciary Duty

141.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

142.    The Individual Defendants owed and owe Ambac fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the highest obligation of good faith, fair dealing, loyalty and due care.

143.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

144.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and health. The Individual Defendants also had actual or constructive knowledge that they were improperly causing Ambac to repurchase over $578 million of its own stock at artificially inflated prices. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Ambac has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiffs, on behalf of Ambac, have no adequate remedy at law.

## COUNT III

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

147.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

148.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Ambac common stock on the basis of such information.

149.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Ambac common stock.

150.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Ambac common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

151.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV

**Against All Individual Defendants for Breach of Fiduciary Duty for Abuse of Control**

152.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

153.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ambac, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing Ambac to issue statements that improperly portrayed Ambac's business prospects.

154.    As a direct and proximate result of the Individual Defendants' abuse of control, Ambac has sustained significant damages.  These damages include, but are not limited to, Ambac's

severe loss of market credibility as reflected in its $9.1 billion market capitalization loss and $578 million paid to repurchase the Company's stock.

155.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156.    Plaintiffs, on behalf of Ambac, have no adequate remedy at law.

## COUNT V

### Against All Individual Defendants for Breach of Fiduciary Duty for Gross Mismanagement

157.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

158.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ambac in a manner consistent with the operations of a publicly held corporation.

159.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ambac has sustained significant damages in excess of hundreds of millions of dollars.

160.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

161.    Plaintiffs, on behalf of Ambac, have no adequate remedy at law.

## COUNT VI

### Against All Individual Defendants for Waste of Corporate Assets

162.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

163.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $578 million to repurchase the Company' stock and paying bonuses to certain of its executive officers.

- 85 -

164.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

165.    Plaintiffs, on behalf of Ambac, have no adequate remedy at law.

## COUNT VII

### Against All Individual Defendants for Unjust Enrichment

166.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

167.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Ambac.

168.    Plaintiffs, as shareholders and representatives of Ambac, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Director Defendants and defendant Leonard are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Ambac damages;

C.    Directing Ambac to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect   and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Ambac to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the accuracy of the qualifications of Ambac's directors, executives and other employees;

4.      a proposal to control insider selling;

5.      a proposal to ensure that Ambac prudently expends funds in stock repurchase programs;

6.      a proposal to better manage and disclose Ambac's credit risks; and

7.      appropriately test and then strengthen the internal audit and control functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that Plaintiffs on behalf of Ambac have an effective remedy;

E.      Awarding to Ambac restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  June 30, 2008                  LAW OFFICES OF THOMAS G. AMON
                                       THOMAS G. AMON

                                       _____
                                       THOMAS G. AMON

                                       250 West 57th Street, Suite 1316
                                       New York, New York 10107
                                       Telephone: (212) 810-2430
                                       Facsimile:  (212) 810-2427

                                       Liaison Counsel for Plaintiffs

ROBBINS UMEDA & FINK, LLP
JEFFREY P. FINK
FELIPE A. ARROYO
MARK A. GOLOVACH
JULIA M. WILLIAMS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

JOHNSON BOTTINI, LP
FRANK J. JOHNSON
BRETT M. WEAVER
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 233-5535

Co-Lead Counsel for Plaintiffs

351005_5.DOC

## **VERIFICATION**

I, Earl Jordan Yaokasin , hereby verify that I am a shareholder of Ambac
Financial Group, Inc. (the "Company"), and am ready, willing, and able to pursue
this action in the hope of improving the Company and recovering damages for the
Company caused by the defendants' conduct. I have reviewed the allegations
made in this VERIFIED CONSOLIDATED AMENDED SHAREHOLDER
DERIVATIVE COMPLAINT and to those allegations of which I have personal
knowledge I believe those allegations to be true. As to those allegations of which I
do not have personal knowledge, I rely upon my counsel and their investigation
and believe them to be true. Having received a copy of this Complaint, having
reviewed it with my counsel, I hereby authorize its filing.

Date: 6/28/08

Earl Jordan Yaokasin

- 1 -

## VERIFICATION

I, Marilyn Clark, have read the Ambac Financial Group, Inc. Verified Consolidated Amended Shareholder Derivative Complaint and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: *6 – 30 – 08*

MARILYN CLARK

### DECLARATION OF SERVICE BY OVERNIGHT DELIVERY

I, the undersigned, certify and declare as follows:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 610 West Ash Street, Suite 1800, San Diego, California 92101.

2.      On June 30, 2008, I deposited in a box or other facility regularly maintained by UPS, an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, the following document:

> VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

in an envelope designated by the said express service carrier for guaranteed next day delivery, with delivery fees paid or provided for, addressed to the parties listed on the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this June 30, 2008, at San Diego, California.

_____
SEAN PUTTICK

*In re Ambac Financial Group, Inc. Derivative Litigation,* Case No. 08-cv-854

COUNSEL FOR PLAINTIFFS

Jeffrey Paul Fink
Felipe J. Arroyo
Mark A. Golovach
Julia M. Williams
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

Thomas G. Amon
LAW OFFICES OF THOMAS G. AMON
250 West, 57th St.
Suite 1316
New York, NY 10107

Brian Philip Murray
MURRAY, FRANK & SAILER, LLP
275 Madison Avenue, Ste. 801
New York, NY 10016

Francis A. Bottini
JOHNSON BOTTINI LLP
655 W. Broadway, Suite 1400
San Diego, CA 92101

COUNSEL FOR DEFENDANTS

Peter C Hein
Warren R. Stern
Joshua Arditi Naftalis
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019