# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC. DERIVATIVE LITIGATION | ) ) ) ) |
| | Lead Case No. 08-CV-854 (SHS) |
| | (Derivative Action) (ECF Case) |
| This Document Relates To: | ) ) ) |
| ALL ACTIONS. | ) ) |

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Peter C. Hein (PH-5279)
Warren R. Stern (WS-2957)
Joshua A. Naftalis (JN-8054)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Attorneys for Defendants*

Dated: August 8, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF THE CASE.......................................................................................2

        A.    The parties. ......................................................................................2

        B.    As the Complaint acknowledges and public records chronicle,
             Ambac is one of many financial services firms that have
             suffered from the credit and mortgage market downturn. ...................................4

ARGUMENT ................................................................................................................7

POINT I    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO
             MAKE A PRE-SUIT DEMAND ...................................................................7

        A.    Delaware law imposes a stringent standard, and Fed. R. Civ. P.
             23.1 establishes a heightened pleading requirement, for
             excusing pre-suit demand. ...................................................................7

        B.    To demonstrate that demand would have been futile, plaintiffs
             must plead particularized facts showing bad faith conduct by a
             majority of Ambac's directors.............................................................9

        C.    Plaintiffs' allegations do not meet the stringent standard
             required to excuse demand. ...............................................................11

              1.    Plaintiffs' allegation that directors "negligently, recklessly
                      and/or intentionally caused or allowed, by their actions or
                      inactions," Ambac to issue allegedly misleading
                      statements does not excuse demand. .......................................12

              2.    Plaintiffs' allegation that the directors' "decisions to
                      authorize the stock repurchases were not the product of
                      valid business judgment" does not excuse demand..............................16

              3.    Plaintiffs' allegation that one of Ambac's six directors,
                      Michael Callen, faces a substantial likelihood of liability
                      for insider trading does not excuse demand. ...........................18

              4.    Plaintiffs' other conclusory allegations do not excuse
                      demand. ...................................................................................18

**Page**

POINT II    ALL OF THE COUNTS MUST BE DISMISSED BECAUSE EACH
LACKS FACTUAL SPECIFICITY AND/OR DOES NOT STATE A
CLAIM ................................................................................................................19

POINT III    PLAINTIFFS' CLAIMS AGAINST THE DIRECTORS ARE
BARRED BY AMBAC'S CHARTER AND THUS DO NOT STATE
A CAUSE OF ACTION ........................................................................................24

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

**Case**                                                                                                          **Page**

*Allison* v. *GM Corp.*,
    604 F. Supp. 1106 (D. Del. 1995) ................................................................................................. 9

*Aronson* v. *Lewis*,
    473 A.2d 805 (Del. 1984) ................................................................................................. 7, 8, 9

*Ash* v. *McCall*,
    2000 WL 1370341 (Del. Ch. 2000) .................................................................................... 16

*Bell Atlantic Corp* v. *Twombly*,
    127 S.Ct. 1955 (2007) ........................................................................................................ 25

*Blasband* v. *Rales*,
    971 F.2d 1034 (3d Cir. 1992) ....................................................................................... 19 n.8

*Cortec Industries, Inc.* v. *Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ............................................................................................. 3 n.1

*Daily Income Fund, Inc.* v. *Fox*,
    464 U.S. 523 (1984) ............................................................................................................. 7

*Desimone* v. *Barrows*,
    924 A.2d 908 (Del. Ch. 2007) ............................................................................................. 9

*Dura Pharms., Inc.* v. *Bruodo*,
    544 U.S. 336 (2005) ........................................................................................................... 21

*Elfenbein* v. *Gulf & W. Indus., Inc.*,
    590 F.2d 445 (2d Cir. 1978) .............................................................................................. 18

*Estate of Carpenter* v. *Dinneen*,
    2008 Del. Ch. LEXIS 40 (Del. Ch. 2008) ........................................................................ 24

*Falkenberg* v. *Baldwin*,
    1977 U.S. Dist. LEXIS 15456 (S.D.N.Y. 1977) ......................................................... 19, 20

*Ferre* v. *McGrath*,
    2007 WL 1180650 (S.D.N.Y. 2007) ........................................................................... 15, 16

*Fink* v. *Komansky*,
    2004 WL 2813166 (S.D.N.Y. Dec. 8, 2004) .................................................................... 14

*Ganino* v. *Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) .......................................................................................... 5 n.4

**Page**

*Grimes* v. *Donald*,
    673 A.2d 1207 (Del. 1996) ........................................................................... 18

*Guttman* v. *Huang*,
    823 A.2d 492 (Del. Ch. 2003)............................................. 8, 11, 12, 14, 15, 16, 22, 23

*Halpert Enters., Inc.* v. *Harrison*,
    362 F. Supp. 2d 426 (S.D.N.Y. 2005)......................................... 8, 11, 12, 15, 16

*Indiana Elec. Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*,
    2008 WL 2894793 (5th Cir. July 29, 2008)...................................................... 20

*In re Baxter Int'l, Inc. S'holders Litig.*,
    654 A.2d 1268 (Del. Ch. 1995).............................................................. 10 n.5, 11

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..................................................................... 22, 23

*In re Caremark Int'l Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996)......................................................... 9, 12, 14, 24

*In re Forest Labs., Inc. Deriv. Litig.*,
    450 F. Supp. 2d 379 (S.D.N.Y. 2006)........................................................ 19 n.8

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)............................................................. 16

*In re Lukens Inc. S'holders Litig.*,
    757 A.2d 720 (Del. Ch. 1999)....................................................................... 25

*In re Morgan Stanley Derivative Litig.*,
    2008 WL 820718 (S.D.N.Y. Mar. 27, 2008) ................................................. 10

*In re Mut. Funds Inv. Litig.*,
    384 F. Supp. 2d 873 (E.D. Md. 2005)....................................................... 13 n.7

*In re Oracle Corp. Deriv. Litig.*,
    867 A.2d 904 (Del. Ch. 2004)................................................................... 21, 22

*In re Pfizer Inc. Deriv. Sec. Litig.*,
    503 F. Supp. 2d 680 (S.D.N.Y. 2007)............................................................ 15

*In re Walt Disney Co. Deriv. Litig.*,
    906 A.2d 27 (Del. 2006) ............................................................................... 24

*In re Wheelabrator Techs. Inc. S'holders Litig.*,
    1992 WL 212595 (Del. Ch. 1992) ................................................................. 25

**Page**

*Jacobs* v. *Yang*,
    2004 WL 1728521 (Del. Ch. 2004) .......................................................................... 18

*Kamen* v. *Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) .................................................................................................... 7

*Kamen* v. *Kemper Fin. Servs., Inc.*,
    939 F.2d 458 (7th Cir. 1991) .................................................................................... 19

*Kaplan* v. *Bennett*,
    465 F. Supp. 555 (S.D.N.Y. 1979) .......................................................................... 20

*Litt* v. *Wycoff*,
    2003 Del. Ch. LEXIS 23 (Del. Ch. 2003) ............................................................... 16

*Malin* v. *XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ............................................................... 23 n.10

*Rales* v. *Blasband*,
    634 A.2d 927 (Del. 1993) ...................................................................................... 8, 9

*Rattner* v. *Bidzos*,
    2003 WL 22284323 (Del. Ch. 2003) ................................................... 15, 16, 18, 23

*Rombach* v. *Chang*,
    355 F.3d 164 (2nd Cir. 2004)............................................................................. 22, 23

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000)............................................................................ 3 n.1, 5 n.4

*St. Clair Shores Gen. Employees Ret. Sys.* v. *Eibeler*,
    2006 WL 2849783 (S.D.N.Y. 2006) ................................................................... 19 n.8

*Stone ex rel. AmSouth Bancorp.* v. *Ritter*,
    911 A.2d 362 (Del. 2006) ................................................. 9, 10 n.6, 12, 14, 16

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)............................................................................................. 20

*Wood* v. *Baum*,
    2008 WL 2600981 (Del. July 1, 2008) ...................................... 7, 8, 9, 10, 11, 15, 16, 17

## Statutes and Rules

8 *Del. C.* § 102(b)(7)................................................................................ 10, 10 n.6, 24, 25

8 *Del. C.* § 174 .................................................................................................... 10 n.6

**Page**

Fed. R. Civ. P. 9(b) ................................................................................................... 19, 22, 23

Fed. R. Civ. P. 23.1 ............................................................................................................ 7

Fed. R. Evid. 201(b) ...................................................................................................... 5 n.4

15 U.S.C. § 78u-4(b) .................................................................................................... 20, 21

## PRELIMINARY STATEMENT

Ambac Financial Group, Inc. ("Ambac") is a bond insurer.  In the wake of the credit and mortgage market downturn, it announced write-downs and losses on its guarantees of financial instruments backed by mortgages or other collateral.  Purported shareholders of Ambac have filed this consolidated derivative action alleging misconduct by Ambac's directors and management.

 This is *not* a case where a company or its personnel have been convicted of a crime or subjected to an administrative or regulatory sanction, or even where a company has been forced to restate its financial statements due to past errors.  Rather, Ambac's losses result from widespread problems affecting the credit and mortgage markets — not misfeasance or nonfeasance by Ambac's Board or management.  These problems have swept across the financial industry, resulting in substantial losses for Ambac's principal competitor, MBIA, as well as other bond insurers (including FGIC, Security Capital Assurance and CIFG — all of whom have had their credit ratings downgraded below investment grade), and many other financial institutions (including Bear Stearns, AIG, Citigroup, Merrill Lynch, UBS, Wachovia and even government-sponsored enterprises Fannie Mae and Freddie Mac).  Given the unfolding market-wide problem, the fact that Ambac suffered losses on some transactions and updated its disclosures as warranted by credit and mortgage market developments does not in any way suggest that anyone at Ambac misrepresented the company's financial condition, traded on inside information, or acted in bad faith.

But even if it were assumed that an allegation of misconduct by someone could be found in plaintiffs' Complaint, there are still no particularized factual allegations showing that the *Ambac Board* — entrusted by law and the Ambac shareholders with the governance of the corporation — is disabled from carrying out its responsibilities.  Plaintiffs seek to by-pass the Board by commencing this action without the legally-required prior demand upon the Board and instead plead that demand would be futile — in essence, because the directors would be called upon to sue themselves.  This is a tactic that this Court and the courts of Delaware, Ambac's corporate domicile, have rejected time and again, even in cases in which the companies at issue, unlike Ambac, had engaged in criminal conduct or restated their financial statements due to errors.  It is well es-

tablished that demand is not futile even when directors are named as defendants unless the plaintiff can plead particularized facts showing that a majority of the directors themselves face a *substantial likelihood of liability*.

Here, the Complaint tries to create the appearance of particularity by quoting extensively from some public materials — mainly Ambac financial reports and public statements, as well as some articles discussing the credit and mortgage market downturns and their impact on Ambac and other companies. But despite its length, the Complaint fails to particularize any facts showing that directors face a substantial likelihood of liability — nor could it, considering that five (out of six) members of Ambac's Board are independent directors; that no Ambac director had a conflict of interest with the Company; and that each director is protected from liability by an exculpation clause in Ambac's Charter that limits directorial liability to bad-faith, disloyal, or criminal conduct of a type not remotely alleged here. The one short section of the Complaint (pp. 78-81; ¶¶ 119-134) that purports to explain why demand is futile is wholly conclusory and does not approach the type of particularized allegations required to excuse demand.

The deficiencies described above are fatal to the Complaint, and, under controlling law, require that the Complaint be dismissed in its entirety on either or both of two alternative grounds: (1) plaintiffs failed to make a pre-suit demand upon the Ambac Board and fail to allege with particularity why such a demand would be futile, and (2) the counts are not pled with the requisite particularity and/or do not state a claim. In the further alternative, the claims against the directors should in any event be dismissed because Ambac's Charter exculpates its directors from liability to the corporation or its stockholders for matters of the kind alleged in the Complaint.

## STATEMENT OF THE CASE

### A.    The parties.

Ambac, a Delaware corporation, sells financial guarantee insurance in three markets: the U.S. public finance market (*e.g.*, municipal bonds), the international market, and the U.S. structured finance/asset-backed market (*e.g.*, securities backed by residential mortgages ("RMBS") and

collateralized debt obligations ("CDOs")).  Ex. 3; Complt. ¶ 5.[1]

The individual defendants are 19 current or former officers or directors of Ambac, and include all six members of Ambac's Board when this suit was filed.  Complt. ¶¶ 29-48.  The directors are distinguished business leaders and former senior government officials:

- *Michael Callen* became Ambac's Chairman and Interim CEO in January 2008 following the retirement of Robert Genader, the prior Chairman and CEO.  Previously, Callen served as an outside director on Ambac's board.  He is the president of Avalon Argus Associates, LLC, a financial consulting company.  He previously served as a director of Citicorp/Citibank.

- *Jill Considine* was the Chairman and CEO of The Depository Trust & Clearing Corporation.  She has also served as the New York State Superintendent of Banks.

- *Laura Unger* has served as the Acting Chairman of the Securities and Exchange Commission.  She also serves as a director of CA, Inc.

- *Henry D.G. Wallace* is the former CFO of Ford Motor Company and President and CEO of Mazda Motor Corp.  He also serves as a director of Diebold, Inc.

- *Thomas Theobald* is a senior advisor to William Blair Capital Partners and has served as Vice Chairman of Citicorp/Citibank.  He is a Trustee of Northwestern University and a director of the MacArthur Foundation.

- *Phillip Duff*  is the Chairman and CEO of Duff Capital Advisors and was formerly the CFO of Morgan Stanley.  (*Id.* ¶¶ 29, 39-43; Ex. 10 at 60-61.)

Five directors are indisputably independent.  Michael Callen is the lone Ambac executive on the Board and even he has served as an executive (Interim CEO) only since January 2008.  *See id.* ¶ 29.[2]  For most of what plaintiffs claim is the relevant period, Callen was an independent, outside director.  While the Complaint asserts that a number of Ambac *executives* sold Ambac shares while in possession of material nonpublic information, Callen is *the only director* alleged to have so traded or otherwise profited from any alleged misconduct.  *Id.* ¶ 29.

---

[1]     On a motion to dismiss, this Court can consider documents attached to or referenced in the complaint, public disclosure documents filed with the SEC, and any other documents that the plaintiffs "possessed or knew about and upon which they relied in bringing the suit."  *Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (permitting, *inter alia*, consideration of public disclosure documents filed with the SEC); *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  Pertinent excerpts are exhibits to the accompanying Declaration of Joshua A. Naftalis dated August 8, 2008 (cited herein as "Ex. __").

[2]     On July 3, 2008, Ambac announced that Paul DeRosa, a principal of Mt. Lucas Management Corporation, a hedge fund management corporation, had joined Ambac's board.  Ex. 11.

**B.    As the Complaint acknowledges and public records chronicle, Ambac is one of many financial services firms that have suffered from the credit and mortgage market downturn.**

The Complaint alleges that, in recent years, Ambac — "lured by incredibly high profits" and "higher growth rates" — guaranteed structured finance instruments such as RMBS and CDOs, a fact Ambac has long disclosed.[3]  *Id.* ¶¶ 5, 63.  The Complaint quotes numerous Ambac press releases and SEC filings that describe how, beginning in the third quarter of 2007, Ambac announced net losses, including mark-to-market losses and loss reserves taken due to the severe problems that have unfolded in the credit and mortgage-backed securities markets.  *See id.* ¶¶ 63-111 and pp. 19-56.  However, nowhere in this litany of public materials do plaintiffs allege facts that demonstrate that any defendant, let alone Ambac's independent directors, acted in bad faith.

Indeed, the allegations are inconsistent with any inference of concealment.  They show that Ambac, suffering from the downturns in the credit and mortgage markets, considered the downturn's effects on its business, updated its disclosures, and (like so many other financial companies) suffered a decline in its stock price.  *E.g.*, *id.* ¶¶ 84, 86, 90, 95, 97, 103.

As the Complaint itself acknowledges, Ambac's adversities arose from this market-wide downturn in the mortgage securities market.  *Id.* ¶ 6.  As these problems unfolded, Ambac's competitors and other financial service companies reported similar losses and experienced similar drops in stock price.  *E.g.*, *id.* ¶ 87 (quoting Bloomberg report stating that "[t]he sharp drop in the stock price at MBIA and Ambac raises questions about whether the turmoil in the markets is hurting franchise value"); *id.* ¶ 90 (referencing analyst report stating that Morgan Stanley was increas-

---

[3]    *See, e.g.*, Ambac's 2006 Form 10-K, Ex. 4 at 40 ("We have observed that with respect to four bond types in particular, it is reasonably possible that a material change in actual loss severities could occur over time.  These four bond types [include] . . . collateralized debt obligations ("CDOs") and mortgage-backed and home equity securitizations."); Ambac's 2005 Form 10-K, Ex. 5 at 36 ("Structured Finance covers U.S. structured finance transactions, including mortgage-backed securities and . . . collateralized debt obligations . . ."); Ambac's 2004 Form 10-K, Ex. 6 (same); Ambac's Form 2003 Form 10-K, Ex. 7 (same); Ambac's 2002 Form 10-K, Ex. 8 at 5 ("Currently, the largest component of Ambac's Structured Finance business relates to the securitization of mortgages and home equity loans.  Another target area in Structured Finance is the credit enhancement of pooled debt obligations known as collateralized debt obligations ("CDOs") including cash flow CDOs and structured credit derivatives.").

ing CDO loss expectations for both Ambac and MBIA due to "an updated tally of various market opinions about cumulative sub prime losses"); *id*. ¶ 89 (ratings agency's announcement that it would be reviewing the capital of all financial guarantors); *id*. ¶ 73 ("[D]ue to the deterioration in the subprime market the U.S. Corporate bond downgrades hit their highest quarterly level in two years — downgrades totaled $92.1 billion in third quarter of 2007."). Thus:[4]

- **MBIA**, Ambac's primary competitor, has reported billions of dollars of write-downs on its mortgage-related guarantees, including guarantees of "CDO squareds," from 3Q 2007 through the present. Exs. 12, 13, 14. From May 2007 to August 6, 2008 (when this brief was being finalized), its stock price declined from $71.80 to $8.79. Ex. 15. Its credit ratings have been downgraded — Moody's has downgraded MBIA below Ambac's credit rating. Ex. 16.

- **FGIC**, a privately owned bond insurer, has announced billions of dollars of write-downs and losses on its mortgage-related guarantees, including guarantees of CDOs, from 3Q 2007 through the present. Exs. 22, 23, 24. Its credit ratings have all been downgraded to below investment grade. Ex. 25.

- **Security Capital Assurance**, a parent of other bond insurers, has reported over a billion dollars in write-downs and loss reserves on its mortgage-related guarantees from 3Q 2007 through the present. Exs. 17, 18, 19. From May 2007 to August 6, 2008, its stock price declined from $34.58 to $2.90. Ex. 20. Moody's has downgraded the credit ratings of its guarantee-providing subsidiaries to below investment grade. Ex. 21.

- **CIFG**, a privately owned bond insurer, has had its rating downgraded to below investment grade. Ex. 26.

Indeed Eric Dinallo, Superintendent of the New York State Insurance Department, recently noted that Ambac and other bond insurers are "experiencing problems because of the subprime crisis" and related rumor-mongering — underscoring that Ambac's problems are the result of a general market downturn affecting many companies. Ex. 64.

Beyond bond insurers, the turmoil in the credit and mortgage markets has also resulted in widespread write-downs and losses across the financial industry. By way of illustration:

---

[4]    As stated in footnote 1, on a motion to dismiss, this Court can consider public disclosure documents filed with the SEC. *Rothman*, 220 F.3d at 88. The court may also take "judicial notice of well-publicized stock prices" on a motion to dismiss. *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000). Other documents cited such as notices of rating agency downgrades are similarly appropriate for judicial notice as they are not subject to reasonable dispute. Fed. R. Evid. 201(b).

- **Bear Stearns**, starting in 3Q 2007, announced large declines in net earnings, losses, and write-downs due to mortgage-related investments. Exs. 27, 28. Bear's stock traded above $150 in June 2007, but plummeted to as low as $2.84. Ex. 30. Bear agreed on March 24, 2008 to be acquired by J.P. Morgan Chase for $10 per share. Ex. 29.

- **Radian**, a credit enhancement company, reported over a billion dollars in net losses during 3Q and 4Q 2007, driven primarily by write-downs, credit losses, higher reserves, and mark-to-market adjustments on mortgage-related guarantees. Ex. 31, 32. From May 2007 to August 6, 2008 (when this brief was being finalized), its stock price declined from $63.95 to $2.79. Ex. 33.

- **PMI Group** reported over a billion dollars in net losses from 3Q 2007 through the present, primarily due to losses and write-downs on mortgage-related operations and its investment in financial guarantor FGIC. Exs. 34, 35, 36. From May 2007 to August 6, 2008, its stock price declined from $50.50 to $3.50. Ex. 37.

- **Citigroup** has announced nearly $20 billion worth of write-downs and losses on mortgage-related assets from 3Q 2007 to the present. Exs. 38, 39, 40. From May 2007 to August 6, 2008, its stock price declined from $55.55 to $19.70. Ex. 41.

- **AIG** has reported over $10 billion in write-downs and losses on mortgage-related instruments from 3Q 2007 to the present. Exs. 42, 43, 44. From May 2007 to August 6, 2008, its stock price declined from $72.97 to $29.09. Ex. 45.

- **Merrill Lynch** has announced over $20 billion in write-downs and losses on CDOs of ABS and sub-prime mortgages from 3Q 2007 to the present. Exs. 46, 47, 48, 49. From May 2007 to August 6, 2008, its stock price declined from $95.00 to $28.50. Ex. 50.

- **UBS** has announced over $20 billion in write-downs and losses on mortgage-related financial instruments from 3Q 2007 to the present. Exs. 51, 52, 53. From May 2007 to August 6, 2008, its NYSE-traded stock declined from $65.75 to $20.61. Ex. 54.

- **Wachovia** has reported over $4 billion in write-downs and losses on CDOs and mortgage structured products from 3Q 2007 to the present. Exs. 55, 56, 57, 58. From May 2007 to August 6, 2008, its stock price declined from $56.90 to $18.41. Ex. 59.

- **Fannie Mae** and **Freddie Mac**, both government-sponsored enterprises engaged in mortgage lending and the guarantee of mortgages, reported large losses in late 2007 and early 2008. Exs. 60, 61. From May 2007 to August 6, 2008, Fannie Mae's stock declined from $66.12 to $11.60. Ex. 62. Freddie Mac's declined from $68.12 to $6.49. Aff. Ex 63.

In short, viewed narrowly as a story about Ambac, the Complaint would fail on its own merits to show any misconduct or establish futility of demand. But, in any event, in the context of the overall market, any inference that Ambac's adversities, however severe, must have been caused by managerial misconduct — much less that any director faces a substantial threat of liability — is wholly unreasonable. If this Complaint were to survive, it would be difficult to imagine how any company affected by the current market turmoil could avoid derivative litigation. The result would be to strip countless numbers of shareholders of the benefits and protections sought to

be achieved by the demand requirement.

## ARGUMENT

**POINT I:    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO MAKE A PRE-SUIT DEMAND**

Plaintiffs' "Derivative and Demand Futility Allegations" (pp. 78-81, ¶¶ 119-134) are wholly conclusory.  Plaintiffs argue that directors are unable to consider a demand because they supposedly face a "substantial likelihood" of liability on plaintiffs' claims.  *Id.* ¶¶ 127-128.  However, to establish that Ambac's directors face a substantial likelihood of liability in this case, plaintiffs must allege particularized facts demonstrating that Ambac's directors acted in bad faith.  Plaintiffs' conclusory allegations fail to make this showing and thus demand is not excused.

### A.    Delaware law imposes a stringent standard, and Fed. R. Civ. P. 23.1 establishes a heightened pleading requirement, for excusing pre-suit demand.

"The decision to initiate litigation[] should be made by the board of directors."  *Daily Income Fund, Inc.* v. *Fox*, 464 U.S. 523, 530 (1984).  This follows from the "cardinal precept . . . that directors, rather than shareholders, manage the business and affairs of the corporation."  *Aronson* v. *Lewis*, 473 A.2d 805, 811 (Del. 1984).  The law of the state of incorporation, here Delaware (Complt. ¶ 28), specifies the circumstances under which a demand must be made or may be excused.  *Kamen* v. *Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991).

As the Delaware Supreme Court recently reiterated in *Wood* v. *Baum*, a shareholder seeking to have a company pursue a claim must either (1) make a pre-suit demand or (2) plead with particularity facts showing that a demand upon the board would have been futile on the grounds that "the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation."  2008 WL 2600981, at *2 (Del. July 1, 2008); *see also Kamen*, 500 U.S. at 95-96 ("To prevent abuse of [the derivative action]," demand is required "unless excused by extraordinary conditions.").  Shareholders — like plaintiffs here — who file suit on behalf of a company without making a demand upon the board, have the heavy burden under Fed. R. Civ. P. 23.1 and

Delaware law to plead particularized facts that would show that a demand would have been futile. *See Halpert Enters., Inc.* v. *Harrison*, 362 F. Supp. 2d 426, 429 (S.D.N.Y. 2005). Rule 23.1 requires that a derivative complaint "*state with particularity*: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and . . . (B) *the reasons for not obtaining the action or not making the effort*." Fed. R. Civ. P. 23.1 "[C]onclusory allegations are not considered as expressly pleaded facts or factual inferences." *Wood*, 2008 WL 2600981 at *2 (Del. July 1, 2008).

As the Delaware Supreme Court noted in *Wood*, the classic Delaware standards governing demand futility were set out in *Aronson* for claims addressing an actual decision of the board and in *Rales* v. *Blasband*, 634 A.2d 927 (Del. 1993), for claims involving allegations of wrongful inaction or where no specific decision by the board is being challenged. *Wood*, 2008 WL 2600981, at *2. For claims arising out of specific board action, *Aronson* held that to establish demand futility, the plaintiff must allege particularized facts that create a reasonable doubt that "(1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. For claims alleging improper board inaction, *Rales* held that to establish demand futility, a plaintiff must allege particularized facts that create a reasonable doubt that "as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.

Where (as here) there are no particularized factual allegations challenging the independence of the five outside directors, in order to determine whether the demand requirement is excused, both the *Aronson* and *Rales* tests require the court to "consider whether the complaint sets forth particularized facts that plead a non-exculpated claim of breach of fiduciary duty against a majority of the board." *Guttman* v. *Huang*, 823 A.2d 492, 501-02 (Del. Ch. 2003); *Wood*, 2008 WL 2600981, at *3 (Del. July 1, 2008). Derivative plaintiffs cannot demonstrate that demand is futile simply by alleging that the directors face a "mere threat of personal liability" on such claims. *Wood*, 2008 WL 2600981, at *2 n.11 (Del. July 1, 2008); *Aronson*, 473 A.2d at 815; *Rales*, 634

A.2d at 936.  Rather, plaintiffs must plead particularized facts establishing that directors face a "substantial likelihood of . . . liability" on plaintiffs' claims.  *Id.*; *Stone ex rel. AmSouth Bancorp.* v. *Ritter*, 911 A.2d 362, 367 (Del. 2006).

**B.    To demonstrate that demand would have been futile, plaintiffs must plead particularized facts showing bad faith conduct by a majority of Ambac's directors.**

As explained in more detail below, in this case — both because plaintiffs' claims are premised on allegations of failure of oversight and because of the exculpation clause in Ambac's Charter — directors can only be found liable on plaintiffs' claims if shown to have breached their duties in bad faith.  *See Wood*, 2008 WL 2600981 at *3 (Del. July 1, 2008).  Thus, to establish the "substantial likelihood of liability" necessary to excuse demand, plaintiffs here must plead particularized facts showing that Ambac's independent directors acted in bad faith.  *Id.*

Plaintiffs' claims are principally failure-of-oversight claims:  that Ambac's directors "failed to properly discuss or consider Ambac's exposure to the subprime mortgage credit market crisis," "permitted the wrongs alleged herein" and "permitted the false statements disseminated directly to the public."  Complt. ¶¶ 123, 130, 132.  A failure of oversight claim is "possibly the most difficult [claim] in corporation law upon which a plaintiff might hope to win a judgment."  *In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  To survive a motion to dismiss for want of demand, such a claim requires a *particularized factual pleading* showing that the directors "knew that they were not discharging their fiduciary obligations," and were acting in "bad faith."  *Stone*, 911 A.2d at 370; *accord Desimone* v. *Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007); *Allison* v. *GM Corp.*, 604 F.Supp. 1106, 1114 (D. Del. 1995).

Plaintiffs do not allege facts describing any affirmative board decision-making.  Instead, plaintiffs make sweeping, conclusory allegations that the directors failed to properly oversee Ambac's affairs, such as allegations that directors "negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the [allegedly] improper statements" to be made.  Complt. ¶ 125.  Plaintiffs' allegations that Ambac's directors authorized the repurchase of Ambac stock at an allegedly inflated price are also in substance failure-of-oversight allegations because

they are not premised on any factual allegations of active board decision-making, but again on al-legations that Ambac's independent directors failed to "properly discuss or consider Ambac's ex-posure to the subprime mortgage credit market crises." *Id.* ¶¶ 123, 125, 127, 132. Thus, despite plaintiffs' references to directors' "approval" or "intentions" or "knowledge," plaintiffs' claims are most properly considered, and analyzed, under the stringent failure-of-oversight standard. *See, e.g.*, *In re Morgan Stanley Deriv. Litig.*, 2008 WL 820718, at *4 (S.D.N.Y. Mar. 27, 2008) (over-sight standard applies where "isolated and conclusory references to the board's 'conceal[ment]' of, or failure to 'disclose,' . . . are insufficiently particularized to allege a specific board decision to omit the information" from public disclosures).

In any event, as the Delaware Supreme Court held recently, even if some of plaintiffs' claims could be characterized as active board decision making (as distinct from failure of over-sight), because Ambac's Charter exculpates its directors from any liability unless the directors acted in bad faith, the directors will only face a substantial likelihood of liability (as required to excuse demand) if plaintiffs plead bad faith conduct by the directors with factual particularity. *See Wood*, 2008 WL 2600981 at *3 (Del. July 1, 2008). Ambac's Charter contains a broad exculpa-tion clause: "[T]o the fullest extent permitted by the General Corporation Law . . . no director of [Ambac] shall be personally liable to [Ambac] or its stockholders for monetary damages for any breach of fiduciary duty as a director." Ex. 1,[5] *see infra* Point III. The only relevant exception found in 8 *Del. C.* § 102(b)(7) to directors' exculpation from liability is for claims of bad faith conduct by directors.[6] In light of the Charter's exculpation provision, the bad faith standard typi-cally applicable to failure-of-oversight claims "matches the liability landscape for [Ambac's] cor-

---

[5]     Courts may consider exculpation provisions on a motion to dismiss. *See Baxter*, 654 A.2d at 1270.

[6]     Under § 102(b)(7), directors cannot be exculpated from liability for breaches of the duty of loyalty, actions or omissions in bad faith, intentional misconduct, knowing violation of the law, for any transaction from which the director received an improper personal benefit, or for claims under 8 *Del. C.* § 174. There are no particularized facts showing the directors received any personal benefit from any transaction and none of plaintiffs' claims arise under § 174. All of the other exceptions are predicated on a showing of bad faith. *See, e.g.*, *Stone*, 911 A.2d at 370 ("The requirement to act in good faith is a subsidiary element . . . of the fundamental duty of loyalty.").

porate directors, who are insulated from monetary damage awards by exculpatory charter provi-

sions." *Guttman*, 823 A.2d at 506; *accord In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268,

1270 (Del. Ch. 1995). Thus, whether plaintiffs' claims are viewed as challenges to board action or

inaction, demand futility cannot be found absent particularized allegations showing that Ambac's

directors acted in bad faith. *Wood*, 2008 WL 2600981 at *3.

**C.    Plaintiffs' allegations do not meet the stringent standard required to excuse demand.**

Plaintiffs have not met their heavy burden of making particularized allegations that a ma-

jority of Ambac's directors acted in bad faith and thus face a substantial likelihood of liability so

as to prevent the directors from considering a demand. This Court's decision in *Halpert Enters.,*

*Inc.* v. *Harrison*, 362 F. Supp. 2d 426, 432 (S.D.N.Y. 2005), is instructive. In *Halpert*, plaintiff

alleged that J.P. Morgan Chase's directors and management were liable for losses resulting from

JPM Chase's transactions with Enron on the grounds that JPM Chase allegedly failed to disclose

material liabilities in SEC filings, that they failed to supervise and monitor JPM Chase's opera-

tions, that they grossly mismanaged the bank, and that they wasted the bank's assets. This Court

dismissed the action for want of demand finding that "plaintiff [had] failed to allege with the re-

quired particularity that it would have been futile for plaintiff to have made a demand on the

Board." *Id.* at 428. Like plaintiffs here, the plaintiff in *Halpert* alleged that demand was futile

because the directors faced liability for "causing false SEC filings" to be made and for "violating

their duties of good faith, loyalty and due care" by knowingly not halting the alleged mismanage-

ment and knowingly allowing J.P. Morgan to make false statements. *Id.* at 429. Plaintiff argued

that directors' knowledge of the Enron transactions could be "reasonably inferred" from the

"widespread nature of the unlawful activity" as well as because some of the directors sat on J.P.

Morgan's "Audit Committee." *Id.*

This Court found such "conclusory allegations" to be insufficient to excuse demand. *Id.* at

432. This Court noted that, while plaintiff may have alleged "a scheme with which some employ-

ees at JPM Chase were familiar," plaintiff never, "except with conclusory allegations, convey[ed]

that the scheme occurred with the Board's knowledge or systemic failure to engage in proper oversight." *Id.* This Court held that, lacking any particularized allegations of director knowledge, plaintiff "plainly" had not met its burden of alleging facts that gave "rise to 'a substantial likelihood of director liability.'" *Id.* at 433. As shown below, in this case, plaintiffs' demand futility allegations likewise lack particularity and do not establish a substantial likelihood of liability sufficient to excuse demand.

Importantly, unlike in *Halpert* where Enron's "infamous" criminal activity had been widely recognized (*see id.* at 428), plaintiffs in this case have not pleaded with particularity *any* wrongdoing on the part of anyone — there are no particularized facts showing any "scheme with which some employees" were clearly complicit. Thus, dismissal in this case follows *a fortiori* from cases like *Halpert* — and *Caremark*, *Stone*, and *Guttman* — where (unlike in this case) parties involved had broken the law or admitted that previous financial statements were incorrect and yet the courts still enforced the demand requirement and dismissed the complaint.

1.   **Plaintiffs' allegation that directors "negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions," Ambac to issue allegedly misleading statements does not excuse demand.**

Plaintiffs allege that "the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the improper statements referenced herein to be disseminated by Ambac" and that demand is excused because directors face a "substantial likelihood of liability" for breach of their fiduciary duties with respect to the public disclosures. Complt. ¶¶ 124, 125, 127. Plaintiffs further allege that five of Ambac's six directors are either currently, or were during the relevant period, members of the Audit and Risk Assessment Committee and therefore "had a duty to know and accordingly did know" that Ambac's statements were allegedly improper and nonetheless "caus[ed] or allow[ed] the improper statements." *Id.* ¶¶ 126-127.

In the first place, the Complaint fails to allege facts showing that Ambac failed to meet any disclosure duty. Plaintiffs' disclosure claims are based only upon hindsight — Ambac's disclosure of losses incurred in the second half of 2007 and early 2008 does not imply that Ambac had a

duty to disclose these losses sooner than it did, and does not imply that Ambac misrepresented the risks of its business.[7]  To hold that the Ambac Board is somehow culpable for failing to predict the ultimate future impacts of the credit and mortgage market downturns prior to the overall market reacting to the unfolding problems in the second half of 2007 would suggest the absurd:  that the directors of virtually every financial institution would face personal liability in the wake of the recent market downturns.

In fact, Ambac, like numerous other institutions, disclosed new information relating to losses and impairments on its mortgage-related obligations as more information came to light regarding the ever-worsening market conditions.  Indeed, the Complaint even recites that as the credit and mortgage market downturns unfolded, Ambac's management "has subjected the mortgage and ABS CDO books to more frequent and more detailed reviews in the current environment."  *Id.* ¶ 90, Ex. 9.  Thus, as noted above, unlike many cases where there was evidence of wrongdoing by company personnel and yet demand on the company's independent directors was still held to be required, here plaintiffs make no particularized showing of wrongdoing at all.

But even if Ambac had failed to meet a disclosure duty, plaintiffs have failed to allege any fact showing that Ambac's *directors* acted in bad faith.  Plaintiffs must make a *particularized factual pleading* showing that the *directors* "knew that they were not discharging their fiduciary obli-

---

[7]     Plaintiffs' listing of several media reports (Complt. ¶¶ 64-69) and statements by Ambac (*id.* ¶¶ 113, 123), which purportedly show that aspects of the credit and mortgage market downturns began as early as mid-2006, is not to the contrary.  First, none of the reports shows that any Ambac executive, let alone its directors, believed that the problems that were reported would have a material impact on Ambac's financial condition beyond the impacts that it from time to time disclosed.  Further, plaintiffs do not identify any information available to the independent directors in the alleged media reports suggesting any reason for the directors to have questioned Ambac's internal controls, the reports Ambac's Board and Audit Committee were receiving from management and its outside auditing firm, or the accuracy of Ambac's public statements.  *See In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873, 879-80 (D. Md. 2005) (finding under Delaware law that "copious [media] coverage" of late trading and market timing activities does not excuse demand [for trustees of] three of defendant's funds absent allegations that the trustees of the[] funds "knew that widespread late trading and market timing activities were occurring within the [defendant's] funds themselves").  Finally, as discussed *infra* at page 17, the statements plaintiffs cite as evidence of Ambac's "tacit acknowledgment of the beginning of the subprime market meltdown" in fact show nothing of the sort.

gations" and were acting in "bad faith." *Stone*, 911 A.2d at 370. Only allegations that show with factual particularity that there was "a sustained or systematic failure of the board to exercise oversight — such as an utter failure to attempt to assure a reasonable information and reporting system exists" — can even potentially demonstrate the requisite bad faith. *Caremark*, 698 A.2d at 971. Plaintiffs, however, merely conclusorily allege that Ambac's directors "negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the improper statements referenced herein to be disseminated." Complt. ¶ 125; *see also id*. ¶ 132 ("authorized and/or permitted the false statements"); *Fink* v. *Komansky*, 2004 WL 2813166, at *4 (S.D.N.Y. Dec. 8, 2004) (demand not excused "[w]here plaintiff has 'not pled with particularity that the directors ignored obvious danger signs of employee wrongdoing' but instead base[d] his claim 'on a presumption that employee wrongdoing would not occur if directors performed their duty properly'").

Plaintiffs' complaint "is empty of the kind of fact pleading that is critical to" demonstrate bad faith — for example, particularized factual allegations such as "contentions that the company lacked an audit committee," that it "had an audit committee that met only sporadically and devoted patently inadequate time to its work," or that the "audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation." *Guttman*, 823 A.2d at 507. Indeed, plaintiffs' allegations even contradict their theory. Plaintiffs allege that Ambac *does* have an Audit and Risk Assessment Committee; that all of its members are outside directors; and that the Committee's charter requires it to meet at least quarterly to review the Company's internal controls, the Company's annual and quarterly financial statements, and other matters. Complt. ¶ 54; *see* Charter of the Audit and Risk Assessment Committee of the Board of Directors, Ex. 2. Plaintiffs do not allege that Ambac's Audit Committee failed to meet as required by the Committee's charter. In fact, Ambac's 2008 proxy statement discloses that the Audit Committee met eight times in 2007. Ex. 10 at 15.

Plaintiffs argue that the fact that five directors serve or served on the Audit and Risk Committee is a reason why demand against those directors is futile. Complt. ¶¶ 126-127. Plaintiffs allege that "[o]n information and belief, the Audit and Risk Assessment Committee reviewed

14

and discussed Ambac's exposures to the subprime and credit crises, which has [sic] been ongoing since at least mid-2006," both within the Committee and with "financial and risk management." *Id.* They also allege directors "had a duty to know and accordingly did know" that a "large percentage" of Ambac's "business revenue" was "comprised of CDO insurance" and that Ambac's statements "did not adequately disclose this exposure." *Id.* ¶ 127. These allegations, however, do not state with particularity when these matters were discussed, are hopelessly vague as to what was discussed, and fail completely to identify why these alleged discussions should have indicated to Ambac's directors that Ambac — which did make detailed disclosures as events occurred — was making improper disclosures. *See, e.g.*, *Ferre* v. *McGrath*, 2007 WL 1180650, at *6 (S.D.N.Y. 2007). Plaintiffs' bare assertion that "membership on the Audit Committee is a sufficient basis to infer the requisite scienter . . . is contrary to well-settled Delaware law." *Wood*, 2008 WL 2600981, at *4; *Rattner* v. *Bidzos*, 2003 WL 22284323, at *12-13 (Del. Ch. 2003); *Halpert*, 362 F.Supp.2d at 429; *In re Pfizer Inc. Deriv. Sec. Litig.*, 503 F. Supp. 2d 680, 686 (S.D.N.Y. 2007); *Ferre*, 2007 WL 1180650, at *6.

On the contrary, courts have reasoned that the existence of an Audit and Risk Committee militates *against* any possible finding of bad faith. The Court in *Guttman* indicated that indicia of oversight, such as an Audit Committee that meets regularly, are the sort of controls that *preclude* a finding of the kind of "sustained or systematic" failure that is necessary to even potentially demonstrate bad faith. *Guttman*, 823 A.2d at 506-07. Plaintiffs further undermine any claim of "failure of oversight" by citing Ambac's statements from November 2007, that in light of the troubled environment, "[m]anagment has subjected the mortgage and ABS CDO books to more frequent and more detailed reviews . . . ." Complt. ¶ 90.

*Guttman* is but one of a long line of cases that have rejected demand-futility claims based on claims of improper disclosures. *See Wood*, 2008 WL 2600981, at *1 ("This case is but another replay of other similar cases where the plaintiff failed to allege with particularity any facts from which it could be inferred that particular directors knew or should have been on notice of [the facts underlying the alleged misstatements], and any facts suggesting that the board knowingly allowed

or participated in a violation of law."); *Rattner*, 2003 WL 22284323, at *12-13; *Ash* v. *McCall*, 2000 WL 1370341, at *14-*16 (Del. Ch. 2000); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 605-06 (S.D.N.Y. 2007).

> **2.    Plaintiffs' allegation that the directors' "decisions to authorize the stock repurchases were not the product of valid business judgment" does not excuse demand.**

Plaintiffs allege that the Board authorized share repurchases in May 2005 and October 2006 without "properly discuss[ing] and consider[ing] Ambac's exposure to the subprime mortgage credit market crises," despite Ambac's contemporaneous financial reports having allegedly "tacitly acknowledged that the subprime market was experiencing severe declines."  Complt. ¶ 123.

Yet mere allegations that a "business decision caused significant loss" or otherwise proved unsuccessful cannot "deny the directors the presumption of the business judgment rule." *Litt* v. *Wycoff*, 2003 Del. Ch. LEXIS 23, at *39-*40 (Del. Ch. 2003).  Under the business judgment rule, directors enjoy a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *Halpert*, 362 F. Supp. 2d at 431.  Plaintiffs can overcome this presumption by showing that "directors face a 'substantial likelihood' of personal liability" for their conduct. *Guttman*, 823 A.2d at 501.  Here, plaintiffs allege three counts against the directors premised on the repurchases: violation of Rule 10b-5 (Complt. ¶ 138), breach of fiduciary duty (*id.* ¶¶ 144, 154), and waste (*id.* ¶ 163).

As explained above, to establish that Ambac's directors face a substantial likelihood of liability on any of these counts, plaintiffs must plead with particularity facts establishing that the directors acted in bad faith. *Stone*, 911 A.2d at 370.  However, plaintiffs' only allegation as to the directors' state of mind is that "*on information and belief*" "the Board members failed to properly discuss and consider the Company's exposure to the subprime mortgage lending and credit crisis." Complt. ¶ 112; *see also id.* ¶ 123.  Such a conclusory allegation does not suffice. *See Ferre*, 2007 WL 1180650, at *9 (holding that Rule 23.1 requires "particularized factual allegations (not just

conclusory assertions) about the defendant directors' actual knowledge."); *Wood*, 2008 WL 2600981, at *3 ("Delaware law on this point is clear: board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer . . . bad faith.").

Further, even the putative "facts" that plaintiffs conclusorily allege the directors "failed to properly discuss and consider" are contradicted by the documents that plaintiffs cite. Plaintiffs misinterpret three documents: an October 19, 2005 Ambac press release (noting that results were "pretty good considering the tight credit spreads and increased market competition"); a July 26, 2006 press release (recognizing the "suboptimal business environment"); and a press release announcing 4Q 2006 financial results (stating that the Company's results were acceptable "[d]espite one of the most difficult business environments the industry has faced in many years"). Complt. ¶ 123; *see also id.* ¶ 113; Ex. 65, 66, 67 (full copies of the documents quoted). Contrary to plaintiffs' characterization of these statements as "a tacit acknowledgement of the beginning of the subprime market meltdown," *id.*, they do not address "the subprime market meltdown" at all.

Rather, the statements reference a business environment in which investors were willing to accept lower returns on RMBS-related instruments ("tight credit spreads") precisely because the market did not predict the coming mortgage and credit market downturn. This market environment resulted in a decrease in the level of premiums Ambac could charge for guarantees. *Id.*, Ex. 65, 66, 67. The statements further describe how Ambac's competitors ("increased market competition") were offering lower rates than Ambac was willing to offer for the assumption of risk. *Id.*, Ex. 65 ("[P]ricing has been impacted by increased competition from other financial guarantors"; "Competition from the market in the form of senior/subordination execution remains strong in many sectors"). The pre-mid-2007 business environment these statements describe differs sharply from that of the mortgage and credit market downturns, which since mid-2007 have resulted in wide credit spreads as investors became unwilling to purchase certain instruments even at high rates of return and in which multiple bond insurers have had their credit ratings downgraded — potentially decreasing the number of bond insurers competing for available business.

### 3. Plaintiffs' allegation that one of Ambac's six directors, Michael Callen, faces a substantial likelihood of liability for insider trading does not excuse demand.

Plaintiffs also allege that demand upon Michael Callen is futile because he "faces a sufficiently substantial threat of liability for . . . insider selling." Complt. ¶ 128. Yet demand is only futile if plaintiffs present particularized allegations "that create a reasonable doubt that *a majority* of the Board is disinterested . . . ." *Rattner*, 2003 Del. Ch. LEXIS 103, at *11 (emphasis added). Plaintiffs allege no insider selling by any of the five independent directors. Moreover, even the insider trading allegations against Callen fail to state a claim, *see infra* Point II. Thus, this allegation categorically fails to establish demand futility.

### 4. Plaintiffs' other conclusory allegations do not excuse demand.

Plaintiffs vaguely allege that demand is excused because the directors "directly benefited from the wrongdoing" or are the "principal beneficiaries of the wrongdoing." Complt. ¶ 129, 132. These allegations are so vague as to be meaningless. If plaintiffs are simply asserting that directors "benefited" from continued employment and fees, that is clearly insufficient: "[a]llegations as to one's position as a director and the receipt of director's fees, without more . . . are not enough for purposes of pleading demand futility." *Jacobs* v. *Yang*, 2004 WL 1728521, at *4 (Del. Ch. 2004).

Plaintiffs also conclusorily allege that demand is futile because directors' and officers' actions "constitute violations of fiduciary duties . . . and these acts are incapable of ratification" (Complt. ¶ 131); because the directors "participated in, approved and/or permitted the wrongs alleged" and "authorized and/or permitted the false statements" (*id*. ¶¶ 130, 132); and because the directors, "despite . . . having knowledge of the claims . . . raised by Plaintiffs, . . . [have] failed and refused to seek recovery for Ambac for any of the wrongdoing alleged" (*id*. ¶ 133). Such allegations have repeatedly and categorically been rejected. *See, e.g.*, *Elfenbein* v. *Gulf & W. Indus., Inc.*, 590 F.2d 445, 451 (2d Cir. 1978) (allegations that "[t]he wrongs alleged . . . are a violation of law and cannot be ratified" do not excuse demand); *Grimes* v. *Donald*, 673 A.2d 1207, 1216 n.8 (Del. 1996) (rejecting allegations that director "participated in" the alleged wrongdoing as a basis

for excusing demand); *Kamen* v. *Kemper Fin. Servs., Inc.*, 939 F.2d 458, 462 (7th Cir. 1991) ("[N]o state treats the directors' failure to capitulate in the lawsuit as forfeiting the firm's entitlement to demand.").[8]

## POINT II:    ALL THE COUNTS MUST BE DISMISSED BECAUSE EACH LACKS FACTUAL SPECIFICITY AND/OR DOES NOT STATE A CLAIM

Plaintiffs allege that the Director Defendants and Sean Leonard, Ambac's CFO, are liable for violating §10(b) of the Exchange Act, that Insider Selling Defendants (Michael Callen as well as certain former Ambac directors and current and former Ambac executives) are liable for insider trading under Delaware law, and that all defendants are liable for various breaches of fiduciary duty.  Yet none of these counts sufficiently states a claim.  Thus, even assuming arguendo that this Court finds that demand is excused, the claims still must be dismissed.

**Count I:  Violations of § 10(b) of the Exchange Act and Rule 10b-5:**  Plaintiffs allege that the "Director Defendants" and Sean Leonard knowingly approved misleading statements, then authorized Ambac to repurchase its own stock at prices directors knew were inflated due to alleged misleading statements, and as a result Ambac suffered damages when it purchased its stock at those prices.  Complt. ¶¶ 135-140.  These conclusory allegations do not meet the heightened pleading standards under the PSLRA, 15 U.S.C. § 78u-4(b), and Fed. R. Civ. P. 9(b).

1. *No reliance* — Because plaintiffs allege that all Ambac's directors knew of the alleged misstatements, Complt. ¶ 136, the 10b-5 claim must be dismissed as the directors' "knowledge" is imputed to Ambac and thus Ambac could not have relied on the alleged misstatements in repurchasing its stock.  *See Falkenberg* v. *Baldwin*, 1977 U.S. Dist. LEXIS 15456 (S.D.N.Y. 1977).  In

---

[8]    *See also St. Clair Shores Gen. Employees Ret. Sys.* v. *Eibeler*, 2006 WL 2849783, at *5-6 (S.D.N.Y. 2006) (noting that "even if [fiduciary duties have] been violated, this board might reasonably determine that it is not in the best interests of the corporation to pursue derivative litigation"); *In re Forest Labs., Inc. Deriv. Litig.*, 450 F. Supp. 2d 379, 388 n.10 (S.D.N.Y. 2006) ("Delaware courts have roundly rejected the proposition that reasonable doubt as to [ability to consider a demand] is established simply by positing that the directors would have to sue themselves."); *Blasband* v. *Rales*, 971 F.2d 1034, 1052 (3d Cir. 1992) ("[A] board's failure to take action, even if it is aware of wrongdoing, does not demonstrate demand futility").

*Falkenberg*, the court dismissed a similar derivative Rule 10b-5 claim. There, as here, plaintiffs brought a derivative action alleging that the failure of the corporation's directors to reveal certain liabilities caused the stock to be "artificially inflated." The corporation was alleged to have been injured when it subsequently purchased shares of its own stock. In dismissing the complaint, the court held that there was "no allegation of fraud cognizable under the federal securities law." *Id*. at *4. When "all the corporation's directors and officers are alleged to have had knowledge of the facts concerning the corporation's potential liability . . . , [that] knowledge of all of these individuals is imputed to the corporation." *Id*. Thus, because the corporation "was wholly aware of all of the facts which plaintiff alleges and was not deceived at all . . . , the essential link between the defendants' actions and the injury to the corporate entity is lacking." *Id*. at *9; *accord Kaplan* v. *Bennett*, 465 F.Supp. 555, 566 (S.D.N.Y. 1979). For the same reason here, plaintiffs' 10b-5 claim must be dismissed.

  2. *No scienter* — Under the PSLRA, a 10b-5 claim must be dismissed unless it "state[s] with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), namely scienter — a mental state embracing "intent to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2507 (2007). Plaintiffs allege this 10b-5 claim against Sean Leonard and the Director Defendants, but do not plead scienter with any particularity. Nowhere do plaintiffs plead any specific facts that show that any particular defendant possessed any particular nonpublic information at the time of the repurchases, let alone facts showing that these defendants had an "intent to deceive, manipulate or defraud." Of the Director Defendants, Considine, Duff, Wallace, Theobald, and Unger are not alleged to have received any financial benefit from the alleged § 10(b) violation. Complt. ¶¶ 39-43. Nor is Leonard. *Id.* ¶ 38. Further, while the Complaint does make conclusory allegations of insider trading against Lassiter, Genader, and Callen, "[m]erely alleging facts that [at best] lead to a strained and tenuous inference of motive" cannot meet the PSLRA's stringent pleading requirements. *See, e.g.*, *Indiana Elec. Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*, 2008 WL 2894793, at *12 (5th Cir. July 29, 2008). Thus, plaintiffs have failed to

give rise to a "strong inference" of scienter.

3. *No material misrepresentation or omission* — The Complaint nowhere specifies with factual particularity, as required by the PSLRA, "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs essentially claim that Ambac's losses and stock price drop establish that statements made in better times must have been inaccurate and misleading when made. These hindsight allegations, particularly in light of the widespread mortgage and credit market downturns that since have caused losses similar to Ambac's for many companies, do not meet the PSLRA's demanding standard.

4. *No loss causation* — Plaintiffs are required to plead more than just the purchase of stock at "artificially inflated prices" to demonstrate loss causation. *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 342 (2005). Plaintiffs must allege "a causal connection between the material misrepresentation and the loss." *Id.* at 342. This is because a decline in stock price may reflect a number of factors other than the alleged misrepresentations, such as "changed economic circumstances . . . ." *Id.* at 343. Here, plaintiffs simply list the various public statements made by Ambac from 2005 to 2008 combined with the statement that "[i]n the wake of these devastating disclosures and events, Ambac's value declined from $96.08 to $6.20 per share." Complt. ¶ 98. These allegations are perfect examples of why the Supreme Court held as it did in *Dura*. Even plaintiffs allege that it was "[Ambac's] disclosures *and* events" that caused the loss. *Id.* (emphasis added). Widespread problems are affecting the mortgage and credit markets and have resulted in a significant market downturn. Nowhere have plaintiffs alleged any facts demonstrating that Ambac's updated disclosures caused the decline in Ambac's stock price, as opposed to the "subprime mortgage credit market crises" (*id.* ¶ 123) — the type of "changed economic circumstances" that the Supreme Court specifically referenced in *Dura*. 544 U.S. at 343.

**Count III: Insider Selling and Misappropriation of Information:** Plaintiffs allege that defendants knew about the likely effects of the market downturns on Ambac "and sold Ambac common stock [at an inflated price] on the basis of such information." Complt. ¶¶ 148, 150. It is unclear whether Delaware even recognizes derivative insider trading claims. *See In re Oracle*

*Corp.*, 867 A.2d 904, 927-29 (Del. Ch. 2004), *aff'd* 872 A.2d 960 (Del. 2005). But, to the extent Delaware may recognize such a claim, at a minimum, plaintiff must show that (1) "the corporate fiduciary possessed material, nonpublic company information," and (2) "the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information" — *i.e.*, that the fiduciary traded stock with *scienter*. *Id.* at 934; *see also Guttman*, 823 A.2d at 505 ("Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof [of] scienter.").

As this claim sounds in fraud, it must be pled with particularity under Rule 9(b). *See Rombach* v. *Chang*, 355 F.3d 164, 171 (2nd Cir. 2004). However, plaintiffs simply list each stock sale over two-and-a-half-years. Complt. ¶ 118. The Complaint impermissibly fails to identify any facts known to the sellers but not public at the time of sale, fails to differentiate between the knowledge of the sellers, and fails to state when any seller obtained allegedly material, non-public information. *See Guttman*, 823 A.2d at 503 (rejecting a non-particularized insider trading claim).

The Complaint also lacks any details from which one could infer that sales were suspicious. Nothing in the timing or size of the sales here, for example, indicates anything other than directors and officers who own or are "compensated in terms of stock" selling it as should be expected "in the normal course of events." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997). Callen, for example, the only current director alleged to have sold stock, is alleged to have sold approximately $300,000 worth of stock on one day per year in each of 2005, 2006 and 2007. Complt. ¶ 118 at p. 60. Each time, as the Complaint shows, his sales took place within approximately two weeks after a quarterly earnings announcement.[9] *See Guttman*, 823 A.2d at 498 (noting that "directors and other insiders [often] sell in periods after the company release[s] a certified financial statement" so that "the company [can] best ensure that company insiders [are] not

---

[9]    Ambac released its 3Q 2005 earnings on October 19, 2005 (Complt. ¶ 75); Callen's alleged sale occurred on October 21, 2005 (*id.* ¶ 118). Ambac released its 1Q 2006 earnings on April 26, 2006 (*id.* ¶ 77); Callen's alleged sale occurred on May 11, 2006 (*id.* ¶ 118). Ambac released its 1Q 2007 earnings on April 25, 2007 (*id.* ¶ 81); Callen's alleged sale occurred on April 27, 2007 (*id.* ¶ 118).

advantaged in selling to outsiders"). This pattern is entirely consistent with an officer or director who receives part of his compensation in stock selling it "in the normal course of events." *Burlington*, 239 F.3d at 825. This conclusion is bolstered by the fact that Callen's 2006 and 2007 sales occurred simultaneously with his exercise of stock options that expired the following week.[10] *Guttman*, 823 A.2d at 504 (stating that "the complaint fail[ed] to address whether the directors traded because options were expiring"). A complaint like the one here that wholly fails to "assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices," must be dismissed. *Rattner*, 2003 WL 22284323, at *12.

**Counts II and IV-VII: Breaches of Fiduciary Duty:** Plaintiffs allege that defendants breached their fiduciary duty by causing the "Company to improperly misrepresent the Company's business prospects and health" and causing Ambac to repurchase its "own stock at artificially inflated prices." Complt. ¶ 144. Plaintiffs also allege that "[d]efendants' misconduct . . . constituted an abuse of their ability to control and influence Ambac," which resulted in Ambac's issuing false statements. *Id.* ¶ 153. Both of these claims are premised on fraud. And Rule 9(b) requires that any fraud claim be pled with particularity. *Rombach,* 355 F.3d at 171. Even if labeled breach of fiduciary duty claims, counts "premised on allegations of fraud" (as the counts here are) must be supported with particularized factual allegations. *Id.* Yet, as described above, plaintiffs do not identify with any particularity why the identified statements were in fact false or misleading when made or how defendants should have known that the statements were (allegedly) false or misleading.

Plaintiffs also allege that defendants engaged in gross and reckless management "through aiding and abetting, abandon[ing] and abdicat[ing]" their responsibilities "with regard to prudently managing the assets and business of Ambac in a manner consistent with the operations of a publicly held corporation." Complt. ¶ 158. This claim should be dismissed because a claim for gross

---

[10]    *See* Ex. 68, 69. This Court may consider Form 4s reporting directors' stock sales on a motion to dismiss. *See*, *e.g.*, *Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 133 (D. Conn. 2007).

mismanagement is in substance subsumed into claims for breach of fiduciary duty. To the extent Delaware even recognizes gross mismanagement as an independent claim, this count must still be dismissed because it is premised on defendants' failure of oversight and thus for this reason alone requires a showing that defendants acted with subjective bad faith. *Caremark*, 698 A.2d at 971. As shown above, the Complaint lacks any factual allegations indicating defendants acted in bad faith.

Further, plaintiffs assert that defendants caused Ambac to waste assets by mismanaging Company affairs and "paying $578 million to repurchase the Company's stock and paying bonuses to certain of its executive officers." Complt. ¶ 163. Delaware law sets an extremely high bar for waste: "a claim of waste will arise only in the rare, 'unconscionable case where directors irration-ally squander or give away corporate assets.'" *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006). Ambac's directors' and officers' decisions are protected if they can be "attributed to any rational business purpose." *Id.* at 74. Plaintiffs simply allege that defendants caused or al-lowed Ambac to make what (in retrospect) may have been disappointing business decisions. Such allegations do not come close to showing this is a "rare, unconscionable case." *Id.*

Finally, plaintiffs claim that defendants were "unjustly enriched at the expense of and to the detriment of Ambac." Complt. ¶ 167. Other than the conclusory allegations against the In-sider Selling Defendants discussed above, plaintiffs fail to allege what benefit was conferred on the defendants and why it would be unjust to permit defendants to retain it (whatever it may be). *Cf. Estate of Carpenter* v. *Dinneen*, 2008 Del. Ch. LEXIS 40*, at *82 (Del. Ch. 2008).

## POINT III:    PLAINTIFFS' CLAIMS AGAINST THE DIRECTORS ARE BARRED BY AMBAC'S CHARTER AND THUS DO NOT STATE A CAUSE OF ACTION

Even if the Court were to find that demand futility has been pled with the particularity re-quired by Rule 23.1 and that plaintiffs' claims survive Rule 12(b)(6), the claims against the direc-tors still must be dismissed because the directors are shielded from personal liability under Am-bac's Amended and Restated Certificate of Incorporation. Ex. 1.

Section 102(b)(7) permits a corporation to adopt provisions "eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for

breach of fiduciary duty as a director," except for claims that directors breached their duty of loy-

alty and "for acts or omissions not in good faith or which involve intentional misconduct or a

knowing violation of law."  As § 102(b)(7) permits, Section 6.2 of Ambac's Charter states:

> NO LIABILITY.  To the fullest extent permitted by the General
> Corporation Law as it now exists and as it may hereafter be
> amended, no director of the Corporation shall be personally liable to
> the Corporation or its stockholders for monetary damages for any
> breach of fiduciary duty as a director.  (Ex. 1)

Plaintiffs have not pled any of the exceptions in § 102(b)(7) — *e.g.*, breach of the duty of

loyalty, bad-faith action, or knowing violation of law — with any factual specificity.  *See Bell At-*

*lantic Corp.* v. *Twombly*, 127 S. Ct. 1955, 1965 (2007) ("Factual allegations must be enough to

raise a right to relief above the speculative level.").  The Complaint consists solely of conclusory

allegations that fail to identify any facts that indicate that the directors did anything improper, let

alone demonstrate that they are guilty of intentional misconduct, an act of bad faith or a knowing

violation of the law as required to state a claim against Ambac's directors.  Thus, the Complaint

must be dismissed.  *See In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 733 (Del. Ch. 1999); *In*

*re Wheelabrator Techs. Inc. S'holders Litig.*, 1992 WL 212595, at *12 (Del. Ch. 1992).

## CONCLUSION

This Court should dismiss plaintiffs' Derivative Complaint in its entirety.

/s/  Peter C. Hein
Peter C. Hein (PH-5279)
Warren R. Stern (WS-2957)
Joshua A. Naftalis (JN-8054)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants*

Dated:  August 8, 2008