**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC. DERIVATIVE LITIGATION | Lead Case No. 08-CV-854 (SHS) (Derivative Action) (ECF Case) |
| This Document Relates To: | |
| ALL ACTIONS. | |

**DECLARATION OF JOSHUA A. NAFTALIS IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED
SHAREHOLDER DERIVATIVE COMPLAINT**

1.      I am an attorney admitted to practice before this Court and an associate of the law firm of Wachtell, Lipton, Rosen & Katz, counsel to Defendants in these actions. I respectfully submit this declaration to transmit to the Court certain documents that are referenced in Defendants' Motion to Dismiss the Consolidated Shareholder Derivative Complaint.

2.      For the Court's convenience, the documents are generally presented in chronological order. For certain documents, which are designated "excerpts" in the chart below, we have excerpted only the portions pertinent to the points made in our brief. The excerpted documents are SEC filings fully available from public sources such as the SEC's EDGAR website: http://www.sec.gov/edgar.shtml. Also, in specific documents, which are designated with a " * " in the chart below, pertinent text has been highlighted for the Court's convenience with a black line in the margin.

3.      Annexed hereto are true and correct copies of the following, or (when so indicated) excerpts thereof:

| Exhibit | Description |
|---------|-------------|
| 1 | Ambac's Amended and Restated Certificate of Incorporation, Exhibit 3.01 to Ambac Form 10-K, dated February 29, 2008 (incorporating by reference Exhibit 4.05 to Ambac Form 10-Q for the Second Quarter 1997, dated August 14, 1997) * |
| 2 | Ambac's Charter of the Audit and Risk Committee, dated July 19, 2005 |
| 3 | Ambac Form 10-K for the year 2007, dated February 29, 2008 (excerpts) * |
| 4 | Ambac Form 10-K for the year 2006, dated March 1, 2007 (excerpts) * |
| 5 | Ambac Form 10-K for the year 2005, dated March 13, 2006 (excerpts) * |
| 6 | Ambac Form 10-K for the year 2004, dated March 15, 2005 (excerpts) * |
| 7 | Ambac Form 10-K for the year 2003, dated March 15, 2004 (excerpts) * |
| 8 | Ambac Form 10-K for the year 2002, dated March 28, 2003 (excerpts) * |
| 9 | Ambac Form 8-K, dated November 6, 2007 |
| 10 | Ambac Form 14A, dated April 21, 2008 (excerpts) * |
| 11 | Ambac Form 8-K, dated July 3, 2008 * |
| 12 | MBIA Form 8-K, dated October 25, 2007 (excerpts) * |
| 13 | MBIA Form 8-K, dated January 31, 2008 (excerpts) * |
| 14 | MBIA Form 8-K, dated May 12, 2008 (excerpts) * |
| 15 | MBIA Historical Stock Prices from May 2007 and August 6, 2008 |
| 16 | MBIA Forms 8-K, dated June 25, 2008 and June 6, 2008 * |

| 17 | Security Capital Assurance Form 8-K, dated October 25, 2007 (excerpts) * |
| 18 | Security Capital Assurance Form 8-K, dated March 13, 2008 (excerpts) * |
| 19 | Security Capital Assurance Form 8-K, dated May 8, 2008 (excerpts) * |
| 20 | Security Capital Assurance Historical Stock Prices from May 2007 and August 6, 2008 |
| 21 | Security Capital Assurance Form 8-K, dated June 23, 2008 * |
| 22 | FGIC Press Release Announcing Third Quarter 2007 Results, dated October 30, 2007 * |
| 23 | FGIC Press Release Announcing Fourth Quarter 2007 Results, dated March 17, 2008 * |
| 24 | FGIC Press Release Announcing First Quarter 2008 Results, dated May 23, 2008 * |
| 25 | Moody's and S&P Ratings Actions on FGIC dated June 20, 2008 and March 28, 2008 * |
| 26 | Moody's Ratings Action on CIFG dated May 20, 2008 |
| 27 | Bear Stearns Form 8-K, dated September 20, 2007 (excerpts) * |
| 28 | Bear Stearns Form 8-K, dated December 20, 2007 (excerpts) * |
| 29 | Bear Stearns Form 8-K, dated March 24, 2008 * |
| 30 | Bear Stearns Historical Stock Prices from January 2007, June 2007, October 2007 and March 2008 |
| 31 | Radian Form 8-K, dated November 1, 2007 (excerpts) * |
| 32 | Radian Form 8-K, dated February 15, 2008 (excerpts) * |
| 33 | Radian Historical Stock Prices from May 2007 and August 6, 2008 |

| 34 | PMI Group Form 8-K, dated October 30, 2007 (excerpts) * |
| 35 | PMI Group Form 8-K, dated March 17, 2008 (excerpts) * |
| 36 | PMI Group Form 8-K, dated May 12, 2008 (excerpts) * |
| 37 | PMI Historical Stock Prices from May 2007 and August 6, 2008 |
| 38 | Citigroup Form 8-K, dated October 15, 2007 (excerpts) * |
| 39 | Citigroup Form 8-K, dated January 15, 2008 (excerpts) * |
| 40 | Citigroup Form 8-K, dated April 18, 2008 (excerpts) * |
| 41 | Citigroup Historical Stock Prices from May 2007 and August 6, 2008 |
| 42 | AIG Form 8-K, dated November 7, 2007 (excerpts) * |
| 43 | AIG Form 8-K, dated February 28, 2008 (excerpts) * |
| 44 | AIG Form 8-K, dated May 8, 2008 (excerpts) * |
| 45 | AIG Historical Stock Prices from May 2007 and August 6, 2008 |
| 46 | Merrill Lynch Form 8-K, dated October 24, 2007 (excerpts) * |
| 47 | Merrill Lynch Form 8-K, dated January 17, 2008 (excerpts) * |
| 48 | Merrill Lynch Form 8-K, dated April 17, 2008 (excerpts) * |
| 49 | Merrill Lynch Form 8-K, dated July 17, 2008 (excerpts) * |
| 50 | Merrill Lynch Historical Stock Prices from May 2007 and August 6, 2008 |

| 51 | UBS Form 6-K, dated October 30, 2007 (excerpts) * |
|----|---|
| 52 | UBS Form 6-K, dated January 30, 2008 (excerpts) * |
| 53 | UBS Form 6-K, dated April 1, 2008 (excerpts) * |
| 54 | UBS AG Historical Stock Prices from May 2007 and August 6, 2008 |
| 55 | Wachovia Form 8-K, dated October 19, 2007 (excerpts) * |
| 56 | Wachovia Form 8-K, dated January 22, 2008 (excerpts) * |
| 57 | Wachovia Form 8-K, dated April 14, 2008 (excerpts) * |
| 58 | Wachovia Form 8-K, dated July 22, 2008 (excerpts) * |
| 59 | Wachovia Historical Stock Prices from May 2007 and August 6, 2008 |
| 60 | Fannie Mae Form 8-K, dated February 27, 2008 (excerpts) * |
| 61 | Fannie Mae Form 8-K, dated May 6, 2008 (excerpts) |
| 62 | Fannie Mae Historical Stock Prices from May 2007 and August 6, 2008 |
| 63 | Freddie Mac Historical Stock Prices from May 2007 and August 6, 2008 |
| 64 | Eric Dinallo, "Tackle false rumors about insurance companies," *Financial Times* (July 31, 2008) |
| 65 | Ambac Form 8-K, dated October 19, 2005 * |
| 66 | Ambac Form 8-K, dated July 26, 2006 * |
| 67 | Ambac Form 8-K, dated January 31, 2007 * |

| 68 | Ambac Form 4, filed May 11, 2006 with respect to transactions by Michael Callen |
| 69 | Ambac Form 4, filed April 27, 2007 with respect to transactions by Michael Callen |

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 8th day of August, 2008 in New York, New York.

Joshua A. Naftalis

# Exhibit 1

EXHIBIT 4.05

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

OF

AMBAC INC.

AMBAC Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), DOES HEREBY CERTIFY as follows:

1. The name of the Corporation is AMBAC Inc. The Corporation was originally incorporated under the name of AMBAC Inc. and the original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on April 29, 1991.

2. Pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware, this Amended and Restated Certificate of Incorporation restates and integrates and further amends the Restated Certificate of Incorporation of the Corporation.

3. The text of the Restated Certificate of Incorporation of the Corporation is hereby restated and further amended to read in its entirety as follows:

ARTICLE I

Name

The name of the corporation is Ambac Financial Group, Inc. (the "Corporation").

ARTICLE II

Registered Office and Registered Agent

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

ARTICLE III

Corporate Purpose

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "General Corporation Law").

ARTICLE IV

Capital Stock

Section 4.1. Authorized Capital. The total number of shares of all classes of stock that the Corporation shall have authority to issue is 104,000,000 consisting of 100,000,000 shares of Common Stock, par value $.01 per share (the "Common Stock") and 4,000,000 shares of Preferred Stock, par value $.01 per share (the "Preferred Stock").

1

Section 4.2. Preferred Stock. The designations and the powers, preferences and rights and the qualifications, limitations or restrictions thereof of the shares of each class as Preferred Stock are as follows:

(a) The Preferred Stock may be issued from time to time in one or more series, the shares of each series to have such voting powers, full or limited, and such designations, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof as are stated and expressed herein or in the resolution or resolutions providing for the issuance of such series, adopted by the Board of Directors as hereinafter provided; provided, however, that in the event the Board of Directors of the Corporation provides that any series of Preferred Stock shall be given voting powers, such series shall not be entitled to vote separately as a single class other than as expressly required by law and for the election of one or more additional directors of the Corporation in the case of dividend arrearages or other specified events and such series of Preferred Stock shall not be granted the right to cast in excess of one vote per share of Preferred Stock.

(b) Authority is hereby expressly granted to the Board of Directors, subject to the provisions of this Article IV and to the limitations prescribed by law, to authorize the issuance of one or more series of

or resolutions providing for the issuance of such series the voting powers, full or limited, if any, of the shares of such series and the designations, preferences and relative, participating, optional or other special rights and the qualifications, limitations or restrictions thereof. The authority of the Board of Directors with respect to each series shall include, but not be limited to, the determination or fixing of the following:

(i) The designation of such series;

(ii) The dividend rate of such series, the conditions and dates upon which such dividends shall be payable, the relation which such dividends shall bear to the dividends payable on any other class or classes of stock, and whether such dividends shall be cumulative or non- cumulative;

(iii) Whether the shares of such series shall be subject to redemption by the Corporation and, if made subject to such redemption, the times, prices and other terms and conditions of such redemption;

(iv) The terms and amount of any sinking fund provided for the purchase or redemption of the shares of such series;

(v) Whether or not the shares of such series shall be convertible into or exchangeable for shares of any other class or classes or of any other series of any class or classes of stock, or for debt securities, of the Corporation and, if provision be made for conversion or exchange, the times, prices, rates, adjustments, and other terms and conditions of such conversion or exchange;

(vi) The extent, if any, to which the holders of the shares of such series shall be entitled to vote with respect to the election of directors or otherwise;

(vii) The restrictions, if any, on the issue or reissue of any additional Preferred Stock; and

(viii) The rights of the holders of the shares of such series upon the dissolution of, or upon the distribution of assets of, the Corporation.

2

Section 4.3. Series A Junior Participating Preferred Stock. Pursuant to the authority vested in the Board of Directors in accordance with Section 4.2 hereof, the Board of Director has authorized the creation of a series of Preferred Stock with the designation and amount thereof and the voting powers, preferences and relative, participating, optional and other special rights of the shares of such series, and the qualifications, limitations or restrictions thereof as follows:

(a) Designation and Amount. The shares of such series shall be designated as "Series A Junior Participating Preferred Stock" and the number of shares constituting such series shall be 500,000.

(b) Dividends and Distributions.

(i) Subject to the prior and superior rights of the holders of any shares of any series of Preferred Stock ranking prior and superior to the shares of Series A Junior Participating Preferred Stock with respect to dividends, the holders of shares of Series A Junior Participating Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available for the purpose, quarterly dividends payable in cash on the fifteenth day of March, June, September and December in each year (each such date being referred to herein as a "Quarterly Dividend Payment Date"), commencing on the first Quarterly Dividend Payment Date after the first issuance of a share or fraction of a share of Series A Junior Participating Preferred Stock, in an amount per share (rounded to the nearest cent) equal to the greater of (a) $1.00 or (b) subject to the provision for adjustment hereinafter set forth, 100 times the aggregate per share amount of all cash dividends, and 100 times the aggregate per share amount (payable in kind) of all non-cash dividends or other distributions other than a dividend payable in shares of Common Stock or a subdivision of the outstanding shares of Common Stock (by reclassification or otherwise), declared on the Common Stock since the immediately preceding Quarterly Dividend Payment Date, or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any share or fraction of a share of Series A Junior Participating Preferred Stock. In the event the Corporation shall at any time after January 31, 1996 (the "Rights Declaration Date") (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the amount to which holders of shares of Series A Junior Participating Preferred Stock were entitled immediately prior to such event under clause (b) of the preceding

Source: AMBAC FINANCIAL GROU, 10-Q, August 14, 1997

the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(ii) The Corporation shall declare a dividend or distribution on the Series A Junior Participating Preferred Stock as provided in subparagraph (b)(i) above immediately after it declares a dividend or distribution on the Common Stock (other than a dividend payable in shares of Common Stock); provided that, in the event no dividend or distribution shall have been declared on the Common Stock during the period between any Quarterly Dividend Payment Date and the next subsequent Quarterly Dividend Payment Date, a dividend of $1.00 per share on the Series A Junior Participating Preferred Stock shall nevertheless be payable on such subsequent Quarterly Dividend Payment Date.

(iii) Dividends shall begin to accrue and be cumulative on outstanding shares of Series A Junior Participating Preferred Stock from the Quarterly Dividend Payment Date next preceding the date of issue of such shares of Series A Junior Participating Preferred Stock, unless the date of issue of such shares is prior to the record date for the first Quarterly Dividend Payment Date, in which case dividends on such shares shall begin to accrue from the date of issue of such shares, or unless the date of issue is a Quarterly Dividend Payment Date or is a date after the

3

record date for the determination of holders of shares of Series A Junior Participating Preferred Stock entitled to receive a quarterly dividend and before such Quarterly Dividend Payment Date, in either of which events such dividends shall begin to accrue and be cumulative from such Quarterly Dividend Payment Date. Accrued but unpaid dividends shall not bear interest. Dividends paid on the shares of Series A Junior Participating Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable on such shares shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding. The Board of Directors may fix a record date for the determination of holders of shares of Series A Junior Participating Preferred Stock entitled to receive payment of a dividend or distribution declared thereon, which record date shall be no more than 30 days prior to the date fixed for the payment thereof.

(c) Voting Rights. The holders of shares of Series A Junior Participating Preferred Stock shall have the following voting rights:

(i) Each share of Series A Junior Participating Preferred Stock shall entitle the holder thereof to one vote on all matters submitted to a vote of the stockholders of the Corporation.

(ii) Except as otherwise provided herein or by law, the holders of shares of Series A Junior Participating Preferred Stock and the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation.

(iii) (A) If at any time dividends on any Series A Junior Participating Preferred Stock shall be in arrears in an amount equal to six (6) quarterly dividends thereon, the occurrence of such contingency shall mark the beginning of a period (herein called a "default period") which shall extend until such time when all accrued and unpaid dividends for all previous quarterly dividend periods and for the current quarterly dividend period on all shares of Series A Junior Participating Preferred Stock then outstanding shall have been declared and paid or set apart for payment. During each default period, all holders of Preferred Stock (including holders of the Series A Junior Participating Preferred Stock) with dividends in arrears in an amount equal to six (6) quarterly dividends thereon, voting as a class, irrespective of series, shall have the right to elect two (2) Directors.

(B) During any default period, such voting right of the holders of Series A Junior Participating Preferred Stock may be exercised initially at a special meeting called pursuant to subparagraph (C) of this subsection (c)(iii) or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders, provided that such voting right shall not be exercised unless the holders of ten percent (10%) in number of shares of Preferred Stock outstanding shall be present in person or by proxy. The absence of a quorum of the holders of Common Stock shall not affect the exercise by the holders of Preferred Stock of such voting right. At any meeting at which the holders of Preferred Stock shall exercise such voting right initially during an existing default period, they shall have the right,

Source: AMBAC FINANCIAL GROU, 10-Q, August 14, 1997

any, in the Board of Directors as may then exist up to two (2) Directors or, if such right is exercised at an annual meeting, to elect two (2) Directors. If the number which may be so elected at any special meeting does not amount to the required number, the holders of the Preferred Stock shall have the right to make such increase in the number of Directors as shall be necessary to permit the election by them of the required number. After the holders of the Preferred Stock shall have exercised their right to elect Directors in any default period and during the continuance of such period, the number of Directors shall not be increased or decreased except by vote of the holders of Preferred Stock as herein provided or pursuant to the rights of any equity securities ranking senior to or pari passu with the Series A Junior Participating Preferred Stock.

4

(C) Unless the holders of Preferred Stock shall, during an existing default period, have previously exercised their right to elect Directors, the Board of Directors may order, or any stockholder or stockholders owning in the aggregate not less than ten percent (10%) of the total number of shares of Preferred Stock outstanding, irrespective of series, may request, the calling of special meeting of the holders of Preferred Stock, which meeting shall thereupon be called by the President, a Vice-President or the Secretary of the Corporation. Notice of such meeting and of any annual meeting at which holders of Preferred Stock are entitled to vote pursuant to this subparagraph (c)(iii)(C) shall be given to each holder of record of Preferred Stock by mailing a copy of such notice to him at his last address as the same appears on the books of the Corporation. Such meeting shall be called for a time not earlier than 20 days and not later than 60 days after such order or request or in default of the calling of such meeting within 60 days after such order or request, such meeting may be called on similar notice by any stockholder or stockholders owning in the aggregate not less than ten percent (10%) of the total number of shares of Preferred Stock outstanding. Notwithstanding the provisions of this subparagraph (c)(iii)(C) no such special meeting shall be called during the period within 60 days immediately preceding the date fixed for the next annual meeting of the stockholders.

(D) In any default period, the holders of Common Stock, and other classes of stock of the Corporation if applicable, shall continue to be entitled to elect the whole number of Directors until the holders of Preferred Stock shall have exercised their right to elect two (2) Directors voting as a class, after the exercise of which right (x) the Directors so elected by the holders of Preferred Stock shall continue in office until their successors shall have been elected by such holders or until the expiration of the default period, and (y) any vacancy in the Board of Directors may (except as provided in subparagraph (iii)(B) of this subsection (c)) be filled by vote of a majority of the remaining Directors theretofore elected by the holders of the class of stock which elected the Director whose office shall have become vacant. References in this paragraph (iii) to Directors elected by the holders of a particular class of stock shall include Directors elected by such Directors to fill vacancies as provided in clause (y) of the foregoing sentence.

(E) Immediately upon the expiration of a default period, (x) the right of the holders of Preferred Stock as a class to elect Directors shall cease, (y) the term of any Directors elected by the holders of Preferred Stock as a class shall terminate, and (z) the number of Directors shall be such number as may be provided for in the Certificate of Incorporation or By-laws irrespective of any increase made pursuant to the provisions of subparagraph (iii)(B) of this subsection (c) (such number being subject, however, to change thereafter in any manner provided by law or in the Certificate of Incorporation or By-laws). Any vacancies in the Board of Directors effected by the provisions of clauses (y) and (z) in the preceding sentence may be filled by a majority of the remaining Directors.

(iv) Except as set forth herein, holders of Series A Junior Participating Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

(d) Certain Restrictions.

(i) Whenever quarterly dividends or other dividends or distributions payable on the Series A Junior Participating Preferred Stock as provided in subsection (b) are in arrears, thereafter and until all accrued and unpaid dividends and distributions, whether or

5

Series A Junior Participating Preferred Stock outstanding shall have been paid in full, the Corporation shall not

(A) declare or pay dividends on, make any other distributions on, or redeem or purchase or otherwise acquire for consideration any shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Junior Participating Preferred Stock;

(B) declare or pay dividends on or make any other distributions on any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Junior Participating Preferred Stock, except dividends paid ratably on the Series A Junior Participating Preferred Stock and all such parity stock on which dividends are payable or in arrears in proportion to the total amounts to which the holders of all such shares are then entitled;

(C) redeem or purchase or otherwise acquire for consideration shares of any stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Junior Participating Preferred Stock, provided that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such parity stock in exchange for shares of any stock of the Corporation ranking junior (either as to dividends or upon dissolution, liquidation or winding up) to the Series A Junior Participating Preferred Stock; or

(D) purchase or otherwise acquire for consideration any shares of Series A Junior Participating Preferred Stock, or any shares of stock ranking on a parity with the Series A Junior Participating Preferred Stock, except in accordance with a purchase offer made in writing or by publication (as determined by the Board of Directors) to all holders of such shares upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights and preferences of the respective series and classes, shall determine in good faith will result in fair and equitable treatment among the respective series or classes.

(ii) The Corporation shall not permit any subsidiary of the Corporation to purchase or otherwise acquire for consideration any shares of stock of the Corporation unless the Corporation could, under paragraph (i) of this subsection (d), purchase or otherwise acquire such shares at such time and in such manner.

(e) Reacquired Shares. Any shares of Series A Junior Participating Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and canceled promptly after the acquisition thereof. All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock and may be reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors, subject to the conditions and restrictions on issuance set forth herein.

(f) Liquidation, Dissolution or Winding Up.

(i) Upon any liquidation (voluntary or otherwise), dissolution or winding up of the Corporation, no distribution shall be made to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Participating Preferred Stock unless, prior thereto, the holders of shares of Series A Junior Participating Preferred Stock shall have received $100 per share, plus an amount equal to accrued and unpaid dividends and distributions thereon, whether or not declared, to the date of such payment (the "Series A Liquidation Preference"). Following the payment of the full

6

amount of the Series A Liquidation Preference, no additional distributions shall be made to the holders of shares of Series A Junior Participating Preferred Stock unless, prior thereto, the holders of shares of Common Stock shall have received an amount per share (the "Common Adjustment") equal to the quotient obtained by dividing (i) the Series A Liquidation Preference by (ii) 100 (as appropriately adjusted as set forth in paragraph (iii) below to reflect such events as stock splits, stock dividends and recapitalizations with respect to the Common Stock) (such number in

full amount of the Series A Liquidation Preference and the Common Adjustment in respect of all outstanding shares of Series A Junior Participating Preferred Stock and Common Stock, respectively, holders of Series A Junior Participating Preferred Stock and holders of Common Stock shall receive their ratable and proportionate share of the remaining assets to be distributed in the ratio of the Adjustment Number to 1 with respect to such Series A Junior Participating Preferred Stock and Common Stock, on a per share basis, respectively.

(ii) In the event, however, that there are not sufficient assets available to permit payment in full of the Series A Liquidation Preference and the liquidation preferences of all other series of preferred stock, if any, which rank on a parity with the Series A Junior Participating Preferred Stock, then such remaining assets shall be distributed ratably to the holders of such parity shares in proportion to their respective liquidation preferences. In the event, however, that there are not sufficient assets available to permit payment in full of the Common Adjustment, then such remaining assets shall be distributed ratably to the holders of Common Stock.

(iii) In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the Adjustment Number in effect immediately prior to such event shall be adjusted by multiplying such Adjustment Number by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(g) Consolidation, Merger, etc. In case the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then in any such case the shares of Series A Junior Participating Preferred Stock shall at the same time be similarly exchanged or changed in an amount per share (subject to the provision for adjustment hereinafter set forth) equal to 100 times the aggregate amount of stock, securities, cash and/or any other property (payable in kind), as the case may be, into which or for which each share of Common Stock is changed or exchanged. In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the amount set forth in the preceding sentence with respect to the exchange or change of shares of Series A Junior Participating Preferred Stock shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(h) No Redemption. The shares of Series A Junior Participating Preferred Stock shall not be redeemable.

(i) Ranking. The Series A Junior Participating Preferred Stock shall rank junior to all other series of the Corporation's Preferred Stock as to the payment of dividends and the distribution of assets, unless the terms of such series shall provide otherwise.

7

(j) Amendment. The Certificate of Incorporation of the Corporation shall not be further amended in any manner which would materially alter or change the powers, preferences or special rights of the Series A Junior Participating Preferred Stock so as to affect them adversely without the affirmative vote of the holders of a majority or more of the outstanding shares of Series A Junior Participating Preferred Stock, voting separately as a class.

(k) Fractional Shares. Series A Junior Participating Preferred Stock may be issued in fractions of a share which shall entitle the holder, in proportion to such holder's fractional shares, to exercise voting rights, receive dividends, participate in distributions and to have the benefit of all other rights of holders of Series A Junior Participating Preferred Stock.

Section 4.4. Common Stock. Except as otherwise provided by this Certificate of Incorporation or as otherwise from time to time provided by law, the holders of Common Stock shall be entitled to one vote per share on all matters to be voted on by the stockholders of the Corporation.

Section 4.5. Substantial Stockholder.

(a) So long as any Person other than the Corporation or a Subsidiary thereof is (without giving effect to this Section 4.5(a)) the beneficial owner of capital stock representing 10% or more of the votes entitled to be

"Substantial Stockholder"), the record holders of the shares of capital stock beneficially owned by such Substantial Stockholder shall have limited voting rights on all matters, as follows: with respect to the shares of capital stock that would entitle such record holders in the aggregate to cast less than 10% of the votes entitled to be cast by the holders of all Outstanding shares of capital stock, such record holders shall be entitled to cast the vote per share specified in this Certificate of Incorporation; and with respect to the shares of capital stock that would otherwise entitle such record holders in the aggregate to cast 10% or more of the votes entitled to be cast by the holders of all outstanding shares of capital stock, such record holders shall not be entitled to cast any votes for such shares, so that such record holders shall be entitled to cast with respect to all shares of capital stock held by such record holders in the aggregate only such number of votes that would equal (after giving effect to this Section 4.5(a)) one vote less than 10% of the votes entitled to be cast by all holders of outstanding shares of capital stock; provided, however, that the restriction on voting contained in this Section 4.5(a) shall not apply to any capital stock beneficially owned by any Substantial Stockholder whose acquisition or ownership of capital stock representing 10% or more of the votes entitled to be cast by the holders of all Outstanding shares of capital stock has been approved by the Wisconsin Insurance Commissioner. The aggregate voting power of such record holders, so limited, for all shares of capital stock beneficially owned by the Substantial Stockholder shall be allocated proportionately among such record holders as follows: for each such record holder, this allocation shall be accomplished by multiplying the aggregate voting power (after giving effect to the provisions of this Section 4.5(a)) of the Outstanding shares of capital stock beneficially owned by the Substantial Stockholder by a fraction the numerator of which is the number of votes that the shares of capital stock owned of record by such record holder would have entitled such record holder to cast were no effect given to this Section 4.5(a), and the denominator of which is the total number of votes which all shares of capital stock beneficially owned by the Substantial Stockholder would have entitled their record holders to cast were no effect given to this Section 4.5(a).

(b) The Board of Directors by majority vote shall have the power and duty to determine for the purposes of this Article IV, on the basis of information known to them after reasonable inquiry, (i) whether a Person is a Substantial Stockholder, (ii) the number of shares of capital stock beneficially owned by any Person, (iii) whether a Person is an Affiliate or Associate of another, (iv) the Persons who may be deemed to be the record holders of shares beneficially owned by a Substantial Stockholder

8

and (v) such other matters with respect to which a determination is required under this Article IV. Any such determination made in good faith shall be binding and conclusive on all parties.

(c) The Board of Directors shall have the right to demand that any Person who is reasonably believed to be a Substantial Stockholder (or to hold of record shares of capital stock beneficially owned by a Substantial Stockholder) supply the Corporation with complete information as to (i) the record holder or holders of all shares beneficially owned by such Person, (ii) the number of shares of capital stock beneficially owned by such Person and held of record by each such record holder, and (iii) any other factual matter relating to the applicability or effect of this Article IV, as may reasonably be requested of such Person, and such Person shall furnish such information within ten days after the receipt of such demand.

(d) Nothing contained in this Article IV shall be construed to relieve any Substantial Stockholder from any fiduciary obligation imposed by law.

Section 4.6. Quorum. Except as otherwise provided in this Certificate of Incorporation, the presence in person or by proxy of the holders of record of shares of capital stock entitling the holders thereof to cast a majority of the votes (after giving effect, if required, to the provisions of Section 4.5(a)) entitled to be cast by the holders of all Outstanding shares of capital stock entitled to vote shall constitute a quorum at all meetings of the stockholders.

Section 4.7. Majority Vote. If any class or series of the Corporation's capital stock shall be entitled to more or less than one vote for any share, on any matter for which such class or series is entitled to vote with one or more other classes or series, together as one class, every reference in this Certificate of Incorporation, the By-laws and in any relevant provision of law to a majority or other proportion of stock shall refer to such majority or other proportion of the votes of such stock.

Section 4.8. No Preemptive Rights. Except as otherwise provided by this Certificate of Incorporation or as otherwise from time to time provided by law, no holder of shares of any class or series of capital stock of the Corporation or of any security or obligation convertible into, or of any warrant, option or right to subscribe for, purchase or otherwise acquire, shares of any class or series of capital stock of the Corporation, whether now or hereafter authorized,

otherwise acquire shares of any class or series of capital stock of the Corporation or any security or obligation convertible into, or any warrant, option or right to subscribe for, purchase or otherwise acquire, shares of any class or series of capital stock of the Corporation, whether now or hereafter authorized.

ARTICLE V

Definitions

As used in this Certificate of Incorporation, the following terms shall have the following meanings:

"Affiliate", with respect to any Person, means any other Person directly or indirectly controlling, controlled by or under common control with, such Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" or "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, by common management or otherwise. A Person having a contract or arrangement giving that Person control is deemed to be in control despite any limitations placed by law on the validity of the contract or arrangement. A corporation is deemed to be under

9

common control with any corporation, regardless of ownership, if substantially the same group of persons manage the two corporations.

"Associate", used to indicate a relationship with a specified Person, shall mean (i) any Person (other than the Corporation or a Subsidiary) of which such specified Person is an officer or partner or is, directly or indirectly, the beneficial owner of 10% or more of the voting securities of such Person, (ii) any trust or other estate in which such specified Person has a substantial beneficial interest or as to which such specified Person serves as trustee or in a similar fiduciary capacity, (iii) any relative or such spouse of such specified Person or any relative of such spouse who has the same home as such specified Person or who is a director or officer of the Corporation or any Subsidiary, and (iv) any Person who is a director or officer of such specified Person or any of its parents or subsidiaries (other than the Corporation or a Subsidiary).

A Person shall be deemed a "beneficial owner" of any shares of capital stock of the Corporation (a) which such Person or any of its Affiliates or Associates beneficially owns, directly or indirectly; (b) which such Person or any of its Affiliates or Associates has, directly or indirectly, the right to vote pursuant to any agreement, contract, arrangement or understanding, or (c) which are beneficially owned, directly or indirectly, by any other Person with which such Person or any of its Affiliates or Associates has any contract, agreement, arrangement or understanding for the purpose of holding or voting of any capital stock of the Corporation.

"Outstanding", when used in reference to shares of stock, shall mean issued shares, excluding shares held in treasury.

"Person" shall mean any individual, firm, corporation or other entity and shall include any group comprised of any Person and any other Person with whom such Person or any Affiliate or Associate of such Person has any agreement, contract, arrangement or understanding, directly or indirectly, for the purpose of acquiring, holding, voting or disposing of any shares of capital stock of the Corporation.

"Subsidiary" shall mean any corporation of which a majority of any class of equity securities is beneficially owned, directly or indirectly, by the Corporation.

"Substantial Stockholder" shall be defined as in Section 4.5 of this Certificate of Incorporation.

ARTICLE VI

Directors

Section 6.1. Written Ballot. Elections of directors of the Corporation need not be by written ballot, except and to the extent provided in the By-laws of the Corporation.

Section 6.2. No Liability. To the fullest extent permitted by the General Corporation Law as it now exists and as it may hereafter be amended, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty as a director.

ARTICLE VII

Indemnification of Directors, Officers and Others

Section 7.1. Indemnification. (a) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the

10

Corporation) by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a false plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person seeking indemnification did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c) To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Sections 7.1(a) and (b) or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(d) Any indemnification under Sections 7.1(a) and (b) (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances because he has met the applicable standard of conduct set forth in such Sections 7.1(a) and (b). Such determination shall be made (i) by the Board of Directors of the Corporation by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or (ii) if such quorum is not obtainable, or, even if obtainable, a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or (iii) by the stockholders of the Corporation.

(e) Expenses incurred by a director or officer of the Corporation in defending a civil or criminal action, suit or proceeding may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation authorized in this Article IX VII. Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Board of Directors of the Corporation deems appropriate.

(f) The indemnification and advancement of expenses provided by, or granted pursuant to, the other sections of this Article VII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, by-law,

11

agreement, vote of stockholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(g) The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of Section 145 of the General Corporation Law.

(h) For purposes of this Article VII, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VII with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

(i) For purposes of this Article VII, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves service by, such director, officer, employee or agent with respect to any employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article VII.

(j) The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VII shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

ARTICLE VIII

By-laws

The directors of the Corporation shall have the power to adopt, amend or repeal the By-laws of the Corporation.

ARTICLE IX

Reorganization

Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation under the provisions of section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation

12

under the provisions of section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

ARTICLE X

Amendment

The Corporation reserves the right to amend, alter, change or repeal any provision of this Certificate of Incorporation, in the manner now or hereafter prescribed by law and the Certificate of Incorporation, and all rights conferred on stockholders in this Certificate of Incorporation are subject to this reservation.

ARTICLE XI

Effective Time

This Amended and Restated Certificate of Incorporation shall become effective on July 11, 1997 at 5:00 p.m.


IN WITNESS WHEREOF, AMBAC Inc. has caused this Amended and Restated Certificate of Incorporation to be signed on this 10th day of July, 1997, in its name and on its behalf by its Chairman, President and Chief Executive Officer.

/s/Phillip B. Lassiter
----------------------------
Phillip B. Lassiter
Chairman, President and
Chief Executive Officer

13

Exhibit 2

**AMBAC FINANCIAL GROUP, INC.**

**CHARTER OF THE AUDIT AND RISK ASSESSMENT COMMITTEE OF THE BOARD OF DIRECTORS**

**(As of July 19, 2005)**

## Mission

The mission of the Ambac Financial Group, Inc. Audit and Risk Assessment Committee (the "***Committee***") is to monitor the corporate control and risk environment of Ambac Financial Group, Inc. (the "***Company***").  The purpose of the Committee shall include, among other things, to assist the Board of Directors in fulfilling its oversight responsibilities by reviewing: 1) the integrity of the Company's financial statements and other financial information that is provided to stockholders; 2) the performance of the Company's internal audit function and the Company's independent auditors; 3) the independent auditors' qualifications and independence; 4) the Company's compliance with relevant legal, regulatory and accounting requirements; and 5) the performance and effectiveness of the Company's management of its portfolio credit and market risks.  It is the objective of the Committee to maintain free and open means of communications among the Board of Directors, the independent auditors, the internal auditors and the financial and senior management of the Company.

## Membership and Meeting Requirements

The Committee will meet as often as it determines but not less frequently than quarterly.  In addition, the Committee shall, periodically, meet separately with the General Counsel, the Director of Internal Audit, the executive officer in charge of the Portfolio and Market Risk Management Group and the independent auditors in order to fulfill its duties and make regular reports to the Board.

The Committee will be comprised of at least four independent directors, who, in the judgment of the Board of Directors, are financially literate or who become financially literate within a reasonable period of time.  Each member of the Committee will satisfy all independence and other membership requirements of the New York Stock Exchange and the Sarbanes-Oxley Act of 2002 (the "***Act***"), related rules of the United States Securities and Exchange Commission (the

"*SEC*") and the Company's categorical standards of independence set out in the Company's Corporate Governance Guidelines.  At least one member of the Committee will be an "audit committee financial expert", as defined under the rules of the SEC, or, if no member of the Committee is an "audit committee financial expert",  then such fact will be disclosed in the Company's filings with the SEC.  At least one member of the Committee will also have, in the judgment of the Board of Directors, accounting or related financial management expertise in accordance with the New York Stock Exchange listing standards (*provided that the Board may presume that an individual who qualifies as an "audit committee financial expert" satisfies this requirement as well*).

Members of the Committee shall not serve on more than two other public company audit committees.

As directed or required by the Committee, the Company's  Head of the Portfolio and Market Risk Management Group, Chief Financial Officer, the General Counsel, representatives from the Company's independent auditors, the Director of Internal Audit,  Chief Executive Officer, President or other members of management of the Company will attend Committee meetings.

**Duties and Responsibilities**

The Company's management is responsible for the preparation, presentation and integrity of the Company's financial statements and the independent auditors are responsible for auditing the financial statements and reviewing the unaudited financial statements.  The Committee is responsible for overseeing the conduct of these activities by the Company's management and the independent auditors and not to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with accounting principles generally accepted in the United States of America (GAAP).  In carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditor's work.  The following responsibilities are within the authority of the Committee, and shall not be delegated or allocated to a different committee of the Board:

1)   Report regularly to the Board to discuss issues regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the performance and independence of the Company's independent auditors, and the performance of the internal audit function.

2)   Prepare a report, for inclusion in the Company's proxy statement or, if applicable, Annual Report on Form 10-K, as required by the rules of the SEC, disclosing that the Committee:

   a)   reviewed and discussed the audited financial statements with management;

   b)   discussed with the independent auditors the matters required by Statement on Auditing Standards No. 61 (*which requires the independent auditors to communicate to the Committee matters related to the conduct of the audit* );

   c)   received the written disclosures and the letter from the auditors regarding the auditors' independence, including all non-audit services and fees and discussed the auditors' independence as required by Independent Standards Board Standard No. 1 with the auditors (*which requires the independent auditors to disclose any relationship that could impact the auditors' objectivity and independence)*;

and that, based on the review and discussions referred to in paragraphs (a) through (c), recommended to the Board of Directors that the financial statements be included in the Company's Annual Report on Form 10-K.

3)   Review with management and the independent auditors the Company's annual financial statements prior to the filing of its Form 10-K and its quarterly financial statements prior to the filing of its Form 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations".  Also, the Committee shall discuss the results of the independent auditors' annual audits and quarterly reviews and any other matters required to be communicated

to the Committee by the independent auditors under the standards of the Public Company Accounting Oversight Board (PCAOB).

4) Review annually with management and the Company's independent auditors:

    a) all critical accounting practices and policies to be used; and

    b) all alternative treatments of financial information within GAAP that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the auditors.

5) Review with management and the Company's independent auditors:

    a) major issues regarding accounting principles and financial statements presentations, including any significant changes in the Company's selection or application of accounting principles;

    b) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the ramifications and effects of alternative GAAP methods on the Company's financial statements;

    c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; and

    d) the effect, if any, of new or pending accounting pronouncements.

6) Review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditors' report on (1) management's assessment and (2) the effectiveness of internal control over financial reporting.

7) Discuss with management, the internal auditors and the independent auditors management's process for assessing effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act.

8) Review on a regular basis with both the Company's independent auditors and internal auditors any problems or difficulties encountered by the auditors in the course of any audit work, including management's response with respect thereto, any restrictions on the scope of the auditors' activities or on access to requested information, and any significant disagreements with management.  In connection with the above, the Committee should review with the independent auditors:

    a)    any accounting adjustments that were noted or proposed by the independent auditors but were rejected by management (*as immaterial or otherwise*);

    b)    any communications between the audit team and the independent auditor's national office regarding auditing or accounting issues; and

    c)    all other material written communications between the independent auditors and management, including any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors that is in addition to their report on the effectiveness of internal control over financial reporting.

9) Discuss the type and presentation of information to be included in the Company's earnings press releases (*paying particular attention to any use of "pro forma" or "adjusted" information not in compliance with GAAP* ), as well as review any financial information and earnings guidance provided by the Company to analysts and rating agencies, provided that the Committee need not discuss in advance, in each instance, such disclosures.

10) Resolve all disagreements between management and independent auditors regarding financial reporting or audit, review or attest services.

11) Select the Company's independent auditors, approve the fees and terms of the independent auditors' engagement, review the overall scope of the annual audit plan of the independent auditors, including planning and staffing, review and evaluate the performance and independence of the independent auditors, including the lead audit partner and other audit partners serving the account, monitor the auditors' compliance

with SEC partner rotation requirements, and make decisions regarding the replacement or termination of the independent auditors.  When evaluating the independent auditors, the Committee should consider the opinions of management and the Company's internal auditors, and should consider the desirability of regularly rotating the Company's independent auditors.

12) Pre-approve all permitted audit-related and non-audit services performed by the independent auditors.  The Committee may adopt policies and procedures that provide for the automatic pre-approval of permitted audit-related and non-audit services to be provided by the independent auditors and/or the delegation of pre-approval authority to the Chairman of the Audit Committee.

13) At least annually, obtain and review a report from the Company's independent auditors describing:

    a)      the independent auditors' internal quality-control procedures;

    b)      any material issues raised by the most recent internal quality-control review, or peer review, or PCAOB review, of the independent auditors, or by any inquiry or investigation by any governmental or professional authority, within the preceding five years, regarding any independent audits carried out by the independent auditors, and any steps taken to deal with any such issues;

    c)      all relationships between the independent auditors and the Company (*including a description of each category of services provided by the independent auditors to the Company and a list of the fees billed for each such category*); and

    d)      compliance with professional and regulatory requirements regarding the conduct of their audit, including that the audit was conducted in a manner consistent with Section 10A of the Exchange Act and no action under Section 10A(b) of the Securities and Exchange Act of 1934 has been initiated.

14) Set clear hiring policies for employees and former employees of the independent auditors.

15) Evaluate whether management is setting the appropriate control environment through an annual review of the Company's entity–level controls, including but not limited to their enforcement of a positive business ethics environment, the establishment of fraud monitoring and fraud prevention controls across all business and         monitoring the enforcement of the Company's Code of Business Conduct.

16) Establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (b) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

17) Review the Company's disclosure controls and procedures policy and other steps the Company has taken to ensure that all financial and non-financial information required to be disclosed is collected, summarized, evaluated and reported within the time periods specified in the SEC's rules and forms, including receiving a quarterly report regarding any Form 8-Ks filed during the prior quarter.

18) Review annually with the Company's internal auditors and independent auditors the Company's guidelines and policies relating to risk assessment and risk management, including the identification of potential fraud risk, fraud protection and fraud detection methods.

19) Review annually with management guidelines and policies of the Company's risk management and underwriting areas, including the Company's insured book of business, derivatives business and investment portfolios and discuss other steps management has taken to monitor and control the Company's major financial risk exposures.

.

20) Review quarterly with the Head of the Portfolio and Market Risk Management Group, the Company's current adversely classified credit book, with particular focus on problem credits.

21) Review with the chief executive officer and chief financial officer, as appropriate, and independent auditors, periodically, the following:

    a)    all significant deficiencies and material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors;

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

    c)    any significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses; and

    d)    procedures undertaken in connection with the CEO and CFO certifications for Form 10-K and 10-Q's, including their evaluation of the Company's disclosure controls and procedures and internal controls.

22) Review the Company's internal audit function, including its independence, its responsibilities, budget and staffing, the scope of the audits, the findings of the internal auditors, and management's response and implementation of such recommendations.

23) Review with the Company's general counsel, and outside counsel, when appropriate, all legal and regulatory matters, if any, that may have a material impact on the Company's financial statements and the Company's compliance policies, and any material reports or inquiries received from regulators or government agencies

24) Conduct or authorize investigations and engage special legal, accounting or other consultants to help advise the Audit Committee with such investigations, into any matters within the Committee's scope of responsibilities.

25) Conduct, and review with the Board, an annual performance evaluation of the Committee.

26) Review and assess the adequacy of this audit and risk assessment committee charter on an annual basis and make any recommended changes.

27) As appropriate, obtain advice and assistance from outside legal, accounting and other advisors, consultants or experts, and ensure that the Company provides appropriate funding for the payment of the fees of such advisors.

28) Perform such additional activities, and consider such other matters, within the scope of its responsibilities, as the Committee or the Board deems necessary or appropriate.

Exhibit 3

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-K

---

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2007

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                to

Commission file number 1-10777

---

# Ambac Financial Group, Inc.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | 13-3621676 |
| (State of Incorporation) | (I.R.S. employer identification no.) |
| **One State Street Plaza** | |
| **New York, New York** | **10004** |
| (Address of principal executive offices) | (Zip code) |

**(212) 668-0340**
(Registrant's telephone number, including area code)

---

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 per share | New York Stock Exchange, Inc. |
| 5.875% Debentures, Due March 24, 2103 | New York Stock Exchange, Inc. |
| 5.95% Debentures, Due February 28, 2103 | New York Stock Exchange, Inc. |

Securities registered pursuant to Section 12(g) of the Act: None

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.    Yes ☐    No ☒

Table of Contents

and certain regulatory and other constraints, including adverse business performance, affect Ambac's ability to pay dividends and make other payments; (28) the risk of litigation and regulatory inquiries or investigations, and the risk of adverse outcomes in connection therewith, which could have a material adverse effect on our business, operations, financial position, profitability or cash flows; (29) other factors described in the Risk Factors section in Part I, 1A of this Annual Report on Form 10-K and also disclosed from time to time by Ambac in its subsequent reports on Form 10-Q and Form 8-K, which are or will be available on the Ambac website at www.ambac.com and at the SEC's website, www.sec.gov; and (30) other risks and uncertainties that have not been identified at this time. Readers are cautioned that forward-looking statements speak only as of the date they are made and that Ambac does not undertake to update forward-looking statements to reflect circumstances or events that arise after the date the statements are made. You are therefore advised to consult any further disclosures we make on related subjects in Ambac's reports to the SEC.

Part I

Item 1.    Business.

INTRODUCTION

Ambac Financial Group, Inc., headquartered in New York City, is a holding company whose subsidiaries provide financial guarantee products (including credit derivatives) and provides other financial services to clients in both the public and private sectors around the world. Ambac was incorporated on April 29, 1991. Ambac's activities are divided into two business segments: (i) Financial Guarantee and (ii) Financial Services. Ambac provides financial guarantee insurance for public and structured finance obligations through its principal operating subsidiary, Ambac Assurance Corporation. Ambac Assurance is the successor to the founding financial guarantee insurance company, which wrote the first bond insurance policy in 1971. As an alternative to financial guarantee insurance credit protection is provided by Ambac Credit Products, a subsidiary of Ambac Assurance, in credit derivative format. Through its financial services subsidiaries, Ambac has provided financial and investment products including investment agreements, funding conduits, interest rate, currency and total return swaps, principally to its clients of the financial guarantee business. Please see "Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" for further discussion.

As a holding company, Ambac is largely dependent on dividends from Ambac Assurance to pay dividends on its common stock, to pay principal and interest on its indebtedness and to pay its operating expenses. Dividends from Ambac Assurance are subject to certain insurance regulatory restrictions. See "Insurance Regulatory Matters—Wisconsin Dividend Restrictions" section and "Management's Discussion and Analysis—Liquidity and Capital Resources" located in Part II, Item 7 for further information.

Ambac's internet address is www.ambac.com. We make available free of charge, or through the investor relations section of our web site, annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934.

Recent Developments:

Currently, Ambac Assurance has triple-A financial strength ratings from Moody's Investors Services, Inc. ("Moody's") and Standard and Poor's Rating Services ("S&P"), and a double-A rating from Fitch Inc. ("Fitch") (downgraded from triple-A on January 18, 2008). These ratings are an essential part of Ambac Assurance's ability to provide credit enhancement and are essential to Ambac Assurance's ability to compete in the financial guarantee business. See "Rating Agencies" section below for further information. Considering the high levels of delinquencies and defaults within residential mortgage loans, each of these rating agencies began a review of the capital adequacy of the financial guarantee industry in the fall of 2007. In late December 2007, following the rating agency reviews, Ambac Assurance's triple-A rating was affirmed by both S&P (with "negative outlook") and Moody's; however, Fitch placed Ambac's triple-A rating on "rating watch negative" and stated that Ambac Assurance had a modeled $1 billion capital shortfall. On January 16, 2008, Moody's put Ambac Assurance's triple-A rating on review for possible downgrade. On January 18, 2008, S&P placed Ambac Assurance's triple-A financial strength rating on Credit Watch Negative. On January 18, 2008, Fitch downgraded Ambac Assurance's insurance financial strength rating to double-A ("ratings watch negative"). On February 25, 2008, S&P reaffirmed Ambac Assurance's triple A rating, but kept it on Credit Watch Negative. On February 29, 2008, Moody's publicly announced that it is continuing a review for possible downgrade that was initiated on January 16, 2008. Based on an updated assessment of Ambac Assurance's mortgage risk, Moody's believes that Ambac Assurance's capital exceeds the minimum Aaa standard but falls below the Aaa target level. Moody's further stated that Ambac is actively pursuing capital strengthening activities that, if successful, are expected to result in Ambac Assurance meeting Moody's current estimate of the Aaa target level. There have been a number of recent developments with respect to ratings actions by the rating agencies. In light of the ongoing nature of ratings actions or announcements by the rating agencies, one should

2

Table of Contents
consult announcements by the rating agencies, the websites of the rating agencies and Ambac's website for the then current publicly available information. These ratings actions have had a significant impact on Ambac Assurance's ability to compete in the financial guarantee business. Please refer to Part I, Item 1 "Business – Business Segments – Financial Guarantee" below for further discussion as to its impact on the U.S. public finance and asset-backed and international markets.

Currently, Ambac Financial Group's long-term senior unsecured debt is rated "AA" by S&P (negative outlook), "Aa2" by Moody's (review for possible downgrade) and A by Fitch (Rating Watch Negative).

As a result of the rating agency actions described above, as well as significant disruption in the capital markets and investor concern with respect to our financial position, we have been able to write only a limited amount of new financial guarantee business since November 2007.

In recent months, we have undertaken a review of all our business units. In conducting this review, we considered the risk exposure within each business (including our view of the probability of default, the potential loss given default and the relevant correlations), the risk adjusted returns over the course of an economic cycle and Ambac's franchise value and competitive advantages.

As a result of this review, in connection with our efforts to raise capital and maintain our triple-A ratings, we expect to:

- Emphasize our public finance business (including municipal finance, healthcare and global utilities) and refocus our structured finance business (including emphasizing segments of the global infrastructure market, student loans, leasing & asset finance and structured insurance). Many of the above businesses will be subject to revised underwriting and risk management guidelines;

- Suspend underwriting all structured finance businesses (domestic and international), for six months in order to accumulate capital;

- Discontinue underwriting certain structured finance businesses (domestic and international), including collateralized debt obligations and collateralized loan obligations, mortgage-backed securities, whole business securitizations, auto and credit cards and emerging market transactions;

- Discontinue the execution of credit enhancement transactions in credit default swap format;

- Discontinue writing new Financial Services business; and

- Focus on reducing single risk concentrations across our portfolio.

We also will reduce the quarterly dividend payable on our common shares to $.01 per share.

Notwithstanding these actions, management remains confident that its claim paying ability is adequate to support policyholder liabilities.

In addition, Ambac is in the process of evaluating several options related to its capitalization which are focused on maintaining Ambac Assurance's triple-A financial strength rating from the major rating agencies. These options may include a plan to raise additional capital. In the event that we do not maintain our triple-A ratings, we believe that we can execute a significantly reduced business plan and operate with double-A ratings that will include Structured Finance, International and reinsurance across a variety of bond types. In that circumstance, we expect to accumulate capital and position ourselves to regain our triple-A ratings. Ambac will continue to work closely with the regulators and the rating agencies to design and implement a strategy to address the credit issues within its portfolio and to preserve and grow the business franchise.

3

Source: AMBAC FINANCIAL GROU, 10-K, February 29, 2008

Table of Contents
## BUSINESS SEGMENTS

The following paragraphs describe the business operations of Ambac and its subsidiaries for its two reportable segments: Financial Guarantee and Financial Services.

### Financial Guarantee

The financial guarantee segment includes financial guarantee insurance and other credit enhancement products, such as credit derivatives. Financial guarantee insurance provides an unconditional and irrevocable guarantee that protects the holder of a fixed income obligation against non-payment of principal and interest when due. Essentially, Ambac Assurance or Ambac Assurance UK makes payments if the obligor responsible for making payments fails to do so. Ambac Assurance and its subsidiaries serve the global capital markets by providing financial guarantee insurance for public finance and structured finance obligations. Total net premiums earned and other credit enhancement fees from external customers, by geographic location of risk is discussed in Part II, Item 8 under Note 19 of Notes to Consolidated Financial Statements. Both issuers and investors benefit from financial guarantee insurance. Issuers typically benefit when the insurance has the effect of lowering their cost of borrowing because the insurance premium is less than the value of the spread between the yield on the insured obligation (carrying the credit rating of Ambac Assurance) and the yield of the uninsured obligation. Financial guarantee insurance also typically increases the marketability of obligations issued by infrequent or unknown issuers or in connection with complex financings. Investors generally benefit from increased liquidity in the secondary market, reduced exposure to price volatility caused by changes in the credit quality of the underlying obligor, monitoring and remediation by Ambac on insured transactions and added protection against a potential loss in the event that the obligor defaults on its obligation. As a result of the actions by the rating agencies in the fourth quarter of 2007 and the beginning of 2008, obligations guaranteed by Ambac Assurance and other financial guarantors have experienced significantly greater price volatility and reduced liquidity, thereby reducing some of the benefit noted above.

In certain floating rate insured transactions, the issuer of insured securities is party to an interest rate swap that hedges their risk to interest rates effectively creating a synthetic fixed rate obligation. In such transactions, Ambac Assurance has, from time-to-time, insured the issuer's obligations under both the insured securities and the derivative contract.

As an alternative to financial guarantee insurance, credit protection relating to a particular pool of assets, security or issuer can be provided through a credit derivative. Ambac Credit Products LLC, a wholly owned subsidiary of Ambac Assurance, provides credit protection in the global markets in credit derivative form. These credit derivatives, which are privately negotiated contracts, provide the counterparty with credit protection against the occurrence of a specific event such as a payment default or bankruptcy relating to an underlying obligation. Upon a credit event, Ambac Credit Products is generally required to make payments equal to the difference between the scheduled debt service payment and the actual payment made by the issuer. In a small number of transactions, Ambac Credit Products is required to (i) make a payment equal to the difference between the par value and market value of the underlying obligation or (ii) purchase the underlying obligation at its par value and a loss is realized for the difference between the par and market value of the underlying obligation. Substantially all of Ambac Credit Product's credit derivative contracts relate to structured finance transactions. Credit derivatives issued by Ambac Credit Products are insured by Ambac Assurance. See "Quantitative and Qualitative Disclosures About Market Risk" located in Part II, Item 7A for further information about credit derivatives.

Ambac Assurance and its subsidiaries also guarantee or provide credit protection on obligations already carrying insurance from other financial guarantors, with Ambac Assurance obligated to pay only

4

Table of Contents
upon a default by both the underlying obligor and the original financial guarantor. At December 31, 2007, Ambac provided credit protection for $1.7 billion outstanding par on these obligations, primarily through the issuance of credit derivatives. The weighted-average rating of these underlying obligations, excluding the guarantee from other financial guarantors, was BBB+ at December 31, 2007.

In addition to the guarantees on fixed income obligations described above, Ambac Assurance, from time to time, enters into transactions that expose the company to risks which may not be correlated to credit risk, for example, market risk, weather-related or other disasters, mortality or other property and casualty type risk characteristics. Ambac underwrites such risks so that a substantial level of first loss protection would have to be exhausted before Ambac would become liable in respect of such risks. Additionally, Ambac underwrites such business primarily in relation to broad indices and reference pools which embody diverse risk characteristics.

Ambac Assurance seeks to minimize the risk inherent in its financial guarantee portfolio by maintaining a diverse portfolio which spreads its risk across a number of criteria, including issue size, type of obligation, geographic area and obligor.

Ambac Assurance derives financial guarantee revenues from: (i) premiums earned from insurance contracts; (ii) net investment income; (iii) revenue from credit derivative transactions; (iv) net realized gains and losses from sales of investment securities; and (v) certain structuring and other fees. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 and Note 19 of Notes to Consolidated Financial Statements located in Part II, Item 8 for further information.

Pricing:

Ambac Assurance determines premium rates on the basis of the type of transaction and its assessment of the risk it is guaranteeing. Factors considered in pricing include underlying credit ratings, term to maturity, structure of the issue and credit and market factors including security features and other credit enhancement features. Additionally, the interest rate spread between insured and uninsured obligations with characteristics similar to those of the proposed issue is considered in the pricing process as well as the cost and the projected return to Ambac Assurance.

Prior to the rating agency actions on Ambac Assurance and other financial guarantors, the business environment was extremely competitive stemming from bank funding, the uninsured market, senior/subordinate securitizations, other providers of credit derivatives and other triple-A rated financial guarantors. This increased competition had an adverse impact on pricing. In the fall of 2007, each of the major rating agencies (S&P, Moody's and Fitch) began a review of the capital adequacy of the financial guarantee industry. As a result of their reviews, the major rating agencies have recently (i) changed their rating outlook for certain financial guarantors to "negative", (ii) placed certain financial guarantee insurers on review for a possible downgrade, and (iii) downgraded certain financial guarantee insurers. Certain financial guarantors had their current ratings affirmed as "stable". Distress in the current credit environment has produced credit spread widening. However, due to the uncertainty of Ambac's ratings as indicated above, Ambac's business has been limited and we have not been able to benefit from the pricing environment. As a result of these actions and the uncertainty regarding future actions to be taken by the rating agencies, Ambac Assurance has been placed at a competitive disadvantage in all three of the financial guarantee markets: public finance, structured finance and international finance. See "Competition" section below for further information.

Financial guarantee products are sold in three principal markets: the U.S. public finance market, the U.S. structured finance and asset-backed market and the international finance market.

5

Source: AMBAC FINANCIAL GROU, 10-K, February 29, 2008

Table of Contents

### U.S. Public Finance Market

The U.S. public finance market includes all U.S. municipal issuance including general obligations, lease and tax-backed obligations, health care, housing, public utilities, transportation and higher education, as well as certain infrastructure privatization transactions, such as toll road and bridge financings, public transportation financings, stadium financings, military housing and student housing. Public finance obligations are generally supported by either the taxing authority of the issuer or the issuer's or underlying obligor's ability to collect fees or assessments for certain projects or public services. Although Ambac Assurance guarantees the full range of public finance obligations, Ambac Assurance concentrates on those projects that require more structuring skills. Certain projects, which had been financed by the local or U.S. government alone, are now being financed through public-private partnerships. In these transactions, debt service on the bonds, rather than being paid solely by tax revenues or other governmental funds, is being paid from a variety of revenue sources, including revenues derived from the project itself. Examples of these transactions include toll road financings, stadium financings, student housing and military housing. In the U.S. public finance market, an issuer typically pays an up-front premium to Ambac Assurance at the time the policy is issued. Premiums are usually quoted as a percentage of the total amount of principal and interest that is scheduled to become due during the life of the insured bonds. The following table sets forth the volume of new issues of long-term (longer than 12 months) public finance bonds and the volume of new issues of insured long-term public finance bonds over the past ten years in the United States.

### U.S. Public Finance Long-Term Market

| ($ in Billions) | New Money | Refundings | Total Volume | Refundings as Percentage of Total Volume | Insured Volume | Insured Bonds as Percentage of Total Volume |
|---|---|---|---|---|---|---|
| 1998 | 204.7 | 82.0 | 286.7 | 28.6 | 145.5 | 50.7 |
| 1999 | 189.3 | 38.3 | 227.6 | 16.8 | 105.6 | 46.4 |
| 2000 | 181.3 | 19.5 | 200.8 | 9.7 | 79.3 | 39.5 |
| 2001 | 223.5 | 64.7 | 288.2 | 22.4 | 134.4 | 46.6 |
| 2002 | 266.7 | 92.1 | 358.8 | 25.7 | 178.9 | 49.9 |
| 2003 | 288.7 | 95.0 | 383.7 | 24.8 | 190.7 | 49.7 |
| 2004 | 271.7 | 88.4 | 360.1 | 24.5 | 192.7 | 53.5 |
| 2005 | 277.6 | 130.7 | 408.3 | 32.0 | 233.0 | 57.1 |
| 2006 | 309.5 | 79.1 | 388.6 | 20.3 | 184.8 | 47.5 |
| 2007 | 351.4 | 76.2 | 427.6 | 17.8 | 201.0 | 47.0 |

Source: Amounts are reported by The Bond Buyer. Amounts represent gross par amounts issued or insured, respectively, during such year.

Changes in volume of public finance bond issuance during this period are primarily attributable to changes in refunding activity related to the then-current interest rate environment, along with the issuers' new money requirements. Volume since 2002 has exceeded historical levels as a result of the low interest rate environment and considerable infrastructure finance needs. Insured volume as a percentage of total volume ("insured penetration") during 2004 through 2005 increased, largely the result of budget deficits experienced by municipalities and the corresponding flight to quality by investors. Beginning December 2007, insured penetration was reduced significantly as a result of the uncertainty regarding the financial stability of the financial guarantors, including Ambac Assurance. This has also caused a reduction in new issuances as certain municipalities either (i) delayed issuance, or (ii) were unable to find purchasers for their obligations, given that their issuance was not going to be insured by a financial guarantor.

6

Source: AMBAC FINANCIAL GROU, 10-K, February 29, 2008

Table of Contents

Proposed new public finance bond issues are submitted to Ambac Assurance by issuers (or their investment bankers or financial advisors) to determine their suitability for financial insurance. Public finance bond issues are sold on either a competitive or a negotiated basis. With respect to competitive issues, an issuer will publish a notice of sale soliciting bids for the purchase of a proposed issue of bonds. Potential bidders on the bonds then form syndicates. These syndicates then solicit a determination from some or all of the financial guarantors whether an issue is suitable for financial guarantee and at what premium rate and on what terms. The syndicate then determines whether to bid on the issue with a financial guarantee (and if so, with which financial guarantor) or without a financial guarantee. The issuer then generally selects the syndicate with the lowest bid. In a negotiated offering, the issuer has already selected an investment bank and that investment bank solicits premium quotes and terms from the financial guarantors.

Ambac Assurance also provides financial guarantees on public finance bonds outstanding in the secondary market that are typically purchased by an institution to hedge or facilitate the sale of bonds in its portfolio or inventory. Historically, the financial guarantee increases the sale price of bonds (typically by an amount greater than the cost of the policy) and affords a wider secondary market and therefore greater marketability to a given issue of previously issued bonds. Ambac's ability to underwrite insurance policies in the secondary market has also been adversely impacted by the actions of the rating agencies. As is the case with new issues, the premium is generally payable in full at the time of policy issuance. Ambac Assurance employs the same underwriting standards on secondary market issues that it does on new public finance issues. For secondary market transactions, Ambac is generally not afforded the same level of control over credit remediation as a new issue insurance policy.

Ambac Assurance guaranteed gross par of $52.3 billion, $43.1 billion and $53.8 billion in 2007, 2006 and 2005, respectively, in the U.S. public finance market. Public Finance new business guaranteed represented 41%, 35% and 43% of total gross par guaranteed for 2007, 2006 and 2005, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further information.

The table below shows our ten largest Public Finance exposures, by repayment source, as a percentage of total Financial Guarantee net par outstanding at December 31, 2007:

| (Dollars in Millions) | Ambac Ratings [1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| California State – GO | A+ | $ 3,109 | 0.6% |
| New Jersey Transportation Trust Fund Authority – Transportation System | A+ | 2,162 | 0.4% |
| Washington State – GO | AA | 1,879 | 0.4% |
| Bay Area Toll Authority, CA Toll Bridge Revenue | AA- | 1,838 | 0.4% |
| MTA, NY Transportation Revenue (Farebox) | A | 1,724 | 0.3% |
| California Department of Water Resources, Power Supply | A | 1,694 | 0.3% |
| NYS Thruway Authority Highway & Bridge Revenue | AA- | 1,488 | 0.3% |
| New Jersey Economic Development Authority – School Facilities Construction | A+ | 1,440 | 0.3% |
| New Jersey Turnpike Authority Revenue | A | 1,374 | 0.3% |
| Massachusetts Commonwealth – GO | AA | 1,327 | 0.3% |
| Total | | $ 18,035 | 3.4% |

(1)   Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. In cases where Ambac has insured multiple tranches of an issue with varying internal ratings, or more than one obligation of an issuer with varying internal ratings, a weighted average rating is used. Ambac credit ratings are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has guaranteed the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

7

Source: AMBAC FINANCIAL GROU, 10-K, February 29, 2008

Table of Contents
U.S. Structured Finance Market

As described above in part I, Item 1, "Introduction", as part of its plan to raise additional capital and maintain triple-A ratings, Ambac has reduced or expects to suspend, discontinue or limit, its participation in various parts of the structured finance sector in 2008; our review of our activities in this sector is ongoing. In addition, we have been able to write only a limited amount of new financial guarantee business since November 2007. Following is a description of our participation in the structured finance sector to date.

Financial guarantees of securities in the U.S. structured finance market are typically issued in connection with transactions in which the securities being issued are secured by or payable from a specific pool of financial or cash flow generating assets. This pool of assets has an identifiable cash flow or market value and is generally held by a special purpose entity. Structured finance obligations insured by Ambac Assurance generally have the benefit of over-collateralization and/or other forms of credit enhancement to mitigate credit risks associated with the related assets. These forms of credit enhancement are designed to absorb the expected losses in these transactions.

Structured Finance includes the securitization of a variety of asset types such as mortgage loans, home equity loans, auto loans, student loans, credit card debt, leases, operating assets and CDOs where the majority of the underlying collateral risks are situated in the United States. Additionally, Ambac's Structured finance business encompasses both secured and unsecured debt issued by investor-owned utilities. Included within the operating asset sector are securitizations of aircraft, rental car, shipping container and rail cars fleets, as well as film rights, franchise fees, pharmaceutical royalties, and intellectual property. Included within CDOs are transactions that contain significant risks to the Residential Mortgage-Backed Securities ("RMBS") market, including subprime borrowers. Please refer to Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations – Residential Mortgage-Backed Securities Exposures" for further discussion.

Structured Finance includes credit enhancement for asset-backed commercial paper conduits ("conduits"). Conduits are used by issuers to efficiently fund assets in the commercial paper market. Typically sponsored by financial institutions, the conduits usually purchase financial assets and asset-backed securities, and issue commercial paper to fund the purchase of the assets. The typical conduit structure provides Ambac with significant credit protection prior to a claim on Ambac's insurance policy. A conduit requires program-wide credit enhancement as one of several elements needed to support the conduit's credit rating for the structure, of which Ambac provides a senior portion.

Structured Finance also includes the credit enhancement of CDOs. These transactions involve the securitization of a portfolio of corporate bonds, corporate loan obligations and/or asset-backed securities, including exposure to subprime residential mortgages (the "Securitized Assets"). The transaction structure provides certain financial protection to Ambac. This financial protection can take several forms; however, the most common are over-collateralization, first loss and excess spread. In the case of over-collateralization (i.e., the principal amount of the Securitized Assets exceeds the principal amount of the structured finance obligations guaranteed by Ambac), the structure allows the transaction to experience defaults among the Securitized Assets before a default is experienced on the structured finance obligations that have been guaranteed by Ambac. In the case of first loss, the financial guarantee only covers a senior layer of debt. A subordinated layer of debt is either retained by the seller or sold off in the form of equity and mezzanine debt to other investors; these subordinated layers absorb losses before the senior layer experiences any loss. In the case of excess spread, the Securitized Assets generate cash flow in the form of interest that is in excess of the interest payments on the related debt. Ambac has participated in CDO transactions whereby the underlying collateral contains other CDO assets (commonly referred to as CDO squared) or mezzanine tranches of RMBS securities. As a result of these underlying securities forming the collateral pool, the senior debt holders or guarantor is not afforded the same control rights or structural protection that is present in Ambac's remaining guaranteed portfolio of CDOs. Currently, Ambac has $2.9 billion of risk to these transactions.

Unlike the public finance market in which a substantial portion of the deals are bid competitively by the financial guarantors, the U.S. structured finance market is often a negotiated one. The financial guarantor will work directly with the investment bank or client to create an acceptable structure once having been awarded the business. Ambac participates in these markets through the issuance of financial guarantee insurance policies and credit default swaps.

8

Source: AMBAC FINANCIAL GROU, 10-K, February 29, 2008

Table of Contents

The U.S. structured finance market in which Ambac provides financial guarantees is broad and varied, comprising public issues, private placements and bank loans. The increasing array of classes of assets securitized or guaranteed, and the ongoing rapid changes to the market, makes estimating the aggregate size of the market that we participate in difficult. Similar to the U.S. public finance market, the U.S. structured finance market has been adversely impacted by the rating agency actions including those with respect to Ambac Assurance, other financial guarantors as well as CDO and MBS securities.

Premiums for structured finance policies are typically based on a percentage of principal insured. Structured finance premiums are generally collected periodically (e.g., monthly, quarterly or annually) from the cash flow generated by the underlying assets, and on occasion, can be collected in a single payment at policy inception date.

Ambac Assurance guaranteed gross par of $53.6 billion, $62.4 billion and $58.8 billion in 2007, 2006 and 2005, respectively, in the U.S. structured finance market. U.S. Structured Finance new business guaranteed represents 43%, 50% and 47% of total gross par guaranteed for 2007, 2006 and 2005, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further discussion.

The table below shows our ten largest Structured Finance transactions, as a percentage of total financial guarantee net par outstanding at December 31, 2007:

| ($ in Millions) | Ambac Rating[1] | Net Par Outstanding [2] | % of Total Net Par Outstanding |
|---|---|---|---|
| CDO of ABS < 25% MBS | AAA | $ 2,700 | 0.5% |
| Private Commercial Asset-Backed Transaction | BBB+ | 2,425 | 0.5% |
| Kleros Preferred Funding VI, Ltd | A | 2,397 | 0.5% |
| Iowa Student Loan Liquidity Corporation Revenue Bonds | A | 2,168 | 0.4% |
| Ridgeway Court Funding II, Ltd | AA- | 1,942 | 0.4% |
| Diversey Harbor ABS CDO, Ltd | AA- | 1,868 | 0.3% |
| Wachovia Asset Securitization Issuance II, LLC 2007-HE2 | BBB+ | 1,827 | 0.3% |
| Vermont Student Assistance Corporation Revenue Bonds | A | 1,779 | 0.3% |
| Belle Haven ABS CDO 2006-1, Ltd | A | 1,667 | 0.3% |
| Total | | $ 18,773 | 3.6% |

(1)   Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. In cases where Ambac has insured multiple tranches of an issue with varying internal ratings, or more than one obligation of an issuer with varying internal ratings, a weighted average rating is used. Ambac credit ratings are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has guaranteed the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

(2)   Ambac also has an outstanding commitment to provide a $2,934 financial guarantee on a pool of ABS CDO securities. Ambac has rated this exposure BBB+. For additional discussion, see "Residential Mortgage-backed Securities Exposure" within Part II, Item 7.

International Finance Market

As described above in part I, Item 1, "Introduction," as part of its plan to raise additional capital and maintain triple-A ratings, Ambac has reduced, or expects to suspend, discontinue or limit, its participation in various parts of the structured finance sector in international markets in 2008; our review of our activities in this sector is ongoing. Following is a description of our participation in the structured finance sector in international markets to date.

Outside of the United States, structured finance issuers, utilities, sub-sovereigns, banks and investors have used financial guarantee products, particularly in markets throughout Western Europe. In the United Kingdom, ongoing privatization efforts have shifted certain risks associated with the development or operation of infrastructure projects from the government to market participants, thus prompting sponsors to secure long term financing and investors in such projects to seek the security of financial guarantee products. These privatization efforts are currently being initiated in most other European countries and Australia as well.

9

Table of Contents

While the principles of securitization have been increasingly applied in overseas markets, development in particular countries has varied as a result of the relative sophistication of the local capital markets, level of bank disintermediation and the impact of legal and financial regulatory requirements. It is anticipated that securitization will continue to expand internationally, albeit at varying rates in each country. Ambac Assurance UK Limited, insures a wide array of obligations in the international markets including infrastructure financings, asset-securitizations, CDOs, utility obligations, whole company securitizations (e.g securitizations of substantially all of the operating assets of a corporation) and other obligations.

Ambac Assurance's strategy in the international markets is to strengthen its franchise in developed markets by focusing on high quality infrastructure, structured finance, securitization, and utility finance transactions, and in emerging markets by focusing on future flow transactions from top tier issuers (structured transactions secured by U.S. Dollar and Euro cash flows generated from exports or payment remittances) in domestic securitizations and infrastructure financings.

Ambac UK, which is authorized and regulated in the United Kingdom to provide certain classes of general financial guarantees (and is also authorized to conduct business throughout much of the European Union), has been Ambac Assurance's primary vehicle for directly issuing financial guarantee policies in the United Kingdom and the European Union. In 2005, Ambac UK established a branch office in Milan, Italy. Ambac UK has entered into net worth maintenance and reinsurance agreements with Ambac Assurance pursuant to which Ambac Assurance provides capital support to Ambac UK.

Ambac Assurance is party to an alliance in Japan with Sompo Japan Insurance Inc. ("Sompo Japan"), one of the largest property and casualty insurance companies in Japan. Although the development of the Japanese securitization market has been slow, Ambac has established a strong franchise in the consumer finance and whole business securitization sectors.

European securitization issuance achieved record levels in 2007, despite market turmoil. Residential mortgage-backed, collateralized debt obligations and commercial mortgage-backed sectors represented more than 89% and 85% of total issuance in 2007 and 2006, respectively. Tight credit spreads during 2007 continued to impact the volume available for insurance by Ambac. Accordingly, while active in other sectors, Ambac UK did not underwrite any mortgage-backed transactions in 2007 and has not done so since 2004. The following table sets forth the volume of new issue European securitizations:

| (€ in Billions) | Total Volume |
|---|---|
| 2001 | 152.6 |
| 2002 | 157.7 |
| 2003 | 217.3 |
| 2004 | 243.5 |
| 2005 | 327.0 |
| 2006 | 458.9 |
| 2007 | 461.0 |

Source: Amounts are reported by the ESF Securitization Data Report

Premiums for international finance policies are generally based on a percentage of principal insured. The timing of the collection of international finance premiums varies among individual transactions; some are collected in a single payment at policy inception date and others are collected periodically (e.g., monthly, quarterly or annually).

10

Source: AMBAC FINANCIAL GROU, 10-K, February 29, 2008

Table of Contents

Ambac Assurance guaranteed gross par of $20.1 billion, $19.0 billion and $12.7 billion in 2007, 2006 and 2005, respectively, in the international market. International Finance new business guaranteed represented 16%, 15% and 10% of total gross par guaranteed for 2007, 2006 and 2005, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further discussion.

The table below shows our ten largest International Finance transactions as a percentage of total financial guarantee net par outstanding at December 31, 2007:

| (S in Millions) | Ambac Rating[1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| Mitchells & Butlers Finance plc-UK Pub Securitisation | A+ | -$   2,565 | .0.5% |
| CDO of IG Corporate | AAA | 1,970 | 0.4% |
| Telereal Securitisation plc | AA- | 1,845 | 0.4% |
| Punch Taverns Finance plc-UK Pub Securitisation | A | 1,776 | 0.3% |
| Synthetic RMBS | AAA | 1,261 | 0.2% |
| Romulus Finance s.r.l | BBB | 1,086 | 0.2% |
| Synthetic RMBS | AAA | 1,076 | 0.2% |
| Tubelines (Finance) plc | A | 1,051 | 0.2% |
| Metronet Rail | BIG | 1,022 | 0.2% |
| Synthetic RMBS | AAA | 1,022 | 0.2% |
| Total | | $   14,674 | 2.8% |

(1) Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. In cases where Ambac has insured multiple tranches of an issue with varying internal ratings, or more than one obligation of an issuer with varying internal ratings, a weighted average rating is used. Ambac credit ratings are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has guaranteed the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

(2) Metronet BCV and SSL are separate operating corporate entities with distinguishable risk features. Individually they would not appear on this list, however their exposures are aggregated to reflect common business and financial issues currently confronting each company. This transaction's rating was upgraded to AA in 2008.

### Risk Management

In 2008, Ambac announced that it has reorganized the risk management function. This reorganization contemplates structural and process-related changes related to risk management at Ambac, with an increased emphasis on risk-adjusted returns.

All risk management responsibilities are now consolidated in a newly created Chief Risk Officer position. The Chief Risk Officer is responsible for credit risk management; capital management and deployment; and surveillance and remediation of the existing insured portfolio. In the area of credit risk management, the Chief Risk Officer is charged with responsibility to review and strengthen underwriting policies and procedures, including identification of business sectors which will be emphasized, deemphasized or exited by Ambac. The Chief Risk Officer is also empowered to veto any transaction that has been approved by the relevant credit committee. However, the CEO may override the Chief Risk Officer's veto, upon notice to the Chairman of the Audit and Risk Assessment Committee of Ambac's Board of Directors. The Chief Risk Officer reports to the Board of Directors on a "dotted line" basis and will inform and update the Audit and Risk Management Committee of the Board of Directors with respect to risk-related topics. Additionally, a newly created Capital and Risk Analysis Group, which has responsibility for transaction and portfolio based risk/return and capital analyses, reports to the Chief Risk Officer.

Ambac has a Portfolio Risk Management Committee ("PRMC") which has established various procedures and controls to monitor and manage risk. The Chief Risk Officer serves as the Chairman of the PRMC. The PRMC consists of senior risk management professionals and senior management of Ambac. Its purview is enterprise-wide and its focus is on credit risk limits and measurement, concentration and correlation of risk and the attribution of economic and regulatory capital in a portfolio context.

31

Source: AMBAC FINANCIAL GROU, 10-K, February 29, 2008

Exhibit 4

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission file number 1-10777**

# Ambac Financial Group, Inc.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3621676** |
| (State of incorporation) | (I.R.S. employer identification no.) |
| **One State Street Plaza** | **10004** |
| **New York, New York** | (Zip code) |
| (Address of principal executive offices) | |

**(212) 668-0340**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, $0.01 per share** | **New York Stock Exchange, Inc.** |
| **5.875% Debentures, Due March 24, 2103** | **New York Stock Exchange, Inc.** |
| **5.95% Debentures, Due February 28, 2103** | **New York Stock Exchange, Inc.** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large Accelerated Filer   ☒   Accelerated filer ☐   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No   ☒

The aggregate market value of voting stock held by non-affiliates of the Registrant as of the close of business on June 30, 2006 was $8,635,586,450 (based upon the closing price of the Registrant's shares of the New York Stock Exchange on that date, which was $81.98**).** For purposes of this information, the outstanding shares of Common Stock which were owned by all directors and executive officers of the Registrant were deemed to be shares of Common Stock held by affiliates.

As of February 22, 2007, 102,358,610 shares of Common Stock, par value $0.01 per share, (net of 6,834,486 treasury shares) were outstanding.

**Documents Incorporated By Reference**

Portions of Ambac Financial Group, Inc.'s Proxy Statement for its 2007 Annual Meeting of Stockholders scheduled to be held on May 8, 2007 are incorporated by reference into the Annual Report on Form 10-K in response to Part III, Items 10, 11, 12 and 14.

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

Table of Contents

Any or all of management's forward-looking statements here or in other publications may turn out to be wrong and are based on current expectations and the current economic environment. Ambac's actual results may vary materially, and there are no guarantees about the performance of Ambac's securities. Among factors that could cause actual results to differ materially are: (1) changes in the economic, credit, or interest rate environment in the United States and abroad; (2) the level of activity within the national and worldwide debt markets; (3) competitive conditions and pricing levels; (4) legislative and regulatory developments; (5) changes in tax laws; (6) the policies and actions of the United States and other governments; (7) changes in capital requirements or other criteria of rating agencies; (8) changes in accounting principles or practices that may impact Ambac's reported financial results; (9) the amount of reserves established for losses and loss expenses; (10) default of one or more of Ambac Assurance's reinsurers; (11) market spreads and pricing on insured pooled debt obligations and other derivative products insured or issued by Ambac; (12) prepayment speeds on insured asset-backed securities and other factors that may influence the amount of installment premiums paid to Ambac Assurance; and (13) other risks and uncertainties that have not been identified at this time. Ambac is not obligated to publicly correct or update any forward-looking statement if we later become aware that it is not likely to be achieved, except as required by law. You are advised, however, to consult any further disclosures we make on related subjects in Ambac's reports to the SEC.


## BUSINESS SEGMENTS

The following paragraphs describe the business operations of Ambac and its subsidiaries for its two reportable segments: Financial Guarantee and Financial Services.


### Financial Guarantee

Financial guarantee represented 74%, 79% and 83% of total revenues for 2006, 2005 and 2004, respectively. The financial guarantee segment includes financial guarantee insurance and other credit enhancement products, such as credit derivatives. Financial guarantee insurance provides an unconditional and irrevocable guarantee that protects the holder of a fixed income obligation against non-payment of principal and interest when due. Essentially, Ambac Assurance or Ambac Assurance UK makes payments if the obligor responsible for making payments fails to do so. Ambac Assurance and its subsidiaries serve the global capital markets by providing financial guarantee insurance for public finance and structured finance obligations. Total net premiums earned and other credit enhancement fees from external customers, by geographic location of risk is located in Part II, Item 8 under Note 19 of Notes to Consolidated Financial Statements. Both issuers and investors benefit from financial guarantee insurance. Issuers benefit when the insurance has the effect of lowering their cost of borrowing because the insurance premium is less than the value of the spread between the yield on the insured obligation (carrying the credit rating of Ambac Assurance) and the yield of the uninsured obligation. Financial guarantee insurance also increases the marketability of obligations issued by infrequent or unknown issuers or in connection with complex financings. Investors benefit from increased liquidity in the secondary market, reduced exposure to price volatility caused by changes in the credit quality of the underlying obligor and added protection against a potential loss in the event that the obligor defaults on its obligation.

In certain floating rate insured transactions, the issuer of insured securities is party to an interest rate swap that hedges their risk to interest rates effectively creating a synthetic fixed rate obligation. In such transactions, Ambac Assurance has, from time-to-time, insured the issuer's obligations under both the insured securities and the derivative contract.

2

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

Table of Contents

As an alternative to financial guarantee insurance, credit protection relating to a particular pool of assets, security or issuer can be provided through a credit derivative. Ambac Credit Products LLC, a wholly owned subsidiary of Ambac Assurance, provides credit protection in the global markets in credit derivative form. These credit derivatives, which are privately negotiated contracts, provide the counterparty with credit protection against the occurrence of a specific event such as a payment default or bankruptcy relating to an underlying obligation. Upon a credit event, Ambac Credit Products is required to either (i) make payments for the difference between the scheduled debt service payment due and the actual payment made by the issuer, (ii) make a payment equivalent to the difference between the par value and market value of the underlying obligation or (iii) purchase the underlying obligation at its par value and a loss is realized for the difference between the par and market value of the underlying obligation. Substantially all of Ambac Credit Product's credit derivative contracts relate to senior tranches of structured finance transactions. Credit derivatives issued by Ambac Credit Products are insured by Ambac Assurance. See "Quantitative and Qualitative Disclosures About Market Risk" located in Part II, Item 7A for further information about credit derivatives.

Ambac Assurance and its subsidiaries also guarantee or provide credit protection on obligations already carrying insurance from other financial guarantors, with Ambac Assurance generally obligated to pay only upon a default by both the underlying obligor and the original financial guarantor.

In addition to the guarantees on fixed income obligations described above, Ambac Assurance, from time to time, enters into transactions that expose the company to risks which may not be correlated to credit risk, for example weather-related or other disasters, mortality or other property and casualty type risk characteristics. Ambac underwrites such risks so that a substantial level of first loss protection would have to be exhausted before Ambac would become liable in respect of such risks. Additionally, Ambac underwrites such business primarily in relation to broad indices and reference pools which embody diverse risk characteristics.

Ambac Assurance seeks to minimize the risk inherent in its financial guarantee portfolio by maintaining a diverse portfolio which spreads its risk across a number of criteria, including issue size, type of obligation, geographic area and obligor.

Ambac derives financial guarantee revenues from: (i) premiums earned from insurance contracts; (ii) net investment income; (iii) revenue from credit derivative transactions; (iv) net realized gains and losses from sales of investment securities; and (v) certain structuring and other fees. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 and Note 19 of Notes to Consolidated Financial Statements located in Part II, Item 8 for further information.

Pricing:

Ambac Assurance determines premium rates on the basis of the type of transaction and its assessment of the risk it is guaranteeing. Factors considered in pricing include underlying credit ratings, term to maturity, structure of the issue and credit and market factors including security features and other credit enhancement features. Additionally, the interest rate spread between insured and uninsured obligations with characteristics similar to those of the proposed issue is considered in the pricing process as well as the cost and the projected return to Ambac Assurance.

Overall, the business environment has become more competitive with increased competition from bank funding, the uninsured market, senior/subordinate securitizations, other providers of credit

3

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

Table of Contents

derivatives and other triple-A rated financial guarantors. This increased competition has had an adverse impact on pricing, however this competition and credit trends such as the ones we are now experiencing are a normal part of Ambac Assurance's business. See "Competition" section below for further information.

Financial guarantee products are sold in three principal markets: the U.S. public finance market, the U.S. structured finance and asset-backed market and the international finance market.

### U. S. Public Finance Market

The U.S. public finance market includes all U.S. municipal issuance including general obligations, lease and tax-backed obligations, health care, public utilities, transportation and higher education, as well as certain infrastructure privatization transactions, such as toll road and bridge financings, public transportation financings, stadium financings, military housing and student housing. Public finance obligations are generally supported by either the taxing authority of the issuer or the issuer's or underlying obligor's ability to collect fees or assessments for certain projects or public services. Although Ambac Assurance guarantees the full range of Public Finance obligations, Ambac Assurance concentrates on those projects that require more structuring skills. Certain projects, which had been financed by the local or U.S. government alone, are now being financed through public-private partnerships. In these transactions, debt service on the bonds, rather than being paid solely by tax revenues or other governmental funds, is being paid from a variety of revenue sources, including revenues derived from the project itself. Examples of these transactions include toll road financings, stadium financings, student housing and military housing. The following table sets forth the volume of new issues of long-term (longer than 12 months) public finance bonds and the volume of new issues of insured long-term public finance bonds over the past ten years in the United States.

<u>U.S. Public Finance Long-Term Market</u>

| ($ in Billions) | New Money | Refundings | Total Volume | Refundings as Percentage of Total Volume | Insured Volume | Insured Bonds as Percentage of Total Volume |
|---|---|---|---|---|---|---|
| 1997 | 160.3 | 60.2 | 220.5 | 27.3 | 107.5 | 48.8 |
| 1998 | 204.7 | 82.0 | 286.7 | 28.6 | 145.5 | 50.7 |
| 1999 | 189.3 | 38.3 | 227.6 | 16.8 | 105.6 | 46.4 |
| 2000 | 181.3 | 19.5 | 200.8 | 9.7 | 79.3 | 39.5 |
| 2001 | 223.5 | 64.7 | 288.2 | 22.4 | 134.4 | 46.6 |
| 2002 | 266.7 | 92.1 | 358.8 | 25.7 | 178.9 | 49.9 |
| 2003 | 288.7 | 95.0 | 383.7 | 24.8 | 190.7 | 49.7 |
| 2004 | 271.7 | 88.4 | 360.1 | 24.5 | 192.7 | 53.5 |
| 2005 | 277.6 | 130.7 | 408.3 | 32.0 | 233.0 | 57.1 |
| 2006 | 306.3 | 77.1 | 383.4 | 20.1 | 184.8 | 48.2 |

Source:    Amounts are reported by The Bond Buyer. Amounts represent gross par amounts issued or insured, respectively, during such year.

Changes in volume of public finance bond issuance during this period are primarily attributable to changes in refunding activity related to the then-current interest rate environment, along with the issuers' new money requirements. Volume since 2002 has exceeded historical levels as a result of the low interest rate environment and considerable infrastructure finance needs. Insured volume as a percentage of total volume ("insured penetration") during 2001 through 2005 increased, largely the result of budget deficits experienced by municipalities and the corresponding flight to quality by investors. In 2006, insured penetration returned to more historical levels. In the U.S. public finance

4

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

**Table of Contents**

market, an issuer typically pays an up-front premium to Ambac Assurance at the time the policy is issued. Premiums are usually quoted as a percentage of the total amount of principal and interest that is scheduled to become due during the life of the insured bonds.

Proposed new public finance bond issues are submitted to Ambac Assurance by issuers (or their investment bankers or financial advisors) to determine their suitability for financial insurance. Public finance bond issues are sold on either a competitive or a negotiated basis. With respect to competitive issues, an issuer will publish a notice of sale soliciting bids for the purchase of a proposed issue of bonds. Potential bidders on the bonds then form syndicates. These syndicates then solicit a determination from some or all of the financial guarantors whether an issue is suitable for financial guarantee and at what premium rate and on what terms. The syndicate then determines whether to bid on the issue with a financial guarantee (and if so, with which financial guarantor) or without a financial guarantee. The issuer then generally selects the syndicate with the lowest bid. In a negotiated offering, the issuer has already selected an investment bank and that investment bank solicits premium quotes and terms from the financial guarantors.

Ambac Assurance also provides financial guarantees on public finance bonds outstanding in the secondary market that are typically purchased by an institution to hedge or facilitate the sale of bonds in its portfolio or inventory. The financial guarantee generally increases the sale price of bonds (typically by an amount greater than the cost of the policy) and affords a wider secondary market and therefore greater marketability to a given issue of previously issued bonds. As is the case with new issues, the premium is generally payable in full at the time of policy issuance. Ambac Assurance employs the same underwriting standards on secondary market issues that it does on new public finance issues.

Ambac Assurance guaranteed gross par of $43.1 billion, $53.8 billion and $44.6 billion in 2006, 2005 and 2004, respectively, in the U.S. public finance market. Public Finance new business guaranteed represented 35%, 43% and 38% of total gross par guaranteed for 2006, 2005 and 2004, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further information.

The table below shows our ten largest Public Finance exposures, by repayment source, as a percentage of total Financial Guarantee net par outstanding at December 31, 2006:

| (Dollars in Millions) | Ambac Ratings [1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| California State—GO | A | $ 2,464 | 0.5% |
| Washington State—GO | AA | 2,092 | 0.4% |
| MTA, NY, Transportation Revenue (Farebox) | A | 1,724 | 0.3% |
| California Department of Water Resources, Power Supply | A | 1,694 | 0.3% |
| NYS Thruway Authority, Highway & Bridge Revenue | AA- | 1,660 | 0.3% |
| New Jersey Turnpike Authority Revenue | A | 1,380 | 0.3% |
| New Jersey Transportation Trust Fund Authority – Transportation System | A+ | 1,370 | 0.3% |
| New York City, NY – GO | A+ | 1,291 | 0.2% |
| Connecticut Housing Authority, Housing Mortgage Finance Program | AAA | 1,259 | 0.2% |
| Citizens Property Insurance Corporation, FL | A- | 1,213 | 0.2% |
| Total | | $ 16,147 | 3.0% |

(1) Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. In cases where Ambac has insured multiple tranches of an issue with varying internal ratings, or more than one obligation of an issuer with varying internal ratings, a weighted average rating is used. Ambac credit ratings are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has insured the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

5

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

Table of Contents

**U.S. Structured Finance and Asset-backed Market**

Financial guarantees of securities in the U.S. structured finance and asset-backed market are typically issued in connection with transactions in which the securities being issued are secured by or payable from a specific pool of financial or cash flow generating assets. This pool of assets has an identifiable cash flow or market value and is generally held by a special purpose entity. Structured finance and asset-backed obligations insured by Ambac Assurance generally have the benefit of over-collateralization and/or other forms of credit enhancement to mitigate credit risks associated with the related assets. These forms of credit enhancement are designed to absorb the expected losses in these transactions.

Structured finance obligations include the securitization of a variety of asset types such as mortgages, home equity loans, auto loans, student loans, credit card debt, leases, operating assets and pooled debt obligations originated in the United States ("Structured Finance"). Included within the operating asset sector are securitizations of aircraft, rental car, shipping container and rail cars fleets, as well as film rights, franchise fees, pharmaceutical royalties, and intellectual property. Exposures to Enhanced Equipment Trust Certificates, included in operating assets, were $1.5 billion at December 31, 2006. Enhanced Equipment Trust Certificates are secured financings used by the airline industry to finance aircraft. The financings are tranched to create a priority of interests in the aircraft collateral.

Structured finance includes credit enhancement for asset-backed commercial paper conduits ("conduits"). Conduits are used by issuers to efficiently fund assets in the commercial paper market. Typically sponsored by financial institutions, the conduits usually purchase financial assets and asset-backed securities, and issue commercial paper to fund the purchase of the assets. The typical conduit structure provides Ambac with significant credit protection prior to a claim on Ambac's insurance policy. A conduit requires program-wide credit enhancement as one of several elements needed to support the conduit's credit rating for the structure, of which Ambac provides a senior portion.

Structured finance also includes the credit enhancement of pooled debt obligations. These transactions involve the securitization of a diverse portfolio of corporate bonds and loan obligations and asset-backed securities (the "Securitized Assets"). The transaction structure provides certain financial protection to Ambac Assurance. This financial protection can take several forms; however, the most common are over-collateralization, first loss and excess spread. In the case of over-collateralization (i.e., the principal amount of the Securitized Assets exceeds the principal amount of the structured finance obligations guaranteed by Ambac Assurance), the structure allows the transaction to experience defaults among the Securitized Assets before a default is experienced on the structured finance obligations that have been guaranteed by Ambac Assurance. In the case of first loss, the financial guarantee insurance policy only covers a senior layer of losses. A subordinated layer of losses is either retained by the seller or sold off in the form of equity and mezzanine debt to other investors. In the case of excess spread, the Securitized Assets generate cash flow in the form of interest that is in excess of the interest payments on the related debt.

6

Table of Contents

Unlike the public finance market in which a substantial portion of the deals is bid competitively by the financial guarantors, the structured and asset-backed market is often a negotiated one. The financial guarantor will work directly with the investment bank or client to create an acceptable structure once having been awarded the business. Ambac participates in these markets through the issuance of financial guarantee insurance policies and credit default swaps.

The U.S. structured finance and asset-backed market in which Ambac Assurance provides financial guarantees is broad and varied, comprising public issues, private placements and bank loans. The increasing array of classes of assets securitized or guaranteed, and the ongoing rapid changes to the market, makes estimating the aggregate size of the market that we participate in difficult.

Premiums for structured finance and asset-backed policies are typically based on a percentage of principal insured. Structured finance and asset-backed premiums can be collected in a single payment at policy inception date or collected periodically (e.g., monthly, quarterly or annually) from the cash flow generated by the underlying assets.

Ambac Assurance guaranteed gross par of $62.4 billion, $58.8 billion and $53.4 billion in 2006, 2005 and 2004, respectively, in the U.S. structured finance and asset-backed market. U. S. Structured Finance and asset-backed new business guaranteed represents 50%, 47% and 45% of total gross par guaranteed for 2006, 2005 and 2004, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further discussion.

The table below shows our ten largest Structured Finance and asset-backed transactions, as a percentage of total financial guarantee net par outstanding at December 31, 2006:

| ($ in Millions) | Ambac Rating[1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| Private Structured Finance Pool | AA + | $  2,026 | 0.4% |
| Capital One Auto Finance Trust, 2006-A | BBB | 1,995 | 0.4% |
| Iowa Student Loan Liquidity Corporation Revenue Bonds | A | 1,900 | 0.4% |
| Private Structured Finance Pool | AAA | 1,875 | 0.4% |
| Michigan Higher Education Student Loan Authority | AA | 1,782 | 0.3% |
| Hertz Vehicle Financing, LLC | BBB | 1,744 | 0.3% |
| Private Structured Finance Pool | AAA | 1,676 | 0.3% |
| Private Structured Finance Pool | AAA | 1,570 | 0.3% |
| Vermont Student Assistance Corporation Revenue Bonds | A | 1,531 | 0.3% |
| Private Structured Finance Pool | AAA | 1,524 | 0.3% |
| Total | | $  17,623 | 3.4% |

(1)    Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. In cases where Ambac has insured multiple tranches of an issue with varying internal ratings, or more than one obligation of an issuer with varying internal ratings, a weighted average rating is used. Ambac credit ratings are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has insured the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

**International Finance Market**

Outside of the United States, structured finance and asset-backed issuers, utilities, sub-sovereigns, banks and investors have used financial guarantee products, particularly in markets throughout

7

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

Table of Contents

Western Europe. In the United Kingdom, ongoing privatization efforts have shifted certain risks associated with the development or operation of infrastructure projects from the government to market participants, thus prompting sponsors to secure long term financing and investors in such projects to seek the security of financial guarantee products. These privatization efforts are currently being initiated in most other European countries and Australia as well.

While the principles of securitization have been increasingly applied in overseas markets, development in particular countries has varied as a result of the relative sophistication of the local capital markets, level of bank disintermediation and the impact of legal and financial regulatory requirements. It is anticipated that securitization will continue to expand internationally, albeit at varying rates in each country. Ambac Assurance UK Limited, insures a wide array of obligations in the international markets including infrastructure financings, asset-securitizations, pooled debt obligations, utility obligations, whole company securitizations (e.g. securitizations of substantially all of the operating assets of a corporation) and other obligations.

Ambac Assurance's strategy in the international markets is to strengthen its franchise in developed markets by focusing on high quality infrastructure, structured finance, securitization, and utility finance transactions, and in emerging markets by focusing on future flow transactions from top tier issuers (structured transactions secured by U.S. Dollar and Euro cash flows generated from exports or payment remittances) and pooled debt obligations.

Ambac UK, which is authorized and regulated in the United Kingdom to provide certain classes of general financial guarantees (and is also authorized to conduct business throughout much of the European Union), has been Ambac Assurance's primary vehicle for directly issuing financial guarantee policies in the United Kingdom and the European Union. In February 2005, Ambac UK established a branch office in Milan, Italy. Ambac UK has entered into net worth maintenance and reinsurance agreements with Ambac Assurance, which support its triple-A ratings.

Ambac Assurance is party to an alliance in Japan with Sompo Japan Insurance Inc. ("Sompo Japan"), one of the largest property and casualty insurance companies in Japan. Although the development of the Japanese securitization market has been slow, we believe that this alliance is competitively positioned for future growth.

European securitization issuance achieved record levels in 2006. This was driven by strong economic growth, improved employment and continued housing market strength. The residential mortgage-backed, collateralized debt obligations and commercial mortgage-backed sectors represented more than 85% and 71% of total issuance in 2006 and 2005, respectively. Tight credit spreads during 2006 continued to impact the volume available for insurance by Ambac. Accordingly, while active in other sectors, Ambac did not underwrite any mortgage-backed transactions in 2006. The following table sets forth the volume of new issues European securitizations:

| (€ in Billions) | Total Volume |
|---|---|
| 2000 | 78.2 |
| 2001 | 152.6 |
| 2002 | 157.7 |
| 2003 | 217.3 |
| 2004 | 243.5 |
| 2005 | 327.0 |
| 2006 | 458.9 |

Source: Amounts are reported by the ESF Securitization Data Report

8

**Table of Contents**

Premiums for international finance policies are generally based on a percentage of principal insured. The timing of the collection of international finance premiums varies among individual transactions; some are collected in a single payment at policy inception date and others are collected periodically (e.g., monthly, quarterly or annually).

Ambac Assurance guaranteed gross par of $19.0 billion, $12.7 billion and $20.1 billion in 2006, 2005 and 2004, respectively, in the international market. International Finance new business guaranteed represented 15%, 10% and 17% of total gross par guaranteed for 2006, 2005 and 2004, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further discussion.

The table below shows our ten largest International Finance transactions as a percentage of total financial guarantee net par outstanding at December 31, 2006:

| ($ in Millions) | Ambac Rating(1) | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| Synthetic CDO-IG Corporate Pool | AAA | $ 2,695 | 0.5% |
| Mitchells & Butlers Finance plc-UK Pub Securitisation | A + | 2,547 | 0.5% |
| Telereal Securitisation plc | AA – | 2,087 | 0.4% |
| Synthetic CDO-IG Corporate Pool | AAA | 1,781 | 0.3% |
| Synthetic CDO-IG Corporate Pool | AAA | 1,577 | 0.3% |
| RMAC Mortgage Services Limited 2004-NSP2 | A – | 1,186 | 0.2% |
| Synthetic RMBS | AAA | 1,143 | 0.2% |
| Synthetic RMBS | AAA | 1,141 | 0.2% |
| Punch Taverns Finance plc-UK Pub Securitisation | A | 1,123 | 0.2% |
| Synthetic RMBS | AAA | 1,069 | 0.2% |
| Total | | $ 16,349 | 3.0% |

(1)   Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. In cases where Ambac has insured multiple tranches of an issue with varying internal ratings, or more than one obligation of an issuer with varying internal ratings, a weighted average rating is used. Ambac credit ratings are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has insured the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

**Risk Management**

Ambac has a Portfolio Risk Management Committee ("PRMC") which has established various procedures and controls to monitor and manage credit risk. The PRMC consists of senior risk management professionals and senior management of Ambac. Its purview is enterprise-wide and its focus is on credit risk limits and measurement, concentration and correlation of risk and the attribution of economic and regulatory capital in a portfolio context.

Ambac has a Transaction Standards Committee which evaluates the suitability of transactions and products for Ambac participation with particular emphasis on potential legal, accounting, regulatory and/or reputation risks.

Underwriting guidelines, policies and procedures have been developed by Ambac Assurance's management with the intent that Ambac Assurance guarantees only those obligations which, in the

9

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

Table of Contents

**CRITICAL ACCOUNTING ESTIMATES**

The discussion and analysis of our financial condition and results of operations are based upon our Consolidated Financial Statements, which have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires us to make estimates and judgments that affect the reported amount of assets and liabilities, revenues and expenses and related disclosure of contingent assets and liabilities at the date of our financial statements. Actual results may differ from these estimates under different assumptions or conditions.

Critical accounting estimates are defined as those that require management to make significant judgments and could potentially result in materially different results under different assumptions and conditions. Management has identified the accounting for loss and loss expenses and the valuation of financial instruments as critical accounting estimates. This discussion should be read in conjunction with the consolidated financial statements and notes thereon included elsewhere in this report. Management has discussed each of these critical accounting estimates with the Audit and Risk Assessment Committee of the Board of Directors.

*Financial Guarantee Insurance Losses and Loss Expenses.* The loss reserve for financial guarantee insurance discussed in this critical accounting estimates disclosure relates only to Ambac's non-derivative insurance business. Losses and loss expenses are based upon estimates of the ultimate aggregate losses inherent in the non-derivative Financial Guarantee portfolio as of the reporting date. The evaluation process for determining the level of reserves is subject to certain estimates and judgments.

The liability for losses and loss expenses consists of active credit and case basis credit reserves. Ambac establishes an active credit reserve to reflect probable and estimable losses due to credit deterioration on insured credits that have not yet defaulted or been reported as of the reporting date. The active credit reserve is established through a process that begins with estimates of probable losses inherent in the adversely classified credit portfolio. These estimates are based upon: (i) Ambac's internal system of credit ratings, which are analogous to the risk ratings of the major rating agencies; (ii) internally developed historical default information (taking into consideration ratings and average life of an obligation); (iii) internally developed loss severities; and (iv) the net par outstanding on the adversely classified credit. The loss severities and default information are based on rating agency information and are specific to each bond type and are established and approved by Ambac's Portfolio Risk Management Committee. The Portfolio Risk Management Committee is comprised of senior risk management professionals and other senior management of Ambac. Our Surveillance group is responsible for designating the classified rating of individual credits and assigning credit ratings, which in turn affect default probabilities used in estimating active credit reserves.

For certain adversely classified credit exposures, Ambac's additional monitoring and loss remediation efforts may provide information relevant to the estimate of the active credit reserve. Additional remediation activities applied to adversely classified credits can include various actions by Ambac. The most common actions include obtaining detailed appraisal information on collateral, more frequent meetings with the issuer's or servicer's management to review operations, financial condition and financial forecasts and more frequent analysis of the issuer's financial statements. In estimating the active credit reserve Ambac uses relevant credit-specific information obtained from its remediation efforts to supplement the statistical approach discussed above.

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

Table of Contents

Case basis credit reserves are established for losses on insured obligations that have already defaulted. We believe our definition of case basis credit reserves differs from other financial guarantee industry participants. Our case reserves represent the present value of anticipated loss and loss expense payments expected over the estimated period of default. Loss and loss expenses consider defaulted debt service payments, estimated expenses associated with settling the claims and estimated recoveries under collateral and subrogation rights.

The primary assumptions impacting the estimate of loss reserves are the probability of default and severity of loss given a default. The probability of default assumption represents the percentage chance that a particular insured obligation will default over its remaining life. Probability of default assumptions are based upon rating agency studies of bond defaults given a particular asset class, rating and remaining tenor of an underlying obligation, modified as appropriate by Ambac's experience and judgment. Severity of loss represents the amount of loss that would be incurred on a defaulted obligation due to the difference in the amount of net par guaranteed and the value of the related collateral and other subrogation rights. Loss severity estimates are based upon available evidence such as rating agency recovery rates with respect to debt obligations in the particular asset class, review of financial statements, collateral performance, and/or surveillance data such as collateral appraisals. However, when credits are in default or have specific attributes that warrant an adjustment, we typically develop a best estimate of the loss based upon transaction specific elements rather than a statistical loss as our knowledge is greater as to the ultimate outcome of these credits due to our surveillance and remediation activity.

For the active credit reserve component of our total reserves, as the probability of default for an individual credit increases and/or the severity of loss given default increases, our loss reserve for that insured obligation will also increase. Political, economic or other unforeseen events could have an adverse impact on default probabilities and loss severities. Our experience has shown that credit deterioration and related changes in the default probabilities are generally gradual processes that typically occur over a long period of time. Nonetheless, downgrades to the underlying rating of a classified credit, particularly those individual credits with a large net par balance, could have a significant impact on our reserves. Case basis credit reserves are only sensitive to severity assumptions because the underlying financial obligation has already defaulted (that is, a 100% probability of default).

Adjustments to our loss reserves may create volatility in our financial results in any given quarter or year. Loss reserve volatility will be a direct result of the credit performance of our insured portfolio including the number, size, asset classes and quality of credits included on our classified list. The number and severity of adversely classified credits depend to a large extent on transaction specific attributes, but will generally increase during periods of economic stress and decline during periods of economic stability. Due to the small number of credits and size of certain individual adversely classified credits, modest changes in underlying ratings or classifications can have a large impact on any quarter's provision for losses and loss expenses. Furthermore, external influences on our transactions beyond our control may result in favorable or unfavorable development on our reserves. Historically Ambac has not ceded large percentages of outstanding exposures to our reinsurers, therefore, reinsurance recoveries have not had a significant effect on loss reserve volatility. The table below indicates the number of credits and net par outstanding for case and active credit reserves at December 31, 2006:

39

Table of Contents

| | Number of credits | | Net par outstanding |
|---|---|---|---|
| Active credit reserves | 55 | $ | 3,831 million |
| Case reserves | 7 | | 668 million |
| Totals | 62 | $ | 4,499 million |

Ambac has exposure to various bond types issued in the debt capital markets. Our experience has shown that for the majority of bond types, we have not experienced claims due to underlying defaults and therefore the estimate of loss severity has remained constant. However, for certain bond types, Ambac has loss experience that indicates that factors or events could have a material impact on the original estimate of loss severity. We have observed that, with respect to four bond types in particular, it is reasonably possible that a material change in actual loss severities could occur over time. These four bond types are healthcare institutions, aircraft lease securitizations known as Enhanced Equipment Trust Certificates ("EETC"), collateralized debt obligations ("CDOs") and mortgage-backed and home equity securitizations. These four bond kinds represent 55% of our ever-to-date claim payments. Typically, bonds insured by Ambac in the healthcare sector are secured by revenues generated by a hospital enterprise. The value of a hospital and its ability to generate revenues are primarily impacted by the essentiality of that hospital enterprise to a particular community. For example, hospitals that do not have significant competition in a community generally have more stable collateral values than facilities in communities with significant competition. Intense competition in the global airline industry and high energy costs could adversely impact our EETC transactions. Increases in mortgage rates, unemployment and/or personal bankruptcies could adversely impact residential real estate values and the probability of default and severity of loss for our transactions. As a result of our experience to date, we note that the mortgage-backed and home equity ultimate severities have been less than or equal to our current severity assumption. However, our past experience has been observed during a period of rising real estate values for much of the United States. When calculating modeled loss estimates for an insured CDO obligation, Ambac considers the unique attributes of the underlying collateral and transaction. It is reasonably possible that loss estimates for CDOs may increase as a result of increased probability of default and severity of loss of the underlying collateral; however Ambac's exposure to CDOs in its classified portfolio is currently limited.

Currently, the credits that comprise our case basis credit reserves do not include any of the four bond kinds discussed above. As such, we do not have a basis to adjust our severity assumptions to provide a reasonably possible negative loss scenario.

Generally, severity assumptions are established for entire asset classes and therefore represent an average severity of loss given a default. Therefore, we have not provided reasonably possible negative scenarios for the severity assumption. The table below outlines the estimated impact on the December 31, 2006 consolidated loss reserve from reasonably possible increases in the probability of default estimate arising via an assumption of one full letter downgrade for each credit of the appropriate bond type that presently resides within the adversely classified credit listing.

| Category (Dollars in millions) | Net Par Outstanding | | Increase in Reserve Estimate |
|---|---|---|---|
| Transportation | $ 1,007 | $ | 35 |
| Healthcare | $ 478 | $ | 23 |
| Mortgage-backed and home equity | $ 1,195 | $ | 16 |
| EETC | $ 541 | $ | 3 |

40

Source: AMBAC FINANCIAL GROU, 10-K, March 01, 2007

Table of Contents

At December 31, 2006, Ambac's existing loss and loss expense liability for Hurricane Katrina amount to $50.1 million, down from the original estimate of $92 million established in the third quarter of 2005. Ambac's exposure to losses as a result of the hurricane is derived primarily from its guarantees of municipal bonds in the greater New Orleans area and the Gulf-front regions that were most seriously impacted by the storm in the third quarter of 2005. In the third quarter of 2006, the state of Louisiana issued $400 million of Gulf Zone bonds backed by the full faith and credit of the state. Funds from that bond issuance went to certain issuers within Orleans parish to assist in debt service payments on their outstanding debt obligations. This liquidity injection is a positive development for our insured credits that has been thoroughly considered in the estimation of reserves and is the primary reason for the decline in the loss reserve estimate at December 31, 2006 from the levels in 2005. In determining our loss estimates, our analysis has considered the unprecedented nature of the disaster, including the displacement of the communities' residents, and the unique aspects of each insured bond, such as the nature of the revenue source, the level of debt service reserves, if any, and other transaction protections. The severity of loss on these credits will be impacted by the timing and extent of residents' return to the affected areas as well as further direct and indirect governmental support. Throughout the history of Ambac, there have not been any significant losses resulting from natural disasters.

Ambac's management believes that the reserves for losses and loss expenses are adequate to cover the ultimate net cost of claims, but the reserves are based on estimates and there can be no assurance that the ultimate liability for losses will not exceed such estimates.

_Valuation of Financial Instruments._ The fair market values of financial instruments held are determined by using independent market quotes when available and valuation models when market quotes are not available. Ambac's financial instruments categorized as assets are mainly comprised of investments in fixed income securities and derivative contracts.

Investments in fixed income securities are accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") 115, "Accounting for Certain Investments in Debt and Equity Securities". SFAS 115 requires that all debt instruments and certain equity instruments be classified in Ambac's balance sheet according to their purpose and, depending on that classification, be carried at either cost or fair market value. The fair values of fixed income investments are based primarily on quoted market prices received from a nationally recognized pricing service or dealer quotes. For those fixed income investments where broker quotes were not available, fair values are based on internal valuation models. Key inputs to the internal valuation models include maturity date, coupon and generic yield curves for industry and credit rating characteristics that closely match those characteristics of the specific investment securities being valued. The valuation results from these models could differ materially from amounts that would actually be realized in the market. Approximately 1% of the investment portfolio was valued using internal valuation models at December 31, 2006 and 2005.

Ambac's exposure to derivative instruments is created through interest rate, currency, total return and credit default swaps. These contracts are accounted for at fair value under SFAS 133 "Accounting for Derivative Instruments and Certain Hedging Activities," as amended ("SFAS 133"). Fair value is determined based upon market quotes from independent sources, when available. When independent quotes are not available, fair value is determined using valuation models. These valuation models require market-driven inputs, including contractual terms, credit spreads and ratings on underlying referenced obligations, yield curves and tax-exempt interest ratios. The net fair value of derivative contracts at December 31, 2006 and 2005 was $352 million and $174 million, respectively, of which

41

Exhibit 5

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2005**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission file number 1-10777**

## Ambac Financial Group, Inc.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3621676** |
| (State of incorporation) | (I.R.S. employer identification no.) |
| **One State Street Plaza** | **10004** |
| **New York, New York** | (Zip code) |
| (Address of principal executive offices) | |

**(212) 668-0340**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, $0.01 per share** | **New York Stock Exchange, Inc.** |
| **5.875% Debentures, Due March 24, 2103** | **New York Stock Exchange, Inc.** |
| **5.95% Debentures, Due February 28, 2103** | **New York Stock Exchange, Inc.** |
| **7% Debentures Due October 17, 2051** | **New York Stock Exchange, Inc.** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large Accelerated Filer ☒   Accelerated filer ☐   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☒

The aggregate market value of voting stock held by non-affiliates of the Registrant as of the close of business on June 30, 2005 was $7,449,006,913 (based upon the closing price of the Registrant's shares of the New York Stock Exchange on that date, which was $69.76). For purposes of this information, the outstanding shares of Common Stock which were owned by all directors and executive officers of the Registrant were deemed to be shares of Common Stock held by affiliates.

As of March 6, 2006, 105,524,792 shares of Common Stock, par value $0.01 per share, (net of 3,668,304 treasury shares) were outstanding.

**Documents Incorporated By Reference**

Portions of Ambac Financial Corp., Inc.'s Proxy Statement for its 2006 Annual Meeting of Stockholders scheduled to be held on May 2, 2006 are incorporated by reference into the Annual Report on Form 10-K in response to Part III, Items 10, 11, 12 and 14.

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

States and abroad; (2) the level of activity within the national and worldwide debt markets; (3) competitive conditions and pricing levels; (4) legislative and regulatory developments; (5) changes in tax laws; (6) the policies and actions of the United States and other governments; (7) changes in capital requirements or other criteria of rating agencies; (8) changes in accounting principles or practices that may impact Ambac Financial Group's reported financial results; (9) the amount of reserves established for losses and loss expenses; (10) default of one or more of Ambac Assurance's reinsurers; (11) market spreads and pricing on insured pooled debt obligations and other derivative products insured or issued by Ambac Financial Group; (12) prepayment speeds on insured asset-backed securities and other factors that may influence the amount of installment premiums paid to Ambac Assurance; and (13) other risks and uncertainties that have not been identified at this time. Ambac Financial Group is not obligated to publicly correct or update any forward-looking statement if we later become aware that it is not likely to be achieved, except as required by law. You are advised, however, to consult any further disclosures we make on related subjects in Ambac Financial Group's reports to the SEC.

## BUSINESS SEGMENTS

The following paragraphs describe the business operations of Ambac Financial Group and its subsidiaries for its two reportable segments: Financial Guarantee and Financial Services.

### Financial Guarantee

The financial guarantee segment includes financial guarantee insurance and other credit enhancement products, such as credit derivatives. Financial guarantee insurance provides an unconditional guarantee that protects the holder of a financial obligation against non-payment of principal and interest when due. Financial guarantee insurance is a form of credit enhancement that benefits both the issuer and the investor. Issuers benefit because their insured securities are sold with the highest available credit rating, resulting in interest cost savings and greater marketability. In addition, for complex financings and obligations of issuers that are not well known by investors, credit enhanced obligations receive greater market acceptance than obligations without credit enhancement. Investors benefit from greater marketability, secondary market price stability, active credit surveillance and protection from loss associated with issuer default. Financial guarantee products are sold in three principal markets: the U.S. public finance market, the U.S. structured finance and asset-backed market and the international finance market.

In certain floating rate insured transactions, the issuer of insured securities is party to an interest rate swap that hedges their risk to interest rates effectively creating a synthetic fixed rate obligation. In such transactions, Ambac Assurance has, from time-to-time, insured the issuer's obligations under both the insured securities and the derivative contract.

As an alternative to financial guarantee insurance, credit protection relating to a particular security or issuer can be provided through a credit derivative, such as a credit default swap. Under the terms of a credit default swap, the seller of credit protection makes a specified payment(s) to the buyer of credit protection upon the occurrence of one or more specified credit events with respect to a referenced obligation or entity.

Ambac Assurance guarantees obligations already carrying insurance from other monoline guarantors, with Ambac Assurance generally obligated to pay claims only upon a default by both the underlying obligor and the original financial guarantor.

3

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

Ambac Financial Group derives financial guarantee revenues from: (i) premiums earned from insurance contracts; (ii) net investment income; (iii) revenue from credit derivative transactions; (iv) net realized gains and losses from sales of investment securities; and (v) certain structuring and other fees. Financial guarantee revenues were $1,324.5 million, $1,168.7 million, and $1,033.6 million in 2005, 2004, and 2003, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 and Note 18 of Notes to Consolidated Financial Statements located in Part II, Item 8 for further information.

Pricing:

Ambac Assurance determines premium rates on the basis of the type of transaction and its assessment of the risk it is guaranteeing. Factors considered in pricing include term to maturity, structure of the issue and credit and market factors including security features and other credit enhancement features. Additionally, the interest rate spread between insured and uninsured obligations with characteristics similar to those of the proposed bond issue is considered in the pricing process as well as the cost and the projected return to Ambac Assurance. The premium rate for a new issue also takes into account the benefits to be obtained by the issuer.

Overall, the business environment has become more competitive. Competition arises from both other insurers as well as other transaction execution (e.g. senior/subordinate structure). This increased competition has had a moderately adverse impact on pricing. See "Competition" section below for further information.

**U. S. Public Finance Market**

The U.S. public finance market includes taxable and tax-exempt bonds, notes and other evidences of indebtedness issued primarily by states, political subdivisions (e.g., cities, counties and towns), water, sewer, electric and other utility districts, airports, higher educational institutions, hospitals, transportation and housing authorities. Public finance obligations are generally supported by either the taxing authority of the issuer or the issuer's or underlying obligor's ability to collect fees or assessments for certain projects or public services. Although Ambac Assurance guarantees the full range of Public Finance obligations, Ambac Assurance concentrates on those projects that require more structuring skills. Certain projects, which had been financed by the local or U.S. government alone, are now being financed through public-private partnerships. In these transactions, debt service on the bonds, rather than being paid solely by tax revenues or other governmental funds, is being paid from a variety of revenue sources, including revenues derived from the project itself. Examples of these transactions include stadium financings, student housing and military housing. Included in transportation obligations is exposure to U.S. airports. Airport obligations are generally supported by (i) terminal lease revenues, parking and other concession revenues; (ii) passenger facility charges; or (iii) payments in respect of specific airport facilities. The following table sets forth the volume of new issues of long-term (longer than 12 months) public finance bonds and the volume of new issues of insured long-term public finance bonds over the past ten years in the United States.

4

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

U.S. Public Finance Long-Term Market

| ($ in Billions) | New Money | Refundings | Total Volume | Refundings as Percentage of Total Volume | Insured Volume | Insured Bonds as Percentage of Total Volume |
|---|---|---|---|---|---|---|
| 1996 | 139.1 | 45.9 | 185.0 | 24.8 | 85.7 | 46.3 |
| 1997 | 160.3 | 60.2 | 220.5 | 27.3 | 107.5 | 48.8 |
| 1998 | 204.7 | 82.0 | 286.7 | 28.6 | 145.5 | 50.7 |
| 1999 | 189.3 | 38.3 | 227.6 | 16.8 | 105.6 | 46.4 |
| 2000 | 181.3 | 19.5 | 200.8 | 9.7 | 79.3 | 39.5 |
| 2001 | 223.5 | 64.7 | 288.2 | 22.4 | 134.4 | 46.6 |
| 2002 | 266.7 | 92.1 | 358.8 | 25.7 | 178.9 | 49.9 |
| 2003 | 288.7 | 95.0 | 383.7 | 24.8 | 190.7 | 49.7 |
| 2004 | 271.7 | 88.4 | 360.1 | 24.5 | 192.7 | 53.5 |
| 2005 | 275.9 | 130.2 | 406.1 | 32.1 | 228.4 | 56.2 |

Source:    Amounts, except for 2005, are reported by The Bond Buyer's 2005 Yearbook. The 2005 amounts are Ambac Assurance estimates, compiled from Securities Data Company, Inc. and the Bond Buyer. Amounts represent gross par amounts issued or insured, respectively, during such year.

The foregoing table illustrates the changes in the total volume and insured volume of new issues of public finance bonds over the past ten years. Changes in volume of public finance bond issuance during this period are primarily attributable to changes in refunding activity related to the then-current interest rate environment, along with the issuers' new money requirements. Volume since 2002 has exceeded historical levels as a result of the low interest rate environment and considerable infrastructure finance needs. Insured volume as a percentage of total volume ("insured penetration"), which had grown consistently from 1996 through 1998, declined during 1999 and 2000. The decline during 2000 is generally considered to have resulted from the combination of the relatively high credit quality of issues that came to market during the period and the firmness in premium pricing in the industry. During 2001 through 2005, the insured penetration has increased, largely the result of budget deficits experienced by municipalities and the corresponding flight to quality by investors.

In the U.S. public finance market, an issuer typically pays an up-front premium to Ambac Assurance at the time the policy is issued. Premiums are usually quoted as a percentage of the total amount of principal and interest that is scheduled to become due during the life of the insured bonds.

Proposed new public finance bond issues are submitted to Ambac Assurance by issuers (or their investment bankers or financial advisors) to determine their suitability for financial insurance. Public finance bond issues are sold on either a competitive or a negotiated basis. With respect to competitive issues, an issuer will publish a notice of sale soliciting bids for the purchase of a proposed issue of bonds. Potential bidders on the bonds then form syndicates. These syndicates then solicit a determination from some or all of the financial guarantors whether an issue is suitable for financial guarantee and at what premium rate and on what terms. The syndicate then determines whether to bid on the issue with a financial guarantee (and if so, with which financial guarantor) or without a financial guarantee. The issuer then generally selects the syndicate with the lowest bid. In a negotiated offering, the issuer has already selected an investment bank and that investment bank solicits premium quotes and terms from the financial guarantors.

5

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

Ambac Assurance also provides financial guarantees on public finance bonds outstanding in the secondary market that are typically purchased by an institution to hedge or facilitate the sale of bonds in its portfolio or inventory. The financial guarantee generally increases the sale price of bonds (typically by an amount greater than the cost of the policy) and affords a wider secondary market and therefore greater marketability to a given issue of previously issued bonds. As is the case with new issues, the premium is generally payable in full at the time of policy issuance. Ambac Assurance employs the same underwriting standards on secondary market issues that it does on new public finance issues.

Ambac Assurance guaranteed gross par of $53.8 billion, $44.6 billion and $43.0 billion in 2005, 2004 and 2003, respectively, in the U.S. public finance market. Public Finance new business guaranteed represented 43%, 38% and 37% of total gross par guaranteed for 2005, 2004 and 2003, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further information.

The table below shows our ten largest Public Finance exposures, by repayment source, as a percentage of total Financial Guarantee net par outstanding at December 31, 2005:

| (Dollars in Millions) | Ambac Ratings [1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| California State—GO | A | $ 2,136 | 0.4% |
| California Department of Water Resources, Power Supply | A | 1,694 | 0.4% |
| MTA, NY, Transportation Revenue (Farebox) | A | 1,684 | 0.4% |
| NYS Thruway Authority, Highway & Bridge Revenue | AA- | 1,464 | 0.3% |
| New Jersey Turnpike Authority Revenue | A | 1,379 | 0.3% |
| New York City, NY—GO | A+ | 1,322 | 0.3% |
| Washington State—GO | AA | 1,289 | 0.3% |
| New Jersey Economic Development Authority—School Facilities Construction | A+ | 1,137 | 0.2% |
| New Jersey Transportation Trust Fund Authority—Transportation System | A+ | 1,122 | 0.2% |
| South Carolina Transportation Infrastructure Bank Revenue | A- | 1,092 | 0.2% |
| Total | | $ 14,319 | 3.0% |

(1)    Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. They are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has insured the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

**U.S. Structured Finance and Asset-backed Market**

Financial guarantees of securities in the U.S. structured finance and asset-backed market are typically issued in connection with transactions in which the securities being issued are secured by or payable from a specific pool of financial or cash flow generating assets. This pool of assets has an identifiable cash flow or market value and is generally held by a special purpose entity. Structured finance and asset-backed obligations insured by Ambac Assurance generally have the benefit of over-collateralization and/or other forms of credit enhancement to mitigate credit risks associated with the related assets. These forms of credit enhancement are designed to absorb the expected losses in these transactions.

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

Structured finance obligations include the securitization of a variety of asset types such as mortgages, home equity loans, auto loans, student loans, credit card debt, leases, commercial asset-backed securities and pooled debt obligations originated in the United States ("Structured Finance"). Included within the commercial asset-backed sector are securitizations of operating assets, including aircraft, rental car fleets, and rail cars, as well as film and publishing royalties.

Structured finance includes credit enhancement for asset-backed commercial paper conduits ("conduits"). Conduits are used by issuers to efficiently fund assets in the short-term commercial paper market. Typically sponsored by financial institutions, the conduits usually purchase financial assets and asset-backed securities, and issue commercial paper to fund the purchase of the assets. The typical conduit structure provides Ambac with significant credit protection prior to a claim on Ambac's insurance policy. A conduit requires program-wide credit enhancement as one of several elements needed to support the conduit's credit rating for the structure, of which Ambac provides a senior portion.

Structured Finance also includes the credit enhancement of pooled debt obligations, including structured credit derivatives. These transactions involve the securitization of a diverse portfolio of corporate bonds and loan obligations and asset-backed securities (the "Securitized Assets"). The transaction structure provides certain financial protection to Ambac Assurance. This financial protection can take several forms, however, the most common are over-collateralization, first loss and excess spread. In the case of over-collateralization (e.g., the principal amount of the Securitized Assets exceeds the principal amount of the structured finance obligations guaranteed by Ambac Assurance), the structure allows the transaction to experience defaults among the Securitized Assets before a default is experienced on the structured finance obligations that have been guaranteed by Ambac Assurance. In the case of first loss, the financial guarantee insurance policy only covers a senior layer of losses. A subordinated layer of losses is either retained by the seller or sold off in the form of equity and mezzanine debt to other investors. In the case of excess spread, the financial assets generate cash flow in the form of interest that is in excess of the interest payments on the related debt.

Unlike the public finance market in which a substantial portion of the deals is bid competitively by the financial guarantors, the structured and asset-backed market is often a negotiated one. The financial guarantor will work directly with the investment bank or client to create an acceptable structure once having been awarded the business.

The U.S. structured finance and asset-backed market in which Ambac Assurance provides financial guarantees is broad and varied, comprising public issues and private placements. The increasing array of classes of assets securitized or guaranteed, and the ongoing rapid changes to the market, makes estimating the aggregate size of the market that we participate in difficult.

Premiums for structured finance and asset-backed policies are typically based on a percentage of principal insured. Structured finance and asset-backed premiums can be collected in a single payment at policy inception date or collected periodically (e.g., monthly, quarterly or annually) from the cash flow generated by the underlying assets.

Ambac Assurance guaranteed gross par of $58.8 billion, $53.4 billion and $50.2 billion in 2005, 2004 and 2003, respectively, in the U.S. structured finance and asset-backed market. U. S. Structured Finance new business guaranteed represents 47%, 45% and 44% of total gross par guaranteed for 2005, 2004 and 2003, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further discussion.

7

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

The table below shows our ten largest Structured Finance transactions, as a percentage of total financial guarantee net par outstanding at December 31, 2005:

| ($ in Millions) | Ambac Rating [1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| Private Structured Finance Pool | AA | $ 2,767 | 0.6% |
| Countrywide Revolving Home Equity Loan Trust 2005—F | BBB+ | 2,499 | 0.5% |
| Cendant Rental Car Funding | BBB | 2,415 | 0.5% |
| Iowa Student Loan Liquidity Corporation Revenue Bonds | A | 1,900 | 0.4% |
| Hertz Vehicle Financing, LLC Series 2005-2 | BBB | 1,847 | 0.4% |
| Michigan Higher Education Student Loan Authority | AA | 1,759 | 0.4% |
| Private Structured Finance Pool | AAA | 1,644 | 0.3% |
| Vermont Student Assistance Corporation Revenue Bonds | A | 1,596 | 0.3% |
| ARG Rental Car Funding Corporation | BBB | 1,384 | 0.3% |
| Synthetic RMBS | AAA | 1,375 | 0.3% |
| Total | | $ 19,186 | 4.0% |

(1)   Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. They are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has insured the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

**International Finance Market**

Outside of the United States, structured finance and asset-backed issuers, utilities, sovereign and sub-sovereign issuers, and other issuers have used financial guarantee products, particularly in markets throughout Western Europe. In the United Kingdom, ongoing privatization efforts have shifted certain risks associated with the development or operation of infrastructure projects from the government to market participants, thus prompting investors in such projects to seek the security of financial guarantee products. These privatization efforts are currently being initiated in most other European countries as well. In Western Europe and the emerging markets, interest in asset-backed securitization is expanding.

While the principles of securitization have been increasingly applied in overseas markets, development in particular countries has varied as a result of the relative sophistication of the local capital markets and the impact of legal and financial regulatory requirements. It is anticipated that securitization will continue to expand internationally, albeit at varying rates in each country. Ambac Assurance UK Limited, insures a wide array of obligations in the international markets including infrastructure financings, asset-securitizations, pooled debt obligations (including structured credit derivatives), utility obligations, whole company securitizations (e.g. securitizations of substantially all of the operating assets of a corporation) and other obligations.

Ambac Assurance's strategy in the international markets is to strengthen its franchise in developed markets by focusing on high quality infrastructure, structured finance, securitization, and utility finance transactions, and in emerging markets by focusing on top tier future flow transactions (structured transactions secured by U.S. Dollar cash flows generated from exports or payment remittances) and pooled debt obligations.

Ambac UK, which is authorized and regulated in the United Kingdom to provide certain classes of general financial guarantees (and is also authorized to conduct business throughout much of the

8

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

European Union), has been Ambac Assurance's primary vehicle for directly issuing financial guarantee policies in the United Kingdom and the European Union. In February 2005, Ambac UK established a branch office in Milan, Italy. Ambac UK has entered into net worth maintenance and reinsurance agreements with Ambac Assurance, which support its triple-A ratings.

Ambac Assurance is party to an alliance in Japan with Sompo Japan Insurance Inc. ("Sompo Japan"). Although the development of the Japanese securitization market has been slow, we believe that this alliance is competitively positioned for future growth.

While there is evidence that the volume of international structured finance transactions has increased in the recent past, unlike the U.S. public finance and domestic asset-backed markets, there are few statistics that effectively track aggregate volumes in the global markets. There are several reasons for this, including the small relative size of individual markets, different currencies, the varied nature of the deals coming to market, the early stages of development of certain asset classes and the fact that many international deals are privately placed.

Premiums for international finance policies are based on a percentage of either principal or principal and interest insured. The timing of the collection of international finance premiums varies among individual transactions; some are collected in a single payment at policy inception date and others are collected periodically (e.g., monthly, quarterly or annually).

Ambac Assurance guaranteed gross par of $12.7 billion, $20.1 billion and $22.1 billion in 2005, 2004 and 2003, respectively, in the international market. International Finance new business guaranteed represented 10%, 17% and 19% of total gross par guaranteed for 2005, 2004 and 2003 respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" located in Part II, Item 7 for further discussion.

The table below shows our ten largest International Finance transactions as a percentage of total financial guarantee net par outstanding at December 31, 2005:

| ($ in Millions) | Ambac Rating[1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| Synthetic CDO—IG Corporate Pool | AAA | $ 2,415 | 0.5% |
| Synthetic CDO—IG Corporate Pool | AA- | 2,127 | 0.4 |
| RMAC Mortgage Services Limited 2004-NSP2 | A- | 2,089 | 0.4 |
| Synthetic CDO—IG Corporate Pool | AAA | 2,015 | 0.4 |
| Synthetic CDO—IG Corporate Pool | AAA | 1,577 | 0.3 |
| Mitchells & Butlers Finance plc-UK Pub Securitisation | A | 1,468 | 0.3 |
| Synthetic RMBS | AAA | 1,203 | 0.3 |
| Telereal Securitisation plc | AA | 1,139 | 0.2 |
| Synthetic CDO—IG Corporate Pool | AAA | 1,118 | 0.2 |
| Synthetic RMBS | AAA | 1,095 | 0.2 |
| Total | | $ 16,246 | 3.2% |

(1) Internal Ambac credit ratings are provided solely to indicate the underlying credit quality of guaranteed obligations based on the view of Ambac Assurance. They are subject to revision at any time and do not constitute investment advice. Ambac Assurance, or one of its affiliates, has insured the obligations listed and may also provide other products or services to the issuers of these obligations for which Ambac may have received premiums or fees.

9

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

**Item 6. Selected Financial Data.**

The following financial information for the five years ended December 31, 2005, has been derived from Ambac's Consolidated Financial Statements. This information should be read in conjunction with the Consolidated Financial Statements and related notes located in Part II, Item 8.

| Financial Data<br>(Dollars in millions, except per share amounts) | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| ***Statement of Operations*** | | | | | |
| Gross premiums written | $ 1,095.7 | $ 1,047.8 | $ 1,143.7 | $ 904.0 | $ 683.3 |
| Net premiums earned and other credit enhancement fees | 866.1 | 764.0 | 667.3 | 500.3 | 400.4 |
| Net investment income | 426.1 | 361.1 | 321.1 | 297.3 | 267.8 |
| Interest income from investment and payment agreements | 270.3 | 198.8 | 212.0 | 255.0 | 249.9 |
| Financial services—other revenue | 15.8 | 26.4 | 20.6 | 17.4 | 24.2 |
| Total revenue | 1,661.7 | 1,406.7 | 1,272.2 | 958.6 | 946.8 |
| Losses and loss expenses | 149.9 | 69.6 | 53.4 | 26.7 | 20.0 |
| Financial guarantee underwriting and operating expenses | 117.8 | 106.6 | 92.0 | 76.5 | 68.0 |
| Interest expense from investment and payment agreements | 239.3 | 168.9 | 196.3 | 231.3 | 235.4 |
| Financial services—other expenses | 13.7 | 14.7 | 12.1 | 9.9 | 8.9 |
| Interest expense | 55.9 | 54.3 | 54.2 | 43.7 | 40.4 |
| Net income | 751.0 | 724.6 | 618.9 | 432.6 | 432.9 |
| Net income per share: | | | | | |
|     Basic | 6.94 | 6.61 | 5.81 | 4.08 | 4.10 |
|     Diluted | 6.87 | 6.53 | 5.66 | 3.97 | 3.97 |
| Return on equity | 14.4% | 15.6% | 15.7% | 13.1% | 15.5% |
| Cash dividends declared per common share | 0.550 | 0.470 | 0.420 | 0.380 | 0.340 |
| ***Balance Sheet Highlights*** | | | | | |
| Total investments, at fair value | $ 15,981.4 | $ 14,768.4 | $ 13,965.4 | $ 12,539.3 | $ 10,287.9 |
| Prepaid reinsurance | 303.4 | 297.3 | 325.5 | 296.1 | 267.7 |
| Total assets | 19,725.1 | 18,749.6 | 16,747.3 | 15,355.5 | 12,339.5 |
| Unearned premiums | 2,954.7 | 2,778.9 | 2,545.5 | 2,128.8 | 1,780.3 |
| Losses and loss expense reserve | 304.1 | 254.1 | 189.4 | 172.1 | 151.1 |
| Obligations under investment agreements, investment repurchase agreements and payment agreements | 7,252.8 | 7,080.7 | 7,076.4 | 7,282.9 | 5,511.9 |
| Long-term debt | 2,233.6 | 1,866.2 | 980.9 | 616.7 | 619.3 |
| Total stockholders' equity | 5,372.2 | 5,024.5 | 4,254.6 | 3,625.2 | 2,983.7 |

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations.**

### OVERVIEW

Ambac Financial Group, Inc. is a holding company whose subsidiaries provide financial guarantees and financial services to clients in both the public and private sectors around the world. Our diluted earnings per share was $6.87 for 2005, a 5% increase compared with 2004. During 2005,

35

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

Ambac recorded record revenues of $1.7 billion, an 18% increase as compared to 2004. Return on average shareholders' equity was 14.4%.

Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading guarantor of public finance and structured finance obligations, has earned triple-A ratings, the highest ratings available from Moody's Investors Service, Inc., Standard & Poor's Ratings Services, Fitch Inc., and Rating and Investment Information, Inc. Ambac Assurance provides financial guarantees for bond issues and other forms of debt financing. Financial guarantee insurance is a promise to pay scheduled interest and principal if the issuer fails to meet its obligations. A bond guaranteed by Ambac receives triple-A ratings, typically resulting in lower financing costs for the issuer and generally makes the issue more marketable, both in the primary and secondary markets.

Ambac reports its financial guarantee segment broken out into three principal markets: Public Finance, Structured Finance and International Finance. Public Finance includes all U.S. municipal issuance including general obligations, lease and tax-backed obligations, health care, public utilities, transportation and higher education, as well as certain infrastructure privatization transactions, such as stadium financings, military housing and student housing. Structured Finance covers U.S. structured finance transactions, including mortgage-backed securities and other consumer asset-backed securities, commercial asset-backed securities, collateralized debt obligations, investor-owned utilities and asset-backed commercial paper conduits. International Finance covers both infrastructure privatization transactions and the structured finance markets outside of the U.S. Pre-tax income growth in the Financial Guarantee segment was the result of increased net premiums earned and other credit enhancement fee revenues, partially offset by increased losses and loss expenses due to Hurricane Katrina.

Management believes that the financial guarantee business thrives on economic cycles. For example, a strong economic environment with good or improving credit is beneficial to our financial guarantee portfolio. However, such conditions, if in place for an extended period of time, will reduce credit spreads and result in lower pricing. Conversely, in a deteriorating credit environment, credit spreads widen and pricing for our product improves. However, if the weakening environment is prolonged, the stresses on our portfolio could result in claims payments in excess of normal or historical expectations. Ambac's management believes that its business is well positioned to withstand, and in fact prosper, within normal economic and business cycles. Further, Ambac's financial guarantee business today enjoys a strong competitive position in a variety of product segments on a global scale and is positioned for further geographic product expansion. Management believes that geographic product expansion will be driven, over the long term, by critical infrastructure needs worldwide and the expansion of global credit markets.

Ambac's Financial Services segment provides financial and investment products including investment agreements, interest rate swaps, currency swaps, total return swaps and funding conduits, principally to clients of the financial guarantee business, which includes municipalities and other public entities, health care organizations, and asset-backed and structured finance issuers. Ambac focuses on these businesses due to the complementary nature of the products to its financial guarantee product.

## CRITICAL ACCOUNTING ESTIMATES

The discussion and analysis of our financial condition and results of operations are based upon our Consolidated Financial Statements, which have been prepared in accordance with U.S. generally

36

accepted accounting principles ("GAAP"). The preparation of these financial statements requires us to make estimates and judgments that affect the reported amount of assets and liabilities, revenues and expenses and related disclosure of contingent assets and liabilities at the date of our financial statements. Actual results may differ from these estimates under different assumptions or conditions.

Critical accounting estimates are defined as those that require management to make significant judgments and could potentially result in materially different results under different assumptions and conditions. Management has identified the accounting for loss and loss expenses and the valuation of financial instruments as critical accounting estimates. This discussion should be read in conjunction with the consolidated financial statements and notes thereon included elsewhere in this report. Management has discussed each of these critical accounting and estimates with the Audit and Risk Assessment Committee of the Board of Directors.

_Financial Guarantee Insurance Losses and Loss Expenses._ The loss reserve for financial guarantee insurance discussed in this critical accounting estimates disclosure relates only to Ambac's non-derivative insurance business. Losses and loss expenses are based upon estimates of the ultimate aggregate losses inherent in the non-derivative Financial Guarantee portfolio as of the reporting date. The evaluation process for determining the level of reserves is subject to certain estimates and judgments.

The liability for losses and loss expenses consists of active credit and case basis credit reserves. Ambac establishes an active credit reserve to reflect probable and estimable losses due to credit deterioration on insured credits that have not yet defaulted or been reported as of the reporting date. The active credit reserve is established through a process that begins with estimates of probable losses inherent in the adversely classified credit portfolio. Estimates are computed on each adversely classified credit. These estimates are based upon: (i) Ambac's internal system of credit ratings, which are analogous to the risk ratings of the major rating agencies; (ii) internally developed historical default information (taking into consideration ratings and average life of an obligation); (iii) internally developed loss severities; and (iv) the net par outstanding on the adversely classified credit. The loss severities and default information are based on rating agency information and are specific to each bond type and are established and approved by Ambac's Portfolio Risk Management Committee. The Portfolio Risk Management Committee is comprised of senior risk management professionals and other senior management of Ambac. For certain credit exposures that have deteriorated significantly, Ambac will undertake additional monitoring and loss remediation efforts. Additional remediation can include various actions by Ambac. The most common actions include obtaining detailed appraisal information on collateral, more frequent meetings with the issuer's or servicer's management to review operations, financial condition and financial forecasts and more frequent analysis of the issuer's financial statements. For these credits Ambac would use relevant information obtained from its remediation efforts to adjust the estimate discussed above.

Case basis credit reserves are established for losses on insured obligations that have already defaulted. We believe our definition of case basis credit reserves differs from other financial guarantee industry participants. Our case reserves represent the present value of anticipated loss and loss expense payments expected over the estimated period of default. Loss and loss expenses consider defaulted debt service payments, estimated expenses associated with settling the claims and estimated recoveries under collateral and subrogation rights.

The primary estimates impacting the statistical loss calculation are probability of default and severity of loss. The probability of default increases as a credit exposure deteriorates in quality.

37

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

Political, economic or other unforeseen events could have an adverse impact on default probabilities. However, despite such unforeseen events, our experience has shown, it is not reasonably likely that there would be a change in the probability of default estimates such that a material change in our loss reserve estimate would occur. Our experience has shown that credit deterioration and related changes in default probabilities is a gradual process that typically occurs over a long period of time. Historically, claim payments on financial guarantee contracts have been infrequent but subject to potential high severity. Severity represents the amount of loss that would be incurred on a defaulted obligation due to the difference in the amount of net par guaranteed and the value of the related collateral and other subrogation rights. Loss severity estimates are based upon available information such as rating agency recovery rates or surveillance data such as collateral appraisals. However, severity data used are estimates that are subject to change with political, economic and other market conditions or as new information becomes available. Severity of loss is a primary assumption used to estimate losses and an increase or decrease of the severity would provide a range of reasonably possible future outcomes that would differ from our current loss estimate, which could be material.

Ambac has exposure to various bond types. Our experience has shown that for the majority of bond types, the estimate of loss severity has remained consistent in that material changes to severity estimates have not occurred. However, for certain bond types, factors or events could have a material impact on the estimate of loss severity. Based upon our historical experience, certain types of exposures are more likely to experience changes in loss severity estimates. We believe, based on our experience, there are three bond types in particular where it is reasonably possible that a material change in loss severity estimates could occur. These three bond types are aircraft lease securitizations known as Enhanced Equipment Trust Certificates ("EETC"), health care institutions and mortgage-backed and home equity securitizations. The collateral for an EETC bond is commercial aircraft. Intense competition in the global airline industry continues and has been further impacted by lower cost start-up regional carriers. As a result, major airlines have been forced to reduce costs and scale back aircraft purchases. Additionally, high energy costs have negatively impacted operations and competition between the largest aircraft manufacturers has served to reduce overall aircraft pricing. These events have adversely impacted the value of certain aircraft and accordingly impacted the loss severity estimates associated with certain EETC exposures. We have observed that the health care industry is also particularly subject to changes in severity estimates. Collateral associated with health care credits is generally in the form of a hospital facility. The value of that facility is primarily impacted by the essentiality of that facility to a particular community. For example, hospital facilities that do not have significant competition in a community generally have more stable collateral values than facilities in communities with significant competition. It is also reasonably possible that severity estimates could materially change in the mortgage-backed and home equity securitization sector. Severity estimates in this sector are impacted by residential real estate values. Increases in mortgage interest rates, increased unemployment or personal bankruptcies could have an adverse impact on residential real estate values and mortgage-backed and home equity loss severity estimates. See Losses and Loss Expenses section of this Management's Discussion and Analysis of Financial Condition and Results of Operations below.

38

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

The table below outlines the estimated impact on the December 31, 2005 consolidated loss reserve estimate (both active credit and case basis reserve) of reasonably possible changes in the loss severity assumptions. These changes in the loss severity assumptions, while maintaining the current probability of default and adversely classified credit rating constant, represent management's estimate of reasonably possible changes in severity and are based upon our historical experience.

| Category (Dollars in millions) | Current Severity Assumption | Reasonably Possible Severity Assumption | Increase in Reserve Estimate |
|---|---|---|---|
| EETC | 20% | 46% | $ 15 |
| Health care | 62% | 79% | $ 15 |
| Mortgage-backed and home equity | 17% | 19% | $ 8 |

As a result of the widespread devastation caused by Hurricane Katrina, Ambac recorded loss and loss expenses of $91.5 million in 2005. Ambac's exposure to losses as a result of the hurricane is derived primarily from its guarantees of municipal bonds in the greater New Orleans area and the Gulf-front regions that were most severely impacted by the storm. In determining our loss estimates, our analysis has considered the unprecedented nature of the disaster, including the displacement of the communities' residents, and the unique aspects of each insured bond, such as the nature of the revenue source, the level of debt service reserves, if any, and other transaction protections. The severity of loss on these credits will be impacted by the timing and extent of residents' return to the affected areas. Throughout the history of Ambac, there have not been any significant losses resulting from natural disasters. As a result, management has adjusted our assumptions to reflect the unprecedented nature of the disaster. Future decreases, if any, to these assumptions will have a similar relative effect on our loss reserves and future increases, if any, to these assumptions, excluding those municipal finance credits fully reserved, will also have a similar relative effect on our loss reserves.

Ambac's management believes that the reserves for losses and loss expenses are adequate to cover the ultimate net cost of claims, but the reserves, including the probability of default and loss severity assumptions are based on estimates and there can be no assurance that the ultimate liability for losses will not exceed such estimates.

*Valuation of Financial Instruments.* The fair market values of financial instruments held are determined by using independent market quotes when available and valuation models when market quotes are not available. Ambac's financial instruments categorized as assets are mainly comprised of investments in fixed income securities and derivative contracts.

Investments in fixed income securities are accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") 115, "Accounting for Certain Investments in Debt and Equity Securities". SFAS 115 requires that all debt instruments and certain equity instruments be classified in Ambac's balance sheet according to their purpose and, depending on that classification, be carried at either cost or fair market value. Ambac classifies investments in fixed income securities as available-for-sale.

The fair values of fixed income investments are based primarily on quoted market prices received from a nationally recognized pricing service or dealer quotes. For those fixed income investments where broker quotes were not available, fair values are based on internal valuation models. Key inputs to the internal valuation models include maturity date, coupon and generic yield curves for industry and credit rating characteristics that closely match those characteristics of the specific investment

39

Source: AMBAC FINANCIAL GROU, 10-K, March 13, 2006

Exhibit 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2004

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 1-10777

# Ambac Financial Group, Inc.
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3621676** |
| (State of incorporation) | (I.R.S. employer identification no.) |
| **One State Street Plaza** | |
| **New York, New York** | **10004** |
| (Address of principal executive offices) | (Zip code) |

**(212) 668-0340**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, $0.01 per share and Preferred Stock Purchase Rights** | **New York Stock Exchange, Inc.** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  ☒ No  ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2) Yes  ☒ No  ☐

The aggregate market value of voting stock held by non-affiliates of the Registrant as of the close of business on June 30, 2004 was $7,963,272,372 (based upon the closing price of the Registrant's shares of the New York Stock Exchange on that date, which was $73.44). For purposes of this information, the outstanding shares of Common Stock which were owned by all directors and executive officers of the Registrant were deemed to be shares of Common Stock held by affiliates.

As of March 7, 2005, 108,942,699 shares of Common Stock, par value $0.01 per share, (net of 2,256 treasury shares) were outstanding.

**Documents Incorporated By Reference**

Portions of the Registrant's Annual Report to Stockholders for the year ended December 31, 2004 are incorporated by reference into Parts II and IV hereof. Portions of the Registrant's Proxy Statement dated March 24, 2005 in connection with the Annual Meeting of Stockholders scheduled to be held on May 3, 2005 are incorporated by reference into Part III hereof.

consult any further disclosures we make on related subjects in Ambac's reports to the Securities and Exchange Commission.

**BUSINESS SEGMENTS**

The following paragraphs describe the business operations of Ambac Financial Group, Inc. and its subsidiaries for its two reportable segments: Financial Guarantee and Financial Services.

**Financial Guarantee**

Generally, financial guarantee insurance written by Ambac Assurance guarantees to the holder of the underlying obligation timely payment of principal and interest on such obligation in accordance with its original payment schedule.

Financial guarantee insurance is a form of credit enhancement that benefits both the issuer and the investor. Issuers benefit because their insured securities are sold with the highest available credit rating, resulting in interest cost savings and greater marketability. In addition, for complex financings and obligations of issuers that are not well known by investors, credit enhanced obligations receive greater market acceptance than obligations without credit enhancement. Investors benefit from greater marketability, secondary market price stability, active credit surveillance and protection from loss associated with issuer default.

Ambac Financial Group derives financial guarantee revenues from: (i) premiums earned from insurance contracts; (ii) net investment income; (iii) revenue from credit derivative transactions; (iv) net realized gains and losses from sales of investment securities; and (v) certain structuring and other fees. Financial guarantee revenues were $1,168.7 million, $1,033.6 million, and $816.2 million in 2004, 2003, and 2002, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 18 of Notes to Consolidated Financial Statements in Ambac Financial Group's 2004 Annual Report to Stockholders.

Financial guarantee products are sold in three principal markets: the U.S. public finance market, the U.S. structured finance and asset-backed market, and the international finance market. Total gross par guaranteed for the years ended December 31, 2004, 2003 and 2002 were $118.1 billion, $115.3 billion, and $116.4 billion, respectively.

**U. S. Public Finance Market**

The U.S. public finance market includes taxable and tax-exempt bonds, notes and other evidences of indebtedness issued primarily by states, political subdivisions (*e.g., cities, counties and towns*), water, sewer, electric and other utility districts, airports, higher educational institutions, hospitals, transportation and housing authorities. Public finance obligations are generally supported by either the taxing authority of the issuer or the issuer's or underlying obligor's ability to collect fees or assessments for certain projects or public services. More recently, the public finance market has expanded to include structured, project finance and asset-backed bond issues for infrastructure projects, sports stadiums, and other municipal purposes. This portion of the market is growing and has become a focus for Ambac Assurance in recent years. The following table sets forth the volume of new issues of long-term (*longer*

3

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2005

*than 12 months*) public finance bonds and the volume of new issues of insured long-term public finance bonds over the past ten years in the United States.

U.S. Public Finance Long-Term Market

| ($ in Billions) | New Money | Refundings | Total Volume | Refundings as Percentage of Total Volume | Insured Volume | Insured Bonds as Percentage of Total Volume |
|---|---|---|---|---|---|---|
| 1995 | 126.1 | 33.9 | 160.0 | 21.1 | 68.5 | 42.8 |
| 1996 | 139.1 | 45.9 | 185.0 | 24.8 | 85.7 | 46.3 |
| 1997 | 160.3 | 60.2 | 220.5 | 27.3 | 107.5 | 48.8 |
| 1998 | 204.7 | 82.0 | 286.7 | 28.6 | 145.5 | 50.7 |
| 1999 | 189.3 | 38.3 | 227.6 | 16.8 | 105.6 | 46.4 |
| 2000 | 181.2 | 19.5 | 200.7 | 9.7 | 79.3 | 39.5 |
| 2001 | 223.6 | 64.7 | 288.3 | 22.4 | 134.3 | 46.6 |
| 2002 | 266.6 | 92.2 | 358.8 | 25.7 | 178.9 | 49.9 |
| 2003 | 290.0 | 94.0 | 384.0 | 24.5 | 190.1 | 49.5 |
| 2004 | 272.6 | 87.8 | 360.4 | 24.4 | 194.0 | 53.8 |

Source: Amounts, except for 2004, are estimated data reported by The Bond Buyer's 2003 Yearbook. The 2004 amounts are Ambac Assurance estimates, compiled from industry sources including Securities Data Company, Inc. and The Bond Buyer. Amounts represent gross par amounts issued or insured, respectively, during such year.

The foregoing table illustrates the changes in the total volume and insured volume of new issues of public finance bonds over the past ten years. Changes in volume of public finance bond issuance during this period are primarily attributable to changes in refunding activity related to the then-current interest rate environment, along with the issuers new money requirements. Total volume in 2002 and 2003 were record issuances as a result of the low interest rate environment and considerable infrastructure finance needs. Total volume in 2004 was down 6% from the record set the previous year. Insured volume, as a percentage of total volume ("insured penetration"), which had grown consistently from 1995 through 1998, declined during 1999 and 2000. The decline during 2000 is generally considered to have resulted from the combination of the relatively high credit quality of issues that came to market during the period and the firmness in premium pricing in the industry. During 2001 through 2004, the insured penetration has increased, largely the result of budget deficits experienced by municipalities and the corresponding flight to quality by investors.

Ambac Assurance guaranteed gross par of $44.6 billion, $43.0 billion and $42.3 billion in 2004, 2003 and 2002, respectively, in the U.S. public finance market.

In the U.S. public finance market, an issuer typically pays an up-front premium to Ambac Assurance at the time the policy is issued. Premiums are usually quoted as a percentage of the total amount of principal and interest that is scheduled to become due during the life of the insured bonds.

Proposed new public finance bond issues are submitted to Ambac Assurance by issuers (*or their investment bankers or financial advisors*) to determine their suitability for financial insurance. Public finance bond issues are sold on either a competitive or a negotiated basis. With respect to competitive issues, an issuer will publish a notice of sale soliciting bids for the purchase of a proposed issue of bonds. Potential bidders on the bonds then form syndicates. These syndicates then solicit a determination from some or all of the financial guarantors whether an issue is suitable for financial guarantee and at what premium rate and on what terms. The syndicate then determines whether to bid on the issue with a financial guarantee (*and if so, with which financial guarantor*) or without a financial guarantee. The issuer then generally selects the syndicate with the lowest bid. In a negotiated offering, the issuer has

4

already selected an investment bank and that investment bank solicits premium quotes and terms from the financial guarantors.

Ambac Assurance also provides financial guarantees on public finance bonds outstanding in the secondary market that are typically purchased by an institution to facilitate the sale of bonds in its portfolio or inventory. The financial guarantee generally increases the sale price of bonds (*typically by an amount greater than the cost of the policy*) and affords a wider secondary market and therefore greater marketability to a given issue of previously issued bonds. As is the case with new issues, the premium is generally payable in full at the time of policy issuance. Ambac Assurance employs the same underwriting standards on secondary market issues that it does on new public finance issues.

As of December 31, 2004 and 2003, net outstanding par exposure related to public finance bond transactions was $239.7 billion and $215.3 billion, respectively. See "Financial Guarantees in Force—Types of Bonds" section, for a breakout of net outstanding par exposure by bond type.

**U.S. Structured Finance and Asset-backed Market**

Financial guarantees of securities in the U.S. structured finance and asset-backed market are typically issued in connection with transactions in which the securities being issued are secured by or payable from a specific pool of financial or tangible assets. This pool of assets has an identifiable cash flow or market value and is generally held by a special purpose entity. Structured finance and asset-backed obligations insured by Ambac Assurance generally have the benefit of over-collateralization and/or other forms of credit enhancement to mitigate credit risks associated with the related assets. These forms of credit enhancement are designed to absorb the expected losses in these transactions.

Structured finance obligations include the securitization of a variety of asset types such as mortgages, home equity loans, auto loans, student loans, credit card debt, leases, commercial asset-backed securities and pooled debt obligations originated in the United States ("Structured Finance"). Currently, the largest component of Ambac's Structured Finance business relates to the securitization of mortgages and home equity loans. Another target area in Structured Finance is the credit enhancement of pooled debt obligations, including structured credit derivatives. These transactions involve the securitization of a diverse portfolio of corporate bonds and loan obligations and asset-backed securities (the "Securitized Assets"). The transaction structure provides certain financial protection to Ambac. This financial protection can take several forms, however, the most common are over-collateralization, first loss retention and excess spread. In the case of over-collateralization (i.e., the principal amount of the Securitized Assets exceeds the principal amount of the structured finance obligations guaranteed by Ambac Assurance), the structure allows the transaction to experience defaults among the Securitized Assets before a default is experienced on the structured finance obligations that have been guaranteed by Ambac. In the case of first loss retention, the financial guarantee insurance policy only covers a senior layer of losses. A subordinated layer of losses is either retained by the seller or sold off in the form of equity and mezzanine debt to other investors. In the case of excess spread, the financial assets generate cash flow in the form of interest that is in excess of the interest payments on the related debt. All or a portion of this excess spread is applied to redeem structured finance obligations, thus creating over-collateralization.

Structured finance also encompasses credit enhancement for asset-backed commercial paper conduits (*"conduits"*). Conduits are used by issuers to efficiently fund assets in the

5

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2005

short-term commercial paper market. Typically sponsored by financial institutions, the conduits usually purchase financial assets and asset-backed securities, and issue commercial paper to fund the purchase of the assets. The typical conduit structure provides Ambac with significant credit protection prior to a claim on Ambac's insurance policy. A conduit requires program-wide credit enhancement as one of several elements needed to support the conduit's credit rating for the structure, of which Ambac provides a senior portion.

Unlike the public finance market in which a substantial portion of the deals is bid competitively by the financial guarantors, the structured and asset-backed market is essentially a negotiated one. The financial guarantor will work directly with the investment bank or client to create an acceptable structure once having been awarded the business.

The U.S. structured finance and asset-backed market in which Ambac Assurance provides financial guarantees is broad and varied, comprising public issues and private placements. The increasing array of classes of assets securitized or guaranteed, and the recent rapid changes to the market, makes estimating the size of the markets that we participate in difficult.

Premiums for structured finance and asset-backed policies are typically based on a percentage of principal insured. The timing of the collection of structured finance and asset-backed premiums can be collected in a single payment at policy inception date or collected periodically (*e.g., monthly, quarterly or annually*) from the cash flow generated by the underlying assets.

As of December 31, 2004 and 2003, net outstanding par exposure related to U.S. structured finance and asset-backed transactions was $132.5 billion and $124.1 billion, respectively. See "Financial Guarantees in Force—Types of Bonds" section, for a breakout of net outstanding par exposure by bond type.

**International Finance Market**

Outside of the United States, structured and asset-backed issuers, utilities, sovereign and sub-sovereign issuers, and other issuers are increasingly using financial guarantee products, particularly in markets throughout Western Europe. A number of important trends in international finance markets have contributed to this expansion. In the United Kingdom, ongoing privatization efforts have shifted certain risks associated with the development or operation of infrastructure projects from the government to market participants, thus prompting investors in such projects to seek the security of financial guarantee products. These privatization efforts are currently being initiated in other European countries, including Spain, Portugal and Italy. In Western Europe and the emerging markets, there also is growing interest in asset-backed securitization.

While the principles of securitization have been increasingly applied in overseas markets, development in particular countries has varied as a result of the relative sophistication of the local capital markets and the impact of legal and financial regulatory requirements. It is anticipated that securitization will continue to expand internationally, albeit at varying rates in each country. Ambac Assurance, and through its United Kingdom subsidiary Ambac Assurance UK Limited, insures a wide array of obligations in the international finance markets including infrastructure finance, asset-backed and structured finance transactions, utilities, whole company securitizations (i.e. securitizations of substantially all of the operating assets of corporate credits typically engaged in the provision of utility services or infrastructure) and other obligations in selected international finance markets.

6

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2005

Ambac Assurance's strategy in the international finance markets is to strengthen its franchise in developed markets by focusing on high quality infrastructure, structured finance, securitization, and utility finance transactions, and in emerging markets by focusing on top tier future flow transactions (*structured transactions secured by U.S. Dollar cash flows generated from exports or payment remittances*) and pooled debt obligations.

Ambac UK, which is authorized and regulated in the United Kingdom to provide certain classes of general financial guarantees (and is also authorized to conduct business throughout much of the European Union), has been Ambac Assurance's primary vehicle for directly issuing financial guarantee policies in the United Kingdom and European Union. In February 2005, Ambac UK has established a branch office in Milan, Italy. Ambac UK has entered into net worth maintenance and reinsurance agreements with Ambac Assurance, which support its triple-A ratings.

Ambac Assurance is party to an alliance in Japan with Sompo Japan Insurance Inc. ("Sompo Japan"). Although the development of the Japanese securitization market has been slow, we believe that this alliance is competitively positioned for future growth.

While there is evidence that the volume of international structured finance transactions has increased significantly in the recent past, unlike the public finance and domestic asset-backed markets, there are few statistics that effectively track volume in the global markets. There are several reasons for this, including the varied nature of the deals coming to market, the early stages of development of certain asset classes and the fact that many international deals are privately placed.

Premiums for international finance policies are based on a percentage of either principal or principal and interest insured. The timing of the collection of international finance premiums varies among individual transactions; some being collected in a single payment at policy inception date, and others being collected periodically (*i.e., monthly, quarterly or annually*).

As of December 31, 2004 and 2003, net outstanding par exposure related to international finance transactions was $87.3 billion and $86.4 billion, respectively. See "Financial Guarantees in Force - Types of Bonds" section, for a breakout of net outstanding par exposure by bond type.

### Risk Management

Ambac Financial Group has a Portfolio Risk Management Committee ("*PRMC*") which has established various procedures and controls to monitor and manage credit risk. The PRMC consists of senior risk management professionals and senior management of Ambac Financial Group. Its purview is enterprise-wide and its focus is on risk limits and measurement, concentration and correlation of risk, and the attribution of economic and regulatory capital in a portfolio context.

Underwriting guidelines, policies and procedures have been developed by Ambac Assurance's management with the intent that Ambac Assurance guarantees only those obligations which, in the opinion of Ambac Assurance underwriting officers, are of investment grade quality with a remote risk of loss. However, losses may occur from time to time and it is Ambac Assurance's policy to provide for loss reserves on non-derivative insurance policies that are adequate to cover probable and estimable losses. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 2 and Note 6 of Notes to

7

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2005

**Management's Discussion and Analysis**
**of Financial Condition and Results of Operations**

## OVERVIEW

Ambac Financial Group, Inc. is a holding company whose subsidiaries provide financial guarantees and financial services to clients in both the public and private sectors around the world. Our diluted earnings per share was $6.53 for 2004, a 15% increase compared with 2003. Ambac recorded record revenues of $1.4 billion, an 11% increase as compared to 2003. Return on average shareholders' equity was 15.6%. Our results reflect strong production in both our financial guarantee and financial services segments.

Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading provider of financial guarantees for public finance and structured finance obligations, has earned triple-A ratings, the highest ratings available from Moody's Investors Service, Inc., Standard & Poor's Ratings Services, Fitch Inc., and Rating and Investment Information, Inc. Ambac Assurance provides financial guarantees for bond issues and other forms of debt financing. Financial guarantee insurance is a promise to pay scheduled interest and principal if the issuer fails to meet its obligations. A bond guaranteed by Ambac receives triple-A ratings, typically resulting in lower financing costs for the issuer and generally makes the issue more marketable, both in the primary and secondary markets.

Ambac reports its financial guarantee business segment broken out by three principal markets: Public Finance, Structured Finance and International Finance. Public Finance includes all U.S. municipal issuance including general obligations, lease and tax-backed obligations, health care, public utilities, transportation and higher education, as well as certain infrastructure privatization transactions, such as stadium financings, military housing and student housing. Structured Finance covers U.S. structured finance transactions including, mortgage-backed securities and other consumer asset-backed securities, commercial asset-backed securities, collateralized debt obligations, investor-owned utilities and asset-backed commercial paper conduits. International Finance covers both infrastructure privatization transactions and the structured finance markets outside of the U.S. Increased net premiums earned and other credit enhancement fee revenues drove growth in our financial guarantee segment. This resulted from continued growth in revenues primarily in the United States, Western Europe and Australia.

Management believes that the financial guarantee business thrives on economic cycles. For example, a strong economic environment with a good or improving credit environment is beneficial to our financial guarantee portfolio. However, such conditions, if in place for an extended period of time, will reduce credit spreads and result in lower pricing. Conversely, in a deteriorating credit environment, credit spreads widen and pricing for our product improves. However, if the weakening environment is prolonged, the stresses on our portfolio could result in claims payments in excess of normal or historical expectations. Ambac's management believes that its business is well positioned to withstand, and in fact prosper, within the normal economic and business cycles witnessed over the past several years. Further, Ambac's financial guarantee business today enjoys a strong competitive position in a variety of product segments on a global scale and is well positioned for further geographic product expansion. Management believes that geographic product expansion will be driven, over the long term, by critical infrastructure needs worldwide and the expansion of global credit markets.

Ambac's Financial Services segment provides financial and investment products including investment agreements, interest rate swaps, total return swaps and funding conduits, principally to clients of the financial guarantee business, which includes municipalities and other public entities, health care organizations, and asset-backed and structured finance issuers. Ambac focuses on these businesses due to the complementary nature of the products to its financial guarantee product. Financial Services growth was fueled by improved interest spreads in our investment agreement business and higher derivative product revenues.

## FORWARD-LOOKING STATEMENTS

Materials in this annual report may contain information that includes or is based upon forward-looking statements within the meaning of the Securities Litigation Reform Act of 1995. Forward-looking statements are not historical facts but instead represent Ambac's belief regarding future events, many of which, by their nature, are inherently uncertain and outside our control. You can identify these statements by the fact that they do not relate strictly to historical or current facts and relate to future plans or objectives and results.

Any or all of Ambac's forward-looking statements here or in other publications may turn out to be wrong and are based on current expectations and the current economic environment. Ambac's actual results may vary materially, and there are no guarantees about the performance of Ambac's securities. Among factors that could cause actual results to differ materially are: (1) changes in the economic, credit or interest rate environment in the United States and abroad; (2) the level of activity within the national and worldwide debt markets; (3) competitive conditions and pricing levels; (4) legislative and regulatory developments; (5) changes in tax laws; (6) the policies and actions of the United States and other governments; and (7) other risks and uncertainties that have not been identified at this time. Ambac is not obligated to publicly correct or update any forward-looking statement if we later become aware that it is not likely to be achieved, except as required by law. You are advised, however, to consult any further disclosures we make on related subjects in Ambac's reports to the Securities and Exchange Commission.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The discussion and analysis of our financial condition and results of operations are based upon our Consolidated Financial Statements, which have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires us to make estimates and judgments that affect the reported amount of

1   Ambac Financial Group, Inc. and Subsidiaries

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2005

assets and liabilities, revenues and expenses and related disclosure of contingent assets and liabilities at the date of our financial statements. Actual results may differ from these estimates under different assumptions or conditions.

Critical accounting policies and estimates are defined as those that require management to make significant judgments and could potentially result in materially different results under different assumptions and conditions. Management has identified the accounting for loss and loss expenses and the valuation of financial instruments as critical accounting policies. This discussion should be read in conjunction with the consolidated financial statements and notes thereon included elsewhere in this report. Management has discussed each of these critical accounting policies and estimates with the Audit Committee of the Board of Directors.

**Financial Guarantee Insurance Losses and Loss Expenses.** The loss reserve for financial guarantee insurance discussed in this critical accounting policy and estimates disclosure relates only to the Company's non-derivative insurance business. Losses and loss expenses are based upon estimates of the ultimate aggregate losses inherent in the non-derivative Financial Guarantee portfolio as of the reporting date. The evaluation process for determining the level of reserves is subject to certain estimates and judgments. Please refer to Note 2 to the Consolidated Financial Statements — "Significant Accounting Policies" for additional detail on loss reserves and potential accounting changes.

The liability for losses and loss expenses consists of active credit and case basis credit reserves. Ambac establishes an active credit reserve to reflect probable and estimable losses due to credit deterioration on insured credits that have not yet defaulted or been reported as of the reporting date. The active credit reserve is established through a process that begins with statistical estimates of probable losses inherent in the adversely classified credit portfolio. Statistical estimates are computed on each adversely classified credit. These statistical estimates are based upon: (i) Ambac's internal system of credit ratings, which are analogous to the risk ratings of the major rating agencies; (ii) internally developed historical default information (taking into consideration ratings and average life of an obligation); (iii) internally developed loss severities; and (iv) the net par outstanding on the adversely classified credit. The loss severities and default information are based on rating agency information and are specific to each bond type and are established and approved by Ambac's Portfolio Risk Management Committee. The Portfolio Risk Management Committee is comprised of senior risk management professionals and other senior management of Ambac. For certain credit exposures that have deteriorated significantly, Ambac will undertake additional monitoring and loss remediation efforts. Additional remediation can include various actions by the Company. The most common actions include obtaining detailed appraisal information on collateral, more frequent meetings with the issuer's or servicer's management to review operations, financial condition and financial forecasts and more frequent analysis of the issuer's financial statements. For these credits the Company would use relevant information obtained from its remediation efforts to adjust the statistical estimate discussed above.

Case basis credit reserves are established for losses on insured obligations that have already defaulted. We believe our definition of case basis credit reserves differs from other financial guaranty industry participants. Our case reserves represent the present value of anticipated loss and loss expense payments expected over the estimated period of default. Loss and loss expenses consider defaulted debt service payments, estimated expenses associated with settling the claims and estimated recoveries under collateral and subrogation rights.

The primary estimates impacting the statistical loss calculation are probability of default and severity of loss. The probability of default increases as a credit exposure deteriorates in quality. Political, economic or other unforeseen events could have an adverse impact on default probabilities. However, despite such unforeseen events, our experience has shown, it is not reasonably likely that there would be a change in the probability of default estimates such that a material change in our loss reserve estimate would occur. Our experience has shown that credit deterioration and related changes in default probabilities are a gradual process that typically occurs over a long period of time. Historically, claim payments on financial guarantee contracts have been infrequent but subject to potential high severity. Severity represents the amount of loss that would be incurred on a defaulted obligation due to the difference in the amount of net par guaranteed and the value of the related collateral and other subrogation rights. Loss severity estimates are based upon available information such as rating agency recovery rates or surveillance data such as collateral appraisals. However, severity data used are estimates that are subject to change with political, economic and other market conditions or as new information becomes available. Severity of loss is a primary assumption used to estimate losses and an increase or decrease of the severity would provide a range of reasonably possible future outcomes that would differ from our current loss estimate, which could be material.

Ambac has exposure to various bond types. Our experience has shown that for the majority of bond types, the estimate of loss severity has remained consistent in that material changes to severity estimates have not occurred. However, for certain bond types, factors or events could have a material impact on the estimate of loss severity. Based upon our historical experience, certain types of exposures are more likely to experience changes in loss severity estimates. We believe, based on our experience, there are three bond types in particular where it is reasonably possible that a material change in loss severity estimates could occur. These three bond types are aircraft lease securitizations known as Enhanced Equipment Trust Certificates ("EETC"), health care institutions and mortgage-backed and home equity securitizations. The collateral for a EETC bond is commercial aircraft. Intense competition in the global airline industry continues and has been further impacted by lower cost start up regional carriers. As a result, major airlines have been forced to reduce costs and scale back aircraft purchases. Additionally, competition between the largest aircraft manufacturers has served to reduce overall aircraft pricing. These events have adversely impacted the value of certain aircraft and accordingly impacted the loss severity estimates associated with certain EETC exposures. We have observed that the health care industry is also particularly subject to changes in severity estimates. If there is collateral associated with a health care credit it is generally in the form of a hospital facility. The value of that facility is primarily impacted by the essentiality of that facility to a particular community. For example, hospital facilities that do not

Ambac Financial Group, Inc. and Subsidiaries    2

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2005

**Management's Discussion and Analysis of Financial Condition and Results of Operations**

have significant competition in a community generally have more stable collateral values than facilities in communities with significant competition. It is also reasonably possible that severity estimates could materially change in the mortgage-backed and home equity securitization sector. Severity estimates in this sector are impacted by residential real estate values. Increases in mortgage interest rates, increased unemployment or personal bankruptcies could have an adverse impact on residential real estate values and mortgage-backed and home equity loss severity estimates. The table below outlines the estimated impact on the December 31, 2004 consolidated loss reserve estimate (both active credit and case basis reserve) given certain changes in the loss severity estimates. The change in the loss severity estimates in the table below represent management's estimate of reasonably possible changes in severity and are based upon our historical experience.

| Bond type *(Dollars in millions)* | Severity assumption | Increase in loss severity assumption | Increase in reserve estimate |
|---|---|---|---|
| EETC | 22% | 12% | $ 26 |
| Health care | 59% | 41% | $ 31 |
| Mortgage-backed and home equity | 19% | 3% | $ 2 |

Ambac's management believes that the reserves for losses and loss expenses are adequate to cover the ultimate net cost of claims, but the reserves, including the probability of default and loss severity assumptions are based on estimates and there can be no assurance that the ultimate liability for losses will not exceed such estimates.

**Valuation of Financial Instruments.** The fair market values of financial instruments held are determined by using independent market quotes when available and valuation models when market quotes are not available. Ambac's financial instruments categorized as assets are mainly comprised of investments in fixed income securities and are accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") 115, "Accounting for Certain Investments in Debt and Equity Securities." SFAS 115 requires that all debt instruments and certain equity instruments be classified in Ambac's balance sheet according to their purpose and, depending on that classification, be carried at either cost or fair market value. Ambac classifies investments in fixed income securities as available-for-sale.

The fair values of fixed income investments are based primarily on quoted market prices received from a nationally recognized pricing service or dealer quotes. For those fixed income investments where broker quotes were not available, fair values are based on internal valuation models. Key inputs to the internal valuation models include maturity date, coupon and generic yield curves for industry and credit rating characteristics that closely match those characteristics of the specific investment securities being valued. The valuation results from these models could differ materially from amounts that would actually be realized in the market. The percentage of the investment portfolio that is based upon internal valuation models was 2% and 1% at December 31, 2004 and 2003, respectively.

Ambac has a formal review process for all securities in its investment portfolio, including a review for impairment losses. Documentation of our analyses is required under our policy. Factors considered when assessing impairment include: (i) securities whose fair values have declined by 20% or more below amortized cost; (ii) securities whose market values have declined by 5% or more below amortized cost for a continuous period of at least six months; (iii) recent downgrades by rating agencies; (iv) the financial condition of the issuer; (v) whether scheduled interest payments are past due; and (vi) whether Ambac has the ability and intent to hold the security for a sufficient period of time to allow for anticipated recoveries in fair value. If we believe a decline in the value of a particular investment is temporary, we record the decline as an unrealized loss, net of tax, in Accumulated Other Comprehensive Income in Stockholders' Equity on our Consolidated Balance Sheets. If we believe the decline is "other than temporary," we write-down the carrying value of the investment and record a loss on our Consolidated Statements of Operations. Ambac's assessment of a decline in value includes management's current judgment of the factors noted above. If that judgment changes in the future, Ambac may ultimately record a loss after having originally concluded that the decline in value was temporary.

Ambac's exposure to derivative instruments is created through interest rate, currency, total return and credit default swaps. These contracts are accounted for under SFAS 133 "Accounting for Derivative Instruments and Certain Hedging Activities," as amended ("SFAS 133"). When available, quotes are obtained from independent market sources. However, when quotes are not available, Ambac uses internally developed valuation models. These valuation models require market-driven inputs, including contractual terms, credit spreads on underlying referenced obligations, yield curves and tax-exempt interest ratios. The net fair value of derivative contracts classified as held for trading purposes was $110 million at December 31, 2004. Contracts with maturities in excess of five years accounted for $112 million of the net fair value. Contracts with maturities of five years or less accounted for $(2) million of net fair value. At the inception of a derivative contract (day one), we value the contract at the model value if we can verify all of the significant model inputs to observable market data. Where we cannot verify all of the significant model inputs to observable market data, we value the contract at the transaction price at inception and, consequently, record no gain or loss in accordance with EITF Issue No. 02-3, "Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities." For additional information regarding the sensitivity of these instruments, see "Risk Management — Market Risk" below.

**RESULTS OF OPERATIONS**

The following paragraphs describe the consolidated results of operations of Ambac and its subsidiaries for 2004, 2003 and 2002, and its financial condition as of December 31, 2004 and 2003. These results are presented for Ambac's two reportable segments: Financial Guarantee and Financial Services.

3    Ambac Financial Group, Inc. and Subsidiaries

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2005

Exhibit 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

**ANNUAL REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended December 31, 2003

Commission File Number 1-10777

# Ambac Financial Group, Inc.
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3621676** |
| (State of incorporation) | (I.R.S. employer identification no.) |

| | |
|---|---|
| **One State Street Plaza** | |
| **New York, New York** | **10004** |
| (Address of principal executive offices) | (Zip code) |

**(212) 668-0340**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 per share and Preferred Stock Purchase Rights | New York Stock Exchange, Inc. |

Securities registered pursuant to Section 12(g) of the Act:

**None**

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2) Yes ☒ No ☐

The aggregate market value of voting stock held by non-affiliates of the Registrant as of the close of business on June 30, 2003 was $7,067,048,488 (based upon the closing price of the Registrant's shares of the New York Stock Exchange on that date, which was $66.25). For purposes of this information, the outstanding shares of Common Stock which were owned by all directors and executive officers of the Registrant were deemed to be shares of Common Stock held by affiliates.

As of March 9, 2004, 108,092,315 shares of Common Stock, par value $0.01 per share, (net of 273,418 treasury shares) were outstanding.

**Documents Incorporated By Reference**

Portions of the Registrant's Annual Report to Stockholders for the year ended December 31, 2003 are incorporated by reference into Parts II and IV hereof. Portions of the Registrant's Proxy Statement dated March 25, 2004 in connection with the Annual Meeting of Stockholders scheduled to be held on May 4, 2004 are incorporated by reference into Part III hereof.

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2004

Table of Contents

**BUSINESS SEGMENTS**

The following paragraphs describe the business operations of Ambac Financial Group, Inc. and its subsidiaries for its two reportable segments: Financial Guarantee and Financial Services.

**Financial Guarantee**

Generally, financial guarantee insurance written by Ambac Assurance guarantees to the holder of the underlying obligation timely payment of principal and interest by the issuer on such obligation in accordance with its original payment schedule.

Financial guarantee insurance is a form of credit enhancement that benefits both the issuer and the investor. Issuers benefit because their insured securities are sold with the highest available credit rating, resulting in interest cost savings and greater marketability. In addition, for complex financings and obligations of issuers that are not well known by investors, credit enhanced obligations receive greater market acceptance than obligations without credit enhancement. Investors benefit from greater marketability, secondary market price stability, active credit surveillance and protection from loss associated with issuer default.

Ambac Financial Group derives financial guarantee revenues from: (i) premiums earned from insurance contracts; (ii) net investment income; (iii) revenue from credit derivative transactions; (iv) net realized gains and losses from sales of investment securities; and (v) certain structuring and other fees. Financial guarantee revenues were $1,033.6 million, $816.2 million and $672.0 million in 2003, 2002 and 2001, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 17 of Notes to Consolidated Financial Statements in Ambac Financial Group's 2003 Annual Report to Stockholders.

Financial guarantee products are sold in three principal markets: the U.S. public finance market, the U.S. structured finance and asset-backed market, and the international finance market. Total gross par guaranteed for the years ended December 31, 2003, 2002 and 2001 were $115.3 billion, $116.4 billion and $90.1 billion, respectively.

**U. S. Public Finance Market**

The U.S. public finance market includes taxable and tax-exempt bonds, notes and other evidences of indebtedness issued primarily by states, political subdivisions (*e.g., cities, counties and towns*), water, sewer, electric and other utility districts, airports, higher educational institutions, hospitals, transportation and housing authorities. Public finance obligations are generally supported by either the taxing authority of the issuer or the issuer's or underlying obligor's ability to collect fees or assessments for certain projects or public services. More recently, the public finance market has expanded to include structured, project finance and asset-backed bond issues for infrastructure projects, sports stadiums, and other municipal purposes. This portion of the market is growing and has become a focus for Ambac Assurance in recent years. The following table sets forth the volume of new issues of long-term (*longer than 12 months*) public finance bonds and the volume of new issues of insured long-term public finance bonds over the past ten years in the United States.

3

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2004

Table of Contents

U.S. Public Finance Long-Term Market

| ($ in Billions) | New Money | Refundings | Total Volume | Refundings as Percentage of Total Volume | Insured Volume | Insured Bonds as Percentage of Total Volume |
|---|---|---|---|---|---|---|
| 1994 | 126.4 | 38.6 | 165.0 | 23.4 | 61.5 | 37.3 |
| 1995 | 126.1 | 33.9 | 160.0 | 21.1 | 68.5 | 42.8 |
| 1996 | 139.1 | 45.9 | 185.0 | 24.8 | 85.7 | 46.3 |
| 1997 | 160.3 | 60.2 | 220.5 | 27.3 | 107.5 | 48.8 |
| 1998 | 204.7 | 82.0 | 286.7 | 28.6 | 145.5 | 50.7 |
| 1999 | 189.1 | 38.3 | 227.4 | 16.8 | 105.3 | 46.3 |
| 2000 | 181.2 | 19.5 | 200.7 | 9.7 | 79.5 | 39.6 |
| 2001 | 223.2 | 63.4 | 286.6 | 22.1 | 132.5 | 46.2 |
| 2002 | 266.1 | 92.0 | 358.1 | 25.7 | 176.7 | 49.3 |
| 2003 | 289.6 | 93.6 | 383.2 | 24.4 | 189.5 | 49.5 |

Source:     Amounts, except for 2003, are estimated data reported by The Bond Buyer's 2002 Yearbook. The 2003 amounts are Ambac Assurance estimates, compiled from industry sources including Securities Data Company, Inc. and The Bond Buyer. Amounts represent gross par amounts issued or insured, respectively, during such year.

The foregoing table illustrates the changes in the total volume and insured volume of new issues of public finance bonds over the past ten years. Changes in volume of public finance bond issuance during this period are primarily attributable to changes in refunding activity related to the then-current interest rate environment, along with the issuers new money requirements. Total volume in 2002 and 2003 were record issuances as a result of the low interest rate environment and considerable infrastructure finance needs. Insured volume, as a percentage of total volume ("insured penetration"), which had grown consistently from 1994 through 1998, declined during 1999 and 2000. The decline during 2000 is generally considered to have resulted from the combination of the relatively high credit quality of issues that came to market during the period and the firmness in premium pricing in the industry. During 2001 through 2003, the insured penetration has increased, largely the result of budget deficits experienced by municipalities and the corresponding flight to quality by investors.

Ambac Assurance guaranteed gross par of $44.7 billion, $43.7 billion and $33.2 billion in 2003, 2002 and 2001, respectively, in the U.S. public finance market.

In the U.S. public finance market, an issuer typically pays an up-front premium to Ambac Assurance at the time the policy is issued. Premiums are usually quoted as a percentage of the total amount of principal and interest that is scheduled to become due during the life of the insured bonds.

Proposed new public finance bond issues are submitted to Ambac Assurance by issuers (*or their investment bankers or financial advisors*) to determine their suitability for financial insurance. Public finance bond issues are sold on either a competitive or a negotiated basis. With respect to competitive issues, an issuer will publish a notice of sale soliciting bids for the purchase of a proposed issue of bonds. Potential bidders on the bonds then form syndicates. These syndicates then solicit a determination from some or all of the financial guarantors whether an issue is suitable for financial guarantee and at what premium rate and on what terms. The syndicate then determines whether to bid on the issue with a financial guarantee (*and if so, with which financial guarantor*) or without a financial guarantee. The issuer then generally selects the syndicate with the lowest bid. In a negotiated offering, the issuer has already selected an investment bank and that investment bank solicits premium quotes and terms from the financial guarantors.

4

Table of Contents

Ambac Assurance also provides financial guarantees on public finance bonds outstanding in the secondary market that are typically purchased by an institution to facilitate the sale of bonds in its portfolio or inventory. The financial guarantee generally increases the sale price of bonds (*typically by an amount greater than the cost of the policy*) and affords a wider secondary market and therefore greater marketability to a given issue of previously issued bonds. As is the case with new issues, the premium is generally payable in full at the time of policy issuance. Ambac Assurance employs the same underwriting standards on secondary market issues that it does on new public finance issues.

As of December 31, 2003 and 2002, net outstanding par exposure related to public finance bond transactions was $224.2 billion and $206.5 billion, respectively. See "Financial Guarantees in Force—Types of Bonds" section, for a breakout of net outstanding par exposure by bond type.

**U.S. Structured Finance and Asset-backed Market**

Financial guarantees of securities in the U.S. structured finance and asset-backed market are typically issued in connection with transactions in which the securities being issued are secured by or payable from a specific pool of financial or tangible assets. This pool of assets has an identifiable cash flow or market value and is generally held by a special purpose entity. Structured finance and asset-backed obligations insured by Ambac Assurance generally have the benefit of over-collateralization and/or other forms of credit enhancement to mitigate credit risks associated with the related assets. These forms of credit enhancement are designed to absorb the expected losses in these transactions.

Structured finance obligations include the securitization of a variety of asset types such as mortgages, home equity loans, auto loans, credit card debt, leases and pooled debt obligations originated in the United States ("Structured Finance"). Currently, the largest component of Ambac's Structured Finance business relates to the securitization of mortgages and home equity loans. Another target area in Structured Finance is the credit enhancement of pooled debt obligations including structured credit derivatives. Types of transactions involve the securitization of a diverse portfolio of corporate bonds and loan obligations and asset-backed securities (the "Securitized Assets"). The transaction structure provides certain financial protection to Ambac. This financial protection can take several forms, however, the most common are over-collateralization, first loss retention and excess spread. In the case of over-collateralization (i.e., the principal amount of the Securitized Assets exceeds the principal amount of the structured finance obligations guaranteed by Ambac Assurance), the structure allows the transaction to experience defaults among the Securitized Assets before a default is experienced on the structured finance obligations that have been guaranteed by Ambac. In the case of first loss retention, the financial guarantee insurance policy only covers a senior layer of losses. A subordinated layer of losses is either retained by the seller or sold off in the form of equity and mezzanine debt to other investors. In the case of excess spread, the financial assets generate cash flow in the form of interest that is in excess of the interest payments on the related debt. All or a portion of this excess spread accumulates and is available to absorb losses in the transaction.

Structured finance also encompasses credit enhancement for asset-backed commercial paper conduits (*"conduits"*). Conduits are used by issuers to efficiently fund assets in the short-term commercial paper market. Typically sponsored by financial institutions, the conduits usually purchase financial assets and asset-backed securities, and issue commercial paper to fund the purchase of the assets. The typical conduit structure provides Ambac with

5

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2004

**Table of Contents**

significant credit protection prior to a claim on Ambac's insurance policy. A conduit requires program-wide credit enhancement as one of several elements needed to support the conduit's credit rating for the structure, of which Ambac provides a senior portion.

Unlike the public finance market in which a substantial portion of the deals is bid competitively by the financial guarantors, the structured and asset-backed market is essentially a negotiated one. The financial guarantor will work directly with the investment bank or client to create an acceptable structure once having been awarded the business.

The U.S. structured finance and asset-backed market in which Ambac Assurance provides financial guarantees is broad and varied, comprising public issues and private placements. The increasing array of classes of assets securitized or guaranteed, and the recent rapid development of the market, makes estimating the size of the aggregate U.S. structured finance and asset-backed markets difficult. Two of the most developed sectors of this market are public asset-backed and mortgage-backed securities.

Premiums for structured finance and asset-backed policies are typically based on a percentage of principal insured. The timing of the collection of structured finance and asset-backed premiums can be collected in a single payment at policy inception date or collected periodically (*e.g., monthly, quarterly or annually*) from the cash flow generated by the underlying assets.

Ambac Assurance insured gross par of $48.5 billion, $47.5 billion and $37.4 billion in 2003, 2002 and 2001, respectively, in the U.S. structured finance and asset-backed market.

As of December 31, 2003 and 2002, net outstanding par exposure related to U.S. structured finance and asset-backed transactions was $115.2 billion and $105.0 billion, respectively. See "Financial Guarantees in Force—Types of Bonds" section, for a breakout of net outstanding par exposure by bond type.

**International Finance Market**

Outside of the United States, structured and asset-backed issuers, utilities, sovereign and sub-sovereign issuers, and other issuers are increasingly using financial guarantee products, particularly in markets throughout Western Europe. A number of important trends in international finance markets have contributed to this expansion. In the United Kingdom, ongoing privatization efforts have shifted certain risks associated with the development or operation of infrastructure projects from the government to market participants, thus prompting investors in such projects to seek the security of financial guarantee products. These privatization efforts are currently being initiated in other European countries, including Spain and Italy. In Europe, Australia, Japan and the emerging markets, there is growing interest in asset-backed securitization.

While the principles of securitization have been increasingly applied in overseas markets, development in particular countries has varied due to the sophistication of the local capital markets and the impact of legal and financial regulatory requirements. It is anticipated that securitization will continue to expand internationally, albeit at varying rates in each country. Ambac Assurance insures a wide array of obligations in the international finance markets including infrastructure finance, asset-backed and structured finance transactions, utilities, whole company securitizations (i.e. securitizations of substantially all of the operating

6

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2004

Table of Contents

assets of corporate credits typically engaged in the provision of utility services or infrastructure) and other obligations in selected international finance markets.

Ambac Assurance's strategy in the international finance markets is to strengthen its franchise in developed markets by focusing on high quality infrastructure, structured finance, securitization, and utility finance transactions, and in emerging markets by focusing on top tier future flow transactions (*structured transactions secured by U.S. Dollar cash flows generated from exports or payment remittances*) and pooled debt obligations.

Ambac Assurance UK Limited, which is authorized to conduct certain classes of general financial guarantee business in the United Kingdom, has been Ambac Assurance's primary vehicle for directly issuing financial guarantee policies in the United Kingdom and Europe. Ambac UK has entered into net worth maintenance and reinsurance agreements with Ambac Assurance, which support its triple-A ratings.

Ambac Assurance is party to an alliance in Japan with Sompo Japan Financial Guarantee Insurance Co., Ltd. ("Sompo Japan"), a monoline financial guarantor in Japan. Although the development of the Japanese securitization market has been slow, we believe that this alliance is competitively positioned for future growth.

While there is evidence that the volume of international structured finance transactions has increased significantly in the recent past, unlike the public finance and domestic asset-backed markets, there are few statistics that effectively track volume in the global markets. There are several reasons for this, including the varied nature of the deals coming to market, the early stages of development of certain asset classes and the fact that many international deals are privately placed.

Ambac Assurance guaranteed gross par of $22.1 billion, $25.2 billion and $19.5 billion in 2003, 2002 and 2001, respectively, in the international finance market. Premiums for international finance policies are based on a percentage of either principal or principal and interest insured. The timing of the collection of international finance premiums varies among individual transactions; some being collected in a single payment at policy inception date, and others being collected periodically (*i.e., monthly, quarterly or annually*).

As of December 31, 2003 and 2002, net outstanding par exposure related to international finance transactions was $86.4 billion and $67.7 billion, respectively. See "Financial Guarantees in Force—Types of Bonds" section, for a breakout of net outstanding par exposure by bond type.

### *Underwriting and Surveillance*

Underwriting guidelines, policies and procedures have been developed by Ambac Assurance's management with the intent that Ambac Assurance guarantees only those obligations which, in the opinion of Ambac Assurance underwriting officers, are of investment grade quality with a remote risk of loss. However, losses may occur from time to time and it is Ambac Assurance's policy to provide for loss reserves that are adequate to cover potential losses. See "Losses and Reserves" section for additional discussion.

The underwriting process involves review of structural, legal, political and credit issues, including compliance with current Ambac Assurance underwriting standards. These standards are reviewed periodically by management. Additionally, the underwriting process often entails

7

Source: AMBAC FINANCIAL GROU, 10-K, March 15, 2004

Ambac Financial Group, Inc.

Management's Discussion and Analysis
of Financial Condition and Results of Operations

## OVERVIEW

Ambac Financial Group, Inc. is a holding company whose subsidiaries provide financial guarantees and financial services to clients in both the public and private sectors around the world.

Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading provider of financial guarantees for public finance and structured finance obligations, has earned triple-A ratings, the highest ratings available from Moody's Investors Service, Inc., Standard & Poor's Ratings Services, Fitch Inc., and Ratings and Investment Information, Inc. Ambac Assurance provides financial guarantees for bond issues and other forms of debt financing. Financial guarantee insurance is a promise to pay scheduled interest and principal if the issuer fails to meet its obligations. A bond guaranteed by Ambac receives triple-A ratings, typically resulting in lower financing costs for the issuer and generally makes the issue more marketable, both in the primary and secondary markets.

Ambac's Financial Services segment provides financial and investment products including investment agreements, interest rate swaps, total return swaps and funding conduits, principally to clients of the financial guarantee business, which includes municipalities and other public entities, health care organizations and asset-backed issuers. Ambac focuses on these businesses due to the complimentary nature of the products to its core financial guarantee product.

Ambac breaks out its core business product into Public Finance, Structured Finance and International Finance. Public Finance includes all U.S. municipal issuance including, for example, general obligations, lease and tax-backed obligations, health care, public utilities, transportation and higher education, as well as certain public/private backed transactions, such as stadium financings, military housing and student housing. Structured Finance covers U.S. structured finance transactions including mortgage-backed securities and other consumer asset-backed securities, commercial asset-backed securities, collateralized debt obligations, investor-owned utilities and asset-backed commercial paper conduits. International Finance covers both public finance initiatives and the structured finance markets outside of the U.S. Ambac has concentrated its international efforts in countries and regions where the capital markets are most advanced, primarily Western Europe, Australia and Japan.

Management believes that the Financial Guarantee business thrives on economic cycles. For example, a strong economic environment with a good or improving credit environment is beneficial to our financial guarantee portfolio. However, such conditions, if in place for an extended period of time, will reduce credit spreads and result in lower pricing. Conversely, in a deteriorating credit environment, credit spreads widen out and pricing for our product improves. However, if the weakening environment is prolonged, the stresses on our portfolio could result in claims payments in excess of normal expectations. Ambac's management believes that its business is well positioned to withstand, and in fact prosper, within the normal economic and business cycles witnessed over the past several years. Further, Ambac's Financial Guarantee business today enjoys a strong competitive position in a variety of product segments on a global scale and is well positioned for further geographic product expansion. Management believes that geographic product expansion will be driven, over the long term, by critical infrastructure needs worldwide and the expansion of global credit markets.

Ambac has stated its long-term financial goals of achieving earnings (exclusive of realized gains/losses in its investment portfolio and mark-to-market gains/losses in its credit derivatives portfolio and the impact of refundings) growth in the range of 14% to 16% and return on equity of 15%. These long-term goals will be missed from time to time, either higher or lower. Ambac's success in achieving its long-term goals will be influenced by the economic and market environments in which we operate.

## FORWARD-LOOKING STATEMENTS

Materials in this annual report may contain information that includes or is based upon forward-looking statements within the meaning of the Securities Litigation Reform Act of 1995. Forward-looking statements present Ambac's expectations or forecasts of future events. You can identify these statements by the fact that they do not relate strictly to historical or current facts and relate to future operating or financial performance.

Any or all of Ambac's forward-looking statements here or in other publications may turn out to be wrong and are based on current expectations and the current economic environment. Ambac's actual results may vary materially, and there are no guarantees about the performance of Ambac's securities. Among factors that could cause actual results to differ materially are: (1) changes in the economic, credit or interest rate environment in the United States and abroad; (2) the level of activity within the national and worldwide debt markets; (3) competitive conditions and pricing levels; (4) legislative and regulatory developments; (5) changes in tax laws; (6) the policies and actions of the United States and other governments and (7) other risks and uncertainties that have not been identified at this time. Ambac is not obligated to publicly correct or update any forward-looking statement if we later become aware that it is not likely to be achieved, except as required by law. You are advised, however, to consult any further disclosures we make on related subjects in Ambac's reports to the Securities and Exchange Commission.

Exhibit 8

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

———————

# FORM 10-K

### ANNUAL REPORT
### PURSUANT TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**For the Fiscal Year Ended**
**December 31, 2002**

**Commission File Number**
**1-10777**

———————

# Ambac Financial Group, Inc.
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3621676** |
| (State of incorporation) | (I.R.S. employer identification no.) |

| | |
|---|---|
| **One State Street Plaza** | |
| **New York, New York** | **10004** |
| (Address of principal executive offices) | (Zip code) |

**(212) 668-0340**
(Registrant's telephone number, including area code)

### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 per share and | |
| Preferred Stock Purchase Rights | New York Stock Exchange, Inc. |

### Securities registered pursuant to Section 12(g) of the Act:

**None**

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes  ☒   No  ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2)   Yes  ☒   No  ☐

The aggregate market value of voting stock held by non-affiliates of the Registrant as of the close of business on June 30, 2002 was $7,021,552,722 (based upon the closing price of the Registrant's shares of the New York Stock Exchange on that date, which was $67.20). For purposes of this information, the outstanding shares of Common Stock which were owned by all directors and executive officers of the Registrant were deemed to be shares of Common Stock held by affiliates.

As of March 11, 2003, 106,069,280 shares of Common Stock, par value $0.01 per share, (net of (182,191 treasury shares) were outstanding.

### Documents Incorporated By Reference

Portions of the Registrant's Annual Report to Stockholders for the year ended December 31, 2002 are incorporated by reference into Parts II and IV hereof. Portions of the Registrant's Proxy Statement dated March 28, 2003 in connection with the Annual Meeting of Stockholders scheduled to be held on May

Source: AMBAC FINANCIAL GROU, 10-K, March 28, 2003

Table of Contents

**BUSINESS SEGMENTS**

The following paragraphs describe the business operations of Ambac Financial Group, Inc. and its subsidiaries for its two reportable segments: Financial Guarantee and Financial Services.

**Financial Guarantee**

Generally, financial guarantee insurance written by Ambac Assurance guarantees to the holder of the underlying obligation timely payment of principal and interest by the issuer on such obligation in accordance with its original payment schedule.

Financial guarantee insurance is a form of credit enhancement that benefits both the issuer and the investor. Issuers benefit because their securities are sold with a higher credit rating than securities of the issuer sold without credit enhancement, resulting in interest cost savings and greater marketability. In addition, for complex financings and obligations of issuers that are not well known by investors, credit enhanced obligations receive greater market acceptance than obligations without credit enhancement. Investors benefit from greater marketability, secondary market price stability, active credit surveillance and protection from loss associated with issuer default.

Ambac Financial Group derives financial guarantee revenues from: (i) premiums earned over the life of the obligations guaranteed; (ii) net investment income; (iii) revenue from credit derivative transactions; (iv) net realized gains and losses from sales of investment securities; and (v) certain structuring and other fees. Financial guarantee revenues were $816.2 million, $672.0 million and $565.4 million in 2002, 2001 and 2000, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 17 of Notes to Consolidated Financial Statements in Ambac Financial Group's 2002 Annual Report to Stockholders.

Financial guarantee products are sold in three principal markets: the U.S. public finance market, the U.S. structured finance and asset-backed market, and the international finance market. Total gross par guaranteed for the years ended December 31, 2002, 2001 and 2000 were $116.4 billion, $90.1 billion and $77.0 billion, respectively.

**U. S. Public Finance Market**

The U.S. public finance market includes taxable and tax-exempt bonds, notes and other evidences of indebtedness issued by states, political subdivisions (*e.g., cities, counties and towns*), water, sewer, electric and other utility districts, airports, higher educational institutions, hospitals, transportation and housing authorities and other similar authorities and agencies. Public finance obligations are generally supported by either the taxing authority of the issuer or the issuer's or underlying obligor's ability to collect fees or assessments for certain projects or public services. More recently, the public finance market has expanded to include structured, project finance and asset-backed bond issues for infrastructure projects, sports stadiums, and other municipal purposes. This portion of the market is growing and has become a focus for Ambac Financial Group in recent years. The following table sets forth the volume of new issues of long-term (*longer than 12 months*) public finance bonds and the volume of new issues of insured long-term public finance bonds over the past ten years in the United States.

3

Source: AMBAC FINANCIAL GROU, 10-K, March 28, 2003

Table of Contents

**U.S. Public Finance Long-Term Market**

| | New Money | Refundings | Total Volume | Refundings as Percentage of Total Volume | Insured Volume | Insured Bonds as Percentage of Total Volume |
|---|---|---|---|---|---|---|
| | | | | ($ in Billions) | | |
| 1993 | $ 142.1 | $ 150.1 | $ 292.2 | 51.4% | $ 108.0 | 37.0% |
| 1994 | 126.4 | 38.6 | 165.0 | 23.4 | 61.5 | 37.3 |
| 1995 | 126.1 | 33.9 | 160.0 | 21.1 | 68.5 | 42.8 |
| 1996 | 139.1 | 45.9 | 185.0 | 24.8 | 85.7 | 46.3 |
| 1997 | 160.3 | 60.2 | 220.5 | 27.3 | 107.5 | 48.8 |
| 1998 | 204.2 | 82.0 | 286.2 | 28.7 | 145.1 | 50.7 |
| 1999 | 189.1 | 38.3 | 227.4 | 16.8 | 105.3 | 46.3 |
| 2000 | 180.8 | 19.4 | 200.2 | 9.7 | 79.4 | 39.6 |
| 2001 | 222.8 | 62.9 | 285.7 | 22.0 | 132.2 | 46.3 |
| 2002 | 265.2 | 91.9 | 357.1 | 25.7 | 173.5 | 48.6 |

Source:   Amounts, except for 2002, are based upon estimated data reported by The Bond Buyer's 2002 Yearbook. The 2002 amounts are Ambac Assurance estimates, compiled from industry sources including Securities Data Company, Inc. and The Bond Buyer. Amounts represent gross par amounts issued or insured, respectively, during such year.

The foregoing table illustrates the changes in the total volume and insured volume of new issues of public finance bonds over the past ten years. Changes in volume of public finance bond issuance during this period are primarily attributable to changes in refunding activity related to the then-current interest rate environment, along with the issuers new money requirements. Insured volume, as a percentage of total volume, which had grown consistently from 1993 through 1998, declined during 1999 and 2000. The decline during 2000 is generally considered to have resulted from the combination of the relatively high credit quality of issues that came to market during the period and the firmness in premium pricing in the industry. During 2001 and 2002, this market has shown a resurgence, largely the result of the lower interest rate environment causing an increase in both the refinancing and new money components of the market. Also, the percentage of insured bonds increased, partially due to general credit concerns.

Ambac Assurance guaranteed gross par of $43.7 billion, $33.2 billion and $19.6 billion in 2002, 2001 and 2000, respectively, in the U.S. public finance market.

In the U.S. public finance market, an issuer typically pays an up-front premium to Ambac Assurance at the time the policy is issued. Premiums are usually quoted as a percentage of the total amount of principal and interest that is scheduled to become due during the life of the insured bonds.

Proposed new public finance bond issues are submitted to Ambac Assurance by issuers (*or their investment bankers or financial advisors*) to determine their suitability for financial guarantee. Public finance bond issues are sold on either a competitive or a negotiated basis. With respect to competitive issues, an issuer will publish a notice of sale soliciting bids for the purchase of a proposed issue of bonds. Potential bidders on the bonds then form syndicates. These syndicates then solicit a determination from some or all of the financial guarantors whether an issue is suitable for financial guarantee and at what premium rate and on what terms. The syndicate then determines whether to bid on the issue with a financial guarantee (*and if so, with which financial guarantor*) or without a financial guarantee. The issuer then generally selects the syndicate with the lowest bid. In a negotiated offering, the issuer has already selected an investment bank and that investment bank solicits premium quotes and terms from the financial guarantors.

Ambac Assurance also provides financial guarantees on public finance bonds outstanding in the secondary market that are typically purchased by an institution to facilitate

4

Table of Contents

the sale of bonds in its portfolio or inventory. The financial guarantee generally increases the sale price of bonds (*typically by an amount greater than the cost of the policy*) and affords a wider secondary market and therefore greater marketability to a given issue of previously issued bonds. As is the case with new issues, the premium is generally payable in full at the time of policy issuance. Ambac Assurance employs the same underwriting standards on secondary market issues that it does on new public finance issues.

As of December 31, 2002 and 2001, net outstanding par exposure related to public finance bond transactions was $206.5 billion and $185.0 billion, respectively. See "Financial Guarantees in Force—Types of Bonds" below, for a breakout of net outstanding par exposure by bond type.

**U.S. Structured Finance and Asset-backed Market**

Financial guarantees of securities in the U.S. structured finance and asset-backed market are typically issued in connection with transactions in which the securities being issued are secured by or payable from a specific pool of financial or tangible assets. This pool of assets has an identifiable cash flow or market value and is generally held by a special purpose issuing entity. Structured finance and asset-backed obligations insured by Ambac Assurance generally have the benefit of over-collateralization and/or other forms of credit enhancement to mitigate credit risks associated with the related assets. These forms of credit enhancement are designed to absorb the expected losses in these transactions.

Structured finance obligations include the securitization of a variety of asset types such as mortgages, home equity loans, leases and pooled debt obligations originated in the United States ("Structured Finance"). Currently, the largest component of Ambac's Structured Finance business relates to the securitization of mortgages and home equity loans. Another target area in Structured Finance is the credit enhancement of pooled debt obligations known as collateralized debt obligations ("CDOs") including cash flow CDOs and structured credit derivatives. These transactions involve the securitization of a portfolio of corporate bonds, loan obligations and asset-backed securities (the "Securitized Assets"). Ambac's exposure to these Securitized Assets is mitigated through first loss protection. Typically, first loss protection is in the form of over-collateralization (i.e., the principal amount of the Securitized Assets exceeds the principal amount of the structured finance obligations guaranteed by Ambac Assurance), which allows the transaction to experience defaults among the Securitized Assets before a default is experienced on the structured finance obligations which have been guaranteed by Ambac.

Structured finance also encompasses credit enhancement for asset-backed commercial paper conduits (*"conduits"*). Conduits are used by issuers to efficiently fund assets in the short-term commercial paper market. Typically sponsored by financial institutions, the conduits typically purchase financial assets and asset-backed securities, and issue commercial paper to fund the purchase of the assets. The typical conduit structure provides Ambac with significant credit protection prior to a claim on Ambac's insurance policy. A conduit requires program-wide credit enhancement as one of several elements needed to support the conduit's credit rating for the structure, of which Ambac provides a senior portion.

Unlike the public finance market in which a substantial portion of the deals is bid competitively by the financial guarantors, the structured and asset-backed market is essentially a negotiated one. The financial guarantor will work directly with the investment bank or client to create an acceptable structure. Consequently, in addition to the types of deals listed above, structured finance will also include unique transactions and small market niches.

5

Source: AMBAC FINANCIAL GROU, 10-K, March 28, 2003

Table of Contents

The U.S. structured finance and asset-backed market in which Ambac Assurance provides financial guarantees is broad and varied, comprising public issues, private placements and asset-backed commercial paper. The increasing array of classes of assets securitized or guaranteed, and the recent rapid development of the market, makes estimating the size of the aggregate U.S. structured finance and asset-backed markets difficult. Two of the most developed sectors of this market are public asset-backed and mortgage-backed securities. According to *Asset-Backed Alert*, volume in U.S. public asset-backed and mortgage-backed securities combined totaled $626.4 billion and $474.7 billion in 2002 and 2001, respectively. Approximately 17% and 19% of those markets were insured in 2002 and 2001, respectively.

Premiums for structured finance and asset-backed policies are typically based on a percentage of principal insured. The timing of the collection of structured finance and asset-backed premiums can be collected in a single payment at policy inception date or collected periodically (*e.g., monthly, quarterly or annually*) from the cash flow generated by the underlying assets.

Ambac Assurance insured gross par of $47.5 billion, $37.4 billion and $33.9 billion in 2002, 2001 and 2000, respectively, in the U.S. Structured Finance and Asset-backed market.

As of December 31, 2002 and 2001, net outstanding par exposure related to U.S. structured finance and asset-backed transactions was $105.0 billion and $88.7 billion, respectively. See "Financial Guarantees in Force—Types of Bonds" below, for a breakout of net outstanding par exposure by bond type.

**International Finance Market**

Outside of the United States, structured and asset-backed issuers, utilities, sovereign and sub-sovereign issuers, and other issuers are increasingly using financial guarantee products, particularly in markets throughout Western Europe. A number of important trends in international finance markets have contributed to this expansion. In the United Kingdom, ongoing privatization efforts have shifted certain risks associated with the development or operation of infrastructure projects from the government to market participants, thus prompting investors in such projects to seek the security of financial guarantee products. In Europe, Australia, Japan and the Emerging Markets, there is growing interest in asset-backed securitization.

While the principles of securitization have been increasingly applied in overseas markets, development in particular countries has varied due to the sophistication of the local capital markets and the impact of legal and financial regulatory requirements. It is anticipated that securitization will continue to expand internationally, albeit at varying rates in each country. Ambac Assurance insures a wide array of obligations in the international finance markets including infrastructure finance, asset-backed and structured finance transactions, utilities, and other obligations in selected international finance markets.

Ambac Assurance's strategy in the international finance markets is to strengthen its franchise in developed markets by focusing on high quality infrastructure, structured finance, securitization, and utility finance transactions, and in emerging markets by focusing on top tier future flow transactions (*structured transactions secured by U.S Dollar cash flows generated from exports or payment remittances*) and collateralized debt obligations.

6

Source: AMBAC FINANCIAL GROU, 10-K, March 28, 2003

Table of Contents

Ambac Assurance UK Limited, which is authorized to conduct certain classes of general financial guarantee business in the United Kingdom, has been Ambac Assurance's primary vehicle for directly issuing financial guarantee policies in the United Kingdom and Europe. Ambac UK has entered into net worth maintenance and reinsurance agreements with Ambac Assurance, which support its triple-A ratings.

Ambac Assurance is party to an alliance in Japan with Sompo Japan Financial Guarantee Insurance Co., Ltd. ("Sompo Japan"), a monoline financial guarantor in Japan. Although the development of the Japanese securitization market has been slow, we believe that this alliance is competitively positioned for future growth.

While there is evidence that the volume of international structured finance transactions has increased significantly in the recent past, unlike the public finance and domestic asset-backed markets, there are few statistics that effectively track volume in the global markets. There are several reasons for this, including the varied nature of the deals coming to market, the early stages of development of certain asset classes and the fact that many international deals are privately placed.

Ambac Assurance guaranteed gross par of $25.2 billion, $19.5 billion and $23.5 billion in 2002, 2001 and 2000, respectively, in the international finance market. Premiums for international finance policies are based on a percentage of either principal or principal and interest insured. The timing of the collection of international finance premiums varies among individual transactions; some being collected in a single payment at policy inception date, and others being collected periodically (*i.e., monthly, quarterly or annually*).

As of December 31, 2002 and 2001, net outstanding par exposure related to international finance transactions was $67.7 billion and $44.3 billion, respectively. See "Financial Guarantees in Force—Types of Bonds" below, for a breakout of net outstanding par exposure by bond type.

### Underwriting and Surveillance

Underwriting guidelines, policies and procedures have been developed by Ambac Assurance's management with the intent that Ambac Assurance guarantee only those obligations which, in the opinion of Ambac Assurance underwriting officers, are of investment grade quality with a remote risk of loss. However, losses may occur from time to time and it is Ambac Assurance's policy to provide for loss reserves that are adequate to cover potential losses. See "Losses and Reserves" below.

The underwriting process involves review of structural, legal, political and credit issues, including compliance with current Ambac Assurance underwriting standards. These standards are reviewed periodically by management. Additionally, the underwriting process often entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, servicer or manager.

The decision to guarantee an issue is based upon such credit factors as the issuer's ability to repay the bonds, the bond's security features and the bond's structure, rather than upon an actuarial prediction of the likelihood that the issuer will default on the underlying debt obligation.

Members of Ambac Assurance's underwriting staff review all requests for guarantees. The underwriting process is designed to screen issues and begins with a credit analysis by the primary analyst assigned to the issue. The credit is then reviewed within the primary analyst's

7

Source: AMBAC FINANCIAL GROU, 10-K, March 28, 2003

# Exhibit 9

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): November 6, 2007 (November 6, 2007)

---

# AMBAC FINANCIAL GROUP, INC.
**(Exact name of Registrant as specified in its charter)**

---

| Delaware | 1-10777 | 13-3621676 |
|---|---|---|
| (State of incorporation) | (Commission file number) | (I.R.S. employer identification no.) |

**One State Street Plaza, New York, New York 10004**
**(Address of principal executive offices) (Zip Code)**

**(212) 668-0340**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4c))

**Item 7.01 Regulation FD Disclosure**

On November 6, 2007, Ambac Financial Group, Inc. ("Ambac" or the "Company") issued a press release announcing that it had posted to its website a response to the Morgan Stanley analyst report that was issued on November 2, 2007. In its press release, Ambac noted that among other points made in its rebuttal, it addresses why the loss estimates presented in the Morgan Stanley report do not accurately reflect the composition of our underlying mortgage portfolio and the structure of our deals. Ambac, in further disputing the report's conclusions with respect to the Company, underscored its internal credit ratings process and its transparency to the financial community regarding its direct mortgage and CDO exposures. A copy of the press release, filed as Exhibit 99.01 to this Current Report on Form 8-K and the response to the Morgan Stanley analyst report, filed as Exhibit 99.02 to this Current Report on Form 8-K, and are each incorporated by reference herein.

The information in Item 7.01 of this report is being furnished, not filed, pursuant to Regulation FD. Accordingly, the information in Item 7.01 of this report will not be incorporated by reference into any registration statement filed by the Company under the Securities Act of 1922, as amended, unless specifically identified therein as being incorporated therein by reference, The furnishing of the information in this report is not intended to, and does not, constitute a determination or admission by the Company, that the information in this report is material or complete or that investors should consider this information before making an investment decision with respect to any security of the Company or any of its affiliates .

Certain statements in this document and the exhibits are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act. These statements are based on management's current expectations and are subject to uncertainty and changes in circumstances. Actual results may differ material from those included in these statements due to a variety of factors. More information about these factors is contained in Ambac's filings with the Securities and Exchange Commission.

**Item 9.01 Financial Statements and Exhibits**

(d) Exhibits.

| Exhibit Number | Item |
|---|---|
| 99.01 | Press release, dated November 6, 2007, issued by Ambac Financial Group, Inc. |
| 99.02 | Disclosure on Website – "Ambac's Response to Morgan Stanley's Report on Financial Guarantors dated November 2, 2007 |

*SIGNATURES*

*Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.*

*Ambac Financial Group, Inc.*
*(Registrant)*

*Dated: November 6, 2007*

By:    */s/ Anne Gill Kelly*
       *Anne Gill Kelly*
       *Managing Director, Corporate Secretary and Assistant General Counsel*

Source: AMBAC FINANCIAL GROU, 8-K, November 07, 2007

### INDEX TO EXHIBITS

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 99.01 | Press release, dated October 10, 2007, issued by Ambac Financial Group, Inc. |
| 99.02 | Disclosure on Website – "Ambac's Response to Morgan Stanley's Report on Financial Guarantors dated November 2, 2007 |

**Ambac Financial Group, Inc.**
One State Street Plaza
New York, NY 10004
212.668.0340

*News Release*

**For Immediate Release**
Investor/Media Contact: Peter R. Poillon
(212) 208-3333
ppoillon@ambac.com
Web site: www.ambac.com



**AMBAC COMMENTS ON RECENT ANALYST REPORT**

NEW YORK, Nov 6, 2007 – **Ambac Financial Group, Inc.** (NYSE: ABK) ("Ambac") today said that it has posted on its website its response to the Morgan Stanley analyst report that was issued on November 2, 2007. The website can be found at www.ambac.com. Amongst other points made in the rebuttal, Ambac addresses why the loss estimates presented in the Morgan Stanley report do not accurately reflect the composition of our underlying mortgage portfolio and the structure of our deals. Ambac, in further disputing the report's conclusions with respect to the Company, underscored its internal credit ratings process and its transparency to the financial community regarding its direct mortgage and CDO exposures.

For further Company comments on the report, please refer to the website.

Certain statements in this document are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act. These statements are based on management's current expectations and are subject to uncertainty and changes in circumstances. Actual results may differ materially from those included in these statements due to a variety of factors. More information about these factors is contained in Ambac's filings with the Securities and Exchange Commission.

*********************

Ambac Financial Group, Inc., headquartered in New York City, is a holding company whose affiliates provide financial guarantees and financial services to clients in both the public and private sectors around the world. Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading guarantor of public finance and structured finance obligations, has earned triple-A ratings, the highest ratings available from Moody's Investors Service, Inc., Standard & Poor's Ratings

Services and Fitch, Inc. Ambac Financial Group, Inc. common stock is listed on the New York Stock Exchange (ticker symbol ABK).

Source: AMBAC FINANCIAL GROU, 8-K, November 07, 2007

**Ambac's Response to Morgan Stanley's Report On**
**Financial Guarantors – Dated November 2, 2007**

**"Questions Arise on Mark to Market Losses"**

On page 6 the analyst states, "One of the first negative surprises we saw last week stemmed from the large discrepancy between the mark-to-market losses reported by the financial guarantors and Merrill Lynch."

**Management Comment:**

It is difficult for us to comment on the Merrill Lynch mark-to-market loss as we do not have any visibility into their transactions. Without such details on Merrill's book, one can only speculate as to the differences in the portfolios.

Several differences may exist between exposures contained in Ambac's portfolio and an investment bank's portfolio and therefore may influence the estimated mark of the different portfolios. For example, we have noted that later vintage high-grade ABS CDOs (particularly those with 2007 and late 2006 vintage underlying collateral) and high-grade ABS CDOs that have large inner CDO components, have suffered more severe mark-to-market losses. Additionally, as one might expect, the amount of first loss subordination and credit migration triggers present in a structure also can impact the market value of the senior tranche. Finally, the terms of the contract may also impact the estimate of fair value. Ambac's Credit Default Swap ("CDS") contracts are highly modified from a standard CDS used by investment banks. Ambac CDS contracts do not include collateral posting provisions, and are generally limited to payment shortfalls of interest and principal. Ambac's contract terms are significant variations from standard CDS contracts and have significant value, particularly in difficult markets. In fact, certain investment banks will not enter into an Ambac CDS due to the favorable nature (towards Ambac) of its terms.

Some background on Ambac's mark-to-market follows. The mark-to-market unrealized loss is an estimate of our CDS contracts' "fair value". It is an estimate because our CDS contract does not trade in any market. Under U.S. generally accepted accounting principles, CDS contracts must be recorded at fair value. Fair value is defined broadly as the price that a contract could be settled in a current transaction between willing parties, other than in a forced or liquidation sale.

Because an estimate of fair value of a CDS contract includes many market factors, an unrealized loss may not result in an increased expectation of loss. A good example of this dynamic is a general decline in the level of liquidity (witnessed by fewer buyers in the market) for a particular asset or asset class. Ambac believes that only through rigorous analytics of the actual transaction and its attributes and protections, as well as performance to date and expected future performance of underlying collateral, will one obtain meaningful information on the potential for actual losses.

Most all-major financial institutions are struggling with this issue. Particularly institutions where the process of marking-to-market is a critical part of operations, such as those that need to calculate required collateral postings. We are subject to information that we receive from market participants, which are primarily comprised of major investment banking institutions. Given the lack of liquidity in the market, the potential for CDO downgrading activity by the rating agencies, the potential for forced selling by other investors (due to downgrades), and the overall uncertainty surrounding the ultimate outcome of the sub prime mortgage market, Ambac does expect significant volatility in the mark-to-market of its CDO portfolio for the foreseeable future.

**"CDO Downgrades Have Started"**

On pages 6 and 7, the analyst discusses the recent internal rating downgrades of certain ABS CDOs. He states "If they were to downgrade the securities further, we would be highly disappointed and expect investor confidence in management to be strained."

**Management Comment:**

Ambac has a rigorous surveillance process surrounding its entire book of business. Management has subjected the mortgage and ABS CDO books to more frequent and more detailed reviews in the current environment. We believe this is prudent and responsible given the current stressed credit environment surrounding the mortgage market. While Ambac underwrites its transactions to withstand significant stress, the underlying credit rating is impacted by expected unfavorable collateral performance. To date, the downgrades noted in the subject transactions are within the parameters of Ambac's original stress tests. Ambac's independent Surveillance and Risk Management group determine the deal ratings. The ratings are based on the performance observed to date and a projection of future performance of the underlying collateral. Given the significant stress in the mortgage market, it should not be surprising that there have been downgrades. We are highly confident in our ratings process. Over time, as new information becomes available and as performance data is analyzed, we will adjust ratings up or down accordingly.

**"Increasing Our Expectation of CDO Losses"**

The analyst states, "We are increasing our CDO loss expectations for both Ambac and MBIA to reflect an updated tally of various market opinions about cumulative sub prime losses."

**Management Comment:**

It appears that the "various market opinions" referred to in the analyst's report relate to the 2006 and early 2007 vintage sub prime. It also appears that he is assuming that the Ambac ABS CDO book will reflect the performance of the ABX index of 2006 and 2007 vintage sub prime collateral and ignores the actual vintage diversification and asset quality triggers inherent in Ambac's book. We see wide differences in the market regarding the estimate of ultimate cumulative loss for the 2006 and early 2007 vintage. We typically hear a range from 8% to 17% with a wide dispersion around the mean. We

understand the three major rating agencies are projecting a range of 10% to 14%. One of the rating agencies recently reported estimates with significant differences dependent upon vintage. There were notable differences between the first half of 2006 and more recent vintages. We believe this is a critical point that is missed by simply applying a broad 15% estimated cumulative loss across the book of business. It does not compensate for vintage dispersion inherent in our transactions, nor does it factor in different rating and FICO segmentation. Additionally, many of the ABS CDOs contain 2005 vintage mortgages, including Ambac transactions that were underwritten in 2007. That vintage is performing significantly better than 2006 and 2007. This illustrates the over simplification of applying a single cumulative loss across the board.

**"Becoming More Conservative with Capital"**

The analyst states, "We can not help but think that if management truly believed losses are unlikely, they would be willing to make a stronger statement with how they manage their capital (i.e. increased share buybacks)."

**Management Comment:**

As management has stated many times in the past, Ambac manages its capital levels to a triple-A standard. That requires us to be very cautious with capital levels, particularly in times of credit stress. For instance, a transaction rated AA will attract more capital than a similar transaction rated AAA. It is unlikely claims will be paid under either transaction. The global capital markets and virtually all major financial institutions are in the midst of a major credit and liquidity crunch. There is uncertainty regarding the ultimate outcome of losses in the U.S. mortgage market, concerns over leveraged investment vehicles and overall concern that the problems surrounding the mortgage market will adversely impact other sectors of the economy. Such an environment has caused credit spreads in many sectors to widen significantly. This environment provides both opportunities and limitations for Ambac. With regard to opportunities, returns on business written are up sharply in many sectors and we have seen a notable increase in attractive opportunities to put our capital to work for our shareholders. With regard to limitations, the market environment has caused some fixed income investors to have increased concern about the financial guaranty industry. As a result, all of the major participants in the industry have seen their credit spreads widen significantly. We believe applying capital to high return business and at the same time maintaining a stronger balance sheet by holding off on share repurchases is a responsible course in the current environment and one that meets our objective of managing our capital consistent with a triple-A standard. We believe this prudent strategy is good for both our equity and fixed income investors and will help restore confidence in our industry.

**Summary comments:**

We certainly understand the heightened concerns summarized in the analyst's report. Most all participants in the financial markets, including Ambac have a heightened concern over the ultimate outcome of the U.S. mortgage market. However, we are confident in the quality of our internal credit ratings process. We have been very transparent to the market and our investors by disclosing significant detail on our direct mortgage and CDO exposure in our various public disclosures. We have a rigorous and

current review and rating process in place and we will react quickly as projected collateral performance changes.

Created by 10KWizard    www.10KWizard.com

# Exhibit 10

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**

Filed by the Registrant    ☒        Filed by a Party other than the Registrant    ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to §240.14a-12

## Ambac Financial Group, Inc.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)    Title of each class of securities to which transaction applies:

    (2)    Aggregate number of securities to which transaction applies:

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)    Proposed maximum aggregate value of transaction:

    (5)    Total fee paid:

☐    Fee paid previously with preliminary materials.

Source: AMBAC FINANCIAL GROU, DEF 14A, April 21, 2008

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)   Amount Previously Paid:

_____

(2)   Form, Schedule or Registration Statement No.:

_____

(3)   Filing Party:

_____

(4)   Date Filed:

_____

Source: AMBAC FINANCIAL GROU, DEF 14A, April 21, 2008

Table of Contents

**AMBAC FINANCIAL GROUP, INC.**

**NOTICE    OF**

**2008 ANNUAL MEETING OF STOCKHOLDERS    AND PROXY STATEMENT**
dated April 21, 2008

*Meeting Date:*

Tuesday, June 3rd, 2008
at 11:30 A.M. (local time)

*Meeting Place:*

Ambac Financial Group, Inc.
One State Street Plaza
New York, New York 10004

Source: AMBAC FINANCIAL GROU, DEF 14A, April 21, 2008

Table of Contents
## The Committees of the Board

The Board has three standing committees: the Audit and Risk Assessment Committee, the Compensation Committee and the Governance Committee. None of the directors who serve as members of these committees is, or has ever been, an employee of Ambac or our subsidiaries. All of the directors who serve as members of these committees are independent in accordance with the rules of the NYSE and Ambac's Director Independence Policy.

**The Audit and Risk Assessment Committee**

The Audit and Risk Assessment Committee (i) selects the independent auditors; (ii) approves the scope of the annual audit by the independent auditors and our internal auditors; (iii) reviews audit findings and accounting policies; (iv) pre-approves all audit, audit-related and other services, if any, to be provided by the independent auditors; (v) assesses the adequacy of internal controls and risk management; (vi) reviews and approves Ambac's financial disclosures; and (vii) oversees compliance with Ambac's Code of Business Conduct.

Additionally, the Audit and Risk Assessment Committee reviews and monitors the adequacy of Ambac's portfolio risk management, which includes reviewing (i) its adversely classified credits, (ii) the sufficiency of its loss reserves and (iii) its economic risk capital. The Audit and Risk Assessment Committee also reviews compliance with risk management and underwriting policies related to Ambac's insured book of business, derivatives business and investment portfolios. The Chief Risk Officer reports to the Board of Directors on a "dotted line" basis and will inform and update the Audit and Risk Assessment Committee with respect to risk-related topics. The Chief Risk Officer is empowered to veto any transaction that has been approved by a credit committee. However, the CEO may override the Chief Risk Officer's veto, upon notice to the Chairman of the Audit and Risk Assessment Committee.

The Audit and Risk Assessment Committee also meets outside the presence of Ambac management, with both the independent auditors and the internal auditors. The Audit and Risk Assessment Committee's Report for 2007 is printed below at pages 24 and 25.

Four out of five of the members of the Audit and Risk Assessment Committee qualify as "audit committee financial experts" as such term is defined in the applicable SEC regulations. For a list of "audit committee financial experts", please see the "Audit and Risk Assessment Committee Report" on page 24 and 25.

The Board has adopted a written charter for the Audit and Risk Assessment Committee. A copy of the Charter is available at our website: http://www.ambac.com. A copy of the Audit and Risk Assessment Committee Charter is also available to stockholders free of charge on request to Anne Gill Kelly, our Corporate Secretary, at 212-208-3355 or akelly@ambac.com.

14

Table of Contents

The Audit and Risk Assessment Committee met eight times during 2007.

*Messrs. Duff, Theobald and Wallace, Ms. Considine and Ms. Unger currently serve as members of the Audit and Risk Assessment Committee. Mr. Wallace serves as Chair of the Audit and Risk Assessment Committee.*

**The Governance Committee**

The Governance Committee is responsible for monitoring Ambac's corporate governance policies and procedures and identifying, evaluating and recommending qualified candidates to the Board for election as directors. Through its monitoring of Ambac's corporate governance policies and procedures, it is responsible for making recommendations concerning the size, structure and composition of the Board and committees, fees for the Board and criteria for retention of directors.

The Governance Committee will consider individuals recommended by stockholders for nomination as a director in accordance with the procedures described on page 79 under "Information About Stockholder Proposals."

The Governance Committee reviews with the Board on an annual basis the appropriate skills and characteristics required of Board members in the context of the then-current composition of the Board. This assessment includes, in addition to the qualities of intellect, integrity and judgment, diversity, a strong understanding of finance and senior management experience.

The Governance Committee evaluates all nominees for director based on these criteria, including nominees recommended by stockholders. Under the Governance Committee's charter, the Governance Committee has the sole authority to retain and terminate any search firm used to identify director candidates and to approve the fees and other retention terms for such firm.

The Board has adopted a written charter for the Governance Committee. A copy of the Governance Committee charter is available at our website: http://www.ambac.com. A copy of the Governance Committee charter is also available to stockholders free of charge on request to Anne Gill Kelly, our Corporate Secretary, at 212-208-3355 or at akelly@ambac.com.

The Governance Committee met four times during 2007.

*Messrs. Duff, Theobald and Wallace and Ms. Considine and Ms. Unger currently serve as members of the Governance Committee. Ms. Unger serves as Chair of the Governance Committee.*

15

Source: AMBAC FINANCIAL GROU, DEF 14A, April 21, 2008

Table of Contents

**The Compensation Committee**

The Compensation Committee oversees Ambac's compensation and employee benefit plans and practices. As outlined in its Charter, the Compensation Committee, among other things, (i) adopts and annually reviews the overall compensation philosophy and policy of Ambac; (ii) adopts and annually reviews a comprehensive statement of executive compensation philosophy, strategy and principles; (iii) selects the peer group of companies that is used in determining competitive compensation packages; (iv) evaluates the performance of our named executive officers, including the Chief Executive Officer, and determines and approves the compensation of each of them; (v) reviews and evaluates succession planning for the Chairman, CEO and other key management positions; (vi) reviews the performance standards for executive officers to be used in succession planning and in our compensation programs; (vii) evaluates existing and proposed employee benefit plans, including any employment, severance and perquisites arrangements for executive officers, and approves all substantive plan changes; (viii) reviews and approves our incentive bonus pool for the year; and (ix) reviews our stock ownership guidelines. In addition, our Compensation Committee administers our Equity Plan (and has the sole authority for awards made under the Equity Plan) as well as the Ambac 1997 Executive Incentive Plan (the "*EIP*"), the Ambac Deferred Compensation Plan for Outside Directors and the Ambac Deferred Compensation SubPlan of the 1997 Equity Plan (the "*SubPlan*").

The Compensation Committee also provides oversight in the development, implementation and effectiveness of Ambac's Human Resources function, including but not limited to those policies and strategies regarding retention, career development and progression, diversity and other employment practices. The Compensation Committee is also responsible for periodically reviewing Ambac's plans regarding succession of senior management.

The Compensation Committee has engaged Alan Johnson, a Managing Director of Johnson Associates, an outside human resources consulting firm, as its compensation consultant. The Compensation Committee asks Mr. Johnson, among other things, to provide peer company compensation data and conduct an annual review of its total compensation program for its executive officers. For a fuller description of the role of the Compensation Committee's compensation consultant, please refer to "Role of Compensation Consultant" in the Compensation Discussion and Analysis section of this Proxy Statement. Management also provides information and proposals for the Compensation Committee's consideration. While the CEO and the Senior Vice President, Chief Administrative Officer attend Compensation Committee meetings regularly by invitation, the Compensation Committee is the final decision maker for the compensation of our named executive officers and other executive officers. The Compensation Committee also considers certain matters in executive session. The Compensation Committee's Chairman reports to the Board on actions taken at each meeting. The Compensation Committee has authority to retain, approve fees for and terminate independent advisors to assist in fulfilling its responsibilities.

16

Source: AMBAC FINANCIAL GROU, DEF 14A, April 21, 2008

**Table of Contents**

### DISCUSSION   OF PROPOSALS RECOMMENDED   BY THE BOARD

## *Proposal 1: Elect Six Directors*

### *General*

The Board has nominated six directors for election at the Annual Meeting. Each nominee is currently serving as a director. If you elect them, they will hold office until the next Annual Meeting or until their successors have been elected. Each nominee also serves as a director of Ambac Assurance.

We know of no reason why any nominee may be unable to serve as a director. If any nominee is unable to serve, your proxy may vote for another nominee proposed by the Board, or the Board may reduce the number of directors to be elected. If any director resigns, dies or is otherwise unable to serve out his or her term, or the Board increases the number of directors, the Board may fill the vacancy until the next Annual Meeting.

#### NOMINEES

| | |
|---|---|
| **Michael A. Callen**<br>Age 67<br>Director since 1991 | **Chairman, Interim President and Chief Executive Officer of Ambac and Ambac Assurance**. On January 16, 2008, Mr. Callen became the Chairman and Interim President and Chief Executive Officer of Ambac and Ambac Assurance. He served as the President of Avalon Argus Associates, LLC, a financial consulting firm from April 1996 until January 2008. Mr. Callen was Special Advisor to the National Commercial Bank located in Jeddah in the Kingdom of Saudi Arabia from April 1993 through April 1996. He was an independent consultant from January 1992 until June 1993, and an Adjunct Professor at Columbia University Business School during 1992. He was a director of Citicorp and Citibank and a Senior Executive for Citicorp from 1987 until January 1992. Mr. Callen also serves as a director of Intervest Corporation of New York and Intervest Bancshares Corporation. |
| **Jill M. Considine**<br>Age 63<br>Director since 2000 | **Senior Advisor of The Depository Trust & Clearing Corporation and its subsidiaries** (*securities depository and clearing house*) since August 2007, having served as Chairman since 2006, and as both Chairman and Chief Executive Officer from January 1998 to August 2006. Prior to joining The Depository Trust Company, Ms. Considine served as the President of the New York Clearing House Association, L.L.C. from 1993 to 1998. Ms. Considine served as a Managing Director, Chief Administrative Officer and as a member of the Board of Directors of American Express Bank Ltd., from 1991 to 1993. Prior to that, Ms. Considine served as the New York State Superintendent of Banks from 1985 to 1991. Ms. Considine also serves as a director of the Atlantic Mutual Insurance Companies and The Interpublic Group of Companies, Inc. On January 30, 2008, Ms. Considine became the Chairman of the Board of Directors of Fulcrum Limited, a leading global administrator for the hedge fund and alternative asset management industry. |

Source: AMBAC FINANCIAL GROU, DEF 14A, April 21, 2008

Table of Contents

**Philip Duff**
Age 50
Director
since May 2007

**CEO and General Partner of Duff Capital Advisors** since January 2007. Prior to founding Duff Capital Advisors (formerly known as Robson Ventures), Mr. Duff was one of the founding partners of FrontPoint Partners LLC, an investment management firm, and served as its Chairman and CEO from November 2000 to December 2006. In December 2006, FrontPoint Partners was sold to Morgan Stanley. Prior to his starting FrontPoint Partners in 2000, Mr. Duff was the Chief Operating Officer and Senior Managing Director of Tiger Management from 1998 to 2000. Before joining Tiger, Mr. Duff spent much of his career at Morgan Stanley and served as the Chief Financial Officer of Morgan Stanley from 1994 to 1997. From 1997 to 1998, Mr. Duff served as President and CEO of VanKampen Investments, a mutual fund acquired by Morgan Stanley. Mr. Duff started his career at Morgan Stanley in 1984 in investment banking, where he became head of the Financial Institutions Group.

**Thomas C. Theobald**
Age 70
Director since 2004

**Senior Advisor for Chicago Growth Partners (Formerly William Blair Capital Partners) and former Chairman and Chief Executive Officer of Continental Bank Corp.** Mr. Theobald joined William Blair Capital Partners in 1994 following his role as Chairman and CEO of Continental Bank, where he had served since 1987 until its sale to BankAmerica in 1994. Prior to 1987, Mr. Theobald worked at Citicorp/Citibank for over 25 years in various capacities in the domestic and international sectors, including serving as Vice Chairman from 1982 to 1987. Mr. Theobald also serves as the Chairman of the Board for Columbia Mutual Funds and as a director for Anixter International, Jones Lang LaSalle Incorporated and Ventas Inc.

**Laura S. Unger**
Age 47
Director since 2002

**Private Consultant and Former SEC Commissioner.** Ms. Unger currently has her own consulting business, advising clients on a range of securities, legal, regulatory and policy matters. She has also served as the Independent Consultant to JPMorgan for the global analyst conflict settlement since 2003. After resigning her Commissioner seat, Ms. Unger joined CNBC in July 2002 and served as CNBC's Regulatory Expert until July 2003. From February 2001 until August 2001, Ms. Unger served as Acting Chairman of the SEC. From November 1997 to February 2002, Ms. Unger served as a SEC Commissioner. Before being appointed to the SEC, Ms. Unger served as Securities Counsel to the United States Senate Committee on Banking, Housing and Urban Affairs from October 1990 to November 1997. Prior to working on Capitol Hill, Ms. Unger was an attorney with the Enforcement Division of the SEC in Washington, D.C. and New York City. Ms. Unger also serves as a director of CA, Inc. (formerly Computer Associates) and the IQ Fund Complex.

**Henry D. G. Wallace**
Age 62
Director since 2004

**Former Group Vice President and Chief Financial Officer of Ford Motor Company** *(auto manufacturing)*. Mr. Wallace was Group Vice President and Chief Financial Officer of Ford Motor Company from January 1999 until he retired in December 2001. In 1998, he served as Vice President of Strategic Planning and CFO for Ford's European Operations. From 1996-1997, he served as President and CEO of Mazda Motor Corporation. Mr. Wallace also serves as a director of Diebold, Inc., Lear Corporation and Hayes Lemmerz International, Inc.

The Board recommends that you vote "**FOR**" the election of all six nominees for director.

61

Exhibit 11

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): July 3, 2008 (July 2, 2008)

---

# AMBAC FINANCIAL GROUP, INC.

**(Exact name of Registrant as specified in its charter)**

---

| | | |
|---|---|---|
| **Delaware** | **1-10777** | **13-3621676** |
| (State of incorporation) | (Commission file number) | (I.R.S. employer identification no.) |

**One State Street Plaza, New York, New York 10004**
**(Address of principal executive offices) (Zip Code)**

**(212) 668-0340**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4c))

***Item 5.02***        ***Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers***

On July 2, 2008, Mr. Paul DeRosa, was appointed as a member of the Board of Directors of Ambac Financial Group, Inc. ("Ambac") to stand until the Board is re-elected, currently scheduled for May 2009. Mr. DeRosa has also been appointed to the Governance Committee, the Compensation Committee, and the Audit and Risk Assessment Committee effective July 7, 2008.

***Item 8.01***        ***Other Events***

On July 3, 2008, Ambac issued a press release announcing that its Board of Directors has authorized up to $50 million for share repurchases of its common stock. The repurchase of shares under the Stock Repurchase Program is conditioned upon the completion of the offering of shares by the underwriters of its March 2008 offering. Ambac is unable to predict when the offering will be completed.

Certain statements in this document and the exhibit are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act. These statements are based on management's current expectations and are subject to uncertainty and changes in circumstances. Actual results may differ materially from those included in these statements due to a variety of factors. More information about these factors is contained in Ambac's filings with the Securities and Exchange Commission.

*SIGNATURES*

*Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.*

*Dated: July 3, 2008*

*Ambac Financial Group, Inc.*
*(Registrant)*

By:     */s/ Anne G. Kelly*

*Anne Gill Kelly*
*Managing Director, Corporate Secretary and Assistant General Counsel*

Created by 10KWizard    www.10KWizard.com

# Exhibit 12

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): October 25, 2007

MBIA INC.
(Exact name of registrant as specified in its charter)

| Connecticut | 1-9583 | 06-1185706 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 113 King Street, Armonk, New York | 10504 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:
914-273-4545

Not Applicable
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

|_| Written communications pursuant to Rule 425 under the Securities Act (17 CFR
230.425)

|_| Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)

|_| Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange
Act (17 CFR 240.14d-2(b))

|_| Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
Act (17 CFR 240.13e-4(c))

Item 2.02.  RESULTS OF OPERATIONS AND FINANCIAL CONDITION.

The following information, including the Exhibit to this Form 8-K, is being
furnished pursuant to Item 2.02 - Results of Operations and Financial Condition
of Form 8-K.

On October 25, 2007, MBIA Inc. issued a press release announcing its results of
operations for the quarter ended September 30, 2007. A copy of the press release
is attached as Exhibit 99.1 to this Form 8-K and is incorporated by reference to
this Item 2.02 as if fully set forth herein.

Item 9.01.  FINANCIAL STATEMENTS AND EXHIBITS.

99.1    Press Release issued by MBIA Inc. dated October 25, 2007.

This information is not deemed to be "filed" for the purposes of Section 18 of
the Securities Exchange Act of 1934 and is not incorporated by reference into
any Securities Act registration statements.

SIGNATURES

        Pursuant to the requirements of the Securities Exchange Act of 1934,
the registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

                                MBIA INC.


                                By: /s/ Ram D. Wertheim
                                    ----------------------
                                    Ram D. Wertheim
                                    General Counsel

Date: October 25, 2007

```
         EXHIBIT INDEX TO CURRENT REPORT ON FORM 8-K
                    Dated October 25, 2007


Exhibit 99.1        Press Release issued by MBIA Inc. dated October 25, 2007.
```

MBIA Inc. Reports 39 Percent Decrease in Nine Months Net Income Per Share;
Operating Income Per Share Down 2 Percent for the Quarter

ARMONK, N.Y.--(BUSINESS WIRE)--Oct. 25, 2007--MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation, today reported that net income per share for the first nine months of 2007 was $2.84, compared with $4.67 during the same period of 2006. In the first nine months of 2007, net income was $373.8 million, down 41 percent compared with $638.3 million in the same period last year.

The decline was due to a pre-tax net loss of $352.4 million, or $1.80 per share, that the Company recorded in the third quarter on financial instruments at fair value ("marked-to-market") and foreign exchange. The loss was a consequence of wider spreads affecting the valuation of the Company's structured credit derivatives portfolio. Compared with the previous quarter, spreads widened significantly on Commercial Mortgage-Backed Securities (CMBS) collateral and on other asset-backed collateral in the Company's structured credit derivatives portfolio. The Company believes that the "mark-to-market" loss does not reflect material credit impairment.

Operating income per share, a non-GAAP measure (which is defined in the attached Explanation of Non-GAAP Financial Measures), for the first nine months of 2007 was $4.57 compared with $4.50 in 2006. After-tax operating income for the first nine months of 2007 was down 2 percent to $600.7 million from $614.5 million in the same period of 2006. Excluding accelerated income from refunded issues, operating income per share was $4.09, up 4 percent in the first nine months of the year from $3.94 in the same period of 2006.

For the third quarter of 2007, net loss per share was $0.29 compared with net income per share of $1.59 in the third quarter of 2006. Net loss for the third quarter of 2007 was $36.6 million compared with net income of $217.9 million in the same period last year.

Operating income per share was $1.52 for the third quarter of 2007, compared with $1.55 for the third quarter of 2006. After-tax operating income for the third quarter of 2007 was down 9 percent to $192.6 million from $212.4 million in the third quarter of 2006. Excluding accelerated income from refunded issues, operating income per share in the third quarter increased to $1.43 from the prior year's third quarter at $1.37.

Diluted earnings per share information

|  | Three Months Ended September 30 | | Nine Months Ended September 30 | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
| Net income (loss) | ($0.29) | $ 1.59 | $ 2.84 | $ 4.67 |
| Income from discontinued operations | 0.00 | 0.01 | 0.00 | 0.03 |
| Net income (loss) from continuing operations | (0.29) | 1.58 | 2.84 | 4.64 |
| Net realized gains | 0.00 | 0.03 | 0.13 | 0.10 |
| Net gains (losses) on financial instruments at fair value and foreign exchange | (1.80) | 0.00 | (1.86) | 0.05 |
| Operating income | $ 1.52 | $ 1.55 | $ 4.57 | $ 4.50 |

(Numbers may not add due to rounding)

Gary Dunton, MBIA Chairman and Chief Executive Officer, said, "Spreads widened significantly across the market in the third quarter and caused our insured credit derivatives portfolio to generate a large "mark-to-market" loss, which we do not believe accurately reflects the economics of our business. The "mark-to-market" loss is not an actual loss, nor is it indicative of future claims. We remain comfortable that our insured credit derivatives portfolio will not result in material credit losses. More important, wider spreads contributed to a substantially better pricing environment for our insurance and asset/liability management products. From an Adjusted Direct Premium production standpoint, the third quarter was outstanding - the Company's second best quarter ever and the best quarter for our structured finance business. Pricing was strong across many sectors, and the credit quality of our new business was very high."

# Exhibit 13

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): January 31, 2008 (January 30, 2008)**

---

# MBIA INC.

**(Exact name of registrant as specified in its charter)**

---

| **Connecticut** | **1-9583** | **06-1185706** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **113 King Street,** | |
| **Armonk, New York** | **10504** |
| **(Addresses of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:
914-273-4545**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 2.02.    RESULTS OF OPERATIONS AND FINANCIAL CONDITION.

The following information, including Exhibit 99.1 to this Form 8-K, is being furnished, not filed, pursuant to Item 2.02 – Results of Operations and Financial Condition of Form 8-K.

On January 31, 2008, MBIA Inc. ("MBIA") issued a press release announcing its results of operations for the year ended December 31, 2007. A copy of the press release is attached as Exhibit 99.1 to this Form 8-K and is incorporated by reference to this Item 2.02 as if fully set forth herein.

Item 3.02.    UNREGISTERED SALES OF EQUITY SECURITIES.

The response to Item 8.01 is hereby incorporated into this Item 3.02. The shares and warrants issued and sold in the transaction described in Item 8.01 were sold in a private placement under Rule 4(2) of the Securities Act of 1933, as amended.

Item 5.02.    DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS.

Richard H. Walker has resigned from the board of directors of MBIA (the "Board"), effective January 28, 2008, due to the possibility of an appearance of a conflict of interest in light of the ongoing discussions among the New York State Superintendent of Insurance, the banking industry and the monoline financial guarantee insurance industry. Mr. Walker had been a member of the Board since September of 2006 and is the General Counsel of Deutsche Bank. Mr. Walker said, "I am proud to have been associated with MBIA, and I would have liked to continue serving on the board. I leave with great affection for all my fellow directors and for the exceptional MBIA staff. I am confident that this top-flight staff, with the board's support, will guide MBIA to future success."

On January 25, 2008 the Board appointed David A. Coulter and Kewsong Lee as directors, effective January 30, 2008, each to serve until his successor shall have been appointed and qualified or until he shall have resigned or been removed. Mr. Coulter will serve as a member of the Compensation & Organization Committee, the Credit Risk Committee and the Executive Committee until the next annual meeting of shareholders. Mr. Lee will serve as a member of the Finance Committee and the Nominating/Corporate Governance Committee until the next annual meeting of shareholders.

Mr. Coulter and Mr. Lee were appointed to the Board in accordance with the Investment Agreement (the "Investment Agreement"), dated as of December 10, 2007, between MBIA and Warburg Pincus Private Equity X, L.P. ("Warburg Pincus"). Pursuant to the Investment Agreement, in connection with the closing of Warburg Pincus's investment in MBIA described below under Item 8.01, at least 2 days prior to the closing of the investment MBIA was required to cause two people nominated by Warburg Pincus to be elected or appointed to the Board on the closing date of the investment. Subject to the share ownership requirements described in the Investment Agreement, Warburg Pincus will be required to recommend to its stockholders the election of up to two directors nominated by Warburg Pincus at MBIA's annual meeting, and Warburg Pincus's nominees will be required to be MBIA's and MBIA's Nominating/Governance Committee's nominees to serve on the Board. In addition, MBIA will be required to use all reasonable best efforts to have Warburg Pincus's nominees elected as directors of MBIA and MBIA will be required to solicit proxies for them to the same extent as it does for any of its other nominees to the Board. Subject to the share ownership requirement described in the Investment Agreement, Warburg Pincus has the right to proportionate representation on each committee of the Board (and the board of directors of any of MBIA's subsidiaries), with at least one representative on each such committee, as permitted by applicable laws and New York Stock Exchange regulations.

ITEM 5.03    AMENDMENTS TO ARTICLES OF INCORPORATION OR BYLAWS; CHANGE IN FISCAL YEAR.

In connection with the Investment Agreement, on January 25, 2008 the Board amended MBIA's bylaws to increase the maximum Board size from twelve to thirteen members, effective January 30, 2008. The Bylaws as amended are attached as Exhibit 3.1.

Item 7.01.    REGULATION FD DISCLOSURE.

MBIA issued a press release on January 30, 2008 and the Chief Executive Officer and President of MBIA received a resignation letter from Richard H. Walker on January 29, 2008. Copies of the press release and the letter are attached hereto as Exhibits 99.2 and 99.3, respectively.

The information in the press release and the letter is being furnished, not filed, pursuant to Item 7.01 of Form 8-K. Accordingly, the information in Item 7.01 of this Current Report, including Exhibits 99.2 and 99.3, will not be incorporated by reference into any registration statement filed by MBIA under the Securities Act of 1933, as amended, unless specifically identified therein as being incorporated by reference.

Item 8.01.    OTHER EVENTS.

The following information is being filed pursuant to Item 8.01 – Other Events of Form 8-K.

On January 30, 2008 MBIA announced the closing and funding of the sale of 16.1 million shares of its common stock at a price of $31 per share for the aggregate amount of $500 million pursuant to its Investment Agreement with Warburg Pincus. The stock sale is part of Warburg Pincus's previously announced commitment to invest up to $1 billion in MBIA. In connection with its investment, Warburg Pincus has received 16.1 million warrants, as previously described.

**FORWARD-LOOKING AND CAUTIONARY STATEMENTS**

This current report of MBIA Inc. includes statements that are not historical or current facts and are "forward-looking statements" made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. The words "believe," "anticipate," "project," "plan," "expect," "intend," "will likely result," "looking forward" or "will continue," and similar expressions identify forward-looking statements. These statements are subject to certain risks and

uncertainties that could cause actual results to differ materially from historical earnings and those presently anticipated or projected. MBIA cautions readers not to place undue reliance on any such forward-looking statements, which speak only to their respective dates. The following are some of the factors that could affect financial performance or could cause actual results to differ materially from estimates contained in or underlying MBIA's forward-looking statements: fluctuations in the economic, credit, interest rate or foreign currency environment in the United States and abroad; level of activity within the national and international credit markets; competitive conditions and pricing levels; legislative or regulatory developments; technological developments; changes in tax laws; changes in MBIA's credit ratings; the effects of mergers, acquisitions and divestitures; and uncertainties that have not been identified at this time. MBIA undertakes no obligation to publicly correct or update any forward-looking statement if it later becomes aware that such results are not likely to be achieved.

Item 9.01.        FINANCIAL STATEMENTS AND EXHIBITS.

3.1        Bylaws as Amended as of January 30, 2008.

99.1        Press Release issued by MBIA Inc. dated January 31, 2008.

99.2        Press Release issued by MBIA Inc. dated January 30, 2008.

99.3        Letter from Richard H. Walker dated January 29, 2008.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.


MBIA INC.


**By:**  /s/ Ram D. Wertheim _____
         Ram D. Wertheim
         General Counsel

Date: January 31, 2008



MBIA Insurance Corporation
113 King Street
Armonk, NY 10504
www.mbia.com

**NEWS RELEASE**

**FOR IMMEDIATE RELEASE**

**Media Contact:** Willard Hill, 914-765-3860
**Media Contact:** Elizabeth James, 914-765-3889
**Investor Contact:** Greg Diamond, 914-765-3190

**MBIA INC. REPORTS FOURTH QUARTER AND FULL YEAR 2007 RESULTS**
**Results Consistent with Previously Announced Estimates; New Capital Plan**
**Positions Company for Continued Market Leadership**

ARMONK, New York – January 31, 2008 — MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation ("the Company"), today reported financial results for its fourth quarter and full year ended December 31, 2007.

The results, as compared with the same period of the prior year, were as follows:

- Net loss for the full year 2007 was $1.9 billion, compared with net income of $819.3 million in 2006.

- Net loss per share for the full year 2007 was $15.22, compared with net income per share of $5.99 in 2006.

Gary Dunton, MBIA Chairman and Chief Executive Officer, said, "We are disappointed in our operating results for the year, as the performance of our insured prime, second-lien mortgage portfolio and three insured CDO-squared transactions led to unprecedented loss reserving and impairment activity. The effect of these reserving and impairment activities on our capital position will be more than offset by the successful completion of our capital plan, which will increase our capital position by well over $2 billion. We have raised $1.5 billion to date through our $1 billion surplus notes offering and the Warburg Pincus' $500 million investment in MBIA common stock, which closed yesterday. Additionally, we have a commitment from Warburg Pincus to backstop a $500 million rights offering, and we are considering this and other steps to raise equity. We believe that these steps, along with reduced capital requirements resulting from slower business growth, will result in our capital position surpassing rating agency Triple-A requirements as currently articulated and will allow us to continue serving the needs of our clients and investors."

The decline in net income for the year was primarily due to the previously announced pre-tax net loss which amounted to $3.5 billion, or on an after-tax basis, $2.3 billion or $18.04 per share, on financial instruments at fair value ("mark-to-market") and foreign exchange. Significantly wider spreads and ratings downgrades of securities backing Collateralized Debt Obligations ("CDO") during the fourth quarter adversely affected the mark-to-market valuation of the Company's insured credit derivatives portfolio. As MBIA previously announced on January 9, 2008, the Company estimates a credit impairment of $200 million included in the pre-tax net loss of $3.5 billion on its insured credit derivatives portfolio for three CDO-squared transactions on which the Company expects to incur actual losses in the future. MBIA continues to believe that the balance of the mark-to-market losses are not predictive of future claims and, in the absence of further credit impairment, the cumulative marks should reverse over the remaining life of the insured credit derivatives. Additionally, the mark-to-market does not affect rating agency evaluations of MBIA's capital adequacy, except to the extent of impairments.

Also contributing to the Company's pre-tax net loss was $713.5 million of pre-tax loss and loss adjustment expense comprising case loss activity of $613.5 million and a special addition of $100 million to the unallocated loss reserve for MBIA's prime, second-lien mortgage exposure. The case loss activity reflects MBIA's best estimate of probable and reasonably estimable losses.

Mark-to-market losses during the fourth quarter on insured credit derivatives that were reinsured for MBIA by Channel Re (a financial guarantee reinsurer in which MBIA has a 17.4 percent equity ownership interest) resulted in the Company adjusting the carrying value of its ownership interest from $85.7 million to zero. The adjustment is reflected in net losses on financial instruments at fair value. Absent further credit impairment, MBIA believes that substantially all of the mark-to-market losses on the business reinsured by Channel Re are not predictive of future claims and should reverse over time; therefore, the carrying value of MBIA's investment in Channel Re would be adjusted accordingly in the future.

2

Source: MBIA INC, 8-K, January 31, 2008

Operating income per share, a non-GAAP measure (defined in the attached *Explanation of Non-GAAP Financial Measures*) that excludes the effects of non-cash net realized gains and losses, net gains and losses on financial instruments at fair value (with the exception of credit impairment) and foreign exchange, was as follows:

- After-tax operating income for 2007 declined to $192.9 million from $793.7 million in 2006.

- Operating income per share was $1.52 in 2007 compared with $5.81 in 2006.

Excluding accelerated income from refunded issues, operating income per share in 2007 was down 81 percent to $0.95 from $5.10 in 2006. The decline in operating income per share was primarily due to the $713.5 million of loss reserving activity and the $200 million of credit impairments in the insured derivatives portfolio in the fourth quarter.

Net loss for the fourth quarter of 2007 was $2.3 billion compared with net income of $181.0 million for the same period of 2006. For the fourth quarter of 2007, net loss per share was $18.61 compared with net income per share of $1.32 for the fourth quarter of 2006.

After-tax operating loss for the fourth quarter of 2007 was $407.8 million compared with after-tax operating income of $179.2 million for the fourth quarter of 2006. Operating loss per share was $3.30 for the fourth quarter of 2007, compared with operating income per share of $1.31 for the fourth quarter of 2006. Excluding accelerated income from refunded issues, operating loss per share for the fourth quarter of 2007 was $3.38, compared with operating income per share of $1.16 for the same period of 2006.

**Earnings per diluted share information**

| | Three Months Ended December 31 | | Years Ended December 31 | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Net income (loss) | $ (18.61) | $ 1.32 | $ (15.22) | $ 5.99 |
| Income from discontinued operations | 0.00 | 0.02 | 0.00 | 0.04 |
| Net income (loss) from continuing operations | (18.61) | 1.30 | (15.22) | 5.95 |
| Net realized gains (losses) | 0.13 | (0.02) | 0.26 | 0.07 |
| Net gains (losses) on financial instruments at fair value and foreign exchange | (16.49) | 0.02 | (18.04) | 0.07 |
| Estimated credit impairment on insured derivatives | 1.05 | 0.00 | 1.03 | 0.00 |
| Operating income (loss) | $ (3.30) | $ 1.31 | $ 1.52 | $ 5.81 |

(Numbers may not add due to rounding)

3

Source: MBIA INC, 8-K, January 31, 2008

Exhibit 14

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 8-K

## CURRENT REPORT

Pursuant to Section 13 or 15 (d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): May 12, 2008

# MBIA INC.
(Exact name of registrant as specified in its charter)

| Connecticut | 1-9583 | 06-1185706 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 113 King Street, Armonk, New York | 10504 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:
**914-273-4545**

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 2.02     RESULTS OF OPERATIONS AND FINANCIAL CONDITION.

The following information, including Exhibits 99.1 and 99.2 to this Form 8-K, is being furnished, not filed, pursuant to Item 2.02 - Results of Operations and Financial Condition of Form 8-K.

On May 12, 2008, MBIA Inc. ("MBIA") issued a press release announcing its results of operations for the quarter ended March 31, 2008 and a second press release to correct the first quarter revenue included in the earlier press release. Copies of the press releases are attached as Exhibits 99.1 and 99.2 to this Form 8-K and are incorporated by reference to this Item 2.02 as if fully set forth herein.

Item 7.01     REGULATION FD DISCLOSURE.

On May 12, 2008, MBIA posted on its Web site, www.mbia.com, under the section "Selected Exposures," certain information on its insured structured finance portfolio as well as detailed information on its multi-sector CDO portfolio. The information is posted as "MBIA's Insured Structured Finance Portfolio" and "MBIA's Multi-Sector CDO Portfolio" and is presented as of December 31, 2007 and March 31, 2008.

On May 12, 2008, MBIA also posted on its Web site, www.mbia.com, a presentation for the financial results conference call to be held on May 12, 2008 at 2:00 p.m. EDT.

Item 9.01.     FINANCIAL STATEMENTS AND EXHIBITS.

99.1  Press Release issued by MBIA Inc. dated May 12, 2008.
99.2  Press Release issued by MBIA Inc. dated May 12, 2008.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MBIA INC.

Date:  May 12, 2008

**By**:  /s/ Ram D. Wertheim

Ram D. Wertheim

General Counsel

Source: MBIA INC, 8-K, May 12, 2008

EXHIBIT INDEX TO CURRENT REPORT ON FORM 8-K
Dated May 12, 2008

Exhibit 99.1          Press Release issued by MBIA Inc. dated May 12, 2008.


Exhibit 99.2          Press Release issued by MBIA Inc. dated May 12, 2008.

Source: MBIA INC, 8-K, May 12, 2008

## MBIA Inc. Reports First Quarter 2008 Financial Results

ARMONK, N.Y.--(BUSINESS WIRE)--MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation, today reported a net loss for the first quarter of 2008 of $2.4 billion, compared with net income of $198.6 million during the same period in 2007. The net loss per share for the first quarter of 2008 was $13.03, compared with net income per share of $1.46 in the first quarter of 2007. Operating loss per share, (which is a non-GAAP measure defined in the attached Explanation of Non-GAAP Financial Measures), was $3.01 compared with operating income of $1.48 in the same period of 2007.

MBIA's insured portfolio, totaling $668 billion at quarter-end, continued to generate substantial revenue in the quarter, even though new business production was off substantially from the same period of the prior year. Total revenue was $741.7 million (before realized and unrealized gains and losses) compared to $738.3 million in last year's first quarter. MBIA generated operating cash flow of $257.4 million for the three months ended March 31, 2008 compared with $142.1 million for the three months ended March 31, 2007.

The majority of the net loss in the quarter was the result of a pre-tax $3.6 billion unrealized loss on insured credit derivatives, which included $0.8 billion of credit impairments. As discussed below, while the size of this mark-to-market adjustment is attention-getting, the Company does not believe it is representative of actual expected impairments.

"MBIA continues to be a sound financial institution. We have ample liquidity, our balance sheet is built to withstand credit stress levels many multiples of what we're experiencing now, and our business model is proving that we are adequately capitalized to satisfy any potential claims on our insured portfolio," said Jay Brown, MBIA Chairman and Chief Executive Officer. "While our operating results this quarter were clearly disappointing, they are consistent with developments in the credit markets."

The Company filed its financial information on Form 10-Q this morning and will hold a conference call to discuss its first quarter results and other relevant financial information at 2:00 p.m. today. A copy of the 10-Q is available on the SEC Filings page of MBIA's Web site. The presentation for today's conference call will be posted on MBIA's Web site prior to 2 p.m.

An executive summary and discussion of MBIA's results and balance sheet position follow:

- **Credit Impairment**: During the first quarter, MBIA conducted a thorough analysis of its housing-related exposures in order to update its estimates for impairments and loss reserves. As a result of this review, the Company recognized a total of $1.34 billion of pre-tax impairments and loss reserves on its housing-related insured portfolio in the quarter, bringing the cumulative total of incurred pre-tax credit losses for housing-related exposures to $2.15 billion over the past two quarters. The impairments and loss reserves are expressed on a net present value basis and are expected to be paid out over the next four years for direct and multi-sector CDO squared exposures, and up to 30 to 40 years for the Company's insured multi-sector collateralized debt obligations ("CDOs"). The Company does not anticipate material additional impairment for these exposures in the foreseeable future, unless the U.S. housing and mortgage markets perform materially worse than MBIA is projecting.

- **Capital Position and Liquidity**: MBIA successfully raised $2.6 billion in the quarter to support its Triple-A ratings, the most raised by any monoline insurer in the current troubled capital market. With the elimination of its shareholder dividend, the holding company, MBIA Inc., has enough cash on hand to cover a multiple of its required cash outflows in 2008, and the asset/liability management business has sufficient cash and assets to cover all of its maturing liabilities in 2008 and beyond. MBIA Insurance Corporation's liquid assets and operating cash flow are expected to be more than sufficient to cover both current and anticipated future claims payments.

- **Ratings Position**: In late February, Standard & Poor's and Moody's affirmed MBIA's Triple-A ratings with negative outlooks. At year-end 2007, the Company exceeded Standard & Poor's target capital requirement by $400 million and met Moody's minimum requirements for a Triple-A rating but fell short of Moody's target capital requirement by $1.7 billion. MBIA expects to meet this target over the next two quarters.

- **New Business Generation**: The Company had very little new business production until its Triple-A ratings were affirmed with negative outlooks by S&P and Moody's in the last week of February. Since March 1, the Company wrapped 24 new public finance issues (primary market) totaling $9.1 million in Adjusted Direct Premium, or ADP, (a non-GAAP measure), and insured 222 bonds previously purchased by investors (secondary market) for a total of $17.9 million of ADP. The Company expects continued growth in opportunities to write profitable new business.

- **Investment Management Services**: MBIA's asset management business continued its new business activities in the quarter, growing its external fee-for-service advisory business by almost $1 billion in assets under management. It also continued to raise funds in the asset/liability management business at advantageous pricing levels, issuing approximately $700 million of investment agreements, signaling continuing strong demand for this product. Total average assets under management for the first quarter, including conduit assets, were $64.6 billion, down 1 percent from $65.4 billion for the first quarter of 2007.

- **Unrealized Losses**: MBIA reported a pre-tax unrealized loss on insured credit derivatives (mark-to-market) of $3.6 billion in the first quarter, which includes $0.8 billion of credit impairments and which reflects the net present value basis of the amount of the mark-to-market that MBIA expects to pay as actual losses. While attention-getting, the mark-to-market loss is far less reflective of MBIA's business than credit impairments, and does not accurately indicate actual or expected losses. In addition, mark-to-market losses, except for the impairment, do not affect the insurance company's statutory capital or rating agency capital requirements. Unlike financial institutions with tradable, liquid portfolios of derivative assets and liabilities, MBIA's contingent insurance liabilities are not typically tradable, and are not subject to acceleration or collateralization. Fair value accounting, however, results in some inappropriate comparisons of MBIA's position to those of other financial institutions who must transact or collateralize at current market values or who could be subject to accelerated payments. This causes confusion about the true impact of mark-to-market losses on the value of the Company in the current environment. The Company does not expect the full amount of cumulative mark-to-market losses to be realized, except to the extent of the $1.0 billion in impairments estimated to date.
- **Disclosures**: In order to further facilitate investors' understanding of its insured portfolio, the Company is substantially increasing its disclosures, including providing sensitivity analysis around key assumptions. With respect to estimates of loss due to the housing downturn, MBIA is providing certain stress estimates as well as the expected amount of losses as recorded in the financial statements.
- **Book Value:** Financial institutions are typically valued by reference to their book values, as investors' confidence in the accounting for earnings ebbs and flows. However, in estimating MBIA's economic value, management believes that investors should adjust MBIA's GAAP book value to eliminate the impact of uneconomic factors like the unimpaired portion of the mark-to-market. MBIA's book value excluding the mark-to-market loss, but including all credit impairments, is approximately $24 per share. Adjustments, primarily representing deferred and contracted future premiums, net of a loss provision, add $18 to book value per share. With these adjustments, Analytical Adjusted Book Value(a non-GAAP measure) would be approximately $42 per share, and provides an economic basis for investors to reach their own conclusions about the fair value of the Company.

These issues are discussed in more depth below:

**Incurred Credit Losses**

MBIA has $668 billion of net par insurance in force, of which 66 percent is on public finance bonds, and 34 percent is on structured financings. Within its structured finance portfolio, it has direct exposure to second mortgages (home equity lines of credit and closed-end second mortgages), and indirect exposure to subprime mortgages through CDOs. MBIA's residential mortgage-backed securities ("RMBS") and multi-sector CDO exposures account for only 10 percent of the Company's net par insured, but they account for essentially all of the economic losses that the Company has sustained in this housing-led economic downturn. MBIA also has $4.2 billion in direct exposure to subprime mortgages. However, the direct subprime mortgage exposure benefits from high subordination levels and the Company does not expect to incur losses on this exposure.

In the mortgage and CDO areas in particular, MBIA, like many market participants, made some underwriting assumptions that have proved inaccurate and led to losses. One of the key assumptions was that past performance is an indication of the future. The prime borrower/second mortgage business has been a quite stable one historically, with expected collateral losses under 5 percent of par, and guarantors' losses being essentially nil (as a result of over-collateralization and the capture of excess spread). In the portfolio originated in 2006 and 2007, the borrowers' FICO scores were similar to the past, but there were other material differentiating factors. The increased "layered risk" in these pools arising from low documentation, high loan-to-value ratios and more instances of non-owner occupancy materially changed the nature of the pools and triggered unexpectedly high delinquencies once the refinance market effectively closed in the summer of 2007.

Similarly, after having avoided direct subprime exposure in all but very highly over-collateralized securitizations, the Company underwrote some multi-sector CDOs that contained subprime exposure, relying on the subordination in the CDO structure itself to provide adequate protection. The problem in the multi-sector CDOs arises primarily due to the "inner" ABS CDOs backed by lesser quality subprime collateral. In addition, some of MBIA's deals are so-called "multi-sector CDO squared" transactions, where a large portion of the collateral is inner CDOs. While most of the collateral in these deals consists of corporate CDOs, 21 to 40 percent is multi-sector CDOs with a high concentration of RMBS collateral. The same protections that work in the Company's favor for CDOs where MBIA is the control party, work against it in "inner ABS CDOs" where another party has control rights. This has been the dominant source of under-performance and recognized impairments in the multi-sector CDO book of business.

The table below shows pre-tax case activity in multi-sector CDOs and prime second mortgages. The losses are expressed on a net present value basis.

| ($ millions) | Q4 2007 | Q1 2008 | Total |
|---|---|---|---|
| Multi-sector CDO squared Impairments | $ 200 | $ 232 | $ 432 |
| Other Multi-sector CDO Impairments | $ 0 | $ 595 | $ 595 |
| Prime Second Mortgage Reserves | $ 614 | $ 510 | $ 1,124 |
| Total | **$ 814** | **$ 1,337** | **$ 2,151** |

There is no economic difference between impairments and loss reserves, but in general, insured credit default swaps covering CDOs are subject to mark-to-market accounting, while financial guarantee policies covering RMBS transactions are subject to insurance accounting with loss reserve requirements. For the Company's CDOs, the income statement reflects the full mark-to-market instead of just the impairment, which is the net present value of the expected claims on MBIA's policies. For the Company's RMBS, the loss reserve provision reflects the net present value of expected claims on MBIA's policies. In both cases, MBIA employs an exacting and rigorous process of identifying and quantifying probable and estimable losses while remaining within the guidelines imposed by relevant accounting standards. In general, the claims payments related to MBIA's reserves for second mortgage and multi-sector CDO squared transactions will be paid over the next several years, while claims payments on the CDO transactions will stretch out over the next 30 to 40 years.

Between the fourth quarter of 2007 and the first quarter of 2008, MBIA recognized impairments on three multi-sector CDO squared, five high-grade and one mezzanine multi-sector CDO transactions. The high-grade and multi-sector CDO squared transactions have significant proportions of inner ABS CDOs with RMBS collateral. The three impaired multi-sector CDO squared transactions total about $3.4 billion in par, and are about 12 percent impaired on average. About 21 to 40 percent of the collateral in these deals is ABS CDOs, and the Company's impairment analysis assumes high severity of losses on those inner ABS CDOs. The remaining collateral in those deals is primarily corporate in nature, and it has not seen material credit deterioration. MBIA expects to begin making payments on the impaired multi-sector CDO squared transactions in 2009, with the full amount expected to be paid out over the ensuing four to five years.

Relative to other high-grade deals in MBIA's portfolio, the five impaired high-grade deals generally have larger "buckets" of inner CDO collateral with high RMBS content that will trigger losses over a long period of time. In these deals, MBIA is the control party, and there are protections built into the structure that enable it to capture substantial cash flows to pay down the senior tranche. In addition, MBIA's insured credit default swap contracts in these cases mirror financial guarantee policies, which pay timely interest and ultimate principal after defaults. Consequently, interest claims payments will begin on the five impaired high-grade deals in approximately 10 years based on the Company's projections, and ultimate principal is not due until legal final maturity, generally up to 40 years out. That timing provides more opportunity for collateral performance to improve and for MBIA to pursue remediation opportunities to offset the payments the Company expects to make.

The one mezzanine multi-sector CDO deal that MBIA has reserved for is the only one the Company underwrote in 2007. It has very strong protection levels, including high subordination (still at 25 percent at March 31, 2008, but expected to erode materially over time) and a long-tailed payout pattern (a maximum payment of $473 million in 2051 in the modeled worst case scenario, which has a present value of approximately $60 million using the same yield as the Company's investment portfolio).

In its impairment analysis, the Company uses a roll-to-loss methodology consistent with the analysis of the Company's direct subprime exposures that starts with representative loan level data on the RMBS within the CDO (the majority of the collateral) and makes assumptions about the percentage of loans in the performing, 30-, 60- and 90-day delinquency categories to estimate losses. To provide some color on MBIA's estimates for 2006 and 2007 subprime loans it assumed 25 percent of the current loans, 35 percent of the 30-day, 50 percent of the 60-day and 75 percent of the 90-day delinquency buckets roll to default. The Company also used a 50 percent severity assumption. The default curve utilized was front-loaded, representing high-loss levels in the first 12 to 18 months followed by a return to historical rates. Consequently, the effective cumulative loss on the RMBS originated in 2006 and 2007 (an outcome of the Company's approach, not an assumption) is approximately 16 to 20 percent, depending on each individual deal's characteristics. For the inner ABS CDO collateral, the Company combines a security-by-security review with an analysis of the deal structure to understand when and if cash flows to the MBIA-insured tranche will cease. The result of this is that, on average, MBIA has projected that 55 to 100 percent of the inner ABS CDO collateral will default with severities of 75 to 100 percent over a short timeframe. Most of this collateral is paying cash today, and MBIA expects the payments to continue until the projected event of default. MBIA also used third-party advisors, who supplemented MBIA's analysis by conducting a loan-level modeling approach that utilized home price appreciation (HPA) expectations (based on moodyseconomy.com assumptions) and borrower default probability assessments segmented by geography, loan product and combined loan to value ("CLTV"). The resulting analysis provided additional data points to support MBIA's ultimate impairment decisions. The Company considers its assumptions conservative enough that it does not expect material additions to impairments unless direct RMBS collateral performance becomes significantly worse than MBIA expects.

Source: MBIA INC, 8-K, May 12, 2008

The following table provides an approximation of the potential sensitivity of MBIA's CDO impairment (multi-sector CDO squared and other multi-sector CDOs) assuming MBIA increases its roll to loss assumptions by 25 percent, discounts future excess spread benefits and, for the multi-sector CDO squared deals, defaults the majority of the remaining ABS CDO collateral:

| $ in millions | Current Impairment Case | Stress Case |
|---|---|---|
| Subprime cumulative net loss | 16-20 % | 18-22 % |
| Total pre-tax CDO impairment | $ 1,027 | $ 1,996 |

MBIA expects that the reserves it is taking in the first quarter of 2008 will adequately address potential losses in its direct housing-related exposures. The Company incurred $510 million of pre-tax case reserves in the first quarter for transactions in its prime second mortgage portfolio. In the fourth quarter of 2007, the Company took $614 million of pre-tax reserves against policies in this portfolio. In the fourth quarter, the Company had sufficient performance data on the home equity line of credit securitizations (HELOCs) to assess case reserves, given their 2005 to 2006 vintages. The Company also advised that it expected losses in the closed-end second mortgage part of the portfolio, but due to their more recent vintage, it did not have sufficient performance data to assess case reserves. Based on the additional performance data on the closed-end second mortgages that the Company received in the first quarter, MBIA established $510 million in additional pre-tax case reserves.

The unallocated reserve stands at $213 million after these actions, which MBIA believes is adequate to provide for potential losses in the non-RMBS portfolio. MBIA also believes that the total $1.1 billion in reserves established for RMBS losses is adequate, and, as with its multi-sector CDOs, the Company does not anticipate additional material increases to reserves in the absence of a significant decline in the market beyond its stress assumptions. The Company's analysis assesses loan level and issuer specific data to derive roll to loss rates for the 30-, 60- and 90-day delinquency categories in cooperation with a 100% loss severity to derive a conditional default rate (CDR). To provide some color on the estimates, MBIA assumed that 45 percent of the 30-day delinquent loans, 60 percent of the 60-day, and 100 percent of the 90-day buckets rolled to default. The Company then took the greater of that derived CDR or the deal's actual 3-month average CDR and maintains that stress level for an additional 12 months. At the end of the total elevated CDR period of 18 months the Company employed a "burnout," which means that it begins to reduce that CDR over the next 12 months by 50 to 100 percent to return the deal to a normalized performance position to maturity. MBIA assumes the elevated static CDR and 100 percent loss severity on all defaults to estimate default probabilities in a declining home price environment. The losses on individual loans are entered into a model of deal performance that considers over-collateralization and the amount of excess spread that is expected to be generated. The results of the analysis indicate that cumulative net losses to the collateral pools that support MBIA's second lien deals could range from 15 to 35 percent with certain outliers experiencing losses as high as 40 to 60 percent. When considering deal structures, loss timing and excess spread, the resulting loss reserves total about 10 percent of net par insured for impaired second lien deals.

Source: MBIA INC, 8-K, May 12, 2008

From a cash perspective, MBIA generally makes payments on these deals when the aggregate outstanding par amount of the mortgages in the collateral pool falls below the par amount of the outstanding securities (parity payments). Through March 31, MBIA paid a total of $152 million, including $44 million in the fourth quarter 2007 and $108 million in the first quarter 2008. The total reserve of $1.1 billion is expected to be paid out over the next two to four years.

MBIA's RMBS reserves take reinsurance into account, but the Company has not reflected any potential recoveries as salvage or subrogation from originators of the RMBS transactions. The Company, along with a team of experts and counsel, is evaluating potential recoveries and intends to pursue them aggressively. Such recoveries may be substantial. Once the Company has concluded its evaluation, including assessing the likelihood of success, it may establish salvage and subrogation reserves to offset the related case basis reserves.

The key driver of this analysis is the length of time during which the stressed roll rates and conditional default rates remain in effect. MBIA is assuming that the stress levels will continue through mid-year 2009, with improvement thereafter. If the housing downturn remains at the current level until the end of 2009 and the burnout period extended by six months, MBIA's second lien associated losses would increase by approximately $600 million.

**Capitalization and Liquidity**

MBIA's $2.6 billion capital raise and credit for its plans to further strengthen its capital position provided enough of a cushion to the rating agencies' stated requirements in December that the Company has continued to meet Triple-A requirements. MBIA's position provides a cushion to Moody's minimum Triple-A capitalization level, but is below their target level. Currently, MBIA believes that its shortfall to Moody's target capital ratio is approximately $1.3 billion, after the first quarter's reduction in capital requirements of roughly $400 million from a combination of amortization and retirements in the portfolio and upgrades of a handful of credits. MBIA believes that its cushion to S&P's Triple-A requirement increased during the quarter to approximately $900 million as a result of amortization, elimination of the shareholder dividend and new business volume which was lower than plan. In order to further strengthen its capital position, MBIA is pursuing the following:

- Writing new business that is capital neutral or accretive
- Monitoring and measuring portfolio runoff and terminations
- Pursuing additional reinsurance

The Company believes that a combination of these steps will bring its capitalization level in line with Moody's target ratio over the next two quarters. In addition, over time, the spread between expected and worst-case housing market performance will converge. The rating agencies have appropriately treated the current housing crisis outside of their normal models since the situation represents a discrete stress loss assessment, with a transaction level review of each insured RMBS and multi-sector CDO exposure. In effect, the current scenario may well be the definition of "worst case." If MBIA's current expected outcome is correct, there will be a substantial reduction in required capital.

The Company does not include issuance of new common equity capital as part of its current capital plan, because it expects to meet and exceed all Triple-A requirements without further issuance of common equity. While MBIA will continue to make decisions based on sound economics, it does not foresee any reasonable scenario that would require more than the $1.65 billion common equity raised in the first quarter of 2008.

The Company's objective is to substantially exceed all Triple-A targets. With a healthy excess capital position, MBIA expects to have the ability to move to an insurance platform that separates its structured and public finance operations over time, deliver the strongest possible ratings for policyholders and debt investors, and create business opportunities that make the investment case compelling. Management continues to believe that high credit quality serves the interests of both shareholders and policyholders.

The Company plans for and measures liquidity at three levels: the insurance company, the asset/liability business, and the holding company. MBIA Insurance Corporation maintains a $12.1 billion fixed-income investment portfolio of assets that are average Double-A quality bonds, with no CDOs and little RMBS exposures. Some investors and observers have asked if the Company has to immediately pay out in cash any reserves or recognized impairments, in full. The answer is no. MBIA pays out these losses over the life of the actual policy (in many cases as long as 40 years). MBIA's business model is built around meeting claims payments in the ordinary course from operating sources. In 2007 the 12-months operating cash flow of MBIA Insurance Corporation and its subsidiaries was $977 million. The annual cash payments the Company expects to make on RMBS/multi-sector CDO squared and high grade and mezzanine multi-sector CDOs will peak in 2008 or 2009 at approximately $550 million. The Company believes it will meet all obligations to policyholders while continuing to grow the investment portfolio. For the first quarter of 2008, operating cash flow of MBIA Insurance Corporation was $304 million, and $108 million in loss payments in the quarter were more than offset by a one-time tax refund of $178 million.

MBIA's asset/liability management ("ALM") business is managed to handle today's severe credit market conditions. The asset portfolio remains of very high quality despite the current "credit crunch." Average quality remains Double-A with less than 0.5 percent of the assets rated below investment grade, though there are several instances where the Company projects asset impairment and has written down assets to current fair value under GAAP accounting rules. However, the Company's assessment of expected principal recovery on these securities is higher than current fair value, and the asset/liability business has sufficient capital to absorb potential credit losses. The ALM business continues to finance itself economically in the current market (approximately $700 million raised in the first quarter) and has increased its cash holdings to be conservative. It continues to have more than enough liquidity under stressed market conditions to meet its obligations, even if it was unable to raise new funding. Furthermore, the asset portfolio of the ALM business is available to be sold or pledged as collateral against borrowings should unexpected cash needs arise. And, while some of the liabilities of the business may require collateralization if MBIA Insurance Corporation were to be downgraded, the business has more than adequate unencumbered assets to meet those obligations.

Source: MBIA INC, 8-K, May 12, 2008

Finally, as a result of the elimination of the shareholder dividend in February, the total of annual interest and other expenses at the holding company level is only about $115 million, while cash and short-term assets are $1.4 billion, which includes the proceeds of the $1.1 billion equity offering completed in February. After consultation with the New York State Insurance Department, MBIA Inc. has decided to contribute $900 million of the proceeds of the offering to its insurance subsidiaries in the next 10 to 30 days. This contribution is consistent with our previously announced capital strengthening plan and is intended to support MBIA Insurance Corporation's Triple-A ratings and existing and future policyholders. After such contribution, MBIA Inc. will have sufficient cash and short-term assets to cover its projected annual cash needs for more than four years, even without any dividends from MBIA Insurance Corporation.

The Company maintains a revolving credit line with a group of highly rated banks, which it does not consider in its liquidity planning. MBIA is in compliance with all covenants of this facility.

**Ratings**

MBIA's ratings were affirmed by S&P on February 25 and by Moody's on February 26. At that time, both rating agencies indicated that they believed they would be able to provide the market some stability from that point and MBIA believes that its ratings and outlook will not change unless there is a significant and unexpected decline or improvement in the housing market. MBIA believes its additions to reserves and impairments are generally consistent with rating agencies' expectations and well within their worst-case forecasts.

**New Business Generation**

For the first quarter of 2008, Adjusted Direct Premium ("ADP") (a non-GAAP measure) declined 84 percent to $43.5 million from $272.9 million in 2007. Approximately $23.5 million of the ADP represented transactions that were in the pipeline prior to the start of the first quarter, and almost all of that came from one structured finance transaction. Twenty million dollars of the ADP represents deals that were priced and closed after MBIA's ratings were affirmed.

MBIA issued insurance policies in both the new issue and secondary public finance markets during the first quarter: a total of $1.7 billion of net par and $21.9 million of ADP, compared with $12.8 billion of net par and $124.7 million of ADP for the same period of 2007. As the quarter progressed, the number of transactions closed increased steadily, and this trend has continued into the second quarter. Since the end of the first quarter, MBIA closed 137 deals compared with 171 transactions closed from January through March 2008.

Source: MBIA INC, 8-K, May 12, 2008

Once MBIA's ratings were affirmed, market demand for and acceptance of its guarantee grew, and the Company has guaranteed 43 deals in the primary market, ranging from a Texas toll road for $374 million, a Florida lottery deal and two other $100 million par transactions, to a $4 million deal for the Rye Neck Fire Department in Westchester County, New York. Ten deals were rated Double-A or higher by at least one rating agency. There is ongoing substantial demand for stable Triple-A rated financial guarantees in the public finance market as demonstrated by the volume of business that is being written by MBIA's monoline competitors with stable Triple-A ratings. MBIA believes that when it regains stable Triple-A ratings, the demand for its financial guarantees likewise will increase substantially.

In addition to new business, MBIA also worked with over 100 issuers to address the increased cost of short-term funding resulting from liquidity and credit stress in the auction-rate market by converting their auction-rate securities into fixed or variable-rate bonds with MBIA insurance. Year to date, 17 deals with over $2.0 billion in par were restructured to fixed-rate, where the value of the MBIA insurance is clear and is locked in from day one. In addition, there are currently over 70 deals in process or completed that are being restructured into fixed or variable-rate form.

In February 2008, MBIA announced a six-month moratorium on writing new structured finance business while the Company considers lessons to be learned from its existing portfolio and the credit crisis and evaluates its options for reentering the structured finance market. The Company completed two structured finance transactions that had been in the pipeline, with $21.6 million of ADP.

**Asset Management**

In the Investment Management Services segment, MBIA recorded $40 million of pre-tax operating income, compared with $25 million in last year's first quarter. In the asset/liability management business, investment income was boosted by $14 million from the opportunistic repurchase of medium-term notes.

Source: MBIA INC, 8-K, May 12, 2008

The ALM business also had other-than-temporary impairments during the first quarter, primarily on structured finance securities. These impaired securities were written down to their fair values, and the reduction in carrying value amounted to $223.6 million, although the Company currently expects to ultimately recover more than the current fair value. The impairments contributed to a net realized loss of $185.9 million in the Investment Management Services segment, after realizing capital gains of $37.7 million on securities sales. The loss of fair value represents only 8/10ths of 1 percent of the carrying value of the ALM business' assets, and the impact on liquidity of the segment is insignificant.

The asset/liability business continued to have access to funding markets, issuing approximately $700 million in insured investment agreements during the quarter at attractive levels. The combination of cash generated from assets, existing cash and short-term securities, and the tight match of assets and liabilities give the business a strong liquidity position.

The advisory business continued to grow its assets under management, from $33 billion at year-end 2007 to $36 billion at March 31, 2008, adding five new accounts and almost $1 billion in its pool and separate account businesses. Management is optimistic about continued growth in this area given its strong track record.

Average assets under management for the first quarter of 2008, including conduit assets of $3.9 billion, was $64.6 billion, down 1 percent from $65.4 billion for first quarter of 2007. Year over year growth in the asset/liability products segment from increased volume of investment agreements and medium-term notes, and increased balances managed in the municipal investment pool and customized asset management business in the advisory services segment, was offset by the wind-down of the Hudson-Thames structured investment vehicle and lower balances in the East-Fleet program.

**Unrealized Loss on Insured Derivatives ("Mark-to-Market")**

Most of MBIA's insured credit derivatives portfolio of $137 billion is subject to fair value accounting under SFAS 133 (Accounting for Derivative Instruments and Hedging Activities). All of the Company's other financial guarantees are accounted for under SFAS 60 (Accounting and Reporting by Insurance Enterprises). This leads to very different accounting treatment for contracts that are functionally and economically quite similar. Further, while fair value accounting is appropriate for tradable, liquid instruments, MBIA's insured credit derivatives are generally not actively traded on any market and do not have directly observable market prices. The Company's contracts are unconditional and irrevocable, and cannot be transferred to most other capital market participants as they are not licensed to write insurance contracts. Historically, there has not been a market for the transfer of such highly structured insured credit derivative contracts.

As a result, MBIA believes that there are no relevant third party "exit value" market observations for its insured credit derivative contracts. In the absence of a principal market, MBIA values these insured credit derivatives in a hypothetical market where the market participants include other monoline financial guarantee insurers. Since there are no active market transactions in the Company's exposures, it generally uses vendor-developed and proprietary models to estimate the fair values, but such estimated fair values cannot be verified and other reasonable approaches could arrive at vastly different values. MBIA's insured credit default swaps valuation model simulates what a bond insurer would charge to guarantee the transactions on the measurement date, based on the market-implied default risk of the underlying collateral, its diversity and the degree of subordination in the transaction.

The Company's forecasts of impairments reflect very specific information and analysis of every insured credit. The marks-to-market reflect an external sentiment about the overall direction of credit risk. As credits have deteriorated and the Company has recognized actual impairments, the market has forecasted larger and larger losses – just as when credit conditions were benign, the market forecasted an ongoing low-default, low-volatility environment.

In the first quarter of 2008, MBIA recorded a $3.6 billion pre-tax net unrealized loss ($2.3 billion after tax or $12.59 per share) on insured credit derivatives. The chart below summarizes the mark by its sources.

| $ billions | Spread | Recovery Rate | Erosion of Subord. | Rating Migration | SFAS 157/MBIA Credit Adj | Other | Total |
|---|---|---|---|---|---|---|---|
| **Multi-sector CDO squared** | (0.5 ) | (0.2 ) | (0.0 ) | (0.4 ) | 0.5 | 0.2 | (0.4 ) |
| **Multi-sector*** | (1.4 ) | (0.7 ) | (0.4 ) | (0.0 ) | 1.3 | (0.1 ) | (1.3 ) |
| **CMBS/CRE** | (1.7 ) | 0.0 | 0.0 | 0.1 | 1.1 | (0.2 ) | (0.7 ) |
| **Corp/other** | (1.8 ) | 0.0 | (0.1 ) | 0.0 | 0.7 | 0.0 | (1.2 ) |
| | (5.4 ) | (0.9 ) | (0.5 ) | (0.3 ) | 3.6 | (0.1 ) | (3.6 ) |

* Multi-sector CDOs excluding multi-sector CDO squared

The impact of widening spreads is the most significant component of the mark-to-market. This reflects the extreme illiquidity of today's market and technical factors having relatively little to do with underlying credit fundamentals. For example, MBIA's multi-sector CDO portfolio shows actual credit degradation in the quarter. Assumed recovery rates fell and actual losses eroded the Company's subordination protection, causing a loss of $1.1 billion before the non-performance adjustment as required by SFAS 157. Spread widening added another $1.4 billion of loss before the SFAS 157 adjustment. The situation is even more extreme in the CMBS and CRE portfolios, where no deals are impaired, no deals have been downgraded below Triple-A, and actual losses in the commercial mortgage industry are at historical low levels. Yet spreads widened sufficiently to cause a mark-to-market loss of $1.7 billion. In this case, the Company has modified the data input to its model from the CMBX index to a composite spread that combines fundamental analysts' views of cumulative loss estimates and the CMBX's implied illiquidity premium. The illiquidity premium drives most of the spread. The total impact of spreads increased the mark-to-market for the quarter by $5.4 billion. Changes in spread have been highly volatile. In the fourth quarter, spreads contributed $2.1 billion to the mark.

The second most significant factor affecting the mark to market results from the adoption of SFAS 157 in the first quarter. SFAS 157 requires the Company to adjust the values of contingent liabilities for the market's perception of the non-performance risk of the Company by applying a discount at LIBOR plus MBIA CDS spreads at March 31, 2008. As shown above, this adjustment results in a cumulative change in fair value of $3.6 billion. This amount will be recalculated each quarter, and will result in substantial volatility in the mark-to-market. Paradoxically, when the market perception of MBIA's credit quality returns to a more normal level, the Company would record large unrealized mark-to-market losses, all other things being equal, due to the SFAS 157 convention.

Source: MBIA INC, 8-K, May 12, 2008

As the Company has often stated, the mark-to-market, which is a GAAP concept, is a less reliable measure of credit performance of our insured portfolio, while impairments are a more reliable measure. In the first quarter, the Company identified $827 million of impairments, while in the fourth quarter of 2007 the mark-to-market included impairments of $200 million. The impairments are due to the erosion of subordination and ratings migration. The total impairment for the multi-sector book (including multi-sector CDO squareds) was $1.0 billion. Even here, the market appears to overstate potential credit degradation. While it is conceivable that worst case losses may be greater than $1.0 billion, market conditions would have to worsen substantially from MBIA's expectations for this to happen. The chart below, which contrasts actual impairment with the mark-to-market unrealized loss indicated on MBIA's balance sheet, indicates that mark-to-market may have correctly identified the direction of losses on the multi-sector CDO portfolio, but substantially overestimated the amount.

| $ Millions | Type | Impairment Q4 '07 | Impairment Q1 '08 | Impairment Total | Net B/S Mark** | Impairment/ B/S Mark |
|---|---|---|---|---|---|---|
| CDO 1 | Multi-Sector CDO | 0 | 193 | 193 | 425 | 45 % |
| CDO 2 | Multi-Sector CDO | 0 | 171 | 171 | 502 | 34 % |
| CDO 3 | MS* CDO squared | 110 | 140 | 250 | 320 | 78 % |
| CDO 4 | Multi-Sector CDO | 0 | 113 | 113 | 484 | 23 % |
| CDO 5 | MS* CDO squared | 70 | 78 | 148 | 279 | 53 % |
| CDO 6 | Multi-Sector CDO | 0 | 60 | 60 | 60 | 100 % |
| CDO 7 | Multi-Sector CDO | 0 | 37 | 37 | 257 | 14 % |
| CDO 8 | Multi-Sector CDO | 0 | 21 | 21 | 193 | 11 % |
| CDO 9 | MS* CDO squared | 20 | 14 | 34 | 205 | 17 % |
| **Total** | | **200** | **827** | **1,027** | **2,725** | **38 %** |

*Multi-sector

** Before effect of SFAS157

The pre-tax net unrealized loss of $3.6 billion on insured credit derivatives includes a fair value adjustment to reflect the nonperformance risk of Channel Re, an affiliated reinsurer 17 percent owned by the Company, on ceded credit derivative contracts. Channel Re continues to be highly rated by S&P and Moody's, and the Company expects Channel Re to be able to pay all reinsurance claims on ceded credit default swap contracts. The adjustment related to Channel Re is for the unrealized fair value, and the Company expects the actual cash losses to be a small fraction of the mark-to-market adjustment.

Source: MBIA INC, 8-K, May 12, 2008

# Exhibit 15

Web  Images  Maps  News  Shopping  Gmail  more ▼

e.g. "CSCO" or "Google"

Get quotes    Stock screener New!

## Historical prices  « Back to overview

**MBIA Inc.**(NYSE:MBI) - **Daily** | Weekly

May 1, 2007  - May 31, 2007    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|------|-------|--------|
| 31-May-07 | 67.40 | 67.51 | 66.40 | 66.55 | 1,295,900 |
| 30-May-07 | 67.05 | 67.35 | 66.39 | 67.28 | 1,421,500 |
| 29-May-07 | 66.81 | 67.18 | 66.74 | 67.05 | 1,790,500 |
| 25-May-07 | 67.05 | 67.62 | 66.61 | 66.80 | 1,445,800 |
| 24-May-07 | 68.71 | 68.71 | 66.80 | 66.81 | 3,980,700 |
| 23-May-07 | 69.53 | 69.85 | 68.87 | 68.95 | 1,606,200 |
| 22-May-07 | 69.24 | 69.83 | 69.15 | 69.46 | 1,518,500 |
| 21-May-07 | 69.30 | 69.55 | 69.07 | 69.31 | 1,332,000 |
| 18-May-07 | 69.52 | 69.80 | 69.05 | 69.43 | 1,396,000 |
| 17-May-07 | 69.54 | 69.60 | 69.06 | 69.42 | 927,800 |
| 16-May-07 | 69.61 | 69.85 | 69.24 | 69.69 | 796,000 |
| 15-May-07 | 69.39 | 69.84 | 69.07 | 69.18 | 1,041,800 |
| 14-May-07 | 70.00 | 70.27 | 69.32 | 69.33 | 998,000 |
| 11-May-07 | 70.24 | 70.57 | 69.91 | 70.10 | 1,190,400 |
| 10-May-07 | 70.22 | 70.42 | 69.67 | 69.67 | 1,007,800 |
| 9-May-07 | 70.59 | 70.83 | 69.90 | 70.76 | 1,003,000 |
| 8-May-07 | 70.07 | 70.69 | 70.03 | 70.58 | 742,800 |
| 7-May-07 | 70.72 | 71.20 | 70.54 | 70.62 | 865,500 |
| 4-May-07 | 71.00 | 71.39 | 70.25 | 70.63 | 1,403,200 |
| 3-May-07 | 70.45 | 71.80 | 70.41 | 70.78 | 1,217,300 |
| 2-May-07 | 69.16 | 69.95 | 68.99 | 69.67 | 1,292,200 |
| 1-May-07 | 69.88 | 70.14 | 69.04 | 69.41 | 1,562,300 |
| 30-Apr-07 | 71.50 | 71.50 | 69.54 | 69.56 | 1,390,100 |

International Google Finance:  Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google  Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▾

Portfolios | Sign in

Get quotes    Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**MBIA Inc.**(NYSE:MBI) - **Daily** | Weekly

Aug 6, 2008   - Aug 6, 2008    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 8.68 | 8.85 | 7.91 | 8.79 | 14,313,900 |
| 5-Aug-08 | 7.90 | 8.70 | 7.74 | 8.42 | 19,290,100 |

International Google Finance:   Canada - U.K. · 中国版 (China)

Information is provided as is and solely for informational purposes, not for trading purposes or advice, and may be delayed. To see all exchange delays, please see disclaimer.

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

# Exhibit 16

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 8-K

## CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): June 25, 2008 (June 19, 2008)

# MBIA INC.
(Exact name of registrant as specified in its charter)

| **Connecticut** | **1-9583** | **06-1185706** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **113 King Street, Armonk, New York** | **10504** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:
**914-273-4545**

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 7.01.    REGULATION FD DISCLOSURE.

MBIA Inc. ("MBIA" or the "Company") issued a press release on June 19, 2008. A copy of the press release is attached as Exhibit 99.1 hereto.

The information in the press release is being furnished, not filed, pursuant to Item 7.01 of Form 8-K. Accordingly, the information in Item 7.01 of this Current Report, including Exhibit 99.1, will not be incorporated by reference into any registration statement filed by MBIA under the Securities Act of 1933, as amended, unless specifically identified therein as being incorporated by reference.

Item 8.01.    OTHER EVENTS.

The following information is being filed pursuant to Item 8.01 – Other Events of Form 8-K.

On June 19, 2008, Moody's Investors Service, Inc. ("Moody's") downgraded the following ratings:

- MBIA Insurance Corporation -- insurance financial strength to A2 from Aaa, and surplus notes to Baa1 from Aa2;
- MBIA Insurance Corp. of Illinois -- insurance financial strength to A2 from Aaa;
- Capital Markets Assurance Corporation -- insurance financial strength to A2 from Aaa;
- MBIA UK Insurance Limited -- insurance financial strength to A2 from Aaa;
- MBIA Assurance S.A. -- insurance financial strength to A2 from Aaa;
- MBIA Mexico, S.A. de C.V.'s -- insurance financial strength to A2 from Aaa (Moody's affirmed the firm's Aaa.mx – national scale rating);
- MBIA Inc. -- senior unsecured debt to Baa2 from Aa3, provisional senior debt to (P) Baa2 from (P) Aa3, provisional subordinated debt to (P) Baa3 from (P) A1, and provisional preferred stock to (P) Ba1 from (P) A2; and
- North Castle Custodial Trusts I-VIII -- contingent capital securities to Baa2 from Aa3.

In its press release, Moody's indicated that the ratings action reflect MBIA Insurance Corporation's "limited financial flexibility and impaired franchise, as well as the substantial risk within its portfolio of insured exposures and a movement toward more aggressive capital management within the group," and that "while the group remains strongly capitalized, estimated to be consistent with a Aa level rating, and benefits from substantial embedded earnings in its existing insurance portfolio, these other business factors led to the lower rating outcome." Moody's outlook for the ratings is also negative, "reflecting the material uncertainty about the firm's strategy and the non-negligible likelihood of further adverse developments in its insurance portfolios or operations."

As a result of the ratings action, the Moody's-rated securities that are guaranteed by MBIA Insurance Corporation are also downgraded to A2, except those with higher public underlying ratings. According to Moody's, a list of these securities will be made available under "Ratings Lists" at www.moodys.com/guarantors.

Item 9.01.    FINANCIAL STATEMENTS AND EXHIBITS.

99.1    Press Release issued by MBIA Inc. dated June 19, 2008.

Source: MBIA INC, 8-K, June 25, 2008

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MBIA INC.

**By**: /s/ Ram D. Wertheim

Ram D. Wertheim

General Counsel

Date:   June 25, 2008

EXHIBIT INDEX TO CURRENT REPORT ON FORM 8-K

Dated June 25, 2008

Exhibit 99.1          Press Release issued by MBIA Inc. dated June 19, 2008.

Source: MBIA INC, 8-K, June 25, 2008

## MBIA Comments on Moody's Downgrade of MBIA's Insurance Financial Strength Rating to A2

ARMONK, N.Y.--(BUSINESS WIRE)--MBIA Inc. (NYSE: MBI) issued the following statement in response to the decision today by Moody's Investors Service to downgrade MBIA Insurance Corporation's insurance financial strength rating from AAA to A2 with negative outlook.

We are disappointed to learn of Moody's decision and baffled by their analysis. We believe the fundamentals of the Company support a higher rating. Moody's states in its release, for instance, that "…the group remains strongly capitalized, estimated to be consistent with a Aa level rating, and benefits from substantial embedded earnings in its existing insurance portfolio." Yet that fact would seem to support sustaining a Aa rating while satisfying Aaa minimum capital requirements. With $16 billion in claims-paying resources, as the Company has made clear in numerous public statements, we have more than enough capital to meet obligations to policyholders. This is an issue of ratings and not solvency.

Given the varying public statements from Moody's over the past several weeks, the outcome was difficult to gauge – although the Company is not unprepared. This ratings action will give certain holders of guaranteed investment contracts the right to terminate the contracts or to require that additional collateral be posted. Again, we have more than sufficient liquid assets to meet any additional requirements arising from any terminations or collateral posting requirements.

"Despite the change in our ratings from Moody's, our financial condition is very strong," said Jay Brown, MBIA Chairman and Chief Executive Officer. "We remain committed to maintaining capital strength for our policyholders and financial flexibility consistent with our goals of increasing shareholder value. We are moving forward with our transformation plan, which we will pursue in conjunction with the New York State Insurance Department and in consideration of our stakeholders."

The following ratings have been downgraded by Moody's:

- MBIA Insurance Corporation -- insurance financial strength to A2 from Aaa, and surplus notes to Baa1 from Aa2;
- MBIA Insurance Corporation of Illinois -- insurance financial strength to A2 from Aaa;
- Capital Markets Assurance Corporation -- insurance financial strength to A2 from Aaa;
- MBIA UK Insurance Limited -- insurance financial strength to A2 from Aaa;
- MBIA Assurance S.A. -- insurance financial strength to A2 from Aaa;
- MBIA Mexico S.A. de C.V.'s -- insurance financial strength to A2 from Aaa (the firm's Aaa.mx – national scale rating -- is affirmed);
- MBIA Inc. -- senior unsecured debt to Baa2 from Aa3, provisional senior debt to (P) Baa2 from (P) Aa3, provisional subordinated debt to (P) Baa3 from (P) A1, and provisional preferred stock to (P) Ba1 from (P) A2;
- North Castle Custodial Trusts I-VIII -- contingent capital securities to Baa2 from Aa3;

**Forward-Looking Statements**

This release contains statements about future results that may constitute "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that these statements are not guarantees of future performance. There are a variety of factors, many of which are beyond MBIA's control, which affect the operations, performance, business strategy and results and could cause its actual results to differ materially from the expectations and objectives expressed in any forward-looking statements. Accordingly, readers are cautioned not to place undue reliance on forward-looking statements which speak only as of the date they are made. MBIA does not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements are made. The reader should, however, consult any further disclosures MBIA may make in its future filings of its reports on Form 10-K, Form 10-Q and Form 8-K.

MBIA Inc., through its subsidiaries, is a financial guarantor and provider of specialized financial services. MBIA's innovative and cost-effective products and services meet the credit enhancement, financial and investment needs of its public and private sector clients, domestically and internationally. Please visit MBIA's Web site at www.mbia.com.

CONTACT:
MBIA
Media:
Willard Hill, +1-914-765-3860
or
Elizabeth James, +1-914-765-3889
or
Investor Relations:
Greg Diamond, +1 914-765-3190
or
APCO Worldwide
Media:
Jim McCarthy, +1-202-333-8810

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 8-K

## CURRENT REPORT

Pursuant to Section 13 or 15 (d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): June 6, 2008 (June 5, 2008)

# MBIA INC.
(Exact name of registrant as specified in its charter)

| **Connecticut** | **1-9583** | **06-1185706** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **113 King Street, Armonk, New York** | **10504** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:
**914-273-4545**

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 7.01.    REGULATION FD DISCLOSURE.

MBIA Inc. ("MBIA" or the "Company") issued a press release on June 5, 2008. A copy of the press release is attached as Exhibit 99.1 hereto.

The information in the press release is being furnished, not filed, pursuant to Item 7.01 of Form 8-K. Accordingly, the information in Item 7.01 of this Current Report, including Exhibit 99.1, will not be incorporated by reference into any registration statement filed by MBIA under the Securities Act of 1933, as amended, unless specifically identified therein as being incorporated by reference.

Item 8.01.    OTHER EVENTS.

The following information is being filed pursuant to Item 8.01 – Other Events of Form 8-K.

On June 5, 2008 MBIA issued a press release commenting on the announcement on June 5, 2008 by Standard & Poor's Rating Services ("S&P") that it had lowered its financial strength ratings on MBIA Insurance Corporation to "AA" from "AAA" and placed the ratings on CreditWatch with negative implications.  S&P also lowered the rating on MBIA Inc. to "A-" from "AA-" and placed it on CreditWatch with negative implications.  According to S&P, the rating actions reflect its "belief that these entities will face diminished public finance and structured finance new business flow and declining financial flexibility." In addition, S&P believes continuing deterioration in key areas of the U.S. residential mortgage sector and related CDO structures will place increasing pressure on capital adequacy.  S&P also noted that the "AA" financial strength ratings of these companies are supported by currently sound claims paying ability and liquidity levels in their opinion, and that resolution of the negative CreditWatch will depend on clarification of ultimate potential losses as well as future business prospects, the outcome of strategic business decisions, and potential regulatory developments. Lists of the ratings that have changed as a result of these actions will be posted at http://www.spviews.com/. S&P stated that its analysis of the impact of the ratings actions is ongoing and that it may publish additional ratings changes.

Item 9.01.    FINANCIAL STATEMENTS AND EXHIBITS.

99.1    Press Release issued by MBIA Inc. dated June 5, 2008.

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MBIA INC.

**By**: /s/ Ram D. Wertheim

Ram D. Wertheim

General Counsel

Date: June 6, 2008

EXHIBIT INDEX TO CURRENT REPORT ON FORM 8-K
Dated June 6, 2008

Exhibit 99.1          Press Release issued by MBIA Inc. dated June 5, 2008.

Source: MBIA INC, 8-K, June 06, 2008

# MBIA Comments on Standard & Poor's Downgrade of MBIA's Financial Strength Rating to AA

ARMONK, N.Y.--(BUSINESS WIRE)--MBIA Inc. (NYSE: MBI) issued the following statement in response to the decision today by Standard & Poor's Ratings Services (S&P) to downgrade MBIA's insurance financial strength rating from AAA to AA.

"Despite the difficulty in managing to changing and uncertain rating agency standards, we remain confident of our capitalization, liquidity and future prospects," said Jay Brown, MBIA Chairman and Chief Executive Officer. "We will engage in discussions with S&P to better understand the basis for their decision. In the coming weeks, we will work with our Board of Directors to thoroughly examine all of our options as we further the transformation of the Company with the goal of delivering long-term value to our shareholders."

## Forward-Looking Statements

This release contains statements about future results that may constitute "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that these statements are not guarantees of future performance. There are a variety of factors, many of which are beyond MBIA's control, which affect the operations, performance, business strategy and results and could cause its actual results to differ materially from the expectations and objectives expressed in any forward-looking statements. Accordingly, readers are cautioned not to place undue reliance on forward-looking statements which speak only as of the date they are made. MBIA does not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements are made. The reader should, however, consult any further disclosures MBIA may make in its future filings of its reports on Form 10-K, Form 10-Q and Form 8-K.

MBIA Inc., through its subsidiaries, is a leading financial guarantor and provider of specialized financial services. MBIA's innovative and cost-effective products and services meet the credit enhancement, financial and investment needs of its public and private sector clients, domestically and internationally. MBIA Inc.'s principal operating subsidiary, MBIA Insurance Corporation, has financial strength ratings of Double-A on CreditWatch Negative from Standard & Poor's Ratings Services and Triple-A, on review for possible downgrade, from Moody's Investors Service. Please visit MBIA's Web site at www.mbia.com.

CONTACT:
**MBIA**
**Media:**
Kevin Brown**,** +1-914-765-3648
Elizabeth James, +1-914-765-3889
or
**Investor Relations:**
Greg Diamond, +1 914-765-3190
or
**APCO Worldwide**
**Media**:
Jim McCarthy +1-202-333-8810

Created by 10KWizard    www.10KWizard.com

Exhibit 17

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): October 25, 2007**

---

## SECURITY CAPITAL ASSURANCE LTD
(Exact name of registrant as specified in its charter)

---

| **Bermuda** | **001-32950** | **Not applicable** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**A.S. Cooper Building, 26 Reid Street, 4th Floor, Hamilton, Bermuda HM 11**
(Address of principal executive offices)

**Registrant's telephone number, including area code: (441) 279 7450**

**Not Applicable**
(Former name or former address, if changed since last report)

---

**Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:**

[  ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[  ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[  ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[  ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.**              **Results of Operations and Financial Condition.**

The following information is being furnished under Item 2.02, "Results of Operations and Financial Condition." This information shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that Section, or incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

On October 25, 2007, Security Capital Assurance Ltd issued the press release attached as Exhibit 99.1 and incorporated by reference herein announcing the results for the third quarter and first nine months of 2007.

**Item 9.01.**              **Financial Statements and Exhibits.**

(d) Exhibits. The following exhibits are filed herewith:

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release ("SECURITY CAPITAL ASSURANCE REPORTS RESULTS FOR THE THIRD QUARTER AND FIRST NINE MONTHS OF 2007") dated October 25, 2007. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: October 25, 2007

SECURITY CAPITAL ASSURANCE LTD
  (Registrant)


By: /s/ Kirstin R. Gould
Name: Kirstin R. Gould
Title:   Secretary

Source: Security Capital Ass, 8-K, October 25, 2007

# SECURITY CAPITAL ASSURANCE

**Security Capital Assurance Ltd**

A.S. Cooper Builing
26 Reid Street, 4th Floor
Hamilton HM11
Bermuda
Tel: +1 441-295-7135

### SECURITY CAPITAL ASSURANCE REPORTS RESULTS FOR THE
### THIRD QUARTER AND FIRST NINE MONTHS OF 2007

*Adjusted gross premiums increased 55% to $141.1 million*
*Operating income increased 45% to $46.0 million*

- Third quarter adjusted gross premiums of $141.1 million, up 55% from third quarter of 2006; year-to-date adjusted gross premiums of $393.5 million, up 10% from 2006

- Third quarter operating income of $46.0 million, up 45% from third quarter 2006; year-to-date operating income of $136.5 million, up 30% from 2006

- Third quarter net premiums earned of $58.2 million up 28% from third quarter 2006; year-to-date net premiums earned of $158.7 million up 14% from 2006. Core net premiums earned of $53.1 million, up 18% from third quarter 2006; year-to-date core net premiums earned of $146.7 million, up 30% from 2006

- Third quarter core income of $41.1 million, up 30% from third quarter 2006; year-to-date core income of $125.6 million, up 53% from 2006

- Annualized operating return on common equity of 12.6% for first nine months of 2007, unchanged from full year 2006; Annualized core return on common equity of 11.6% versus 10.4% for the full year 2006

**Hamilton, Bermuda, October 25, 2007**– Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today announced earnings for the third quarter and first nine months of 2007. The net loss to common shareholders under generally accepted accounting principles ("GAAP") for the third quarter of 2007 was $89.9 million or $1.40 per share compared to net income of $28.4 million or $0.49 per share for the third quarter of 2006. As previously announced by the Company, the net loss per share during the quarter was due to a $143.0 million pre-tax ($131.7 million after-tax, or $2.05 per share), unrealized mark-to-market loss on financial guarantee obligations executed in credit derivative form. Operating income, the non-GAAP measure of income used by equity research analysts to assess the Company's performance, excludes this unrealized mark-to-market loss. For the first nine months of 2007, the GAAP net loss to common shareholders was $26.7 million compared to GAAP net income of $81.5 million in the prior-year period.

Operating income, a non-GAAP measure as defined below, for the third quarter of 2007 increased 45% to $46.0 million, or $0.72 per share, compared to 2006 third quarter operating income of $31.8 million, or $0.55 per share. The increase in operating income per share was principally due to earned premium and investment income growth during the quarter. For the first nine months of 2007, operating income increased 30% to $136.5 million, or $2.12 per share, compared to $104.9 million, or $2.09 per share in the prior-year period.

Nine-month operating income per share for 2007 was relatively flat as compared to the same period in 2006 due to the additional shares that were issued in connection with the initial public offering ("IPO") of SCA during the third quarter of 2006.

Operating income measures net income available to common shareholders, as determined in accordance with GAAP, excluding net realized gains (losses) on investments and net realized and unrealized gains (losses) on derivative financial instruments, after taxes. Additionally, in determining operating income we have adjusted the amount of dividends on our perpetual non-cumulative preference shares reported in accordance with GAAP during the period to reflect the amount of such dividends that would be attributable to the period as if such dividends were accrued ratably over the period.

The weighted average diluted number of shares used to calculate operating income per share for the third quarter of 2007 was 64,255,689 versus 58,094,902 for the comparable period in 2006. For the first nine-months of 2007, weighted average diluted number of shares was 64,321,482 and the comparable number for 2006 was 50,160,203. The increase in the average number of shares for both the quarter and first nine months was due to the August 2006 IPO.

"We posted solid operating results this third quarter amid very challenging conditions in the credit markets," said Paul S. Giordano, SCA's president and chief executive officer. "New business production in the third quarter was one of the strongest in our history, fueled by generally higher pricing and stronger credit terms. Our triple-A ratings remain strong despite the stress in the residential mortgage market and we are well positioned to take advantage of the improved environment for new business."

Set forth below is a discussion of SCA's operating results for the three- and nine-month periods ended September 30, 2007, compared to the same periods in 2006. Factors associated with the Company's IPO in August 2006 may make some period-to-period comparisons with 2006 less meaningful.

**Adjusted Gross Premiums.** SCA's adjusted gross premiums ("AGP"), as defined below, in the third quarter of 2007 increased 55% to $141.1 million from $91.3 million in the third quarter of 2006. During the third quarter of 2007, U.S. Public Finance AGP rose 98% and totaled $34.6 million as compared to $17.5 million in the prior-year period. The increase was primarily due to several large, structured transactions in the public finance sector that closed during the quarter. U.S. Structured Finance AGP grew by 32% to $52.4 million in the third quarter of 2007 from $39.6 million in the comparable period in 2006. The increase was primarily due to several transactions written in the commercial and consumer asset-backed securities ("ABS") sectors. International AGP increased 58% and totaled $54.2 million in the third quarter of 2007 versus $34.2 million in the prior-year period. The increase was driven by several utility transactions from the United Kingdom and a large European infrastructure transaction that closed during the quarter. AGP for the first nine months of 2007 increased 10% to $393.5 million compared to $358.9 million in the first nine months of 2006. AGP is a non-GAAP financial measure of new business production that is calculated by adding the sum of upfront premiums on business

2

Source: Security Capital Ass, 8-K, October 25, 2007

Exhibit 18

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

———————————

**FORM 8-K**

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): March 13, 2008 (March 13, 2008)**

———————————

**SECURITY CAPITAL ASSURANCE LTD**
(Exact name of registrant as specified in its charter)

———————————

| **Bermuda** | **001-32950** | **Not applicable** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**A.S. Cooper Building, 26 Reid Street, 4th Floor, Hamilton, Bermuda HM 11**
(Address of principal executive offices)

**(441) 279-7450**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

———————————

**Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:**

[  ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[  ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[  ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[  ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

See Item 7.01 below.

**ITEM 7.01 REGULATION FD DISCLOSURE**

On March 13, 2008, Security Capital Assurance Ltd ("SCA") issued a press release announcing its financial results for the three months and year ended December 31, 2007. As described in the press release, SCA will host a conference call for investors to discuss its financial results for the three months and year ended December 31, 2007 on March 14, 2008. A copy of the press release is attached as Exhibit 99.1 to this current report and incorporated by reference herein. SCA utilized certain non-GAAP financial measures in the press release that are detailed at the end of the press release.

This information shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or incorporated by reference in any filing under the Securities Act of 1933, as amended (the "Securities Act"), except as shall be expressly set forth by specific reference in such a filing.

**ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS.**

Exhibit 99.1 Press Release of SCA dated March 13, 2008.

Exhibit 99.1 shall not be deemed filed for purposes of Section 18 of the Exchange Act, nor shall it be deemed incorporated by reference in any filing under the Securities Act, except as shall be expressly set forth by specific reference in a filing.

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**SECURITY CAPITAL ASSURANCE LTD**
**(Registrant)**

Date: March 13, 2008　　　　　　　　　　By:　/s/ Michael Rego　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　　Name: Michael Rego
　　　　　　　　　　　　　　　　　　　　　Title:　Executive Vice President

3

Source: Security Capital Ass, 8-K, March 14, 2008

# SECURITY CAPITAL ASSURANCE

**Security Capital Assurance Ltd**
A.S. Cooper Building
26 Reid Street, 4th Floor
Hamilton HM 11
Bermuda
(441) 279-7450

### SECURITY CAPITAL ASSURANCE REPORTS FOURTH QUARTER
### AND FULL-YEAR 2007 RESULTS

- Fourth quarter 2007 net loss of $1,197.9 million versus net income of $35.8 million in the fourth quarter of 2006. 2007 net loss of $1,224.5 million versus net income of $117.4 million in 2006;
- Total shareholder's equity of $427.1 million, common shareholders' equity $180.5 million, or $2.81 per share;
- Fourth quarter 2007 net operating cash flow of $79.1 million versus $133.8 million in the fourth quarter of 2006. 2007 operating cash flow of $285.5 million versus operating cash flow of $393.5 million in 2006;
- Fourth quarter 2007 non-cash, mark-to-market charge related to credit derivative exposures of $518.8 million;
- Fourth quarter 2007 net case loss reserve provisions associated with collateralized debt obligations of asset-backed securities ("CDO of ABS") of $651.5 million. Fourth quarter 2007 net case loss reserve provisions associated with home equity line of credit ("HELOC") and closed-end second lien ("CES") transactions of $37.2 million;
- SCA's board of directors elected not to declare either a quarterly dividend with respect to our common shares or a semi-annual dividend with respect to our Series A Perpetual Non- Cumulative Preference Shares (the "SCA Series A Preference Shares").

**Hamilton, Bermuda, March 13, 2008** – Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today announced results for the three-month and full-year periods ended December 31, 2007. The net loss in the fourth quarter of 2007 was $1,197.9 million, or $18.67 per share, versus net income of $35.8 million, or $0.56 per share, in the fourth quarter of 2006. For the full-year 2007, the Company reported a net loss of $1,224.5 million, or $19.09 per share, versus net income of $117.4 million, or $2.18 per diluted share, for the full-year 2006. As of December 31, 2007, the Company had total shareholders' equity of $427.1 million and common shareholders' equity of $180.5 million, or $2.81 per share.

"The extraordinary and rapid deterioration in U.S. residential mortgage-related credits led us to incur record levels of case reserves in the fourth quarter of last year," said Paul S. Giordano, SCA's president and chief executive officer. "We are continuing to explore our strategic options to generate or raise capital and improve our ratings. In the interim, we are in the process of realigning our cost structure to reflect the current business conditions and have made the strategic decision to cease writing new business for a period of time to preserve capital."

Source: Security Capital Ass, 8-K, March 14, 2008

For the fourth quarter of 2007 the Company had an operating loss of $36.7 million, or $10.31 per share, compared to operating income of $37.5 million, or $0.58 per share for the fourth quarter of 2006. For the full-year 2007, the operating loss was $530.3 million, or $8.27 per share, compared to operating income of $141.9 million, or $2.64 per share, for the full-year 2006. The fourth quarter and full-year 2007 operating losses were primarily due to the $651.5 million net case loss provision associated with the CDO of ABS portfolio and the $37.2 million net case loss provision that was incurred during the fourth quarter for HELOC and CES transactions. The fourth quarter 2007 net case loss provisions totaling $9.5 million, associated with the Company's third party reinsurance business, also contributed to the operating loss.

Operating income (loss) is a non-GAAP measure that is calculated by taking net income available to common shareholders, as determined in accordance with GAAP, and excluding net realized gains (losses) on investments and net realized and unrealized gains (losses) on derivative financial instruments, after taxes. The reconciliation of non-GAAP measures can be found in the attachments at the end of this release.

The weighted average diluted number of shares used in the "per share" calculations was 64,169,788 for the fourth quarter and 64,150,375 for the year ended December 31, 2007. This compared to weighted average diluted shares of 64,237,292 for the fourth quarter and 53,718,326 for the year ended December 31, 2006. Weighted average diluted shares were higher for the full-year 2007 because SCA was a public company for the entire twelve months of 2007 compared to only five months in 2006.

**Mark-to-Market and Case Loss Provisions.** The net loss during the quarter was primarily due to a $518.8 million, or $8.09 per share, unrealized mark-to-market adjustment on financial guarantee obligations executed in credit derivative form, and additional net case loss provisions of $698.2 million, or $10.88 per share. The unrealized mark-to-market adjustment is attributable to significant changes in the estimated fair value of the Company's credit derivative exposures since the quarter ended September 30, 2007.

The following table summarizes the gross and net case loss provisions that were incurred by the Company during the fourth quarter of 2007:

| ($ in millions) | Q4 2007 Gross Case Loss Provision | | Q4 2007 Net Case Loss Provision | |
|---|---|---|---|---|
| CDO of ABS transactions | $ | 838.6 | $ | 651.5 |
| HELOC and CES transactions | $ | 216.7 | $ | 37.2 |
| 3rd Party Reinsurance transactions | $ | 9.5 | $ | 9.5 |
| **Total** | **$** | **1,064.8** | **$** | **698.2** |

2

Source: Security Capital Ass, 8-K, March 14, 2008

Exhibit 19

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

**FORM 8-K**

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): May 8, 2008 (May 8, 2008)

---

**SECURITY CAPITAL ASSURANCE LTD**
(Exact name of registrant as specified in its charter)

---

| | | |
|---|---|---|
| **Bermuda** | **001-32950** | **Not applicable** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**A.S. Cooper Building, 26 Reid Street, 4th Floor, Hamilton, Bermuda HM 11**
(Address of principal executive offices)

**Registrant's telephone number, including area code: (441) 279 7450**

**Not Applicable**
(Former name or former address, if changed since last report)

---

**Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:**

[  ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[  ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[  ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[  ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**ITEM 2.02 RESULTS OF OPERATIONS AND FINANCIAL CONDITION**

   See Item 7.01 below.

**ITEM 7.01 REGULATION FD DISCLOSURE**

   On May 8, 2008, Security Capital Assurance Ltd ("SCA") issued a press release announcing its financial results for the three months ended March 31, 2008. As described in the press release, SCA will host a conference call for investors to discuss its financial results for the three months ended March 31, 2008 on May 9, 2008. A copy of the press release is attached as Exhibit 99.1 to this current report and incorporated by reference herein. SCA utilized certain non-GAAP financial measures in the press release that are detailed in Appendix A thereto.

   This information shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or incorporated by reference in any filing under the Securities Act of 1933, as amended (the "Securities Act"), except as shall be expressly set forth by specific reference in such a filing.

**ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS.**

Exhibit 99.1: Press Release, "Security Capital Assurance Reports First Quarter 2008 Results," dated May 8, 2008.

Exhibit 99.1 shall not be deemed filed for purposes of Section 18 of the Exchange Act, nor shall it be deemed incorporated by reference in any filing under the Securities Act, except as shall be expressly set forth by specific reference in a filing.

Source: Security Capital Ass, 8-K, May 09, 2008

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**SECURITY CAPITAL ASSURANCE LTD**
**(Registrant)**

Date: May 8, 2008

By: /s/ Susan Comparato
    Name: Susan Comparato
    Title:   Senior Vice President and General Counsel

Source: Security Capital Ass, 8-K, May 09, 2008

Security Capital Assurance Ltd
A.S. Cooper Building
26 Reid Street, 4th Floor
Hamilton HM 11
Bermuda
(441) 279-7450

**SECURITY CAPITAL ASSURANCE REPORTS FIRST QUARTER 2008 RESULTS**

- First quarter 2008 net loss of ($96.8) million, or ($1.51), per common share, versus net income of $37.3 million, or $0.58, per common share in the first quarter of 2007;
- First quarter 2008 operating loss of ($2.7) million, or ($0.04) per common share, versus operating income of $44.1 million, or $0.68 per common share, in the first quarter of 2007;
- Total shareholders' equity of $348.4 million and common shareholders' equity of $101.8 million, or $1.58 per common share, as of March 31, 2008;
- Earnings from refundings, calls or other accelerations net of deferred acquisition costs in the first quarter of 2008 totaled $18.7 million, or $0.29 per common share, versus $1.0 million, or $0.02 per common share, in the first quarter of 2007;
- First quarter 2008 non-cash, unrealized mark-to-market losses related to credit derivative exposures of $187.2 million. Credit impairment charges of $22.2 million associated with collateralized debt obligations of asset backed securities ("CDO of ABS") transactions included in the first quarter 2008 mark-to-market charge;
- Net realized and unrealized gains of $72.5 million, attributable to the exercise of our option under XL Financial Assurance Ltd's ("XLFA") capital facility to convert $200 million of trust certificates into XLFA Series B Perpetual Preferred Shares during the quarter; and
- Net case loss provisions associated with Home Equity Line of Credit ("HELOC") and closed- end second lien ("CES") mortgage transactions of $37.7 million.

**Hamilton, Bermuda, May 8, 2008** – Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today announced results for the three-month period ended March 31, 2008. The net loss in the first quarter of 2008 was ($96.8) million, or ($1.51) per common share, versus net income of $37.3 million, or $0.58 per common share, in the first quarter of 2007. The net loss for the quarter was primarily due to non-cash, unrealized mark-to-market losses on financial guarantee obligations in credit derivative form of $187.2 million. As of March 31, 2008, the Company had total shareholders' equity of $348.4 million and common shareholders' equity of $101.8 million, or $1.58 per common share.

"The credit environment in the first quarter of 2008 continued to be very difficult," said Paul S. Giordano, SCA's President and Chief Executive Officer. "We are focused on trying to restructure our Company. In the first quarter, we also took steps to realign our operating costs with our present situation of writing almost no new business."

For the first quarter of 2008, the Company reported an operating loss of ($2.7) million, or ($0.04) per common share, compared to operating income of $44.1 million, or $0.68 per

common share for the first quarter of 2007. The deterioration in operating income was due to higher net losses and loss adjustment expenses, credit impairment charges associated with net credit default swap ("CDS") exposure, and restructuring related expenses associated with severance, legal and advisory fees, offset by higher net premiums earned and net investment income.

Operating income (loss) is a non-GAAP measure that is calculated by taking net income excluding the after tax effect of: (i) net realized gains (losses) on investments, (ii) unrealized gains (losses) on derivatives net of credit impairment adjustments included in unrealized gains (losses) on derivatives and (iii) certain other items. The reconciliation of non-GAAP measures can be found in Appendix A at the end of this release.

The weighted average number of shares used in the "per share" calculations was 64,213,908 for the first quarter of 2008. This compares to weighted average shares of 64,342,897 for the first quarter of 2007.

**Net Change in Fair Value of Credit Derivatives and Credit Impairment Charges Associated with CDS Exposure.**  The net loss during the quarter was primarily due to a $187.2 million, or $2.92 per common share, unrealized mark-to-market loss on financial guarantee obligations executed in credit derivative form. This unrealized mark-to-market charge was partially offset by net realized and unrealized gains of $72.5 million, attributable to the exercise of our option under XLFA's capital facility to issue XLFA Series B Perpetual Preferred Shares during the quarter. Of the first quarter 2008 mark-to-market loss, $22.2 million, or $0.35 per common share, represents credit impairment charges associated with our credit derivative exposures. These credit impairment charges represent accretion associated with the discounted amount of net anticipated claims and recoveries recorded during the fourth quarter of 2007 on our CDO of ABS portfolio and does not represent further adverse developments.

**Net Change in Fair Value of Derivatives**

| (Dollar amounts in millions) | | Gains | | Losses | | Net |
|---|---|---|---|---|---|---|
| XLFA capital facility put option | $ | 179.5 | $ | (107.0) | $ | 72.5 |
| Net earned premiums from derivatives | | 18.4 | | | | 18.4 |
| Change in fair value of derivative exposures including impairments of ($22.2) million | | | | (187.2) | | (187.2) |
| Totals | $ | 197.9 | $ | (294.2) | $ | (96.3) |

**Net Cash (Used) Provided by Operating Activities.**  For the three months ended March 31, 2008, net cash used in operating activities was ($44.6) million compared to net cash flows provided by operating activities of $58.8 million in the comparable three-month period in 2007.

2

Source: Security Capital Ass, 8-K, May 09, 2008

Exhibit 20

Web   Images   Maps   News   Shopping   Gmail   more ▼

Get quotes    Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**Security Capital Assurance Ltd**(NYSE:SCA) - **Daily** | Weekly

May 1, 2007   - May 31, 2007    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-May-07 | 33.14 | 33.19 | 32.07 | 32.17 | 365,400 |
| 30-May-07 | 32.61 | 33.27 | 32.33 | 32.94 | 280,200 |
| 29-May-07 | 32.37 | 33.10 | 32.37 | 32.81 | 171,900 |
| 25-May-07 | 32.60 | 33.00 | 31.30 | 32.29 | 241,300 |
| 24-May-07 | 33.95 | 33.95 | 32.44 | 32.57 | 169,700 |
| 23-May-07 | 33.84 | 34.44 | 33.61 | 33.88 | 66,700 |
| 22-May-07 | 33.21 | 34.04 | 33.00 | 33.83 | 118,500 |
| 21-May-07 | 33.25 | 33.50 | 32.94 | 33.47 | 151,500 |
| 18-May-07 | 32.98 | 33.54 | 32.27 | 33.52 | 185,800 |
| 17-May-07 | 33.50 | 33.50 | 32.40 | 33.05 | 108,700 |
| 16-May-07 | 32.93 | 33.49 | 32.78 | 33.47 | 85,300 |
| 15-May-07 | 33.15 | 33.39 | 32.85 | 32.96 | 267,100 |
| 14-May-07 | 33.56 | 33.65 | 33.00 | 33.15 | 684,900 |
| 11-May-07 | 33.37 | 34.58 | 33.30 | 33.55 | 899,200 |
| 10-May-07 | 33.28 | 33.78 | 33.10 | 33.37 | 237,000 |
| 9-May-07 | 32.59 | 33.40 | 32.53 | 33.36 | 315,600 |
| 8-May-07 | 32.75 | 34.52 | 32.43 | 32.64 | 254,000 |
| 7-May-07 | 33.63 | 33.63 | 32.61 | 33.00 | 177,500 |
| 4-May-07 | 32.32 | 33.67 | 32.32 | 33.65 | 127,500 |
| 3-May-07 | 32.16 | 32.29 | 32.06 | 32.17 | 55,200 |
| 2-May-07 | 31.60 | 32.24 | 31.50 | 32.09 | 155,900 |
| 1-May-07 | 32.00 | 32.14 | 31.25 | 31.54 | 287,500 |
| 30-Apr-07 | 32.25 | 32.30 | 31.96 | 32.10 | 248,400 |

International Google Finance:  Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Get quotes   Stock screener New!

'g  CSCO' o. 'Google'

## Historical prices  « Back to overview

### Security Capital Assurance Ltd(NYSE:SCA) - **Daily** | Weekly

Aug 6, 2008    - Aug 6, 2008    Update   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 2.51 | 2.95 | 1.90 | 2.90 | 4,994,800 |
| 5-Aug-08 | 2.40 | 2.70 | 2.07 | 2.19 | 2,850,100 |

International Google Finance:  Canada - U.K. - 中国版 (China)

information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed
To see all exchange delays, please see disclaimer

©2008 Google  Google Home - Help - Privacy Policy - Terms of Service

Exhibit 21

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

———————————

**FORM 8-K**

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): June 23, 2008 (June 20, 2008)**

———————————

**SECURITY CAPITAL ASSURANCE LTD**
(Exact name of registrant as specified in its charter)

———————————

| **Bermuda** | **001-32950** | **Not applicable** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**A.S. Cooper Building, 26 Reid Street, 4th Floor, Hamilton, Bermuda HM 11**
(Address of principal executive offices)

**Registrant's telephone number, including area code: (441) 279 7450**

**Not Applicable**
(Former name or former address, if changed since last report)

———————————

**Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:**

[ ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: Security Capital Ass, 8-K, June 23, 2008

**Item 8.01    Other Events.**

On June 20, 2008, Moody's Investors Service ("Moody's") announced rating actions on Security Capital Assurance Ltd ("SCA"), XL Capital Assurance Inc. ("XLCA"), XL Financial Assurance Ltd ("XLFA") and XL Capital Assurance (U.K.) Limited ("XLCA-UK") in which Moody's downgraded the "A3" insurance financial strength ratings of XLCA, XLFA and XLCA-UK to "B2." Moody's further announced that the outlook for the ratings is negative.

Moody's also downgraded SCA's provisional senior debt rating to "(P)Caa3" from "(P)Ba1," its provisional subordinated debt rating to "(P)Ca" from "(P)Ba2" and its preference share rating to "Ca" from "B3." In addition, Moody's downgraded the rating of XLFA's Twin Reefs Pass-Through Trust to "Caa2" from "Ba1." Finally, Moody's announced that, based on current rating agency policy, it will withdraw ratings on certain securities that are guaranteed or "wrapped" by XLCA and XLFA that it had previously rated because XLCA and XLFA have been downgraded below investment grade level and there exists no published underlying rating for such securities.

In taking the rating actions described above, Moody's noted that such actions: "reflect[] the company's severely impaired financial flexibility and the company's proximity to minimum regulatory capital requirements relative to [Moody's] estimations of expected case losses." Moody's also noted that: "According to Moody's, the negative outlook on SCA's ratings reflects continued uncertainty with respect to the amount of losses that will ultimately arise from the company's insured portfolio and attendant risks that could occur if losses develop adversely, including the potential of regulatory intervention."

A press release relating to these ratings actions is filed as Exhibit 99.1 to this report and incorporated herein by reference.

**Item 9.01    Financial Statements and Exhibits.**

(d) Exhibits. The following exhibit is filed herewith:

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release, "Security Capital Assurance Acknowledges Moody's Rating Actions ," dated June 20, 2008 |

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**SECURITY CAPITAL ASSURANCE LTD**
**(Registrant)**

Date: June 23, 2008                    By: _____/s/ Claude LeBlanc_____

Name:  Claude LeBlanc
Title:  Executive Vice President

Source: Security Capital Ass, 8-K, June 23, 2008

Exhibit 99.1

# SECURITY CAPITAL ASSURANCE

**Security Capital Assurance Ltd**
A.S. Cooper Building
26 Reid Street, 4th Floor
Hamilton HM 11
Bermuda
(441) 279-7450

**SECURITY CAPITAL ASSURANCE LTD ACKNOWLEDGES MOODY'S RATING ACTIONS**

**Hamilton, Bermuda, June 20, 2008** – Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today confirmed Moody's Investor Services ("Moody's") downgraded the insurance financial strength ("IFS") ratings of SCA's subsidiaries, XL Capital Assurance Inc. ("XLCA") and XL Financial Assurance Ltd ("XLFA"), as well as XLCA subsidiary, XL Capital Assurance (U.K) Limited.

The following rating actions were taken by Moody's today on SCA operating companies:

XL Capital Assurance Inc. -- IFS from A3 to B2, outlook is negative;
XL Capital Assurance (U.K.) Limited -- IFS from A3 to B2, outlook is negative; and
XL Financial Assurance Ltd -- IFS from A3 to B2, outlook is negative.

**About Security Capital Assurance**

Security Capital Assurance Ltd is a Bermuda-domiciled holding company whose common shares are listed on the New York Stock Exchange (NYSE: SCA). For more information please visit www.scafg.com.

**Contact:**

Investors
Frank Constantinople
+1 441-279-7450
frank.constantinople@scafg.com

Media
Michael Gormley
+1 441-279-7450
michael.gormley@scafg.com

Cindy Leggett-Flynn or Michele Loguidice
+1 212-333-3810
clf@brunswickgroup.com or
mloguidice@brunswickgroup.com

**FORWARD-LOOKING STATEMENTS**

This release contains statements about future results, plans and events that may constitute "forward-looking" statements within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. You are cautioned that these statements are not guarantees of future results, plans or events and such statements involve risks and uncertainties that may cause actual results to differ materially from those set forth in these statements. Forward-looking statements are subject to a number of risks and uncertainties, many of which are beyond the Company's control. These factors include, but are not limited to: recent and future rating agency statements and ratings actions; the outcome of the Company's dispute with Merrill Lynch International ("MLI") concerning the Company's termination of seven

Source: Security Capital Ass, 8-K, June 23, 2008

credit default swap ("CDS") contracts; the Company's ability to successfully implement its strategic plan; higher risk of loss in connection with obligations guaranteed by the Company due to recent deterioration in the credit markets stemming from the poor performance of subprime residential mortgage loans; the suspension of writing substantially all new business and the Company's ability to continue to operate its business in its historic form; the development and implementation of a strategic plan; developments in the world's financial and capital markets that adversely affect the performance of the Company's investments and its access to such markets; the performance of invested assets, losses on credit derivatives or changes in the fair value of credit derivatives; the availability of capital and liquidity; the timing of claims payments and the receipt of reinsurance recoverables; greater frequency or severity of claims and loss activity including in excess of the Company's loss reserves; changes in the Company's reinsurance agreements with certain of its subsidiaries; the impact of provisions in business arrangements and agreements triggered by the ratings downgrades; the impact of other triggers in business arrangements including CDS contracts; changes in regulation, tax laws, legislation or accounting policies or practices; changes in officers; general economic conditions; changes in the availability, cost or quality of reinsurance or retrocessions; possible downgrade of the Company's reinsurers; possible default by the counterparties to the Company's reinsurance arrangements; the Company's ability to compete; changes that may occur in Company operations and ownership as the Company matures; and other additional factors, risks or uncertainties described in Company filings with the SEC, including in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007, and also disclosed from time to time in subsequent reports on Form 10-Q and Form 8-K. Readers are cautioned not to place undue reliance on forward-looking statements which speak only as of the date they are made. The Company does not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements are made.

# # #

2

Created by 10KWizard    www.10KWizard.com

Exhibit 22



**FGIC Corporation**
125 Park Avenue
New York, NY 10017

**Contact: Brian Moore**
Senior Vice President
Investor Relations and Marketing
T  212·312·2776
brian.moore@fgic.com

## FGIC CORPORATION ANNOUNCES QUARTERLY RESULTS
## THIRD QUARTER NET LOSS $65.3 MILLION

**October 30, 2007 – New York, NY –** FGIC Corporation, the parent company of Financial Guaranty Insurance Company, today announced a net loss for the quarter ended September 30, 2007 of $65.3 million, compared to net income of $59.6 million for the quarter ended September 30, 2006. The net loss was attributable to an after-tax unrealized mark-to-market loss of $134.0 million related to the portion of FGIC's insured portfolio accounted for as derivatives. This mark-to-market adjustment was discussed in FGIC's October 18, 2007 announcement.

Frank J. Bivona, CEO, commented, "As mentioned in our prior release, we do not believe that these mark-to-market adjustments reflect the credit quality of FGIC's insured credit derivative portfolio but are instead an indication of the volatility in structured credit markets. FGIC is well-positioned financially to withstand this market turmoil."

Howard Pfeffer, President, added, "On the business production side, FGIC had excellent results from our non-US operations on a quarter-on-quarter basis, more than offsetting declines in the US businesses. This underscores the benefit of a diversified business model for both FGIC and the financial guaranty industry generally. We also believe that continued spread widening will translate into future business opportunities."

**Non-GAAP Performance Measures**
FGIC uses three non-GAAP performance measures in discussing its financial results and performance: Core Net Income, Adjusted Book Value (ABV) and Adjusted Gross Premiums (AGP). These measures are not promulgated in accordance with GAAP and should not be considered substitutes for GAAP measures. Reconciliations of these non-GAAP measures to the comparable GAAP measures are provided elsewhere in this press release.

Core Net Income is an earnings measure used by management and many research analysts. It excludes the net income impact of various gains and losses, principally net investment gains and losses and mark-to-market gains and losses on credit derivative contracts; it also excludes the net income effect of premiums and deferred acquisition costs that have been accelerated due to refunding activity. A refunding occurs when an insured obligation is called or legally defeased by the issuer prior to its stated maturity. When an obligation insured by the Company is refunded prior to the end of the expected policy coverage period, any remaining unearned premiums ("refunding premiums") and deferred acquisition costs are recognized.

**FGIC**

ABV adjusts stockholders' equity to add the impact of deferred income from business previously generated, net of expenses and taxes. Management and many research analysts consider ABV to be helpful in valuing the Company, as it reflects income from business previously written that will be earned over time.

AGP includes both direct and assumed financial guaranty premiums and amounts received for credit derivative contracts, which the Company considers to be a normal extension of its financial guaranty business. AGP adjusts gross premiums written to add the present value of estimated future installment premiums written on financial guaranty policies issued in the period. Management and many research analysts believe that AGP is a useful measure of business production because it provides an estimate of the total value associated with business written in a period, rather than just the premiums collected or earned in the period. Further, AGP correlates to reported insured par written.

**Net (Loss) Income**

The Company incurred a net loss of $65.3 million for the quarter ended September 30, 2007, compared to net income of $59.6 million for the quarter ended September 30, 2006. The net loss was attributable to an after-tax unrealized mark-to-market adjustment of $134.0 million related to the portion of FGIC's insured portfolio accounted for as derivatives. For the quarter ended September 30, 2007 the net income effect of refunding premiums was $4.4 million compared to $3.8 million for the quarter ended September 30, 2006. Table I shows net income and Core Net Income for the third quarters and first nine months of 2007 and 2006.

| Table I – Net Income<br>($ millions) | 3Q 2007 | 3Q 2006 | %<br>Change | 9 months<br>2007 | 9 months<br>2006 | %<br>Change |
|---|---|---|---|---|---|---|
| Net (Loss) Income | $(65.3) | $59.6 | -210% | $77.0 | $177.5 | -57% |
| Less: Net effect of net realized gains and losses on foreign exchange and investments | (0.0) | (0.1) | | (0.7) | (0.3) | |
| Plus:  Net effect of net realized and unrealized losses (gains) on credit derivative contracts | 134.0 | (0.7) | | 144.4 | (0.2) | |
| Less: Net income effect of refunding premiums | (4.4) | (3.8) | | (24.4) | (18.2) | |
| Core Net Income | $64.3 | $55.0 | +17% | $196.3 | $158.8 | +24% |

**Net Realized and Unrealized Gains (Losses) on Credit Derivative Contracts**

Net realized and unrealized losses for the quarter ended September 30, 2007 were $206.2 million compared to net realized and unrealized gains of $1.1 million for the quarter ended September 30, 2006. The net realized and unrealized losses for the quarter ended September 30, 2007 were principally due to unrealized mark-to-market losses related to increases in credit spreads on credit derivative contracts issued by the Company, particularly in the CDO of ABS sector. The Company considers these contracts to be a normal extension of its financial guaranty insurance business and intends to hold these contracts for their full contractual terms. Additional information regarding FGIC's CDO of ABS portfolio can be found in the Investor Relations section of the Company's website at *http://www.fgic.com/investorrelations/selectexposures/*.



**Book Value and ABV**
At September 30, 2007, stockholders' equity, or book value, equaled $2.44 billion, an increase of 4% over stockholders' equity of $2.35 billion at December 31, 2006. ABV also increased by 6%, to $3.69 billion at September 30, 2007, from $3.48 billion at December 31, 2006. Table II shows the increases in book value and ABV between September 30, 2007 and December 31, 2006.

| Table II – Increase in Book Value and ABV ($ millions) | September 30, 2007 | Dec 31, 2006 | % Change |
|---|---|---|---|
| Book Value | $2,440.9 | $2,354.0 | +4% |
| Adjusted Book Value | $3,687.6 | $3,478.0 | +6% |

**NEW BUSINESS PRODUCTION**
**AGP**
AGP for the quarter ended September 30, 2007 was $203.8 million, a 62% increase from AGP of $125.8 million for the quarter ended September 30, 2006.

In public finance, FGIC insured a number of tax-backed transactions, particularly for education projects. FGIC also guaranteed large deals for the State of Florida and Puerto Rico. However, though the Company did insure significant portions of the Giants/Jets stadium financings, FGIC saw fewer of the more complex public finance transactions in the quarter. Such deals continue to be an area of focus.

The US structured finance business was particularly slow for FGIC with only a few secondary market transactions closed in the quarter. Overall new issue volume was negatively impacted by the current turmoil in the MBS and CDO markets, and FGIC did not qualify any new deals in these areas. Further, because the commercial asset-backed sector is marked by larger deals and less frequent issuers, production in this area is subject to some volatility. This sector was dramatically affected by current market conditions, which delayed several financings that were scheduled to close. However, widened credit spreads bode well for structured finance and FGIC continues to see solid opportunities going forward.

In international finance, FGIC had its best quarter to date. FGIC guaranteed several large public finance infrastructure transactions in the UK, for transportation and hospital projects, as well as infrastructure deals in Canada and France, and a variety of smaller transactions. International deals continue to be marked by long lead times; thus, quarterly production remains unpredictable.

AGP for the nine months ended September 30, 2007 was $540.8 million, a 1% increase from AGP of $533.2 million for the nine months ended September 30, 2006.



Table III breaks down AGP for public, structured and international finance for the third quarters and first nine months of 2007 and 2006.

| Table III – AGP ($ millions) | 3Q 2007 | 3Q 2006 | % Change | 9 months 2007 | 9 months 2006 | % Change |
|---|---|---|---|---|---|---|
| U.S. Public Finance | $58.8 | $63.1 | -7% | $185.5 | $248.0 | -25% |
| U.S. Structured Finance | 9.9 | 35.7 | -72% | 121.9 | 165.6 | -26% |
| International Finance | 135.1 | 27.0 | +400% | 233.4 | 119.6 | +95% |
| **Total** | **$203.8** | **$125.8** | **+62%** | **$540.8** | **$533.2** | **+1%** |

**REVENUE ANALYSIS**

**Gross Premiums Written**

Gross direct and assumed premiums written for the quarter ended September 30, 2007 were $122.3 million, a 44% increase from the $85.0 million written for the quarter ended September 30, 2006. For public finance, gross premiums written in the third quarter of 2007 were $40.8 million, compared to $51.0 million for the comparable period of 2006, for the reasons stated above. Structured finance gross premiums written in the quarter were $30.5 million, growing 24% from $24.6 million in the comparable quarter of 2006. This growth stemmed from the build-up of FGIC's structured finance portfolio over the past several years. International finance gross premiums written in the third quarter of 2007 were $51.0 million, compared to $9.4 million for the third quarter of 2006. The increase in international finance gross premiums written was driven by several large infrastructure transactions.

Gross direct and assumed premiums written for the nine months ended September 30, 2007 were $350.4 million, a 4% increase from $337.6 million for the nine months ended September 30, 2006.

**Net Premiums Written**

Net premiums written (gross direct and assumed premiums written less premiums ceded to reinsurers) for the quarter ended September 30, 2007 were $93.9 million compared to $66.6 million for the quarter ended September 30, 2006. For the 2007 quarter, ceded premiums were $28.4 million, compared to $18.4 million for the 2006 quarter.

Net premiums written for the nine months ended September 30, 2007 were $278.3 million compared to $283.8 million for the nine months ended September 30, 2006

**Net Premiums Earned**

Net premiums earned for the quarter ended September 30, 2007 were $74.6 million, a 19% increase over net premiums earned of $62.7 million for the quarter ended September 30, 2006. Most of this improvement resulted from the substantial increase in new business production since the beginning of 2004.



Net premiums earned for the nine months ended September 30, 2007 were $231.8 million compared to net premiums earned of $194.0 million for the nine months ended September 30, 2006. Table IV breaks down net earned premiums for the third quarters and first nine months of 2007 and 2006.

| Table IV – Net Premiums Earned ($ millions) | 3Q 2007 | 3Q 2006 | % Change | 9 months 2007 | 9 months 2006 | % Change |
|---|---|---|---|---|---|---|
| U.S. Public Finance | $29.5 | $29.8 | -1% | $88.6 | $87.2 | +2% |
| U.S. Structured Finance | 29.4 | 23.5 | +25% | 83.6 | 68.6 | +22% |
| International Finance | 8.9 | 3.6 | +147% | 21.3 | 9.7 | +120% |
| Total Scheduled Premiums Earned | $67.8 | $56.9 | +19% | $193.5 | $165.5 | +17% |
| Refunding Premiums | 6.8 | 5.8 | +17% | 38.3 | 28.5 | +34% |
| **Total** | **$74.6** | **$62.7** | **+19%** | **$231.8** | **$194.0** | **+19%** |

**Investment Income**

For the quarter ended September 30, 2007, net investment income was $40.2 million, an 11% increase over net investment income of $36.2 million for the quarter ended September 30, 2006. The increase in the 2007 third quarter was attributable to continued growth in the investment portfolio as a result of strong positive cash flow from premium production.

For the nine months ended September 30, 2007, net investment income was $116.6 million, a 13% increase over net investment income of $103.1 million for the nine months ended September 30, 2006.

**EXPENSE ANALYSIS**

**Underwriting and Other Operating Expenses**

Underwriting and other operating expenses for the quarter ended September 30, 2007 were $20.7 million, compared to $16.1 million for the quarter ended September 30, 2006. The increase was attributable to the higher staffing levels required to support business growth and increased employee-related expenses. In addition, amortization of policy acquisition costs increased due to the build-up of FGIC's structured finance portfolio over the past several years.

Underwriting and other operating expenses for the nine months ended September 30, 2007 were $62.0 million, a 21% increase compared to $51.1 million for the nine months ended September 30, 2006.



**Loss Expenses**

FGIC's loss reserves fall into two categories: case reserves and watchlist reserves. Case reserves are established for insured obligations that are presently or likely to be in payment default at the balance sheet date, and for which future loss is probable and can be reasonably estimated. Watchlist reserves recognize the potential for claims against FGIC on insured obligations that are not presently in payment default, but which have migrated to an impaired level where there is a substantially increased probability of default. Watchlist reserves reflect an estimate of probable loss given evidence of impairment, and a reasonable estimate of the amount of loss in the event of default. Loss expense increases when there is deterioration relating to credits within the impaired portfolio and declines, or may be negative, if there are improvements in credits within the various impaired list categories.

For the quarter ended September 30, 2007, FGIC's loss and loss adjustment expenses provided a benefit of $2.0 million compared to an expense of $0.5 million for the comparable period of 2006. The benefit reflects a reduction in Katrina-related watchlist reserves, as well as a reduction in par outstanding on a healthcare credit on the watchlist offset by the addition of a reserve related to a 2005 second lien mortgage-backed transaction.

For the nine months ended September 30, 2007, loss expenses provided a benefit of $6.2 million, compared to a benefit of $1.7 million for the nine months ended September 30, 2006. The 2007 benefit was primarily attributable to $4.5 million in claim reimbursements received by the Company during the second quarter for claims paid during 2006 and 2005 relating to an insured obligation of an investor-owned utility impacted by Hurricane Katrina.

**Interest Expense**

For the quarter ended September 30, 2007, interest expense was $4.9 million, unchanged from the quarter ended September 30, 2006. Debt outstanding at both September 30, 2007 and 2006 was $323.4 million.

For the nine months ended September 30, 2007, interest expense was $14.6 million, unchanged from the nine months ended September 30, 2006.

**BALANCE SHEET ITEMS**
**Assets**

Total assets as of September 30, 2007 were $5.355 billion compared to total assets of $5.013 billion as of December 31, 2006. Total assets include $750 million, reflecting the Company's consolidation of a third party variable interest entity (VIE) in connection with a financial guaranty provided by the Company on a structured insurance transaction. The Company has consolidated an equal amount of liabilities related to this transaction. The creditors of the VIE do not have recourse to the general assets of the Company outside the financial guaranty policy provided to the VIE.

**Investment Portfolio**

At September 30, 2007, the market value of the Company's investment portfolio was $4.07 billion. The portfolio had an average credit quality of 'AA' based on Standard & Poor's ratings, and no investment was rated below 'A'.



**ADDITIONAL INFORMATION**
**Claims-Paying Resources**
As of September 30, 2007 FGIC had total claims-paying resources of $5.14 billion. This included capital and surplus of $1.09 billion and contingency reserves of $1.48 billion (which combined comprise qualified statutory capital, shown below), and unearned premium and loss and loss adjustment expense reserves totaling $1.47 billion. Table V provides comparisons of claims-paying resources as of September 30, 2007 and December 31, 2006.

| Table V – Statutory Basis Claims-Paying Resources<br>($ millions) | As of<br>September 30,<br>2007 | As of<br>Dec 31, 2006 |
|---|---|---|
| Qualified Statutory Capital | $ 2,578.5 | $ 2,405.1 |
| Soft Capital | 300.0 | 300.0 |
| Unearned Premiums and Loss and Loss Adjustment Expense Reserves | 1,471.1 | 1,407.1 |
| Present Value of Installment Premiums | 793.9 | 630.8 |
| **Total Claims-Paying Resources** | **$ 5,143.5** | **$ 4,743.0** |

**Insured Portfolio**
As of September 30, 2007, FGIC had $314.8 billion in insured net par outstanding. U.S. public finance transactions represented approximately 71% of the total insured portfolio; U.S. structured finance represented approximately 23% of the portfolio; and international finance obligations accounted for the remaining 6%. Based on FGIC internal ratings, expressed in industry terms, 83% of the insured portfolio had an underlying credit quality of 'A' or better, with over 99% rated investment grade at September 30, 2007.

**Conference Call**
FGIC will host a conference call at 2:00 p.m. (ET) on Tuesday, October 30, 2007, to discuss third quarter 2007 results. The dial-in number for the call is (877) 407-8035 (domestic) and (201) 689-8035 (international). The call will also be broadcast live at *http://www.fgic.com/investorrelations/conferencecalls/*.

Beginning at 4:00 p.m. (ET) on October 30, 2007, and running through November 30, 2007, the conference call will be available in replay. The replay numbers are (877) 660-6853 (domestic) and (201) 612-7415 (international). The Account and Conference ID numbers for the replay are 286 and 257012, respectively. A recording will also be available on FGIC's website, *http://www.fgic.com*, approximately one hour after the end of the conference call.

**NON-GAAP PERFORMANCE MEASURES**
As discussed above, FGIC uses non-GAAP performance measures in discussing its financial results and performance, and management, investors and others consider these non-GAAP measures to be useful in understanding the Company's financial position and new business production. Investors routinely request this information, and many of FGIC's competitors disclose similar information. However, these items are not promulgated in accordance with GAAP and should not be considered substitutes for GAAP measures.



**ABV**

ABV is defined as book value (stockholders' equity), plus the after-tax value of the net unearned premium reserve less deferred acquisition costs, plus the after-tax present value of estimated future installment premiums, discounted at 5%. Table VI provides a reconciliation of ABV to book value at September 30, 2007 and December 31, 2006.

| Table VI – ABV to Book Value ($ millions) | As of September 30, 2007 | As of Dec 31, 2006 |
|---|---|---|
| ABV | $ 3,687.6 | $ 3,478.0 |
| Net unearned premium reserve less deferred acquisition costs | (730.6) | (714.0) |
| Net present value of future installment premiums | (516.1) | (410.0) |
| Book value | $ 2,440.9 | $ 2,354.0 |

**AGP**

AGP is defined as gross up-front premiums written plus the present value of estimated future installment premiums written on financial guaranty policies issued in the period, discounted at 5%. A reconciliation of AGP to gross premiums written for the quarters and nine-month periods ended September 30, 2007 and 2006 is included below in Table VII:

| Table VII – AGP to Gross Premiums Written ($ millions) | 3Q 2007 | 3Q 2006 | 9 months 2007 | 9 months 2006 |
|---|---|---|---|---|
| AGP | $203.8 | $125.8 | $540.8 | $533.2 |
| Present value of installment premiums written on policies issued during the period | (123.6) | (88.5) | (303.4) | (315.2) |
| Gross up-front premiums written | 80.2 | 37.3 | 237.4 | 218.0 |
| Gross installment premiums written | 42.1 | 47.7 | 113.0 | 119.6 |
| Gross premiums written | $122.3 | $85.0 | $350.4 | $337.6 |

**Company Profile**

FGIC Corporation is an insurance holding company whose wholly owned subsidiary, Financial Guaranty Insurance Company, provides credit enhancement on infrastructure finance and structured finance securities worldwide. Established in 1983, FGIC is one of the four leading monoline financial guarantors. FGIC typically guarantees the scheduled payments of principal and interest on an issuer's obligation. FGIC's financial strength is rated triple-A by Moody's Investors Service, Standard & Poor's and Fitch Ratings.



**Cautionary Statement**

This press release contains "forward-looking statements" – that is, statements related to possible future events. Forward-looking statements often address expectations and beliefs as to future performance, results and business plans. You should not place undue reliance on forward-looking statements, because they are necessarily subject to risks and uncertainties that could cause actual results and performance to differ materially from those expressed or implied by our forward-looking statements. Among the factors that could cause our results or performance to differ are: (1) our ability to maintain our ratings; (2) our ability to execute our business plan and to continue to expand into new markets and asset classes; (3) competitive conditions and pricing levels; (4) legislative and regulatory developments within the United States and abroad, including the effect of new pronouncements by accounting authorities and changes in tax laws; (5) the level of activity within the national and international credit and other markets; (6) fluctuations in the economic, credit or interest rate environment in the United States or abroad; (7) possible defaults and/or additional ratings downgrades or actions in mortgage-backed securities and (8) other risks and uncertainties that have not been identified by us at this time. Forward-looking statements are based upon our current expectations and beliefs concerning future events. We undertake no obligation to update or revise any forward-looking statement, except as required by law.

**FGIC**

**FGIC Corporation and Subsidiaries**
## Consolidated Balance Sheets

| ($ thousands, except per share amounts) | September 30, 2007 | Dec 31, 2006 |
|---|---|---|
| **Assets** | *(unaudited)* | |
| Fixed maturity securities, available for sale, at fair value (amortized cost of **$3,920,075** in 2007 and $3,644,851 in 2006) | **$ 3,914,622** | $ 3,644,195 |
| Variable interest entity fixed maturity securities, held to maturity at amortized cost | **750,000** | 750,000 |
| Short-term investments | **153,153** | 222,844 |
| Total investments | **4,817,775** | 4,617,039 |
| Cash and cash equivalents | **71,870** | 33,278 |
| Accrued investment income | **55,753** | 50,214 |
| Reinsurance recoverable on losses | **3,425** | 1,485 |
| Prepaid reinsurance premiums | **204,638** | 156,708 |
| Policy acquisition costs deferred, net | **113,439** | 93,170 |
| Property and equipment, net of accumulated depreciation of **$3,132** in 2007 and $2,107 in 2006 | **12,587** | 2,617 |
| Prepaid expenses | **1,286** | 1,282 |
| Foreign deferred tax asset | **3,942** | 3,491 |
| Derivative assets | **190** | 314 |
| Deferred income taxes | **6,406** | – |
| Other assets | **63,669** | 53,634 |
| Total assets | **5,354,980** | 5,013,232 |
| **Liabilities and stockholders' equity** | | |
| Liabilities: | | |
| Unearned premiums | **1,442,018** | 1,347,592 |
| Loss and loss adjustment expense reserves | **40,239** | 40,299 |
| Ceded reinsurance balances payable | **9,682** | 7,524 |
| Accounts payable and accrued expenses | **41,860** | 46,207 |
| Derivative liabilities | **224,273** | 1,817 |
| Other liabilities | **43,492** | 38,418 |
| Payable for securities purchased | **5,447** | 10,770 |
| Variable interest entity floating rate notes | **750,000** | 750,000 |
| Accrued interest expense – variable interest entity | **1,511** | 1,298 |
| Capital lease obligations | **2,299** | 2,941 |
| Current income taxes payable | **29,919** | 22,609 |
| Deferred income taxes | **–** | 66,424 |
| Debt | **323,390** | 323,373 |
| Total liabilities | **2,914,130** | 2,659,272 |
| Stockholders' equity: | | |
| Senior Participating Mandatorily Convertible Modified Preferred Stock, par value $0.01 per share; 2,500 shares authorized, 2,346 shares issued and outstanding at September 30, 2007 and December 31, 2006 | **301,921** | 287,355 |
| Preferred stock, par value $0.01 per share; 47,500 authorized, none issued and outstanding | **–** | – |
| Common stock, par value $0.01 per share; 6,000,000 shares authorized, 2,403,223 and 2,403,067 shares issued and outstanding at September 30, 2007 and December 31, 2006, respectively | **24** | 24 |
| Treasury stock | **(165)** | – |
| Additional paid-in capital | **1,449,096** | 1,442,077 |
| Accumulated other comprehensive income, net of tax | **10,271** | 7,237 |
| Retained earnings | **679,703** | 617,267 |
| Total stockholders' equity | **2,440,850** | 2,353,960 |
| Total liabilities and stockholders' equity | **$ 5,354,980** | $ 5,013,232 |

FGIC Corporation and Subsidiaries

## Consolidated Statements of Income (unaudited)

| ($ thousands) | Three months ended Sep 30, 2007 | Three months ended Sep 30, 2006 | Nine months ended Sep 30, 2007 | Nine months ended Sep 30, 2006 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Gross direct and assumed premiums written | **$ 122,268** | $ 85,030 | **$ 350,419** | $ 337,571 |
| Ceded premiums written | **(28,351)** | (18,440) | **(72,128)** | (53,751) |
| Net premiums written | **93,917** | 66,590 | **278,291** | 283,820 |
| Increase in net unearned premiums | **(19,298)** | (3,852) | **(46,496)** | (89,775) |
| Net premiums earned | **74,619** | 62,738 | **231,795** | 194,045 |
| Net investment income | **40,247** | 36,166 | **116,632** | 103,066 |
| Interest income – investments held by variable interest entity | **10,901** | 10,033 | **31,013** | 24,628 |
| Net realized gains (losses) | **54** | (4) | **425** | 47 |
| Net realized and unrealized (losses) gains on credit derivative contracts | **(206,221)** | 1,110 | **(222,077)** | 339 |
| Other income | **167** | 490 | **1,512** | 1,532 |
| Total revenues | **(80,233)** | 110,533 | **159,300** | 323,657 |
| | | | | |
| **Expenses:** | | | | |
| Loss and loss adjustment expenses | **(2,031)** | 520 | **(6,237)** | (1,679) |
| Underwriting expenses | **23,638** | 21,231 | **75,794** | 68,817 |
| Policy acquisition costs deferred | **(8,858)** | (8,736) | **(30,613)** | (30,243) |
| Amortization of deferred policy acquisition costs | **3,848** | 1,930 | **11,502** | 7,486 |
| Other operating expenses | **2,043** | 1,675 | **5,321** | 5,048 |
| Interest expense – debt held by variable interest entity | **10,901** | 10,033 | **31,013** | 24,628 |
| Interest expense | **4,875** | 4,875 | **14,625** | 14,625 |
| Total expenses | **34,416** | 31,528 | **101,405** | 88,682 |
| | | | | |
| (Loss) Income before income taxes | **(114,649)** | 79,005 | **57,895** | 234,975 |
| | | | | |
| Income tax (benefit) expense | **(49,354)** | 19,413 | **(19,107)** | 57,479 |
| Net (loss) income | **(65,295)** | 59,592 | **77,002** | 177,496 |
| Preferred stock dividends | **(4,854)** | (4,543) | **(14,566)** | (13,627) |
| | | | | |
| Net (loss) income available to common stockholders | **$(70,149)** | $ 55,049 | **$62,436** | $ 163,869 |

# Exhibit 23



**FGIC Corporation**
125 Park Avenue
New York, NY 10017

**Contact: Brian Moore**
Senior Vice President
Investor Relations and Marketing
T 212·312·2776
brian.moore@fgic.com

## FGIC Corporation Announces Fourth Quarter and Full Year 2007 Results
### Says It Remains Focused On Enhancing Capital Position, Loss Mitigation, Restructuring Operations

**March 17, 2008 – New York, NY –** FGIC Corporation, the parent company of Financial Guaranty Insurance Company, today announced net losses of $1.89 billion for the quarter ended December 31, 2007 and $1.82 billion for the year ended December 31, 2007.

The fourth quarter loss resulted primarily from loss and loss adjustment expense reserves and mark-to-market losses recorded for the quarter. The loss and loss adjustment expense reserves related principally to the Company's exposure to certain collateralized debt obligations of asset-backed securities (ABS CDOs), which are backed primarily by subprime residential mortgage-backed securities, and to certain residential mortgage-backed securities (RMBS), primarily RMBS backed by second-lien mortgages. The mark-to-market losses are related principally to ABS CDOs guaranteed in credit derivative form. Loss and loss adjustment expenses for the fourth quarter 2007 were $1.23 billion before taxes and mark-to-market losses were $1.71 billion before taxes for the quarter.

The increase in loss reserves for the quarter stemmed from the rapid and substantial deterioration during the quarter in the performance of certain RMBS and ABS CDO transactions written primarily in 2006 and 2007. FGIC anticipates that any claims relating to these transactions will be made over a period of years. The loss reserves do not reflect the effects, if any, of loss mitigation efforts. There can be no assurance that any loss mitigation efforts will be successful, and it is not possible to predict the magnitude of any benefit that might be derived from any such efforts that are successful.

The fourth quarter 2007 mark-to-market loss of $1.71 billion consists of approximately $750 million related to estimated credit impairments and $960 million related to the widening of credit spreads in the structured credit markets. The estimated credit impairment of $750 million represents management's estimate of future claim payments on certain ABS CDOs. The Company paid no claims related to ABS CDOs in 2007.

### Capital Preservation and Enhancement Activities

FGIC has ceased writing new financial guaranty business for a period of time to preserve capital. The Company reiterated its commitment to take steps necessary to enhance its capital position, restructure operations and mitigate losses. FGIC has engaged Goldman Sachs to provide advice in connection with its capital enhancement initiatives. In addition, FGIC has proposed a significant

**FGIC**

restructuring of its insurance operations to the New York Insurance Department, including the organization of a new financial guaranty insurer to be domiciled in New York to provide support for global public finance and infrastructure obligations previously insured by FGIC and to write new business to serve those markets. Any restructuring will require significant capital, as well as approval from the New York Insurance Department, among others.

**Financial Statements**

FGIC's anticipates that its 2007 Consolidated Financial Statements will be posted on its website (www.fgic.com) as soon as they are available.

**Company Profile**

FGIC Corporation is an insurance holding company whose wholly owned subsidiary, Financial Guaranty Insurance Company, provides credit enhancement on infrastructure finance and structured finance securities worldwide. Established in 1983, FGIC typically guarantees the scheduled payments of principal and interest on an issuer's obligation. FGIC is rated "AA" by Fitch Ratings, "A" by Standard & Poor's (S&P) and "A3" by Moody's Investors Service. FGIC remains on Ratings Watch Negative from Fitch, CreditWatch with developing implications from S&P, and review for possible downgrade by Moody's.

## Cautionary Statement

This press release contains "forward-looking statements" – that is, statements related to possible future events. Forward-looking statements often address expectations and beliefs as to future performance, results and business plans. You should not place undue reliance on forward-looking statements, because they are necessarily subject to risks and uncertainties that could cause actual results and performance to differ materially from those expressed or implied by our forward-looking statements. Among the factors that could cause our results or performance to differ are: (1) further downgrades to our ratings; (2) our ability to execute our business plan given our current ratings, possible further downgrades and market conditions; (3) the results of loss mitigation efforts; (4) legislative and regulatory developments within the United States and abroad, including the effect of new pronouncements by accounting authorities; (5) competitive conditions and pricing levels; (6) the level and nature of activity within the national and international credit and other markets; (7) fluctuations in the economic, credit or interest rate environment in the United States or abroad; (8) possible defaults and/or additional ratings downgrades or actions in mortgage-backed securities and (9) other risks and uncertainties that have not been identified by us at this time. Forward-looking statements are based upon our current expectations and beliefs concerning future events. We undertake no obligation to update or revise any forward-looking statement, except as required by law.

**FGIC Corporation and Subsidiaries**
## Consolidated Balance Sheets

| ($ thousands, except per share amounts) | December 31, 2007 | December 31, 2006 |
|---|---|---|
| **Assets** | | |
| Fixed maturity securities, available for sale, at fair value (amortized cost of **$3,942,868** in 2007 and $3,644,851 in 2006) | **$ 3,976,178** | $ 3,644,195 |
| Variable interest entity fixed maturity securities, held to maturity at amortized cost | **750,000** | 750,000 |
| Short-term investments | **126,688** | 222,844 |
| Total investments | **4,852,866** | 4,617,039 |
| Cash and cash equivalents | **140,590** | 33,278 |
| Accrued investment income | **55,745** | 50,214 |
| Reinsurance recoverable on losses | **8,693** | 1,485 |
| Prepaid reinsurance premiums | **225,516** | 156,708 |
| Policy acquisition costs deferred, net | **107,854** | 93,170 |
| Property and equipment, net of accumulated depreciation of **$3,891** in 2007 and $2,107 in 2006 | **16,713** | 2,617 |
| Income taxes receivable | **116,766** | – |
| Derivative assets | **267** | 314 |
| Deferred income taxes | **839,265** | 3,491 |
| Other assets | **65,092** | 54,916 |
| Total assets | **6,429,367** | 5,013,232 |
| **Liabilities and stockholders' equity** | | |
| Liabilities: | | |
| Unearned premiums | **1,458,476** | 1,347,592 |
| Loss and loss adjustment expense reserves | **1,267,420** | 40,299 |
| Ceded reinsurance balances payable | **3,696** | 7,524 |
| Accounts payable and accrued expenses | **55,976** | 46,207 |
| Derivative liabilities | **1,938,930** | 1,817 |
| Other liabilities | **44,276** | 38,418 |
| Payable for securities purchased | **–** | 10,770 |
| Variable interest entity floating rate notes | **750,000** | 750,000 |
| Accrued interest expense – variable interest entity | **1,208** | 1,298 |
| Capital lease obligations | **1,562** | 2,941 |
| Current income taxes payable | **–** | 22,609 |
| Deferred income taxes | **–** | 66,424 |
| Debt | **323,397** | 323,373 |
| Total liabilities | **5,844,941** | 2,659,272 |
| Stockholders' equity: | | |
| Senior Participating Mandatorily Convertible Modified Preferred Stock, par value $0.01 per share; 2,500 shares authorized, 2,346 shares issued and outstanding at September 30, 2007 and December 31, 2006 | **301,921** | 287,355 |
| Preferred stock, par value $0.01 per share; 47,500 authorized, none issued and outstanding | **–** | – |
| Common stock, par value $0.01 per share; 6,000,000 shares authorized, 2,403,223 and 2,403,067 shares issued and outstanding at September 30, 2007 and December 31, 2006, respectively | **24** | 24 |
| Treasury stock | **(165)** | – |
| Additional paid-in capital | **1,451,530** | 1,442,077 |
| Accumulated other comprehensive income, net of tax | **37,309** | 7,237 |
| Retained (loss) earnings | **(1,206,193)** | 617,267 |
| Total stockholders' equity | **584,426** | 2,353,960 |
| Total liabilities and stockholders' equity | **$ 6,429,367** | $ 5,013,232 |

FGIC Corporation and Subsidiaries

## Consolidated Statements of Income

| ($ thousands) | Three months ended Dec 31, 2007 | Three months ended Dec 31, 2006 | Year ended Dec 31, 2007 | Year ended Dec 31, 2006 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Gross direct and assumed premiums written | $ 100,849 | $ 103,660 | $ 451,268 | $ 441,231 |
| Ceded premiums written | (31,779) | (20,666) | (103,907) | (74,417) |
| Net premiums written | 69,070 | 82,994 | 347,361 | 366,814 |
| Increase in net unearned premiums | 4,420 | (10,582) | (42,076) | (100,357) |
| Net premiums earned | 73,490 | 72,412 | 305,285 | 266,457 |
| Net investment income | 41,338 | 36,682 | 157,970 | 139,748 |
| Interest income – investments held by variable interest entity | 10,678 | 11,265 | 41,691 | 35,893 |
| Net realized gains | 537 | 289 | 962 | 336 |
| Net mark-to-market (losses) gains on credit derivative contracts | (1,714,459) | 168 | (1,936,536) | 507 |
| Other income | 2,167 | 283 | 3,679 | 1,815 |
| Total revenues | (1,586,249) | 121,099 | (1,426,949) | 444,756 |
| **Expenses:** | | | | |
| Loss and loss adjustment expenses | 1,233,012 | (7,021) | 1,226,775 | (8,700) |
| Underwriting expenses | 20,216 | 22,539 | 96,010 | 91,356 |
| Policy acquisition costs deferred | 998 | (9,485) | (29,615) | (39,728) |
| Amortization of deferred policy acquisition costs | 4,150 | 4,000 | 15,652 | 11,486 |
| Other operating expenses | 2,920 | 1,656 | 8,241 | 6,704 |
| Interest expense – debt held by variable interest entity | 10,678 | 11,265 | 41,691 | 35,893 |
| Interest expense | 4,875 | 4,875 | 19,500 | 19,500 |
| Total expenses | 1,276,849 | 27,829 | 1,378,254 | 116,511 |
| (Loss) Income before income taxes | (2,863,098) | 93,270 | (2,805,203) | 328,245 |
| Income tax (benefit) expense | (977,202) | 22,922 | (996,309) | 80,401 |
| Net (loss) income | (1,885,896) | 70,348 | (1,808,894) | 247,844 |
| Preferred stock dividends | – | (4,858) | (14,566) | (18,485) |
| Net (loss) income available to common stockholders | $(1,885,896) | $ 65,490 | $(1,823,460) | $ 229,359 |

Exhibit 24



**FGIC Corporation**
125 Park Avenue
New York, NY 10017

**Contact: Brian Moore**
Senior Vice President
Investor Relations and Marketing
T 212·312·2776
brian.moore@fgic.com

## FGIC Corporation Announces First Quarter 2008 Results

**May 23, 2008 – New York, NY –** FGIC Corporation, the parent company of Financial Guaranty Insurance Company, today announced a net loss of $33.4 million for the quarter ended March 31, 2008. The loss resulted primarily from loss and loss adjustment expenses recorded for the quarter, which were largely offset by net unrealized gains in the fair value of credit protection contracts provided by FGIC that are considered credit derivatives under generally accepted accounting principles, as discussed below. The loss and loss adjustment expense reserves related principally to FGIC's exposure to certain collateralized debt obligations of asset-backed securities (ABS CDOs), which are backed primarily by sub-prime residential mortgage-backed securities, and to certain residential mortgage-backed securities (RMBS). The fair value, or mark-to-market, gains related principally to credit protection provided by FGIC in credit default swap form in respect of ABS CDOs.

Loss and loss adjustment expenses for the first quarter of 2008 were $279.2 million before taxes. The increase in loss reserves for the quarter stemmed from continued deterioration in the performance of certain RMBS and ABS CDO transactions written primarily in 2005, 2006 and 2007. FGIC anticipates that any claims relating to these transactions will be made over a period of years. The loss reserves do not reflect the effects, if any, of the Company's loss mitigation efforts and it is not possible to predict the magnitude of any benefit that might be derived from such efforts.

In accordance with SFAS No. 157, which the Company adopted effective January 1, 2008, FGIC updated its mark-to-market methodology to take into account the market's perception of FGIC's non-performance risk. The adjusted methodology, which resulted in a reduction in the valuation of FGIC's derivative liabilities, incorporated spreads of FGIC's credit default swaps. In accordance with SFAS No. 157, the Company recorded a benefit of $1.56 billion in the fair value of credit protection contracts provided by FGIC that are considered credit derivatives, which more than offset the mark-to-market losses of $1.40 billion related to such credit derivatives and resulted in a net unrealized gain of $157.0 million in the fair value of such credit derivatives for the first quarter of 2008.

The first quarter 2008 mark-to-market loss of $1.40 billion consisted of approximately $228 million related to estimated credit impairments and $1.18 billion related to the widening of credit spreads in the structured credit markets. The estimated credit impairment of $228 million represents management's estimate of future claim payments on certain ABS CDOs and other derivative transactions.

**FGIC**

**Claims-Paying Resources**

As of March 31, 2008, FGIC had total claims-paying resources of $5.32 billion. This included capital and surplus of $366 million and contingency reserves of $635 million (which combined comprise qualified statutory capital of $1.0 billion), unearned premium and loss and loss adjustment expense reserves totaling $3.22 billion, the present value of installment premiums of $799 million and soft capital of $300 million.

**Financial Statements**

The Company expects to post its first quarter 2008 consolidated financial statements on its website (www.fgic.com) as soon as they are available.

**Company Profile**

FGIC Corporation is an insurance holding company whose wholly owned subsidiary, Financial Guaranty Insurance Company, provides credit enhancement on infrastructure finance and structured finance securities worldwide. FGIC's guaranties typically cover the scheduled payment of principal and interest on an issuer's obligations. Established in 1983, FGIC is rated "BBB" by Fitch Ratings, "Baa3" by Moody's Investors Service and "BB" by Standard & Poor's (S&P). FGIC remains on Ratings Outlook Negative from Fitch, review for possible downgrade by Moody's and Rating Watch Negative from S&P.

## Cautionary Statement

This press release contains "forward-looking statements" – that is, statements related to possible future events. Forward-looking statements often address expectations and beliefs as to future performance, results and business plans. You should not place undue reliance on forward-looking statements, because they are necessarily subject to risks and uncertainties that could cause actual results and performance to differ materially from those expressed or implied by our forward-looking statements. Among the factors that could cause our results or performance to differ are: (1) the extent to which we are able to pursue and achieve strategic alternatives, either with or without the participation of potential investors and other third parties; (2) further downgrades to our ratings; (3) our ability to execute our business plan given our current ratings, possible further downgrades and market conditions; (4) the results of loss mitigation efforts; (5) legislative and regulatory developments within the United States and abroad, including the effect of new pronouncements by accounting authorities; (6) competitive conditions and pricing levels; (7) the level and nature of activity within the national and international credit and other markets; (8) fluctuations in the economic, credit or interest rate environment in the United States or abroad; (9) possible defaults and/or additional ratings downgrades or actions in mortgage-backed securities and (10) other risks and uncertainties that have not been identified by us at this time. Forward-looking statements are based upon our current expectations and beliefs concerning future events. We undertake no obligation to update or revise any forward-looking statement, except as required by law.

**FGIC Corporation and Subsidiaries**
## Consolidated Balance Sheets

| ($ thousands, except per share amounts) | March 31, 2008 | December 31, 2007 |
|---|---|---|
| **Assets** | | |
| Fixed maturity securities, available for sale, at fair value (amortized cost of **$3,873,931** in 2008 and $3,942,868 in 2007) | **$ 3,901,964** | $ 3,976,178 |
| Variable interest entity fixed maturity securities, held to maturity at amortized cost | **750,000** | 750,000 |
| Short-term investments | **58,048** | 126,688 |
| Total investments | **4,710,012** | 4,852,866 |
| Cash and cash equivalents | **576,367** | 140,590 |
| Accrued investment income | **54,696** | 55,745 |
| Reinsurance recoverable on paid and unpaid losses | **40,166** | 8,693 |
| Prepaid reinsurance premiums | **220,209** | 225,516 |
| Policy acquisition costs deferred, net | **103,681** | 107,854 |
| Property and equipment, net of accumulated depreciation of **$4,565** in 2008 and $3,891 in 2007 | **17,150** | 16,713 |
| Deferred income taxes | **836,869** | 839,265 |
| Derivative assets | **18** | 267 |
| Premiums receivable | **14,013** | 9,607 |
| Income taxes receivable | **59,757** | 116,766 |
| Other assets | **54,744** | 55,485 |
| Total assets | **6,687,682** | 6,429,367 |
| **Liabilities and stockholders' equity** | | |
| Liabilities: | | |
| Unearned premiums | **1,414,580** | 1,458,476 |
| Loss and loss adjustment expense reserves | **1,538,637** | 1,267,420 |
| Ceded reinsurance balances payable | **2,996** | 3,696 |
| Accounts payable and accrued expenses | **33,851** | 55,976 |
| Derivative liabilities | **1,781,664** | 1,938,930 |
| Other liabilities | **41,498** | 44,276 |
| Variable interest entity floating rate notes | **750,000** | 750,000 |
| Accrued interest expense – variable interest entity | **1,264** | 1,208 |
| Capital lease obligations | **1,587** | 1,562 |
| Long term debt and other borrowings | **573,402** | 323,397 |
| Total liabilities | **6,139,479** | 5,844,941 |
| Stockholders' equity: | | |
| Senior Participating Mandatorily Convertible Modified Preferred Stock, par value $0.01 per share; 2,500 shares authorized, 2,346 shares issued and outstanding at March 31, 2008 and December 31, 2007 | **301,921** | 301,921 |
| Preferred stock, par value $0.01 per share; 47,500 authorized, none issued and outstanding | **–** | – |
| Common stock, par value $0.01 per share; 6,000,000 shares authorized at March 31, 2008 and December 31, 2007, 2,404,117 and 2,403,223 shares issued and outstanding at March 31, 2008 and December 31, 2007, respectively | **24** | 24 |
| Treasury stock | **(165)** | (165) |
| Additional paid-in capital | **1,452,725** | 1,451,530 |
| Accumulated other comprehensive income, net of tax | **33,246** | 37,309 |
| Retained (loss) | **(1,239,548)** | (1,206,193) |
| Total stockholders' equity | **548,203** | 584,426 |
| Total liabilities and stockholders' equity | **$ 6,687,682** | $ 6,429,367 |

FGIC Corporation and Subsidiaries

## Consolidated Statements of Income

| ($ thousands) | Three months ended March 31, 2008 | Three months ended March 31, 2007 |
|---|---:|---:|
| **Revenues:** | | |
| Gross direct and assumed premiums written | $ **36,675** | $ 97,041 |
| Ceded premiums written | **(6,181)** | (12,137) |
| Net premiums written | **30,494** | 84,904 |
| Change in net unearned premiums | **39,497** | (14,397) |
| Net premiums earned | **69,991** | 70,507 |
| | | |
| Change in fair value of credit derivatives: | | |
| Realized gains and other settlements | **8,416** | 6,076 |
| Unrealized gains | **157,017** | 462 |
| Net change in fair value of credit derivatives | **165,433** | 6,538 |
| | | |
| Net investment income | **40,989** | 37,772 |
| Interest income – investments held by variable interest entity | **9,942** | 11,357 |
| Net realized (losses) gains | **(102)** | 261 |
| Other income | **1,942** | 412 |
| Total revenues | **288,195** | 126,847 |
| | | |
| **Expenses:** | | |
| Loss and loss adjustment expenses | **279,200** | 1,182 |
| Underwriting expenses | **35,503** | 28,753 |
| Policy acquisition costs deferred, net | **457** | (13,973) |
| Amortization of policy acquisition costs deferred | **3,754** | 3,783 |
| Other operating expenses | **3,039** | 1,646 |
| Interest expense – debt held by variable interest entity | **9,942** | 11,357 |
| Interest expense | **6,332** | 4,875 |
| Total expenses | **338,227** | 37,623 |
| | | |
| (Loss) income before income tax | **(50,032)** | 89,224 |
| | | |
| Total income tax (benefit) expense | **(16,677)** | 15,838 |
| Net (loss) income | **(33,355)** | 73,386 |
| Preferred stock dividends | **–** | (4,856) |
| Net (loss) income available to common stockholders | **$(33,355)** | $ 68,530 |

Exhibit 25



**Moody's Investors Service**

Global Credit Research
Rating Action
20 JUN 2008

Rating Action: Financial Guaranty Insurance Company

## Moody's downgrades FGIC's rating to B1; outlook is negative

New York, June 20, 2008 — Moody's Investors Service has downgraded to B1, from Baa3, the insurance financial strength (IFS) ratings of the main operating subsidiaries of FGIC Corporation, including Financial Guaranty Insurance Company and FGIC UK Limited (collectively "FGIC"). In the same rating action, Moody's has also downgraded the senior debt ratings of the holding company, FGIC Corporation to Caa2 from B3 and the contingent capital securities ratings of Grand Central Trusts I-IV to B3 from B2. Today's rating action concludes a review for possible downgrade that was initiated on March 31, 2008, and reflects the company's severely impaired financial flexibility and the company's proximity to minimum regulatory capital requirements relative to our estimations of expected case losses. The rating action also considers the likelihood that FGIC's previously announced restructuring plan will ultimately result in the company retaining the higher-risk portion of the insured portfolio without the premiums associated with its lower-risk business. The outlook for the rating is negative.

Moody's ratings on securities that are guaranteed or "wrapped" by a financial guarantor are generally maintained at a level equal to the higher of a) the rating of the guarantor or b) the published underlying rating. However, as FGIC's ratings are downgraded below the investment grade level, and reflecting current rating agency policy, Moody's will withdraw ratings on FGIC-wrapped securities for which there is no published underlying rating. Should the guarantor's rating subsequently move back into the investment grade range or should the agency subsequently publish the underlying rating, Moody's would reinstate the rating to the wrapped instruments. For further information please see Moody's recently published special comment entitled: Assignment of Wrapped Ratings When Financial Guarantor Falls Below Investment Grade (May 6, 2008).

The B1 insurance financial strength rating reflects Moody's view that FGIC has limited cushion above its regulatory capital requirement given uncertainty surrounding future loss development on its mortgage exposures. FGIC has recorded approximately $1.8 billion in cumulative statutory loss reserves (net of anticipated recoveries), much of which is associated with its mortgage-related exposures, primarily from second lien mortgage backed securities and asset-backed CDOs (ABS CDOs). FGIC's statutory surplus at 1Q2008 was $366 million, which is approximately $300 million above the statutory minimum regulatory requirement. Moody's has estimated losses on FGIC's insured portfolio of residential mortgage-backed securities that are significantly higher than the company's reserves for these transactions.

The rating agency added that if FGIC's capital were to fall below the regulatory minimum, there could be material adverse effects on the firm's financial condition. A meaningful portion of FGIC's credit exposure was written in Credit Default Swap (CDS) form, and contains a clause that exposes the firm to mark to market termination in the event of insolvency. A breach of minimum regulatory capital requirement heightens the risk of regulatory intervention, which could trigger a market value termination of the CDS contracts.

Moody's has re-estimated expected and stress loss projections on FGIC's insured portfolio, focusing on the company's mortgage-related exposures, as well as other sectors of the portfolio potentially vulnerable to deterioration in the current environment. Based on Moody's revised assessment of the risks in FGIC's pro-forma residual portfolio (assuming the completion of the company's restructuring initiatives), estimated stress-case losses would approximate $6.2 billion at the Aaa rating threshold. This compares to Moody's estimate of FGIC's total claims paying resources of approximately $3.7 billion, a capital position more consistent with a rating in the Ba category.

Moody's said that the downgrade of FGIC Corporation's senior unsecured debt to Caa2 reflects the operating company's inability, without regulatory approval, to upstream dividends to the holding company to service debt.

According to Moody's, the negative outlook on FGIC's ratings reflects continued uncertainty regarding losses that may arise on the insured portfolio and attendant risks that could occur if loses develop adversely, including the potential for regulatory intervention. The negative outlook also considers the uncertainty regarding the ultimate impact of FGIC's potential restructuring efforts on its residual portfolio.

LIST OF RATING ACTIONS

The following ratings have been downgraded, with a negative outlook:

Financial Guaranty Insurance Company -- insurance financial strength to B1 from Baa3.

FGIC UK Limited -- insurance financial strength to B1 from Baa3;

Grand Central Capital Trusts I-VI -- contingent capital securities to B3, from B2 and

FGIC Corporation -- senior unsecured debt to Caa2 from B3.

OVERVIEW OF FGIC CORPORATION

FGIC Corporation is a holding company whose primary operating subsidiaries, Financial Guaranty Insurance Corporation and FGIC UK Limited, provide credit enhancement and protection products to the public finance and structured finance markets throughout the United States and internationally. FGIC Corporation is privately owned by an investor group consisting of The PMI Group, GE and private equity firms Blackstone, Cypress and CIVC. For the three months ended March 31, 2008, FGIC Corporation reported GAAP losses of $33.3 million. As of March 31, 2008, the company had shareholders' equity of approximately $548 million.

New York
Arlene Isaacs-Lowe
Senior Vice President
Financial Institutions Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

New York
Jack Dorer
Managing Director
Financial Institutions Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

© Copyright 2008, Moody's Investors Service, Inc. and/or its licensors including Moody's Assurance Company, Inc. (together, "MOODY'S"). All rights reserved.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings and financial reporting analysis observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling.

MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,400,000. Moody's Corporation (MCO) and its wholly-owned credit rating agency subsidiary, Moody's Investors Service (MIS), also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually on Moody's website at www.moodys.com under the heading "Shareholder Relations - Corporate Governance - Director and Shareholder Affiliation Policy."



March 28, 2008

## Research Update:
# Financial Guaranty Insurance Co. Lowered To 'BB' From 'A'

**Primary Credit Analyst**
Robert E Green, New York (1) 212-438-2013;robert_green@standardandpoors.com

## Table Of Contents

Rationale

Ratings List

Standard & Poor's. All rights reserved. No reprint or dissemination without S&P's permission. See Terms of Use/Disclaimer on the last page.                                     639767 | 300700936

**Research Update:**

# Financial Guaranty Insurance Co. Lowered To 'BB' From 'A'

## Rationale

On March 28, 2008, Standard & Poor's Ratings Services lowered its financial strength rating on Financial Guaranty Insurance Co. (FGIC) six notches, to 'BB' from 'A', and its rating on holding company FGIC Corp. six notches, to 'B' from 'BBB'. Standard & Poor's also removed the ratings from CreditWatch with negative implications, where they had been placed on March 21, 2008; the outlook is negative.

At the same time, Standard & Poor's suspended its ratings on public finance and corporate transactions insured by FGIC that do not have an underlying public rating (SPUR).

In our opinion, FGIC has been slow to identify the unfavorable insured portfolio trends that have emerged and has failed to implement a strategic plan to re-establish itself as a viable operating entity capable of writing new business. The company has suspended underwriting new business in order to generate internal capital. Our increased concerns over regulatory and managerial issues have led to a downgrade to the speculative grade level. Unlike many of its peers, FGIC has been unsuccessful so far in raising new external capital. The violation of certain New York State Insurance Department risk limits, as noted in financial statements released on March 26, 2008, may further hamper these efforts. The departure of FGIC's president, announced today, may further reduce management's overall effectiveness.

While the company has reportedly advised the Insurance Department of its desire to split into a mostly municipal operation, with a second company insuring mostly structured finance transactions, progress has been slow, in our view. Most importantly, and regardless of whatever structure the company ultimately decides upon, we believe that new capital is a critical component. The recent announcement by the PMI Group, FGIC's principal owner, that it would not be contributing additional capital was a setback. As time passes, the possibility of a run-off situation for FGIC becomes greater in our opinion, and the likelihood of FGIC continuing as an operating entity capable of writing new business is waning.

Holding company FGIC Corp.'s ability to service its debt may be constrained by FGIC's statutory earned surplus deficit, resulting in FGIC being unable to upstream dividends to FGIC Corp. without insurance department approval.

Standard & Poor's believes that the credit characteristics of the underlying insured municipal, corporate, and structured transactions may be stronger than the FGIC-enhanced rating following the downgrade. For those issuers or issues

Standard & Poor's. All rights reserved. No reprint or dissemination without S&P's permission. See Terms of Use/Disclaimer on the last page.

633787 | 300123995

for which we currently have an underlying rating, or SPUR, Standard & Poor's will rate to the higher of the SPUR or the insurer. Standard & Poor's has suspended its ratings on those issuers or issues that do not currently carry a SPUR. The option to enter a rating process in order to obtain a SPUR remains available to issuers.

A SPUR is our opinion of the stand-alone creditworthiness of an issuer or transaction--that is, the capacity to pay debt service on a debt issue in accordance with its terms, without considering an otherwise applicable bond insurance policy. The SPUR, once assigned, remains in place regardless of what happens to the credit enhancer's rating, and is subject to surveillance by Standard & Poor's.

Lists of the ratings that have changed as a result of this action are posted at www.spviews.com. Go to the left-hand navigation bar and click on "Deals Affected" to view or download the lists.

## Ratings List

Downgraded; CreditWatch/Outlook Action

| | To | From |
|---|---|---|
| Financial Guaranty Insurance Co. | | |
| Issuer Credit Rating | BB/Negative/-- | A/Watch Neg/-- |
| Financial Strength Rating | | |
| Local Currency | BB/Negative/-- | A/Watch Neg/-- |
| Financial Enhancement Rating | | |
| Local Currency | BB/-- | A/Watch Neg/-- |
| Financial Program | | |
| Local Currency | BB/-- | A/Watch Neg/-- |
| | | |
| FGIC Corp. | | |
| Issuer Credit Rating | | |
| Foreign Currency | B/Negative/-- | BBB/Watch Neg/-- |
| Senior Unsecured | | |
| Local Currency | B | BBB/Watch Neg |
| | | |
| FGIC UK Ltd. | | |
| Issuer Credit Rating | BB/Negative/-- | A/Watch Neg/-- |
| Financial Strength Rating | | |
| Local Currency | BB/Negative/-- | A/Watch Neg/-- |
| Financial Enhancement Rating | | |
| Local Currency | BB/-- | A/Watch Neg/-- |

Complete ratings information is available to subscribers of RatingsDirect, the real-time Web-based source for Standard & Poor's credit ratings, research, and risk analysis, at www.ratingsdirect.com. All ratings affected by this rating action can be found on Standard & Poor's public Web site at

Standard & Poor's. All rights reserved. No reprint or dissemination without S&P's permission. See Terms of Use/Disclaimer on the last page.                                    619787 | 300028896

Exhibit 26



**Moody's Investors Service**

Global Credit Research
Rating Action
20 MAY 2008

Rating Action: CIFG Guaranty

**Moody's downgrades CIFG to Ba2 leaves rating under review direction uncertain**

New York, May 20, 2008 -- Moody's Investors Service downgraded the insurance financial strength ratings of CIFG Guaranty, CIFG Europe, and CIFG Assurance North America, Inc (collectively CIFG) to Ba2, from A1, and kept the ratings under review with direction uncertain. The rating agency said that the rating actions reflect the high likelihood that, absent material developments, the firm will fail minimum regulatory capital requirements in New York and Bermuda due to expected significant increases in modeled loss reserves on ABS CDOs. The breach of such regulatory capital requirements would put the firm in a precarious position, especially in light of the solvency provisions embedded in its CDS exposures. The review with direction uncertain reflects potential changes in the credit profile of the firm that could occur over the next couple of months as CIFG attempts to implement capital strengthening plans.

Moody's ratings on securities that are guaranteed or "wrapped" by a financial guarantor are generally maintained at a level equal to the higher of a) the rating of the guarantor or b) the published underlying rating. However, as CIFG's rating is downgraded below the investment grade level, and reflecting current rating agency policy, Moody's will withdraw ratings on CIFG-wrapped securities for which there is no published underlying rating. Should the guarantor's rating subsequently move back into the investment grade range or should the agency subsequently publish the underlying rating, Moody's would reinstate the rating to the wrapped instruments. For further information please see Moody's recently published special comment entitled: Assignment of Wrapped Ratings When Financial Guarantor Falls Below Investment Grade (May 6, 2008).

A list of the securities affected will be made available under "Ratings Lists" at www.moodys.com/guarantors.

Moody's said that CIFG employs a loss reserving approach for its insured ABS CDOs that uses as inputs the lowest available ratings of any of three rating agencies on underlying CDO collateral. With further downgrades of RMBS securities by different rating agencies occurring since the beginning of the year, Moody's believes CIFG will experience sizable increases in reserves, and could breach regulatory capital requirements in the near future. Moody's noted that the company has failed to meet certain regulatory filing deadlines in both the US and Bermuda, including 1st quarter 2008 results for CIFG Assurance North America, Inc. and year-end 2007 financials for CIFG Guaranty.

Moody's believes that the firm's loss reserve methodology may result in a substantial conservative bias by using the lowest rating on the underlying exposures of its ABS CDOs given the material differences in average collateral ratings across rating agencies. In March, Moody's had estimated CIFG's expected loss on ABS CDOs at $433 million, and stress losses, consistent with a 21% cumulative loss on 2006 vintage subprime first liens pools, at $1.3 billion.

The rating agency added that the expected substantial increase in loss reserves, despite their potential conservativeness, could have material adverse effects on the firm's financial condition. A large part of CIFG's credit exposure was written in Credit Default Swap (CDS) form, and contains a clause that exposes the firm to mark to market termination in the event of insolvency. The current mark to market value of such CDS contracts is a multiple of the expected economic loss on the exposure (as estimated by Moody's and CIFG) and well in excess of the firm's claims paying resources, said Moody's.

A breach of minimum regulatory capital requirement may not, in itself mean that the firm is insolvent and therefore trigger a market value termination of the CDS contracts, but it does expose the firm to possible regulatory actions and other risks that could trigger such termination given the lack of specificity as to what would qualify as insolvency under the terms of the contracts, added the rating agency. CIFG is pursuing various strategic options, including a recapitalization or a commutation of its ABS CDO exposures that, if successful, would essentially remove the risk of market value termination. The rating agency added, however, that until such a solution is implemented, CIFG remains exposed to a heightened risk of extreme financial distress. CIFG's parents, Caisse Nationale des Caisses d'Epargne Prévoyance (CNCEP) and Banque Federale des Banques Populaires (BFBP) are expected to play a decreasing role in the firm's future,

and Moody's believes it is unlikely that they will provide significant additional support to their subsidiary beyond their recent $1.5 billion capital infusion.

Moody's said that the review with direction uncertain reflects the expectation of material changes to the firm's financial profile over the next few months. In the unlikely event that a market value termination of CIFG's CDS exposures is triggered, the firm's rating would likely fall to the Ca-C range due to the inability of the firm to fully meet such obligations out of its financial resources. Under the most likely scenario, where the firm is able to substantially remove the risk of market value termination, the ratings could go up, but are likely to remain below investment grade, reflecting Moody's serious concerns about the insurer's operational effectiveness and governance. Moody's will continue to closely monitor the evolving credit profile of CIFG and will update its opinion as material changes occur.

The following ratings have been changed and kept under review direction uncertain:

CIFG Guaranty -- insurance financial strength at Ba2, from A1;

CIFG Europe -- insurance financial strength at Ba2, from A1; and

CIFG Assurance North America, Inc. -- insurance financial strength at Ba2, from A1.

Established in 2001, CIFG has provided financial guarantees to issuers in the municipal and structured finance markets in the US and Europe through CIFG Assurance North America, Inc. and CIFG Europe, though it ceased writing business earlier this year to conserve capital and to evaluate its strategic alternatives. Caisse Nationale des Caisses d'Epargne Prévoyance (rated Aa2/P-1/B-) and Banque Federale des Banques Populaires (rated Aa2/P-1/B-) recently gained control of CIFG when they invested approximately $1.5 billion in the financial guarantor, which was previously owned by their joint venture Natixis (rated Aa2/P-1/C).

New York
Jack Dorer
Managing Director
Financial Institutions Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

New York
Stanislas Rouyer
Senior Vice President
Financial Institutions Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

© Copyright 2008, Moody's Investors Service, Inc. and/or its licensors including Moody's Assurance Company, Inc. (together, "MOODY'S"). All rights reserved.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings and financial reporting analysis observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly

make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling.

MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,400,000. Moody's Corporation (MCO) and its wholly-owned credit rating agency subsidiary, Moody's Investors Service (MIS), also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually on Moody's website at www.moodys.com under the heading "Shareholder Relations - Corporate Governance - Director and Shareholder Affiliation Policy."

Exhibit 27

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) September 20, 2007

**THE BEAR STEARNS COMPANIES INC.**
(Exact Name of Registrant as Specified in its Charter)

| DELAWARE | File No. 1-8989 | 13-3286161 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

383 Madison Avenue, New York, New York   10179
(Address of Principal Executive Offices)  (Zip Code)

Registrant's telephone number, including area code:     (212) 272-2000

Not Applicable
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: BEAR STEARNS COMPANI, 8-K, September 20, 2007

Item 2.02. Results of Operations and Financial Condition.

On September 20, 2007, The Bear Stearns Companies Inc. (the "Registrant") issued a press release announcing financial results for its quarter ended August 31, 2007.

Item 8.01. Other Events.

The Board of Directors of the Registrant declared a regular quarterly cash dividend of 32 cents per share on the outstanding shares of common stock payable October 26, 2007 to stockholders of record on October 16, 2007. Also, the Board of Directors of the Registrant declared regular quarterly cash dividends on the outstanding shares of Preferred Stock, Series E, F & G, all payable October 15, 2007 to stockholders of record on September 28, 2007.

The Board of Directors of the Registrant approved an amendment to its share repurchase program to allow the company to purchase up to $2.5 billion in aggregate cost of common stock. The amendment supersedes the previous $2.0 billion authorization.

A copy of the press release is filed as Exhibit 99 to this Form 8-K and by this reference incorporated herein and made a part hereof.

This information shall be considered "filed" for purposes of the Securities Exchange Act of 1934, as amended.

Item 9.01. Financial Statements and Exhibits.

(c)    Exhibit:

(99)        Press Release, dated September 20, 2007.

Signature

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE BEAR STEARNS COMPANIES INC.

By:   /s/ Jeffrey M. Farber

Jeffrey M. Farber
Senior Vice President -- Finance
and Controller
(Principal Accounting Officer)

Dated:     September 20, 2007

THE BEAR STEARNS COMPANIES INC.

FORM 8-K

CURRENT REPORT

EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| (99) | Press Release, dated September 20, 2007. |



The Bear Stearns Companies Inc.
383 Madison Avenue
New York, NY 10179
Tel (212) 272-2000
www.bearstearns.com

Contact:    Elizabeth Ventura    (212) 272-9251
            John Quinn          (212) 272-5934

### BEAR STEARNS REPORTS THIRD QUARTER FINANCIAL RESULTS
### EQUITY FRANCHISE DELIVERS STRONG QUARTERLY PERFORMANCE

**Institutional Equities Net Revenues Up 53%**
**Record Global Clearing Net Revenues Up 30%**
**Private Client Services Net Revenues Up 15%**

*Share Repurchase Authorization Increased to $2.5 Billion*
*Including $1.0 Billion for Corporate Share Buyback*

NEW YORK, NY – September 20, 2007 – The Bear Stearns Companies Inc. (NYSE:BSC) today reported earnings per share (diluted) of $1.16 for the third quarter ended August 31, 2007, down 62% from $3.02 per share for the third quarter of 2006. Net income for the third quarter of 2007 was $171.3 million, down 61% from $438 million for the third quarter of 2006. Net revenues were $1.3 billion for the third quarter, down 38% from $2.1 billion for the third quarter of 2006. The annualized return on common stockholders' equity for the third quarter of 2007 was 5.3%, and 13.7% for the 12-month period ended August 31, 2007. Third quarter results include approximately $200 million in losses and expenses related to the BSAM High-Grade hedge funds.

"The third quarter was characterized by extremely difficult securitization markets and high volatility levels across asset classes. While our fixed income results clearly reflect these market conditions, we reported solid revenues in Investment Banking and record revenues in Global Equities and Global Clearing Services." said James E. Cayne, chairman and chief executive officer. "I am confident in the underlying strength of our business and proud of the effort and determination displayed by our employees during these challenging times."

A brief discussion of the firm's business segments follows:

Source: BEAR STEARNS COMPANI, 8-K, September 20, 2007

## CAPITAL MARKETS

Net revenues for the Capital Markets segment were $1.0 billion for the quarter ended August 31, 2007, down 36% from $1.6 billion for the third quarter of 2006.

- Institutional Equities net revenues were a record $719 million for the 2007 third quarter, a 53% increase from $471 million for the comparable prior-year quarter. This strong performance was driven by record results in structured equity products and robust international sales and trading net revenues.

- Fixed Income net revenues were $118 million for the 2007 third quarter, down 88% from $945 million reported for the quarter ended August 31, 2006. Market conditions in both the mortgage and credit businesses were extremely challenging this quarter. A general re-pricing of risk in the market led to significant reductions in both mortgage and credit-related revenues as volumes decreased while asset values declined.

- Investment Banking net revenues were $211 million for the quarter ended August 31, 2007 down 9% from $232 million for the year-ago third quarter. Merger and acquisition advisory fees increased as a number of announced transactions were completed during the quarter. Total underwriting net revenues were flat as increased equity underwriting revenues were offset by lower fixed income underwriting revenues. Merchant Banking revenues decreased during the quarter due to changes in mark-to-market values of several portfolio companies.

## GLOBAL CLEARING SERVICES

Net revenues for Global Clearing Services were a record $332 million for the quarter ended August 31, 2007, up 30% from $255 million for the third quarter of 2006. Higher average customer margin debt and average customer short balances resulted in increased net interest revenues. Average customer margin debt balances were $102.2 billion during the quarter ended August 31, 2007, up 49% from $68.8 billion in the comparable quarter of fiscal 2006. Customer short balances averaged $102.2 billion for the third quarter of 2007, compared with $82.1 billion for the third quarter of 2006.

## WEALTH MANAGEMENT

Wealth Management net revenues for the quarter ended August 31, 2007 were a negative $38 million compared with $233 million for the quarter ended August 31, 2006.

- Private Client Services net revenues were $148 million in the third quarter of 2007, up 15% from $128 million in the prior-year quarter. Increased client activity levels driven by market volatility and the continued growth in fee-based assets drove the increase in net revenues for the 2007 third quarter.

- Asset Management net revenues were a negative $186 million for the third quarter of 2007compared with $105 million in the prior-year quarter. Included in the quarter's results is a loss of approximately $200 million relating to the BSAM High-Grade hedge funds. The negative impact included the reversal of accrued performance fees, the write down of hedge fund investments and receivables, and lower management fees related to proprietary hedge fund products. Assets under management increased 15% to $57.8 billion at quarter end, up from $50.2 billion at August 31, 2006.

Exhibit 28

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) December 20, 2007

THE BEAR STEARNS COMPANIES INC.
--------------------------------
(Exact Name of Registrant as Specified in its Charter)

| DELAWARE | File No. 1-8989 | 13-3286161 |
|----------|-----------------|------------|
| -------- | --------------- | ---------- |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

383 Madison Avenue, New York, New York 10179
---------------------------------------------
(Address of Principal Executive Offices) (Zip Code)

Registrant's telephone number, including area code: (212) 272-2000
                                                     --------------

Not Applicable
--------------
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of
the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR
230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange
Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
Act (17 CFR 240.13e-4(c))

Item 2.02.  Results of Operations and Financial Condition.
            ----------------------------------------------

On December 20, 2007, The Bear Stearns Companies Inc. (the "Registrant") issued
a press release announcing financial results for its quarter ended and fiscal
year ended November 30, 2007.

Item 8.01.  Other Events.
            -------------

An update on the Company's collateralized debt obligations (or "CDO's") and
subprime related exposures is filed herewith as Exhibit 99.1 and incorporated
herein by reference.

The Board of Directors of the Registrant declared a regular quarterly cash
dividend of 32 cents per share on the outstanding shares of common stock payable
January 25, 2008 to stockholders of record on January 15, 2008. Also, the Board
of Directors of the Registrant declared regular quarterly cash dividends on the
outstanding shares of Preferred Stock, Series E, F & G, all payable January 15,
2008 to stockholders of record on December 31, 2007.

A copy of the press release is filed as Exhibit 99.2 to this Form 8-K and by
this reference incorporated herein and made a part hereof.

This information shall be considered "filed" for purposes of the Securities
Exchange Act of 1934, as amended.

Item 9.01.  Financial Statements and Exhibits.
            ----------------------------------

(c)   Exhibits

    (99.1)     Risk Exposure Chart

    (99.2)     Press Release, dated December 20, 2007.


               Signature


Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

             THE BEAR STEARNS COMPANIES INC.


                By:  /s/ Jeffrey M. Farber
                   --------------------------------
                   Jeffrey M. Farber
                   Senior Vice President - Finance
                   and Controller
                   (Principal Accounting Officer)


Dated:   December 21, 2007


           THE BEAR STEARNS COMPANIES INC.

                FORM 8-K

              CURRENT REPORT

               EXHIBIT INDEX
               -------------

Exhibit No.          Description
-----------          -----------

(99.1)               Risk Exposure Chart

(99.2)               Press Release, dated December 20, 2007.

Risk Exposures
($ in millions)

| | November 30, 2007 | November 9, 2007 | August 31, 2007 |
|---|---|---|---|
| AAA - Super Senior Exposure | | | |
| High-Grade Collateral | 167 | 169 | 166 |
| Mezz Collateral | 597 | 704 | 778 |
| CDO((2)) Collateral | 1 | 1 | 19 |
| Subtotal: AAA - Super Senior Exposure | 765 | 874 | 963 |
| Below-AAA Exposure | (10) | 10 | 165 |
| Total: ABS CDO Exposure | 755 | 884 | 1,128 |
| CDO Warehouse | - | - | 944 |
| Total: ABS CDO-Related Exposures | 755 | 884 | 2,072 |
| US Subprime Mortgage Exposure | | | |
| Subprime Whole Loans | 496 | 530 | 1,272 |
| IG Subprime Securities | 1,062 | 1,236 | 1,245 |
| Non-IG Subprime Securities | 211 | 73 | 313 |
| ABS CDS | (2,351) | (1,891) | (1,711) |
| Total: US Subprime Mortgage Exposure | (582) | (52) | 1,119 |

Source: BEAR STEARNS COMPANI, 8-K, December 21, 2007

[LETTERHEAD OF BEAR STEARNS]

Contact:    Elizabeth Ventura (212) 272-9251
            John Quinn      (212) 272-5934

                    BEAR STEARNS REPORTS FULL YEAR

                 AND FOURTH QUARTER 2007 FINANCIAL RESULTS

         Record Year in Institutional Equities, Global Clearing Services and Private
                              Client Services

          Fourth quarter loss reflects net mortgage-related write downs of $1.9 billion

NEW YORK, NY - December 20, 2007 - The Bear Stearns Companies Inc. (NYSE:BSC)
reported results today for the fiscal year and the fourth quarter ended November
30, 2007. For the fiscal year the company reported $1.52 earnings per share
(diluted), compared with $14.27 for fiscal 2006. Net income for the fiscal year
was $233 million compared with $2.1 billion earned in fiscal year ended November
30, 2006. Net revenues for the 2007 fiscal year were $5.9 billion, compared with
$9.2 billion in the prior fiscal year. The after-tax return on common
stockholders' equity was 1.8% for fiscal 2007.

In early November the company announced that it anticipated write-downs of
approximately $1.2 billion in mortgage inventory net of hedges. At November 30,
total net inventory write-downs were $1.9 billion. These write-downs served to
reduce fourth quarter earnings per share (diluted) by $8.21. Including these
write-downs the company reported a loss for the fourth quarter ended November
30, 2007 of $6.90 per share(1). For the comparable fourth quarter of 2006, the
company reported earnings per share (diluted) of $4.00. The net loss for the
fourth quarter of 2007 was

----------
(1) Due to the net loss in the fourth quarter of 2007, unvested units and stock
options from stock compensation awards were not included in the computation of
diluted net loss per share because to do so would have been antidilutive. The
full year diluted earnings per share computation includes the dilutive effect of
weighted average CAP plan and restricted stock units, together with the dilutive
effect of stock options. The exclusion of such unvested units and stock options
in the fourth quarter increased the computation of loss per share by $.62 per
share.




$854 million as compared with net income of $563 million for the fourth quarter
of 2006. Net revenues for the 2007 fourth quarter were a loss of $379 million
down from revenues of $2.4 billion for the 2006 fourth quarter.

"We are obviously upset with our 2007 results, particularly in light of the fact
that weakness in fixed income more than offset strong and, in some areas,
record-setting performance in other businesses," said James E. Cayne, chairman
and chief executive officer. "Our underlying fixed income franchise remains
strong and we have taken steps to size the division to market conditions. We are
taking appropriate measures to position Bear Stearns for renewed profitability
in 2008 by focusing our resources on the businesses with growth potential in the
current environment, while streamlining our operations in areas with lower
expected activity levels. We are confident that these efforts will ensure Bear
Stearns remains a strong and profitable competitor in the global marketplace in
the years to come."

"When Bear Stearns became a public company, consistent with our entrepreneurial
roots and to ensure alignment of interests between management and shareholders,
we designed our executive compensation programs to pay for performance. In a
year in which we produced unacceptable results, the plans are working as they
were designed -- and the members of the executive committee will not receive any
bonuses for 2007."

A brief discussion of the firm's business segments follows:

CAPITAL MARKETS

Fourth Quarter

Net revenues in Capital Markets, which includes Institutional Equities, Fixed
Income and Investment Banking, were a loss of $956 million in the fourth quarter
of 2007, down from net revenues of $1.9 billion in the fourth quarter ended
November 30, 2006.

o       Institutional Equities net revenues were $384 million, down 11% from $430
        million in the fourth quarter of 2006. Record results from international
        equity sales and trading and

                                      2

Exhibit 29

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

———————

FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): March 24, 2008
                                                   ——————————————

THE BEAR STEARNS COMPANIES INC.
————————————————————————————————
(Exact name of registrant as specified in its charter)

DELAWARE              File No. 1-8989          13-3286161
————————              ——————————————          ——————————

(State or other      (Commission File Number)   (IRS Employer
jurisdiction of                                  Identification
incorporation)                                     Number)

383 Madison Avenue, New York, New York    10179
————————————————————————————————————————————————
(Address of principal executive offices) (zip code)

Registrant's telephone number, including area code: (212) 272-2000
                                                     ——————————————

Not Applicable
————————————————————————————————————————————————————————
(Former name or former address, if changed since last report)

     Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

|X| Written communications pursuant to Rule 425 under the Securities Act (17 CFR
230.425)

|_| Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)

|_| Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange
Act (17 CFR 240.14d-2(b))

|_| Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
Act (17 CFR 240.13e-4(c))


Item 1.01.   Entry into a Material Definitive Agreement.

Amendment to Agreement and Plan of Merger

     On March 24, 2008, JPMorgan Chase & Co. ("JPMorgan Chase") and The Bear
Stearns Companies Inc. ("Bear Stearns") entered into an Amendment No. 1 (the
"Amendment") to the Agreement and Plan of Merger, dated as of March 16, 2008, by
and between JPMorgan Chase and Bear Stearns (as amended, the "Merger
Agreement"). Under the revised terms, each share of Bear Stearns common stock
will be exchanged for 0.21753 of a share of JPMorgan Chase common stock.
Pursuant to the Amendment, Bear Stearns and JPMorgan Chase agreed to terminate
and revoke in all respects the Stock Option Agreement, filed as Exhibit 99.2 to
Bear Stearns' Current Report on Form 8-K dated March 20, 2008. The foregoing
description of the Amendment does not purport to be complete and is qualified in
its entirety by reference to the Amendment, which is filed as Exhibit 2.1
hereto, and incorporated into this report by reference.


Share Exchange Agreement

     On March 24, 2008, JPMorgan Chase and Bear Stearns, in connection with
entering into the Amendment, entered into a Share Exchange Agreement, under
which JPMorgan Chase will purchase 95 million newly issued shares of Bear
Stearns common stock, or 39.5% of the outstanding Bear Stearns common stock
after giving effect to the issuance, in exchange for the issuance of 20,665,350
shares of JPMorgan Chase common stock to Bear Stearns and the entry by JPMorgan
Chase into the Amended and Restated Guaranty Agreement and the Fed Guaranty
Agreement (each as described below). While the rules of the New York Stock
Exchange (the "NYSE") generally require shareholder approval prior to the
issuance of securities constituting 20% or more of the outstanding shares of a
listed company, the NYSE's Shareholder Approval Policy provides an exception in
cases where the delay involved in securing shareholder approval for the issuance
would seriously jeopardize the financial viability of the listed company. In
accordance with the NYSE's rule providing that exception, the Audit Committee of

Bear Stearns' Board of Directors has approved the Amendment and the full Board of Directors has unanimously concurred with, Bear Stearns's use of the exception. The foregoing description of the Share Exchange Agreement does not purport to be complete and is qualified in its entirety by reference to the Share Exchange Agreement, which is filed as Exhibit 2.2 hereto, and is incorporated into this report by reference.

Amended and Restated Guaranty Agreement

    On March 24, 2008, JPMorgan Chase, in connection with the Amendment, entered into an Amended and Restated Guaranty Agreement (the "Guaranty"), effective retroactively from March 16, 2008, which replaces the Guaranty Agreement entered into on March 16, 2008 in connection with the Merger Agreement. The Guaranty is filed as Exhibit 99.1 hereto, and is incorporated into this report by reference.

Guarantee and Collateral Agreement

    On March 24, 2008, JPMorgan Chase, in connection with the Amendment and the Guaranty, entered into a Guarantee and Collateral Agreement (the "Collateral Agreement") with Bear Stearns and certain of its subsidiaries, pursuant to which the parties agree to guarantee their obligations to repay JPMorgan Chase for amounts loaned or amounts paid under the Guaranty and the Fed Guaranty and to provide collateral for such obligations. The foregoing description of the Collateral Agreement does not purport to be complete and is qualified in its entirety by reference to the Collateral Agreement, which we intend to file at a later date.

Fed Guaranty Agreement

    On March 23, 2008, JPMorgan Chase, in connection with the Amendment, entered into a guarantee (the "Fed Guaranty") in favor of the Federal Reserve Bank of New York (the "New York Fed"). The Fed Guaranty is filed as Exhibit 99.2 hereto, and is incorporated into this report by reference.

Item 8.01.   Other Events.

    On March 24, 2008, Bear Stearns and JPMorgan Chase issued a joint press release announcing that they had entered into the Amendment. A copy of the press release is attached hereto as Exhibit 99.3, and is incorporated into this report by reference.

Forward Looking Statements

Certain statements contained in this report are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from those discussed in the forward-looking statements. The following factors, among others, could cause actual results to differ from those set forth in the forward-looking statements: the ability to obtain governmental and self-regulatory organization approvals of the merger on the proposed terms and schedule and any changes to regulatory agencies' outlook on, responses to and actions and commitments taken in connection with the merger and the agreements and arrangements related thereto. For a discussion of the additional risks and uncertainties that may affect Bear Stearns' future results, please see "Risk Factors" in Bear Stearns' Annual Report on Form 10-K for the year ended November 30, 2007, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Management" filed as Exhibit 13 to Bear Stearns' Annual Report on Form 10-K for the year ended November 30, 2007 and similar sections of Bear Stearns' quarterly reports on Form 10-Q, which have been filed with the Securities and Exchange Commission ("SEC").

Additional Information

In connection with the proposed merger, JPMorgan Chase will file with the SEC a Registration Statement on Form S-4 that will include a proxy statement of Bear Stearns that also constitutes a prospectus of JPMorgan Chase. Bear Stearns will mail the proxy statement/prospectus to its stockholders. JPMorgan Chase and Bear Stearns urge investors and security holders to read the proxy statement/prospectus regarding the proposed merger when it becomes available because it will contain important information. You may obtain these documents, free of charge, from Bear Stearns' website (www.bearstearns.com) under the heading "Investor Relations" and then under the tab "SEC Filings." You may also obtain these documents, free of charge, from JPMorgan Chase's website (www.jpmorganchase.com) under the tab "Investor Relations" and then under the heading "Financial Information" then under the item "SEC Filings". You may also obtain copies of all documents filed with the SEC regarding this transaction, free of charge, at the SEC's website (www.sec.gov).

Participants in the Solicitation

Bear Stearns, JPMorgan Chase and their respective directors, executive officers and certain other members of management and employees may be soliciting proxies from Bear Stearns stockholders in favor of the merger. Information regarding the persons who may, under the rules

of the SEC, be deemed participants in the solicitation of the Bear Stearns
stockholders in connection with the proposed merger will be set forth in the
proxy statement/prospectus when it is filed with the SEC. You can find
information about Bear Stearns' executive officers and directors in its
definitive proxy statement filed with the SEC on March 27, 2007. You can find
information about JPMorgan Chase's executive officers and directors in its
definitive proxy statement filed with the SEC on March 30, 2007. You can obtain
free copies of these documents from JPMorgan Chase and Bear Stearns as set forth
above.

Item 9.01.   Financial Statements and Exhibits

(d)   Exhibits

Exhibit No.                    Description
-----------                    -----------

   2.1     Amendment No. 1, dated as of March 24, 2008, to the Agreement and
           Plan of Merger, dated as of March 16, 2008, by and between JPMorgan
           Chase & Co. and The Bear Stearns Companies Inc.

   2.2     Share Exchange Agreement, dated as of March 24, 2008, by and between
           JPMorgan Chase & Co. and The Bear Stearns Companies Inc.

  99.1     Amended and Restated Guaranty Agreement, executed March 24, 2008 and
           effective as of March 16, 2008

  99.2     Fed Guaranty, dated March 23, 2008

  99.3     Press Release, dated March 24, 2008


                              SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.


                    THE BEAR STEARNS COMPANIES INC.


                    By:   /s/ Samuel Molinaro Jr.
                          ---------------------------------------
                          Samuel Molinaro Jr.
                          Executive Vice President, Chief Financial
                          Officer and Chief Operating Officer
                          (Principal Financial Officer)

Dated: March 24, 2008


                    THE BEAR STEARNS COMPANIES INC.

                              FORM 8-K

                           CURRENT REPORT

                           EXHIBIT INDEX

                           -------------

Exhibit No.                    Description
-----------                    -----------

   2.1     Amendment No. 1, dated as of March 24, 2008, to the Agreement and
           Plan of Merger, dated as of March 16, 2008, by and between JPMorgan
           Chase & Co. and The Bear Stearns Companies Inc.

   2.2     Share Exchange Agreement, dated as of March 24, 2008, by and between
           JPMorgan Chase & Co. and The Bear Stearns Companies Inc.

  99.1     Amended and Restated Guaranty Agreement, executed March 24, 2008 and
           effective as of March 16, 2008

  99.2     Fed Guaranty, dated March 24, 2008

  99.3     Press Release, dated March 24, 2008

Source: BEAR STEARNS COMPANI, 8-K, March 24, 2008

JPMorgan Chase and Bear Stearns Announce Amended Merger

Agreement and Agreement for JPMorgan Chase to Purchase 39.5% of Bear Stearns

NEW YORK--(BUSINESS WIRE)--March 24, 2008 JPMorgan Chase & Co. (NYSE: JPM) and
The Bear Stearns Companies Inc. (NYSE: BSC) announced an amended merger
agreement regarding JPMorgan Chase's acquisition of Bear Stearns.

Under the revised terms, each share of Bear Stearns common stock would be
exchanged for 0.21753 shares of JPMorgan Chase common stock (up from 0.05473
shares), reflecting an implied value of approximately $10 per share of Bear
Stearns common stock based on the closing price of JPMorgan Chase common stock
on the New York Stock Exchange on March 20, 2008.

In addition, JPMorgan Chase and Bear Stearns entered into a share purchase
agreement under which JPMorgan Chase will purchase 95 million newly issued
shares of Bear Stearns common stock, or 39.5% of the outstanding Bear Stearns
common stock after giving effect to the issuance, at the same price as provided
in the amended merger agreement. As discussed below, the purchase of the 95
million shares is expected to be completed on or about April 8, 2008.

The Boards of Directors of both companies have approved the amended agreement
and the purchase agreement. All of the members of the Bear Stearns Board of
Directors have indicated that they intend to vote their shares held as of the
record date in favor of the merger.

The JPMorgan Chase guaranty of Bear Stearns' trading obligations has also been
significantly clarified and expanded. For more information, the guaranty
agreement will be filed publicly and the parties will provide a Question and
Answer document describing the guaranty in further detail on their respective
websites. JPMorgan Chase has also agreed to guarantee Bear Stearns' borrowings
from the Federal Reserve Bank of New York.

The Federal Reserve Bank of New York's $30 billion special financing associated
with the transaction has also been amended so that JPMorgan Chase will bear the
first $1 billion of any losses associated with the Bear Stearns assets being
financed and the Fed will fund the remaining $29 billion on a non-recourse basis
to JPMorgan Chase.

"We believe the amended terms are fair to all sides and reflect the value and
risks of the Bear Stearns franchise," said Jamie Dimon, Chairman and Chief
Executive Officer of JPMorgan Chase, "and bring more certainty for our
respective shareholders, clients, and the marketplace. We look forward to a
prompt closing and being able to operate as one company."

"Our Board of Directors believes that the amended terms provide both
significantly greater value to our shareholders, many of whom are Bear Stearns
employees, and enhanced coverage and certainty for our customers,
counterparties, and lenders," said Alan Schwartz, President and Chief Executive
Officer of Bear Stearns. "The substantial share issuance to JPMorgan Chase was a
necessary condition to obtain the full set of amended terms, which in turn, were
essential to maintaining Bear Stearns' financial stability."

While the rules of the New York Stock Exchange (NYSE) generally require
shareholder approval prior to the issuance of securities that are convertible
into more than 20% of the outstanding shares of a listed company, the NYSE's
Shareholder Approval Policy provides an exception in cases where the delay
involved in securing shareholder approval for the issuance would seriously
jeopardize the financial viability of the listed company. In accordance with the
NYSE rule providing that exception, the Audit Committee of Bear Stearns' Board
of Directors has expressly approved, and the full Board of Directors has
unanimously concurred with, Bear Stearns' intended use of the exception. The
closing of the sale of the 95 million shares is expected to be completed upon
the conclusion of a shareholder notice period required by the NYSE, which is
expected to occur on or about April 8, 2008.

JPMorgan Chase & Co. (NYSE: JPM) is a leading global financial services firm
with assets of $1.6 trillion and operations in more than 60 countries. The firm
is a leader in investment banking, financial services for consumers, small
business and commercial banking, financial transaction processing, asset
management, and private equity. A component of the Dow Jones Industrial Average,
JPMorgan Chase serves millions of consumers in the United States and many of the
world's most prominent corporate, institutional and government clients under its
JPMorgan and Chase brands. Information about the firm is available at
www.jpmorganchase.com.

The Bear Stearns Companies Inc. (NYSE: BSC) serves governments, corporations,
institutions and individuals worldwide. The company's core business lines
include institutional equities, fixed income, investment banking, global
clearing services, asset management, and private client services. For additional
information about Bear Stearns, please visit the firm's website at
www.bearstearns.com.

This press release contains forward-looking statements within the meaning of the
Private Securities Litigation Reform Act of 1995. Such statements include, but
are not limited to, statements about the benefits of the merger between J.P.
Morgan Chase & Co. and The Bear Stearns Companies Inc., including future

expectations and intentions and other statements that are not historical facts. Such statements are based upon the current beliefs and expectations of J.P. Morgan Chase's management and are subject to significant risks and uncertainties. Actual results may differ from those set forth in the forward-looking statements.

The following factors, among others, could cause actual results to differ from those set forth in the forward-looking statements: the ability to obtain governmental and self-regulatory organization approvals of the merger on the proposed terms and schedule, and any changes to regulatory agencies' outlook on, responses to and actions and commitments taken in connection with the merger and the agreements and arrangements related thereto; the extent and duration of continued economic and market disruptions; adverse developments in the business and operations of Bear Stearns, including the loss of client, employee, counterparty and other business relationships; the failure of Bear Stearns stockholders to approve the merger; the risk that the businesses will not be integrated successfully; the risk that the cost savings and any other synergies from the merger may not be fully realized or may take longer to realize than expected; disruption from the merger making it more difficult to maintain business and operational relationships; increased competition and its effect on pricing, spending, third-party relationships and revenues; the risk of new and changing regulation in the U.S. and internationally and the exposure to litigation and/or regulatory actions. Additional factors that could cause JPMorgan Chase's results to differ materially from those described in the forward-looking statements can be found in the firm's Annual Report on Form 10-K for the year ended December 31, 2007, filed with the Securities and Exchange Commission and available at the Securities and Exchange Commission's Internet site (http://www.sec.gov).

Additional Information

In connection with the proposed merger, J.P. Morgan Chase & Co. will file with the SEC a Registration Statement on Form S-4 that will include a proxy statement of Bear Stearns that also constitutes a prospectus of J.P. Morgan Chase & Co. Bear Stearns will mail the proxy statement/prospectus to its stockholders. J.P. Morgan Chase & Co. and Bear Stearns urge investors and security holders to read the proxy statement/prospectus regarding the proposed merger when it becomes available because it will contain important information. You may obtain copies of all documents filed with the SEC regarding this transaction, free of charge, at the SEC's website (www.sec.gov). You may also obtain these documents, free of charge, from JPMorgan Chase & Co.'s website (www.jpmorganchase.com) under the tab "Investor Relations" and then under the heading "Financial Information" then under the item "SEC Filings." You may also obtain these documents, free of charge, from Bear Stearns's website (www.bearstearns.com) under the heading "Investor Relations" and then under the tab "SEC Filings."

JPMorgan Chase, Bear Stearns and their respective directors, executive officers and certain other members of management and employees may be soliciting proxies from Bear Stearns stockholders in favor of the merger. Information regarding the persons who may, under the rules of the SEC, be deemed participants in the solicitation of the Bear Stearns stockholders in connection with the proposed merger will be set forth in the proxy statement/prospectus when it is filed with the SEC. You can find information about JPMorgan Chase's executive officers and directors in its definitive proxy statement filed with the SEC on March 30, 2007. You can find information about Bear Stearns's executive officers and directors in definitive proxy statement filed with the SEC on March 27, 2007. You can obtain free copies of these documents from JPMorgan Chase and Bear Stearns using the contact information above.

CONTACT: Investors: JPMorgan Chase Julia Bates, 212-270-7318 or Bear Stearns Elizabeth Ventura, 212-272-9251 or Media: JPMorgan Chase Kristin Lemkau, 212-270-7454 Joseph Evangelisti, 212-270-7438 or Bear Stearns Russell Sherman, 212-272-5219

---

Created by 10KWizard    www.10KWizard.com

Exhibit 30

Web  Images  Maps  News  Shopping  Gmail  more ▼

Get quotes     Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices  « Back to overview

**BEAR STEARNS COS INC**(NYSE:BSC) - **Daily** | Weekly

Jan 1, 2007   - Jan 31, 2007     Update      Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-Jan-07 | 162.92 | 165.47 | 161.60 | 164.85 | 1,308,800 |
| 30-Jan-07 | 162.85 | 164.20 | 161.34 | 162.80 | 1,230,900 |
| 29-Jan-07 | 164.61 | 164.77 | 161.76 | 162.05 | 1,545,000 |
| 26-Jan-07 | 165.32 | 165.39 | 162.10 | 164.07 | 1,451,000 |
| 25-Jan-07 | 169.85 | 169.93 | 163.90 | 164.72 | 1,889,300 |
| 24-Jan-07 | 166.70 | 170.00 | 166.70 | 169.85 | 1,021,100 |
| 23-Jan-07 | 168.60 | 169.35 | 166.04 | 166.50 | 1,800,900 |
| 22-Jan-07 | 170.50 | 171.00 | 168.23 | 169.21 | 1.256,000 |
| 19-Jan-07 | 169.70 | 170.75 | 169.00 | 169.91 | 955,200 |
| 18-Jan-07 | 171.70 | 172.61 | 168.61 | 169.23 | 1,347,900 |
| 17-Jan-07 | 170.10 | 172.30 | 169.64 | 171.22 | 1,202.300 |
| 16-Jan-07 | 171.10 | 171.50 | 169.75 | 170.62 | 1,162,200 |
| 12-Jan-07 | 170.00 | 171.66 | 169.23 | 171.51 | 1,506,200 |
| 11-Jan-07 | 168.80 | 171.08 | 167.17 | 170.65 | 1,660,500 |
| 10-Jan-07 | 164.44 | 169.03 | 163.88 | 168.68 | 2,089,000 |
| 9-Jan-07 | 165.25 | 166.09 | 163.99 | 165.25 | 1,212,000 |
| 8-Jan-07 | 161.02 | 165.25 | 161.02 | 164.99 | 1,241,200 |
| 5-Jan-07 | 162.32 | 162.68 | 161.55 | 162.32 | 1,368,800 |
| 4-Jan-07 | 162.66 | 162.75 | 160.91 | 162.64 | 981,200 |
| 3-Jan-07 | 163.00 | 163.70 | 161.00 | 162.83 | 1,827,500 |

International Google Finance:   Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▼

Get quotes     Stock screener **New!**

e.g. CSCO* or "Google

# Historical prices   « Back to overview

## BEAR STEARNS COS INC(NYSE:BSC) - **Daily** | Weekly

Jun 1, 2007   - Jun 30, 2007     Update     Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 29-Jun-07 | 144.51 | 144.51 | 138.09 | 140.00 | 6,077,100 |
| 28-Jun-07 | 143.31 | 145.79 | 142.00 | 144.00 | 3,437,600 |
| 27-Jun-07 | 138.20 | 144.15 | 138.15 | 143.31 | 5,830,500 |
| 26-Jun-07 | 139.72 | 140.88 | 137.00 | 139.35 | 7,404,000 |
| 25-Jun-07 | 143.07 | 143.25 | 136.13 | 139.10 | 10,516,700 |
| 22-Jun-07 | 143.75 | 145.58 | 142.40 | 143.75 | 8,288,800 |
| 21-Jun-07 | 143.02 | 146.28 | 140.44 | 145.81 | 5,599,800 |
| 20-Jun-07 | 146.09 | 146.73 | 142.89 | 143.20 | 4,491,300 |
| 19-Jun-07 | 146.80 | 148.09 | 145.85 | 146.79 | 3,083,800 |
| 18-Jun-07 | 150.08 | 150.59 | 145.81 | 147.95 | 3,337,300 |
| 15-Jun-07 | 151.00 | 152.95 | 148.47 | 150.09 | 3,979,800 |
| 14-Jun-07 | 146.30 | 150.40 | 146.07 | 149.60 | 6,309,000 |
| 13-Jun-07 | 147.15 | 149.58 | 146.16 | 149.49 | 3,006,100 |
| 12-Jun-07 | 147.15 | 149.28 | 145.60 | 146.00 | 4,050,900 |
| 11-Jun-07 | 147.81 | 149.40 | 146.66 | 148.39 | 1,828,100 |
| 8-Jun-07 | 144.50 | 147.90 | 144.00 | 147.81 | 2,014,300 |
| 7-Jun-07 | 147.50 | 149.50 | 144.22 | 144.40 | 2,820,600 |
| 6-Jun-07 | 148.63 | 149.00 | 147.30 | 148.71 | 1,578,500 |
| 5-Jun-07 | 151.00 | 152.00 | 149.21 | 149.66 | 2,132,600 |
| 4-Jun-07 | 153.17 | 153.50 | 150.83 | 152.16 | 1,941,100 |
| 1-Jun-07 | 150.85 | 153.95 | 149.38 | 153.50 | 2,769,100 |
| 31-May-07 | 151.00 | 153.68 | 149.96 | 149.96 | 1,691,100 |

International Google Finance:   Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▼

Get quotes   Stock screener New!

e.g. CSCO* or "Google"

## Historical prices « Back to overview

### BEAR STEARNS COS INC(NYSE:BSC) - **Daily** | Weekly

Oct 1, 2007   - Oct 31, 2007   | Update |   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|------|-------|--------|
| 31-Oct-07 | 113.18 | 115.58 | 111.15 | 113.60 | 5,171,700 |
| 30-Oct-07 | 113.82 | 114.92 | 112.11 | 112.77 | 2,810,800 |
| 29-Oct-07 | 115.85 | 115.90 | 113.46 | 114.54 | 2,331,700 |
| 26-Oct-07 | 114.50 | 117.00 | 111.69 | 116.21 | 3,576,200 |
| 25-Oct-07 | 112.32 | 114.93 | 109.60 | 111.05 | 4,816,500 |
| 24-Oct-07 | 115.00 | 116.45 | 110.02 | 113.54 | 6,943,700 |
| 23-Oct-07 | 119.20 | 119.50 | 115.03 | 116.16 | 3,571,100 |
| 22-Oct-07 | 115.75 | 118.88 | 114.58 | 117.85 | 4,797,700 |
| 19-Oct-07 | 118.44 | 121.18 | 116.09 | 116.41 | 7,492,900 |
| 18-Oct-07 | 117.85 | 120.53 | 117.06 | 119.34 | 3,506,100 |
| 17-Oct-07 | 122.65 | 123.87 | 117.80 | 120.41 | 5,476,000 |
| 16-Oct-07 | 123.49 | 126.44 | 120.20 | 123.05 | 6,698,000 |
| 15-Oct-07 | 122.77 | 123.16 | 119.20 | 120.69 | 3,536,100 |
| 12-Oct-07 | 123.75 | 125.38 | 121.87 | 123.16 | 2,891,500 |
| 11-Oct-07 | 126.87 | 126.87 | 121.51 | 124.14 | 5,703,800 |
| 10-Oct-07 | 127.27 | 127.42 | 124.16 | 125.81 | 3,295,800 |
| 9-Oct-07 | 127.49 | 128.43 | 124.64 | 127.46 | 3,508,400 |
| 8-Oct-07 | 129.30 | 129.40 | 125.83 | 126.64 | 3,879,800 |
| 5-Oct-07 | 126.94 | 133.20 | 125.73 | 131.58 | 6,717,000 |
| 4-Oct-07 | 128.35 | 128.76 | 126.10 | 127.61 | 3,475,700 |
| 3-Oct-07 | 128.90 | 129.23 | 126.29 | 128.28 | 3,691,500 |
| 2-Oct-07 | 125.97 | 129.14 | 125.97 | 128.57 | 3,753,500 |
| 1-Oct-07 | 122.25 | 127.19 | 122.03 | 125.50 | 4,155,400 |

International Google Finance:   Canada - UK - China

Information is provided as is and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▼

| Get quotes |   Stock screener New!

e.g. CSCO" or "Google"

# Historical prices   « Back to overview

**BEAR STEARNS COS INC**(NYSE:BSC) - Daily | Weekly

Mar 1, 2008    - Mar 31, 2008    | Update |   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-Mar-08 | 10.62 | 10.68 | 10.29 | 10.49 | 9,584,700 |
| 28-Mar-08 | 10.85 | 10.90 | 10.62 | 10.78 | 10,922,000 |
| 27-Mar-08 | 11.40 | 11.65 | 10.94 | 11.23 | 11,345,800 |
| 26-Mar-08 | 10.67 | 12.00 | 10.55 | 11.21 | 25,574,600 |
| 25-Mar-08 | 11.42 | 11.47 | 10.51 | 10.94 | 48,917,200 |
| 24-Mar-08 | 9.92 | 13.85 | 9.80 | 11.25 | 136,126,300 |
| 20-Mar-08 | 5.44 | 6.39 | 5.01 | 5.96 | 48,512,100 |
| 19-Mar-08 | 6.83 | 7.10 | 4.90 | 5.33 | 76,895,200 |
| 18-Mar-08 | 5.50 | 8.50 | 5.01 | 5.91 | 166,729,900 |
| 17-Mar-08 | 3.17 | 5.50 | 2.84 | 4.81 | 166,545,600 |
| 14-Mar-08 | 54.24 | 54.79 | 26.85 | 30.00 | 186,986,900 |
| 13-Mar-08 | 57.64 | 58.60 | 50.48 | 57.00 | 70,720,800 |
| 12-Mar-08 | 65.50 | 67.82 | 61.35 | 61.58 | 26,803,300 |
| 11-Mar-08 | 68.02 | 68.24 | 55.42 | 62.97 | 54,966,600 |
| 10-Mar-08 | 70.28 | 70.59 | 60.26 | 62.30 | 32,465,300 |
| 7-Mar-08 | 68.71 | 73.00 | 68.30 | 70.08 | 8,034,400 |
| 6-Mar-08 | 75.21 | 76.59 | 69.88 | 69.90 | 9,757,600 |
| 5-Mar-08 | 77.75 | 79.31 | 75.03 | 75.78 | 6,809,100 |
| 4-Mar-08 | 76.76 | 78.03 | 74.69 | 77.17 | 5,282,100 |
| 3-Mar-08 | 79.62 | 79.89 | 76.62 | 77.32 | 5,408,800 |
| 29-Feb-08 | 82.70 | 83.56 | 78.80 | 79.86 | 5,544,300 |

International Google Finance:   Canada - UK - China

Information is provided "as is" and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Exhibit 31

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of report (Date of earliest event reported): November 1, 2007**

---

# Radian Group Inc.
**(Exact name of registrant as specified in its charter)**

---

**Delaware**
**(State or other jurisdiction of incorporation)**

| | |
|---|---|
| **1-11356** | **23-2691170** |
| **(Commission File Number)** | **(IRS Employer Identification No.)** |

| | |
|---|---|
| **1601 Market Street, Philadelphia, Pennsylvania** | **19103** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(215) 231 - 1000**
**(Registrant's telephone number, including area code)**

---

**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.**    **Results of Operations and Financial Condition.**

On November 1, 2007, Radian Group Inc. (the "Company") issued a news release announcing its financial results for the quarter ended September 30, 2007 and posted to its website the presentation slides to be referenced during the Company's third quarter investor call, which will take place at 10 am (Eastern) on November 1, 2007. A copy of the news release and presentation slides are furnished as Exhibits 99.1 and 99.2, respectively, to this report and are incorporated into this Item 2.02 as if fully set forth herein.

The information included in, or furnished with, this report shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933 or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

**Item 9.01.**    **Financial Statements and Exhibits.**

(d)    *Exhibits.*

99.1*    Radian Group Inc. News Release dated November 1, 2007.

99.2*    Presentation Slides for November 1, 2007 Investor Call.

\*    Furnished herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**RADIAN GROUP INC.**

Date: November 1, 2007

By:    /s/ Edward J. Hoffman
      Edward J. Hoffman
      Vice President, Securities Counsel

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 99.1* | Radian Group Inc. News Release dated November 1, 2007. |
| 99.2* | Presentation Slides for November 1, 2007 Investor Call. |

\*  Furnished herewith.

Source: RADIAN GROUP INC, 8-K, November 01, 2007

Radian Group Inc.    **RADIAN**

1601 Market Street
Philadelphia, Pennsylvania
19103-2337
800 523.1988
215 564.6600

**News Release**

Contact:
For investors:    Mona Zeehandelaar – phone: 215 231.1674
                 email: mona.zeehandelaar@radian.biz

For the media:   Steve Frankel / Tim Lynch
                 Joele Frank, Wilkinson Brimmer Katcher
                 212 355.4449

Radian Reports Third Quarter Net Loss of $704 Million

**Strong Capital Position and Balance Sheet**

**PHILADELPHIA, November 1, 2007**—Radian Group Inc. (NYSE: RDN) today reported a net loss of $704 million and a diluted net loss per share of $8.78 for the third quarter ended September 30, 2007.

"The third quarter's results were disappointing but not unexpected given market conditions," said S.A. Ibrahim, Chief Executive Officer of Radian. "However, our book value is $42.86 per share and we are well positioned with our strong capital and liquidity position to weather the challenging credit cycle." Mr. Ibrahim added, "While mortgage insurance credit losses will continue to impact our results for the foreseeable future, I'm encouraged by the positive trends in mortgage insurance penetration and by the resiliency of our financial guaranty business."

Source: RADIAN GROUP INC, 8-K, November 01, 2007

**RADIAN**

Radian Group Inc.

1601 Market Street
Philadelphia, Pennsylvania
19103-2337
800523.1988
215 564.6600

The table below shows the significant components of the company's results for the third quarter:

($ in millions except per share amounts)

| | Total | Per Share |
|---|---|---|
| **6/30/2007 Book Value** | **$4.1B** | **$51.53** |

| | Pre-tax | After-tax impact | BV per share impact | EPS impact |
|---|---|---|---|---|
| C-BASS Impairment | (468)(1) | (304) | (3.78) | $(3.78) |
| NIMS mark-to-market | (366)(2) | (238) | (2.96) | (2.96) |
| Financial Guaranty mark-to-market | (256) | (166) | (2.06) | (2.06) |
| Second Lien premium deficiency | (155)(3) | (101) | (1.26) | (1.26) |
| FG Reserve for CDO of ABS transaction | (50) | (33) | (0.41) | (0.41) |
| Sherman Gain on Sale | 182 | 118 | 1.47 | 1.47 |
| All Other | — | 26 | 0.33 | 0.22 |

| | Total | Per Share |
|---|---|---|
| **9/30/2007 Book Value** | **$3.4B** | **$42.86** |

| | | EPS |
|---|---|---|
| **Quarter Ended 9/30/2007 EPS** | | **$(8.78)** |

(1)  Does not include possible write-down of between $0 and $50 million related to our loan to
     C-BASS.

(2)  Includes approximately $270 million of projected future principal credit losses.

(3)  Represents an acceleration of the present value of expected future losses (approximately $300 million as previously
     disclosed) and expenses less expected future premiums.

Radian will discuss each of these items in its conference call today, Thursday, November 1, 2007 at 10:00 a.m. Eastern time.
The conference call will be broadcast live over the internet at
http://www.ir.radian.biz/phoenix.zhtml?c=112301&p=irol-audioarchives or at http://www.radian.biz >News. The call may also
be accessed by calling 800-762-6568 inside the U.S., or 480-248-5088 for international callers, using passcode 891232 or by
referencing Radian.

Source: RADIAN GROUP INC, 8-K, November 01, 2007

Exhibit 32

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of report (Date of earliest event reported): February 15, 2008

# Radian Group Inc.
### (Exact name of registrant as specified in its charter)

**Delaware**
**(State or other jurisdiction of incorporation)**

| | |
|---|---|
| **1-11356** | **23-2691170** |
| **(Commission File Number)** | **(IRS Employer Identification No.)** |
| **1601 Market Street, Philadelphia, Pennsylvania** | **19103** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(215) 231-1000**
**(Registrant's telephone number, including area code)**

**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02. Results of Operations and Financial Condition.**

On February 15, 2008, Radian Group Inc. issued a news release announcing its financial results for the quarter and year ended December 31, 2007. A copy of this news release is furnished as Exhibit 99.1 to this report.

The information included in, or furnished with, this report shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933 or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

**Item 9.01. Financial Statements and Exhibits.**

(d)    *Exhibits.*

99.1*       Radian Group Inc. News Release dated February 15, 2008.

*  Furnished herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**RADIAN GROUP INC.**

Date: February 15, 2008                                           By:  /s/ C. Robert Quint
                                                                       C. Robert Quint
                                                                       Executive Vice President, Chief Financial Officer

Source: RADIAN GROUP INC, 8-K, February 15, 2008

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 99.1* | Radian Group Inc. News Release dated February 15, 2008. |

\* Furnished herewith.

Radian Group Inc.        **RADIAN**

1601 Market Street
Philadelphia, Pennsylvania
19103-2337
800 523.1988
215 564.6600

**News Release**

**Contact:**

For investors:        Terri Williams-Perry – phone: 215 231.1486
                      Email: terri.williams-perry@radian.biz

For the media:        Rick Gillespie – phone: 215 231.1061
                      Email: rick.gillespie@radian.biz

                      Steve Frankel / Tim Lynch
                      Joele Frank, Wilkinson Brimmer Katcher
                      212 355 4449

### Radian Reports Fourth Quarter Net Loss of $618 Million

#### Company Maintains Strong Capital Position

**PHILADELPHIA, February 15, 2008** - Radian Group Inc. (NYSE: RDN) today reported a net loss of $618 million and a diluted net loss per share of $7.74 for the fourth quarter, ended December 31, 2007. For the full year ended December 31, 2007, Radian reported a net loss of $1.2 billion and a diluted net loss per share of $14.92. Book value per share at December 31, 2007 was $35.10, after the impact of the third and fourth quarter 2007 losses, driven primarily by the C-BASS write-down, credit losses, higher reserves and mark-to-market adjustments.

"2007 was a year of great change for Radian, and I am proud that our team was able to overcome the challenges of unwinding the merger with MGIC while maintaining a solid balance sheet and retaining mortgage customer and GSE confidence," said S.A. Ibrahim, Chief Executive Officer of Radian. "While our disappointing 2007 results clearly illustrate the challenges of the mortgage market, our franchise continues to be strong, which is a testament to the skills and dedication of our workforce."

In the mortgage insurance business, paid claims in the fourth quarter were in-line with the Company's guidance. During the quarter, mortgage insurance loss reserves continued to



# RADIAN

1601 Market Street
Philadelphia, Pennsylvania
19103-2337
800 523.1988
215 564.6600

increase, reflecting the credit, housing and overall economic environment. Radian ended the year with $1.3 billion in mortgage insurance loss reserves.

"We have come through a difficult year and the environment continues to be very challenging," added Mr. Ibrahim. "These challenges will remain with us for the near-term and may intensify, so we are looking at various scenarios and responses. In considering the book value of our company, we think it is important to take into consideration the significant embedded value within our Financial Guaranty business, as well as our ownership stake in Sherman."

"Our claims paying resources in both business segments are strong and we stand to benefit from a stable and well-capitalized financial guaranty business," concluded Mr. Ibrahim.

The market value of Radian's investment portfolio at year-end was $6.41 billion compared to $5.75 billion a year ago.

The key financial highlights of the quarter and year ended December 31, 2007, are as follows:

| | Total | Per Share |
|---|---|---|
| **9/30/2007 Book Value** | **$  3.4B** | **$  42.86** |

| | Pre-tax | After-tax impact | BV per share impact | EPS impact |
|---|---|---|---|---|
| C-BASS | ($50) | ($33) | ($0.41) | ($0.41) |
| Change in Fair Value of Derivatives* | (459) | (298) | (3.71) | (3.73) |
| Mortgage Insurance Incurred Losses | (630) | (410) | (5.10) | (5.13) |
| Second Lien Premium Deficiency | (41) | (27) | (0.34) | (0.34) |



1601 Market Street
Philadelphia, Pennsylvania
19103-2337
800 523.1988
215 564.6600

| | | | | |
|---|---|---|---|---|
| FG Credit Loss for CDO of ABS transaction | (50) | (33) | (0.41) | (0.41) |
| All Other (Premiums, Investment Income and Expenses) | | 201 | 2.21 | |
| **12/31/2007 Book Value** | | **$2.8B** | **$35.10** | |
| **Quarter Ended 12/31/2007 EPS** | | | | **($7.74)** |

\*  Includes ($120 Million) related to non-corporate CDO transactions, including a small number of AAA-rated CDOs of ABS and CMBS. This mark remains subject to possible adjustment.

Radian will discuss each of these items in its conference call today, Friday, February 15, 2008, at 10:00 a.m. Eastern time. The conference call will be broadcast live over the internet at http://www.ir.radian.biz/phoenix.zhtml?c=112301&p=irol-audioarchives or at http://www.radian.biz >News. The call may also be accessed by dialing 866-254-5941 inside the U.S., or 612-234-9959 for international callers, using passcode 907669 or by referencing Radian.

A replay of the webcast will be available at the Radian website approximately two hours after the live broadcast ends for a period of one year. A replay of the conference call will be available two and a half hours after the call ends for two weeks, using the following dial-in numbers and passcode: 800-475-6701 inside the U.S., or 320-365-3844 for international callers, passcode 907669.

Radian Group Inc. is a global credit risk management company headquartered in Philadelphia with significant operations in New York and London. Radian develops innovative financial solutions by applying its core mortgage credit risk expertise and structured finance capabilities to the credit enhancement needs of the capital markets worldwide, primarily through credit insurance products. The company also provides credit enhancement for public finance and other corporate and consumer assets on both a direct and reinsurance basis and holds strategic interests in credit-based consumer asset businesses. Additional information may be found at www.radian.biz.

Source: RADIAN GROUP INC, 8-K, February 15, 2008

Exhibit 33

Web  Images  Maps  News  Shopping  Gmail  more ▼

Get quotes   Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices  « Back to overview

**Radian Group Inc.**(NYSE:RDN) - **Daily** | Weekly

May 1, 2007   - May 31, 2007    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-May-07 | 62.90 | 63.29 | 61.60 | 61.90 | 671,300 |
| 30-May-07 | 62.54 | 62.79 | 62.00 | 62.79 | 347,500 |
| 29-May-07 | 62.65 | 62.89 | 62.35 | 62.79 | 231,700 |
| 25-May-07 | 61.99 | 62.60 | 61.85 | 62.50 | 283,800 |
| 24-May-07 | 63.50 | 63.87 | 61.95 | 61.95 | 457,400 |
| 23-May-07 | 62.80 | 63.95 | 62.50 | 63.34 | 540,800 |
| 22-May-07 | 63.05 | 63.15 | 62.28 | 62.75 | 807,400 |
| 21-May-07 | 62.72 | 63.29 | 62.63 | 62.97 | 1,008,600 |
| 18-May-07 | 62.44 | 63.00 | 62.25 | 62.87 | 546,300 |
| 17-May-07 | 62.42 | 62.84 | 61.91 | 62.36 | 523,300 |
| 16-May-07 | 61.79 | 62.66 | 61.73 | 62.55 | 669,900 |
| 15-May-07 | 62.55 | 63.31 | 61.84 | 61.84 | 642,800 |
| 14-May-07 | 62.40 | 62.70 | 62.34 | 62.36 | 445,000 |
| 11-May-07 | 61.93 | 63.15 | 61.89 | 62.55 | 496,300 |
| 10-May-07 | 62.05 | 62.87 | 61.81 | 61.81 | 939,500 |
| 9-May-07 | 59.44 | 61.75 | 59.44 | 61.65 | 1,029,300 |
| 8-May-07 | 59.14 | 59.88 | 58.85 | 59.52 | 750,200 |
| 7-May-07 | 59.58 | 59.89 | 59.20 | 59.46 | 1,160,700 |
| 4-May-07 | 59.32 | 59.82 | 58.80 | 59.46 | 409,900 |
| 3-May-07 | 59.16 | 59.97 | 58.95 | 59.27 | 576,600 |
| 2-May-07 | 58.22 | 59.58 | 58.10 | 58.91 | 455,100 |
| 1-May-07 | 58.02 | 58.66 | 57.59 | 58.32 | 891,100 |
| 30-Apr-07 | 60.20 | 60.20 | 57.99 | 58.11 | 1,472,500 |

International Google Finance:  Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▼                    Portfolios | Sign In

Get quotes    Stock screener New!

e.g. 'CSCO' or 'Google'

## Historical prices   « Back to overview

**Radian Group Inc.**(NYSE:RDN) - **Daily** | Weekly

Aug 6, 2008    - Aug 6, 2008    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 2.77 | 3.18 | 2.69 | 2.79 | 7,939,000 |
| 5-Aug-08 | 2.43 | 2.90 | 2.38 | 2.67 | 7,113.300 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided as is and solely for informational purposes, not for trading purposes or advice and may be delayed.
To see all exchange delays please see disclaimer

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Exhibit 34

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of**
**the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): October 30, 2007

# THE PMI GROUP, INC.
### (Exact name of registrant as specified in its charter)

| Delaware | 1-13664 | 94-3199675 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**PMI Plaza, 3003 Oak Road**
**Walnut Creek, California 94597**
(Address of principal executive offices, including zip code)

**(925) 658-7878**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02     Results of Operations and Financial Condition.**

On October 30, 2007, The PMI Group, Inc: (1) issued a press release announcing its financial results for the quarter ended September 30, 2007, a copy of which is attached hereto as Exhibit 99.1 and is incorporated herein by reference; and (2) posted on its website (www.pmigroup.com under Investor Relations) a financial supplement for the quarter ended September 30, 2007, a copy of which is attached hereto as Exhibit 99.2 and is incorporated herein by reference.

The information contained in this Current Report on Form 8-K (including the exhibits) is being furnished to, and shall not be deemed "filed" with, the Securities and Exchange Commission.

**Item 9.01     Financial Statements and Exhibits.**

(d)     Exhibits:

The following material is furnished as an exhibit to this Current Report on Form 8-K:

| Exhibit No. | Description |
| --- | --- |
| 99.1 | The PMI Group, Inc. Press Release, dated October 30, 2007. |
| 99.2 | The PMI Group, Inc. Third Quarter 2007 Financial Supplement. |

-2-

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE PMI GROUP, INC.

Dated: October 30, 2007                    By:    /s/ Donald P. Lofe, Jr.
                                                  Donald P. Lofe, Jr.
                                                  Executive Vice President, Chief Financial Officer

Dated: October 30, 2007                    By:    /s/ Thomas H. Jeter
                                                  Thomas H. Jeter
                                                  Senior Vice President, Chief Accounting Officer and Corporate
                                                  Controller

-3-



News Release
Investors and Media Contacts:
Bill Horning / Beth Haiken
925.658.6193 / 925.658.6192

**THE PMI GROUP, INC. REPORTS**
**THIRD QUARTER 2007 FINANCIAL RESULTS**

**Walnut Creek, CA, October 30, 2007** - The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported a net loss for the third quarter of 2007 of $86.8 million, or $1.04 per basic and diluted[1] share. Net income for the third quarter of 2006 was $104.2 million, or $1.16 per diluted share. The net loss for the third quarter of 2007 was primarily due to $348.3 million in paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "Losses and LAE") in the U.S. Mortgage Insurance Operations, and FGIC's negative mark-to-market adjustments on its insured credit derivative portfolio in the Company's Financial Guaranty segment.

**Highlights include:**

• U.S. Mortgage Insurance Operations[2] — The net loss was $65.2 million in the third quarter of 2007. During the third quarter, the Company added $253.6 million to the reserves for losses and loss adjustment expenses (LAE) and paid $92.6 million in claims. Total revenues in the third quarter increased by approximately 20% compared to the third quarter of 2006, driven by strong growth in net premiums written and earned. Insurance in force at the end of the third quarter of 2007 was $120.0 billion, representing a 20% increase from one year ago.

• International Operations[3] — PMI Australia posted net income of $19.7 million on higher premiums earned and net investment income, partially offset by higher losses and LAE. PMI Australia reported solid growth year over year in net premiums written and grew its insurance in force to $182.8 billion. Total losses and LAE increased in the third quarter of 2007 to $21.8 million due primarily to higher claim rates. PMI Europe reported a net loss of $8.4 million, primarily as a result of an unrealized $8.4 million, after tax, negative mark-to-market adjustment on credit default swaps related to European prime mortgage risks due to

[1] Due to the net loss in this quarter, normally dilutive components of shares outstanding such as stock options were not included in fully diluted shares outstanding as their inclusion would have been anti-dilutive.

[2] "U.S. Mortgage Insurance Operations" includes the results of PMI Mortgage Insurance Co. (PMI), affiliated U.S. reinsurance companies and equity in earnings from CMG Mortgage Insurance Company (CMG MI).

[3] "International Operations" includes the results of PMI Australia, PMI Europe, PMI Asia and PMI Canada.

Page 1

widening credit spreads. PMI Europe's net premiums written increased approximately 50% compared with the third quarter of 2006 driven particularly by flow business in Italy. PMI Asia reported net income of $2.9 million fueled by strong growth in reinsurance premiums written and earned compared to the third quarter 2006.

- Financial Guaranty[4] — equity in losses from FGIC for the third quarter of 2007 were $28.9 million (pre-tax), as a result of a negative unrealized mark-to-market adjustment in its insured credit derivative portfolio due to widening credit spreads partially offset by strong premium earnings and increased net investment income.

- Capital Events — The Company repurchased 5,454,381 common shares for approximately $178 million in the third quarter of 2007.

## Consolidated Operating Results

*Consolidated net premiums written* for the third quarter and year to date totaled $276.7 million and $776.8 million, respectively, compared with $212.4 million and $626.1 million for the same periods one year ago. The year over year increases were primarily due to increases in insurance in force from new insurance written, and higher average insured loan balances in the U.S. Mortgage Insurance Operations and an increase in International Operations' net premiums written combined with favorable Australian foreign exchange rates.

*Consolidated premiums earned* for the third quarter and year to date were $256.8 million and $735.5 million, respectively, compared with $214.9 million and $634.8 million for the same periods one year ago. The increases were due primarily to insurance in force growth, new insurance written, improved persistency and larger loan sizes in the U.S. Mortgage Insurance Operations.

*Consolidated losses and LAE* for the third quarter and year to date were $372.8 million and $628.3 million, respectively, compared with $79.6 million and $212.4 million for the same periods last year. The increases were primarily a result of higher losses and LAE in the U.S. Mortgage Insurance Operations as a result of an increase in notices of default, increased claim rates and larger claim sizes.

*Consolidated reserve for losses and LAE* totaled $770.4 million as of September 30, 2007 compared with $507.0 million as of June 30, 2007 and $394.2 million as of September 30, 2006. Reserves for losses and LAE in the U.S. Mortgage Insurance Operations increased $253.6 million in the third quarter of 2007 primarily due to an increase in notices of default, increased claim rates and larger claim

[4] "Financial Guaranty" includes PMI Guaranty Co. (PMI Guaranty) and our equity investments in Financial Guaranty Insurance Company, Inc. (FGIC) and Ram Reinsurance Company Ltd. (RAM Re).

Page 2

sizes. PMI Australia's reserve for losses and LAE increased $7.3 million in the third quarter of 2007 principally due to higher claim rates and claim sizes.

**Consolidated other underwriting and operating expenses** for the third quarter and year to date were $50.6 million and $173.1 million, respectively, compared with $55.9 million and $169.0 million for the same periods one year ago. The decrease in the third quarter of 2007 was primarily the result of lower employee compensation expenses compared to the corresponding period in 2006. The increase in the first nine months of 2007 compared to the corresponding period in 2006 was primarily due to growth in our International Operations and lower share-based compensation expenses in 2006.

### The PMI Group, Inc. Third Quarter Results by Segment

| (Dollars in millions, except per share data) | Third Quarter Total Revenues | | | Third Quarter Net (Loss) Income | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | % Change | 2007 | 2006 | % Change |
| U.S. Mortgage Insurance Operations | $ 241.5 | $ 201.8 | 19.7% | $ (65.2) | $ 70.8 | (192.1)% |
| International Operations | 65.2 | 68.6 | (5.0)% | 13.9 | 29.4 | (52.7)% |
| Financial Guaranty [6] | (24.3) | 26.5 | (191.7)% | (24.4) | 23.7 | (203.0)% |
| Corporate and Other [5] | 4.6 | 4.0 | n.m. | (11.0) | (19.8) | n.m. |
| Consolidated Total | $ 287.0 | $ 300.9 | (4.6)% | $ (86.8) | $ 104.2 | (183.3)% |
| Diluted Net (Loss) Income Per Share [1] | | | | $ (1.04) | $ 1.16 | (189.7)% |
| Book Value Per Share | | | | $ 43.96 | $ 39.14 | 12.3% |

May not total due to rounding.

n.m. – Not meaningful.

### The PMI Group, Inc. Year to Date Results by Segment

| (Dollars in millions, except per share data) | Nine Months Ended September 30 Total Revenues | | | Nine Months Ended September 30 Net (Loss) Income | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | % Change | 2007 | 2006 | % Change |
| U.S. Mortgage Insurance Operations | $ 697.7 | $ 600.7 | 16.1% | $ 45.2 | $ 213.1 | (78.8)% |
| International Operations | 197.0 | 187.1 | 5.3% | 65.1 | 83.5 | (22.0)% |
| Financial Guaranty | 43.6 | 76.3 | (42.9)% | 34.5 | 68.8 | (49.9)% |
| Corporate and Other [5] | 15.1 | 24.2 | n.m. | (45.7) | (46.3) | n.m. |
| Consolidated Total | $ 953.3 | $ 888.2 | 7.3% | $ 99.1 | $ 319.2 | (69.0)% |
| Diluted Net Income Per Share | | | | $ 1.14 | $ 3.38 | (66.3)% |

May not total due to rounding.

n.m. – Not meaningful.

### *Segment Highlights*

#### U.S. Mortgage Insurance Operations

- The net loss totaled $65.2 million for the third quarter of 2007 compared with net income of $70.8 million in the third quarter of 2006. The net loss in the third quarter was due primarily to higher losses and LAE partially offset by higher premiums earned and net investment income.

[5] The "Corporate and Other" segment primarily consists of the holding company, contract underwriting operations and intercompany eliminations.

[6] Revenues for the Financial Guaranty segment were negative due to the equity in loss from FGIC in the third quarter of 2007 of $28.9 million.

Page 3

Source: PMI GROUP INC, 8-K, October 30, 2007

- Net premiums written in the third quarter of 2007 increased by 33.6% to $214.4 million from $160.5 million in the third quarter of 2006. The increase was due primarily to increases in insurance in force driven by new insurance written.

- The primary persistency rate increased to 73.3% in the third quarter of 2007 compared with 67.3% in the third quarter of 2006.

- Total losses and LAE in the third quarter of 2007 were $348.3 million compared with $67.7 million in the third quarter of 2006 driven by an increase in notices of default, increased claim rates and larger claim sizes.

- Total claims paid increased to $92.6 million for the third quarter of 2007 compared with $62.0 million in the third quarter of 2006 driven by an increase in the claim rates and larger average claim sizes.

- After tax equity in earnings from CMG MI for the third quarter of 2007 was $2.7 million, compared with $3.3 million for the same period of 2006. The decline in equity in earnings was primarily driven by higher incurred losses partially offset by higher premiums earned. CMG MI's insurance in force grew to $18.3 billion, persistency increased to 80.7% and the primary default rate was 1.23%.

**International Operations**

- PMI Australia reported net income of $19.7 million for the third quarter of 2007 compared with net income of $24.7 million for the third quarter of 2006. The decrease in net income was due primarily to higher losses and LAE and other underwriting and operating expenses partially offset by increased premiums earned and net investment income. The third quarter of 2007 addition to reserves for losses and LAE was $7.3 million while claims paid for the quarter totaled $16.8 million.

- PMI Europe reported a net loss of $8.4 million in the third quarter of 2007 compared with net income of $2.0 million for the same period a year ago. The decrease was due primarily to an unrealized $8.4 million (after tax) negative mark-to-market adjustment on credit default swaps related to European, prime mortgage risks due to widening credit spreads and to a lesser extent higher expenses and loss adjustment expenses.

- PMI Asia's net income in the third quarter of 2007 totaled $2.9 million compared with $2.7 million for the same period a year ago.

**Financial Guaranty**

- After tax equity in losses from FGIC for the third quarter of 2007 totaled $27.0 million compared with after tax equity in earnings of $21.9 million for the same period a year ago. The loss in the third quarter of 2007 was primarily due to a negative unrealized mark-to-market adjustment in its insured credit derivative portfolio due to widening credit spreads partially offset by strong premium earnings and increased net investment income.

Page 4

- After tax equity in earnings from RAM Re for the third quarter of 2007 was $1.4 million compared with $1.9 million for the same period one year ago.

- PMI Guaranty, which began operations in the fourth quarter of 2006, reported net income of $1.2 million in the third quarter of 2007.

**Corporate and Other**

- The Corporate and Other segment reported a net loss of $11.0 million for the third quarter of 2007 compared with a net loss of $19.8 million for the same period a year ago. The decrease in the net loss for the third quarter of 2007 compared with the third quarter of 2006 was due to lower other underwriting and operating expenses and interest expense.

**Supplemental Financial Information**

- The PMI Group, Inc.'s Third Quarter 2007 Financial Supplement can be found at www.pmigroup.com under Investor Relations.

**ABOUT THE PMI GROUP, INC.**

The PMI Group, Inc. (NYSE: PMI), headquartered in Walnut Creek, CA, is an international provider of credit enhancement products that promote homeownership and facilitate mortgage transactions in the capital markets. Through its wholly owned subsidiaries and unconsolidated strategic investments, the company offers residential mortgage insurance and credit enhancement products domestically and internationally, financial guaranty insurance, and financial guaranty reinsurance. Through its subsidiaries, The PMI Group, Inc. is one of the world's largest providers of private mortgage insurance with operations in the United States, Australia and New Zealand, Canada and the European Union, as well as one of the largest providers of mortgage guaranty reinsurance in Hong Kong. For more information: www.pmigroup.com.

Cautionary Statement: Statements in this earnings release that are not historical facts, and that relate to future plans, events or performance are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that forward-looking statements by their nature involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future. Many factors could cause actual results and developments to differ materially from those expressed or implied by these forward-looking statements. Risks and uncertainties that could affect the Company are discussed in our Form 10-K for the year ended December 31, 2006 and Form 10-Q for the quarter ended June 30, 2007 and include changes in economic conditions such as interest rates, home values, employment rates and refinance activity. We undertake no obligation to update forward-looking statements.

# # #

Page 5

Source: PMI GROUP INC, 8-K, October 30, 2007

Exhibit 35

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of
### the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): March 17, 2008

# THE PMI GROUP, INC.
#### (Exact name of registrant as specified in its charter)

| Delaware | 1-13664 | 94-3199675 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**PMI Plaza, 3003 Oak Road**
**Walnut Creek, California 94597**
**(Address of principal executive offices, including zip code)**

**(925) 658-7878**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02      Results of Operations and Financial Condition.**

On March 17, 2008, The PMI Group, Inc: (1) issued a press release announcing its consolidated financial results for the quarter and year ended December 31, 2007, a copy of which is attached hereto as Exhibit 99.1 and is incorporated herein by reference; and (2) posted on its website (www.pmigroup.com under Investor Relations) supplemental portfolio information as of December 31, 2007, a copy of which is attached hereto as Exhibit 99.2 and is incorporated herein by reference.

The information contained in this Current Report on Form 8-K (including the exhibits) is being furnished to, and shall not be deemed "filed" with, the Securities and Exchange Commission.

**Item 8.01      Other Events.**

See Item 2.02 above.

**Item 9.01      Financial Statements and Exhibits.**

(d)    Exhibits:

The following material is furnished as an exhibit to this Current Report on Form 8-K:

| Exhibit No. | Description |
| --- | --- |
| 99.1 | The PMI Group, Inc. Press Release dated March 17, 2008 (including Financial Supplement). |
| 99.2 | The PMI Group, Inc. Supplemental Portfolio Information as of December 31, 2007. |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE PMI GROUP, INC.

Dated: March 17, 2008            By:    /s/ Donald P. Lofe, Jr.

                                                Donald P. Lofe, Jr.
                                                Executive Vice President, Chief Financial Officer

Dated: March 17, 2008            By:    /s/ Thomas H. Jeter

                                                Thomas H. Jeter
                                                Senior Vice President, Chief Accounting Officer and Corporate Controller

Source: PMI GROUP INC, 8-K, March 17, 2008

EXHIBIT 99.1



NEWS RELEASE

Investors and Media Contacts:
Bill Horning / Nate Purpura
925.658.6193 / 925.658.6247

### THE PMI GROUP, INC. REPORTS
### FOURTH QUARTER AND YEAR END 2007 FINANCIAL RESULTS

**Walnut Creek, CA, March 17, 2008 -** The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported a net loss for the full year 2007 of $915.3 million, or $10.81 per basic and diluted[1] share. Net income for the full year 2006 was $419.7 million, or $4.57 per diluted share. The net loss for the fourth quarter 2007 was $1.0 billion or $12.51 per basic and diluted share, compared to net income in the fourth quarter 2006 of $100.5 million, or $1.19 per diluted share. The net loss for the fourth quarter of 2007 was primarily due to our equity in the losses from FGIC of $776.1 million (after tax) and a net loss of $236.0 million in the U.S. Mortgage Insurance Operations due to increases in paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "Losses and LAE").

**Key results include:**

○   U.S. Mortgage Insurance Operations[2] — The net loss was $236.0 million in the fourth quarter of 2007. During the fourth quarter, the Company added $434.8 million to the reserves for losses and loss adjustment expenses and paid $114.5 million in claims. Total revenues in the fourth quarter increased by approximately 9% compared to the fourth quarter of 2006, driven by strong growth in net premiums written and earned. Insurance in force at the end of 2007 was $123.6 billion, representing a 20% increase from one year ago.

○   International Operations[3] — PMI Australia posted net income of $17.8 million in the fourth quarter of 2007 on higher premiums earned and net investment income, partially offset by higher Losses and LAE. Losses and LAE increased in the fourth quarter of 2007 to $29.4 million from $17.8 million in the fourth quarter 2006 due primarily to higher claim rates. PMI Europe reported a net loss of $29.6 million in the fourth quarter 2007, primarily as a result of increased Losses and LAE of $22.1 million and an unrealized $8.4 million (pre-tax) mark-to-market loss on credit default swaps related to European prime mortgage risks due to widening credit spreads. PMI Asia reported net income of $2.9 million fueled by strong growth in reinsurance premiums written compared to the fourth quarter 2006.

---

[1] Due to the net loss in the fourth quarter 2007, normally dilutive components of shares outstanding such as stock options were not included in fully diluted shares outstanding as their inclusion would have been anti-dilutive.

[2] "U.S. Mortgage Insurance Operations" includes the results of PMI Mortgage Insurance Co. (PMI), affiliated U.S. reinsurance companies and equity in earnings from CMG Mortgage Insurance Company (CMG MI).

[3] "International Operations" includes the results of PMI Australia, PMI Europe, PMI Asia and PMI Canada.

○ Financial Guaranty [4] — equity in losses from FGIC for the fourth quarter of 2007 were $776.1 million (after tax), as a result of higher Losses and LAE and an unrealized mark-to-market loss related to its credit derivative portfolio. During the fourth quarter, the Company recorded an other than temporary impairment of its investment in Ram Re of $38.5 million (pre-tax).

### Consolidated Operating Results

**Consolidated net premiums written** for the fourth quarter and full year totaled $263.5 million and $1.0 billion, respectively, compared with $235.5 million and $861.6 million for the same periods one year ago. The year over year increase was primarily due to increases in new insurance written in the U.S. Mortgage Insurance Operations and an increase in International Operations' net premiums written combined with favorable Australian foreign exchange rates.

**Consolidated premiums earned** for the fourth quarter and full year were $259.6 million and $995.2 million, respectively, compared with $225.7 million and $860.5 million for the same periods one year ago. The increases were due primarily to new insurance written, improved persistency and larger loan sizes in the U.S. Mortgage Insurance Operations.

**Consolidated losses and LAE** for the fourth quarter and full year were $574.7 million and $1.2 billion, respectively, compared with $90.5 million and $302.9 million for the same periods last year. The increases were primarily a result of higher Losses and LAE in our U.S. Mortgage Insurance Operations as a result of the significant deterioration of the U.S. housing, mortgage and capital markets.

**Consolidated reserve for losses and LAE** totaled $1.2 billion as of December 31, 2007 compared with $770.4 million as of September 30, 2007 and $414.7 million as of December 31, 2006. Reserves for losses and LAE in the U.S. Mortgage Insurance Operations increased $434.8 million in the fourth quarter of 2007 primarily due to an increase in notices of default, increased claim rates and larger claim sizes. PMI Australia's reserve for losses and LAE increased $13.8 million in the fourth quarter of 2007 principally due to higher claim rates and claim sizes.

**Consolidated other underwriting and operating expenses** for the fourth quarter and full year were $56.7 million and $229.8 million, respectively, compared with $68.0 million and $237.0 million for the same periods one year ago.

---

[4] "Financial Guaranty" includes PMI Guaranty Co. (PMI Guaranty) and our equity investments in Financial Guaranty Insurance Company, Inc. (FGIC) and Ram Reinsurance Company Ltd. (RAM Re).

| The PMI Group, Inc. Fourth Quarter Results by Segment | | | | |
| :--- | :---: | :---: | :---: | :---: |
| | Fourth Quarter Total Revenues | | Fourth Quarter Net (Loss) Income | |
| *(Dollars in millions, except per share data)* | **2007** | **2006** | **2007** | **2006** |
| U.S. Mortgage Insurance Operations | $   231.9 | $   212.2 | $   (236.0) | $   77.2 |
| International Operations | 68.0 | 61.5 | (10.1) | 20.0 |
| Financial Guaranty | (35.8) | 2.0 | (766.2) | 28.4 |
| Corporate and Other[5] | 17.4 | 6.2 | (2.1) | (25.1) |
| Consolidated Total | $   281.5 | $   281.9 | $   (1,014.9) | $   100.5 |
| Diluted Net (Loss) Income Per Share[1] | | | $   (12.51) | $   1.19 |
| Book Value Per Share | | | $   30.98 | $   41.14 |

May not total due to rounding.
n.m. – Not meaningful.

| The PMI Group, Inc. Full Year Results by Segment | | | | |
| :--- | :---: | :---: | :---: | :---: |
| | Full Year Ended December 31 Total Revenues | | Full Year Ended December 31 Net (Loss) Income | |
| *(Dollars in millions, except per share data)* | **2007** | **2006** | **2007** | **2006** |
| U.S. Mortgage Insurance Operations | $   916.0 | $   797.6 | $   (190.8) | $   290.3 |
| International Operations | 265.0 | 248.6 | 55.0 | 103.5 |
| Financial Guaranty | (28.0) | 2.0 | (731.7) | 97.3 |
| Corporate and Other[2] | 32.2 | 30.5 | (47.8) | (71.4) |
| Consolidated Total | $   1,185.2 | $   1,078.7 | $   (915.3) | $   419.7 |
| Diluted Net (Loss) Income Per Share | | | $   (10.81) | $   4.57 |

May not total due to rounding.
n.m. – Not meaningful.

*Segment Highlights*

**U.S. Mortgage Insurance Operations**

- The net loss totaled $236.0 million for the fourth quarter of 2007 compared with net income of $77.2 million in the fourth quarter of 2006. The net loss in the fourth quarter was due primarily to higher Losses and LAE and an impairment of the deferred policy acquisition asset, partially offset by higher premiums earned and lower other underwriting and operating expenses.

- Net premiums written in the fourth quarter of 2007 increased by 14.0% to $200.3 million from $175.7 million in the fourth quarter of 2006. The increase was due primarily to increases in insurance in force driven by new insurance written and higher persistency.

- The primary persistency rate increased to 75.5% in the fourth quarter of 2007 compared with 69.6% in the fourth quarter of 2006.

- Losses and LAE in the fourth quarter of 2007 were $520.6 million compared with $72.0 million in the fourth quarter of 2006 driven by an increase in notices of default, increased claim rates and larger claim sizes.

- Total claims paid increased to $114.5 million for the fourth quarter of 2007 compared with $61.4 million in the fourth quarter of 2006 driven by an increase in the claim rates and larger average claim sizes.

- After tax equity in earnings from CMG MI for the fourth quarter of 2007 was $2.3 million, compared with $3.3 million for the same period of 2006. The decline in equity in earnings was primarily driven by higher

[5] The "Corporate and Other" segment primarily consists of the holding company, contract underwriting operations and intercompany eliminations.

Losses and LAE partially offset by higher premiums earned. CMG MI's insurance in force grew to $18.9 billion, persistency increased to 81.6% and the primary default rate was 1.42%.

**International Operations**

- PMI Australia reported net income of $17.8 million for the fourth quarter of 2007 compared with net income of $13.8 million for the fourth quarter of 2006. The increase in net income was due primarily to increased premiums earned and net investment income partially offset by higher Losses and LAE. The fourth quarter of 2007 addition to reserves for losses and LAE was $13.8 million bringing the total reserves for losses and LAE to $65.1 million. Claims paid for the fourth quarter totaled $14.9 million.

- PMI Europe reported a net loss of $29.6 million in the fourth quarter of 2007 compared with net income of $3.5 million for the same period a year ago. The decrease was due primarily to higher Losses and LAE and, to a lesser extent, an unrealized $8.4 million (pre-tax) negative mark-to-market adjustment on credit default swaps related to European prime mortgage risks due to widening credit spreads.

- PMI Asia's net income in the fourth quarter of 2007 totaled $2.9 million compared with $2.7 million for the same period a year ago.

**Financial Guaranty**

- After tax equity in losses from FGIC for the fourth quarter of 2007 totaled $776.1 million compared with after tax equity in earnings of $25.9 million for the same period a year ago. The loss in the fourth quarter of 2007 was primarily due to Losses and LAE from its structured finance portfolio and an unrealized mark-to-market loss related to its credit derivative portfolio due to widening credit spreads. Following equity in losses from FGIC in the third and fourth quarters, the Company's carrying value of its investment as of December 31, 2007 was $103.6 million.

- After tax equity in losses from RAM Re for the fourth quarter of 2007 was $2.3 million compared with after tax equity in earnings of $1.9 million for the same period one year ago. As RAM Re reports on a one quarter lag, PMI's share of their third quarter 2007 loss is accounted for in the fourth quarter. The Company also recorded a partial impairment of $38.5 million (pre-tax) of its investment in RAM Re. After impairment, the carrying value of our investment in RAM Re as of December 31, 2007 was $60.0 million.

- A valuation allowance of approximately $168.1 million was established against a $214.3 million deferred tax asset associated with our investment in FGIC and RAM Re. The deferred tax asset is created upon the recognition of losses from FGIC and RAM Re in excess of our tax basis with respect to our investment in those companies. The Company did not record a full valuation against the deferred tax asset, as it is management's expectation that some portion of the tax benefit will be realized. The deferred tax benefit of $46.2 million is not included in the after tax equity in losses discussed above.

- PMI Guaranty, which began operations in the fourth quarter of 2006, reported a net loss of $0.8 million in the fourth quarter of 2007.

**Corporate and Other**

- The Corporate and Other segment reported a net loss of $2.1 million for the fourth quarter of 2007 compared with a net loss of $25.1 million for the same period a year ago. The decrease in the net loss for the fourth quarter of 2007 compared with the fourth quarter of 2006 was due to higher net realized investment gains, a reversal of an impairment charge related to the sale of our investment in SPS and lower other underwriting and operating expenses and interest expense.

**Supplemental Financial Information**

- The PMI Group, Inc.'s Fourth Quarter 2007 Financial Supplement can be found at www.pmigroup.com under Investor Relations.

**ABOUT THE PMI GROUP, INC.**

The PMI Group, Inc. (NYSE: PMI), headquartered in Walnut Creek, CA, is an international provider of credit enhancement products that promote homeownership and facilitate mortgage transactions in the capital markets. Through its wholly owned subsidiaries and unconsolidated strategic investments, the company offers residential mortgage insurance and credit enhancement products domestically and internationally, financial guaranty insurance, and financial guaranty reinsurance. Through its subsidiaries, The PMI Group, Inc. is one of the world's largest providers of private mortgage insurance with operations in the United States, Australia and New Zealand, Canada and the European Union, as well as one of the largest providers of mortgage guaranty reinsurance in Hong Kong. For more information: www.pmigroup.com.

Cautionary Statement: Statements in this earnings release that are not historical facts, and that relate to future plans, events or performance are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that forward-looking statements by their nature involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future. Many factors could cause actual results and developments to differ materially from those expressed or implied by these forward-looking statements. Risks and uncertainties that could affect the Company are discussed in our Form 10-K for the year ended December 31, 2007 and include changes in economic conditions such as interest rates, home values, employment rates and refinance activity. We undertake no obligation to update forward-looking statements.

# # #

Source: PMI GROUP INC, 8-K, March 17, 2008

Exhibit 36

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): May 12, 2008**

# THE PMI GROUP, INC.
#### (Exact name of registrant as specified in its charter)

| Delaware | 1-13664 | 94-3199675 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

**PMI Plaza, 3003 Oak Road
Walnut Creek, California 94597**
**(Address of principal executive offices, including zip code)**

**(925) 658-7878**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02      Results of Operations and Financial Condition.**

On May 12, 2008, The PMI Group, Inc. issued a press release and supplement announcing its financial results for the quarter ended March 31, 2008, a copy of which is attached hereto as Exhibit 99.1 and is incorporated herein by reference. The information contained in this Current Report on Form 8-K (including the exhibit) is being furnished to, and shall not be deemed "filed" with, the Securities and Exchange Commission.

**Item 9.01      Financial Statements and Exhibits.**

(d)    Exhibits:

The following material is furnished as an exhibit to this Current Report on Form 8-K:

| Exhibit No. | Description |
|---|---|
| 99.1 | The PMI Group, Inc. Press Release and Supplement, dated May 12, 2008. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE PMI GROUP, INC.

Dated: May 12, 2008                           By:    /s/ Donald P. Lofe, Jr.

Donald P. Lofe, Jr.
Executive Vice President, Chief Financial Officer

Dated: May 12, 2008                           By:    /s/ Thomas H. Jeter

Thomas H. Jeter
Senior Vice President, Chief Accounting Officer
and Corporate Controller

Source: PMI GROUP INC, 8-K, May 12, 2008



NEWS RELEASE

Investors and Media Contacts:
Bill Horning / Nate Purpura
925.658.6193 / 925.658.6247

**THE PMI GROUP, INC. REPORTS**
**FIRST QUARTER 2008 FINANCIAL RESULTS**

   **Walnut Creek, CA, May 12, 2008 -** The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported a net loss for the first quarter of 2008 of $274.0 million, or $3.37 per basic and diluted[1] share, compared to net income in the first quarter of 2007 of $102.0 million, or $1.16 per diluted share. The net loss for the first quarter of 2008 was primarily due to a net loss of $172.5 million in the U.S. Mortgage Insurance Operations due to increases in paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "Losses and LAE") and an other-than-temporary impairment of the Company's investment in FGIC. These losses were partially offset by higher net income from International Operations.

**First Quarter 2008 Update:**

•   In the U.S. Mortgage Insurance Operations, net premiums earned increased by 7.2% to $207.8 million from $193.8 million in the first quarter of 2007. Primary insurance in force increased by 16.3% to $124.3 billion from $106.9 billion in the first quarter of 2007.

•   PMI Australia reported record net income of $30.5 million, an increase of 69% from the first quarter 2007. Insurance in force for PMI Australia increased by 16.6% to $182.7 billion from $156.7 billion.

•   In the Financial Guaranty segment, the Company determined that its investment in FGIC was other-than-temporarily impaired and reduced the carrying value of its investment from $103.6 million at December 31, 2007 to zero. The impairment resulted in an $88.0 million loss in the current quarter and a $15.6 million loss in other comprehensive income. To the extent that the Company's carrying value remains zero, the Company will not recognize in future periods its proportionate share of FGIC losses, if any, and the Company is under no obligation to provide additional capital to FGIC.

•   The Company completed the collateral pledge agreement for its revolving credit facility and drew $200 million under the facility.

[1]   Due to the net loss in the first quarter 2008, normally dilutive components of shares outstanding such as stock options were not included in fully diluted shares outstanding as their inclusion would have been anti-dilutive.

Source: PMI GROUP INC, 8-K, May 12, 2008

# Exhibit 37

Web  Images  Maps  News  Shopping  Gmail  more ▼

Get quotes  Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices  « Back to overview

**The PMI Group, Inc.**(NYSE:PMI) - **Daily** | Weekly

May 1, 2007  - May 31, 2007    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-May-07 | 49.76 | 49.78 | 49.30 | 49.44 | 789,200 |
| 30-May-07 | 49.13 | 49.59 | 48.64 | 49.57 | 407,500 |
| 29-May-07 | 49.44 | 49.64 | 49.19 | 49.28 | 378,700 |
| 25-May-07 | 49.37 | 49.42 | 48.97 | 49.26 | 325,900 |
| 24-May-07 | 49.87 | 49.90 | 49.08 | 49.15 | 487,500 |
| 23-May-07 | 49.95 | 50.00 | 49.68 | 49.74 | 543,800 |
| 22-May-07 | 50.00 | 50.00 | 49.47 | 49.87 | 646,000 |
| 21-May-07 | 49.84 | 49.99 | 49.56 | 49.99 | 819,100 |
| 18-May-07 | 50.25 | 50.50 | 49.94 | 50.00 | 1,101,700 |
| 17-May-07 | 49.52 | 49.85 | 49.27 | 49.56 | 800,000 |
| 16-May-07 | 49.09 | 49.73 | 49.03 | 49.71 | 912,900 |
| 15-May-07 | 49.06 | 49.71 | 48.84 | 48.89 | 855,100 |
| 14-May-07 | 49.66 | 49.66 | 48.96 | 49.05 | 590,100 |
| 11-May-07 | 49.22 | 49.94 | 49.22 | 49.65 | 783,800 |
| 10-May-07 | 49.11 | 49.37 | 48.83 | 49.17 | 881,000 |
| 9-May-07 | 48.65 | 49.44 | 48.60 | 49.36 | 973,600 |
| 8-May-07 | 48.88 | 48.95 | 48.38 | 48.81 | 649,200 |
| 7-May-07 | 48.88 | 49.07 | 48.80 | 48.96 | 652,100 |
| 4-May-07 | 48.62 | 48.74 | 48.36 | 48.61 | 620,300 |
| 3-May-07 | 48.30 | 48.96 | 48.28 | 48.62 | 486,100 |
| 2-May-07 | 47.85 | 48.75 | 47.84 | 48.32 | 736,500 |
| 1-May-07 | 48.27 | 48.48 | 47.60 | 47.97 | 1,333,000 |
| 30-Apr-07 | 48.30 | 48.89 | 47.51 | 48.47 | 1,461,000 |

International Google Finance:  Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google:  Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▾

Portfolios | Sign In

| Get quotes |   Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**The PMI Group, Inc.**(NYSE:PMI) - **Daily** | Weekly

Aug 6, 2008    - Aug 6, 2008    | Update |   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 3.22 | 3.63 | 3.22 | 3.50 | 2,616,200 |
| 5-Aug-08 | 3.47 | 3.60 | 3.35 | 3.43 | 3,253,400 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided "as is" and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Exhibit 38

# U.S. SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported)  **October 15, 2007**

# Citigroup Inc.
(Exact name of Registrant as specified in its charter)

| **Delaware** | **1-9924** | **52-1568099** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**399 Park Avenue,
New York, New York**                     **10043**
(Address of principal executive offices)          (Zip Code)

**(212) 559-1000**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐      Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐      Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐      Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐      Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: CITIGROUP INC, 8-K, October 15, 2007

**CITIGROUP INC.**
**Current Report on Form 8-K**

**Item 2.02  Results of Operations and Financial Condition.**

On October 15, 2007, Citigroup Inc. announced its results of operations for the quarter ended September 30, 2007. A copy of the related press release is being filed as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference in its entirety. In addition, a copy of the Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended September 30, 2007 is being filed as Exhibit 99.2 to this Form 8-K and is incorporated herein by reference in its entirety.

The information furnished under Item 2.02 of this Current Report on Form 8-K, including Exhibit 99.1 and Exhibit 99.2, shall be deemed to be "filed" for purposes of the Securities Exchange Act of 1934, as amended.

**Item 9.01  Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit Number | |
|---|---|
| 99.1 | Press Release, dated October 15, 2007, issued by Citigroup Inc. |
| 99.2 | Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended September 30, 2007. |

2

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CITIGROUP INC.

Dated: October 15, 2007

By:   /s/ JOHN C. GERSPACH
Name: John C. Gerspach
Title: Controller and Chief Accounting Officer

3

## EXHIBIT INDEX

| Exhibit Number | |
| --- | --- |
| 99.1 | Press Release, dated October 15, 2007, issued by Citigroup Inc. |
| 99.2 | Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended September 30, 2007. |

Exhibit 99.1



**CITI REPORTS NET INCOME OF $2.4 BILLION, EARNINGS PER SHARE OF $0.47**


**REVENUES OF $22.7 BILLION, UP 6%**
**ROBUST INTERNATIONAL VOLUME GROWTH; INTERNATIONAL REVENUES UP 30%**
**RECORD REVENUES IN INTERNATIONAL CONSUMER, TRANSACTION SERVICES**
**AND WEALTH MANAGEMENT**
**INCOME DECLINE PRIMARILY DRIVEN BY LOWER REVENUES IN FIXED INCOME**
**AND HIGHER CONSUMER CREDIT COSTS**

New York, NY, October 15, 2007 — Citigroup Inc. (NYSE:C) today reported net income for the 2007 third quarter of $2.38 billion, or $0.47 per share, a decline of 57% from the prior-year quarter.  Results include a $729 million pre-tax gain on the sale of Redecard shares.  Return on equity was 7.4%.  On October 1, 2007, Citi announced that it expected third quarter 2007 net income to decline in the range of 60%, subject to finalizing third quarter results.

**Management Comment**

"This was a disappointing quarter, even in the context of the dislocations in the sub-prime mortgage and credit markets.  A significant amount of our income decline was in our fixed income business, where we have a long track record of strong earnings, and this quarter's performance was well below our expectations.  Although we generated strong momentum in many of our franchises, our fixed income results, along with higher credit costs in global consumer, led to significantly lower net income," said Charles Prince, Chairman and CEO.

"Importantly, many of our businesses performed well this quarter.  Our international franchise continued to expand rapidly, with revenues up 30%.  Our global wealth management franchise generated record revenues and transaction services posted another record quarter on double-digit earnings growth.  In securities and banking, equity markets and underwriting revenues were up a combined 33%, and our advisory revenues grew 29%.  Volumes in our consumer franchise continued to grow strongly with deposits up 18%, managed loans up 13%, and we opened 96 new branches around the world," said Prince.

"As we move in to the fourth quarter, we are focusing closely on improving those areas where we performed below expectation, while at the same time continuing to execute on our strategic priorities," said Prince.

**Citi Segment Results**

| (In Millions of Dollars, except EPS) | Third Quarter Revenues 2007 | | 2006 | % Change | Third Quarter Net Income 2007 | | 2006 | % Change |
|---|---|---|---|---|---|---|---|---|
| Global Consumer | $ | 14,683 | $ 12,834 | 14% | $ | 1,783 | $ 3,195 | (44)% |
| Markets & Banking | | 4,603 | 6,067 | (24) | | 446 | 1,721 | (74) |
| Global Wealth Management | | 3,509 | 2,486 | 41 | | 489 | 399 | 23 |
| Alternative Investments | | 125 | 334 | (63) | | (67) | 117 | NM |
| Corporate/Other | | (257) | (299) | 14 | | (273) | (129) | NM |
| **Results from Continuing Operations** | $ | 22,663 | $ 21,422 | 6% | $ | 2,378 | $ 5,303 | (55)% |
| Discontinued Operations | | | | | | — | 202 | NM |
| **Total Citi** | | | | | $ | 2,378 | $ 5,505 | (57)% |
| Earnings per Share from Continuing Operations | | | | | $ | 0.47 | $ 1.06 | (56)% |
| Earnings per Share | | | | | $ | 0.47 | $ 1.10 | (57)% |
| **International results** (1) | $ | 12,256 | $ 9,460 | 30% | $ | 2,035 | $ 2,276 | (11)% |

(1) International results are fully reflected in the Total Citi results above, and exclude Alternative Investments, Corporate/Other, and Discontinued Operations.

NM  Not meaningful

1

## THIRD QUARTER SUMMARY

- **Revenues** were up 6%, led by 30% growth in international revenues.

  - Global consumer revenues increased 14%, driven by international consumer up 35%, which included a $729 million pre-tax gain on the sale of Redecard shares. Excluding the gain, international consumer revenues increased 21%, reflecting deposit and loan growth of 18% and 29%, respectively, and higher investment sales, up 26%. U.S. consumer revenues were flat with the prior-year period as deposit and managed loan growth of 16% and 8%, respectively, was offset by lower securitization results in cards and the absence of gains on sale of securities in the prior-year period in consumer lending.

  - Markets & banking revenues declined 24%, reflecting record transaction services revenues, up 38%, offset by a 44% decline in securities and banking. Securities and banking revenues declined due to write-downs and losses related to dislocations in the mortgage-backed securities and credit markets, including:

    - Write-downs of $1.35 billion pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments.

    - Losses of $1.56 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.

    - Losses of $636 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.

    U.S. markets & banking revenues declined 87% and international revenues grew 7%. International revenues included strong double-digit revenue growth in Asia, Latin America, and Mexico.

  - Global wealth management revenues increased 41%, as U.S. revenues grew 14% and international revenues more than doubled, due to double-digit organic growth and increased ownership in Nikko Cordial.

  - Alternative Investments revenues declined 63% as strong growth in client revenues was offset by lower revenues from proprietary investment activities.

  - Excluding acquisitions and the gain on sale of Redecard shares, total organic revenues declined 3%.

  - The net interest margin declined 3 basis points versus the second quarter 2007.

- **Operating expenses** increased 22%, driven by increased business volumes and acquisitions, which were partially offset by savings from structural expense initiatives announced in April 2007.

  - The company opened 96 new retail bank or consumer finance branches during the quarter, including 47 internationally and 49 in the U.S. Over the last twelve months, 820 retail bank and consumer finance branches have been opened or acquired.

  - Excluding the impact of acquisitions, organic expense growth was 14%.

- **Credit costs** increased $2.98 billion, primarily driven by an increase in net credit losses of $780 million and a net charge of $2.24 billion to increase loan loss reserves.

  - In U.S. consumer, higher credit costs reflected an increase in net credit losses of $278 million and a net charge of $1.30 billion to increase loan loss reserves. The $1.30 billion net charge compares to a net reserve release of $197 million in the prior-year period. The increase in credit costs primarily reflected a weakening of leading credit indicators, including increased delinquencies on mortgages and unsecured personal loans, as well as trends in the U.S. macro-economic environment, portfolio growth, and a change in estimate of loan losses inherent in the portfolio but not yet visible in delinquencies ("a change in estimate of loan losses").

  - In international consumer, higher credit costs reflected an increase in net credit losses of $460 million and a net charge of $717 million to increase loan loss reserves. The $717 million net charge compares to a net charge of $101 million in the prior-year period. The increase in credit costs primarily reflected the impact of recent acquisitions, portfolio growth, and a change in estimate of loan losses.

  - Markets & banking credit costs increased $98 million, primarily reflecting higher net credit losses and a $123 million net charge to increase loan loss reserves for specific counterparties. Credit costs reflected a slight weakening in portfolio credit quality.

- **Taxes.** The effective tax rate on continuing operations was 27.1% versus 27.4% in the prior-year period. The decline in the tax rate primarily reflects a higher proportion of earnings in foreign jurisdictions that have lower tax rates.

2

Source: CITIGROUP INC, 8-K, October 15, 2007

Exhibit 39

# U.S. SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

---

# FORM 8-K

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) **January 15, 2008**

# Citigroup Inc.
(Exact name of Registrant as specified in its charter)

| **Delaware** | **1-9924** | **52-1568099** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **399 Park Avenue, New York, New York** | **10043** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(212) 559-1000**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: CITIGROUP INC, 8-K, January 15, 2008

**CITIGROUP INC.**
**Current Report on Form 8-K**

**Item 2.02  Results of Operations and Financial Condition.**

On January 15, 2008, Citigroup Inc. announced its results of operations for the quarter ended December 31, 2007. A copy of the related press release is being filed as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference in its entirety. In addition, a copy of the Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended December 31, 2007 is being filed as Exhibit 99.2 to this Form 8-K and is incorporated herein by reference in its entirety.

The information furnished under Item 2.02 of this Current Report on Form 8-K, including Exhibit 99.1 and Exhibit 99.2, shall be deemed to be "filed" for purposes of the Securities Exchange Act of 1934, as amended.

**Item 9.01  Financial Statements and Exhibits.**

(d)  Exhibits.

| Exhibit Number | |
|---|---|
| 99.1 | Press Release, dated January 15, 2008, issued by Citigroup Inc. |
| 99.2 | Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended December 31, 2007. |

2

**SIGNATURE**

      Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CITIGROUP INC.

Dated: January 15, 2008

By:    /s/ JOHN C. GERSPACH

Name: John C. Gerspach
Title: Controller and Chief Accounting Officer

Source: CITIGROUP INC, 8-K, January 15, 2008

**EXHIBIT INDEX**

| Exhibit Number | |
|---|---|
| 99.1 | Press Release, dated January 15, 2008, issued by Citigroup Inc. |
| 99.2 | Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended December 31, 2007. |

4

Source: CITIGROUP INC, 8-K, January 15, 2008

Exhibit 99.1



**CITI REPORTS FOURTH QUARTER NET LOSS OF $9.83 BILLION, LOSS PER SHARE OF $1.99**

**RESULTS REFLECT WRITE-DOWNS ON SUB-PRIME RELATED DIRECT EXPOSURES IN FIXED INCOME MARKETS AND INCREASED CREDIT COSTS RELATED TO U.S. CONSUMER LOANS**

**RECORD RESULTS IN INTERNATIONAL CONSUMER, TRANSACTION SERVICES AND GLOBAL WEALTH MANAGEMENT**

**STRONG BUSINESS VOLUMES; AVERAGE DEPOSITS UP 21%, AVERAGE LOANS UP 19%**

---

**FULL YEAR 2007 REVENUES OF $81.7 BILLION, NET INCOME OF $3.62 BILLION**

**FULL YEAR RECORD REVENUES AND NET INCOME IN INTERNATIONAL CONSUMER TRANSACTION SERVICES AND GLOBAL WEALTH MANAGEMENT**

**FULL YEAR RECORD INTERNATIONAL REVENUES, UP 15%**

New York, NY, January 15, 2008 — Citigroup Inc. (NYSE:C) today reported a net loss for the 2007 fourth quarter of $9.83 billion, or $1.99 per share. Results include $18.1 billion in pre-tax write-downs and credit costs on sub-prime related direct exposures in fixed income markets, and a $4.1 billion increase in credit costs in U.S. consumer primarily related to higher current and estimated losses on consumer loans.

For the full year 2007, net income was $3.62 billion, or $0.72 per share. See Schedule A for full year business segment results.

**Management Comment**

"Our financial results this quarter are clearly unacceptable. Our poor performance was driven primarily by two factors — significant write-downs and losses on our sub-prime direct exposures in fixed income markets, and a large increase in credit costs in our U.S. consumer loan portfolio. Looking beyond these two factors, revenues and volumes continued to grow strongly in a number of our franchises and we generated record results in international consumer, transaction services, wealth management, and advisory," said Vikram Pandit, Chief Executive Officer of Citi.

"We have begun to take actions to ensure that Citi is well positioned to compete and win across our franchises while effectively keeping a tight control over our business risks. We are taking several steps to strengthen our capital base, including today's announcement regarding an investment in Citi by several long-term sophisticated investors, our dividend reset, and our continued focus on divesting non-core assets and businesses. We are taking actions to enhance our risk management processes and to improve expense productivity. We are also in the midst of a thorough review of our businesses, which when complete, will drive our execution priorities," said Pandit.

"Over the past five weeks I have been touring our businesses and listening to many of Citi's important constituents — employees, investors, clients, regulators and many others. These discussions have only confirmed my deep belief in the power and strength of Citi. We have a unique franchise that is well positioned in growing markets with tremendous capabilities to serve clients around the world. We intend to build on our advantages to deliver superior results for our clients, investors, and employees," said Pandit.

---

Source: CITIGROUP INC, 8-K, January 15, 2008

Exhibit 40

# U.S. SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) **April 18, 2008**

# Citigroup Inc.
(Exact name of Registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **1-9924** | **52-1568099** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |
| **399 Park Avenue, New York, New York** | | **10043** |
| (Address of principal executive offices) | | (Zip Code) |

**(212) 559-1000**
(Registrant's telephone number,
including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**CITIGROUP INC.**
**Current Report on Form 8-K**

**Item 2.02  Results of Operations and Financial Condition.**

On April 18, 2008, Citigroup Inc. announced its results of operations for the quarter ended March 31, 2008. A copy of the related press release is being filed as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference in its entirety. In addition, a copy of the Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended March 31, 2008 is being filed as Exhibit 99.2 to this Form 8-K and is incorporated herein by reference in its entirety.

The information furnished under Item 2.02 of this Current Report on Form 8-K, including Exhibit 99.1 and Exhibit 99.2, shall be deemed to be "filed" for purposes of the Securities Exchange Act of 1934, as amended.

**Item 9.01  Financial Statements and Exhibits.**

(d)  Exhibits.

| Exhibit Number | |
| --- | --- |
| 99.1 | Press Release, dated April 18, 2008, issued by Citigroup Inc. |
| 99.2 | Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended March 31, 2008. |

2

Source: CITIGROUP INC, 8-K, April 18, 2008

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CITIGROUP INC.

Dated: April 18, 2008

By:    /s/ JOHN C. GERSPACH
        Name: John C. Gerspach
        Title: Controller and Chief Accounting Officer

3

**EXHIBIT INDEX**

| Exhibit Number | |
|---|---|
| 99.1 | Press Release, dated April 18, 2008, issued by Citigroup Inc. |
| 99.2 | Citigroup Inc. Quarterly Financial Data Supplement for the quarter ended March 31, 2008. |

4

Source: CITIGROUP INC, 8-K, April 18, 2008

Exhibit 99.1



### CITI REPORTS FIRST QUARTER NET LOSS OF $5.1 BILLION, LOSS PER SHARE OF $1.02

### NET LOSS PRIMARILY DRIVEN BY FIXED INCOME RESULTS AND HIGHER CONSUMER CREDIT COSTS

### CONTINUED BUSINESS VOLUME MOMENTUM

### RECORD EARNINGS IN TRANSACTION SERVICES, UP 63%; INTERNATIONAL REVENUES STRONG

New York, NY, April 18, 2008 — Citigroup Inc. (NYSE:C) today reported a net loss for the 2008 first quarter of $5.1 billion, or $1.02 per share, based on 5,086 million shares outstanding(1).  Results include $6.0 billion in pre-tax write-downs and credit costs on sub-prime related direct exposures.  Results also include write-downs of $3.1 billion (net of underwriting fees) on funded and unfunded highly leveraged finance commitments, a downward credit value adjustment of $1.5 billion related to exposure to monoline insurers, write-downs of $1.5 billion on auction rate securities inventory, and a $3.1 billion increase in credit costs in global consumer.

---

(1) Fully diluted shares are 5,591 million.

**First Quarter Highlights**

- Record revenues in transaction services, up 42%, and record net income, up 63%.  Liability balances increased 32% and assets under custody grew 21%.

- Within fixed income markets, client-related rates and currencies business revenues rose 17%. Local markets sales and trading in emerging markets produced strong results.

- Strong growth in equity prime finance revenues.

- Smith Barney revenues increased 18% and Private Bank revenues grew 10%.

- International retail banking revenues grew 21%.

**Management Comment**

"Our financial results reflect the continuation of the unprecedented market and credit environment and its impact on our historical risk positions. During the first quarter, valuations of our sub-prime related exposures in fixed income markets and leveraged finance assets have further declined and credit costs in our consumer lending businesses have increased. Despite the negative factors in the broader markets, we continue to see strong momentum throughout the organization with robust volumes in many of our products and regions," said Vikram Pandit, Chief Executive Officer of Citi.

"We have taken decisive and significant actions to strengthen our balance sheet, including over $30 billion of capital raised during December and January, a significant increase in our credit reserves, the sale of Redecard shares, the recently announced divestitures of CitiCapital and Diners Club International, and the realignment of and pending asset reductions in our mortgage business. We continue to enhance our risk management processes, our capital productivity and expense containment, as well as our ability to deliver innovative, world-class products that meet our clients' specific needs. To achieve this, we recently reorganized the businesses along regional and product lines to bring us closer to our clients.  At the same time, we are taking the necessary steps to make Citi more efficient while fostering a culture of accountability and teamwork."

"As we move into the second quarter and beyond, we will continue to divest non-strategic assets and allocate capital to the products and regions that will drive increased revenues, enhance the value of our franchise, and ultimately, maximize shareholder value," said Pandit.

Source: CITIGROUP INC, 8-K, April 18, 2008

# Exhibit 41

Web   Images   Maps   News   Shopping   Gmail   more ▼

Get quotes    Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**Citigroup Inc.**(NYSE:C) - **Daily** | Weekly

May 1, 2007   - May 31, 2007    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-May-07 | 55.11 | 55.20 | 54.31 | 54.49 | 19,542,400 |
| 30-May-07 | 54.77 | 55.24 | 54.55 | 55.20 | 14,200,200 |
| 29-May-07 | 55.42 | 55.42 | 54.62 | 54.91 | 15,920,700 |
| 25-May-07 | 54.96 | 55.16 | 54.48 | 55.12 | 13,538,600 |
| 24-May-07 | 55.24 | 55.52 | 54.74 | 54.93 | 22,431,100 |
| 23-May-07 | 55.12 | 55.53 | 54.85 | 55.01 | 18,969,700 |
| 22-May-07 | 54.88 | 55.33 | 54.52 | 55.08 | 21,280,000 |
| 21-May-07 | 55.18 | 55.20 | 54.74 | 54.84 | 23,317,000 |
| 18-May-07 | 55.00 | 55.55 | 54.74 | 55.00 | 21,021,000 |
| 17-May-07 | 54.89 | 55.19 | 53.95 | 54.80 | 22,369,200 |
| 16-May-07 | 53.80 | 55.04 | 53.50 | 54.91 | 64,523,700 |
| 15-May-07 | 53.03 | 53.24 | 52.74 | 52.79 | 24,677,000 |
| 14-May-07 | 53.18 | 53.30 | 52.58 | 52.86 | 23,984,900 |
| 11-May-07 | 53.21 | 53.76 | 52.90 | 53.11 | 76,732,800 |
| 10-May-07 | 53.77 | 54.05 | 53.18 | 53.20 | 20,865,400 |
| 9-May-07 | 53.63 | 54.15 | 53.43 | 54.12 | 20,771,400 |
| 8-May-07 | 53.75 | 54.00 | 53.48 | 53.72 | 15,392,700 |
| 7-May-07 | 53.97 | 54.40 | 53.72 | 53.88 | 16,029,800 |
| 4-May-07 | 54.10 | 54.56 | 53.95 | 54.09 | 17,702,100 |
| 3-May-07 | 53.95 | 54.10 | 53.55 | 53.95 | 16,228,000 |
| 2-May-07 | 54.45 | 54.45 | 54.07 | 54.30 | 19,346,500 |
| 1-May-07 | 53.80 | 54.32 | 53.74 | 54.20 | 20,989,200 |
| 30-Apr-07 | 53.64 | 54.71 | 53.48 | 53.62 | 30,495,700 |

International Google Finance:   Canada - UK - China

Information is provided "as is" and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▼                    Portfolios | Sign In

c.g. "CSCO" or "Google"                                   [ Get quotes ]   Stock screener New!

# Historical prices   « Back to overview

**Citigroup Inc.**(NYSE:C) - **Daily** | Weekly

Aug 6, 2008   -  Aug 6, 2008     [ Update ]    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 19.64 | 20.23 | 19.25 | 19.70 | 67,392,000 |
| 5-Aug-08 | 19.37 | 20.02 | 19.10 | 19.92 | 92,478,400 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Exhibit 42

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): November 7, 2007

# AMERICAN INTERNATIONAL GROUP, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 1-8787 | 13-2592361 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**70 Pine Street**
**New York, New York 10270**

(Address of principal executive offices)

Registrant's telephone number, including area code: **(212) 770-7000**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: AMERICAN INTERNATION, 8-K, November 07, 2007

**TABLE OF CONTENTS**

Section 2 — Financial Information
Item 2.02. Results of Operations and Financial Condition.
Section 9 — Financial Statements and Exhibits
Item 9.01 Financial Statements and Exhibits.
SIGNATURES
EXHIBIT INDEX
EX-99.1: PRESS RELEASE

Table of Contents

**Section 2 — Financial Information**

**Item 2.02. Results of Operations and Financial Condition.**

On November 7, 2007, American International Group, Inc. issued a press release reporting its results for the three and nine-month periods ended September 30, 2007.

A copy of the press release is attached as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated by reference herein.

**Section 9 — Financial Statements and Exhibits**

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

Exhibit 99.1    Press release of American International Group, Inc. dated November 7, 2007.

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**AMERICAN INTERNATIONAL GROUP, INC.**

(Registrant)

Date: November 7, 2007                    By:    /s/ Kathleen E. Shannon
                                                 Name:    Kathleen E. Shannon
                                                 Title:    Senior Vice President and Secretary

Source: AMERICAN INTERNATION, 8-K, November 07, 2007

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release of American International Group, Inc. dated November 7, 2007. |

Source: AMERICAN INTERNATION, 8-K, November 07, 2007

Source: AMERICAN INTERNATION, 8-K, November 07, 2007

**Exhibit 99.1**

Contact:  Charlene Hamrah (Investment Community)
(212) 770-7074
Chris Winans (News Media)
(212) 770-7083

### AIG REPORTS THIRD QUARTER 2007 RESULTS

NEW YORK, NY, November 7, 2007 — American International Group, Inc. (AIG) today reported that its net income for the third quarter of 2007 was $3.09 billion or $1.19 per diluted share, compared to $4.22 billion or $1.61 per diluted share in the third quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses.

Third quarter 2007 adjusted net income, as defined below, was $3.49 billion or $1.35 per diluted share, compared to $4.02 billion or $1.53 per diluted share in the third quarter of 2006.

Included in both third quarter and nine months 2007 net income and adjusted net income was a charge of approximately $352 million pretax ($229 million after tax) for a net unrealized market valuation loss related to AIG Financial Product Corp.'s (AIGFP) super senior credit default swap portfolio. AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives.

Net income for the first nine months of 2007 was $11.49 billion or $4.40 per diluted share, compared to $10.61 billion or $4.04 per diluted share in the first nine months of 2006. Adjusted net income for the first nine months of 2007 was $12.51 billion or $4.79 per diluted share, compared to $11.55 billion or $4.40 per diluted share in the first nine months of 2006.

### THIRD QUARTER
(in millions, except per share data)

| | 2007 | 2006 | Change | Per Diluted Share 2007 | 2006 | Change |
|---|---|---|---|---|---|---|
| Net income | $ 3,085 | $ 4,224 | (27.0)% | $ 1.19 | $ 1.61 | (26.1)% |
| Net realized capital gains (losses), net of tax | (600) | (62) | — | (0.23) | (0.02) | — |
| FAS 133 gains (losses), excluding net realized capital gains (losses), net of tax (a) | 196 | 267 | — | 0.07 | 0.10 | — |
| Adjusted net income (b)(c) | $ 3,489 | $ 4,019 | (13.2)% | $ 1.35 | $ 1.53 | (11.8)% |
| Effect of AIGFP unrealized market valuation loss on super senior credit default swaps, net of tax, on income | $ 229 | — | — | $ 0.09 | — | — |
| Average shares outstanding | | | | 2,589 | 2,626 | |

**NINE MONTHS**
(in millions, except per share data)

| | 2007 | 2006 | Change | Per Diluted Share 2007 | 2006 | Change |
|---|---|---|---|---|---|---|
| Net income | $ 11,492 | $ 10,609 | 8.3% | $ 4.40 | $ 4.04 | 8.9% |
| Net realized capital gains (losses), net of tax | (673) | (88) | — | (0.26) | (0.03) | — |
| FAS 133 gains (losses), excluding net realized capital gains (losses), net of tax (a) | (341) | (890) | — | (0.13) | (0.34) | — |
| Cumulative effect of an accounting change, net of tax (d) | — | 34 | — | — | 0.01 | — |
| Adjusted net income (b)(c) | $ 12,506 | $ 11,553 | 8.2% | $ 4.79 | $ 4.40 | 8.9% |
| Effect of AIGFP unrealized market valuation loss on super senior credit default swaps, net of tax, on income | $ 229 | — | — | $ 0.09 | — | — |
| Average shares outstanding | | | | 2,609 | 2,625 | |

| | |
|---|---|
| (a) | Represents the effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. In the first quarter of 2007, AIG began applying hedge accounting for certain transactions, primarily its Capital Markets operations. In the second quarter of 2007, AGF and ILFC began applying hedge accounting to most of their derivatives hedging interest rate and foreign exchange risks associated with their floating rate and foreign currency denominated borrowings. |
| (b) | Excludes net realized capital gains (losses), cumulative effect of an accounting change and FAS 133, net of tax. |
| (c) | Includes out of period adjustments detailed in note (g) on page 12. |
| (d) | Represents the cumulative effect of an accounting change, net of tax, related to FAS 123R "Share-Based Payment". |

At September 30, 2007, AIG's consolidated assets were $1.072 trillion and shareholders' equity was $104.07 billion. Shareholders' equity declined slightly compared to June 30, 2007, primarily as a result of net income offset by share repurchase activity and $2.45 billion after tax in unrealized depreciation of investments reported in Other Comprehensive Income.

Book value per share increased to $40.81, including a reduction of $0.50 per share related to payments of $1.27 billion advanced to repurchase shares.

During the third quarter of 2007, AIG repurchased 30,611,884 shares of its common stock. An additional 13,964,098 shares were purchased through November 5, 2007, for a total of 69,067,943 shares purchased year to date.

2

Source: AMERICAN INTERNATION, 8-K, November 07, 2007

Commenting on the third quarter's results, AIG President and Chief Executive Officer Martin J. Sullivan said, "In a volatile market environment that challenged many financial institutions, AIG reported adjusted net income of $3.49 billion in the third quarter of 2007 and increased book value per share to $40.81, once again confirming the benefits of our diversified portfolio of global businesses. While U.S. residential mortgage and credit market conditions adversely affected our results, our active and strong risk management processes helped contain the exposure. Our balance sheet remains strong with the financial resources to weather continued uncertainty as well as to take advantage of attractive market opportunities as they emerge.

"Domestic Brokerage Group, Aircraft Leasing and Asset Management reported strong operating income growth. Life Insurance & Retirement Services operating income declined as market volatility adversely affected investment returns of certain asset classes and our businesses in the Japan and U.S. markets faced challenging market conditions. However, we experienced strong life insurance production in Asia, improved universal life and variable universal life sales in the Domestic Life operations and improved deposits for group retirement products and individual variable annuities in Domestic Retirement Services.

"Our Mortgage Guaranty business reported an operating loss in the quarter resulting from the continued deterioration in the U.S. housing market. American General Finance's adherence to disciplined underwriting standards has helped maintain the credit quality of its real estate portfolio. AIGFP reported an operating loss in the quarter due principally to the unrealized market valuation loss related to its super senior credit default swap portfolio. Although GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that it is highly unlikely that AIGFP will be required to make any payments with respect to these derivatives.

"During the quarter we recorded pretax net realized capital losses of $864 million on a total cash and invested asset portfolio of $872.3 billion. Within the net realized capital losses are $529 million of charges for other-than-temporary declines in value, including impairments of approximately $149 million related to AIG's residential mortgage-backed securities portfolio. Despite the volatility of the recent quarter, AIG's exposure to the residential mortgage-backed securities market within the investment portfolios remains high quality and with substantial protection through collateral subordination.

"Overall, our diverse global businesses are well positioned to respond to both challenges and opportunities. We continue to manage risks carefully and remain confident in our long term strategies to build shareholder value."

GENERAL INSURANCE

General Insurance third quarter 2007 operating income before net realized capital gains (losses) declined 3.4 percent to $2.51 billion compared to the third quarter of 2006. Improved underwriting results in the Domestic Brokerage Group were offset by a $215 million operating loss in the Mortgage Guaranty business and declines in operating income in the Personal Lines and Foreign General businesses. The third quarter 2007 combined ratio was 90.17, compared to 89.10 in the third quarter of 2006. Third quarter 2007 General Insurance net investment income increased 1.8 percent compared to the third quarter of 2006, which included $213 million of income for an out of period adjustment for unit investment trusts and partnership income.

Source: AMERICAN INTERNATION, 8-K, November 07, 2007

Exhibit 43

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): February 28, 2008

**AMERICAN INTERNATIONAL GROUP, INC.**

(Exact name of registrant as specified in its charter)

| Delaware | 1-8787 | 13-2592361 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**70 Pine Street**
**New York, New York 10270**

(Address of principal executive offices)
Registrant's telephone number, including area code: **(212) 770-7000**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 2 —Financial Information**

**Item 2.02. Results of Operations and Financial Condition.**

On February 28, 2008, American International Group, Inc. issued a press release reporting its results for the quarter and year ended December 31, 2007.

A copy of the press release is attached as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated by reference herein.

**Section 9 —Financial Statements and Exhibits**

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

Exhibit 99.1          Press release of American International Group, Inc. dated February 28, 2008.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**AMERICAN INTERNATIONAL GROUP, INC.**
(Registrant)

Date: February 28, 2008

By: /s/ Kathleen E. Shannon
Name: Kathleen E. Shannon
Title: Senior Vice President and Secretary

Source: AMERICAN INTERNATION, 8-K, February 29, 2008

**EXHIBIT INDEX**

| Exhibit No | Description |
| --- | --- |
| 99.1 | Press release of American International Group, Inc. dated February 28, 2008. |

Source: AMERICAN INTERNATION, 8-K, February 29, 2008

**EXHIBIT 99.1**

Contact: Charlene Hamrah (Investment Community)
(212) 770-7074
Chris Winans (News Media)
(212) 770-7083

## AIG REPORTS FULL YEAR AND

## FOURTH QUARTER 2007 RESULTS

NEW YORK, NY, February 28, 2008 – American International Group, Inc. (AIG) today reported that its net income for full year 2007 was $6.20 billion or $2.39 per diluted share, compared to $14.05 billion or $5.36 per diluted share for full year 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. Full year 2007 adjusted net income, as shown below, was $9.31 billion or $3.58 per diluted share, compared to $15.41 billion or $5.88 per diluted share for full year 2006.

The net loss for the fourth quarter of 2007 was $5.29 billion or $2.08 per diluted share, compared to net income of $3.44 billion or $1.31 per diluted share for the fourth quarter of 2006. The adjusted net loss for the fourth quarter of 2007 was $3.20 billion or $1.25 per diluted share, compared to adjusted net income of $3.85 billion or $1.47 per diluted share for the fourth quarter of 2006.

Included in both the full year and fourth quarter 2007 net income (loss) and adjusted net income (loss) were charges of approximately $11.47 billion pretax ($7.46 billion after tax) and $11.12 billion pretax ($7.23 billion after tax), respectively, for a net unrealized market valuation loss related to the AIG Financial Products Corp. (AIGFP) super senior credit default swap portfolio. AIG continues to believe that the unrealized market valuation losses on this super senior credit default swap portfolio are not indicative of the losses AIGFP may realize over time. Under the terms of these credit derivatives, losses to AIG would result from the credit impairment of any bonds AIG would acquire in satisfying its swap obligations. Based upon its most current analyses, AIG believes that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial condition, although it is possible that realized losses could be material to AIG's consolidated results of operations for an individual reporting period. Except to the extent of any such realized credit impairment losses, AIG expects AIGFP's unrealized market valuation losses to reverse over the remaining life of the super senior credit default swap portfolio.

Fourth quarter 2007 results included pretax net realized capital losses of $2.63 billion ($1.71 billion after tax) primarily from other-than-temporary impairment charges in AIG's investment portfolio, with an additional $643 million pretax other-than-temporary impairment charge ($418 million after tax) related to AIGFP's available for sale investment securities. This compares to pretax net realized capital gains of $238 million ($121 million after tax) in the fourth quarter of 2006. The 2007 other-than-temporary impairment charges resulted primarily from the significant, rapid declines in market values of certain residential mortgage backed securities in the fourth quarter for which AIG cannot reasonably determine that the recovery period will be temporary.

### TWELVE MONTHS
(in millions, except per share data)

| | | | | Per Diluted Share | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Net income | $ 6,200 | $14,048 | (55.9)% | $ 2.39 | $ 5.36 | (55.4)% |
| Net realized capital gains (losses), net of tax | (2,386) | 33 | — | (0.92) | 0.01 | — |
| Capital Markets other-than-temporary impairments, net of tax (a) | (418) | — | — | (0.16) | — | — |
| FAS 133 gains (losses), excluding net realized capital gains (losses), net of tax (b) | (304) | (1,424) | — | (0.11) | (0.54) | — |
| Cumulative effect of an accounting change, net of tax (c) | — | 34 | — | — | 0.01 | — |
| Adjusted net income (d) | $ 9,308 | $15,405 | (39.6)% | $ 3.58 | $ 5.88 | (39.1)% |
| Effect of Capital Markets unrealized market valuation (losses) on super senior credit default swaps, net of tax | $(7,457) | — | — | $(2.87) | — | — |
| Average shares outstanding | | | | 2,598 | 2,623 | |

### FOURTH QUARTER
(in millions, except per share data)

| | | | | Per Diluted Share | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Net income (loss) | $(5,292) | $3,439 | — | $ (2.08) | $ 1.31 | — |
| Net realized capital gains (losses), net of tax | (1,713) | 121 | — | (0.68) | 0.04 | — |
| Capital Markets other-than-temporary impairments, net of tax (a) | (418) | — | — | (0.16) | — | — |
| FAS 133 gains (losses), excluding net realized capital gains (losses), net of tax (b) | 37 | (534) | — | 0.01 | (0.20) | — |
| Adjusted net income (loss) (d) | $(3,198) | $3,852 | — | $ (1.25) | $ 1.47 | — |
| Effect of Capital Markets unrealized market valuation (losses) on super senior credit default swaps, net of tax | $(7,228) | — | — | $ (2.83) | — | — |
| Average shares outstanding (e) | | | | 2,550 | 2,622 | |

_____

(a) Represents Capital Markets other-than-temporary impairments on securities available for sale reported in other income on AIG's Consolidated Statement of Income and excluded from adjusted net income (loss) on AIG's Statement of Segment Operations in both the fourth quarter and twelve months of 2007.

(b) Represents the effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. In the first quarter of 2007, AIG began applying hedge accounting for certain transactions, primarily in its Capital Markets operations. In the second quarter of 2007, AGF and ILFC began applying hedge accounting to most of their derivatives hedging interest rate and foreign exchange risks associated with their floating rate and foreign currency denominated borrowings.

(c) Represents the cumulative effect of an accounting change, net of tax, related to FAS 123R "Share-Based Payment".

(d)    Includes out of period adjustments detailed in note (h) on page 12.

(e)    As a result of the loss reported in fourth quarter 2007, basic shares outstanding were used for this period.

2

Source: AMERICAN INTERNATION, 8-K, February 29, 2008

At December 31, 2007, AIG's consolidated assets were $1.061 trillion and shareholders' equity was $95.80 billion. Shareholders' equity declined from September 30, 2007 due to the fourth quarter 2007 net loss and an additional $2.54 billion in after-tax unrealized depreciation of investments reported in other comprehensive income. Book value per share at December 31, 2007 was $37.87, including a reduction of $0.36 per share related to payments of $912 million advanced to repurchase shares. A significant portion of the decrease in shareholders' equity during 2007 was the result of share purchases, substantially all of which were funded from the issuance of hybrid debt securities. These transactions replaced high cost common stock with cost efficient hybrid securities, a substantial portion of which is treated as equity capital by the rating agencies.

During the fourth quarter of 2007, AIG repurchased 21,257,364 shares of its common stock, bringing the total to 76,361,209 shares repurchased for full year 2007. An additional 12,196,187 shares were purchased through February 15, 2008, for a total of 88,557,396 shares purchased since March 2007. AIG does not expect to purchase additional shares for the foreseeable future, other than to meet commitments that existed at December 31, 2007.

Commenting on full year and fourth quarter 2007 results, AIG President and Chief Executive Officer Martin J. Sullivan said, "AIG's results in 2007 were clearly unsatisfactory. This was a challenging year in which the deterioration of both the U.S. residential mortgage and credit markets significantly affected several of our operations and investments. Following record performance through the first six months of 2007, AIG experienced deteriorating results in its Mortgage Guaranty and Consumer Finance businesses, unrealized market valuation losses related to the AIGFP super senior credit default swap portfolio, and increased markdowns and impairments in our investment portfolios in the second half of the year, primarily in the fourth quarter.

"Despite our reported results, a number of areas within AIG's diversified portfolio of global businesses performed well in the quarter. The underwriting results of the Domestic Brokerage Group and Foreign General were excellent. Aircraft Leasing and Institutional Asset Management reported strong operating income growth. The underlying performance of our Life Insurance & Retirement Services businesses provided further evidence that our continued focus on multiple distribution initiatives to capitalize on our broad product portfolio is gaining traction. Operating income growth in this segment, however, was affected by unusual items in 2007 and 2006, as well as by market volatility.

"During 2008, we expect the U.S. housing market to remain weak and credit market uncertainty will likely persist. Continuing market deterioration would cause AIG to report additional unrealized market valuation losses and impairment charges. However, with a diverse portfolio of global businesses, a strong capital base and outstanding talent, AIG has the ability to absorb the current volatility while committing the resources to grow and take advantage of opportunities. We continue to invest in improvements in internal controls, processes, systems and overall effectiveness and will continue to assign the highest priority to remediation efforts over our material weakness in internal control and oversight over the fair value valuation of AIGFP's super senior credit default swap portfolio. At the same time, we are looking to better leverage our significant scale, promote efficiency and improve margins. We are confident AIG is pursuing the right strategies, and has the global franchise and financial strength to meet our performance goals and build long-term shareholder value."

3

Source: AMERICAN INTERNATION, 8-K, February 29, 2008

Exhibit 44

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): May 8, 2008

# AMERICAN INTERNATIONAL GROUP, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 1-8787 | 13-2592361 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**70 Pine Street**
**New York, New York 10270**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(212) 770-7000**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: AMERICAN INTERNATION, 8-K, May 08, 2008

**Section 2 — Financial Information**

**Item 2.02.  Results of Operations and Financial Condition.**

On May 8, 2008, American International Group, Inc. issued a press release reporting its results for the quarterly period ended March 31, 2008.

A copy of the press release is attached as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated by reference herein.

**Section 9 — Financial Statements and Exhibits**

**Item 9.01.  Financial Statements and Exhibits.**

(d) Exhibits.

Exhibit 99.1        Press release of American International Group, Inc. dated May 8, 2008.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**AMERICAN INTERNATIONAL GROUP, INC.**
(Registrant)

Date: May 8, 2008

By:     /s/ Kathleen E. Shannon
      Name:  Kathleen E. Shannon
      Title:   Senior Vice President and Secretary

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release of American International Group, Inc. dated May 8, 2008. |

Source: AMERICAN INTERNATION, 8-K, May 08, 2008

**Exhibit 99.1**

Contact:  Charlene Hamrah (Investment Community)
(212) 770-7074
Chris Winans (News Media)
(212) 770-7083

### AIG REPORTS FIRST QUARTER 2008 RESULTS

NEW YORK, NY, May 8, 2008 — American International Group, Inc. (AIG) today reported that the continuation of the weak U.S. housing market, the disruption in the credit markets, as well as equity market volatility, had a substantial adverse effect on its results for the first quarter ended March 31, 2008. These factors were primarily responsible for AIG incurring a net loss for the first quarter of 2008 of $7.81 billion or $3.09 per diluted share. The net loss, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses. For the 2007 first quarter, in which none of these external conditions existed in a material fashion, AIG reported net income of $4.13 billion or $1.58 per diluted share. First quarter 2008 adjusted net loss, as defined below, was $3.56 billion or $1.41 per diluted share, compared to adjusted net income of $4.39 billion or $1.68 per diluted share for the first quarter of 2007.

AIG emphasized that despite the difficult environment and its resulting effect on AIG's overall financial performance for the first quarter, core insurance businesses continue to perform satisfactorily. AIG is confident that, although present economic conditions are difficult, AIG's unmatched competitive advantages, strong brand, and unmatched global franchise position it extremely well for the future.

AIG also today announced a plan to raise approximately $12.5 billion in capital to fortify its balance sheet and provide increased financial flexibility. The capital is to be raised through a common stock offering and an equity-linked offering for an aggregate of approximately $7.5 billion. At a later date AIG also expects to issue high equity content fixed income securities. These offerings are designed to further strengthen AIG's significant financial resources and will enhance its ability to grow while maintaining the strength to withstand potential short-term market volatility.

## FIRST QUARTER
### (in millions, except per share data)

| | 2008 | 2007 | Change | Per Diluted Share | | |
| | | | | 2008 | 2007 | Change |
|---|---|---|---|---|---|---|
| Net income (loss) | $(7,805) | $4,130 | — | $ (3.09) | $ 1.58 | — |
| Net realized capital gains (losses), net of tax | (3,963) | (56) | — | (1.57) | (0.02) | — |
| FAS 133 gains (losses), excluding net realized capital gains (losses), net of tax (a) | (281) | (205) | — | (0.11) | (0.08) | — |
| Adjusted net income (loss) | $(3,561) | $4,391 | — | $ (1.41) | $ 1.68 | — |
| Effect of Capital Markets unrealized market valuation (losses) on super senior credit default swaps, net of tax | $(5,920) | — | — | $ (2.34) | — | — |
| Average shares outstanding (b) | | | | 2,528 | 2,621 | |

(a)    Represents the effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. In the second quarter of 2007, AGF and ILFC began applying hedge accounting to most of their derivatives hedging interest rate and foreign exchange risks associated with their floating rate and foreign currency denominated borrowings.

(b)    As a result of the loss reported in first quarter 2008, basic shares outstanding were used for this period.

Included in the first quarter 2008 net loss and adjusted net loss was a pre-tax charge of approximately $9.11 billion ($5.92 billion after tax) for a net unrealized market valuation loss related to the AIG Financial Products Corp. (AIGFP) super senior credit default swap portfolio.

First quarter 2008 results included pre-tax net realized capital losses of $6.09 billion ($3.96 billion after tax) primarily from other-than-temporary impairment charges in AIG's investment portfolio. This compares to pre-tax net realized capital losses of $70 million ($56 million after tax) in the first quarter of 2007. The 2008 other-than-temporary impairment charges resulted primarily from the severe, rapid declines in market values of certain residential mortgage backed securities and other structured securities in the first quarter for which AIG concluded it could not reasonably assert that the recovery period would be temporary.

At March 31, 2008, AIG's consolidated assets were $1.051 trillion and shareholders' equity was $79.70 billion. Shareholders' equity declined from December 31, 2007 due to the first quarter 2008 net loss and an additional $6.82 billion in after tax unrealized depreciation of investments reported in accumulated other comprehensive income (loss). Additionally, opening 2008 shareholders' equity included a $1.11 billion after tax decrease due to the cumulative effect of adopting FAS 157 and FAS 159. Book value per share at March 31, 2008 was $31.93.

Commenting on first quarter 2008 results, AIG President and Chief Executive Officer Martin J. Sullivan said, "AIG's results do not reflect the underlying strengths and potential of AIG; rather they reflect the extremely adverse external conditions affecting the spectrum of companies exposed to the U.S. residential housing, credit and capital markets. The sizable unrealized losses and decline in partnership income were among the key drivers impairing our overall net performance. With that said, it is important to underscore that our operating strategies are working well in our core insurance businesses. We believe that our businesses provide an attractive foundation for growth for AIG over the long-term. As part of this effort, we are taking appropriate strategic actions to ensure our businesses are well positioned to capitalize on opportunities provided by the current environment.

2

Source: AMERICAN INTERNATION, 8-K, May 08, 2008

"While we anticipated a difficult trading environment, the severity of the unrealized valuation losses and decline in value of our investments were beyond our expectations. Current market conditions also contributed to a significant decline in partnership income compared to a record level in the first quarter of 2007, as well as to declines in mutual fund income. However, the underlying fundamentals of our core businesses remain solid, and several performed quite well in the quarter, despite the challenging environment many faced. Top line production was very strong in many of our businesses including Foreign General, Foreign Life and ILFC. Operations facing competitive market challenges, such as Commercial Insurance and Domestic Life Insurance, are maintaining their focus on profitable growth.

"Despite the challenges of today's markets, our talented and dedicated employees remain focused on serving our clients and executing our global growth strategies. We have established, well run businesses in our chosen markets around the globe and are confident we have the right strategies and resources to succeed. With the support of the newly added capital, we have every confidence in our ability to respond to today's market conditions and opportunities that may arise."

GENERAL INSURANCE

General Insurance first quarter 2008 operating income before net realized capital gains (losses) declined 45.9 percent to $1.61 billion compared to the first quarter of 2007. These results reflect lower underwriting profit, principally in AIG Commercial Insurance, Mortgage Guaranty and Personal Lines, and lower net investment income. First quarter 2008 General Insurance net investment income declined 22.9 percent as increased interest and dividend income was more than offset by lower partnership and mutual fund investment income compared to the first quarter of 2007.

AIG Commercial Insurance (formerly Domestic Brokerage Group) first quarter 2008 operating income was $958 million, a decline of 48.3 percent compared to the first quarter of 2007, due to declines in both underwriting profit and net investment income. Underwriting results declined as the current accident year loss ratios increased as a result of property losses, including the Atlanta tornados, and workers' compensation. The current accident year loss ratio remained largely unchanged from the prior year for other classes of business. Additionally, Commercial Insurance experienced unfavorable prior year loss development, when excluding favorable development on loss sensitive policies that resulted in return premiums in the first quarter of 2008, compared to favorable prior year loss development in the first quarter of 2007. The unfavorable prior year loss development in the first quarter of 2008 primarily related to certain excess casualty losses. First quarter 2008 net premiums written declined 14.9 percent to $5.11 billion compared to the first quarter of 2007, primarily due to the return of $339 million in premiums related to loss sensitive policies and declines in workers' compensation premiums due to reductions in statutory rates and increased competition.

Personal Lines first quarter 2008 operating income was $7 million compared to $105 million in the first quarter of 2007. The loss ratio increased 8.53 points compared to the first quarter of 2007 due to an increase in the current accident year loss ratio and unfavorable loss reserve development on prior accident years. Net premiums written increased 4.8 percent on continued growth in the Private Client Group, while direct and agency auto premiums were virtually unchanged.

United Guaranty Corporation (UGC) reported an operating loss of $352 million in the first quarter of 2008, compared to operating income of $7 million in the first quarter of 2007. These results reflect increased losses incurred in both the domestic first- and second-lien businesses. First quarter 2008 net premiums written increased 14.3 percent compared to the first quarter of 2007, primarily due to growth in domestic first-lien premiums.

3

Source: AMERICAN INTERNATION, 8-K, May 08, 2008

Exhibit 45

Web   Images   Maps   News   Shopping   Gmail   more ▼

| | Get quotes | Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**American International Group, Inc.**(NYSE:AIG) - **Daily** | Weekly

May 1, 2007   - May 31, 2007     Update     Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-May-07 | 72.01 | 72.53 | 71.92 | 72.34 | 9,867,900 |
| 30-May-07 | 71.72 | 72.34 | 71.38 | 72.09 | 9,946,100 |
| 29-May-07 | 72.27 | 72.35 | 71.60 | 71.89 | 8,727,400 |
| 25-May-07 | 71.97 | 72.00 | 71.58 | 71.95 | 7,734,500 |
| 24-May-07 | 71.90 | 72.17 | 71.30 | 71.54 | 12,376,900 |
| 23-May-07 | 72.07 | 72.36 | 71.87 | 71.91 | 10,150,800 |
| 22-May-07 | 72.08 | 72.25 | 71.82 | 71.94 | 8,375,000 |
| 21-May-07 | 72.10 | 72.20 | 71.80 | 71.99 | 8,502,900 |
| 18-May-07 | 72.34 | 72.45 | 72.00 | 72.22 | 8,962,500 |
| 17-May-07 | 72.46 | 72.46 | 72.17 | 72.20 | 8,853,900 |
| 16-May-07 | 72.10 | 72.51 | 71.47 | 72.46 | 13,023,700 |
| 15-May-07 | 72.61 | 72.80 | 71.91 | 72.07 | 11,350,200 |
| 14-May-07 | 72.55 | 72.75 | 72.10 | 72.47 | 9,209,200 |
| 11-May-07 | 72.65 | 72.97 | 71.80 | 72.58 | 21,720,700 |
| 10-May-07 | 72.00 | 72.20 | 71.47 | 72.20 | 10,388,800 |
| 9-May-07 | 72.00 | 72.40 | 71.50 | 72.00 | 11,962,500 |
| 8-May-07 | 71.23 | 71.87 | 71.11 | 71.75 | 6,832,200 |
| 7-May-07 | 71.05 | 71.99 | 71.01 | 71.60 | 11,592,000 |
| 4-May-07 | 70.80 | 71.13 | 70.53 | 70.85 | 8,558,600 |
| 3-May-07 | 70.48 | 70.83 | 70.22 | 70.65 | 10,539,300 |
| 2-May-07 | 69.20 | 70.69 | 69.16 | 70.42 | 9,881,700 |
| 1-May-07 | 70.00 | 70.24 | 69.66 | 70.03 | 7,364,700 |
| 30-Apr-07 | 70.92 | 70.92 | 69.64 | 69.91 | 9,424,500 |

International Google Finance:   Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▼                    Portfolios | Sign In

| Get quotes |   Stock screener New!

e.g. "CSCO" or "Google"

# Historical prices   « Back to overview

**American International Group, Inc.**(NYSE:AIG) - **Daily** | Weekly

Aug 6, 2008   - Aug 6, 2008   | Update |   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 29.21 | 29.47 | 28.08 | 29.09 | 35,764,300 |
| 5-Aug-08 | 28.00 | 29.90 | 27.83 | 29.89 | 41,651,600 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed
To see all exchange delays, please see disclaimer

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Exhibit 46

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---------------------------------------------------------------

FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):      October 24, 2007
--------------------------------------------------------------------------------

Merrill Lynch & Co., Inc.
--------------------------------------------------------------------------------
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 1-7182 | 13-2740599 |
--------------------------------------------------------------------------------

| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

4 World Financial Center, New York, New York                    10080
--------------------------------------------------------------------------------
(Address of Principal Executive Offices)              (Zip Code)

Registrant's telephone number, including area code:      (212) 449-1000
--------------------------------------------------------------------------------


--------------------------------------------------------------------------------
(Former Name or Former Address, if Changed Since Last Report.)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

|_|  Written communications pursuant to Rule 425 under the Securities Act
     (17 CFR 230.425)

|_|  Soliciting material pursuant to Rule 14a-12 under the Exchange Act
     (17 CFR 240.14a-12)

|_|  Pre-commencement communications pursuant to Rule 14d-2(b) under the
     Exchange Act (17 CFR 240.14d-2(b))

|_|  Pre-commencement communications pursuant to Rule 13e-4(c) under the
     Exchange Act (17 CFR 240.13e-4(c))


Item 2.02. Results of Operations and Financial Condition.
------------------------------------------------------

On October 24, 2007, Merrill Lynch & Co., Inc. (Merrill Lynch) announced its
results of operations for the three- and nine-month periods ended September 28,
2007. A copy of the related press release is filed as Exhibit 99.1 to this Form
8-K and is incorporated herein by reference. A Preliminary Unaudited Earnings
Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three-
and nine-month periods ended September 28, 2007 and supplemental quarterly data
for Merrill Lynch are filed as Exhibit 99.2 to this Form 8-K and are
incorporated herein by reference.

This information furnished under this Item 2.02, including Exhibits 99.1 and
99.2, shall be considered "filed" for purposes of the Securities Exchange Act of
1934, as amended.

Item 9.01. Financial Statements and Exhibits.
--------------------------------------------

        (d)    Exhibits
               --------


        99.1   Press release dated October 24, 2007 issued by Merrill Lynch &
               Co., Inc.

        99.2   Preliminary Unaudited Earnings Summary, Reconciliation of
               "Non-GAAP" Measures and Segment Data for the three- and nine-month
               periods ended September 28, 2007 and supplemental quarterly data.

* * *

2

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MERRILL LYNCH & CO., INC.
-----------------------------------------------
(Registrant)


By: /s/ Jeffrey N. Edwards
    -----------------------------------------
    Jeffrey N. Edwards
    Senior Vice President and
    Chief Financial Officer


By: /s/ Christopher B. Hayward
    -----------------------------------------
    Christopher B. Hayward
    Finance Director and
    Principal Accounting Officer


Date:    October 24, 2007

3

EXHIBIT INDEX
-------------

| Exhibit No. | Description |
| ----------- | ----------- |
| 99.1 | Press release dated October 24, 2007 issued by Merrill Lynch & Co., Inc. |
| 99.2 | Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three- and nine-month periods ended September 28, 2007 and supplemental quarterly data. |

4

Merrill Lynch Reports Third Quarter 2007 Net Loss from Continuing
Operations of $2.85 Per Diluted Share

Record Net Revenues from Global Private Client, Equity Markets and
Investment Banking for the First Nine Months of 2007

NEW YORK--(BUSINESS WIRE)--October 24, 2007--Merrill Lynch (NYSE: MER) today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006. Third quarter 2006 net earnings per diluted share, excluding the impact of the one-time, after-tax net benefit of $1.1 billion ($1.8 billion pre-tax) related to the merger of Merrill Lynch Investment Managers (MLIM) and BlackRock (NYSE: BLK), were $1.97. Third quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. sub-prime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release. These write-downs and losses were partially offset by strong revenues in Global Wealth Management (GWM), Equity Markets, and Investment Banking, particularly in regions outside of the U.S. The results described above and herein, exclude Merrill Lynch Insurance Group (MLIG) which is reported under discontinued operations.

1

Third quarter 2007 total net revenues of $577 million decreased 94% from $9.8 billion in the prior-year period and were down 94% from $9.7 billion in the second quarter of 2007. Merrill Lynch's third quarter 2007 pre-tax net loss was $3.5 billion. At the end of the third quarter, book value per share was $39.75, down slightly from the end of the third quarter of 2006.

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for sub-prime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued. "Away from the mortgage-related areas, we continue to believe that secular trends in the global economy are favorable and that our businesses can perform well, as they have all year."

Net revenues for the first nine months of 2007 were $20.0 billion, down 23% from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62% from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61%. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pre-tax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16%, net earnings per diluted share were down 63% and net earnings were down 62% from the prior-year period. The pre-tax profit margin for the first nine months was 12.8%, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the one-time items. The annualized return on average common equity was 6.5%, down 13.0 percentage points from the first nine months of 2006, or down 13.4 percentage points excluding the one-time items.

2

Business Segment Review:

In the first quarter of 2006, Merrill Lynch recorded the one-time compensation expenses (pre-tax) in the business segments as follows: $1.4 billion to Global Markets and Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). The one-time net benefit associated with the MLIM merger was recorded in the Corporate Segment. Comparisons to results from the third quarter and first nine months of 2006 in the following discussion of business segment results exclude the impact of these

Exhibit 47

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

## FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15 (d) of the**
**Securities Exchange Act of 1934**

---

Date of Report (Date of earliest event reported):                    January 17, 2008

---

Merrill Lynch & Co., Inc.

---

(Exact Name of Registrant as Specified in its Charter)

| Delaware | 1-7182 | 13-2740599 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

---

4 World Financial Center, New York, New York                    10080

---

(Address of Principal Executive Offices)                    (Zip Code)

---

Registrant's telephone number, including area code:                    (212) 449-1000

---

---

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.    Results of Operations and Financial Condition.**

On January 17, 2008, Merrill Lynch & Co., Inc. (Merrill Lynch) announced its results of operations for the three-month period and fiscal year ended December 28, 2007. A copy of the related press release is filed as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference. A Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three-month period and fiscal year ended December 28, 2007 and supplemental quarterly and annual data for Merrill Lynch are filed as Exhibit 99.2 to this Form 8-K and are incorporated herein by reference.

This information furnished under this Item 2.02, including Exhibits 99.1 and 99.2, shall be considered "filed" for purposes of the Securities Exchange Act of 1934, as amended.

**Item 9.01.    Financial Statements and Exhibits.**

    (d)   <u>Exhibits</u>

99.1   Press release dated January 17, 2008 issued by Merrill Lynch & Co., Inc.

99.2   Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the

       three-month period and fiscal year ended December 28, 2007 and supplemental quarterly and annual data.

* * *

Source: MERRILL LYNCH & CO I, 8-K, January 17, 2008

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MERRILL LYNCH & CO., INC.

(Registrant)

By:　/s/ Nelson Chai

Nelson Chai

Executive Vice President and

Chief Financial Officer

By:　/s/ Christopher B. Hayward

Christopher B. Hayward

Finance Director and

Principal Accounting Officer

Date:　January 17, 2008

3

EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 99.1 | Press release dated January 17, 2008 issued by Merrill Lynch & Co., Inc. |
| 99.2 | Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three-month period and fiscal year ended December 28, 2007 and supplemental quarterly and annual data. |

4

Source: MERRILL LYNCH & CO I, 8-K, January 17, 2008

# Merrill Lynch Reports Full Year 2007 Net Loss from Continuing Operations of $8.6 Billion

## Record Full Year 2007 Net Revenues from Equity Markets, Investment Banking and Global Private Client

NEW YORK--(BUSINESS WIRE)--Merrill Lynch **(NYSE: MER)** today reported a net loss from continuing operations for the full year 2007 of $8.6 billion, or $10.73 per diluted share, significantly below net earnings from continuing operations of $7.1 billion, or $7.17 per diluted share for 2006. Merrill Lynch's net loss for the full year 2007 was $7.8 billion, or $9.69 per diluted share, significantly below net earnings of $7.5 billion, or $7.59 per diluted share for 2006. Net revenues for 2007 were $11.3 billion, down 67% from $33.8 billion in 2006, while the 2007 pre-tax loss from continuing operations was $12.8 billion compared to pre-tax earnings from continuing operations of $9.8 billion for 2006.

The firm's substantially reduced performance in 2007 was primarily driven by significant declines in Fixed Income, Currencies & Commodities (FICC) net revenues for the second half of the year, which more than offset record full year net revenues in Equity Markets, Investment Banking and Global Private Client (GPC), and record first half net revenues from FICC. During the second half of 2007, FICC net revenues were materially impacted by a weaker business environment and net write-downs that included

1

Source: MERRILL LYNCH & CO I, 8-K, January 17, 2008

$7.9 billion in the third quarter and $11.5 billion in the fourth quarter related to U.S. ABS CDOs[1] and U.S. sub-prime residential mortgages outside of the firm's U.S. bank-related investment securities portfolio. In addition, credit valuation adjustments of $2.6 billion related to hedges with financial guarantors on U.S. ABS CDOs were recorded in the fourth quarter of 2007.

For the fourth quarter of 2007, net revenues were negative $8.2 billion, down from $8.4 billion in the prior-year period, and Merrill Lynch's fourth quarter 2007 pre-tax loss from continuing operations was $14.9 billion. The net loss from continuing operations for the fourth quarter was $10.3 billion, or $12.57 per diluted share, down substantially from net earnings from continuing operations of $2.2 billion in the prior-year quarter. Merrill Lynch's net loss for the fourth quarter of 2007 was $9.8 billion, or $12.01 per diluted share, significantly below net earnings of $2.3 billion, or $2.41 per diluted share for the 2006 fourth quarter.

At the end of the fourth quarter, book value per share was $29.37, down from $41.35 at the end of 2006. Including the impact of the equity and equity-related transactions which closed subsequent to year end, Merrill Lynch's pro forma book value per share would be $30.30 at the end of 2007[2]. Furthermore, adjusting for the company's $6.6 billion mandatory convertible preferred offering on an "if-converted" basis, the pro-forma adjusted book value per share would be $32.80 at year end. These amounts include the assumption that Temasek Holdings exercises its option to acquire an additional 12.5 million shares.

"While the firm's earnings performance for the year is clearly unacceptable, over the last few weeks we have substantially strengthened the firm's liquidity and balance sheet," said John A. Thain, chairman and chief executive officer. "In addition, a great majority of Merrill Lynch's key businesses delivered record results in 2007, and as I look ahead to 2008, the firm is intensely focused on continuing this momentum and delivering growth and increased profitability for our shareholders and employees."

2

Source: MERRILL LYNCH & CO I, 8-K, January 17, 2008

Exhibit 48

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15 (d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported):                    April 17, 2008

Merrill Lynch & Co., Inc.

(Exact Name of Registrant as Specified in its Charter)

| Delaware | 1-7182 | 13-2740599 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 4 World Financial Center, New York, New York | 10080 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code:                    (212) 449-1000

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 2.02. Results of Operations and Financial Condition.

On April 17, 2008, Merrill Lynch & Co., Inc. (Merrill Lynch) announced its results of operations for the three-month period ended March 28, 2008. A copy of the related press release is filed as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference. A Preliminary Unaudited Earnings Summary and Segment Data for the three-month period ended March 28, 2008 and supplemental quarterly data for Merrill Lynch are filed as Exhibit 99.2 to this Form 8-K and are incorporated herein by reference.

This information furnished under this Item 2.02, including Exhibits 99.1 and 99.2, shall be considered "filed" for purposes of the Securities Exchange Act of 1934, as amended.

Item 9.01. Financial Statements and Exhibits.

(d)    Exhibits

99.1    Press release, dated April 17, 2008 issued by Merrill Lynch & Co., Inc.

99.2    Preliminary Unaudited Earnings Summary and Segment Data for the three-month period ended March 28, 2008 and supplemental quarterly data.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MERRILL LYNCH & CO., INC.

(Registrant)

By:    /s/ Nelson Chai

Nelson Chai

Executive Vice President and

Chief Financial Officer

By:    /s/ Christopher B. Hayward

Christopher B. Hayward

Finance Director and

Principal Accounting Officer

Date:  April 17, 2008

EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 99.1 | Press release, dated April 17, 2008, issued by Merrill Lynch & Co., Inc. |
| 99.2 | Preliminary Unaudited Earnings Summary and Segment Data for the three-month period ended March 28, 2008 and supplemental quarterly data. |

Source: MERRILL LYNCH & CO I, 8-K, April 17, 2008

**Merrill Lynch Reports First Quarter 2008 Net Loss from Continuing Operations of $1.97 Billion**

**Record Quarterly Net Revenues in Global Wealth Management**

NEW YORK--(BUSINESS WIRE)--Merrill Lynch **(NYSE: MER)** today reported a net loss from continuing operations for the first quarter of 2008 of $1.97 billion, or $2.20 per diluted share, compared to net earnings from continuing operations of $2.03 billion, or $2.12 per diluted share for the first quarter of 2007. Merrill Lynch's net loss for the first quarter of 2008 was $1.96 billion, or $2.19 per diluted share, compared to net earnings of $2.16 billion, or $2.26 per diluted share for the year-ago quarter.

In this challenging market environment, which continued to deteriorate during the quarter, first quarter 2008 net revenues were $2.9 billion, down 69% from the prior-year period, primarily due to net write-downs totaling $1.5 billion related to U.S. ABS CDOs[1] and credit valuation adjustments of negative $3.0 billion related to hedges with financial guarantors, most of which related to U.S. super senior ABS CDOs. To a lesser extent, net revenues were also impacted by net write-downs related to leveraged finance and residential mortgage exposures, which were offset by a net benefit of $2.1 billion due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain of our long-term debt liabilities. Excluding these write-downs, credit valuation adjustments and the net benefit related to long-term debt liabilities, net revenues were $7.4 billion[2], down 26% from the prior-year period.

**First Quarter Highlights**

- Record quarterly net revenues in Global Wealth Management ("GWM") with record net interest profit and strong fee-based revenues
- $9 billion of net inflows of client assets into annuitized revenue products and $4 billion net new money, despite challenging market environment

Source: MERRILL LYNCH & CO I, 8-K, April 17, 2008

# Exhibit 49

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): July 17, 2008

Merrill Lynch & Co., Inc.

(Exact Name of Registrant as Specified in its Charter)

| Delaware | 1-7182 | 13-2740599 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 4 World Financial Center, New York, New York | 10080 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: (212) 449-1000

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 2.02.    Results of Operations and Financial Condition.

On July 17, 2008, Merrill Lynch & Co., Inc. (Merrill Lynch) announced its results of operations for the three- and six-month periods ended June 27, 2008.  A copy of the related press release is filed as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference.  A Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three- and six-month periods ended June 27, 2008 and supplemental quarterly data for Merrill Lynch are filed as Exhibit 99.2 to this Form 8-K and are incorporated herein by reference.

This information furnished under this Item 2.02, including Exhibits 99.1 and 99.2, shall be considered "filed" for purposes of the Securities Exchange Act of 1934, as amended.

Item 9.01.    Financial Statements and Exhibits.

      (d)     Exhibits

    99.1     Press release, dated July 17, 2008 issued by Merrill Lynch & Co., Inc.

    99.2     Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three- and six-month periods ended June 27, 2008 and supplemental quarterly data.

* * *

2

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MERRILL LYNCH & CO., INC.

(Registrant)

By:    /s/ Nelson Chai

Nelson Chai

Executive Vice President and

Chief Financial Officer

By:    /s/ Christopher B. Hayward

Christopher B. Hayward

Finance Director and

Principal Accounting Officer

Date:  July 17, 2008

3

EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release, dated July 17, 2008, issued by Merrill Lynch & Co., Inc. |
| 99.2 | Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three- and six-month periods ended June 27, 2008 and supplemental quarterly data. |

4

Source: MERRILL LYNCH & CO I, 8-K, July 17, 2008

**Merrill Lynch Reports Second Quarter 2008 Net Loss from Continuing Operations of $4.6 Billion**

**Merrill Lynch Completes Sale of Bloomberg and Announces Expected Sale of Financial Data Services in Deals Valued at Approximately $8 Billion in Aggregate**

NEW YORK--(BUSINESS WIRE)--Merrill Lynch **(NYSE: MER)** today reported a net loss from continuing operations for the second quarter of 2008 of $4.6 billion, or $4.95 per diluted share, compared to net earnings from continuing operations of $2.0 billion, or $2.10 per diluted share, for the second quarter of 2007. Merrill Lynch's net loss for the second quarter of 2008 was $4.7 billion, or $4.97 per diluted share, compared to net earnings of $2.1 billion, or $2.24 per diluted share, for the year-ago quarter. Second quarter 2008 results included a restructuring charge of $445 million pre-tax ($286 million after-tax) arising from headcount reductions completed during the quarter.

Subsequent to the end of the second quarter, Merrill Lynch continues to enhance its capital position. Earlier today, Merrill Lynch completed the sale of its 20% ownership stake in Bloomberg, L.P. to Bloomberg Inc., for $4.425 billion, and as part of this transaction has entered into a long-term service agreement. Merrill Lynch is also in negotiations and has signed a non-binding letter of intent to sell a controlling interest in Financial Data Services, Inc. (FDS), based on an enterprise value for FDS in excess of $3.5 billion. FDS is currently a wholly-owned subsidiary of Merrill Lynch and is a provider of administrative functions for mutual funds, retail banking products and other services within Global Wealth Management (GWM). Merrill Lynch has provided Bloomberg Inc. with debt financing and intends to provide debt financing for the FDS transaction on a commercially reasonable basis.

Amidst a challenging market environment, Merrill Lynch's core businesses continued to perform well; however, second quarter 2008 net revenues were negative $2.1 billion, compared with positive $9.5 billion in the prior-year period. The revenue decline was driven by net losses totaling $3.5 billion related to U.S. super senior ABS CDOs[1] and credit valuation adjustments of negative $2.9 billion related to hedges with financial guarantors, about half of which related to U.S. super senior ABS CDOs. Other significant net losses included $1.7 billion in the investment portfolio of Merrill Lynch's U.S. banks, as well as $1.3 billion from certain residential mortgage exposures. Active efforts to reduce risk through asset sales combined with these net losses, resulted in meaningful exposure reductions for many of these asset classes.

Net revenues for the second quarter were $7.5 billion, excluding these net losses, credit valuation adjustments and a $91 million net benefit related to credit spread widening on Merrill Lynch's long-term debt liabilities. On a comparable basis, these revenues were down 21% from the prior-year period but up slightly from the first quarter of 2008, reflecting the strength and stability of the firm's core franchise. [2]

The net loss from continuing operations for the first six months of 2008 was $6.6 billion, or $7.17 per diluted share, compared with net earnings from continuing operations of $4.0 billion, or $4.22 per diluted share, in the prior-year period. The first half 2008 net loss and loss per diluted share were $6.6 billion and $7.18, respectively, compared to net earnings of $4.3 billion, or $4.50 per diluted share, for the prior-year period. First half 2008 net revenues were $818 million compared to $19.1 billion in the prior-year period. Excluding the net losses, credit valuation adjustments and a $2.2 billion net benefit related to credit spread widening on Merrill Lynch's long-term debt liabilities, first half 2008 net revenues were $14.9 billion, down 22% from the prior-year period. [2]

**Second Quarter and First Half 2008 Highlights**

- Record first half revenues in Rates and Currencies and third-highest quarterly revenues
- Record first half and quarterly revenues in Global Markets Financing and Services, demonstrating double-digit growth, both year-on-year and sequentially
- Nearly 60% growth in Commodities quarterly revenues compared to the prior-year
- Strong Investment Banking revenues of more than $1 billion for the quarter, where the firm ranked #3 globally for debt and equity origination fees [3]

(1) ABS CDOs are defined as collateralized debt obligations comprised of asset-backed securities.

(2) See Attachment VIII for a reconciliation of non-GAAP measures.

(3) Source: Dealogic.

Source: MERRILL LYNCH & CO I, 8-K, July 17, 2008

Exhibit 50

Web  Images  Maps  News  Shopping  Gmail  more ▾

Portfolios | Sign In

Get quotes    Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**Merrill Lynch & Co., Inc.**(NYSE:MER) - Daily | Weekly

May 1, 2007    - May 31, 2007    [ Update ]   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-May-07 | 94.01 | 95.00 | 92.72 | 92.73 | 5,961,500 |
| 30-May-07 | 92.50 | 93.10 | 91.48 | 92.96 | 6,881,400 |
| 29-May-07 | 91.85 | 93.23 | 91.56 | 93.14 | 3,467,500 |
| 25-May-07 | 92.95 | 93.19 | 91.48 | 91.85 | 4,851,300 |
| 24-May-07 | 93.90 | 94.76 | 92.47 | 92.61 | 5,855,900 |
| 23-May-07 | 94.28 | 95.00 | 93.81 | 93.82 | 3,870,500 |
| 22-May-07 | 93.58 | 94.58 | 93.31 | 94.01 | 3,293,100 |
| 21-May-07 | 93.90 | 94.65 | 93.02 | 93.83 | 5,102,400 |
| 18-May-07 | 93.04 | 94.27 | 92.15 | 94.17 | 5,322,700 |
| 17-May-07 | 92.20 | 92.90 | 91.77 | 92.20 | 3,260,100 |
| 16-May-07 | 92.16 | 92.50 | 91.24 | 92.48 | 4,535,600 |
| 15-May-07 | 92.64 | 93.59 | 91.45 | 91.58 | 5,977,700 |
| 14-May-07 | 93.26 | 93.49 | 91.91 | 92.37 | 4,622,800 |
| 11-May-07 | 91.23 | 93.63 | 91.22 | 93.51 | 6,285,100 |
| 10-May-07 | 91.62 | 92.19 | 90.76 | 91.02 | 4,765,700 |
| 9-May-07 | 91.19 | 92.79 | 90.71 | 92.52 | 5,500,700 |
| 8-May-07 | 91.95 | 92.00 | 90.47 | 91.30 | 4,447,300 |
| 7-May-07 | 92.90 | 93.23 | 92.01 | 92.41 | 4,009,000 |
| 4-May-07 | 92.47 | 92.93 | 92.02 | 92.70 | 4,463,500 |
| 3-May-07 | 91.49 | 92.28 | 90.73 | 92.28 | 4,829,700 |
| 2-May-07 | 90.43 | 91.79 | 90.43 | 91.19 | 4,402,200 |
| 1-May-07 | 90.10 | 90.81 | 88.53 | 90.56 | 5,897,700 |
| 30-Apr-07 | 90.56 | 91.31 | 90.00 | 90.23 | 5,687,200 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▼                              Portfolios | Sign In

[ Get quotes ]   Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**Merrill Lynch & Co., Inc.**(NYSE:MER) - **Daily** | Weekly

Aug 6, 2008   - Aug 6, 2008        [ Update ]   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 27.49 | 28.50 | 26.88 | 28.50 | 33,794,800 |
| 5-Aug-08 | 27.07 | 28.30 | 26.65 | 28.22 | 33,841,100 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Exhibit 51

**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

_____

# FORM 6-K

**REPORT OF FOREIGN ISSUER**

**PURSUANT TO RULE 13a-16 OR 15d-16 OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

**Date: October 30, 2007**

# UBS AG

(Registrant's Name)

Bahnhofstrasse 45, Zurich, Switzerland, and
Aeschenvorstadt 1, Basel, Switzerland
(Registrant's Address)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F ☑                                        Form 40-F ☐

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934.

Yes ☐                                              No ☑

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b): 82-

This Form 6-K consists of the Third Quarter 2007 Financial Report, and Media Release which appear immediately following this page.

# UBS Financial Highlights

**UBS Group**

| CHF million, except where indicated | As of or for the quarter ended | | | % change from | | Year to date | |
|---|---|---|---|---|---|---|---|
| | **30.9.07** | 30.6.07 | 30.9.06 | 2Q07 | 3Q06 | 30.9.07 | 30.9.06 |
| Operating profit before tax (from continuing and discontinued operations) | **(726)** | 6,236 | 2,814 | | | 9,902 | 11,619 |
| Net profit attributable to UBS shareholders | **(830)** | 5,622 | 2,199 | | | 8,067 | 8,850 |
| Net profit attributable to minority interests | **117** | 149 | 105 | (21) | 11 | 428 | 397 |
| **Performance indicators from continuing operations** | | | | | | | |
| Diluted earnings per share (CHF)[1] | **(0.49)** | 2.69 | 1.07 | | | 3.87 | 4.04 |
| Return on equity attributable to UBS shareholders (%)[2] | | | | | | 20.7 | 26.0 |
| **Financial Businesses** [3] | | | | | | | |
| Operating income | **6,169** | 15,651 | 10,462 | (61) | (41) | 35,167 | 34,899 |
| Operating expenses | **7,123** | 9,695 | 7,715 | (27) | (8) | 25,909 | 24,137 |
| Net profit attributable to UBS shareholders from continuing operations | **(1,086)** | 5,152 | 2,114 | | | 7,248 | 8,194 |
| Cost / income ratio (%)[4] | **115.2** | 62.0 | 73.8 | | | 73.7 | 69.4 |
| Net new money (CHF billion)[5] | **38.3** | 34.0 | 41.9 | | | 125.1 | 126.2 |
| Personnel (full-time equivalents) | **83,814** | 81,557 | 75,593 | 3 | 11 | | |
| **UBS balance sheet & capital management** | | | | | | | |
| **Balance sheet key figures** | | | | | | | |
| Total assets | **2,484,235** | 2,539,741 | 2,261,009 | (2) | 10 | | |
| Equity attributable to UBS shareholders | **48,229** | 51,259 | 48,094 | (6) | 0 | | |
| **Market capitalization** | **127,525** | 151,203 | 156,615 | (16) | (19) | | |
| **BIS capital ratios** | | | | | | | |
| Tier 1 (%)[6] | **10.6** | 12.3 | 12.2 | | | | |
| Total BIS (%) | **13.6** | 15.5 | 15.1 | | | | |
| Risk-weighted assets | **390,320** | 378,430 | 331,697 | 3 | 18 | | |
| **Invested assets (CHF billion)** | **3,265** | 3,265 | 2,879 | 0 | 13 | | |
| **Long-term ratings** | | | | | | | |
| Fitch, London | **AA+** | AA+ | AA+ | | | | |
| Moody's, New York | **Aaa** | Aaa | Aa2 | | | | |
| Standard & Poor's, New York[7] | **AA+** | AA+ | AA+ | | | | |

**1** For the EPS calculation, see note 8 to the financial statements. **2** Net profit attributable to UBS shareholders from continuing operations year to date (annualized as applicable) / average equity attributable to UBS shareholders less distributions (estimated as applicable). **3** Excludes results from industrial holdings. **4** Operating expenses / operating income less credit loss expense or recovery. **5** Excludes interest and dividend income. **6** Includes hybrid Tier 1 capital. Please refer to the BIS capital and ratios table in the capital management section. **7** Standard & Poor's long-term rating was changed to AA on 1 October 2007.

## Group: Net profit attributable to UBS shareholders from continuing operations

*CHF million*



Impact on net profit attributable to UBS shareholders from continuing operations from gain on sale of 20.7% stake in Julius Baer (CHF 1,926 million, post-tax) and costs related to the closure of DRCM (CHF 229 million, post-tax)

**Financial Businesses: Net profit attributable to UBS shareholders from continuing operations**



*CHF million*

Impact on net profit attributable to UBS shareholders from continuing operations from gain on sale of 20.7% stake in Julius Baer (CHF 1,926 million, post-tax) and costs related to the closure of DRCM (CHF 229 million, post-tax)

1

# Letter to shareholders

**Dear shareholders,**

On 1 October, we announced that for third quarter we were likely to record an overall loss following a writedown of positions in the Investment Bank, mainly related to deteriorating conditions in the US sub-prime residential mortgage market. We also announced a number of management changes. This followed the outlook statement we made in August, when we released our second quarter results, where we warned of a very weak trading result from the Investment Bank.

The events that led to these announcements are unsatisfactory. However, we believe it is vital to be clear and open at all times, and to make sure you, our shareholders, and the market generally, are informed promptly of developments in your company.

We closed the quarter with a loss for the group, before tax and minority interests, of CHF 726 million. This is within the range of CHF 600 to 800 million we indicated in the announcement. After tax and minority interests, this results in a loss of CHF 830 million attributable to shareholders. It means that, for the first time for many quarters, we have not met our return on equity target. Excluding the gain from the sale of our Julius Baer stake in second quarter 2007 and costs related to the closure of DRCM (post-tax CHF 229 million), annualized RoE for the first three quarters of the year was 17.2% - the lowest level since 2003 and below our revised objective of a minimum return of 20% over the cycle.

**We have introduced a number of measures to improve performance.** With the new management team, we are implementing changes to address the weaknesses that led to the losses. These include the management, size and structure of our balance sheet, and the internal charges we apply to business group funding from treasury. We are also taking steps to strengthen our market risk management and control framework. We will, as a matter of course, continue to keep you updated on these changes.

As our shareholders, you expect us to manage UBS to produce profitable growth. To us, this means: establishing a set of earnings streams that are based on true customer benefit, building a strong and growing client base, and maintaining unique assets and capabilities that are hard for competitors to copy.

Efficiency in managing our financial resources and risks is a prerequisite for all three of these. By making continuous efficiency improvement a permanent task, we will enforce discipline in the way we manage costs, allowing us to direct our investment spending where it makes the greatest difference for our clients and investors. To do this, we will change the incentive structure within UBS to reward people who deliver efficiency gains as well as people who deliver increased revenues.

**What happened to UBS in third quarter?** The difficulties which surfaced in the US sub-prime mortgage market in the first half of 2007 spilled over into the wider global markets in late July, and have continued. As widely reported, this led to losses in several parts of the financial services industry. In some affected areas, such as leveraged lending, UBS saw relatively modest losses. Our exposure to hedge funds as counterparties did not pose any problems. We also did not have material exposure to the widely discussed "conduit business" - an area we deliberately avoided.

We did see substantial losses, though, in our inventory of trading positions related to the US sub-prime residential mortgage-backed securities market. These were mostly in our Investment Bank's mortgage-backed securities business and in positions taken over from the now closed Dillon Read Capital Management business. When these positions, which are sizeable and of which UBS still holds a proportion, were taken, we offset them to some extent with hedges that were designed to mitigate risk in normal market conditions. However, the deterioration in the US sub-prime market, especially in August, was so severe and sudden that markets turned illiquid. There was a substantial deterioration in the value of these securities - including those with high credit ratings. Conditions in the US housing market continued to be weak in the quarter, and the end-September valuations we have put on our holdings of US mortgage-linked securities reflect this. The value of these holdings in the future will, nevertheless, depend on developments in the underlying mortgage pools. The losses led to revenues of negative CHF 4.2 billion in our fixed income, currencies and commodities business (FICC). In addition, we recorded proprietary trading losses in equities statistical arbitrage. Following the announcement of the expected loss for third quarter, Standard & Poor's lowered our long-term credit rating to AA. The rating agency's decision was not wholly unexpected - although we would re-emphasize that UBS remains one of the best capitalized banks with one of the strongest credit ratings in the industry.

**The losses in a few areas in our Investment Bank outweighed the sustained strength in all our other businesses.** Our wealth management businesses had an excellent quarter, with record levels of profitability. Their asset gathering performance remained strong, with inflows of net new money totalling CHF 40.2 billion in the quarter. Fees in both wealth and asset management remained high, driven by the level of invested assets, which stood at CHF 3.1 trillion on 30 September 2007.

For the whole of UBS, net fee and commission income was significantly higher than the levels recorded in third quarter 2006 and only slightly below the all-time high set in second quarter 2007. On top of strong performance in wealth management and asset management, fee and commission income was also boosted by year on year gains in the Investment Bank's equity underwriting and corporate advisory business, plus strong commissions in our equity cash business. Revenues also rose, year on year, in some of our trading businesses, in particular equity derivatives, prime brokerage, rates derivatives, and government bonds as well as the client-facing distribution area of our money market, currencies and commodities business.

Continued strong fee and commission income reflects our structural strengths. By operating together, each business group achieves higher revenues and lower costs, and sees increased client referrals. The market opportunity presented by the record level of wealth creation around the world continues to grow. Our task now is to make the most of the tremendous potential for profitable growth offered by UBS's structure and market position.

Despite the disappointing third quarter result, our performance in the first nine months of this year has been strong. Over this period, net profit attributable to shareholders from continuing operations was CHF 7,713 million. Excluding the gain from the sale of the Julius Baer stake and DRCM closure costs in second quarter, net attributable profit would have been CHF 6,016 million compared with CHF 8,349 million a year earlier.

**Outlook** - The fourth quarter has started with good results from all businesses, including the Investment Bank. However, our FICC business remains exposed to further deterioration in the US housing and mortgage markets as well as rating downgrades for mortgage-related securities, which could lead to further writedowns on our positions. As a result, we are not assuming that the quarter will continue as positively as it has begun, or that the current difficulties will be resolved in the short term.

(For more information, see the sidebar article on page 22 and Note 1 to the Financial Statements on page 61).

30 October 2007

UBS

Marcel Ospel, Chairman

Marcel Rohner, Chief Executive Officer

# Exhibit 52

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 6-K

### REPORT OF FOREIGN ISSUER

### PURSUANT TO RULE 13a-16 OR 15d-16 OF
### THE SECURITIES EXCHANGE ACT OF 1934

**Date: January 30, 2008**

# UBS AG
(Registrant's Name)

Bahnhofstrasse 45, Zurich, Switzerland, and
Aeschenvorstadt 1, Basel, Switzerland
(Registrant's Address)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F  ☑    Form 40-F  ☐

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934.

Yes  ☐    No  ☑

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b): 82-

Source: UBS AG, 6-K, January 30, 2008

This Form 6-K consists of the Media Release that appears immediately following this page.

Source: UBS AG, 6-K, January 30, 2008

**UBS**

UBS AG

Media Relations
Tel. +41-44-234 85 00

www.ubs.com

**30 January 2008**

**Media release**

**UBS pre-announces full-year and fourth quarter 2007 results**

**UBS will report a net loss attributable to shareholders of approximately CHF 4.4 billion for full-year 2007.**

Zurich/Basel, 30 January 2008 — On 10 December 2007, UBS indicated it may record a net loss for full-year 2007.

UBS now expects to report a net loss attributable to shareholders of approximately CHF 4.4 billion for full-year 2007.

For fourth quarter 2007, the net loss attributable to UBS shareholders will be approximately CHF 12.5 billion. These results reflect weak trading revenues in the Fixed Income, Currencies and Commodities (FICC) business in the Investment Bank. FICC numbers will include around USD 12 billion (CHF 13.7 billion) in losses on positions related to the US sub-prime mortgage market and approximately USD 2 billion (CHF 2.3 billion) on other positions related to the US residential mortgage market.

UBS will provide further details on its financial performance on 14 February 2008, when it publishes its final full-year and fourth quarter 2007 results.

On 10 December 2007, UBS also announced a capital improvement program. Two elements of this - replacement of the cash dividend with a stock dividend and a decision to rededicate treasury shares for disposal — immediately contributed to BIS Tier 1 capital. During fourth quarter 2007, UBS reduced its balance sheet and risk weighted assets. This process included the sale of some positions at a loss. The combination of the fourth quarter result, the stock dividend, the re-issue of treasury shares and the reduction in risk weighted assets mean that UBS will report a BIS Tier 1 ratio of 8.8% as of 31 December 2007. This number does not take into account proceeds from the Mandatory Convertible Notes, which, if approved at the Extraordinary General Meeting on 27 February 2008, will further strengthen UBS's Tier 1 capital.

**UBS**

Source: UBS AG, 6-K, January 30, 2008

UBS

Media Relations
30 January 2008
Page 2 of 2

UBS is one of the world's leading financial firms, serving a discerning international client base. Its business, global in scale, is focused on growth. As an integrated firm, UBS creates added value for clients by drawing on the combined resources and expertise of all its businesses.

UBS is the leading global wealth manager, a top tier investment banking and securities firm, and one of the largest global asset managers. In Switzerland, UBS is the market leader in retail and commercial banking.

UBS is present in all major financial centers worldwide. It has offices in 50 countries, with about 39% of its employees working in the Americas, 33% in Switzerland, 16% in the rest of Europe and 12% in Asia Pacific. UBS's financial businesses employ more than 80,000 people around the world. Its shares are listed on the SWX Swiss Stock Exchange, the New York Stock Exchange (NYSE) and the Tokyo Stock Exchange (TSE).

INCORPORATION BY REFERENCE

This Form 6-K is hereby incorporated by reference into (1) each of the registration statements of UBS AG on Form F-3 (Registration Numbers 333-52832; 333-52832-01 to –03; 333-46216; 333-46216-01 and –02; 333-46930; 333-64844; 333-62448; and 333-62448-01 to –04; 333-132747; and 333-132747-01 to -10) and Form S-8 (Registration Numbers 333-57878; 333-50320; 333-49216; 333-49214; 333-49212; 333-49210; 333-103956; 333-127180; 333-127182; 333-127183; and 333-127184) and into each prospectus outstanding under any of the foregoing registration statements, (2) any outstanding offering circular or similar document issued or authorized by UBS AG that incorporates by reference any Form 6-K's of UBS AG that are incorporated into its registration statements filed with the SEC, and (3) the base prospectus of Corporate Asset Backed Corporation ("CABCO") dated June 23, 2004 (Registration Number 333-111572), the Form 8-K of CABCO filed and dated June 23, 2004 (SEC File Number 001-13444), and the Prospectus Supplements relating to the CABCO Series 2004-101 Trust dated May 10, 2004 and May 17, 2004 (Registration Number 033-91744 and 033-91744-05).

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

UBS AG

By:   /s/ Louis Eber
      Name: Louis Eber
      Title: Managing Director

By:   /s/ Niall O'Toole
      Name: Niall O'Toole
      Title: Executive Director

Date: January 30, 2008

Created by 10KWizard    www.10KWizard.com

Exhibit 53

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 6-K

### REPORT OF FOREIGN ISSUER

### PURSUANT TO RULE 13a-16 OR 15d-16 OF
### THE SECURITIES EXCHANGE ACT OF 1934

**Date: April 1, 2008**

# UBS AG
(Registrant's Name)

Bahnhofstrasse 45, Zurich, Switzerland, and
Aeschenvorstadt 1, Basel, Switzerland
(Registrant's Address)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F ☑    Form 40-F ☐

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934.

Yes ☐    No ☑

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b): 82-

Source: UBS AG, 6-K, April 01, 2008

Source: UBS AG, 6-K, April 01, 2008

This Form 6-K consists of the two Media Releases that appear immediately following this page.

Source: UBS AG, 6-K, April 01, 2008



**UBS AG**

Media Relations
Tel. +41-44-234 85 00

www.ubs.com

**1 April 2008**

## Media release

**Pre-announcement of first quarter 2008 estimated net loss of approximately CHF 12 billion**

**Fully underwritten rights issue of approximately CHF 15 billion to strengthen Tier 1 capital**

**Creation of separate unit to manage selected US real estate related positions**

**Marcel Ospel not to seek re-election at Annual General Meeting, to be succeeded as Chairman by Peter Kurer (separate media release)**

**To maintain its position as one of the world's strongest and best capitalized banks, UBS announces a rights issue, fully underwritten by four leading international banks, to raise approximately CHF 15 billion. For the first quarter 2008 UBS expects to report a net loss attributable to UBS shareholders of approximately CHF 12 billion after losses and writedowns of approximately USD 19 billion on US real estate and related structured credit positions. In the first quarter, UBS substantially reduced its real estate related positions through both valuation adjustments and significant disposals. UBS also announces the formation of a new unit to hold certain currently illiquid US real estate assets. UBS is confident that these measures will deal effectively with the firm's real estate exposures and allow the bank to focus on strengthening its core operations. Marcel Ospel, Chairman of UBS, will not seek re-election at the Annual General Meeting on 23 April 2008. Peter Kurer, currently General Counsel of UBS, is proposed for election to the Board of Directors and is to succeed Marcel Ospel as Chairman (see separate media release).**

Zurich/Basel, 1 April 2008 – Commenting on these moves, **Marcel Rohner**, **Chief Executive Officer** of UBS said: "We believe this capital increase and the creation of a vehicle to separate problem assets from the remainder of our businesses will allow us to return to sustainable value creation over time. These measures enable UBS to remain strongly capitalized and focused on client needs – just as our clients expect. During the quarter, profits from most of the businesses remained acceptable in challenging conditions. We have made further prompt writedowns and sales of our impaired US real estate-related positions. We have reduced risk



Media Relations
1 April 2008
Page 2 of 7

weighted assets and implemented measures to control costs and strengthen the structure of the firm. However, the environment remains difficult, and while we are committed to further substantially reducing our exposures we do not want to undertake sales of positions at severely distressed levels. With these measures we have created the basis to weather one of the most difficult periods in the history of the industry."

**Formation of a separate unit for work-out portfolio**

For risk management purposes UBS has already segregated most of its assets related to US residential real estate into a portfolio work-out unit, separating these positions from its other, profitable, businesses. UBS today announces that it will form a new entity to hold substantial parts of the work-out portfolio, which will initially be wholly owned and financed by UBS. UBS's intention is to reduce its exposure in a way that reduces the effect of distressed market conditions on the core businesses while providing the greatest opportunity for shareholders to realize value over time.

**Estimated results for first quarter**

First quarter performance in most of UBS's businesses was acceptable considering the current market environment. Conditions for positions related to US residential mortgages have further deteriorated during the first quarter, particularly in the month of March. These developments have led to further writedowns and losses in the Investment Bank's Fixed Income, Currencies and Commodities (FICC) business. UBS has used all available relevant market parameters and indices to mark its positions.

Based on preliminary internal estimates for the first quarter 2008 UBS expects a net loss attributable to shareholders of approximately CHF 12 billion.

The first quarter 2008 figure includes pre-tax results of approximately CHF 2.1 billion from Global Wealth Management & Business Banking, consistent with its longer-term track record, and a weaker pre-tax performance of approximately CHF 0.3 billion in Global Asset Management. The Investment Bank is expected to record a pre-tax loss of approximately CHF 18 billion. This includes writedowns and losses of approximately USD 19 billion on US real estate and related structured credit positions. Equities and investment banking results were satisfactory, albeit down from both first quarter 2007 and fourth quarter 2007. Costs, however, also fell. Corporate Center's pre-tax result, minorities and tax expenses for the Group accounted for positive CHF 3.5 billion to CHF 4.0 billion.

The result also includes technical accounting effects of approximately CHF 6 billion, mostly recorded in Corporate Center.

Over the first quarter, UBS's exposure to US residential sub-prime mortgage related positions declined to approximately USD 15 billion from USD 27.6 billion on 31 December, and the exposure to Alt-A positions was reduced from USD 26.6 billion to approximately USD 16 billion. These developments are the result of asset disposals as well as the effects of further writedowns. Other risk positions were also reduced. Auction rate certificate positions increased from USD 5.9 billion on 31 December to approximately USD 11 billion.

Exhibit 54

Web   Images   Maps   News   Shopping   Gmail   more ▾

Portfolios | Sign In

Get quotes      Stock screener New!

e.g. CSCO or 'Google

## Historical prices   « Back to overview

### UBS AG (USA)(NYSE:UBS) - Daily | Weekly

May 1, 2007   - May 31, 2007      Update      Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|------|-------|--------|
| 31-May-07 | 65.44 | 65.53 | 65.08 | 65.24 | 645,700 |
| 30-May-07 | 63.95 | 64.96 | 63.94 | 64.90 | 917,100 |
| 29-May-07 | 64.85 | 65.04 | 64.36 | 64.64 | 1,240,600 |
| 25-May-07 | 63.95 | 64.42 | 63.91 | 64.31 | 1,332,700 |
| 24-May-07 | 63.76 | 64.03 | 62.96 | 63.21 | 889,700 |
| 23-May-07 | 64.43 | 64.50 | 64.00 | 64.02 | 654,100 |
| 22-May-07 | 63.96 | 64.01 | 63.50 | 63.74 | 585,100 |
| 21-May-07 | 64.62 | 64.71 | 63.81 | 63.93 | 1,678,900 |
| 18-May-07 | 64.18 | 64.86 | 64.01 | 64.80 | 2,213,200 |
| 17-May-07 | 63.39 | 63.72 | 63.33 | 63.45 | 1,377,200 |
| 16-May-07 | 63.55 | 63.88 | 62.80 | 63.63 | 1,688,800 |
| 15-May-07 | 62.67 | 63.50 | 62.54 | 62.95 | 1,673,900 |
| 14-May-07 | 63.45 | 63.47 | 62.60 | 62.75 | 1,508,800 |
| 11-May-07 | 62.94 | 63.82 | 62.79 | 63.39 | 1,919,600 |
| 10-May-07 | 62.60 | 62.90 | 61.75 | 61.86 | 954,300 |
| 9-May-07 | 62.87 | 63.37 | 62.80 | 63.24 | 1,175,700 |
| 8-May-07 | 62.66 | 62.83 | 62.03 | 62.70 | 1,456,700 |
| 7-May-07 | 63.94 | 64.35 | 63.62 | 63.90 | 1,564,000 |
| 4-May-07 | 63.80 | 63.96 | 63.29 | 63.55 | 1,244,200 |
| 3-May-07 | 62.48 | 63.92 | 62.00 | 63.43 | 6,545,300 |
| 2-May-07 | 64.05 | 65.75 | 64.05 | 65.45 | 2,890,000 |
| 1-May-07 | 65.17 | 65.43 | 64.62 | 65.19 | 1,485,000 |
| 30-Apr-07 | 65.46 | 65.86 | 64.89 | 64.90 | 1,201,000 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Web   Images   Maps   News   Shopping   Gmail   more ▾

Portfolios | Sign In

Get quotes    Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**UBS AG (USA)**(NYSE:UBS) - **Daily** | Weekly

Aug 6, 2008   - Aug 6, 2008      Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 20.61 | 20.81 | 20.25 | 20.61 | 3,404,800 |
| 5-Aug-08 | 19.94 | 20.72 | 19.60 | 20.58 | 4,308,400 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed. To see all exchange delays, please see disclaimer

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Exhibit 55

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) October 19, 2007

# Wachovia Corporation
#### (Exact Name of Registrant as Specified in Its Charter)

**North Carolina**
(State or Other Jurisdiction of Incorporation)

| | |
|---|---|
| **1-10000** | **56-0898180** |
| (Commission File Number) | (IRS Employer Identification No.) |
| **One Wachovia Center** **Charlotte, North Carolina** | **28288-0013** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(704) 374-6565**
(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.**    *Results of Operations and Financial Condition.*

On October 19, 2007, Wachovia Corporation ("Wachovia") issued a news release announcing its financial results for the third quarter ended September 30, 2007 (the "Earnings News Release"). The Earnings News Release is attached as Exhibit (99)(a) to this report and is incorporated by reference into this Item 2.02. In connection with issuing the Earnings News Release, Wachovia also made available its Third Quarter 2007 Quarterly Earnings Report (the "Quarterly Earnings Report"), which includes certain additional historical and forward-looking financial information relating to Wachovia. The Quarterly Earnings Report is attached as Exhibit (99)(b) to this report and is incorporated by reference into this Item 2.02. On October 19, 2007, Wachovia intends to hold a conference call/webcast to discuss the Earnings News Release, the Quarterly Earnings Report, and the Supplemental Information (as defined below).

The information in the preceding paragraph, including Exhibit (99)(a) and Exhibit (99)(b), shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor shall it be incorporated by reference in any filing under the Securities Act of 1933, as amended (the "Securities Act").

Wachovia's Consolidated Balance Sheets and Consolidated Statements of Income, included as part of the Earnings News Release, are attached as Exhibit (99)(c) to this report (the "Financial Statements"), and are incorporated by reference into this Item 2.02. Exhibit (99)(c) is "filed" for purposes of Section 18 of the Exchange Act, and, therefore, may be incorporated by reference in filings under the Securities Act.

The Quarterly Earnings Report contains references to certain information previously furnished to the Securities and Exchange Commission ("SEC") in Exhibit 99(d) to Wachovia's Current Report on Form 8-K dated January 23, 2007 (such furnished information, the "Supplemental Information"). The Supplemental Information shows (1) certain historical financial data for each of Wachovia and Golden West Financial Corporation ("Golden West") and (2) similar combined illustrative information reflecting the merger of Golden West with Wachovia. The historical financial data show the actual financial results of Wachovia and Golden West for the periods indicated. The combined illustrative information shows the illustrative effect of the Golden West merger under the purchase method of accounting hypothetically assuming the merger was consummated as of the applicable prior period, instead of October 1, 2006, the actual merger consummation date. In the case of the combined illustrative information for the full year ended December 31, 2006, the standalone Golden West information represents the period from January 1, 2006 to September 30, 2006.

The combined illustrative information is not prepared in accordance with U.S. generally accepted accounting principles ("GAAP"), although both the historical Wachovia and historical Golden West financial information presented in the Supplemental Information were respectively prepared in accordance with GAAP. Wachovia believes the combined illustrative information is useful to investors in understanding how the financial information of Wachovia and Golden West may have appeared on a combined basis had the two companies

2

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

actually been merged as of the dates indicated and how the financial information of the business segments and a certain sub-segment of the new combined company may have appeared had the two companies actually been merged as of the dates indicated.

The combined illustrative information includes estimated adjustments to record certain assets and liabilities of Golden West at their respective fair values and to record certain exit costs related to Golden West. The estimated adjustments included in the Supplemental Information are subject to updates as additional information becomes available and as additional analyses are performed. Certain other assets and liabilities of Golden West will also be subject to adjustment to their respective fair values, including additional intangible assets which may be identified. Pending more detailed analyses, no estimated adjustments are included in the Supplemental Information for these assets and liabilities. Any change in the fair value of the net assets of Golden West will change the amount of the purchase price allocable to goodwill. In addition, the final adjustments may be materially different from the unaudited estimated adjustments presented in the Supplemental Information. The combined illustrative information cannot be reconciled to GAAP because many of the purchase accounting adjustments resulting from the merger are based upon valuations of assets as of the merger date and therefore cannot be ascertained for prior periods.

Wachovia anticipates that the Golden West merger will provide Wachovia with financial benefits that include increased revenue and reduced operating expenses, but these financial benefits are not reflected in the combined illustrative information. Accordingly, the combined illustrative information does not attempt to predict or suggest future results. It also does not necessarily reflect what the historical results of the combined company would have been had our companies been combined during the periods presented.

The Supplemental Information is based on historical financial information and related notes that Wachovia and Golden West have respectively presented in prior filings with the SEC. Shareholders are encouraged to review that historical financial information and related notes in connection with the Supplemental Information.

**Item 9.01.**     *Financial Statements and Exhibits.*

(d)        Exhibits.

(99)(a)        The Earnings News Release (solely furnished and not filed for purposes of Item 2.02).

(99)(b)        The Quarterly Earnings Report (solely furnished and not filed for purposes of Item 2.02).

(99)(c)        The Financial Statements (filed for purposes of Item 2.02).

* * *

3

This Current Report on Form 8-K (including information included or incorporated by reference herein) may contain, among other things, certain forward-looking statements, including, without limitation, (i) statements regarding certain of Wachovia's goals and expectations with respect to earnings, earnings per share, revenue, expenses and the growth rate in such items, as well as other measures of economic performance, including statements relating to estimates of Wachovia's credit quality trends, (ii) statements relating to the benefits of the merger between A.G. Edwards, Inc. ("A.G. Edwards") and Wachovia completed on October 1, 2007 (the "A.G. Edwards Merger"), including future financial and operating results, cost savings, enhanced revenues and the accretion/dilution to reported earnings that may be realized from the A.G. Edwards Merger, (iii) statements relating to the benefits of the merger between Wachovia and Golden West completed on October 1, 2006 (the "Golden West Merger"), including future financial and operating results, cost savings, enhanced revenues and the accretion/dilution to reported earnings that may be realized from the Golden West Merger, and (iv) statements preceded by, followed by or that include the words "may", "could", "should", "would", "believe", "anticipate", "estimate", "expect", "intend", "plan", "projects", "outlook" or similar expressions. These statements are based upon the current beliefs and expectations of Wachovia's management and are subject to significant risks and uncertainties that are subject to change based on various factors (many of which are beyond Wachovia's control). Actual results may differ from those set forth in the forward-looking statements.

The following factors, among others, could cause Wachovia's financial performance to differ materially from that expressed in such forward-looking statements: (1) the risk that the applicable businesses in connection with the A.G. Edwards Merger or the Golden West Merger will not be integrated successfully or such integrations may be more difficult, time-consuming or costly than expected; (2) the risk that expected revenue synergies and cost savings from the A.G. Edwards Merger or the Golden West Merger may not be fully realized or realized within the expected time frame; (3) the risk that revenues following the A.G. Edwards Merger or the Golden West Merger may be lower than expected; (4) deposit attrition, operating costs, customer loss and business disruption following the A.G. Edwards Merger or the Golden West Merger, including, without limitation, difficulties in maintaining relationships with employees, may be greater than expected; (5) the risk that the strength of the United States economy in general and the strength of the local economies in which Wachovia conducts operations may be different than expected resulting in, among other things, a deterioration in credit quality or a reduced demand for credit, including the resultant effect on Wachovia's loan portfolio and allowance for loan losses; (6) the effects of, and changes in, trade, monetary and fiscal policies and laws, including interest rate policies of the Board of Governors of the Federal Reserve System; (7) potential or actual litigation; (8) inflation, interest rate, market and monetary fluctuations; (9) adverse conditions in the stock market, the public debt market and other capital markets (including changes in interest rate conditions) and the impact of such conditions on Wachovia's brokerage and capital markets activities; (10) the timely development of competitive new products and services by Wachovia and the acceptance of these products and services by new and existing customers; (11) the willingness of customers to accept third party products marketed by Wachovia; (12) the willingness of customers to substitute competitors' products and services for Wachovia's products and services and vice

4

versa; (13) the impact of changes in financial services' laws and regulations (including laws concerning taxes, banking, securities and insurance); (14) technological changes; (15) changes in consumer spending and saving habits; (16) the effect of corporate restructurings, acquisitions and/or dispositions, including, without limitation, the A.G. Edwards Merger and the Golden West Merger, and the actual restructuring and other expenses related thereto, and the failure to achieve the expected revenue growth and/or expense savings from such corporate restructurings, acquisitions and/or dispositions; (17) the growth and profitability of Wachovia's noninterest or fee income being less than expected; (18) unanticipated regulatory or judicial proceedings or rulings; (19) the impact of changes in accounting principles; (20) adverse changes in financial performance and/or condition of Wachovia's borrowers which could impact repayment of such borrowers' outstanding loans; (21) the impact on Wachovia's businesses, as well as on the risks set forth above, of various domestic or international military or terrorist activities or conflicts; and (22) Wachovia's success at managing the risks involved in the foregoing.

Wachovia cautions that the foregoing list of factors is not exclusive. All subsequent written and oral forward-looking statements concerning Wachovia, the A.G. Edwards Merger, the Golden West Merger or other matters and attributable to Wachovia or any person acting on its behalf are expressly qualified in their entirety by the cautionary statements above. Wachovia does not undertake any obligation to update any forward-looking statement, whether written or oral, relating to the matters discussed in this Current Report on Form 8-K.

5

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WACHOVIA CORPORATION

By: _____ /s/   THOMAS J. WURTZ _____

Name:          **Thomas J. Wurtz**
Title:          **Senior Executive Vice President**
                **and Chief Financial Officer**

Date: October 19, 2007

6

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

**Exhibit Index**

| Exhibit No. | Description |
| --- | --- |
| (99)(a) | The Earnings News Release. |
| (99)(b) | The Quarterly Earnings Report. |
| (99)(c) | The Financial Statements. |

7

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

Exhibit (99)(a)





Press Release October 19, 2007

**WACHOVIA EARNS $1.69 BILLION, EPS OF 89 CENTS PER SHARE**

*Strength in core banking and brokerage businesses offset by impact of global fixed income market disruption*

3rd QUARTER 2007 COMPARED WITH 3rd QUARTER 2006

- Lower earnings reflecting disruption in the capital markets resulting in valuation losses of $1.3 billion before tax and reduced origination and distribution revenues in the Corporate and Investment Bank.

- Revenue growth led by a 28 percent increase in net interest income, including Golden West, coupled with disciplined expense control partially offset lower fee income.

- Average loans up 53 percent, driven by higher consumer real estate loans related to the Golden West acquisition, and strong organic growth in commercial, international and auto lending.

- Average core deposits up 30 percent, including Golden West. Sales productivity solid in expanded markets.

- Net charge-offs rose 3 basis points to an annualized 0.19 percent of average net loans. Increased provision for credit losses reflects modest deterioration in credit quality, a more uncertain credit environment and loan growth. Higher nonperforming assets largely related to Golden West consumer real estate NPAs and to higher commercial real estate NPAs largely related to downgrades of residential developers.

- Customer loyalty scores at near record 53.1 percent; organic customer acquisition grew 14.8 percent annualized.

**Earnings Highlights**

| | | | | | | Three Months Ended | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | | |
| (In millions, except per share data) | Amount | EPS | Amount | EPS | Amount | EPS | |
| **Earnings** | | | | | | | |
| Net income *(GAAP)* | $ 1,690 | 0.89 | 2,341 | 1.22 | 1,877 | 1.17 | |
| Net merger-related and restructuring expenses | 22 | 0.01 | 20 | 0.01 | 25 | 0.02 | |
| Earnings excluding merger-related and restructuring expenses | $ 1,712 | 0.90 | 2,361 | 1.23 | 1,902 | 1.19 | |
| **Financial ratios** | | | | | | | |
| Return on average common stockholders' equity | 9.60 % | | 13.54 | | 14.85 | | |
| Net interest margin (a) | 2.92 | | 2.94 | | 3.03 | | |
| Fee and other income as % of total revenue (a) | 37.59 | | 48.38 | | 49.20 | | |
| Overhead efficiency ratio (a) | 59.55 % | | 55.85 | | 57.44 | | |
| **Capital adequacy (b)** | | | | | | | |
| Tier 1 capital ratio | 7.2 % | | 7.5 | | 7.7 | | |
| Total capital ratio | 11.0 | | 11.5 | | 11.5 | | |
| Leverage ratio | 6.1 % | | 6.2 | | 6.6 | | |
| **Asset quality (c)** | | | | | | | |
| Allowance for loan losses as % of nonaccrual and restructured loans | 135 % | | 182 | | 520 | | |
| Allowance for loan losses as % of loans, net | 0.78 | | 0.79 | | 1.03 | | |
| Allowance for credit losses as | | | | | | | |
| % of loans, net (d) | 0.82 | | 0.83 | | 1.09 | | |
| Net charge-offs as % of average loans, net | 0.19 | | 0.14 | | 0.16 | | |
| Nonperforming assets as % of loans, net, foreclosed properties and loans held for sale | 0.63% | | 0.47 | | 0.26 | | |

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

(a)   Tax-equivalent.

(b)   The third quarter of 2007 is based on estimates.

(c)   Asset quality ratios at September 30 and June 30, 2007, reflect the impact of Golden West.

(d)   The allowance for credit losses is the sum of the allowance for loan losses and the reserve for unfunded lending commitments.

— **more** —

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

Table of Contents

**WACHOVIA EARNS $1.69 BILLION, EPS OF 89 CENTS PER SHARE/page 2**

CHARLOTTE, N.C. — Wachovia Corp. (NYSE:WB) today reported net income of $1.69 billion, or 89 cents per share, in the third quarter of 2007 compared with $1.88 billion, or $1.17 per share, in the third quarter of 2006.

After-tax net merger-related expenses amounted to 1 cent per common share in the third quarter of 2007 and 2 cents per common share in the third quarter of 2006. Excluding these expenses, earnings were $1.71 billion, or 90 cents per share, in the third quarter of 2007 and $1.90 billion, or $1.19 per share, in the third quarter of 2006.

"I'm very proud of our ability to provide capital, liquidity and advice to our customers and peers in the face of the disruption in the fixed income markets in the third quarter. These conditions clearly had a disappointing impact on the results of market-oriented businesses, but the strength in our core banking and brokerage businesses continued to serve us very well," said Ken Thompson, Wachovia chairman and chief executive officer. "Our loan and deposit trends were solid, and our retail brokerage performance was strong – and poised for even more growth as our A.G. Edwards colleagues join our team. Additionally, the first of our World Savings branch and deposit conversions was completed successfully last weekend, and going forward, attention in our expanded platform returns fully to sales production. While the impact of the market disruption was significant, it's worth noting that the majority of the lower market valuations in the third quarter largely arose from a repricing of risk in the marketplace and do not reflect deterioration in the underlying credit quality of the assets in our leveraged finance and commercial real estate securitization businesses. Looking ahead, we're taking the appropriate steps to ensure that as markets remain unsettled, we focus intently on actively managing our exposures and controlling costs. Longer term, we believe the challenges of the third quarter will be an advantage to companies like Wachovia with strong capital and liquidity positions and a clear understanding of the needs of customers and investors."

Results in the third quarter of 2007 included the full quarter impact of the October 1, 2006, acquisition of Golden West. Results do not include the impact of the acquisition of A.G. Edwards, Inc., a retail brokerage firm headquartered in St. Louis, Missouri, which closed on October 1 of this year.

**Wachovia Corporation**

| | | | Three Months Ended | |
| --- | --- | --- | --- | --- |
| (In millions) | | September 30, 2007 | June 30, 2007 | September 30, 2006 |
| Net interest income *(Tax-equivalent)* | $ | **4,584** | 4,487 | 3,578 |
| Fee and other income | | **2,761** | 4,206 | 3,465 |
| Total revenue *(Tax-equivalent)* | | **7,345** | 8,693 | 7,043 |
| Provision for credit losses | | **408** | 179 | 108 |
| Noninterest expense | | **4,374** | 4,856 | 4,045 |
| Net income | | **1,690** | 2,341 | 1,877 |
| Average loans, net | | **429,801** | 421,257 | 281,110 |
| Average core deposits | $ | **379,009** | 378,496 | 291,227 |

In the third quarter of 2007 compared with the third quarter of 2006, Wachovia:

- Grew revenue 4 percent on higher loans and deposits, driven by the addition of Golden West and organic growth, while fee and other income declined reflecting disruption in the capital markets in fixed income and other market-related fees, including net valuation losses of:

  - $1.3 billion in the Corporate and Investment Bank on structured products and leveraged finance warehouse loans and commitments; and

  - $40 million in Capital Management on asset-backed commercial paper investments.

*— more —*

Table of Contents

**WACHOVIA EARNS $1.69 BILLION, EPS OF 89 CENTS PER SHARE/page 3**

- Increased net interest income 28 percent reflecting growth in average commercial loans, up 16 percent, and higher average consumer loans, including the impact of acquisitions.

- Generated strong commercial loan growth led by strength in middle-market commercial, large corporate and international lending. Increased consumer loans were led by higher real estate loans primarily due to the addition of Golden West, as well as growth in auto lending.

- Also generated 30 percent growth in average core deposits while average low-cost core deposits were up 7 percent.

- Generated continued strong performance in retail brokerage managed account fees and solid retail brokerage transaction activity. Strong principal investing results and higher traditional banking fees also contributed to growth.

- Held noninterest expense growth, including the effect of acquisitions, to 8 percent largely reflecting lower revenue-based compensation in light of the market disruption.

- Recorded a provision for credit losses of $408 million reflecting modest deterioration in credit quality, a more uncertain credit environment and loan growth. Net charge-offs were $206 million, or an annualized 0.19 percent of average net loans. Total nonperforming assets including loans held for sale were $3.0 billion, or 0.63 percent of loans, foreclosed properties and loans held for sale.

Earnings in the third quarter of 2007 included a $249 million after-tax benefit related to correction of errors primarily in earlier periods in 2007. This related primarily to incorrect application of hedge accounting to certain variable rate demand deposits in the second quarter of 2007. Wachovia's management believes that this impact is not material to current or prior period financial statements, and the Audit Committee of Wachovia's Board of Directors, based on information reviewed by management with the Committee, concurred with management's conclusion.

**Lines of Business**

The following discussion covers the results for Wachovia's four core business segments and is on a segment earnings basis, which excludes net merger-related and restructuring expenses, other intangible amortization and discontinued operations. Segment earnings are the basis on which Wachovia manages and allocates capital to its business segments. Pages 13 and 14 include a reconciliation of segment results to Wachovia's consolidated results of operations in accordance with GAAP.

**General Bank Highlights**

| | | Three Months Ended | |
|---|---|---|---|
| (In millions) | September 30, 2007 | June 30, 2007 | September 30, 2006 |
| Net interest income *(Tax-equivalent)* | $ 3,486 | 3,397 | 2,529 |
| Fee and other income | 969 | 969 | 886 |
| Total revenue *(Tax-equivalent)* | 4,500 | 4,407 | 3,451 |
| Provision for credit losses | 214 | 160 | 120 |
| Noninterest expense | 2,015 | 2,035 | 1,621 |
| Segment earnings | $ 1,443 | 1,405 | 1,086 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | 44.75% | 46.17 | 46.96 |
| Average loans, net | $ 297,295 | 294,369 | 162,501 |
| Average core deposits | 290,693 | 290,970 | 208,705 |
| Economic capital, average | $ 11,556 | 11,502 | 7,121 |

**General Bank**

The General Bank includes retail, small business and commercial customers. The third quarter of 2007 compared with the third quarter of 2006 included:

- Earnings of $1.4 billion on a 30 percent increase in revenue to $4.5 billion, driven by increased loans and deposits primarily reflecting the addition of Golden West, as well as strong organic growth. The business mix continued to shift, reflecting customer preference for fixed rate instead of variable rate loans and certificates of deposit over demand deposits.

— more —

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

Table of Contents

**WACHOVIA EARNS $1.69 BILLION, EPS OF 89 CENTS PER SHARE/page 4**

- An increase in average loans of $134.8 billion including primarily consumer real estate loans from the Golden West acquisition. Organic growth was led by auto lending, middle market commercial and business banking loans.

- Deposit growth led by consumer certificates of deposit, reflecting the addition of Golden West and organic growth. Net new retail checking accounts increased by 255,000 in the third quarter of 2007 compared with an increase of 139,000 in the year ago quarter. World Savings branches generated more than 20,000 of these new accounts. Year to date, net new retail checking accounts amounted to 832,000, compared with 554,000 in full year 2006.

- 9 percent higher fee and other income, with solid growth in service charges and interchange income offsetting lower mortgage banking fees.

- A 221 basis point improvement to a 44.75 percent overhead efficiency ratio, which included the acquisition impact, de novo branch activity and other growth initiatives.

- Increased provision as a result of higher auto, commercial and consumer real estate loan losses.

**Wealth Management Highlights**

| (In millions) | | September 30, 2007 | June 30, 2007 | September 30, 2006 |
|---|---|---|---|---|
| | | | **Three Months Ended** | |
| Net interest income *(Tax-equivalent)* | $ | **183** | 181 | 176 |
| Fee and other income | | **185** | 202 | 197 |
| Total revenue *(Tax-equivalent)* | | **372** | 386 | 376 |
| Provision for credit losses | | **6** | 2 | 2 |
| Noninterest expense | | **252** | 255 | 249 |
| Segment earnings | $ | **72** | 82 | 79 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | | **67.87%** | 65.89 | 66.34 |
| Average loans, net | $ | **21,492** | 21,047 | 19,237 |
| Average core deposits | | **16,638** | 17,028 | 16,312 |
| Economic capital, average | $ | **650** | 654 | 626 |

**Wealth Management**

Wealth Management includes private banking, personal trust, investment advisory services, charitable services, financial planning and insurance brokerage. The third quarter of 2007 compared with the third quarter of 2006 included:

- Lower earnings of $72 million on flat revenue growth due to lower insurance commissions.

- A 4 percent increase in net interest income on solid loan growth and modest deposit growth, partially offset by continued margin compression.

- Record fiduciary and asset management fees, up 10 percent driven by client acceptance of the new investment platform introduced in 2006, new sales and higher market valuations, more than offset by a decline in insurance commissions largely related to an $11 million insurance commission receivables write-off and nonstrategic insurance account dispositions.

- Relatively flat expenses due to efficiency initiatives.

- 14 percent growth in assets under management to $82.8 billion as a result of higher market valuations and new sales.

*— more —*

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

Table of Contents

**WACHOVIA EARNS $1.69 BILLION, EPS OF 89 CENTS PER SHARE/page 5**

**Corporate and Investment Bank Highlights**

| (In millions) | | Three Months Ended | | |
| | | September 30, 2007 | June 30, 2007 | September 30, 2006 |
|---|---|---|---|---|
| Net interest income *(Tax-equivalent)* | $ | **837** | 773 | 709 |
| Fee and other income | | **21** | 1,505 | 998 |
| Total revenue *(Tax-equivalent)* | | **819** | 2,243 | 1,676 |
| Provision for credit losses | | **1** | (2) | (4) |
| Noninterest expense | | **655** | 1,068 | 840 |
| Segment earnings | $ | **105** | 746 | 533 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | | **79.75%** | 47.64 | 50.09 |
| Average loans, net | $ | **82,942** | 76,718 | 70,901 |
| Average core deposits | | **37,040** | 36,520 | 31,576 |
| Economic capital, average | $ | **9,897** | 8,927 | 7,921 |

**Corporate and Investment Bank**

The Corporate and Investment Bank includes corporate lending, investment banking, and treasury and international trade finance. Third quarter 2007 results compared with the third quarter of 2006 included:

- Earnings of $105 million, down $428 million, driven by the $1.3 billion effect of the market disruption, partially offset by improved principal investing results and strong advisory and underwriting fees.

- The market valuation losses, net of applicable hedges, in the Corporate and Investment Bank of:

    - $488 million on commercial mortgage structured products;

    - $103 million on consumer mortgage structured products;

    - $438 million in collateralized debt obligations, collateralized loan obligations and other structured credit products; and

    - $272 million in leveraged finance net of fees.

- Improved principal investing results largely related to a $270 million unrealized gain related to the sale of a minority interest in a fund of direct investments and strong advisory and underwriting fees largely from structured products, merger and acquisition advisory services, and equities underwriting.

- 18 percent growth in net interest income, reflecting growth in loans and in structured product warehouse balances related to the market disruption.

- Core deposit growth in global money market deposits and commercial mortgage servicing, and loan growth primarily in real estate financial services, international and asset-based lending.

- Lower noninterest expense due to decreased revenue-based incentives.

— **more** —

Source: WACHOVIA CORP NEW, 8-K, October 19, 2007

# Exhibit 56

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

---

# FORM 8-K

## CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) January 22, 2008

---

# Wachovia Corporation
**(Exact Name of Registrant as Specified in Its Charter)**

**North Carolina**
**(State or Other Jurisdiction of Incorporation)**

| | |
|---|---|
| **1-10000**<br>(Commission<br>File Number) | **56-0898180**<br>(IRS Employer<br>Identification No.) |
| **One Wachovia Center**<br>**Charlotte, North Carolina**<br>(Address of Principal Executive Offices) | **28288-0013**<br>(Zip Code) |

**(704) 374-6565**
**(Registrant's Telephone Number, Including Area Code)**

---

**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

**Item 2.02.**     *Results of Operations and Financial Condition.*

On January 22, 2008, Wachovia Corporation ("Wachovia") issued a news release announcing its financial results for the fourth quarter and full year ended December 31, 2007 (the "Earnings News Release"). The Earnings News Release is attached as Exhibit (99)(a) to this report and is incorporated by reference into this Item 2.02. In connection with issuing the Earnings News Release, Wachovia also made available its Fourth Quarter Financial Highlights Presentation (the "Fourth Quarter Presentation") and Fourth Quarter 2007 Quarterly Earnings Report (the "Quarterly Earnings Report"), which include certain additional historical and forward-looking financial information relating to Wachovia. Each of the Fourth Quarter Presentation, which is attached as Exhibit (99)(b) to this report, and the Quarterly Earnings Report, which is attached as Exhibit (99)(c) to this report, is incorporated by reference into this Item 2.02. On January 22, 2008, Wachovia intends to hold a conference call/webcast to discuss the Earnings News Release, the Fourth Quarter Presentation, and the Quarterly Earnings Report.

The information in the preceding paragraph, including Exhibit (99)(a), Exhibit (99)(b) and Exhibit (99)(c), shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor shall it be incorporated by reference in any filing under the Securities Act of 1933, as amended (the "Securities Act").

Wachovia's Consolidated Balance Sheets and Consolidated Statements of Income, included as part of the Earnings News Release, are attached as Exhibit (99)(d) to this report (the "Financial Statements"), and are incorporated by reference into this Item 2.02. Exhibit (99)(d) is "filed" for purposes of Section 18 of the Exchange Act, and, therefore, may be incorporated by reference in filings under the Securities Act.

**Item 9.01.**     *Financial Statements and Exhibits.*

(d)          Exhibits.

(99)(a)     The Earnings News Release (solely furnished and not filed for purposes of Item 2.02).

(99)(b)     The Fourth Quarter Presentation (solely furnished and not filed for purposes of Item 2.02).

(99)(c)     The Quarterly Earnings Report (solely furnished and not filed for purposes of Item 2.02).

(99)(d)     The Financial Statements (filed for purposes of Item 2.02).

* * *

2

This Current Report on Form 8-K (including information included or incorporated by reference herein) may contain, among other things, certain forward-looking statements, including, without limitation, (i) statements regarding certain of Wachovia's goals and expectations with respect to earnings, earnings per share, revenue, expenses and the growth rate in such items, as well as other measures of economic performance, including statements relating to estimates of Wachovia's credit quality trends, (ii) statements relating to the benefits of the merger between A.G. Edwards, Inc. ("A.G. Edwards") and Wachovia completed on October 1, 2007 (the "A.G. Edwards Merger"), including future financial and operating results, cost savings, enhanced revenues and the accretion/dilution to reported earnings that may be realized from the A.G. Edwards Merger, (iii) statements relating to the benefits of the merger between Wachovia and Golden West completed on October 1, 2006 (the "Golden West Merger"), including future financial and operating results, cost savings, enhanced revenues and the accretion/dilution to reported earnings that may be realized from the Golden West Merger, and (iv) statements preceded by, followed by or that include the words "may", "could", "should", "would", "believe", "anticipate", "estimate", "expect", "intend", "plan", "projects", "outlook" or similar expressions. These statements are based upon the current beliefs and expectations of Wachovia's management and are subject to significant risks and uncertainties that are subject to change based on various factors (many of which are beyond Wachovia's control). Actual results may differ from those set forth in the forward-looking statements.

The following factors, among others, could cause Wachovia's financial performance to differ materially from that expressed in such forward-looking statements: (1) the risk that the applicable businesses in connection with the A.G. Edwards Merger or the Golden West Merger will not be integrated successfully or such integrations may be more difficult, time-consuming or costly than expected; (2) the risk that expected revenue synergies and cost savings from the A.G. Edwards Merger or the Golden West Merger may not be fully realized or realized within the expected time frame; (3) the risk that revenues following the A.G. Edwards Merger or the Golden West Merger may be lower than expected; (4) deposit attrition, operating costs, customer loss and business disruption following the A.G. Edwards Merger or the Golden West Merger, including, without limitation, difficulties in maintaining relationships with employees, may be greater than expected; (5) the risk that the strength of the United States economy in general and the strength of the local economies in which Wachovia conducts operations may be different than expected resulting in, among other things, a deterioration in credit quality or a reduced demand for credit, including the resultant effect on Wachovia's loan portfolio and allowance for loan losses; (6) the effects of, and changes in, trade, monetary and fiscal policies and laws, including interest rate policies of the Board of Governors of the Federal Reserve System; (7) potential or actual litigation; (8) inflation, interest rate, market and monetary fluctuations; (9) adverse conditions in the stock market, the public debt market and other capital markets (including changes in interest rate conditions) and the impact of such conditions on Wachovia's brokerage and capital markets activities; (10) the timely development of competitive new products and services by Wachovia and the acceptance of these products and services by new and existing customers; (11) the willingness of customers to accept third party products marketed by Wachovia; (12) the willingness of customers to substitute competitors' products and services for Wachovia's products and services and vice versa; (13) the impact of changes in financial services' laws and regulations (including laws

3

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

concerning taxes, banking, securities and insurance); (14) technological changes; (15) changes in consumer spending and saving habits; (16) the effect of corporate restructurings, acquisitions and/or dispositions, including, without limitation, the A.G. Edwards Merger and the Golden West Merger, and the actual restructuring and other expenses related thereto, and the failure to achieve the expected revenue growth and/or expense savings from such corporate restructurings, acquisitions and/or dispositions; (17) the growth and profitability of Wachovia's noninterest or fee income being less than expected; (18) unanticipated regulatory or judicial proceedings or rulings; (19) the impact of changes in accounting principles; (20) adverse changes in financial performance and/or condition of Wachovia's borrowers which could impact repayment of such borrowers' outstanding loans; (21) the impact on Wachovia's businesses, as well as on the risks set forth above, of various domestic or international military or terrorist activities or conflicts; and (22) Wachovia's success at managing the risks involved in the foregoing.

Wachovia cautions that the foregoing list of factors is not exclusive. All subsequent written and oral forward-looking statements concerning Wachovia, the A.G. Edwards Merger, the Golden West Merger or other matters and attributable to Wachovia or any person acting on its behalf are expressly qualified in their entirety by the cautionary statements above. Wachovia does not undertake any obligation to update any forward-looking statement, whether written or oral, relating to the matters discussed in this Current Report on Form 8-K.

4

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WACHOVIA CORPORATION

By: _____ /s/ THOMAS J. WURTZ _____

Name:         **Thomas J. Wurtz**
Title:         **Senior Executive Vice President**
            **and Chief Financial Officer**

Date: January 22, 2008

5

**Exhibit Index**

| Exhibit No. | Description |
| --- | --- |
| (99)(a) | The Earnings News Release. |
| (99)(b) | The Fourth Quarter Presentation. |
| (99)(c) | The Quarterly Earnings Report. |
| (99)(d) | The Financial Statements. |

6

Exhibit (99)(a)





Press Release January 22, 2008

**WACHOVIA EARNS $6.3 BILLION, EPS OF $3.26 PER SHARE IN FULL YEAR 2007**
*In tough economic environment, 4th quarter net income was $51 million, or 3 cents per share*

---

**4th QUARTER 2007 COMPARED WITH 4th QUARTER 2006**

•   Lower earnings largely reflect the effect of continued disruption in the capital markets, which resulted in net valuation losses of $1.7 billion as well as a provision for credit losses of $1.5 billion, which exceeded net charge-offs by $1.0 billion.

•   Net interest income grew modestly, while fee income declined substantially due to the market disruption. Strong momentum in fiduciary and asset management fees and commissions due to the A.G. Edwards acquisition and solid organic growth.

•   Provision expense increased largely reflecting heightened portfolio risks relating to recent significant deterioration in the housing market as well as loan growth.

•   Average loans up 9 percent with strength in commercial lending and auto lending. Average deposits grew 8 percent particularly in money market accounts and certificates of deposit. Strong momentum continued in net new checking accounts, which increased 935,000 in 2007, including 100,000 generated in the former World Savings branch network.

•   Tier 1 and total capital ratios increased from the third quarter of 2007 following the issuance of $2.3 billion of preferred stock and $838 million of trust preferred.

•   Income tax benefit of $285 million principally reflects a reduction in the full year tax rate given a lower than expected level of earnings.

•   Customer loyalty scores maintain near record 53%; organic customer acquisition grew 15% annualized.

**Earnings Highlights**

| | | | Three Months Ended | | | |
|---|---|---|---|---|---|---|
| | December 31, 2007 | | September 30, 2007 | | December 31, 2006 | |
| (In millions, except per share data) | Amount | EPS | Amount | EPS | Amount | EPS |
| **Earnings** | | | | | | |
| Net income *(GAAP)* | $  51 | 0.03 | 1,618 | 0.85 | 2,301 | 1.20 |
| Net merger-related and restructuring expenses | 109 | 0.05 | 21 | 0.01 | 29 | 0.01 |
| Earnings excluding merger-related and restructuring expenses | $  160 | 0.08 | 1,639 | 0.86 | 2,330 | 1.21 |
| Discontinued operations, net of income taxes | — | — | — | — | (46) | (0.02) |
| Earnings excluding merger-related and restructuring expenses, and discontinued operations | $  160 | 0.08 | 1,639 | 0.86 | 2,284 | 1.19 |
| **Financial ratios** | | | | | | |
| Return on average common stockholders' equity | 0.28% | | 9.19 | | 13.09 | |
| Net interest margin (a) | 2.88 | | 2.92 | | 3.09 | |
| Fee and other income as % of total revenue (a) | 35.09 | | 37.90 | | 46.51 | |
| Overhead efficiency ratio (a) | 80.36% | | 61.31 | | 57.53 | |
| **Capital adequacy (b)** | | | | | | |
| Tier 1 capital ratio | 7.2% | | 7.1 | | 7.4 | |
| Total capital ratio | 11.5 | | 10.8 | | 11.3 | |
| Leverage ratio | 6.1% | | 6.1 | | 6.0 | |

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

**Asset quality**

| | | | |
|---|---|---|---|
| Allowance for loan losses as % of nonaccrual and restructured loans | **96%** | 135 | 272 |
| Allowance for loan losses as % of loans, net | **0.98** | 0.78 | 0.80 |
| Allowance for credit losses as % of loans, net (c) | **1.02** | 0.82 | 0.84 |
| Net charge-offs as % of average loans, net | **0.41** | 0.19 | 0.14 |
| Nonperforming assets as % of loans, net, foreclosed properties and loans held for sale | **1.08%** | 0.63 | 0.32 |

(a)    Tax-equivalent.

(b)    The fourth quarter of 2007 is based on estimates.

(c)    The allowance for credit losses is the sum of the allowance for loan losses and the reserve for unfunded lending commitments.

— **more** —

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

Table of Contents
**WACHOVIA EARNS $6.3 BILLION, EPS OF $3.26 PER SHARE IN 2007/page 2**

CHARLOTTE, N.C. – Wachovia Corp. (NYSE:WB) today reported net income of $51 million, or 3 cents per share, in the fourth quarter of 2007 compared with $2.30 billion, or $1.20 per share, in the fourth quarter of 2006.

Excluding after-tax net merger-related expenses of 5 cents per share in the fourth quarter of 2007 and 1 cent per share in the fourth quarter of 2006, earnings were $160 million, or 8 cents per share, in the fourth quarter of 2007 compared with $2.33 billion, or $1.21 per share, in the fourth quarter of 2006.

Full year 2007 net income was $6.31 billion, down 19 percent from $7.79 billion in 2006, and earnings per share were down 30 percent from 2006 to $3.26. Excluding after-tax net merger-related expenses of 8 cents in 2007 and 7 cents in 2006, earnings in 2007 were $6.47 billion, or $3.34 per share, compared with $7.91 billion, or $4.70 per share, in 2006.

"The continued turmoil in the capital markets and the dramatic change in the credit environment diminished our fourth quarter results substantially," said Ken Thompson, Wachovia chairman and chief executive officer. "We took active and prudent steps in the second half of the year to deal with the market disruption and credit deterioration, and we believe this allows us to move forward from a position of strength despite the uncertain economic environment. For the full year, we earned $6.3 billion, paid $4.6 billion in dividends, and maintained a well-capitalized balance sheet even as we had $3.1 billion in net market-related valuation losses and increased our allowance for credit losses by $1.2 billion. Our management team and dedicated employees are focused intently on the strategic priorities that prepared us well for this more difficult economic environment: controlling expenses, managing risk appropriately, creating revenue synergies between our businesses, and continuing to provide industry-leading customer service. We're excited about the future with our new partners from A.G. Edwards and with our newest banking markets in some of the nation's fastest growing and affluent regions."

Results in 2007 included the impact of the acquisition of A.G. Edwards, Inc., a retail brokerage firm headquartered in St. Louis, Missouri. This transaction was consummated on October 1, 2007, and the retail brokerage business was consolidated into Wachovia Securities LLC on January 1, 2008. Integration activity will continue through 2009.

**Wachovia Corporation**

| | | Three Months Ended | | |
| --- | --- | --- | --- | --- |
| (In millions) | | December 31, 2007 | September 30, 2007 | December 31, 2006 |
| Net interest income *(Tax-equivalent)* | $ | **4,674** | 4,584 | 4,612 |
| Fee and other income | | **2,526** | 2,797 | 4,011 |
| Total revenue *(Tax-equivalent)* | | **7,200** | 7,381 | 8,623 |
| Provision for credit losses | | **1,497** | 408 | 206 |
| Noninterest expense | | **5,786** | 4,525 | 4,962 |
| Income (loss) from continuing operations before income taxes (benefits) *(Tax-equivalent)* | | **(190)** | 2,259 | 3,330 |
| Income taxes (benefits) *(Tax-equivalent)* | | **(241)** | 641 | 1,075 |
| Net income | | **51** | 1,618 | 2,301 |
| Average loans, net | | **449,805** | 429,801 | 412,561 |
| Average core deposits | $ | **390,043** | 379,009 | 362,427 |

In the fourth quarter of 2007 compared with the fourth quarter of 2006, Wachovia:

• Generated revenue of $7.2 billion on higher loan and deposit balances driven primarily by organic growth, while fee and other income declined due to net market disruption-related valuation losses of $1.7 billion and significantly reduced fee income related to the disruption in the capital markets.

— **more** —

Table of Contents
**WACHOVIA EARNS $6.3 BILLION, EPS OF $3.26 PER SHARE IN 2007/page 3**

- Increased net interest income modestly, reflecting higher average commercial loans, up 22 percent, and average consumer loans, up 1 percent, as well as solid deposit growth.

  - Commercial loan growth was led by middle-market commercial, large corporate and international lending, while consumer loan growth, which benefited from lower mortgage prepayments, was led by traditional mortgage lending and auto loans.

  - Average core deposits rose 8 percent and average low-cost core deposits were up 5 percent.

  - Growth in lower spread loans and other earning assets, a shift in deposit mix and the effects of the inverted yield curve resulted in 21 basis points of margin compression, although the margin decline slowed to 4 basis points from the third quarter of 2007.

- Generated growth in fee and other income in key relationship management areas, with strength in service charges, up 11 percent, and higher commissions, up 53 percent, primarily related to the addition of A.G. Edwards. Asset management fees reached a new high, reflecting continued growth in retail brokerage managed account fees, trust and investment fees, and the addition of A.G. Edwards. Trading, securities losses and other income reflected the net valuation losses related to the market disruption.

- Recorded a 17 percent increase in noninterest expense largely reflecting the acquisition impact.

- Recorded a provision for credit losses of $1.5 billion, which exceeded net charge-offs by $1.0 billion. The provision largely reflected the recent significant deterioration in the residential housing market and the related portions of the commercial real estate portfolio, including higher expected loss factors for the consumer real estate and auto loan portfolios, and for the commercial portfolios following an extensive review of a large portion of the real estate financial services portfolio in light of this deterioration. Net charge-offs were $461 million, or an annualized 0.41 percent of average net loans. Total nonperforming assets including loans held for sale were $5.2 billion, or 1.08 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer due to the effects of the weakened housing industry.

**Lines of Business**

The following discussion covers the results for Wachovia's four core business segments and is on a segment earnings basis, which excludes net merger-related and restructuring expenses, other intangible amortization and discontinued operations. Segment earnings are the basis on which Wachovia manages and allocates capital to its business segments.

Pages 14 and 15 include a reconciliation of segment results to Wachovia's consolidated results of operations in accordance with GAAP.

— **more** —

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

**Table of Contents**

**WACHOVIA EARNS $6.3 BILLION, EPS OF $3.26 PER SHARE IN 2007/page 4**

**General Bank Highlights**

| | | Three Months Ended | |
| --- | --- | --- | --- |
| (In millions) | December 31, 2007 | September 30, 2007 | December 31, 2006 |
| Net interest income *(Tax-equivalent)* | $ **3,420** | 3,483 | 3,468 |
| Fee and other income | **963** | 969 | 956 |
| Total revenue *(Tax-equivalent)* | **4,428** | 4,497 | 4,461 |
| Provision for credit losses | **329** | 214 | 148 |
| Noninterest expense | **2,148** | 2,013 | 1,934 |
| Segment earnings | $ **1,239** | 1,441 | 1,510 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | **48.52%** | 44.77 | 43.36 |
| Average loans, net | $ **305,750** | 297,142 | 289,474 |
| Average core deposits | **296,560** | 290,354 | 280,069 |
| Economic capital, average | $ **11,721** | 11,554 | 11,147 |

**General Bank**

The General Bank includes retail, small business and commercial customers. The fourth quarter of 2007 compared with the fourth quarter of 2006 included:

- Earnings of $1.2 billion, down $271 million, driven by a small decrease in revenue, a higher provision for credit losses and higher noninterest expense.

- A continued shift in the business mix reflecting customer preferences for fixed rate instead of variable rate loans and certificates of deposit over demand deposits.

- Average loan growth of 6 percent, reflecting double digit growth in wholesale businesses and small business, and 4 percent growth in consumer loans.

- 6 percent deposit growth led by consumer certificates of deposit, up $15.2 billion, and money market deposits, up $3.0 billion from year-end 2006. Net new retail checking accounts increased by 90,000 in the fourth quarter of 2007 compared with an increase of 87,000 in the fourth quarter of 2006. For the full year, net new retail checking accounts increased 935,000 in 2007 compared with an increase of 554,000 in 2006; this increase included more than 100,000 generated in the former World Savings branch network.

- Modest growth in fee and other income, with double digit growth in service charges and interchange income offsetting lower mortgage banking fee income and losses of $30 million on the sale of student loans.

- Noninterest expense up 11 percent, with expenses up across the board as organizational realignment drove salaries and severance costs higher. De novo branch activity continued, with 109 branches added and 128 consolidated in full year 2007. The increased investment drove the General Bank's overhead efficiency ratio up 516 basis points to 48.52 percent.

- A $181 million increase in the provision for credit losses largely reflecting significant deterioration in consumer real estate, as well as losses in auto, partially offset by a decline in commercial real estate losses.

— more —

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

Table of Contents
**WACHOVIA EARNS $6.3 BILLION, EPS OF $3.26 PER SHARE IN 2007/page 5**

**Wealth Management Highlights**

| | | | Three Months Ended | |
| --- | --- | --- | --- | --- |
| (In millions) | | December 31, 2007 | September 30, 2007 | December 31, 2006 |
| Net interest income *(Tax-equivalent)* | $ | **184** | 186 | 180 |
| Fee and other income | | **215** | 184 | 200 |
| Total revenue *(Tax-equivalent)* | | **402** | 374 | 384 |
| Provision for credit losses | | **7** | 6 | — |
| Noninterest expense | | **260** | 253 | 253 |
| Segment earnings | $ | **85** | 74 | 84 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | | **64.87%** | 67.39 | 65.57 |
| Average loans, net | $ | **21,831** | 21,600 | 19,840 |
| Average core deposits | | **16,772** | 16,943 | 17,255 |
| Economic capital, average | $ | **655** | 652 | 635 |

**Wealth Management**

Wealth Management includes private banking, personal trust, investment advisory services, charitable services, financial planning and insurance brokerage. The fourth quarter of 2007 compared with the fourth quarter of 2006 included:

- Modest earnings growth to $85 million on 5 percent revenue growth, offset by 3 percent growth in expense and higher provision for credit losses.

- Strong fiduciary and asset management fees related to a pricing initiative implemented in the third quarter and other growth, all of which contributed to 8 percent growth in fee and other income. Insurance commissions declined largely due to nonstrategic insurance account dispositions.

- 2 percent growth in net interest income on 10 percent average loan growth, which offset spread compression.

- An increase in expense on modest growth in salaries and benefits including higher non-merger severance costs.

**Corporate and Investment Bank Highlights**

| | | | Three Months Ended | |
| --- | --- | --- | --- | --- |
| (In millions) | | December 31, 2007 | September 30, 2007 | December 31, 2006 |
| Net interest income *(Tax-equivalent)* | $ | **988** | 839 | 776 |
| Fee and other income | | **(789)** | 21 | 1,363 |
| Total revenue *(Tax-equivalent)* | | **162** | 822 | 2,102 |
| Provision for credit losses | | **112** | 1 | 3 |
| Noninterest expense | | **991** | 654 | 1,044 |
| Segment earnings (loss) | $ | **(596)** | 105 | 670 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | | **609.60%** | 79.69 | 49.63 |
| Average loans, net | $ | **91,646** | 82,993 | 72,699 |
| Average core deposits | | **36,131** | 37,066 | 32,466 |
| Economic capital, average | $ | **11,326** | 9,881 | 8,363 |

**Corporate and Investment Bank**

The Corporate and Investment Bank includes corporate lending, investment banking, and treasury and international trade finance. Fourth quarter 2007 results compared with the fourth quarter of 2006 included:

— more —

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

Table of Contents
**WACHOVIA EARNS $6.3 BILLION, EPS OF $3.26 PER SHARE IN 2007/page 6**

- A segment loss of $596 million driven by $1.6 billion in net valuation losses reflecting continued disruption in the capital markets and reduced origination volume in most market-related businesses.

- Market valuation losses, net of applicable hedges of:

  - $1.0 billion in subprime residential asset-backed collateralized debt obligations and other related exposures, compared with $350 million in the prior quarter;

  - $600 million in commercial mortgage structured products, compared with $488 million in the prior quarter;

  - $123 million in consumer mortgage structured products, compared with $82 million in the prior quarter;

  - $93 million gain in leveraged finance net of fees, compared with a net $272 million in losses in the prior quarter; and

  - $59 million net gain in non-subprime collateralized debt obligations and other structured products, compared with $109 million net loss in the prior quarter.

- A 27 percent increase in net interest income, which reflected 26 percent growth in average loans particularly in real estate products in growth markets and international lending in emerging markets, as well as a shift from originate, warehouse and sell to originate and hold assets on the balance sheet.

- Lower principal investing compared with strong results in the prior year quarter and particularly from a very strong third quarter of 2007.

- Lower noninterest expense primarily related to lower incentive compensation.

- Provision of $112 million largely reflecting residential-related commercial real estate losses.

**Capital Management Highlights**

| (In millions) | | Three Months Ended | | |
| --- | --- | --- | --- | --- |
| | | December 31, 2007 | September 30, 2007 | December 31, 2006 |
| Net interest income *(Tax-equivalent)* | $ | **323** | 271 | 258 |
| Fee and other income | | **2,211** | 1,444 | 1,370 |
| Total revenue *(Tax-equivalent)* | | **2,523** | 1,707 | 1,620 |
| Provision for credit losses | | **—** | — | — |
| Noninterest expense | | **1,972** | 1,273 | 1,232 |
| Segment earnings | $ | **350** | 275 | 247 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | | **78.14%** | 74.62 | 75.99 |
| Average loans, net | $ | **2,295** | 2,142 | 1,419 |
| Average core deposits | | **38,019** | 31,489 | 30,100 |
| Economic capital, average | $ | **2,392** | 1,560 | 1,507 |

**Capital Management**

Capital Management includes retail brokerage services and asset management. The fourth quarter of 2007 compared with the fourth quarter of 2006 included:

— more —

Source: WACHOVIA CORP NEW, 8-K, January 22, 2008

Exhibit 57

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

---

# FORM 8-K

### CURRENT REPORT PURSUANT

## TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of report (Date of earliest event reported) April 14, 2008**

---

# Wachovia Corporation
#### (Exact Name of Registrant as Specified in Its Charter)

**North Carolina**
**(State or Other Jurisdiction of Incorporation)**

| | |
|---|---|
| **1-10000** | **56-0898180** |
| (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **One Wachovia Center** | |
| **Charlotte, North Carolina** | **28288-0013** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(704) 374-6565**
**(Registrant's Telephone Number, Including Area Code)**

---

**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.**     *Results of Operations and Financial Condition.*

On April 14, 2008, Wachovia Corporation ("Wachovia") issued a news release announcing its financial results for the first quarter ended March 31, 2008 (the "Earnings News Release"). The Earnings News Release is attached as Exhibit (99)(a) to this report and is incorporated by reference into this Item 2.02. In connection with issuing the Earnings News Release, Wachovia also made available its First Quarter Financial Highlights Presentation (the "First Quarter Presentation") and First Quarter 2008 Quarterly Earnings Report (the "Quarterly Earnings Report"), which include certain additional historical and forward-looking financial information relating to Wachovia. Each of the First Quarter Presentation, which is attached as Exhibit (99)(b) to this report, and the Quarterly Earnings Report, which is attached as Exhibit (99)(c) to this report, is incorporated by reference into this Item 2.02. On April 14, 2008, Wachovia intends to hold a conference call/webcast to discuss the Earnings News Release, the First Quarter Presentation, the Quarterly Earnings Report and other matters relating to Wachovia.

The information in the preceding paragraph, including Exhibit (99)(a), Exhibit (99)(b) and Exhibit (99)(c), shall be deemed to be "filed" for purposes of the Securities Exchange Act of 1934, as amended, and shall be incorporated by reference in any filing under the Securities Act of 1933, as amended.

**Item 8.01.**     *Other Events.*

*Common Stock Dividend*

As set forth in the Earnings News Release, on April 14, 2008, Wachovia announced that it is reducing its quarterly common stock dividend to $0.375 per share from $0.64 per share. The $0.375 per share dividend will be payable on June 16, 2008 to Wachovia's common stock shareholders of record as of May 30, 2008. The Earnings News Release is attached as Exhibit (99)(a) to this report and is incorporated by reference into this Item 8.01.

*Legal Proceedings*

The following updates the disclosure in Part I Item 3 of Wachovia's Annual Report on Form 10-K:

*Payment Processing Center.* As previously disclosed, the Office of the Comptroller of the Currency is conducting a formal investigation of Wachovia's handling of the PPC account relationship and of five other customers engaged in similar businesses. Wachovia anticipates resolution of the investigation will involve restitution.

*Municipal Derivative Bid Practices Investigation.* In addition to matters previously disclosed, Wachovia Bank N.A. has been named as a defendant in three substantially identical purported class actions, two originally filed in the U.S. District Court for the Southern District of New York and one filed in the U.S. District Court for the District of Columbia. The

2

complaints allege that Wachovia Bank, N.A. and various co-defendant financial institutions engaged in a conspiracy not to compete and to fix prices and rig bids for municipal derivatives (including Guaranteed Investment Contracts) sold to issuers of municipal bonds. All the complaints assert claims for violations of Section 1 of the Sherman Act, and one complaint also asserts a claim for unjust enrichment.

The complaint in the *Fairfax County* action (D.D.C.) was filed March 12, 2008; the complaint in the *Hinds County* action (S.D.N.Y.) was filed on March 13, 2008; and the complaint in the *Haywood County* action (S.D.N.Y.) was filed on March 24, 2008. On March 19, 2008, plaintiff *Fairfax County* filed a motion before the Judicial Panel on Multidistrict Litigation ("MDL Panel") to consolidate all the actions for pretrial proceedings in the District of the District of Columbia. The plaintiff in the *Hinds County* action has consented to transfer the case from the Southern District of New York to the District of the District of Columbia.

*Other Regulatory Matters*. In the course of its banking and financial services businesses, Wachovia and its affiliates are subject to information requests and investigations by governmental and self-regulatory authorities. These authorities have instituted numerous ongoing investigations of various practices in the banking, securities and mutual fund industries, including those discussed in Wachovia's previous filings with the SEC and those relating to anti-money laundering, sales practices, record retention and other laws and regulations involving our customers and their accounts. The investigations cover advisory companies to mutual funds, broker-dealers, hedge funds and others and may involve the activities of customers or third parties with respect to accounts maintained by Wachovia or transactions in which Wachovia may be involved. Wachovia has received subpoenas and other requests for documents and testimony relating to the investigations, is endeavoring to comply with those requests, is cooperating with the investigations, and where appropriate, is engaging in discussions to resolve the investigations or take other remedial actions.

**Item 9.01.    *Financial Statements and Exhibits.***

(d)        Exhibits.

(99)(a)    The Earnings News Release (filed for purposes of Item 2.02 and Item 8.01).

(99)(b)    The First Quarter Presentation (filed for purposes of Item 2.02).

(99)(c)    The Quarterly Earnings Report (filed for purposes of Item 2.02).

***

This Current Report on Form 8-K (including information included or incorporated by reference herein) may contain, among other things, certain forward-looking statements, including, without limitation, (i) statements regarding certain of Wachovia's goals and

3

Source: WACHOVIA CORP NEW, 8-K, April 14, 2008

expectations with respect to earnings, earnings per share, revenue, expenses and the growth rate in such items, as well as other measures of economic performance, including statements relating to estimates of Wachovia's credit quality trends, (ii) statements relating to the benefits of the merger between A.G. Edwards, Inc. ("A.G. Edwards") and Wachovia completed on October 1, 2007 (the "A.G. Edwards Merger"), including future financial and operating results, cost savings, enhanced revenues and the accretion/dilution to reported earnings that may be realized from the A.G. Edwards Merger, (iii) statements relating to the benefits of the merger between Wachovia and Golden West completed on October 1, 2006 (the "Golden West Merger"), including future financial and operating results, cost savings, enhanced revenues and the accretion/dilution to reported earnings that may be realized from the Golden West Merger, and (iv) statements preceded by, followed by or that include the words "may", "could", "should", "would", "believe", "anticipate", "estimate", "expect", "intend", "plan", "projects", "outlook" or similar expressions. These statements are based upon the current beliefs and expectations of Wachovia's management and are subject to significant risks and uncertainties that are subject to change based on various factors (many of which are beyond Wachovia's control). Actual results may differ from those set forth in the forward-looking statements.

The following factors, among others, could cause Wachovia's financial performance to differ materially from that expressed in such forward-looking statements: (1) the risk that the applicable businesses in connection with the A.G. Edwards Merger or the Golden West Merger will not be integrated successfully or such integrations may be more difficult, time-consuming or costly than expected; (2) the risk that expected revenue synergies and cost savings from the A.G. Edwards Merger or the Golden West Merger may not be fully realized or realized within the expected time frame; (3) the risk that revenues following the A.G. Edwards Merger or the Golden West Merger may be lower than expected; (4) deposit attrition, operating costs, customer loss and business disruption following the A.G. Edwards Merger or the Golden West Merger, including, without limitation, difficulties in maintaining relationships with employees, may be greater than expected; (5) the risk that the strength of the United States economy in general and the strength of the local economies in which Wachovia conducts operations may be different than expected resulting in, among other things, a deterioration in credit quality or a reduced demand for credit, including the resultant effect on Wachovia's loan portfolio and allowance for loan losses; (6) the effects of, and changes in, trade, monetary and fiscal policies and laws, including interest rate policies of the Board of Governors of the Federal Reserve System; (7) potential or actual litigation; (8) inflation, interest rate, market and monetary fluctuations; (9) adverse conditions in the stock market, the public debt market and other capital markets (including changes in interest rate conditions) and the impact of such conditions on Wachovia's brokerage and capital markets activities; (10) the timely development of competitive new products and services by Wachovia and the acceptance of these products and services by new and existing customers; (11) the willingness of customers to accept third party products marketed by Wachovia; (12) the willingness of customers to substitute competitors' products and services for Wachovia's products and services and vice versa; (13) the impact of changes in financial services' laws and regulations (including laws concerning taxes, banking, securities and insurance); (14) technological changes; (15) changes in consumer spending and saving habits; (16) the effect of corporate restructurings, acquisitions and/or dispositions, including, without limitation, the A.G. Edwards Merger and

4

Source: WACHOVIA CORP NEW, 8-K, April 14, 2008

the Golden West Merger, and the actual restructuring and other expenses related thereto, and the failure to achieve the expected revenue growth and/or expense savings from such corporate restructurings, acquisitions and/or dispositions; (17) the growth and profitability of Wachovia's noninterest or fee income being less than expected; (18) unanticipated regulatory or judicial proceedings or rulings; (19) the impact of changes in accounting principles; (20) adverse changes in financial performance and/or condition of Wachovia's borrowers which could impact repayment of such borrowers' outstanding loans; (21) the impact on Wachovia's businesses, as well as on the risks set forth above, of various domestic or international military or terrorist activities or conflicts; and (22) Wachovia's success at managing the risks involved in the foregoing.

Wachovia cautions that the foregoing list of factors is not exclusive. All subsequent written and oral forward-looking statements concerning Wachovia, the A.G. Edwards Merger, the Golden West Merger or other matters and attributable to Wachovia or any person acting on its behalf are expressly qualified in their entirety by the cautionary statements above. Wachovia does not undertake any obligation to update any forward-looking statement, whether written or oral, relating to the matters discussed in this Current Report on Form 8-K.

5

**SIGNATURES**

    Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WACHOVIA CORPORATION

By:                   /s/   T<small>HOMAS</small> J. W<small>URTZ</small>

Name:                   **Thomas J. Wurtz**
Title:                     **Senior Executive Vice President**
                             **and Chief Financial Officer**

Date: April 14, 2008

6

**Exhibit Index**

| Exhibit No. | Description |
| --- | --- |
| (99)(a) | The Earnings News Release. |
| (99)(b) | The First Quarter Presentation. |
| (99)(c) | The Quarterly Earnings Report. |

7

Source: WACHOVIA CORP NEW, 8-K, April 14, 2008

Exhibit (99)(a)





Press Release April 14, 2008

**WACHOVIA REPORTS 1ST QUARTER RESULTS; ANNOUNCES INITIATIVES
TO FURTHER ENHANCE CAPITAL BASE AND FLEXIBILITY**

**— Plans to Raise Capital through Public Offering**

**— Reduces Quarterly Dividend to $0.375 Per Common Share, Preserving $2.0 Billion of
Capital Annually**

**— Increases Credit Reserves; Provision $2.1 Billion Above Net Charge-offs**

**— Net Loss of $350 Million or $393 Million (20 Cents) after Preferred Dividend**

**— Strong Sales Momentum and Solid Underlying Expense Control Cushions Impact of
Rising Credit Costs and Market Disruption Losses**

---

CHARLOTTE, N.C. – Wachovia today announced a series of actions to further enhance its capital base and operational flexibility, and updated its credit reserve modeling to reflect greater emphasis on forecasted changes in customer behavior assuming continued house price depreciation. These actions include:

- Plans to raise capital through a public offering of common stock and perpetual convertible preferred stock;

- Lowering the quarterly common stock dividend, which preserves $2.0 billion of capital annually, to build capital ratios and provide more operational flexibility. The board of directors declared a quarterly common stock dividend of $0.375 cents per common share, payable on June 16, 2008, to stockholders of record on May 30, 2008. This dividend level is consistent with Wachovia's capital needs and growth opportunities for each of its business segments, and with an anticipated 40 percent to 50 percent cash payout ratio over the intermediate horizon; and

- The update in the credit reserve modeling in response to the current and forecasted market environment and its effect on consumer behavior, particularly in stressed markets, resulting in a significant increase in the first quarter 2008 provision for credit losses. In addition, the scope of credit disclosures was increased to provide enhanced insight into the payment option consumer real estate portfolio.

In addition, Wachovia reported a first quarter 2008 net loss of $350 million before preferred dividends, or a net loss available to common stockholders of $393 million, (20 cents per common share). These results, which reflect higher credit costs and the continued disruption in the capital markets, compared with earnings of $2.30 billion, or $1.20 per share, in the first quarter of 2007.

While solid underlying performance was overshadowed by market disruption-related valuation losses of $2.0 billion, Wachovia generated total revenue of $7.9 billion on higher loans and deposits and strength in fiduciary and asset management fees, brokerage commissions and traditional banking fees, including the impact of the A.G. Edwards acquisition.

"I'm deeply disappointed with our first quarter results, but I am confident we're taking prudent and appropriate actions in this challenging period to restore Wachovia to a more profitable path. The precipitous decline in housing market conditions and unprecedented changes in consumer behavior prompted us to update our credit reserve modeling and rely less heavily on historical trends to forecast losses. As a result, we have substantially increased our reserves," said Ken Thompson, Wachovia's chief executive officer. "The most painful decision was to reduce the dividend because it adversely affects our shareholders. But we believe the long-term benefit to

— more —

WACHOVIA REPORTS 1ST QUARTER RESULTS; ANNOUNCES CAPITAL INITIATIVES/page 2

shareholder value outweighs the disadvantage of the dividend reduction as we fortify our balance sheet against continued instability in the housing and capital markets.

"It's important to note that in early 2007 in advance of the market dislocation, we took steps to bolster our liquidity and reduce market-related exposures in products originally intended for distribution," Thompson added. "We have generally been a provider of liquidity to the market during this period of market disruption, and we also continue to reduce our market-related exposures. The actions we announced today will further enhance and ensure our ongoing financial flexibility to invest and drive future earnings growth. With strengthened reserves and capital, and our strong deposit base, we believe we're well-positioned to continue to successfully weather this uniquely challenging period."

**Earnings Highlights**

| (In millions, except per share data) | Three Months Ended | | | | | |
| | March 31, 2008 | | December 31, 2007 | | March 31, 2007 | |
| | Amount | EPS | Amount | EPS | Amount | EPS |
|---|---|---|---|---|---|---|
| **Earnings** | | | | | | |
| Net income (loss) | $ (350) | — | 193 | 0.10 | 2,302 | 1.20 |
| Discontinued operations, net of income taxes | — | — | (142) | (0.07) | — | — |
| Dividends on preferred stock | (43) | | | | | |
| Net income (loss) available to common stockholders | $ (393) | (0.20) | 51 | 0.03 | 2,302 | 1.20 |
| Discontinued operations, net of income taxes | — | — | 142 | 0.07 | — | — |
| Income (loss) from continuing operations | (393) | (0.20) | 193 | 0.10 | 2,302 | 1.20 |
| Net merger-related and restructuring expenses | 123 | 0.06 | 108 | 0.05 | 6 | — |
| Earnings (loss) excluding merger-related and restructuring expenses, and discontinued operations | $ (270) | (0.14) | 301 | 0.15 | 2,308 | 1.20 |
| **Financial ratios** | | | | | | |
| Return on average common stockholders' equity | (2.11)% | | 0.28 | | 13.47 | |
| Net interest margin (a) | 2.92 | | 2.88 | | 3.06 | |
| Fee and other income as % of total revenue (a) | 39.15 | | 36.99 | | 45.15 | |
| Overhead efficiency ratio (a) | 68.91% | | 78.00 | | 55.88 | |
| **Capital adequacy (b)** | | | | | | |
| Tier 1 capital ratio | 7.5% | | 7.4 | | 7.4 | |
| Total capital ratio | 12.1 | | 11.8 | | 11.4 | |
| Leverage ratio | 6.2% | | 6.1 | | 6.1 | |
| **Asset quality** | | | | | | |
| Allowance for loan losses as % of nonaccrual and restructured loans | 84% | | 90 | | 207 | |
| Allowance for loan losses as % of loans, net | 1.37 | | 0.98 | | 0.80 | |
| Allowance for credit losses as % of loans, net (c) | 1.41 | | 1.02 | | 0.84 | |
| Net charge-offs as % of average loans, net | 0.66 | | 0.41 | | 0.15 | |
| Nonperforming assets as % of loans, net, foreclosed properties and loans held for sale | 1.70% | | 1.14 | | 0.42 | |

(a)    Tax-equivalent.
(b)    The first quarter of 2008 is based on estimates.
(c)    The allowance for credit losses is the sum of the allowance for loan losses and the reserve for unfunded lending commitments.

Results include after-tax net merger-related expenses of 6 cents per share in the first quarter of 2008; these expenses did not affect earnings per share in the first quarter of 2007. Excluding the merger-related expenses, results were a net loss available to common stockholders of $270 million, or 14 cents per share, in the first quarter of 2008. Results also include the impact of the A.G. Edwards, Inc., acquisition from October 1, 2007.

— more —

Source: WACHOVIA CORP NEW, 8-K, April 14, 2008

**WACHOVIA REPORTS 1ST QUARTER RESULTS; ANNOUNCES CAPITAL INITIATIVES/page 3**

**Wachovia Corporation**

| | | Three Months Ended | |
|---|---|---|---|
| (In millions) | March 31, 2008 | December 31, 2007 | March 31, 2007 |
| Net interest income *(Tax-equivalent)* | $ 4,805 | 4,674 | 4,537 |
| Fee and other income | 3,091 | 2,744 | 3,734 |
| Total revenue *(Tax-equivalent)* | 7,896 | 7,418 | 8,271 |
| Provision for credit losses | 2,831 | 1,497 | 177 |
| Noninterest expense | 5,441 | 5,786 | 4,621 |
| Income (loss) from continuing operations before income taxes (benefits) *(Tax-equivalent)* | (531) | 28 | 3,337 |
| Income taxes (benefits) *(Tax-equivalent)* | (181) | (165) | 1,035 |
| Net income (loss) available to common stockholders | (393) | 51 | 2,302 |
| Average loans, net | 465,936 | 449,805 | 415,261 |
| Average core deposits | $ 394,513 | 390,043 | 369,270 |

Other key trends in the first quarter of 2008 compared with the first quarter of 2007 included:

- Revenue of $7.9 billion on higher loan and deposit balances, while fee and other income declined due to net market disruption-related valuation losses of $2.0 billion and significantly reduced fee income related to the disruption in the capital markets. Otherwise, strong momentum continued in fiduciary and asset management fees and brokerage commissions reflecting the A.G. Edwards acquisition and organic growth. Results included $445 million in net gains related to adoption of new fair value accounting standards and a $225 million gain related to the Visa initial public offering.

- Net interest margin compression of 14 basis points year over year, although the margin rose 4 basis points from the fourth quarter of 2007. Net interest income rose modestly, reflecting growth in average commercial loans, up 26 percent, and average consumer loans, up 4 percent, as well as solid core deposit growth, up 7 percent. Average loan growth included the impact of $7.3 billion of transfers to the loan portfolio from held-for-sale as well as strength in commercial, commercial real estate and traditional conforming mortgage loans. Deposit growth was led by strength in IRAs and money market accounts.

- An 18 percent increase in noninterest expense largely reflecting the impact of A.G. Edwards, as well as growth in credit-related sundry expense.

- Provision for credit losses of $2.8 billion, which exceeded net charge-offs by $2.1 billion. The provision largely reflected more severe deterioration in the residential housing market, particularly in specific markets in California and Florida, as well as the result of the refinements made to the credit reserve model for the payment option product. These refinements incorporate multiple and more granular factors regarding unprecedented consumer behavior, housing price deterioration and increased foreclosures. Net charge-offs were $765 million, or an annualized 0.66 percent of average net loans. Total nonperforming assets including loans held for sale were $8.4 billion, or 1.70 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer real estate-related nonperforming assets due to the effects of the weakened housing industry.

**Lines of Business**

The following discussion covers the results for Wachovia's four core business segments and is on a segment earnings basis, which excludes net merger-related and restructuring expenses, other intangible amortization and discontinued operations. Segment earnings are the basis on which

— **more** —

**WACHOVIA REPORTS 1ST QUARTER RESULTS; ANNOUNCES CAPITAL INITIATIVES/page 4**

Wachovia manages and allocates capital to its business segments. In accordance with Wachovia's business segment methodology, provision expense in excess of charge-offs, which amounted to $2.1 billion in the first quarter of 2008, is not allocated to business segments.

Pages 13 and 14 include a reconciliation of segment results to Wachovia's consolidated results of operations in accordance with GAAP.

**General Bank Highlights**

| | | Three Months Ended | |
| --- | --- | --- | --- |
| (In millions) | March 31, 2008 | December 31, 2007 | March 31, 2007 |
| Net interest income *(Tax-equivalent)* | $  3,455 | 3,402 | 3,398 |
| Fee and other income | 990 | 929 | 845 |
| Total revenue *(Tax-equivalent)* | 4,500 | 4,389 | 4,290 |
| Provision for credit losses | 569 | 320 | 147 |
| Noninterest expense | 2,050 | 2,041 | 1,869 |
| Segment earnings | $  1,195 | 1,287 | 1,444 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | 45.55% | 46.50 | 43.56 |
| Average loans, net | $  311,447 | 303,269 | 288,229 |
| Average core deposits | 297,680 | 296,568 | 284,046 |
| Economic capital, average | $  12,695 | 11,179 | 10,662 |

**General Bank**

The General Bank includes retail, small business and commercial customers. The first quarter of 2008 compared with the first quarter of 2007 included:

- Earnings of $1.2 billion, down $249 million, driven by rapidly rising credit costs and related expenses, which overshadowed continued strong sales momentum reflected in total revenue of $4.5 billion, up 5 percent.

- Average loan growth of 8 percent, with double digit growth in wholesale businesses and 4 percent growth in mortgage lending as a decline in prepayments offset lower volumes on the payment option mortgage product.

    - Significant efforts in the mortgage business included a restructuring of the operating model, extensive loss mitigation efforts and initiatives to increase the volume of marketable mortgages.

    - A home equity lending decline of 41 percent, reflecting implementation of tightened credit standards. Over 95 percent of our home equity loans are originated through our branch network and other direct channels.

    - A 26 percent increase in auto loan originations

- Average core deposit growth of 5 percent, largely reflecting strength in wholesale deposits, which were up 10 percent, and an increase of 4 percent in retail deposits.

    - Growth in net new retail checking accounts slowed to a still strong increase of 174,000 in the first quarter of 2008 compared with an increase of 268,000 in the first quarter of 2007.

    - Net new checking accounts include 139,000 linked to the new Way2Save accounts, which launched in mid-January 2008.

— more —

Source: WACHOVIA CORP NEW, 8-K, April 14, 2008

**WACHOVIA REPORTS 1ST QUARTER RESULTS; ANNOUNCES CAPITAL INITIATIVES/page 5**

- 17 percent growth in fee and other income, with strength in service charges, interchange income and mortgage banking fee income. Strong interchange income reflected an 18 percent increase in debit/credit card volume from the first quarter of 2007.

- Noninterest expense up 10 percent due to growth in credit-related sundry expense, as well as on continued strategic investment in de novo branch activity, Western expansion and buildup in credit card operations. During the first quarter of 2008, 23 de novo branches were opened and 58 branches were consolidated. As a result of performance initiatives, operating leverage continued to improve, which enabled the continued strategic investment.

- A $422 million increase in the provision for credit losses largely reflecting rapid deterioration in consumer real estate in certain housing markets and higher losses on auto loans.

**Wealth Management Highlights**

| | | | Three Months Ended | |
| --- | --- | --- | --- | --- |
| (In millions) | | March 31, 2008 | December 31, 2007 | March 31, 2007 |
| Net interest income *(Tax-equivalent)* | $ | **181** | 183 | 181 |
| Fee and other income | | **211** | 214 | 196 |
| Total revenue *(Tax-equivalent)* | | **397** | 400 | 380 |
| Provision for credit losses | | **5** | 7 | 1 |
| Noninterest expense | | **246** | 249 | 247 |
| Segment earnings | $ | **92** | 91 | 84 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | | **62.08%** | 62.27 | 65.12 |
| Average loans, net | $ | **22,413** | 21,791 | 20,394 |
| Average core deposits | | **17,397** | 16,773 | 17,267 |
| Economic capital, average | $ | **705** | 616 | 592 |

**Wealth Management**

Wealth Management includes private banking, personal trust, investment advisory services, charitable services, financial planning and insurance brokerage. The first quarter of 2008 compared with the first quarter of 2007 included:

- Earnings of $92 million on 4 percent revenue growth in challenging markets.

- Strong fiduciary and asset management fees as a pricing initiative implemented in the third quarter of 2007 and new sales offset declines in equity valuations. Insurance commissions declined largely due to a soft market for insurance premiums and nonstrategic insurance account dispositions.

- Relatively flat net interest income as solid loan growth offset deposit spread compression.

- A slight decline in expense driven by efficiency initiatives, which offset the impact of private banking and Western expansion investment.

- 5 percent growth in assets under management to $79.8 billion as asset gathering overcame market depreciation.

— **more** —

Source: WACHOVIA CORP NEW, 8-K, April 14, 2008

**WACHOVIA REPORTS 1ST QUARTER RESULTS; ANNOUNCES CAPITAL INITIATIVES/page 6**

**Corporate and Investment Bank Highlights**

| | | | Three Months Ended | |
|---|---|---|---|---|
| (In millions) | | March 31, 2008 | December 31, 2007 | March 31, 2007 |
| Net interest income *(Tax-equivalent)* | $ | **1,032** | 988 | 716 |
| Fee and other income | | **(159)** | (555) | 1,109 |
| Total revenue *(Tax-equivalent)* | | **823** | 383 | 1,782 |
| Provision for credit losses | | **197** | 112 | 6 |
| Noninterest expense | | **747** | 952 | 911 |
| Segment earnings (loss) | $ | **(77)** | (431) | 550 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | | **90.76%** | 247.83 | 51.10 |
| Average loans, net | $ | **101,024** | 91,702 | 73,385 |
| Average core deposits | | **33,623** | 36,200 | 34,227 |
| Economic capital, average | $ | **13,242** | 11,293 | 8,329 |

**Corporate and Investment Bank**

The Corporate and Investment Bank includes corporate lending, investment banking, and treasury and international trade finance. First quarter 2008 results compared with the first quarter of 2007 included:

- A segment loss of $77 million driven by $1.6 billion in net valuation losses reflecting continued disruption in the capital markets and reduced origination volume in most market-related businesses.

- Market valuation losses, net of applicable hedges, of:

  - $339 million in subprime residential asset-backed collateralized debt obligations and other related exposures, compared with $818 million in fourth quarter 2007, excluding discontinued operations;

  - $521 million in commercial mortgage structured products, compared with $600 million in fourth quarter 2007;

  - $251 million in consumer mortgage structured products, compared with $123 million in fourth quarter 2007;

  - $309 million in leveraged finance net of fees, compared with a net $93 million gain in fourth quarter 2007; and

  - $144 million in non-subprime collateralized debt obligations and other structured products, compared with a $59 million net gain in fourth quarter 2007.

- A 44 percent increase in net interest income, which reflected 38 percent growth in average loans including the transfer into the loan portfolio at fair value of certain loans originally slated for disposition, as well as loan growth in the corporate lending and global financial institutions business.

- Principal investing revenue of $414 million, largely due to a net $486 million of gains related to the adoption of new fair value accounting standards in January 2008, offset by mark-to-market losses in the direct investment portfolio.

— more —

Source: WACHOVIA CORP NEW, 8-K, April 14, 2008

**WACHOVIA REPORTS 1ST QUARTER RESULTS; ANNOUNCES CAPITAL INITIATIVES/page 7**

- An 18 percent decline in noninterest expense primarily due to lower variable compensation and reduced headcount in investment banking.

- Provision of $197 million largely reflecting residential-related commercial real estate losses.

**Capital Management Highlights**

| (In millions) | | Three Months Ended | |
| --- | --- | --- | --- |
| | March 31, 2008 | December 31, 2007 | March 31, 2007 |
| Net interest income *(Tax-equivalent)* | $    274 | 318 | 259 |
| Fee and other income | 2,191 | 2,211 | 1,477 |
| Total revenue *(Tax-equivalent)* | 2,455 | 2,518 | 1,728 |
| Provision for credit losses | — | — | — |
| Noninterest expense | 1,855 | 1,938 | 1,237 |
| Segment earnings | $    381 | 368 | 312 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | 75.54% | 76.96 | 71.59 |
| Average loans, net | $  2,562 | 2,295 | 1,554 |
| Average core deposits | 43,084 | 38,019 | 31,683 |
| Economic capital, average | $  2,143 | 2,120 | 1,334 |

**Capital Management**

Capital Management includes retail brokerage services and asset management. The first quarter of 2008 compared with the first quarter of 2007 included:

- Earnings of $381 million on 42 percent revenue growth, which primarily reflected the A.G. Edwards acquisition. In addition, solid growth in retail brokerage managed account and other asset-based fees despite declining equity markets offset lower transactional revenue and equity syndicate distribution fees. The impact of FDIC sweep deposit growth of $11.0 billion partially offset spread compression in the declining interest rate environment.

- Record annuity sales of $2.7 billion, including $1.5 billion in the General Bank financial centers.

- 50 percent growth in noninterest expense largely due to the effect of A.G. Edwards, as well as higher legal expense and revenue-based commissions.

Total assets under management of $258.7 billion at March 31, 2008, decreased 6 percent from December 31, 2007, primarily due to declining market valuations.

***

Wachovia Corporation (NYSE:WB) is one of the nation's largest diversified financial services companies, with assets of $808.9 billion and market capitalization of $53.8 billion at March 31, 2008. Wachovia provides a broad range of retail banking and brokerage, asset and wealth management, and corporate and investment banking products and services to customers through 3,300 retail financial centers in 21 states from Connecticut to Florida and west to Texas and California, and nationwide retail brokerage, mortgage lending and auto finance businesses. Globally, clients are served in selected corporate and institutional sectors and through more than 40 international offices. Our retail brokerage operations under the Wachovia Securities brand name manage more than $1.1 trillion in client assets through 18,600 registered representatives in 1,500 offices nationwide. Online banking is available at wachovia.com; online brokerage products and services at wachoviasec.com; and investment products and services at evergreeninvestments.com.

— more —

Source: WACHOVIA CORP NEW, 8-K, April 14, 2008

Exhibit 58

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

---

# FORM 8-K

### CURRENT REPORT PURSUANT

### TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) July 22, 2008

---

# Wachovia Corporation
(Exact Name of Registrant as Specified in Its Charter)

**North Carolina**
(State or Other Jurisdiction of Incorporation)

| | |
|---|---|
| **1-10000**<br>(Commission<br>File Number) | **56-0898180**<br>(IRS Employer<br>Identification No.) |
| **One Wachovia Center**<br>**Charlotte, North Carolina**<br>(Address of Principal Executive Offices) | **28288-0013**<br>(Zip Code) |

(704) 374-6565
(Registrant's Telephone Number, Including Area Code)

---

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.**   *Results of Operations and Financial Condition.*

On July 22, 2008, Wachovia Corporation ("Wachovia") issued a news release announcing its financial results for the second quarter ended June 30, 2008 (the "Earnings News Release"). The Earnings News Release is attached as Exhibit (99)(a) to this report and is incorporated by reference into this Item 2.02. In connection with issuing the Earnings News Release, Wachovia also made available its Second Quarter Financial Highlights Presentation (the "Second Quarter Presentation") and Second Quarter 2008 Quarterly Earnings Report (the "Quarterly Earnings Report"), which include certain additional historical and forward-looking financial information relating to Wachovia. Each of the Second Quarter Presentation, which is attached as Exhibit (99)(b) to this report, and the Quarterly Earnings Report, which is attached as Exhibit (99)(c) to this report, is incorporated by reference into this Item 2.02. On July 22, 2008, Wachovia intends to hold a conference call/webcast to discuss the Earnings News Release, the Second Quarter Presentation, the Quarterly Earnings Report and other matters relating to Wachovia.

The information in the preceding paragraph, including Exhibit (99)(a), Exhibit (99)(b) and Exhibit (99)(c), shall not be deemed to be "filed" for purposes of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor shall it be incorporated by reference in any filing under the Securities Act of 1933, as amended (the "Securities Act").

Wachovia's Consolidated Balance Sheets and Consolidated Statements of Income, included as part of the Earnings News Release, are attached as Exhibit (99)(d) to this report (the "Financial Statements"), and are incorporated by reference into this Item 2.02. Exhibit (99)(d) is "filed" for purposes of Section 18 of the Exchange Act, and, therefore, may be incorporated by reference in filings under the Securities Act.

**Item 8.01.**   *Other Events.*

As set forth in the Earnings News Release, on July 22, 2008, Wachovia announced that it is reducing its quarterly common stock dividend to $0.05 per share from $0.375 per share. The $0.05 per share dividend will be payable on September 15, 2008 to Wachovia's common stock shareholders of record as of August 29, 2008. The Earnings News Release is attached as Exhibit (99)(a) to this report and is incorporated by reference into this Item 8.01.

**Item 9.01.**   *Financial Statements and Exhibits.*

(d)       Exhibits.

(99)(a)       The Earnings News Release (solely furnished and not filed for purposes of Item 2.02).

(99)(b)       The Second Quarter Presentation (solely furnished and not filed for purposes of Item 2.02).

(99)(c)       The Quarterly Earnings Report (solely furnished and not filed for purposes of Item 2.02).

(99)(d)       The Financial Statements (filed for purposes of Item 2.02).

***

2

This Current Report on Form 8-K (including information included or incorporated by reference herein) may contain, among other things, certain forward-looking statements, including, without limitation, (i) statements regarding certain of Wachovia's goals and expectations with respect to earnings, earnings per share, revenue, expenses and the growth rate in such items, as well as other measures of economic performance, including statements relating to estimates of Wachovia's credit quality trends, (ii) statements relating to the benefits of the merger between A.G. Edwards, Inc. ("A.G. Edwards") and Wachovia completed on October 1, 2007 (the "A.G. Edwards Merger"), including future financial and operating results, cost savings, enhanced revenues and the accretion/dilution to reported earnings that may be realized from the A.G. Edwards Merger, (iii) statements relating to the benefits of the merger between Wachovia and Golden West completed on October 1, 2006 (the "Golden West Merger"), including future financial and operating results, cost savings, enhanced revenues and the accretion/dilution to reported earnings that may be realized from the Golden West Merger, and (iv) statements preceded by, followed by or that include the words "may", "could", "should", "would", "believe", "anticipate", "estimate", "expect", "intend", "plan", "projects", "outlook" or similar expressions. These statements are based upon the current beliefs and expectations of Wachovia's management and are subject to significant risks and uncertainties that are subject to change based on various factors (many of which are beyond Wachovia's control). Actual results may differ from those set forth in the forward-looking statements.

The following factors, among others, could cause Wachovia's financial performance to differ materially from that expressed in such forward-looking statements: (1) the risk that the applicable businesses in connection with the A.G. Edwards Merger or the Golden West Merger will not be integrated successfully or such integrations may be more difficult, time-consuming or costly than expected; (2) the risk that expected revenue synergies and cost savings from the A.G. Edwards Merger or the Golden West Merger may not be fully realized or realized within the expected time frame; (3) the risk that revenues following the A.G. Edwards Merger or the Golden West Merger may be lower than expected; (4) deposit attrition, operating costs, customer loss and business disruption following the A.G. Edwards Merger or the Golden West Merger, including, without limitation, difficulties in maintaining relationships with employees, may be greater than expected; (5) the risk that the strength of the United States economy in general and the strength of the local economies in which Wachovia conducts operations may be different than expected resulting in, among other things, a deterioration in credit quality or a reduced demand for credit, including the resultant effect on Wachovia's loan portfolio and allowance for loan losses; (6) the effects of, and changes in, trade, monetary and fiscal policies and laws, including interest rate policies of the Board of Governors of the Federal Reserve System; (7) potential or actual litigation; (8) inflation, interest rate, market and monetary fluctuations; (9) adverse conditions in the stock market, the public debt market and other capital markets (including changes in interest

3

rate conditions) and the impact of such conditions on Wachovia's brokerage and capital markets activities; (10) the timely development of competitive new products and services by Wachovia and the acceptance of these products and services by new and existing customers; (11) the willingness of customers to accept third party products marketed by Wachovia; (12) the willingness of customers to substitute competitors' products and services for Wachovia's products and services and vice versa; (13) the impact of changes in financial services' laws and regulations (including laws concerning taxes, banking, securities and insurance); (14) technological changes; (15) changes in consumer spending and saving habits; (16) the effect of corporate restructurings, acquisitions and/or dispositions, including, without limitation, the A.G. Edwards Merger and the Golden West Merger, and the actual restructuring and other expenses related thereto, and the failure to achieve the expected revenue growth and/or expense savings from such corporate restructurings, acquisitions and/or dispositions; (17) the growth and profitability of Wachovia's noninterest or fee income being less than expected; (18) unanticipated regulatory or judicial proceedings or rulings; (19) the impact of changes in accounting principles; (20) adverse changes in financial performance and/or condition of Wachovia's borrowers which could impact repayment of such borrowers' outstanding loans; (21) the impact on Wachovia's businesses, as well as on the risks set forth above, of various domestic or international military or terrorist activities or conflicts; and (22) Wachovia's success at managing the risks involved in the foregoing.

Wachovia cautions that the foregoing list of factors is not exclusive. All subsequent written and oral forward-looking statements concerning Wachovia, the A.G. Edwards Merger, the Golden West Merger or other matters and attributable to Wachovia or any person acting on its behalf are expressly qualified in their entirety by the cautionary statements above. Wachovia does not undertake any obligation to update any forward-looking statement, whether written or oral, relating to the matters discussed in this Current Report on Form 8-K.

4

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WACHOVIA CORPORATION

/s/  THOMAS J. WURTZ

By:

Name:               **Thomas J. Wurtz**
Title:            **Senior Executive Vice President**
                        **and Chief Financial Officer**

Date: July 22, 2008

5

Source: WACHOVIA CORP NEW, 8-K, July 22, 2008

**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| (99)(a) | The Earnings News Release. |
| (99)(b) | The Second Quarter Presentation. |
| (99)(c) | The Quarterly Earnings Report. |
| (99)(d) | The Financial Statements. |

6

Source: WACHOVIA CORP NEW, 8-K, July 22, 2008





Press Release July 22, 2008

### WACHOVIA DETAILS 2ND QUARTER LOSS; OUTLINES INITIATIVES TO PRESERVE AND GENERATE CAPITAL, PROTECT STRONG LIQUIDITY AND REDUCE RISK

#### Actions Include Quarterly Common Stock Dividend Reduction to 5 Cents per Share

#### $8.9 Billion Net Loss Includes $6.1 Billion Noncash Goodwill Impairment and $4.2 Billion Credit Reserve Build; Strength Apparent in Underlying Results

CHARLOTTE, N.C. -- Consistent with previously announced expectations, Wachovia today reported a net loss in the second quarter of 2008 of $8.9 billion, or a net loss of $4.20 per share, including a $6.1 billion noncash goodwill impairment charge in commercial-related subsegments reflecting declining market valuations and asset values. The goodwill impairment charge has no impact on Wachovia's tangible capital levels, regulatory capital ratios or on liquidity.

Wachovia added $5.6 billion to its loan loss reserve to cover net charge-offs and increase the reserve by $4.2 billion.

Excluding goodwill impairment and other notable items that drove the quarter's loss, Wachovia generated solid underlying growth on $7.5 billion in revenue. Revenue was driven by higher loans and deposits and strength in traditional banking fees, while strong fiduciary and asset management fees and brokerage commissions largely reflected the A.G. Edwards acquisition.

"These bottom-line results are disappointing and unacceptable," said Lanty L. Smith, Wachovia's board chairman, who served as interim chief executive officer beginning June 1. "While to some degree they reflect industry headwinds and weaker macroeconomic conditions, they also reflect performance for which we at Wachovia accept responsibility. Our company is facing up to these issues, is addressing the challenges head-on and has redirected near-term strategic priorities."

Two immediate actions were announced: First, reducing the quarterly common stock dividend to five cents per share, which will conserve approximately $700 million of capital per quarter. The dividend is payable on September 15, 2008, to shareholders of record on August 29, 2008. The second immediate action is exiting the General Bank wholesale mortgage origination channel. Earlier the company ceased offering the negative amortization option for the Pick-a-Pay mortgage product and committed to work with customers to refinance existing Pick-a-Pay mortgages into conventional mortgage products. Approximately 1,000 Wachovia mortgage origination personnel are being redeployed in the company's efforts to assist customers to refinance and restructure Pick-a-Pay mortgages. The objective is to assist customers in avoiding foreclosures and meaningfully reduce the company's risks in the mortgage area.

Robert K. Steel, CEO and president said, "In the short term, the entire organization is focused on protecting, preserving and generating capital; reinforcing Wachovia's strong liquidity position; and reducing risk." Steel, who was named to his new post on July 9, further commented that, even as the company focuses on and addresses its credit-related challenges, Wachovia's underlying businesses are performing well: "Wachovia has an exceptionally attractive franchise, footprint and set of businesses. Revenue in our general banking business grew 8 percent over last year and we maintained industry-leading customer satisfaction. The securities brokerage business continues its excellent performance, with increases in both the number and quality of brokers and with industry-leading margins. Our corporate and investment bank has reduced its exposure to further market disruption charges. We had a record quarter in our Wealth Management business."

Wachovia outlined additional initiatives that are under way, ranging from reducing expense growth and capital expenditures, reducing earning assets, repositioning the certificate of deposit book and generating further growth in low-cost core deposits and other deposits. Also, the company is taking actions to reduce the number of credit-only commercial borrowers and to sell selected noncore assets.

— more —

WACHOVIA REPORTS 2ND QUARTER LOSS AMID TOUGH ENVIRONMENT/page 2

Steel summarized by saying: "Our balance sheet and liquidity position are strong, and we are committed to keeping them that way. The actions taken and initiatives under way are expected to generate or preserve more than $5 billion of capital. We ended the quarter with approximately $50 billion in regulatory capital and a tier 1 ratio of 8 percent, and we will be intensely focused on improving that level between now and the end of 2009."

Steel said, "As we consider the company's position, it is clearly prudent and necessary to further reduce our common dividend. While this is a difficult decision, it is the best course for our shareholders over the long term. I am confident of the commitment of the Wachovia team to manage successfully through this period as we continue to diligently serve our customers and communities. I am impressed by the work the Wachovia leadership group has undertaken, the clarity around the issues we face and the direction Wachovia is headed as we focus on being good stewards of the company."

The second quarter 2008 net loss compared with earnings of $2.34 billion or $1.22 per share in the second quarter of 2007. Excluding goodwill impairment of $6.1 billion and net merger-related and restructuring expense of $128 million, results in the second quarter of 2008 were a net loss available to common stockholders of $2.67 billion, or a net loss of $1.27 per share. Results included the A.G. Edwards, Inc., acquisition from October 1, 2007.

Earnings Highlights

| | | | | | Three Months Ended | |
| | June 30, 2008 | | March 31, 2008 | | June 30, 2007 | |
| (In millions, except per share data) | Amount | EPS | Amount | EPS | Amount | EPS |
|---|---|---|---|---|---|---|
| **Earnings** | | | | | | |
| Net income (loss) | $ (8,662) | (4.11) | (664) | (0.34) | 2,341 | 1.22 |
| Dividends on preferred stock | (193) | (0.09) | (43) | (0.02) | — | — |
| Net income (loss) available to common stockholders | $ (8,855) | (4.20) | (707) | (0.36) | 2,341 | 1.22 |
| Net goodwill impairment | 6,056 | 2.87 | — | — | — | — |
| Net merger-related and restructuring expenses | 128 | 0.06 | 123 | 0.06 | 20 | 0.01 |
| Earnings (loss) excluding goodwill impairment, and merger-related and restructuring expenses | $ (2,671) | (1.27) | (584) | (0.30) | 2,361 | 1.23 |
| **Financial ratios** | | | | | | |
| Return on average common stockholders' equity | (49.07) % | | (3.81) | | 13.54 | |
| Net interest margin (a) | 2.58 (d) | | 2.92 | | 2.96 | |
| Fee and other income as % of total revenue (a) | 42.15 | | 36.62 | | 48.58 | |
| Overhead efficiency ratio (a) | 163.58 % | | 71.76 | | 56.02 | |
| **Capital adequacy (b)** | | | | | | |
| Tier 1 capital ratio | 8.0 % | | 7.4 | | 7.5 | |
| Total capital ratio | 12.7 | | 12.1 | | 11.5 | |
| Leverage ratio | 6.6 % | | 6.2 | | 6.2 | |
| **Asset quality** | | | | | | |
| Allowance for loan losses as % of nonaccrual and restructured loans | 95 % | | 84 | | 174 | |
| Allowance for loan losses as % of loans, net | 2.20 | | 1.37 | | 0.79 | |
| Allowance for credit losses as % of loans, net (c) | 2.24 | | 1.41 | | 0.83 | |
| Net charge-offs as % of average loans, net | 1.10 | | 0.66 | | 0.14 | |
| Nonperforming assets as % of loans, net, foreclosed properties and loans held for sale | 2.41 % | | 1.70 | | 0.49 | |

(a) Tax-equivalent.
(b) The second quarter of 2008 is based on estimates.
(c) The allowance for credit losses is the sum of the allowance for loan losses and the reserve for unfunded lending commitments.
(d) Includes the SILO charge of $975 million pre-tax; without that charge, the net interest margin would have been 3.15%.

The pre-tax loss stemmed from:

- The $6.1 billion in noncash goodwill impairment reflecting declining market valuations and the resulting effect on commercial, corporate lending and investment banking subsegments. The goodwill impairment charge has no impact on Wachovia's tangible capital levels or

— more —

Source: WACHOVIA CORP NEW, 8-K, July 22, 2008

WACHOVIA REPORTS 2ND QUARTER LOSS AMID TOUGH ENVIRONMENT/page 3

regulatory capital ratios, because goodwill is deducted when computing those ratios.

- A $5.6 billion loan loss provision, which increased reserves by $4.2 billion, including $3.3 billion for the payment option mortgage portfolio;

- A $975 million noncash charge announced previously related to the tax treatment of certain leasing transactions widely referred to as "sale in, lease out" or SILO transactions;

- $936 million in market disruption-related losses;

- $590 million in legal reserves primarily related to previously disclosed matters; and

- $391 million in losses related to planned discretionary securities sales.

**Wachovia Corporation**

| | | | Three Months Ended | |
|---|---|---|---|
| (In millions) | June 30, 2008 | March 31, 2008 | June 30, 2007 |
| Net interest income *(Tax-equivalent)* | $ 4,344 | 4,805 | 4,487 |
| Fee and other income | 3,165 | 2,777 | 4,240 |
| Total revenue *(Tax-equivalent)* | 7,509 | 7,582 | 8,727 |
| Provision for credit losses | 5,567 | 2,831 | 179 |
| Noninterest expense | 12,284 | 5,441 | 4,890 |
| Income (loss) from continuing operations before income taxes (benefits) *(Tax-equivalent)* | (10,439) | (845) | 3,519 |
| Income taxes (benefits) *(Tax-equivalent)* | (1,777) | (181) | 1,178 |
| Net income (loss) available to common stockholders | (8,855) | (707) | 2,341 |
| Average loans, net | 476,734 | 465,936 | 421,257 |
| Average core deposits | $ 390,670 | 394,513 | 378,496 |

Other key trends in the second quarter of 2008 compared with the second quarter of 2007 included:

- A decline in fee and other income due to net market disruption-related valuation losses, which overshadowed strength in traditional banking. Fiduciary and asset management fees and brokerage commissions reflected the A.G. Edwards acquisition.

- A net interest margin of 2.58 percent, or 3.15 percent excluding the effect of the SILO charge. The SILO charge diminished net interest income, offset by growth in average commercial loans, up 25 percent, and average consumer loans, up 6 percent, as well as solid core deposit growth, up 3 percent. Average loan growth included the impact of the first quarter 2008 transfer of $6.9 billion of commercial and consumer loans to the loan portfolio from held-for-sale as well as strength in commercial, commercial real estate and traditional conforming mortgage loans. Deposit growth was led by strength in IRAs and money market accounts.

- An increase in noninterest expense largely reflecting the impact of A.G. Edwards, as well as growth in credit-related sundry expense and legal reserves. A renewed expense reduction initiative is under way throughout the company.

- Provision for credit losses of $5.6 billion, which included a reserve build of $4.2 billion. The provision largely reflected current and anticipated severe deterioration in the residential housing market, particularly in specific markets in California and Florida. Net charge-offs were $1.3 billion, or an annualized 1.10 percent of average net loans. Total nonperforming assets including loans held for sale were $12.0 billion, or 2.41 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer real estate-related nonperforming assets due to the effects of the weakened housing industry.

— more —

Source: WACHOVIA CORP NEW, 8-K, July 22, 2008

WACHOVIA REPORTS 2ND QUARTER LOSS AMID TOUGH ENVIRONMENT/page 4

**Lines of Business**

The following discussion covers the results for Wachovia's four core business segments and is on a segment earnings basis, which excludes net merger-related and restructuring expenses, goodwill impairment charges, other intangible amortization, excess provision and discontinued operations. Segment earnings are the basis on which Wachovia manages and allocates capital to its business segments. In accordance with Wachovia's business segment methodology, goodwill impairment of $6.1 billion and provision expense in excess of charge-offs and other credit losses, which amounted to $4.2 billion in the second quarter of 2008, are not allocated to business segments.

Pages 14 and 15 include a reconciliation of segment results to Wachovia's consolidated results of operations in accordance with GAAP.

**General Bank Highlights**

| | | Three Months Ended | |
|---|---|---|---|
| (In millions) | June 30, 2008 | March 31, 2008 | June 30, 2007 |
| Net interest income *(Tax-equivalent)* | $ 3,671 | 3,445 | 3,372 |
| Fee and other income | 1,000 | 980 | 935 |
| Total revenue *(Tax-equivalent)* | 4,728 | 4,480 | 4,363 |
| Provision for credit losses | 919 | 569 | 154 |
| Noninterest expense | 2,050 | 2,038 | 1,922 |
| Segment earnings | $ 1,117 | 1,189 | 1,453 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | 43.35% | 45.50 | 44.05 |
| Average loans, net | $ 319,574 | 311,556 | 291,607 |
| Average core deposits | 290,381 | 297,171 | 290,455 |
| Economic capital, average | $ 16,786 | 12,693 | 10,821 |

**General Bank**

The General Bank includes retail, small business and commercial customers. The second quarter of 2008 compared with the second quarter of 2007 included:

- Earnings of $1.1 billion, down $336 million, driven by rising credit costs and related expenses, primarily in the mortgage business, which overshadowed continued strong sales momentum elsewhere as reflected in total revenue of $4.7 billion, up 8 percent.

- Average loan growth of 10 percent, with double digit growth in wholesale and retail businesses. Mortgage lending through our largely branch-originated mortgage and home equity channels was up 6 percent, primarily reflecting a decline in prepayments, and home equity lending was up 5 percent. Auto loan originations rose 12 percent.

- Relatively stable average core deposits.

  - Growth in net new retail checking accounts slowed, but still increased by 263,000 in the second quarter of 2008 compared with an increase of 314,000 in the second quarter of 2007.

  - 305,000 new retail checking accounts were tied to the Way2Save campaign; this product launched in mid-January 2008.

- 7 percent growth in fee and other income, with strength in service charges, interchange income and mortgage banking fee income. Strong interchange income reflected a 14 percent increase in debit/credit card volume from the second quarter of 2007.

— more —

WACHOVIA REPORTS 2ND QUARTER LOSS AMID TOUGH ENVIRONMENT/page 5

- Noninterest expense up 7 percent due to growth in credit-related sundry expense and severance expense, as well as continued strategic investment in de novo branch activity and Western expansion. During the second quarter of 2008, 23 de novo branches were opened and 38 branches were consolidated. As a result of performance initiatives, operating leverage continued to improve, which enabled continued strategic investment.

- A $765 million increase in the provision for credit losses to $919 million, largely reflecting higher net charge-offs in the Pick-a-Pay portfolio.

### Wealth Management Highlights

| | | Three Months Ended | |
|---|---|---|---|
| (In millions) | June 30, 2008 | March 31, 2008 | June 30, 2007 |
| Net interest income *(Tax-equivalent)* | $ 202 | 182 | 182 |
| Fee and other income | 207 | 211 | 202 |
| Total revenue *(Tax-equivalent)* | 412 | 398 | 387 |
| Provision for credit losses | 8 | 5 | 2 |
| Noninterest expense | 253 | 246 | 244 |
| Segment earnings | $ 98 | 92 | 90 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | 61.05% | 61.98 | 62.80 |
| Average loans, net | $ 23,151 | 22,365 | 21,056 |
| Average core deposits | 17,559 | 17,906 | 17,466 |
| Economic capital, average | $ 731 | 699 | 612 |

### Wealth Management

Wealth Management includes private banking, personal trust, investment advisory services, charitable services, financial planning and insurance brokerage. The second quarter of 2008 compared with the second quarter of 2007 included:

- 9 percent earnings growth to $98 million on 6 percent revenue growth in challenging markets.

- 11 percent growth in net interest income on 10 percent loan growth and improved deposit spreads.

- 16 percent growth in fiduciary and asset management fees as a pricing initiative implemented in the third quarter of 2007 and other growth offset declines in equity valuations. Insurance commissions declined largely due to a soft market for insurance premiums and nonstrategic insurance account dispositions.

- A 4 percent increase in noninterest expense driven by continued investment in private banking and Western expansion.

- A 3 percent decline in assets under management to $77.3 billion largely due to market depreciation.

-- more --

WACHOVIA REPORTS 2ND QUARTER LOSS AMID TOUGH ENVIRONMENT/page 6

**Corporate and Investment Bank Highlights**

| (In millions) | | Three Months Ended | |
| --- | --- | --- | --- |
| | June 30, 2008 | March 31, 2008 | June 30, 2007 |
| Net interest income *(Tax-equivalent)* | $ 1,124 | 1,028 | 773 |
| Fee and other income | 657 | (158) | 1,522 |
| Total revenue *(Tax-equivalent)* | 1,729 | 820 | 2,245 |
| Provision for credit losses | 438 | 197 | (2) |
| Noninterest expense | 960 | 747 | 1,020 |
| Segment earnings (loss) | $ 209 | (78) | 779 |
| Cash overhead efficiency ratio *(Tax-equivalent)* | 55.60% | 91.00 | 45.43 |
| Average loans, net | $ 106,642 | 101,046 | 76,744 |
| Average core deposits | 31,682 | 33,623 | 36,713 |
| Economic capital, average | $ 13,816 | 13,233 | 8,850 |

**Corporate and Investment Bank**

The Corporate and Investment Bank includes corporate lending, investment banking, and treasury and international trade finance. Unless otherwise noted, second quarter 2008 results are compared with the second quarter of 2007. These results included:

- Earnings of $209 million, down $570 million, due to continued net valuation losses related to disruption in the capital markets, and increased provision for credit losses.

  - Investment bank origination fees down 4 percent year over year, although these fees rose 16 percent from the first quarter of 2008.

  - Market share of 4.3 percent at June 30, 2008, up from 3.8 percent at June 30, 2007.

- Market valuation losses of $565 million, including a recovery on certain losses on leveraged finance commitments, compared with market valuation losses of $1.6 billion in the first quarter of 2008. Market valuation losses, net of applicable hedges, were:

  - $238 million in subprime residential asset-backed collateralized debt obligations and other related exposures, compared with $339 million in first quarter 2008;

  - $209 million in commercial mortgage structured products, compared with $521 million in first quarter 2008;

  - $68 million in consumer mortgage structured products, compared with $251 million in first quarter 2008;

  - $102 million gain in leveraged finance net of fees, compared with a net $309 million loss in first quarter 2008; and

  - $152 million in non-subprime collateralized debt obligations and other structured products, compared with $144 million in first quarter 2008.

- A 45 percent increase in net interest income, which reflected 39 percent growth in average loans including the first quarter 2008 transfer into the loan portfolio at fair value of certain loans originally slated for disposition, as well as loan growth in the corporate lending and global financial institutions businesses.

- Principal investing revenue of $115 million, down from $300 million in the second quarter of 2007 on lower gains in the public and private direct investment portfolios.

— more —

Source: WACHOVIA CORP NEW, 8-K, July 22, 2008

WACHOVIA REPORTS 2ND QUARTER LOSS AMID TOUGH ENVIRONMENT/page 7

- A 6 percent decline in noninterest expense primarily due to lower variable compensation and reduced headcount in investment banking.

- Provision of $438 million largely reflecting residential-related commercial real estate and other corporate lending losses.

Capital Management Highlights

|  | | | Three Months Ended |
|---|---|---|---|
| (In millions) | June 30, 2008 | March 31, 2008 | June 30, 2007 |
| Net interest income (Tax-equivalent) | $   308 | 281 | 260 |
| Fee and other income | 1,995 | 2,191 | 1,536 |
| Total revenue (Tax-equivalent) | 2,295 | 2,462 | 1,785 |
| Provision for credit losses | — | — | — |
| Noninterest expense | 1,827 | 1,855 | 1,294 |
| Segment earnings | $   297 | 386 | 312 |
| Cash overhead efficiency ratio (Tax-equivalent) | 79.61% | 75.34 | 72.47 |
| Average loans, net | $  2,881 | 2,562 | 1,663 |
| Average core deposits | 48,647 | 43,084 | 31,221 |
| Economic capital, average | $  2,105 | 2,144 | 1,348 |

Capital Management

Capital Management includes retail brokerage services and asset management. The second quarter of 2008 compared with the second quarter of 2007 included:

- Earnings of $297 million on 29 percent revenue growth, with net market disruption-related losses of $118 million, including $89 million of securities impairments relating to the liquidation of an Evergreen fund.

- An 18 percent increase in net interest income driven by retail brokerage deposit growth of $17.5 billion primarily due to the A.G. Edwards acquisition as well as solid growth since the acquisition, partially offset by spread compression.

- Continued solid momentum in retail brokerage managed account fees and the impact of the A.G. Edwards acquisition.

- 41 percent growth in noninterest expense largely due to the effect of A.G. Edwards, as well as higher legal expense.

Total assets under management of $245.9 billion at June 30, 2008, decreased 10 percent from December 31, 2007, driven by net outflows of $17.6 billion as well as $11.2 billion in lower market valuations.

***

Wachovia Corporation (NYSE:WB) is one of the nation's largest diversified financial services companies, with assets of $812.4 billion and market capitalization of $33.5 billion at June 30, 2008. Wachovia provides a broad range of retail banking and brokerage, asset and wealth management, and corporate and investment banking products and services to customers through 3,300 retail financial centers in 21 states from Connecticut to Florida and west to Texas and California, and nationwide retail brokerage, mortgage lending and auto finance businesses. Globally, clients are served in selected corporate and institutional sectors and through more than 40 international offices. Our retail brokerage operations under the Wachovia Securities brand name manage more than $1.1 trillion in client assets through 14,600 financial advisors in 1,500 offices nationwide. Online banking is available at wachovia.com; online brokerage products and services at wachoviasec.com; and investment products and services at evergreeninvestments.com.

— more —

Source: WACHOVIA CORP NEW, 8-K, July 22, 2008

Exhibit 59

Web  Images  Maps  News  Shopping  Gmail  more ▼

Portfolios | Sign In

Get quotes    Stock screener New!

e.g. "CSCO" or "Google"

# Historical prices  « Back to overview

## Wachovia Corporation(NYSE:WB) - **Daily** | Weekly

May 1, 2007    - May 31, 2007    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-May-07 | 54.30 | 54.83 | 54.00 | 54.19 | 13,225,100 |
| 30-May-07 | 54.45 | 54.70 | 54.15 | 54.55 | 6,321,300 |
| 29-May-07 | 54.85 | 54.94 | 54.25 | 54.47 | 6,982,300 |
| 25-May-07 | 55.45 | 55.55 | 54.93 | 55.08 | 6,769,000 |
| 24-May-07 | 55.91 | 56.34 | 55.20 | 55.45 | 7,178,300 |
| 23-May-07 | 56.31 | 56.67 | 55.90 | 55.91 | 6,470,500 |
| 22-May-07 | 56.56 | 56.65 | 56.16 | 56.25 | 6,056,600 |
| 21-May-07 | 56.66 | 56.76 | 56.40 | 56.65 | 5,683,900 |
| 18-May-07 | 56.76 | 56.83 | 56.40 | 56.66 | 5,927,900 |
| 17-May-07 | 56.60 | 56.78 | 56.47 | 56.58 | 4,673,500 |
| 16-May-07 | 56.53 | 56.90 | 56.46 | 56.81 | 5,896,700 |
| 15-May-07 | 56.24 | 56.72 | 56.06 | 56.11 | 4,889,900 |
| 14-May-07 | 56.35 | 56.57 | 55.85 | 56.04 | 4,758,900 |
| 11-May-07 | 56.01 | 56.49 | 55.75 | 56.22 | 4,890,600 |
| 10-May-07 | 56.56 | 56.62 | 55.94 | 55.97 | 5,470,600 |
| 9-May-07 | 56.10 | 56.80 | 56.05 | 56.66 | 4,879,700 |
| 8-May-07 | 56.07 | 56.55 | 55.97 | 56.29 | 4,585,200 |
| 7-May-07 | 56.20 | 56.53 | 56.09 | 56.36 | 4,331,100 |
| 4-May-07 | 55.65 | 56.16 | 55.50 | 56.15 | 5,013,900 |
| 3-May-07 | 56.21 | 56.26 | 54.54 | 55.64 | 4,232,000 |
| 2-May-07 | 55.59 | 55.70 | 55.29 | 55.37 | 7,557,200 |
| 1-May-07 | 55.83 | 55.90 | 55.02 | 55.36 | 6,500,400 |
| 30-Apr-07 | 56.01 | 56.14 | 55.53 | 55.54 | 6,658,500 |

International Google Finance:  Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Web   images   Maps   News   Shopping   Gmail   more ▼                    Portfolios | Sign In

Get quotes    Stock screener New!

e.g. CSCO* or *Google*

## Historical prices   « Back to overview

**Wachovia Corporation**(NYSE:WB) - **Daily** | Weekly

Aug 6. 2008   - Aug 6, 2008    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 18.59 | 18.93 | 17.80 | 18.41 | 75,167,100 |
| 5-Aug-08 | 17.84 | 19.10 | 17.70 | 19.06 | 92,520,200 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

# Exhibit 60

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): February 27, 2008**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

| **Federally chartered corporation** | **000-50231** | **52-0883107** |
|---|---|---|
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(IRS Employer Identification Number)* |

| **3900 Wisconsin Avenue, NW** | **20016** |
|---|---|
| **Washington, DC** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number, including area code: 202-752-7000**
*(Former Name or Former Address, if Changed Since Last Report):_____*

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

The information in this report, including the exhibits submitted herewith, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall it be deemed incorporated by reference into any disclosure document relating to Fannie Mae except to the extent, if any, expressly set forth by specific reference in that document.

### Item 2.02 Results of Operation and Financial Condition

On February 27, 2008, Fannie Mae (formally known as the Federal National Mortgage Association) issued a news release reporting its filing of its Form 10-K for the year ended December 31, 2007 and its financial results for the periods covered by the Form 10-K. A copy of the press release, in the form in which it was issued but with additional and clarifying language relating to Fannie Mae's subprime private-label securities, is furnished as Exhibit 99.1 to this report. Exhibit 99.1 is incorporated herein by reference.

### Item 7.01 Regulation FD Disclosure

On February 27, 2008, Fannie Mae is posting to its Web site a 2007 10-K Investor Summary presentation consisting primarily of summary historical financial information about the company excerpted from Fannie Mae's 2007 Form 10-K and information about the company's credit book of business. The presentation, a copy of which is furnished as Exhibit 99.2 to this report, is incorporated herein by reference. Fannie Mae's Web site is at www.fanniemae.com. Information appearing on our Web site is not incorporated into this report.

### Item 9.01 Financial Statements and Exhibits.

*(d) Exhibits.* The exhibit index filed herewith is incorporated herein by reference.

2

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FEDERAL NATIONAL MORTGAGE ASSOCIATION

By  /s/ Stephen M. Swad
    Stephen M. Swad
    Executive Vice President and Chief Financial Officer

Date: February 27, 2008

3

Source: FEDERAL NATIONAL MOR, 8-K, February 27, 2008

EXHIBIT INDEX

The following exhibits are submitted herewith:

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 99.1 | News release, dated February 27, 2008 |
| 99.2 | 2007 10-K Investor Summary Presentation, dated February 27, 2008 |

4

Source: FEDERAL NATIONAL MOR, 8-K, February 27, 2008

Source: FEDERAL NATIONAL MOR, 8-K, February 27, 2008

**Exhibit 99.1**

**news release**
**Media Hotline : 1-888-326-6694**
**Consumer Resource Center: 1-800-732-6643**

FannieMae.

| **Contact :** | Chuck Greener | Janis Smith |
|---|---|---|
| | 202-752-2616 | 202-752-6673 |

**Number:**     4282a

**Date:**     February 27, 2008

### Fannie Mae Reports 2007 Financial Results

WASHINGTON, DC — Fannie Mae (FNM/NYSE) today reported fourth quarter and full-year 2007 results and filed its annual report on
Form 10-K with the Securities and Exchange Commission (SEC).

### 2007 Overview

- **Net loss of $2.1 billion, or ($2.63) per diluted share, vs. net income of $4.1 billion, or $3.65 per diluted share in 2006.**

- **Credit-related expenses, including incremental additions to the allowance for loan losses and the reserve for guaranty losses of $5.0 billion, vs. $783 million in 2006.**

- **Guaranty fee income of $5.1 billion in 2007, a 19.3 percent increase, from $4.3 billion in 2006. Fannie Mae's single-family guaranty book grew 15 percent to $2.6 trillion.**

- **Net interest income of $4.6 billion in 2007, a $2.2 billion decrease driven by higher relative borrowing costs.**

- **Derivatives fair value losses of $4.1 billion, vs. $1.5 billion in 2006, due to the impact of declining yields on the interest rate swaps used to hedge net assets.**

- **Combined loss allowance of $3.4 billion at Dec. 31, compared with $859 million on Dec. 31, 2006.**

- **Core capital of $45.4 billion at year end, compared with $42.0 billion at the end of 2006.**

- **Completion of the remediation of material weaknesses in accounting systems and controls, and all 81 requirements of the Consent Order.**

"We are working through the toughest housing and mortgage markets in a generation," said President and Chief Executive Officer Daniel H. Mudd. "Our results for 2007 reflect the challenging conditions in the market we serve. While we are pleased that demand for our mortgage guaranty businesses has surged as we respond to the market's urgent need for liquidity and stability, this positive trend has been far outweighed by the negative financial impacts of rising mortgage defaults, falling home prices, and extraordinary disruptions in the credit markets."

(more)

**Fannie Mae 2007 Results**
**Page Two**

"While our business has always been cyclical, Fannie Mae's credit loss experience in this cycle reflects the significant decline in home prices in a number of large regional markets and the growing number of borrowers struggling with their mortgages," Mudd said. "Our strategy for moving through another tough year is to protect and conserve our capital base, and control credit losses. We have also increased our credit loss reserves. Finally, we will also provide liquidity to the market by growing our guaranty business as we build a very strong credit book. These steps will help us do our part to maintain a liquid, stable and affordable mortgage market — and also position us well when the market recovers."

In the fourth quarter of 2007, the company had a net loss of $3.6 billion. The largest drivers of the fourth quarter results were derivative fair value losses of $3.2 billion, largely a result of the impact of declining yields on the interest rate swaps used to hedge our net assets; a $2.0 billion increase in combined credit loss reserves in light of delinquency, default and severity trends; and an approximately $600 million other-than-temporary impairment loss on certain investments in the company's mortgage portfolio and liquid investment portfolio, recognized because the company no longer had the intent to hold these securities until the decline in fair value recovered. The securities were redesignated to trading on January 1, 2008, when we adopted the fair value option. The company also reported a near doubling of its single-family guaranty market share from a year ago, and a 26.4 percent increase in its total guaranty fee income (single-family and multifamily guaranty businesses), in the fourth quarter of 2007 compared with the fourth quarter of 2006.

"Market dynamics, including declining interest rates and credit market illiquidity, had a pronounced impact on our bottom line in the fourth quarter of 2007," Executive Vice President and Chief Financial Officer Stephen M. Swad said. "A substantial portion of losses in '07 came from mark-to-market valuation declines you would expect in a mortgage and credit market this volatile."

"To bolster our capital, we issued $7.8 billion of preferred stock, net of fees, in the fourth quarter, and we will continue to evaluate further avenues to conserve our capital and reduce the impact of market disruptions on our capital base," Swad said.

(more)

Source: FEDERAL NATIONAL MOR, 8-K, February 27, 2008

**Fannie Mae 2007 Results**
**Page Three**

"In addition, we have completed the 81 requirements of the Consent Order, and we are in ongoing discussions with the Office of Federal Housing Enterprise Oversight, our regulator, regarding the 30 percent capital surplus requirement," he said. Swad added that all of the company's internal control material weaknesses dating from its 2004 restatement have now been fully remediated.

"Today's filing closes a period of rebuilding at Fannie Mae, both to re-do our accounting and internal controls, and to strengthen the enterprise for the future," Mudd said. "At the same time, Fannie Mae's management and employees are fully focused on meeting the challenges of a troubled housing and mortgage market — and pursuing the long-term opportunities that our business and our mission present to us."

## Summary of Financial Results for 2007

Fannie Mae's financial results for 2007 were dramatically different for the first half of the year as compared to the second half of the year. Beginning in the second half of 2007, results were severely affected by the disruption in the mortgage and credit markets, and continued weakness in the housing markets. The company's financial results for the first and second quarters — including net income of $2.9 billion — were more than offset by a $5.0 billion net loss for the third and fourth quarters in the face of significant increases in serious delinquency rates and foreclosures, home price declines, widening credit spreads, shifts in interest rates and illiquidity in the capital markets.

The following factors had the most significant adverse effect on the company's 2007 financial results:

- An increase of $2.8 billion in provision for credit losses, excluding the component of the provision attributable to fair value losses recorded in connection with the purchase of delinquent loans from mortgage backed securities (MBS) trusts;

- An increase of $5.1 billion in market-based valuation losses, including derivatives fair value losses on interest rate swaps, losses on certain guaranty contracts, fair value losses on delinquent loans purchased from MBS trusts, and losses on trading securities; and

- A decrease of $2.2 billion in net interest income.

(more)

# Exhibit 61

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, DC 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): May 6, 2008**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

| | | |
|---|---|---|
| **Federally chartered corporation** | **000-50231** | **52-0883107** |
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(IRS Employer Identification Number)* |

| | |
|---|---|
| **3900 Wisconsin Avenue, NW** | |
| **Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: 202-752-7000**

*(Former Name or Former Address, if Changed Since Last Report):* _____

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

The information in this report, including information in the exhibits submitted herewith, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall it be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly incorporated by specific reference in that document.

### Item 2.02   Results of Operation and Financial Condition

On May 6, 2007, Fannie Mae (formally known as the Federal National Mortgage Association) issued a news release (the "News Release") reporting the filing of its Form 10-Q for the quarter ended March 31, 2008 and its financial results for the periods covered by the Form 10-Q. The News Release, a copy of which is furnished as Exhibit 99.1 to this report, is incorporated herein by reference.

### Item 7.01   Regulation FD Disclosure

The News Release also reported Fannie Mae's plans to issue common and preferred stock, and to reduce its common stock dividend. The news release also reported that the company's regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), had lifted the May 2006 Consent Order.

In addition, on May 6, 2008, Fannie Mae posted to its Web site a 2008 Q1 10-Q Investor Summary presentation consisting primarily of summary historical financial information about the company excerpted from Fannie Mae's Form 10-Q and information about the company's credit book of business. The presentation, a copy of which is furnished as Exhibit 99.2 to this report, is incorporated herein by reference. Fannie Mae's Web site address is www.fanniemae.com. Information appearing on the company's Web site is not incorporated into this report.

### Item 9.01   Financial Statements and Exhibits.

*(d) Exhibits.* The exhibit index filed herewith is incorporated herein by reference.

2

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION

By    /s/ Stephen M. Swad
Stephen M. Swad
Executive Vice President and Chief Financial Officer

Date: May 6, 2008

3

Source: FEDERAL NATIONAL MOR, 8-K, May 06, 2008

EXHIBIT INDEX

The following exhibits are submitted herewith:

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 99.1 | News release, dated May 6, 2008 |
| 99.2 | 2008 1Q 10-Q Investor Summary presentation, dated May 6, 2008 |

4

Source: FEDERAL NATIONAL MOR, 8-K, May 06, 2008

Exhibit 99.1

**news release**                                                    **FannieMae.**

**Media Hotline: 1-888-326-6694**
**Consumer Resource Center: 1-800-732-6643**

| **Contact:** | Chuck Greener | Janis Smith |
|---|---|---|
| | 202-752-2616 | 202-752-6673 |

**Number:**          4355a

**Date:**              May 6, 2008

**Fannie Mae Reports First Quarter 2008 Results;**
**Announces Equity Offering to Increase Capital**
**And an Expected Reduction in Common Stock Dividend**

WASHINGTON, DC — Fannie Mae (FNM/NYSE) today reported financial results for the quarter ended March 31, 2008. The company reported a net loss of ($2.2 billion), compared with a fourth quarter 2007 net loss of ($3.6 billion). First quarter 2008 results were driven primarily by increased revenues from net interest income and guaranty fee income, which were more than offset by fair value losses and credit-related expenses due to adverse market conditions. These conditions included a significant widening of credit spreads, and higher-than-expected home price declines and loan loss severity during the quarter. The mortgage credit book of business grew by three percent, and estimated market share increased to approximately 50 percent of new single-family mortgage-related securities issued. Core capital totaled $42.7 billion at the end of the quarter, $5.1 billion above the company's current regulatory requirements.

The company also announced its plan to raise $6 billion in new capital through public offerings of common stock, non-cumulative mandatory convertible preferred stock and non-cumulative, non-convertible preferred stock. The new capital will enable Fannie Mae to maintain a strong, conservative balance sheet, enhance long-term shareholder value, and provide stability to the secondary mortgage market.

Fannie Mae said that its regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), had lifted the May 2006 Consent Order, and would reduce the current OFHEO-directed requirement from 20 percent capital to 15 percent upon the successful completion of the company's capital-raising plan. The company said OFHEO also indicated its intention to reduce the capital surplus by an additional 5 percentage points to a 10 percent surplus requirement in September 2008, based upon the company's continued maintenance of excess capital well above OFHEO's regulatory requirement, and no material adverse change to the company's ongoing regulatory compliance.

(more)

**Fannie Mae Reports First Quarter 2008 Results**
**Page Two**

As part of the company's announced plan to raise capital, Fannie Mae's Board of Directors said it intends to reduce the company's quarterly common stock dividend beginning with the third quarter of 2008 to $0.25 per share, which will make available approximately $390 million of capital annually.

In addition, Fannie Mae plans to announce a series of new initiatives called "Keys to Recovery" on a conference call with investors and analysts in connection with today's Form 10-Q filing. The new effort is geared toward providing liquidity, stability and affordability to the housing and mortgage markets for the long term, keeping struggling borrowers in their homes, assisting prospective homebuyers with home purchases, and stabilizing communities affected by the mortgage market downturn. The initiatives include 1) a new refinancing option for up-to-date but "underwater" borrowers with loans owned by Fannie Mae that will allow for refinancing up to 120 percent of a property's current value; 2) a renewal and expansion of the company's partnership with the state Housing Finance Agencies to provide $10 billion in financing for qualified, first-time homebuyers; 3) in partnership with Self-Help Credit Union, a new initiative that allows families in hard-hit communities to reside in foreclosed properties on a rent-to-own basis and 4) new jumbo-conforming loans will be priced flat to conforming for portfolio asset acquisition through the end of the year.

## First Quarter 2008 Overview

- **Net loss** of ($2.2 billion), or ($2.57) per diluted share, compared with a ($3.6 billion) net loss, or ($3.80) per diluted share, for the fourth quarter of 2007. Key drivers of first quarter results were as follows:

  - Net revenues rose to $3.8 billion from $3.1 billion in the fourth quarter of 2007, as guaranty fee income increased by $131 million and net interest income increased by $554 million. The increase in net revenues reflects growth in the guaranty business, higher guaranty fees, and lower debt costs.

  - Mark-to-market fair value losses rose to ($4.4 billion) from ($3.4 billion) in the fourth quarter of 2007, primarily due to continuing adverse market conditions, including a decline in interest rates that resulted in fair value losses on derivatives, and significant widening of credit spreads that resulted in fair value losses on trading securities.

(more)

---

**Fannie Mae Reports First Quarter 2008 Results**
**Page Three**

- <u>Credit-related expenses</u> — the provision for credit losses plus foreclosed property expenses — rose to $3.2 billion from $3.0 billion in the fourth quarter of 2007, primarily due to an increase in charge-offs. This reflects higher defaults and average loan loss severities, driven by national home price declines and weak economic conditions in the Midwest.

- **Combined loan loss reserves** increased to $5.2 billion as of March 31, 2008 from $3.4 billion as of December 31, 2007, as the company substantially increased its loan loss reserves to reflect losses it believes will be recorded over time in charge-offs.

- **Total mortgage credit book of business** grew by 3 percent during the quarter to $3.0 trillion as of March 31, 2008, compared with $2.9 trillion as of December 31, 2007.

- **Core capital** as of March 31, 2008 was $42.7 billion compared with $45.4 billion as of December 31, 2007, exceeding the statutory minimum capital requirement by $11.3 billion, and exceeding the statutory minimum capital requirement plus the 20 percent OFHEO-directed capital surplus requirement by $5.1 billion.

- **Losses on certain guaranty contracts** have been eliminated, beginning January 1, 2008, and going forward, in connection with the company's adoption of Statement of Financial Accounting Standards No. 157, *Fair Value Measurements* (SFAS 157). This change is described starting on page 11 of this release and in the company's Form 10-Q filed today.

- Beginning in April 2008, the company implemented **fair value hedge accounting** with respect to its derivatives used to hedge, for accounting purposes, the interest rate risk related to some of its mortgage assets. This change is described on page 12 in this release.

- **Estimated fair value of net assets** as of March 31, 2008 was $12.2 billion, compared with $35.8 billion as of December 31, 2007. The decline was due primarily to the impact of market volatility and home price declines, and also pricing changes on the company's existing guaranty obligations in connection with the adoption of SFAS 157. This change is described on page 11 of this release.

- **Shareholders' equity** was $38.8 billion as of March 31, 2008, compared with $44.0 billion as of December 31, 2007.

(more)

Source: FEDERAL NATIONAL MOR, 8-K, May 06, 2008

Exhibit 62

Web   Images   Maps   News   Shopping   Gmail   more ▼

Get quotes   Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**Fannie Mae**(NYSE:FNM) - Daily | Weekly

May 1, 2007   - May 31, 2007   Update   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 31-May-07 | 63.99 | 64.41 | 63.45 | 63.92 | 2,759,500 |
| 30-May-07 | 63.75 | 64.09 | 63.37 | 64.09 | 2,930,000 |
| 29-May-07 | 64.77 | 64.99 | 63.70 | 64.16 | 2,806,300 |
| 25-May-07 | 64.75 | 65.03 | 64.08 | 64.56 | 1,679,600 |
| 24-May-07 | 65.64 | 65.72 | 63.75 | 64.75 | 4,796,700 |
| 23-May-07 | 63.68 | 66.12 | 63.68 | 65.63 | 5,655,400 |
| 22-May-07 | 63.30 | 63.73 | 62.91 | 63.43 | 2,276,000 |
| 21-May-07 | 62.94 | 63.42 | 62.82 | 63.29 | 3,827,200 |
| 18-May-07 | 63.11 | 63.48 | 62.80 | 63.18 | 2,802,500 |
| 17-May-07 | 63.00 | 63.20 | 62.83 | 62.99 | 1,685,300 |
| 16-May-07 | 62.05 | 63.44 | 61.79 | 63.23 | 5,286,700 |
| 15-May-07 | 62.15 | 62.69 | 61.72 | 61.95 | 2,550,800 |
| 14-May-07 | 62.81 | 62.95 | 61.96 | 62.19 | 2,952,200 |
| 11-May-07 | 62.26 | 62.78 | 62.17 | 62.59 | 5,848,100 |
| 10-May-07 | 62.83 | 62.83 | 62.02 | 62.06 | 2,934,600 |
| 9-May-07 | 62.44 | 62.95 | 61.65 | 62.83 | 10,011,400 |
| 8-May-07 | 61.40 | 62.69 | 61.33 | 62.46 | 3,050,300 |
| 7-May-07 | 61.50 | 61.86 | 61.34 | 61.68 | 2,803,400 |
| 4-May-07 | 61.39 | 61.81 | 61.07 | 61.19 | 4,018,500 |
| 3-May-07 | 60.15 | 61.18 | 59.65 | 61.10 | 12,135,200 |
| 2-May-07 | 59.00 | 60.08 | 58.17 | 59.82 | 2,907,100 |
| 1-May-07 | 58.94 | 59.52 | 58.25 | 59.28 | 2,443,600 |
| 30-Apr-07 | 59.30 | 59.50 | 58.92 | 58.92 | 3,441,600 |

International Google Finance:   Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Historical prices for FNM (Fannie Mae) - Google Finance
Case 1:08-cv-00854-SHS    Document 22-3    Filed 08/08/2008    Page 160 of 232
Page 1 of 1

Web   Images   Maps   News   Shopping   Gmail   more ▼

Portfolios | Sign In

[ Get quotes ]   Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**Fannie Mae**(NYSE:FNM) - **Daily** | Weekly

Aug 6, 2008   - Aug 6, 2008      [ Update ]   Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 11.57 | 12.66 | 11.38 | 11.60 | 58,786,500 |
| 5-Aug-08 | 12.38 | 13.60 | 12.01 | 13.60 | 32,863,100 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed. To see all exchange delays, please see disclaimer.

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Exhibit 63

Web   Images   Maps   News   Shopping   Gmail   more ▼

Get quotes    Stock screener New!

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**Freddie Mac**(NYSE:FRE) - **Daily** | Weekly

May 1, 2007  - May 31, 2007    Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|------|-------|--------|
| 31-May-07 | 67.45 | 67.57 | 66.72 | 66.79 | 1,904,600 |
| 30-May-07 | 66.35 | 67.11 | 66.00 | 67.09 | 2,763,400 |
| 29-May-07 | 67.50 | 67.54 | 66.12 | 66.48 | 1,570,000 |
| 25-May-07 | 66.60 | 66.76 | 66.18 | 66.65 | 1,448,300 |
| 24-May-07 | 68.01 | 68.12 | 66.32 | 66.38 | 3,541,700 |
| 23-May-07 | 67.73 | 68.11 | 67.59 | 67.89 | 2,966,500 |
| 22-May-07 | 67.61 | 67.88 | 67.13 | 67.68 | 2,067,100 |
| 21-May-07 | 67.71 | 67.87 | 67.37 | 67.50 | 2,111,400 |
| 18-May-07 | 67.31 | 67.75 | 67.10 | 67.59 | 2,058,000 |
| 17-May-07 | 67.30 | 67.42 | 67.06 | 67.18 | 1,788,700 |
| 16-May-07 | 66.67 | 67.42 | 66.38 | 67.33 | 3,938,600 |
| 15-May-07 | 66.39 | 67.32 | 66.08 | 66.57 | 2,918,500 |
| 14-May-07 | 66.36 | 66.86 | 65.87 | 66.06 | 3,034,600 |
| 11-May-07 | 66.39 | 67.02 | 66.35 | 66.72 | 2,646,500 |
| 10-May-07 | 67.20 | 67.54 | 66.36 | 66.38 | 1,886,800 |
| 9-May-07 | 67.05 | 67.50 | 66.43 | 67.44 | 2,804,600 |
| 8-May-07 | 67.14 | 67.66 | 66.94 | 67.57 | 2,483,800 |
| 7-May-07 | 66.88 | 67.30 | 66.61 | 67.21 | 2,543,600 |
| 4-May-07 | 66.89 | 66.98 | 66.16 | 66.31 | 2,581,800 |
| 3-May-07 | 66.50 | 66.75 | 66.12 | 66.69 | 9,660,400 |
| 2-May-07 | 65.89 | 66.43 | 65.82 | 66.28 | 2,514,300 |
| 1-May-07 | 65.58 | 66.03 | 64.85 | 65.90 | 2,458,000 |
| 30-Apr-07 | 65.50 | 65.50 | 64.74 | 64.78 | 2,364,900 |

International Google Finance:   Canada - UK - China

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed. To see all exchange delays, please see disclaimer.

©2008 Google   Google Home - Help - Privacy Policy - Terms of Service

Get quotes    Stock screener **New!**

e.g. "CSCO" or "Google"

## Historical prices   « Back to overview

**Freddie Mac**(NYSE:FRE) - **Daily** | Weekly

Aug 6, 2008    - Aug 6, 2008        Update    Download to spreadsheet

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 6-Aug-08 | 6.84 | 7.23 | 6.49 | 6.49 | 106,061,200 |
| 5-Aug-08 | 8.00 | 8.12 | 7.73 | 8.04 | 54,249,700 |

International Google Finance:   Canada - U.K. - 中国版 (China)

Information is provided 'as is' and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2008 Google    Google Home - Help - Privacy Policy - Terms of Service

Exhibit 64



COMMENT & ANALYSIS
**COMMENT**

Close

# Tackle false rumours about insurance companies     

By Eric Dinallo
Published: July 31 2008 15:52 | Last updated: July 31 2008 15:52

Rumours that can destroy the stock price of banks and investment banks have been the focus of the media and have now attracted the attention of regulators. But what about rumours that cast doubt on the solvency of insurance companies that are equally important to the New York economy and global capital markets? All financial services companies – banks, investment banks and insurance companies – rely on market confidence. Just as a depository institution's continued existence depends on the confidence of depositors, so an insurance company's existence depends on the confidence of policyholders.

This is why New York State enacted a law in the 1930's providing for civil and criminal sanctions for spreading false rumours or making statements "untrue in fact" about an insurance company's solvency.

This law recognises that insurance companies can be destroyed by false claims that they are insolvent – that is, unable to pay their claims. Because insurers provide long-term promises of protection, falsely attacking an insurance company undermines all those promises and the economic activities that depend on them. Thus, these attacks can produce systemic harm that may extend beyond the policyholders of that company to the economy as a whole.

A prime example of the potential for widespread damage is the current case of the bond insurers, which are experiencing problems because of the subprime crisis. These companies guarantee that issuers will pay principal and interest on bonds, including municipal bonds, which are widely held by households and institutions. If the issuer of a bond cannot pay, the bond insurer steps in and pays the holder.

Recently, some individuals have asserted that some of the bond insurers are insolvent – a far more serious, far reaching and risky allegation than claims that the insurer's holding company stock is overvalued. Publicly questioning the solvency of these companies is of a completely different order. If the bond insurers, also known as financial guaranty companies, cannot pay claims, major US commercial and investment banks will likely suffer additional writedowns, the current credit crisis may get worse, and the current economic downturn could become deeper. Also, the cost of borrowing for some state and local governments may increase, resulting in reduced services or higher taxes.

This is of particular importance to New York for two reasons. First, New York is home to most of the large commercial and investment banks. Further damage to them will hurt our local economy and runs contrary to Governor David Paterson's efforts to protect New York's status as the financial center of the globe. Indeed, the financial sector downturn has already produced serious job-losses and other negative effects on the New York economy. Second, all of the major bond insurers and many other large insurance companies are located in New York State.

The New York State Insurance Department has been working with the bond insurers to resolve their problems. Our goal is not to protect managers or stockholders of the these companies, but rather to promote a healthy competitive market, to ensure that bond insurance is available for municipalities that need it to lower borrowing costs, and to protect the policyholders of existing companies.

To protect policyholders, we facilitated the injection of more than $7bn into existing bond insurers, licensed new entrants in record time, continue to facilitate additional capital infusions and are preparing for the rational wind-down, that is, run-off, of any impaired companies. We have been successful despite attacks on the stock prices of the insurance holding companies, which have made those tasks more complicated and challenging. Rumour mongering and inaccurately disparaging insurance company solvency, however, crosses a line.

Indeed, solvency determination is one of the Insurance Department's most important roles. For insurance, solvency is a regulatory concept that is complicated because premiums and claims are often paid over a long period of time. Insurance has its own system of Statutory Accounting Principles that differs from Generally Accepted Accounting Principles in meaningful and logical ways. Solvency essentially means that an insurance company can pay its claims when they become due. That is a determination generally made only by the regulator based on examinations or confidential insurance company filings.

We take all these responsibilities very seriously. But our efforts could be stymied – and policy holders and all New Yorkers irreparably damaged – by false accusations as to an insurer's solvency and that is why the law does not permit it.

The author is superintendent of the New York State Insurance Department

Copyright The Financial Times Limited 2008

"FT" and "Financial Times" are trademarks of the Financial Times. Privacy policy | Terms
© Copyright The Financial Times Ltd 2008.

# Exhibit 65

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): October 19, 2005**

---

# AMBAC FINANCIAL GROUP, INC.
**(Exact name of Registrant as specified in its charter)**

---

| Delaware | 1-10777 | 13-3621676 |
|---|---|---|
| (State of incorporation) | (Commission file number) | (I.R.S. employer identification no.) |

**One State Street Plaza, New York, New York 10004**
**(Address of principal executive offices) (Zip Code)**

**(212) 668-0340**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4c))

*Item 2.02 Results of Operations and Financial Condition.*

On October 19, 2005, Ambac Financial Group, Inc. (the "***Registrant***") issued a press release containing unaudited interim financial information and accompanying discussion for the 2005 third quarter and nine month earnings. Exhibit 99.08 is a copy of such press release and is incorporated by reference.

The information furnished under Item 2.02 of this Current Report on Form 8-K, including Exhibit 99.08, shall be deemed to be "filed" for purposes of the Securities and Exchange Act of 1934, as amended.

*Item 7.01 Regulation FD Disclosure*

The Registrant has posted on its website updated information as of September 30, 2005 relating to Ambac's exposure resulting from Hurricane Katrina.

The disclosure includes six tables. Table I is a breakout of Ambac's Hurricane Katrina loss provision as of September 30, 2005. In determining our loss estimate, our analysis has considered the unprecedented nature of the disaster, including the displacement of the communities' residents, and the unique aspects of each insured bond, such as the nature of the revenue source, the level of debt service reserves, if any, and other transaction protections. Ambac's estimate of losses related to the hurricane was made without regard to any potential, federal, state or local government assistance to individual municipalities or institutions. The credit loss estimation process involves the exercise of considerable judgment. Due to the nature of the loss reserve estimate, Ambac's ultimate actual loss associated with the hurricane may be materially different than the current estimate and thereby may affect future operating results. As of September 30, 2005, all of the credits included in the provision are classified as Public Finance, however, none are healthcare related. Ambac does not have material exposure to credits adversely affected by Hurricane Rita.

Table II is information related to Ambac's Public Finance exposure to FEMA-designated counties within the three states – Louisiana, Mississippi and Alabama, broken out by bond type, including our exposure to the region of Greater New Orleans separately. Table III lists Ambac's exposure to the three New Orleans parishes that make up Greater New Orleans. Table IV lists Ambac's exposure to investor-owned utilities within all counties of the three affected states. It is too early to determine the effect the storm will have on the underlying credit quality of the Public Finance and IOU exposures within these states. All of the Ambac-insured hospitals in the region are currently up and running.

Included within the Tables V and VI is information related to Ambac's estimated current exposures to asset-backed bonds collateralized by mortgages on residential homes and manufactured housing located in the FEMA-designated counties and New Orleans. The amounts shown represent the estimated portions of larger, geographically diversified securitizations. Ambac does not have exposure to manufactured housing securitizations in Greater New Orleans. The impact on each transaction will be affected by the concentration

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

of loans within the three states, the level of flood/hurricane or other insurance coverage on impacted homes within the pool and the amount of federal relief provided, if any. It is too early to determine the effect the storm will have on our MBS/MH exposures within these three states.

The complete disclosure relating to Ambac's Hurricane Katrina exposure is included in Exhibit 99.09 attached hereto and is posted on Ambac's website www.ambac.com. Ambac will periodically update its website as additional information becomes available.

***Item 9.01 Financial Statements and Exhibits.***

    (c)    Exhibits.

| Exhibit Number | Item |
| --- | --- |
| 99.08 | Press Release dated October 19, 2005. |
| 99.09 | Disclosure on Hurricane Katrina as posted on Ambac's website as of September 30, 2005. |

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Ambac Financial Group, Inc.
(Registrant)

Dated: October 19, 2005

By:     /s/ Sean T. Leonard

Sean T. Leonard
Senior Vice President and
Chief Financial Officer

### INDEX TO EXHIBITS

| Exhibit Number | Description of Exhibit |
|---|---|
| 99.08 | Unaudited interim financial statements and accompanying discussion for the three and nine months ended September 30, 2005 contained in the press release issued by the Registrant on October 19, 2005. |
| 99.09 | Updated information as of September 30, 2005 regarding Ambac's exposure resulting from Hurricane Katrina. |

Exhibit 99.08

**Ambac Financial Group, Inc.**
One State Street Plaza
New York, NY 10004
212.668.0340

*News Release*

**For Immediate Release**

Investor/Media Contact: Peter R. Poillon
(212) 208-3333
ppoillon@ambac.com
Web site: www.ambac.com



### AMBAC FINANCIAL GROUP, INC. ANNOUNCES THIRD QUARTER NET INCOME OF $175.1 MILLION, DOWN 5% REPORTS HURRICANE KATRINA LOSS ESTIMATE OF $60.0 MILLION, AFTER-TAX

**Third Quarter Net Income Per Diluted Share of $1.61, down 2%,**

**Third Quarter Credit Enhancement Production<sup>(1)</sup> $256.6 million, down 6%**

NEW YORK, October 19, 2005—**Ambac Financial Group, Inc.** (NYSE: ABK) (Ambac) today announced third quarter 2005 net income of $175.1 million, or $1.61 per diluted share. This represents a 5% decrease from third quarter 2004 net income of $183.5 million, and a 2% decrease in net income per diluted share from $1.65 in the third quarter of 2004. The third quarter 2005 results were negatively impacted by a loss provision amounting to $60.0 million on an after-tax basis, or $0.55 per diluted share, related to its exposure to municipal finance credits impacted by Hurricane Katrina.

<u>**Net Income Per Diluted Share**</u>

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts typically exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain non-recurring and other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the third quarter 2005, net security gains and losses had the effect of increasing net income by $8.8 million, $0.08 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $28.5 million, or $0.26 per diluted share for the third quarter 2005. Table I, below, provides third quarter and nine-month comparisons of earnings for the years 2005 and 2004.

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

Ambac Third Quarter 2005 Earnings/2

**Table I**

| | Third Quarter | | | Nine months | | |
|---|---|---|---|---|---|---|
| | **2005** | **2004** | **% Change** | **2005** | **2004** | **% Change** |
| Net income per diluted share | $ 1.61 | $ 1.65 | - 2% | $ 4.97 | $ 4.84 | + 3% |
| Effect of net security gains | $ (0.08) | $ (0.06) | n.a. | $ (0.27) | $ (0.17) | n.a. |
| Non-recurring and other[a] | $ 0.00 | $ 0.00 | n.a. | $ 0.00 | $ (0.02) | n.a. |
| **Sub-total excluding effect of net security gains/losses and non-recurring items[b]** | **$ 1.53** | **$ 1.59** | **- 4%** | **$ 4.70** | **$ 4.65** | **+ 1%** |
| Effect of Accelerated earnings | $ (0.26) | $ (0.11) | n.a. | $ (0.56) | $ (0.35) | n.a. |
| Total excluding items | $ 1.27 | $ 1.48 | - 14% | $ 4.14 | $ 4.30 | - 4% |

(a)     **2004 third quarter and nine months results have been adjusted by $1.3 million and $3.5 million, respectively, for expenses related to Ambac's contingent capital facility to be comparable with 2005 reporting.**

(b)     **Consensus earnings that are reported by earnings estimate services, such as First Call, are on this basis, which excludes net security gains and losses and non-recurring items.**

Commenting on the overall results, Ambac President and Chief Executive Officer, Robert J. Genader, noted, "Our operating results, excluding the $0.55 per share impact of Hurricane Katrina, were pretty good considering the tight credit spreads and increased competition that have persisted during the past 18 months. Domestic top-line production in both public and structured finance was encouraging, with attractive deals closed in a wide array of sectors. European booked business was sparse despite strong activity and growing pipelines – it remains a lumpy and less predictable business flow with long lead times." Mr. Genader continued, "The story of the quarter was Hurricane Katrina and the physical destruction and human suffering that it wrought. While early in the assessment process, we have completed a detailed loss analysis using the best information we could develop. By its very nature, it will be an evolving situation which will require and get our full attention on surveillance and active remediation. On a positive note, the balance of our risk portfolio showed improvement."

**Revenues**

*Highlights*

•    *Credit enhancement production[1]* in the third quarter of 2005 was $256.6 million, down 6% from the third quarter of 2004 which came in at $273.7 million. Growth in U.S. public finance was more than offset by a decline in production in U.S. structured finance and international.

**— MORE —**

**Ambac Third Quarter 2005 Earnings/3**

*Credit enhancement production* for the nine months of 2005 of $853.5 million was 10% lower than credit enhancement production of $943.6 million in the same period of 2004 primarily driven by tighter credit spreads across many of the markets that Ambac serves.

Table II, below, provides the third quarter and nine-month comparisons of credit enhancement production by market sector, for 2005 and 2004.

**Table II**
**Credit Enhancement Production**[1]

| $-millions | Third Quarter | | | Nine months | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | % Change | 2005 | 2004 | % Change |
| Public Finance | $ 118.3 | $ 105.9 | + 12% | $ 397.3 | $ 440.5 | - 10% |
| Structured Finance | 110.5 | 123.5 | - 11% | 329.1 | 290.3 | + 13% |
| International | 27.8 | 44.3 | - 37% | 127.1 | 212.8 | - 40% |
| Total | $ 256.6 | $ 273.7 | - 6% | $ 853.5 | $ 943.6 | - 10% |

- In Public Finance, municipal market issuance, as reported by third party sources, was 27% higher in the third quarter of 2005 than in the comparable prior period while insured market penetration remained strong at 55% but slightly lower than third quarter of 2004. Transactions guaranteed during the quarter included strong writings in the health care and municipal lease sectors of the market offset by lower writings in the municipal utilities and housing sectors. Spreads in U.S. public finance remain fairly attractive, however, pricing has been impacted by increased competition from other financial guarantors. U.S. structured finance production during the quarter was good but slightly lower than the comparable prior period as significant commercial asset-backed securitization activity was offset by lower consumer asset-backed writings. Competition from the market in the form of senior/subordination execution remains strong in many sectors. International writings were slow for the quarter but opportunities are plentiful across many business sectors and geographies. The international segment production is lumpy primarily due to long transaction closing cycles typically caused by the size and complexity of the deals.

- *Net premiums written* in the third quarter of 2005 of $203.6 million were 6% higher than net premiums written of $191.9 million in the same period of 2004. Gross premiums written in the third quarter of 2005 and 2004 were offset by $34.3 million and $18.7 million, respectively, in ceded premiums. Ceded premiums as a percentage of gross premiums written were 14% and 9% for the third quarter of 2005 and 2004, respectively. The mix of business underwritten and greater reinsurance treaty participation during the quarter drove the increase.

  *Net premiums written* for the nine months of 2005 of $728.0 million were 5% lower than net premiums written of $763.6 million in the same period of 2004. Excluding the impact of return premiums in each of the periods ($55.8 million in the first quarter of 2005 and $64.8 million in the second quarter of 2004), net premiums written are down 4%, period on period due to less U.S. public finance business written (where premiums are primarily collected up front) and greater reinsurance treaty participation during 2005.

— **MORE** —

**Ambac Third Quarter 2005 Earnings/4**

A breakdown of gross premiums written by market sector and ceded premiums for the third quarter and nine-month periods of 2005 and 2004 are included below in Table III.

**Table III**
**Premiums Written**

| $-millions | Third Quarter | | | Nine months | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2005 | 2004 | % Change | 2005 | 2004 | % Change |
| Public Finance | $ 111.7 | $ 93.1 | + 20% | $ 393.2 | $ 431.8 | - 9% |
| Structured Finance | 78.1 | 69.6 | + 12% | 231.2 | 211.2 | + 9% |
| International | 48.1 | 47.9 | 0% | 165.3 | 157.2 | + 5% |
| Total Gross Premiums Written | 237.9 | 210.6 | + 13% | 789.7 | 800.2 | - 1% |
| Ceded Premiums Written | (34.3) | (18.7) | + 83% | (61.7) | (36.6) | + 69% |
| Net Premiums Written | $ 203.6 | $ 191.9 | + 6% | $ 728.0 | $ 763.6 | - 5% |

- *Net premiums earned and other credit enhancement fees* for the third quarter of 2005 were $231.1 million, which represented an 18% increase from the $195.3 million earned in the third quarter of 2004. Net premiums earned increased for all market sectors but was most significant in U.S. public finance where accelerated premiums were very strong during the quarter.

Net premiums earned include accelerated premiums, which result from refundings, calls and other accelerations recognized during the quarter. Accelerated premiums were $48.9 million in the third quarter of 2005 (which had a net income per diluted share effect of $0.26), up 133% from $21.0 million ($0.11 per diluted share) in accelerated premiums in the third quarter of 2004. The third quarter 2005 was impacted by one large refunded transaction, representing almost half of the total accelerated amount. Long-term interest rates have remained relatively low during 2005 and we continue to see strong refunding activity in our public finance segment. However, as interest rates rise, the level of accelerated premiums should decline.

*Net premiums earned and other credit enhancement fees* for the nine months of 2005 were $648.6 million, which represented a 13% increase from $573.6 million earned in the nine months of 2004. Accelerated premiums were $107.9 million for the nine months of 2005 ($0.56 per diluted share), up 56% from $69.2 million ($0.35 per diluted share) in accelerated premiums for the nine months of 2004. Accelerated premiums in 2005 include the impact of a reinsurance cancellation in the first quarter of 2005 amounting to $4.5 million. Accelerated premiums in 2004 include the impact of reinsurance cancellations in the second quarter of 2004 amounting to $10.4 million.

A breakdown of net premiums earned and other credit enhancement fees by market sector for the third quarter and nine months of 2005 and 2004 are included below in Table IV. Normal net premiums earned exclude accelerated premiums that result from refundings, calls and other accelerations.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

Ambac Third Quarter 2005 Earnings/5

**Table IV**
**Net Premiums Earned and Other Credit Enhancement Fees**

| $-millions | Third Quarter | | | Nine months | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2005 | 2004 | % Change | 2005 | 2004 | % Change |
| Public Finance | $ 56.9 | $ 53.5 | + 6% | $ 166.7 | $ 153.3 | + 9% |
| Structured Finance | 71.4 | 70.2 | + 2% | 211.7 | 203.4 | + 4% |
| International | 53.9 | 50.6 | + 7% | 162.3 | 147.7 | + 10% |
| Total Normal Premiums/Fees | 182.2 | 174.3 | + 5% | 540.7 | 504.4 | + 7% |
| Accelerated Premiums/Fees | 48.9 | 21.0 | + 133% | 107.9 | 69.2 | + 56% |
| Total | $ 231.1 | $ 195.3 | + 18% | $ 648.6 | $ 573.6 | + 13% |

Public finance earned premiums, before accelerations, grew 6%. Earned premium growth in this segment has been negatively impacted by the high level of refunding activity in Ambac's public finance book. The high refunding level has substantially offset the positive impact resulting from our focus on higher value-added structured municipal transactions.

Structured finance earned premiums and other credit enhancement fees grew 2%. The rate of growth in structured finance has slowed significantly over the past 18 months, adversely impacted by lower premium production in mortgage-backed and home equity securitizations and pooled debt obligations. These relatively short-term asset classes had experienced significant growth in years prior to 2004, fueled by heavy issuance and wide spreads. However, narrowing credit spreads and increased competition has led to significantly lower writings in these segments. The lower business writings combined with the high level of principal pay downs (mortgage-backed securities) and deal terminations (CDOs) has reduced the size of the portfolios, resulting in lower earnings from these specific asset classes.

International earned premiums and other credit enhancement fees grew 7%. The rate of growth in this sector has also slowed in 2005. The decline is driven primarily by maturities and calls of our pooled debt obligations outstanding. Additionally, new business generation in this asset class has slowed somewhat as credit spreads have generally narrowed, reducing the need for financial guarantee protection.

• *Net investment income* for the third quarter of 2005 was $110.6 million, representing an increase of 22% from $90.5 million in the comparable period of 2004. Net investment income excluding net investment income from Variable Interest Entities ("VIEs") for the third quarter of 2005 was $98.5 million, representing an increase of 10% from $89.6 million in the third quarter of 2004. This increase was due primarily to the growth in the investment portfolio driven by ongoing collection of financial guarantee premiums and fees and a net positive adjustment to investment income for certain municipal securities within the investment portfolio that have been pre-refunded. A pre-refunding shortens the maturity of a bond resulting in accelerated amortization of bond premium or discount These positive effects on investment income during the period were partially offset by a lower reinvestment rate and use of cash for repurchases of Ambac stock during 2005 totaling approximately $300 million. Net

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

**Ambac Third Quarter 2005 Earnings/6**

investment income from VIEs for the third quarter of 2005 was $12.1 million, up from $0.9 million in the third quarter of 2004. Investment income from VIEs results from the consolidation of certain trusts that Ambac has insured and consolidated under accounting pronouncement FIN 46. The increase in interest income from VIEs reflects the consolidation of two transactions executed in the fourth quarter of 2004. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

*Net investment income* (including net investment income from VIEs) for the nine months of 2005 was $317.1 million, representing an increase of 19% from $267.1 million in the comparable period of 2004, primarily as a result of the reasons provided above.

*Financial services.* The financial services segment is comprised of the investment agreement business and derivative products business. The investment agreement business is managed with the goal of approximately matching the cash flows of the investment agreement liabilities with the cash flows of the related investment portfolio. The primary activities in the derivative products business are intermediation of interest rate and currency swap transactions and taking total return swap positions on certain fixed income obligations. Gross interest income less gross interest expense from investment and payment agreements plus results from the derivative products business, excluding net realized investment gains and losses and unrealized gains and losses on total return swaps and non-trading derivative contracts, were $17.1 million in the third quarter of 2005, up 23% from $13.9 million in the third quarter of 2004. The increase was driven by spread improvement in the investment agreement business and net mark-to-market gains in the derivative products business primarily resulting from the decrease in the ratio of tax-exempt interest rates to taxable interest rates.

*Financial services revenues,* as defined above, were $35.4 million in the nine months of 2005, down 15% from the $41.7 million in the first nine months of 2004, primarily due to lower revenues in the derivative products business.

## Expenses

### Highlights

- *Financial guarantee expenses* of $128.6 million for the third quarter of 2005 increased by 188% over the $44.6 million of expenses for the same quarter of 2004. Financial guarantee loss and loss expenses grew significantly from $17.7 million in the third quarter of 2004 to $89.1 million in the third quarter of 2005, due to increased reserves resulting from municipal exposures in the region impacted by Hurricane Katrina, as described below in "Loss Reserve Activity". Net underwriting and operating expenses of the financial guarantee segment totaled $27.8 million in the third quarter of 2005, up 6% from $26.2 in the third quarter of 2004. Interest expense on VIE notes amounting to $11.6 million and $0.7 million in the third quarter of 2005 and 2004, respectively, result from the consolidation of certain trusts that Ambac has insured and consolidated under accounting pronouncement FIN 46.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

**Ambac Third Quarter 2005 Earnings/7**

*Financial guarantee expenses* of $259.2 million for the nine months of 2005 increased by 90% over the $136.1 million of expenses for the same period of 2004. Financial guarantee loss and loss expenses of $134.3 million for the nine months of 2005 increased 155% from $52.7 million in 2004 primarily due to the Hurricane Katrina provisioning, described below. Net underwriting and operating expenses of the financial guarantee segment for the first nine months totaled $89.9 million, up 11% from $81.3 in the comparable period of 2004, primarily due to higher compensation costs.

• *Financial services other expenses,* which represent the operating expenses for the segment, amounted to $2.9 million for the third quarter of 2005, down 12% from $3.3 million in the comparable prior period.

*Financial services expenses* for the nine months of 2005 of $10.2 million were relatively flat to the comparable prior period.

*Loss Reserve Activity*

• Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $3.7 million during the third quarter of 2005 from $86.6 million at June 30, 2005 to $82.9 million at September 30, 2005.

• Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on insured transactions that are considered adversely classified. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR increased by $79.3 million during the quarter, primarily as a result of municipal exposures to the region impacted by Hurricane Katrina. Ambac's exposure to losses as a result of the hurricane is derived primarily from its guarantees of municipal bonds in the greater New Orleans area and the Gulf-front regions that were most severely impacted by the storm. The company has classified 35 individual obligations in the region with total net par outstanding of approximately $1.1 billion. To date, Ambac has paid three claims on obligations in the region, totaling approximately $2.0 million and has subsequently recovered the full amounts. In determining our loss estimate, our analysis has considered the unprecedented nature of the disaster, including the displacement of the communities' residents, and the unique aspects of each insured bond, such as the nature of the revenue source, the level of debt service reserves, if any, and other transaction protections. Ambac's estimate of losses related to the hurricane was made without regard to any potential federal, state or local government assistance to individual municipalities or institutions. The credit loss estimation process involves the exercise of considerable judgment. Due to the nature of the loss reserve estimate, Ambac's ultimate actual loss associated with the hurricane may be materially different than the current estimate and thereby may affect future operating results. Ambac will continue to assess the impact of Hurricane Katrina on the fourth quarter and subsequent periods as more information becomes available to us. Ambac does not have material exposure to credits adversely affected by Hurricane Rita. Outside of the ACR activity related to the hurricane, the remaining portfolio experienced slightly favorable credit migration during the quarter.

— **MORE** —

**Ambac Third Quarter 2005 Earnings/8**

**Other Items**

- *Total net securities gains/(losses)* for the third quarter of 2005 were $14.5 million on a pre-tax basis, or $0.08 per diluted share; consisting of net realized gains on investment securities of $9.5 million, net mark-to-market gains on credit and total return derivatives of $3.9 million and net mark-to-market gains on non-trading derivative contracts of $1.1 million. For the third quarter of 2004, net securities gains/(losses) were $10.1 million on a pre-tax basis, or $0.06 per diluted share; consisting of net realized gains on investment securities of $6.6 million, net mark-to-market gains on credit and total return derivatives of $3.0 million and net mark-to-market gains on non-trading derivative contracts of $0.5 million.

   *Total net securities gains/(losses)* for the nine months of 2005 were $53.1 million, or $0.27 per diluted share, consisting of net realized gains on investment securities of $10.8 million, net mark-to-market losses on credit and total return derivatives of ($7.0) million and net mark-to-market gains on non-trading derivative contracts of $49.3 million. As discussed in the previous quarter, the mark-to-market gains on non-trading derivative contracts related almost entirely to interest rate hedge contracts related to long-term fixed rate liabilities in Ambac's investment agreement business that were highly effective from an economic perspective but did not meet the technical requirements of FAS 133. As of July 1, 2005, the hedges were redesignated to meet the technical requirements and it is expected that the mark-to-market of the hedge and hedged item will substantially offset each other in the income statement prospectively. For the nine months of 2004 net securities gains were $29.3 million, or $0.17 per diluted share, consisting of net realized gains on investment securities of $27.6 million, mark-to-market gains on credit derivatives and total return swaps of $15.2 million and net mark-to-market losses on non-trading derivative contracts of ($13.5) million.

**Balance Sheet**

*Highlights*

- Total assets as of September 30, 2005 were $19.06 billion, up 2% from total assets of $18.74 billion at December 31, 2004. The increase was driven by cash generated from business written during the period offset by a decrease in the unrealized gains in the investment portfolio driven by higher long-term interest rates and stock repurchases during the period. As of September 30, 2005, stockholders' equity was $5.19 billion, a 3% increase from year-end 2004 stockholders' equity of $5.02 billion. The increase was primarily the result of net income during the period, offset by lower "Accumulated Other Comprehensive Income," driven by higher long-term interest rates and stock repurchases during the period.

**Stock Repurchase Activity**

During the quarter, Ambac repurchased approximately 2.4 million shares of its stock at a total cost of approximately $164.4 million. Year-to-date repurchases have amounted to approximately 4.3 million shares at a total cost of approximately $298.2 million. The company has approximately 4.6 million shares remaining under the Company's Share Repurchase Program authorized by the Board of Directors earlier this year.

— **MORE** —

**Ambac Third Quarter 2005 Earnings/9**

<u>**Cash Dividend Declared**</u>

At its October 2005 Board meeting, the Board of Directors of Ambac Financial Group, Inc. approved the regular quarterly cash dividend of $0.15 per share of common stock. The dividend is payable on December 7, 2005 to stockholders of record on November 10, 2005.

<u>**Forward-Looking Statements**</u>

This release, in particular the President and Chief Executive Officer's remarks, contains statements about our future results that may be considered "forward-looking statements" under the Private Securities Litigation Reform Act of 1995. These statements are based on current expectations and the current economic environment. We caution you that these statements are not guarantees of future performance. They involve a number of risks and uncertainties that are difficult to predict. Our actual results could differ materially from those expressed or implied in the forward-looking statements. Among the factors that could cause actual results to differ materially are (1) changes in the economic, credit, or interest rate environment in the United States and abroad; (2) the level of activity within the national and worldwide debt markets; (3) competitive conditions and pricing levels; (4) legislative and regulatory developments; (5) changes in tax laws; (6) the policies and actions of the United States and other governments; (7) changes in capital requirement or other criteria of rating agencies; (8) changes in accounting principles or practices that may impact the Company's reported financial results; (9) inadequacy of reserves established for losses and loss adjustment expenses; (10) default of one or more of the Company's reinsurers; (11) market spreads and pricing on insured pooled debt obligations and other derivative products insured or issued by the Company; (12) prepayment speeds on insured asset-backed securities and other factors that may influence the amount of installment premiums paid to the Company; and (13) other risks and uncertainties that have not been identified at this time. We undertake no obligation to publicly correct or update any forward-looking statement if we later become aware that it is not likely to be achieved, except as required by law.

********************

Ambac Financial Group, Inc., headquartered in New York City, is a holding company whose affiliates provide financial guarantees and financial services to clients in both the public and private sectors around the world. Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading guarantor of public finance and structured finance obligations, has earned triple-A ratings, the highest ratings available from Moody's Investors Service, Inc., Standard & Poor's Ratings Services, Fitch, Inc. and Rating and Investment Information, Inc. Ambac Financial Group, Inc. common stock is listed on the New York Stock Exchange (ticker symbol ABK).

********************

**— MORE —**

**Ambac Third Quarter 2005 Earnings/10**

<u>**Footnotes**</u>

(1) Credit enhancement production, which is not promulgated under GAAP, is used by management, equity analysts and investors as an indication of new business production in the period. Credit enhancement production, which Ambac reports as analytical data, is defined as gross (direct and assumed) up-front premiums plus the present value of estimated installment premiums on insurance policies and structured credit derivatives issued in the period. The definition of credit enhancement production used by Ambac may differ from definitions of credit enhancement production used by other public holding companies of financial guarantors. The following table reconciles credit enhancement production to gross premiums written calculated in accordance with GAAP:

| $-millions | Third Quarter | | Nine months | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| Credit enhancement production | $ 257 | $ 274 | $ 854 | $ 944 |
| Present value of estimated installment premiums written on insurance policies and structured credit derivatives issued in the period | (143) | (180) | (446) | (495) |
| Gross up-front premiums written | $ 114 | $ 94 | $ 408 | $ 449 |
| Gross installment premiums written on insurance policies | 124 | 117 | 382 | 351 |
| Gross premiums written | $ 238 | $ 211 | $ 790 | $ 800 |

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

**Ambac Financial Group, Inc. and Subsidiaries**
**Consolidated Statements of Operations**
**(Unaudited)**
**For the Three and Nine Months Ended September 30, 2005 and 2004**
**(Dollars in Thousands Except Share Data)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2005** | **2004** | **2005** | **2004** |
| **Revenues:** | | | | |
| **Financial Guarantee:** | | | | |
| Gross premiums written | $ 237,943 | $ 210,587 | $ 789,697 | $ 800,217 |
| Ceded premiums written | (34,296) | (18,649) | (61,707) | (36,586) |
| Net premiums written | $ 203,647 | $ 191,938 | $ 727,990 | $ 763,631 |
| Net premiums earned | $ 218,098 | $ 183,499 | $ 610,974 | $ 538,527 |
| Other credit enhancement fees | 13,014 | 11,839 | 37,617 | 35,084 |
| Net premiums earned and other credit enhancement fees | 231,112 | 195,338 | 648,591 | 573,611 |
| Net investment income | 110,646 | 90,454 | 317,104 | 267,088 |
| Net realized investment gains | 5,013 | 7,358 | 6,004 | 22,523 |
| Net mark-to-market gains (losses) on credit derivative contracts | 1,555 | (330) | (4,785) | 9,888 |
| Other income (loss) | 2,859 | 799 | 6,150 | (10,014) |
| **Financial Services:** | | | | |
| Interest from investment and payment agreements | 70,854 | 48,452 | 192,951 | 146,542 |
| Derivative products | 8,896 | 7,175 | 13,202 | 20,269 |
| Net realized investment gains (losses) | 4,520 | (830) | 4,808 | 5,013 |
| Net mark-to-market gains (losses) on total return swap contracts | 2,347 | 3,277 | (2,255) | 5,301 |
| Net mark-to-market (losses) gains on non-trading derivatives | (57) | 22 | 48,869 | 126 |
| **Corporate:** | | | | |
| Net investment income | 515 | 416 | 1,320 | 1,172 |
| Net realized investment gains | — | — | — | 18 |
| Total revenues | 438,260 | 352,131 | 1,231,959 | 1,041,537 |
| **Expenses:** | | | | |
| **Financial Guarantee:** | | | | |
| Loss and loss expenses | 89,126 | 17,700 | 134,255 | 52,700 |
| Underwriting and operating expenses | 27,844 | 26,186 | 89,939 | 81,299 |
| Interest expense on variable interest entity notes | 11,623 | 710 | 35,018 | 2,102 |
| **Financial Services:** | | | | |
| Interest from investment and payment agreements | 62,602 | 41,736 | 170,781 | 125,106 |
| Other expenses | 2,912 | 3,349 | 10,162 | 10,425 |
| Interest | 13,627 | 13,722 | 40,653 | 40,808 |
| Corporate | 3,548 | 2,678 | 11,291 | 7,468 |
| Total expenses | 211,282 | 106,081 | 492,099 | 319,908 |
| Income before income taxes | 226,978 | 246,050 | 739,860 | 721,629 |
| Provision for income taxes | 51,861 | 61,632 | 193,102 | 184,560 |
| Income from continuing operations | 175,117 | 184,418 | 546,758 | 537,069 |
| **Discontinued operations:** | | | | |
| Loss from discontinued operations | — | (799) | — | (1,349) |
| Income tax benefit | — | 160 | — | (60) |
| Net loss from discontinued operations | — | (959) | — | (1,289) |
| Net income | $ 175,117 | $ 183,459 | $ 546,758 | $ 535,780 |
| **Earnings per share:** | | | | |
| Income from continuing operations | $ 1.63 | $ 1.68 | $ 5.02 | $ 4.90 |
| Discontinued operations | $ 0.00 | $ (0.01) | $ 0.00 | $ (0.01) |
| Net income | $ 1.63 | $ 1.67 | $ 5.02 | $ 4.89 |

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

**Earnings per diluted share:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income from continuing operations | $ | 1.61 | $ | 1.66 | $ | 4.97 | $ | 4.85 |
| Discontinued operations | $ | 0.00 | $ | (0.01) | $ | 0.00 | $ | (0.01) |
| Net income | $ | 1.61 | $ | 1.65 | $ | 4.97 | $ | 4.84 |

**Weighted average number of common shares outstanding:**

| | | | | |
|---|---|---|---|---|
| Basic | 107,392,176 | 109,771,249 | 108,891,738 | 109,468,844 |
| Diluted | 108,484,035 | 111,107,367 | 110,121,701 | 110,777,264 |

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

**Ambac Financial Group, Inc. and Subsidiaries**
**Consolidated Balance Sheets**
**September 30, 2005 and December 31, 2004**
**(Dollars in Thousands Except Share Data)**

| | September 30, 2005 | December 31, 2004 |
|---|---|---|
| | (unaudited) | |
| **Assets** | | |
| Investments: | | |
| Fixed income securities, at fair value (amortized cost of $14,757,218 in 2005 and $13,425,475 in 2004) | $ 15,155,998 | $ 13,901,218 |
| Fixed income securities pledged as collateral, at fair value (amortized cost of $383,545 in 2005 and $345,195 in 2004) | 376,928 | 341,742 |
| Short-term investments, at cost (approximates fair value) | 175,097 | 521,226 |
| Other (cost of $3,781 in 2005 and $3,731 in 2004) | 4,412 | 4,234 |
| Total investments | 15,712,435 | 14,768,420 |
| Cash | 28,468 | 19,957 |
| Securities purchased under agreements to resell | 32,000 | 353,000 |
| Receivable for securities sold | 1,136 | 1,319 |
| Investment income due and accrued | 155,715 | 162,506 |
| Reinsurance recoverable on paid and unpaid losses | 1,160 | 16,765 |
| Prepaid reinsurance | 287,161 | 297,330 |
| Deferred acquisition costs | 201,734 | 184,766 |
| Loans | 1,347,136 | 1,405,700 |
| Derivative assets | 1,145,224 | 1,455,609 |
| Other assets | 150,132 | 77,523 |
| Total assets | $ 19,062,301 | $ 18,742,895 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities: | | |
| Unearned premiums | $ 2,875,956 | $ 2,778,893 |
| Loss and loss expense reserve | 288,822 | 254,055 |
| Ceded reinsurance balances payable | 19,072 | 18,248 |
| Obligations under investment and payment agreements | 6,902,790 | 6,813,914 |
| Obligations under investment repurchase agreements | 201,680 | 266,806 |
| Deferred income taxes | 266,199 | 217,373 |
| Current income taxes | 1,627 | 16,406 |
| Long-term debt | 1,860,727 | 1,866,207 |
| Accrued interest payable | 79,581 | 71,058 |
| Derivative liabilities | 987,545 | 1,206,740 |
| Other liabilities | 240,928 | 208,732 |
| Payable for securities purchased | 143,379 | 6 |
| Total liabilities | 13,868,306 | 13,718,438 |
| Stockholders' equity: | | |
| Preferred stock | — | — |
| Common stock | 1,091 | 1,089 |
| Additional paid-in capital | 716,870 | 694,465 |
| Accumulated other comprehensive income | 235,502 | 296,814 |
| Retained earnings | 4,520,475 | 4,032,089 |
| Common stock held in treasury at cost | (279,943) | — |
| Total stockholders' equity | 5,193,995 | 5,024,457 |
| Total liabilities and stockholders' equity | $ 19,062,301 | $ 18,742,895 |
| Number of shares outstanding (net of treasury shares) | 105,150,417 | 108,915,944 |
| Book value per share | $ 49.40 | $ 46.13 |

**Ambac Assurance Corporation and Subsidiaries**
**Capitalization Table - GAAP**
**September 30, 2005 and December 31, 2004**
**(Dollars in Millions)**

The following table sets forth Ambac Assurance's consolidated capitalization as of September 30, 2005 and December 31, 2004, respectively, on the basis of accounting principles generally accepted in the United States of America.

|  | September 30, 2005 | December 31, 2004 |
|---|---|---|
|  | (unaudited) |  |
| Unearned premiums | $ 2,888 | $ 2,783 |
| Long-term debt | 1,069 | 1,074 |
| Other liabilities | 2,014 | 2,192 |
| Total liabilities | 5,971 | 6,049 |
| Stockholder's equity: |  |  |
| Common stock | 82 | 82 |
| Additional paid-in capital | 1,252 | 1,233 |
| Accumulated other comprehensive income | 165 | 238 |
| Retained earnings | 4,314 | 4,094 |
| Total stockholder's equity | 5,813 | 5,647 |
| Total liabilities and stockholder's equity | $ 11,784 | $ 11,696 |

**Exposure to Hurricane Katrina**
**Updated September 30, 2005**

Included in Table I below is a breakout of Ambac's Hurricane Katrina loss provision as of September 30, 2005. In determining our loss estimate, our analysis has considered the unprecedented nature of the disaster, including the displacement of the communities' residents, and the unique aspects of each insured bond, such as the nature of the revenue source, the level of debt service reserves, if any, and other transaction protections. Ambac's estimate of losses related to the hurricane was made without regard to any potential, federal, state or local government assistance to individual municipalities or institutions. The credit loss estimation process involves the exercise of considerable judgment. Due to the nature of the loss reserve estimate, Ambac's ultimate actual loss associated with the hurricane may be materially different than the current estimate and thereby may affect future operating results. Ambac will continue to assess the impact of Hurricane Katrina on subsequent periods as more information becomes available to us. As of September 30, 2005, all of the credits included in the provision are classified as Public Finance, however none are healthcare related. Ambac does not have material exposure to credits adversely affected by Hurricane Rita.

Table I

#### Ambac's Loss Estimate Broken Out by Region
#### September 30, 2005 ($ millions)

| Region | # of Issues | Net Par Outstanding | Total Reserve Estimate |
|---|---|---|---|
| Louisiana | 22 | $ 869 | $ 75 |
| Mississippi/Alabama | 13 | 226 | 17 |
| **Total** | **35** | **$ 1,095** | **$ 92** |

Included in Table II below is information related to Ambac's Public Finance exposure to FEMA-designated counties (designated for the combined category of individual and public assistance as of 9/9/05) within the three states – Louisiana, Mississippi and Alabama, broken out by bond type, including our exposure to the region of Greater New Orleans separately. Table III lists Ambac's exposure to the three New Orleans parishes that make up Greater New Orleans. Table IV lists Ambac's exposure to investor-owned utilities within all counties of the three affected states. It is too early to determine the effect the storm will have on the underlying credit quality of the Public Finance and IOU exposures within these states. All of the Ambac-insured hospitals in the region are currently up and running.

Table II

#### Ambac's Public Finance Exposure in FEMA-Designated Counties
#### as of September 30, 2005 ($000)

| Bond Type | Alabama | Greater New Orleans | Other Louisiana | Mississippi | Total |
|---|---|---|---|---|---|
| General obligation | $ 523,928 | $ 372,029 | $ 354,340 | 414,334 | $ 1,664,631 |
| Leases and tax backed | 92,257 | 814,789 | 341,560 | 36,817 | 1,285,423 |
| University | 105,573 | 235,248 | 126,817 | 197,241 | 664,879 |
| Utility | 97,481 | — | 116,440 | 56,363 | 270,284 |
| Transportation | — | 176,342 | — | 56,997 | 233,339 |
| Health care | 68,750 | — | 105,034 | 13,684 | 187,468 |
| Other | — | 49,000 | 675 | — | 49,675 |
| **Grand Total** | **$ 887,988** | **$ 1,647,407** | **$ 1,044,866** | **$ 775,437** | **$ 4,355,699** |
| **Scheduled D/S due (10/1/05-12/31/05)** | **14,276** | **34,637** | **44,904** | **18,629** | **112,446** |
| **Scheduled D/S due (1/1/06-12/31/06)** | **86,142** | **140,797** | **167,665** | **68,156** | **462,759** |

**Table III**

**Ambac's Public Finance Exposure in Greater New Orleans**
**Net Par as of September 30, 2005 ($000)**

| Bond Type | Orleans | Jefferson | St. Bernard | Total |
|---|---|---|---|---|
| General obligation | $    324,314 | $    41,410 | $    6,305 | $    372,029 |
| Leases and tax backed | 368,090 | 446,698 | — | 814,789 |
| University | 235,248 | — | — | 235,248 |
| Utility | — | — | — | — |
| Transportation | 176,342 | — | — | 176,342 |
| Health care | — | — | — | — |
| Other | — | 49,000 | — | 49,000 |
| **Grand Total** | **$  1,103,994** | **$  537,108** | **$  6,305** | **$  1,647,407** |

**Table IV**

**Ambac's Investor-Owned Utility Exposure in Alabama, Louisiana and Mississippi**
**Net Par as of July 31, 2005 ($000)**

| | Alabama | Louisiana | Mississippi | Total |
|---|---|---|---|---|
| Investor-owned utilities | $   97,955 | $   220,779 | $   109,030 | $   427,764 |

Included within the Tables V and VI below is information related to Ambac's estimated current exposures to asset-backed bonds collateralized by mortgages on residential homes and manufactured housing located in the FEMA-designated counties and New Orleans. The amounts shown represent the estimated portions of larger, geographically diversified securitizations. Ambac does not have exposure to manufactured housing securitizations in Greater New Orleans. The impact on each transaction will be affected by the concentration of loans within the three states, the level of flood/hurricane or other insurance coverage on impacted homes within the pool and the amount of federal relief provided, if any. It is too early to determine the effect the storm will have on our MBS/MH exposures within these three states.

**Table V**

**MBS Securitization Pools**
**(Total Net Par $45.7B)**

| | Net Par ($Millions) | % Total MBS Net Par |
|---|---|---|
| Alabama | $      131 | 0.3 |
| New Orleans | 44 | 0.1 |
| Other Louisiana | 219 | 0.5 |
| Mississippi | 156 | 0.3 |
| **Total** | **$      550** | **1.1** |

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

Table VI

**Manufactured Housing Securitization Pools**
**(Total Net Par = $1.1B)**

|  | Net Par ($Millions) | | % Total MH Net Par |
|---|---|---|---|
| Alabama | $ | 10 | 0.9 |
| Louisiana | | 12 | 1.1 |
| Mississippi | | 18 | 1.7 |
| **Total** | $ | **40** | **3.7** |

Created by 10KWizard   www.10KWizard.com

Source: AMBAC FINANCIAL GROU, 8-K, October 19, 2005

Exhibit 66

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): July 26, 2006**

---

# AMBAC FINANCIAL GROUP, INC.
**(Exact name of Registrant as specified in its charter)**

---

| **Delaware** | **1-10777** | **13-3621676** |
|:---:|:---:|:---:|
| (State of incorporation) | (Commission file number) | (I.R.S. employer identification no.) |

**One State Street Plaza, New York, New York 10004**
**(Address of principal executive offices) (Zip Code)**

**(212) 668-0340**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4c))

**Item 2.02 Results of Operations and Financial Condition.**

On July 26, 2006, Ambac Financial Group, Inc. (the "***Registrant***") issued a press release containing unaudited interim financial information and accompanying discussion for the 2006 second quarter earnings. Exhibit 99.04 is a copy of such press release and is incorporated by reference.

The information furnished under Item 2.02 of this Current Report on Form 8-K, including Exhibit 99.04, shall be deemed to be "filed" for purposes of the Securities and Exchange Act of 1934, as amended.

**Item 9.01 Financial Statements and Exhibits.**

(c)    Exhibits.

| Exhibit Number | Item |
| --- | --- |
| 99.04 | Press Release dated July 26, 2006. |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Ambac Financial Group, Inc.
(Registrant)

Dated: July 26, 2006

By:    **/s/ Sean T. Leonard**

       Sean T. Leonard
       Senior Vice President and
       Chief Financial Officer

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

**INDEX TO EXHIBITS**

| Exhibit Number | Description of Exhibit |
|---|---|
| 99.04 | Unaudited interim financial statements and accompanying discussion for the three and six months ended June 30, 2006 contained in the press release issued by the Registrant on July 26, 2006. |

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006



**Ambac Financial Group, Inc.**

One State Street Plaza
New York, NY 10004
212.668.0340

*News Release*

**For Immediate Release**

Investor/Media Contact: Peter R. Poillon
(212) 208-3333
ppoillon@ambac.com
Web site: www.ambac.com

**AMBAC FINANCIAL GROUP, INC. ANNOUNCES SECOND
QUARTER NET INCOME OF $238.6 MILLION, UP 28%**

**Second Quarter Net Income Per Diluted Share of $2.22, up 31%,**

**Second Quarter Credit Enhancement Production[1] $531.0 million, up 33%**

NEW YORK, July 26, 2006—**Ambac Financial Group, Inc.** (NYSE: ABK) (Ambac) today announced second quarter 2006 net income of $238.6 million, or $2.22 per diluted share. This represents a 28% increase from second quarter 2005 net income of $186.1 million, and a 31% increase in net income per diluted share from $1.69 in the second quarter of 2005.

<u>**Net Income Per Diluted Share**</u>

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the second quarter 2006, net security gains and losses had the effect of increasing net income by $32.9 million, $0.31 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $22.8 million, or $0.21 per diluted share for the second quarter 2006. Table I, below, provides second quarter and six-month comparisons of earnings for 2006 and 2005.

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

Ambac Second Quarter 2006 Earnings/2

**Table I**
**Earnings Per Diluted Share**

| | Second Quarter | | | Six Months | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **% Change** | **2006** | **2005** | **% Change** |
| Net income per diluted share | $ 2.22 | $ 1.69 | +31% | $ 4.28 | $ 3.35 | +28% |
| Effect of net security gains | $ (0.31) | $ (0.14) | n.a. | $ (0.38) | $ (0.19) | n.a. |
| Other | $ 0.00 | $ 0.01 | n.a. | $ 0.00 | $ 0.00 | n.a. |
| **Operating earnings** [a][b] | **$ 1.91** | **$ 1.56** | **+22%** | **$ 3.90** | **$ 3.16** | **+23%** |
| Effect of Accelerated earnings | $ (0.21) | $ (0.12) | n.a. | $ (0.32) | $ (0.29) | n.a. |
| Core earnings [b] | $ 1.70 | $ 1.44 | +18% | $ 3.58 | $ 2.87 | +25% |

(a)    Consensus earnings that are reported by earnings estimate services, such as First Call, are on this basis.

(b)    Operating and core earnings are non-GAAP measures. See footnote 2 on page 10.

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "I am encouraged by the strong credit enhancement production and solid financial results for the quarter. The company's ability to produce record results in this suboptimal business environment is a testament to our people and our strategy. We continue to uncover attractive opportunities to put our capital to work in the short-term and I am confident that the company is well positioned both domestically and internationally for the long-term."

**Revenues**

*Highlights*

•    *Credit enhancement production* [1] in the second quarter of 2006 was $531.0 million, up 33% from the second quarter of 2005 which came in at $397.9 million. Growth in international and U.S. structured finance was partially offset by a decline in U.S. public finance.

*Credit enhancement production* for the six months of 2006 of $764.4 million was 28% higher than credit enhancement production of $596.9 million in the same period of 2005.

Table II, below, provides the second quarter and six-month comparisons of credit enhancement production by market segment for 2006 and 2005.

**Table II**
**Credit Enhancement Production**[1]

| $-millions | Second Quarter | | | Six Months | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **% Change** | **2006** | **2005** | **% Change** |
| Public Finance | $ 132.1 | $ 170.0 | - 22% | $ 231.2 | $ 279.0 | - 17% |
| Structured Finance | 212.8 | 141.6 | +50% | 303.5 | 218.6 | +39% |
| International | 186.1 | 86.3 | +116% | 229.7 | 99.3 | +131% |
| Total | $ 531.0 | $ 397.9 | +33% | $ 764.4 | $ 596.9 | +28% |

— MORE —

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

**Ambac Second Quarter 2006 Earnings/3**

- In public finance, Ambac's premium production was lower as market issuance declined slightly. Overall municipal market issuance, as reported by third party sources, was down 3% quarter on quarter. A significant reduction in refunding issuance was almost entirely offset by strong new money issuance during the quarter. However, the primary driver of the decline in credit enhancement production was the change in the mix of credit quality of municipal transactions that came to market during the quarter which resulted in fewer insurable transactions. The municipal market penetration rate for the industry declined to 45% in the second quarter 2006, down significantly from 61% in the comparable quarter of 2005. Spreads in the U.S. public finance segment have remained attractive but competition has negatively impacted pricing, especially in the more commoditized sectors such as general obligations. Ambac had strong writings in the healthcare, tax-backed and housing sectors during the quarter.

  U.S. structured finance production during the quarter was strong as increased writings in commercial asset-backed securitizations, structured insurance securitizations and collateralized debt obligations were partially offset by lower auto securitizations and investor-owned utilities. Competition from the senior/subordinated market remains challenging and spreads remain tight across most asset classes of U.S. structured finance. International production was strong as several large U.K. private finance initiatives (PFI) transactions closed. Outside of the U.K., Ambac continues to see attractive opportunities across diverse geographic regions and asset classes including transportation, utilities, and future flow deals.

- Net premiums written in the second quarter of 2006 of $255.7 million were 5% lower than net premiums written of $268.6 million in the same period of 2005. Gross premiums written in the second quarter of 2006 and 2005 were $313.5 million and $322.6 million, respectively. The decreases in net and gross premiums written are primarily attributable to lower U.S. public finance business written during the second quarter of 2006 as premiums in that business are generally collected at inception of the policy. Ceded premiums as a percentage of gross premiums written were 18.4% and 16.7% for the second quarter of 2006 and 2005, respectively.

  *Net premiums written* for the six months of 2006 of $483.5 million were 8% lower than net premiums written of $524.4 million in the same period of 2005. Excluding the impact of return premiums from reinsurance cancellations in each of the periods ($37.0 million in the first quarter of 2006 and $55.8 million in the first quarter of 2005), net premiums written are down 5%, period on period primarily due to less U.S. public finance business written during 2006.

  A breakdown of gross premiums written by market segment and ceded premiums for the second quarter and six-month periods of 2006 and 2005 are included below in Table III.

— <b>MORE</b> —

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

Ambac Second Quarter 2006 Earnings/4

**Table III**
**Premiums Written**

| $-millions | Second Quarter | | | Six Months | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **% Change** | **2006** | **2005** | **% Change** |
| Public Finance | $ 122.9 | $ 174.2 | - 29% | $ 215.2 | $ 281.4 | - 24% |
| Structured Finance | 90.2 | 79.0 | +14% | 169.0 | 153.1 | +10% |
| International | 100.4 | 69.4 | +45% | 148.3 | 117.3 | +26% |
| Total Gross Premiums Written | 313.5 | 322.6 | - 3% | 532.5 | 551.8 | - 3% |
| Ceded Premiums Written | (57.8) | (54.0) | +7% | (49.0) | (27.4) | +79% |
| Net Premiums Written | $ 255.7 | $ 268.6 | - 5% | $ 483.5 | $ 524.4 | - 8% |

- *Net premiums earned and other credit enhancement fees* for the second quarter of 2006 were $224.9 million, which represented a 9% increase from the $205.8 million earned in the second quarter of 2005. The increase was driven by higher accelerated premiums from refundings and policy termination fees and increased normal premiums earned in U.S. public finance and U.S. structured finance, partially offset by decreased normal premiums earned in international.

  Net premiums earned include accelerated premiums, which result from refundings, calls and other accelerations recognized during the quarter. Accelerated premiums were $37.3 million in the second quarter of 2006, up 52% from $24.5 million in accelerated premiums in the second quarter of 2005. Accelerated premiums in the second quarter of 2006 include $8.8 million from termination fees on structured finance and international transactions. No such fees were included in accelerated premiums in the second quarter of 2005.

  *Net premiums earned and other credit enhancement fees* for the first half of 2006 were $433.3 million, which represented a 4% increase from the $417.5 million earned in the first half of 2005. Accelerated premiums were $62.3 million for the first half 2006, up 6% from $59.0 million in accelerated premiums for the first half of 2005. Accelerated premiums in 2006 and 2005 include $7.7 million and $4.5 million, respectively, related to the impact of reinsurance cancellations occurring in the first quarter of the respective years.

  A breakdown of net premiums earned and other credit enhancement fees by market segment for 2006 and 2005 are included below in Table IV. Normal net premiums earned exclude accelerated premiums that result from refundings, calls and other accelerations.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

Ambac Second Quarter 2006 Earnings/5

**Table IV**
**Net Premiums Earned and Other Credit Enhancement Fees**

| $-millions | Second Quarter | | | Six Months | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **% Change** | **2006** | **2005** | **% Change** |
| Public Finance | $ 58.1 | $ 54.6 | +6% | $ 114.0 | $ 109.8 | +4% |
| Structured Finance | 77.9 | 71.7 | +9% | 154.8 | 140.3 | +10% |
| International | 51.6 | 55.0 | - 6% | 102.2 | 108.4 | - 6% |
| Total Normal Premiums/Fees | 187.6 | 181.3 | +3% | 371.0 | 358.5 | +3% |
| Accelerated Premiums | 37.3 | 24.5 | +52% | 62.3 | 59.0 | +6% |
| Total | $ 224.9 | $ 205.8 | +9% | $ 433.3 | $ 417.5 | +4% |

Public finance earned premiums, before accelerations, grew 6% quarter on quarter. Earned premium growth in this segment has been negatively impacted by the competitive pricing environment and compounded by the high level of refunding activity in Ambac's public finance book. However, Ambac's historic focus on the high-return structured sectors of the municipal market has proven beneficial to maintaining growth in a difficult business environment.

Structured finance earned premiums and other credit enhancement fees grew 9%. The rate of growth in structured finance has improved as the recent level of writings in asset classes such as commercial asset-backed securities, auto securitizations and pooled debt obligations has increased. Narrow credit spreads and high prepayment speeds in the mortgage-backed and home equity book of business and early terminations of transactions in other structured finance sectors continue to partially offset the positive effects of new business writings.

International earned premiums and other credit enhancement fees decreased by 6%. The decline was driven primarily by significant paydowns and calls over the past several quarters, a slow-down in new business generated in the past several quarters prior to this quarter, and the recent business mix which has trended towards long-dated infrastructure transactions that earn premiums over a longer period of time than typical structured finance exposures.

• Net investment income for the second quarter of 2006 was $117.0 million, representing an increase of 12% from $104.5 million in the comparable period of 2005. Net investment income excluding net investment income from Variable Interest Entities ("VIEs") for the second quarter of 2006 was $104.5 million, representing an increase of 13% from $92.2 million in the second quarter of 2005. This increase was due primarily to growth in the investment portfolio driven by the ongoing collection of financial guarantee premiums and fees and a $200 million capital contribution from the parent company in the fourth quarter of 2005. Net investment income was also modestly affected by recent increases in interest rates. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

*Net investment income* (including net investment income from VIEs) for the six months of 2006 was $230.9 million, representing an increase of 12% from $206.5 million in the comparable period of 2005, primarily as a result of the reasons provided above.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

**Ambac Second Quarter 2006 Earnings/6**

• *Financial services revenues.* The financial services segment is comprised of the investment agreement business and the derivative products business. The investment agreement business is managed with the goal of approximately matching the cash flows of the investment agreement liabilities with the cash flows of the related investment portfolio. The primary activities in the derivative products business are intermediation of interest rate and currency swap transactions and taking total return swap positions on certain fixed income obligations. Gross interest income less gross interest expense from investment and payment agreements plus results from the derivative products business, excluding net realized investment gains and losses and unrealized gains and losses on total return swaps and non-trading derivative contracts, was $10.8 million in the second quarter of 2006, up 227% from $3.3 million in the second quarter of 2005. The increase was primarily due to a negative mark-to-market adjustment in the derivatives products business in the second quarter of 2005 driven by the increased ratio of tax-exempt to taxable interest rates during that quarter.

*Financial services revenues* were $22.5 million in the first half of 2006, up 24% from the $18.2 million of revenues in the first half of 2005 primarily due to the reason provided above.

## Expenses

### *Highlights*

• *Financial guarantee expenses* of $56.7 million for the second quarter of 2006 decreased by 9% from the $62.2 million of expenses for the same quarter of 2005. Financial guarantee loss and loss expenses were $12.8 million in the second quarter of 2006 down from $21.7 million in the second quarter of 2005. The $12.8 million loss provision in the second quarter of 2006 is the result of an increased case reserve for a healthcare transaction and an increase to loss adjustment expenses (included as case reserves) offset by net positive migration in the active credit reserves. See "Loss Reserve Activity," below, for additional information on losses. Net underwriting and operating expenses of the financial guarantee segment totaled $31.9 million in the second quarter of 2006, up 11% from $28.7 million in the second quarter of 2005 primarily due to increased compensation expense.

Interest expense on VIE notes amounting to $12.0 million and $11.8 million in the second quarter of 2006 and 2005, respectively, result from the consolidation of certain trusts that Ambac has insured and consolidated under accounting pronouncement FIN 46.

*Financial guarantee expenses* of $107.3 million for the first six months of 2006 decreased 18% from $130.6 million of expenses for the same period of 2005. The decrease results primarily from lower loss expenses partially offset by higher compensation expenses during the period.

### *Loss Reserve Activity*

• Case basis loss reserves (loss reserves for exposures that have defaulted) increased $17.4 million during the second quarter of 2006 from $121.3 million at March 31, 2006 to $138.7 million at June 30, 2006. The increase was primarily related to additional case reserves for a healthcare transaction and an addition to loss adjustment expense reserves. Paid claims during the quarter amounting to $20.1 million included a payment on a CDO which had previously been classified within the active credit reserves, paid and terminated during the current quarter.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

**Ambac Second Quarter 2006 Earnings/7**

- Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR decreased by $24.7 million during the quarter, from $171.7 million at March 31, 2006 to $147.0 million at June 30, 2006. The decrease was primarily the result of net improvements in the classified portfolio and a transfer of ACR reserves to case reserves for the CDO transaction noted above. At June 30, 2006, the specific Hurricane Katrina-related provision amounts to $90.4 million, down slightly from $91.1 million at March 31, 2006. Approximately $1.1 billion of Katrina-impacted credits remain in Ambac's adversely classified credit portfolio. Ambac did not pay any Katrina-related claims during the quarter.

## Other Items

- *Total net securities gains/(losses)* for the second quarter of 2006 were $51.0 million, or $0.31 per diluted share; consisting of net realized gains on investment securities of $44.4 million, net mark-to-market gains on credit and total return derivatives of $7.2 million and net mark-to-market losses on non-trading derivative contracts of ($0.6) million. Approximately $38 million of the net realized gains on investment securities relate to cash recoveries received during the quarter related to a security in the investment agreement portfolio that had been written down in 2002 and 2003. For the second quarter of 2005, net securities gains/(losses) were $29.6 million, or $0.14 per diluted share; consisting of net realized losses on investment securities of ($0.6) million, net mark-to-market losses on credit and total return derivatives of ($17.0) million and net mark-to-market gains on non-trading derivative contracts of $47.2 million. The mark-to-market gains on non-trading derivative contracts relate almost entirely to interest rate hedge contracts related to long-term fixed rate liabilities in Ambac's investment agreement business that were redesignated during that quarter. Those hedges were redesignated to meet the technical requirements of FAS 133 as of July 1, 2005.

  *Total net securities gains/(losses)* for the first half of 2006 were $64.4 million, or $0.38 per diluted share; consisting of net realized gains on investment securities of $49.5 million, net mark-to-market gains on credit and total return derivatives of $14.4 million and net mark-to-market gains on non-trading derivative contracts of $0.5 million. For the first half of 2005 net securities gains were $38.8 million, or $0.19 per diluted share; consisting of net realized gains on investment securities of $1.3 million, mark-to-market losses on credit derivatives and total return swaps of ($10.9) million and net mark-to-market gains on non-trading derivative contracts of $48.4 million.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

**Ambac Second Quarter 2006 Earnings/8**

**Balance Sheet**

*Highlights*

- Total assets as of June 30, 2006 were $20.27 billion, up 3% from total assets of $19.73 billion at December 31, 2005. The increase was driven by cash generated from operations during the period, partially offset by a decrease in unrealized gains in the investment portfolio driven by higher long-term interest rates.

  As of June 30, 2006, stockholders' equity was $5.63 billion, a 5% increase from year-end 2005 stockholders' equity of $5.37 billion. The increase was primarily the result of net income during the period, offset by lower "Accumulated Other Comprehensive Income" driven by higher long-term interest rates.

**Increased Cash Dividend Declared**

At its July 2006 Board meeting, the Board of Directors of Ambac Financial Group Inc. approved a 20% increase in the regular quarterly cash dividend from $0.15 to $0.18 per share of common stock. The dividend is payable on September 6, 2006 to stockholders of record on August 10, 2006. Ambac has declared an increased cash dividend in every year since going public in 1991.

**Forward-Looking Statements**

This release, in particular the Chairman and Chief Executive Officer's remarks, contains statements about our future results that may be considered "forward-looking statements" under the Private Securities Litigation Reform Act of 1995. These statements are based on current expectations and the current economic environment. We caution you that these statements are not guarantees of future performance. They involve a number of risks and uncertainties that are difficult to predict. Our actual results could differ materially from those expressed or implied in the forward-looking statements. Among the factors that could cause actual results to differ materially are (1) changes in the economic, credit, or interest rate environment in the United States and abroad; (2) the level of activity within the national and worldwide debt markets; (3) competitive conditions and pricing levels; (4) legislative and regulatory developments; (5) changes in tax laws; (6) the policies and actions of the United States and other governments; (7) changes in capital requirement or other criteria of rating agencies; (8) changes in accounting principles or practices that may impact the Company's reported financial results; (9) inadequacy of reserves established for losses and loss adjustment expenses; (10) default of one or more of the Company's reinsurers; (11) market spreads and pricing on insured pooled debt obligations and other derivative products insured or issued by the Company; (12) prepayment speeds on insured asset-backed securities and other factors that may influence the amount of installment premiums paid to the Company; and (13) other risks and uncertainties that have not been identified at this time. We undertake no obligation to publicly correct or update any forward-looking statement if we later become aware that it is not likely to be achieved, except as required by law.

— <b>MORE</b> —

**Ambac Second Quarter 2006 Earnings/9**

*********************

Ambac Financial Group, Inc., headquartered in New York City, is a holding company whose affiliates provide financial guarantees and financial services to clients in both the public and private sectors around the world. Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading guarantor of public finance and structured finance obligations, has earned triple-A ratings, the highest ratings available from Moody's Investors Service, Inc., Standard & Poor's Ratings Services, Fitch, Inc. and Rating and Investment Information, Inc. Ambac Financial Group, Inc. common stock is listed on the New York Stock Exchange (ticker symbol ABK).

*********************

## Footnotes

(1)   Credit enhancement production, which is not promulgated under GAAP, is used by management, equity analysts and investors as an indication of new business production in the period. Credit enhancement production, which Ambac reports as analytical data, is defined as gross (direct and assumed) up-front premiums plus the present value of estimated installment premiums on insurance policies and structured credit derivatives issued in the period. The discount rate used to measure the present value of estimated installment premiums was 5.6% and 7% during the second quarter of 2006 and 2005, respectively. The definition of credit enhancement production used by Ambac may differ from definitions of credit enhancement production used by other public holding companies of financial guarantors. The following table reconciles credit enhancement production to gross premiums written calculated in accordance with GAAP:

| $-millions | Second Quarter | | Six Months | |
| --- | --- | --- | --- | --- |
|  | **2006** | **2005** | **2006** | **2005** |
| Credit enhancement production | $ 531 | $ 398 | $ 764 | $ 597 |
| Present value of estimated installment premiums written on insurance policies and structured credit derivatives issued in the period | (358) | (208) | (494) | (302) |
| Gross up-front premiums written | $ 173 | $ 190 | $ 270 | $ 295 |
| Gross installment premiums written on insurance policies | 140 | 133 | 262 | 257 |
| Gross premiums written | $ 313 | $ 323 | $ 532 | $ 552 |

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

Ambac Second Quarter 2006 Earnings/10

(2)    Operating earnings and core earnings are not substitutes for net income computed in accordance with GAAP, but are useful measures of performance used by management, equity analysts and investors. Operating earnings measures income from operations excluding the impact of investment portfolio realized gains and losses, mark-to-market gains and losses from certain non-trading derivative instruments and certain other items. Core earnings further exclude the impact of refundings, calls and other accelerations. The definitions of operating earnings and core earnings used by Ambac may differ from definitions of operating earnings and core earnings used by other public holding companies of financial guarantors.

— **MORE** —

**Ambac Financial Group, Inc. and Subsidiaries**
**Consolidated Statements of Operations**
**(Unaudited)**
**For the Three and Six Months Ended June 30, 2006 and 2005**
**(Dollars in Thousands Except Share Data)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| **Revenues:** | | | | |
| **Financial Guarantee:** | | | | |
| Gross premiums written | $ 313,458 | $ 322,628 | $ 532,465 | $ 551,754 |
| Ceded premiums written | (57,747) | (54,038) | (48,990) | (27,411) |
| Net premiums written | $ 255,711 | $ 268,590 | $ 483,475 | $ 524,343 |
| Net premiums earned | $ 210,788 | $ 193,242 | $ 404,968 | $ 392,876 |
| Other credit enhancement fees | 14,155 | 12,536 | 28,343 | 24,603 |
| Net premiums earned and other credit enhancement fees | 224,943 | 205,778 | 433,311 | 417,479 |
| Net investment income | 116,983 | 104,450 | 230,938 | 206,458 |
| Net realized investment gains (losses) | 1,892 | (1,030) | 1,513 | 991 |
| Net mark-to-market gains (losses) on credit derivative contracts | 5,381 | (11,606) | 7,334 | (6,340) |
| Other income | 2,930 | 906 | 32,384 | 3,291 |
| **Financial Services:** | | | | |
| Interest from investment and payment agreements | 98,048 | 64,416 | 179,983 | 122,097 |
| Derivative products | 3,321 | (3,759) | 8,007 | 4,306 |
| Net realized investment gains | 41,728 | 443 | 47,231 | 288 |
| Net mark-to-market gains (losses) on total return swap contracts | 1,818 | (5,350) | 7,041 | (4,602) |
| Net mark-to-market (losses) gains on non-trading derivatives | (306) | 48,235 | (62) | 48,926 |
| **Corporate:** | | | | |
| Net investment income | 3,396 | 396 | 6,396 | 805 |
| Net realized investment gains | 791 | — | 791 | — |
| Total revenues | 500,925 | 402,879 | 954,867 | 793,699 |
| **Expenses:** | | | | |
| **Financial Guarantee:** | | | | |
| Loss and loss expenses | 12,822 | 21,657 | 12,949 | 45,129 |
| Underwriting and operating expenses | 31,871 | 28,692 | 69,767 | 62,095 |
| Interest expense on variable interest entity notes | 11,958 | 11,816 | 24,581 | 23,395 |
| **Financial Services:** | | | | |
| Interest from investment and payment agreements | 90,533 | 57,399 | 165,498 | 108,179 |
| Other expenses | 3,303 | 3,431 | 6,875 | 7,250 |
| Interest | 19,475 | 13,513 | 38,950 | 27,026 |
| Corporate | 4,000 | 5,461 | 7,643 | 7,743 |
| Total expenses | 173,962 | 141,969 | 326,263 | 280,817 |
| Income before income taxes | 326,963 | 260,910 | 628,604 | 512,882 |
| Provision for income taxes | 88,393 | 74,812 | 168,894 | 141,241 |
| Net income | $ 238,570 | $ 186,098 | 459,710 | 371,641 |
| Net income per share | $ 2.24 | $ 1.71 | $ 4.32 | $ 3.39 |
| Net income per diluted share | $ 2.22 | $ 1.69 | $ 4.28 | $ 3.35 |
| **Weighted average number of common shares outstanding:** | | | | |
| Basic | 106,485,245 | 109,098,498 | 106,462,001 | 109,641,520 |
| Diluted | 107,450,639 | 110,327,148 | 107,398,480 | 110,990,318 |

**Ambac Financial Group, Inc. and Subsidiaries**
**Consolidated Balance Sheets**
**June 30, 2006 and December 31, 2005**
**(Dollars in Thousands Except Share Data)**

| | June 30, 2006 (unaudited) | | December 31, 2005 | |
|---|---|---|---|---|
| **Assets** | | | | |
| **Investments:** | | | | |
| Fixed income securities, at fair value (amortized cost of $16,444,737 in 2006 and $14,781,028 in 2005) | $ | 16,517,931 | $ | 15,124,016 |
| Fixed income securities pledged as collateral, at fair value (amortized cost of $380,450 in 2006 and $378,480 in 2005) | | 371,702 | | 371,160 |
| Short-term investments, at cost (approximates fair value) | | 241,798 | | 472,034 |
| Other (cost of $13,458 in 2006 and $13,537 in 2005) | | 14,302 | | 14,173 |
| Total investments | | 17,145,733 | | 15,981,383 |
| Cash | | 32,795 | | 28,295 |
| Securities purchased under agreements to resell | | 200,000 | | 419,000 |
| Receivable for securities sold | | 2,578 | | 2,161 |
| Investment income due and accrued | | 182,352 | | 178,779 |
| Reinsurance recoverable on paid and unpaid losses | | 5,279 | | 3,730 |
| Prepaid reinsurance | | 310,790 | | 303,383 |
| Deferred acquisition costs | | 213,086 | | 202,195 |
| Loans | | 1,196,678 | | 1,344,140 |
| Derivative assets | | 878,594 | | 1,102,649 |
| Other assets | | 105,885 | | 159,425 |
| Total assets | $ | 20,273,770 | $ | 19,725,140 |
| **Liabilities and Stockholders' Equity** | | | | |
| **Liabilities:** | | | | |
| Unearned premiums | $ | 3,042,128 | $ | 2,954,718 |
| Loss and loss expense reserve | | 291,026 | | 304,139 |
| Ceded reinsurance balances payable | | 38,080 | | 23,746 |
| Obligations under investment and payment agreements | | 7,585,058 | | 7,056,222 |
| Obligations under investment repurchase agreements | | 166,227 | | 196,568 |
| Securities sold under agreement to repurchase | | 20,000 | | — |
| Deferred income taxes | | 132,462 | | 257,987 |
| Current income taxes | | 87,694 | | 16,726 |
| Long-term debt | | 2,164,061 | | 2,233,582 |
| Accrued interest payable | | 78,321 | | 108,195 |
| Derivative liabilities | | 650,188 | | 935,440 |
| Other liabilities | | 243,559 | | 253,969 |
| Payable for securities purchased | | 144,745 | | 11,641 |
| Total liabilities | | 14,643,549 | | 14,352,933 |
| **Stockholders' equity:** | | | | |
| Preferred stock | | — | | — |
| Common stock | | 1,092 | | 1,092 |
| Additional paid-in capital | | 745,337 | | 723,680 |
| Accumulated other comprehensive income | | 42,323 | | 202,312 |
| Retained earnings | | 5,083,048 | | 4,692,701 |
| Common stock held in treasury at cost | | (241,579) | | (247,578) |
| Total stockholders' equity | | 5,630,221 | | 5,372,207 |
| Total liabilities and stockholders' equity | $ | 20,273,770 | $ | 19,725,140 |
| Number of shares outstanding (net of treasury shares) | | 105,795,481 | | 105,639,446 |
| Book value per share | $ | 53.22 | $ | 50.85 |

Source: AMBAC FINANCIAL GROU, 8-K, July 26, 2006

**Ambac Assurance Corporation and Subsidiaries**
**Capitalization Table - GAAP**
**June 30, 2006 and December 31, 2005**
**(Dollars in Millions)**

The following table sets forth Ambac Assurance's consolidated capitalization as of June 30, 2006 and December 31, 2005, respectively, on the basis of accounting principles generally accepted in the United States of America.

| | June 30, 2006 | December 31, 2005 |
|---|---|---|
| | (unaudited) | |
| Unearned premiums | $ 3,052 | $ 2,966 |
| Long-term debt | 972 | 1,042 |
| Other liabilities | 1,770 | 1,996 |
| Total liabilities | 5,794 | 6,004 |
| Stockholder's equity: | | |
| Common stock | 82 | 82 |
| Additional paid-in capital | 1,467 | 1,453 |
| Accumulated other comprehensive income | 10 | 137 |
| Retained earnings | 4,875 | 4,499 |
| Total stockholder's equity | 6,434 | 6,171 |
| Total liabilities and stockholder's equity | $ 12,228 | $ 12,175 |

Created by 10KWizard     www.10KWizard.com

Exhibit 67

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): January 31, 2007**

---

# AMBAC FINANCIAL GROUP, INC.
**(Exact name of Registrant as specified in its charter)**

---

| Delaware | 1-10777 | 13-3621676 |
|---|---|---|
| (State of incorporation) | (Commission file number) | (I.R.S. employer identification no.) |

**One State Street Plaza, New York, New York 10004**
**(Address of principal executive offices) (Zip Code)**

**(212) 668-0340**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4c))

***Item 2.02 Results of Operations and Financial Condition.***

On January 31, 2007, Ambac Financial Group, Inc. (the "***Registrant***") issued a press release containing unaudited interim financial information and accompanying discussion for the 2006 fourth quarter and full year earnings. Exhibit 99.12 is a copy of such press release and is incorporated by reference.

The information furnished under Item 2.02 of this Current Report on Form 8-K, including Exhibit 99.12, shall be deemed to be "filed" for purposes of the Securities and Exchange Act of 1934, as amended.

***Item 9.01 Financial Statements and Exhibits.***

    (d)   Exhibits.

| Exhibit Number | Item |
| --- | --- |
| 99.12 | Press Release dated January 31, 2007. |

*SIGNATURES*

*Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.*

*Ambac Financial Group, Inc.*
*(Registrant)*

*Dated: January 31, 2007*

By:  */s/ Sean T. Leonard* _____
     *Sean T. Leonard*
     *Senior Vice President and Chief Financial Officer*

*INDEX TO EXHIBITS*

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 99.12 | Unaudited interim financial statements and accompanying discussion for the three months and full year ended December 31, 2006 contained in the press release issued by the Registrant on January 31, 2007. |

**Ambac Financial Group, Inc.**
One State Street Plaza
New York, NY 10004
212.668.0340

*News Release*

**For Immediate Release**

Investor/Media Contact: Peter R. Poillon
(212) 208-3333
ppoillon@ambac.com
Web site: www.ambac.com

## AMBAC FINANCIAL GROUP, INC. ANNOUNCES FOURTH QUARTER NET INCOME OF $202.7 MILLION, DOWN 1%

**Fourth Quarter Net Income Per Diluted Share of $1.88, down 1%,**

**Fourth Quarter Credit Enhancement Production[1] $314.5 million, down 21%**

NEW YORK, January 31, 2007—**Ambac Financial Group, Inc.** (NYSE: ABK) (Ambac) today announced fourth quarter 2006 net income of $202.7 million, or $1.88 per diluted share. This represents a 1% decrease from fourth quarter 2005 net income of $204.3 million, or $1.90 per diluted share.

### Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the fourth quarter 2006, net security gains and losses had the effect of increasing net income by $3.6 million, or $0.04 on a per diluted share basis. Other items during the fourth quarter 2006 had a net income effect of ($3.9) million, ($0.04) on a per diluted share basis, and represents the write-off of previously deferred issuance expenses related to debentures that were redeemed in October 2006. Accelerated earnings had the effect of increasing net income by $18.1 million, or $0.17 per diluted share for the fourth quarter 2006. Table I, below, provides fourth quarter and full year comparisons of earnings for 2006 and 2005.

Source: AMBAC FINANCIAL GROU, 8-K, January 31, 2007

Ambac Fourth Quarter 2006 Earnings/2

**Table I**
**Earnings Per Diluted Share**

| | Fourth Quarter | | | Full Year | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **% Change** | **2006** | **2005** | **% Change** |
| Net income per diluted share | $ 1.88 | $ 1.90 | -1% | $ 8.15 | $ 6.87 | +19% |
| Effect of net security gains | $ (0.04) | $ (0.12) | n.a. | $ (0.48) | $ (0.40) | n.a. |
| Other items | $ 0.04 | $ 0.00 | n.a. | $ 0.04 | $ 0.00 | n.a. |
| **Operating earnings** [a][b] | **$ 1.88** | **$ 1.78** | **+6%** | **$ 7.71** | **$ 6.47** | **+19%** |
| Effect of accelerated earnings | $ (0.17) | $ (0.19) | n.a. | $ (0.63) | $ (0.74) | n.a. |
| Core earnings [b] | $ 1.71 | $ 1.59 | +8% | $ 7.08 | $ 5.73 | +24% |

(a)    Consensus earnings that are reported by earnings estimate services, such as First Call, are on this basis.
(b)    Operating and core earnings are non-GAAP measures. See footnote 2 on page 9.

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "I am satisfied with our overall business results for the quarter and for the full year. Despite one of the most difficult business environments the industry has faced in many years, Ambac's full-year top line production is very acceptable. Most gratifyingly, our record-level full-year international production demonstrates our success in expanding our global reach, as our triple-A financial strength and reputation for innovative and efficient execution is now firmly planted across a broad segment of the international markets."

**Revenues**

*Highlights*

- *Credit enhancement production* [1] in the fourth quarter of 2006 was $314.5 million, down 21% from the fourth quarter of 2005 which came in at $395.8 million. Growth in international was more than offset by declines in U.S. public finance and U.S. structured finance.

  *Credit enhancement production* [1] for the full year of 2006 of $1,295.2 million was 4% higher than credit enhancement production of $1,249.4 million in 2005, as significant growth in international business more than offset the decline in the U.S. public finance business.

  Table II, below, provides the fourth quarter and full year comparisons of credit enhancement production by market segment for 2006 and 2005.

— MORE —

Source: AMBAC FINANCIAL GROU, 8-K, January 31, 2007

Ambac Fourth Quarter 2006 Earnings/3

**Table II**
**Credit Enhancement Production[1]**

| $-millions | Fourth Quarter | | | Full Year | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **% Change** | **2006** | **2005** | **% Change** |
| Public Finance | $ 84.0 | $ 153.5 | -45% | $ 405.0 | $ 550.8 | -26% |
| Structured Finance | 97.1 | 143.4 | -32% | 479.3 | 479.0 | 0% |
| International | 133.4 | 98.9 | +35% | 410.9 | 219.6 | +87% |
| Total | $ 314.5 | $ 395.8 | -21% | $ 1,295.2 | $ 1,249.4 | +4% |

In public finance, Ambac's premium production was lower while overall market issuance, as reported by third party sources, was up approximately 24% quarter on quarter. The increase in issuance for the quarter was driven by strong new-money issuance across a broad range of municipal sectors. Ambac's market share remained stable at approximately 23% but the mix of business written in the fourth quarter 2006 varied significantly from the comparable prior period. Ambac's fourth quarter 2005 production included three large well-priced transactions and strong business flow in the health care sector. While fourth quarter 2006 overall market deal flow was fairly strong, the mix of issuance during the quarter was more inclined towards smaller, less complex transactions. Additionally, pricing continues to be negatively affected by competition from other financial guarantors.

U.S. structured finance production during the quarter was lower as the fourth quarter 2005 included two very large transactions (an auto rental securitization and a commercial asset-backed securitization) which combined represented almost 40% of the total structured finance production from that period. Otherwise, the current quarter was characterized by increased business activity in the investor-owned utility, pooled debt obligations and consumer asset-backed securities sectors. Competition from the senior/subordinated market remains challenging and spreads remain tight across most asset classes of U.S. structured finance.

International production was stronger as Ambac closed three large U.K. transactions in the current quarter and the geographic breadth of transactions closed was once again, encouraging. During the quarter, Ambac closed deals in five different countries along with several multi-national pooled debt obligations transactions. Management continues to believe that the broad international markets provide an array of opportunities and will be a driver of short-term and long-term growth for the industry.

- *Net premiums written* (which represent premiums collected during the period, net of reinsurance) in the fourth quarter of 2006 of $223.6 million were 17% lower than net premiums written of $268.1 million in the comparable period of 2005. Gross premiums written in the fourth quarter of 2006 and 2005 were $251.8 million and $306.1 million, respectively. The decreases in net and gross premiums written are primarily attributable to less U.S. public finance business written during the fourth quarter of 2006. Ceded premiums as a percentage of gross premiums written were 11.2% and 12.4% for the fourth quarter of 2006 and 2005, respectively.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, January 31, 2007

Ambac Fourth Quarter 2006 Earnings/4

*Net premiums written* for the full year of 2006 of $893.2 million were 10% lower than net premiums written of $996.3 million in 2005. Excluding the impact of return premiums from reinsurance cancellations in each of the years ($37.0 million in the first quarter of 2006 and $55.8 million in the first quarter of 2005), net premiums written are down 9% year on year primarily due to less U.S. public finance business written during 2006.

A breakdown of gross premiums written by market segment and ceded premiums for the fourth quarter and full year 2006 and 2005 are included below in Table III.

**Table III**
**Premiums Written**

| $-millions | Fourth Quarter | | | Full Year | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **% Change** | **2006** | **2005** | **% Change** |
| Public Finance | $ 89.4 | $ 159.1 | -44% | $ 375.7 | $ 552.2 | -32% |
| Structured Finance | 85.9 | 83.3 | +3% | 333.6 | 314.5 | +6% |
| International | 76.5 | 63.7 | +20% | 287.4 | 229.3 | +25% |
| Total Gross Premiums Written | 251.8 | 306.1 | -18% | 996.7 | 1,096.0 | -9% |
| Ceded Premiums Written | (28.2) | (38.0) | -26% | (103.5) | (99.7) | +4% |
| Net Premiums Written | $ 223.6 | $ 268.1 | -17% | $ 893.2 | $ 996.3 | -10% |

- *Net premiums earned and other credit enhancement fees* for the fourth quarter of 2006 were $223.4 million, which represented a 3% increase from the $217.6 million earned in the fourth quarter of 2005. The increase was driven by higher normal premiums and other credit enhancement fees across all segments, partially offset by lower accelerated premiums from refundings and policy termination fees.

Net premiums earned include accelerated premiums, which result from refundings, calls and other accelerations recognized during the quarter. Accelerated premiums were $32.1 million in the fourth quarter of 2006, down 9% from $35.4 million in accelerated premiums in the fourth quarter of 2005.

*Net premiums earned and other credit enhancement fees* for the full year 2006 were $871.4 million, up 1% from $866.4 million earned in 2005. Accelerated premiums were $119.0 million for the full year 2006, down 17% from $143.3 million in accelerated premiums in 2005.

A breakdown of net premiums earned and other credit enhancement fees by market segment for the fourth quarter and full year 2006 and 2005 are included below in Table IV. Normal net premiums earned exclude accelerated premiums that result from refundings, calls and other accelerations.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, January 31, 2007

Ambac Fourth Quarter 2006 Earnings/5

**Table IV**
**Net Premiums Earned and Other Credit Enhancement Fees**

| $-millions | Fourth Quarter | | | Full Year | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **% Change** | **2006** | **2005** | **% Change** |
| Public Finance | $  58.3 | $  57.0 | +2% | $ 231.1 | $ 223.6 | +3% |
| Structured Finance | 82.2 | 76.8 | +7% | 317.3 | 288.5 | +10% |
| International | 50.8 | 48.4 | +5% | 204.0 | 211.0 | -3% |
| Total Normal Premiums/Fees | 191.3 | 182.2 | +5% | 752.4 | 723.1 | +4% |
| Accelerated Premiums | 32.1 | 35.4 | -9% | 119.0 | 143.3 | -17% |
| Total | $ 223.4 | $ 217.6 | +3% | $ 871.4 | $ 866.4 | +1% |

Public finance earned premiums, before accelerations, grew 2% this quarter. Earned premium growth in this segment has been negatively impacted by the high level of refunding activity in Ambac's public finance book over the past two years, increasingly competitive pricing and the mix of business underwritten in recent periods.

Structured finance earned premiums and other credit enhancement fees grew 7%. The rate of growth in structured finance improved in 2006 driven by strong recent premium production in asset classes such as commercial asset-backed securities, auto securitizations and pooled debt obligations. Narrow credit spreads and accelerated prepayment speeds in the mortgage-backed and home equity book of business persist, continuing to partially offset the positive effects of new business writings in other asset classes.

International earned premiums and other credit enhancement fees increased 5%. This represents the first increase in this segment since the third quarter 2005 and was driven primarily by strong business writings across many geographies and asset classes during 2006. The paydowns and calls that had beset the international business in 2005 and the first half of 2006, slowed in the latter half of this year.

• *Net investment income* for the fourth quarter of 2006 was $110.5 million, representing an increase of 14% from $96.7 million in the comparable period of 2005. This increase was due primarily to growth in the investment portfolio driven by the ongoing collection of financial guarantee premiums and fees and a $200 million capital contribution from the parent company that occurred in late December 2005.

Note that Ambac has deconsolidated its previously reported Variable Interest Entities ("VIEs") due to new interpretive guidance recently issued by the Financial Accounting Standards Board. Affected balances in all accounts, primarily investment income and interest expense, have been adjusted accordingly for all periods presented.

*Net investment income* for the full year of 2006 was $423.9 million, representing an increase of 12% from $378.1 million in the comparable period of 2005, primarily as a result of the reasons provided above.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, January 31, 2007

**Ambac Fourth Quarter 2006 Earnings/6**

- *Financial services revenues.* The financial services segment is comprised of the investment agreement business and the derivative products business. Gross interest income less gross interest expense from investment and payment agreements plus results from the derivative products business, excluding net realized investment gains and losses and unrealized gains and losses on total return swaps and non-trading derivative contracts, was $12.7 million in the fourth quarter of 2006, up 11% from $11.4 million in the fourth quarter of 2005. The increase was primarily due to higher mark-to-market gains included within derivative products revenues in the fourth quarter 2006.

  *Financial services revenues* were $48.5 million in the full year 2006, up 4% from the $46.8 million of revenues in 2005.

## Expenses

### Highlights

- *Financial guarantee expenses* of $43.4 million for the fourth quarter of 2006 were flat compared to $43.5 million of expenses for the fourth quarter of 2005. Financial guarantee loss and loss expenses were $9.6 million in the fourth quarter of 2006, down from $15.6 million in the fourth quarter of 2005. See "Loss Reserve Activity," below, for additional information on losses. Net underwriting and operating expenses of the financial guarantee segment totaled $33.8 million in the fourth quarter of 2006, up 21% from $27.9 million in the fourth quarter of 2005 primarily due to increased compensation expense.

  *Financial guarantee expenses* of $153.7 million for the full year 2006 decreased 43% from $267.6 million in 2005. The decrease results primarily from lower loss expenses partially offset by higher compensation expenses in 2006.

### Loss Reserve Activity

- Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $84.2 million during the fourth quarter of 2006 from $126.7 million at September 30, 2006 to $42.5 million at December 31, 2006. The decrease was driven by the settlement of several impaired transactions during the quarter including a health care transaction that had been fully-reserved. Total claim payments during the quarter amounted to $68.8 million.

- Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR increased by $25.0 million during the quarter, from $147.6 million at September 30, 2006 to $172.6 million at December 31, 2006. The increase was driven primarily by net increases in reserves on certain credits within the U.S. public finance portfolio, most notably within the transportation sector. At December 31, 2006, the specific Hurricane Katrina-related provision amounts to $50.1 million, down slightly from $50.5 million at September 30, 2006. Ambac did not pay any Katrina-related claims during the year.

— **MORE** —

Ambac Fourth Quarter 2006 Earnings/7

**Other Items**

- *Total net securities gains/(losses)* for the fourth quarter of 2006 were $5.8 million, or $0.04 per diluted share; consisting of net realized gains on investment securities of $9.6 million, net mark-to-market losses on credit and total return derivatives of ($4.8) million and net mark-to-market gains on non-trading derivative contracts of $1.0 million. For the fourth quarter of 2005, net securities gains/(losses) were $20.0 million, or $0.12 per diluted share; consisting of net realized losses on investment securities of ($2.2) million, net mark-to-market gains on credit and total return derivatives of $22.0 million and net mark-to-market gains on non-trading derivative contracts of $0.2 million.

  *Total net securities gains/(losses)* for the full year of 2006 were $80.2 million, or $0.48 per diluted share; consisting of net realized gains on investment securities of $67.1 million, net mark-to-market gains on credit and total return derivatives of $11.6 million and net mark-to-market gains on non-trading derivative contracts of $1.5 million. Approximately $56 million of the net realized gains on investment securities in 2006 relate to cash recoveries received during the year related to a security in the investment agreement portfolio that had been written down in 2002 and 2003. For the full year of 2005, net securities gains were $73.1 million, or $0.40 per diluted share; consisting of net realized gains on investment securities of $8.6 million, mark-to-market losses on credit derivatives and total return swaps of $15.0 million and net mark-to-market gains on non-trading derivative contracts of $49.5 million. The mark-to-market gains on non-trading derivative contracts relate almost entirely to interest rate hedge contracts in Ambac's investment agreement business that were redesignated to meet the technical requirements of FAS 133 as of July 1, 2005.

**Balance Sheet**

*Highlights*

- Total assets as of December 31, 2006 were $20.27 billion, up 9% from total assets of $18.55 billion at December 31, 2005. The increase was driven primarily by cash generated from operations during the period.

- As of December 31, 2006, stockholders' equity was $6.18 billion, a 15% increase from year-end 2005 stockholders' equity of $5.38 billion. The increase was primarily the result of net income during the period.

**Cash Dividend Declared**

At its January 2007 Board meeting, the Board of Directors approved the regular quarterly cash dividend of $0.18 per share of common stock. The dividend is payable on March 7, 2007 to stockholders of record on February 12, 2007.

— **MORE** —

Ambac Fourth Quarter 2006 Earnings/8

**Forward-Looking Statements**

This release, in particular the Chairman and Chief Executive Officer's remarks, contains statements about our future results that may be considered "forward-looking statements" under the Private Securities Litigation Reform Act of 1995. These statements are based on current expectations and the current economic environment. We caution you that these statements are not guarantees of future performance. They involve a number of risks and uncertainties that are difficult to predict. Our actual results could differ materially from those expressed or implied in the forward-looking statements. Among the factors that could cause actual results to differ materially are (1) changes in the economic, credit, or interest rate environment in the United States and abroad; (2) the level of activity within the national and worldwide debt markets; (3) competitive conditions and pricing levels; (4) legislative and regulatory developments; (5) changes in tax laws; (6) the policies and actions of the United States and other governments; (7) changes in capital requirement or other criteria of rating agencies; (8) changes in accounting principles or practices that may impact the Company's reported financial results; (9) inadequacy of reserves established for losses and loss adjustment expenses; (10) default of one or more of the Company's reinsurers; (11) market spreads and pricing on insured pooled debt obligations and other derivative products insured or issued by the Company; (12) prepayment speeds on insured asset-backed securities and other factors that may influence the amount of installment premiums paid to the Company; and (13) other risks and uncertainties that have not been identified at this time. We undertake no obligation to publicly correct or update any forward-looking statement if we later become aware that it is not likely to be achieved, except as required by law.

*******************

Ambac Financial Group, Inc., headquartered in New York City, is a holding company whose affiliates provide financial guarantees and financial services to clients in both the public and private sectors around the world. Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading guarantor of public finance and structured finance obligations, has earned triple-A ratings, the highest ratings available from Moody's Investors Service, Inc., Standard & Poor's Ratings Services and Fitch, Inc. Ambac Financial Group, Inc. common stock is listed on the New York Stock Exchange (ticker symbol ABK).

*******************

— **MORE** —

Ambac Fourth Quarter 2006 Earnings/9

**Footnotes**

(1)  Credit enhancement production, which is not promulgated under GAAP, is used by management, equity analysts and investors as an indication of new business production in the period. Credit enhancement production, which Ambac reports as analytical data, is defined as gross (direct and assumed) up-front premiums plus the present value of estimated installment premiums on insurance policies and structured credit derivatives issued in the period. The discount rate used to measure the present value of estimated installment premiums was 5.4% and 7.0% during the fourth quarter of 2006 and 2005, respectively. The definition of credit enhancement production used by Ambac may differ from definitions of credit enhancement production (or similar terms) used by other public holding companies of financial guarantors. The following table reconciles credit enhancement production to gross premiums written calculated in accordance with GAAP:

| $-millions | Fourth Quarter | | Full Year | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Credit enhancement production | $ 314 | $ 396 | $ 1,295 | $ 1,249 |
| Present value of estimated installment premiums written on insurance policies and structured credit derivatives issued in the period | (192) | (229) | (836) | (674) |
| Gross up-front premiums written | $ 122 | $ 167 | $ 459 | $ 575 |
| Gross installment premiums written on insurance policies | 130 | 139 | 538 | 521 |
| Gross premiums written | $ 252 | $ 306 | $ 997 | $ 1,096 |

(2)  Operating earnings and core earnings are not substitutes for net income computed in accordance with GAAP, but are useful measures of performance used by management, equity analysts and investors. Operating earnings measures income from operations excluding the impact of investment portfolio realized gains and losses, mark-to-market gains and losses from certain non-trading derivative instruments and certain other items. Core earnings further exclude the impact of refundings, calls and other accelerations. The definitions of operating earnings and core earnings used by Ambac may differ from definitions of operating earnings and core earnings used by other public holding companies of financial guarantors.

— **MORE** —

Source: AMBAC FINANCIAL GROU, 8-K, January 31, 2007

**Ambac Financial Group, Inc. and Subsidiaries**
**Consolidated Statements of Operations**
**(Unaudited)**
**For the Three Months and Years Ended December 31, 2006 and 2005**
**(Dollars in Thousands Except Share Data)**

| | Three Months Ended December 31, | | Years Ended December 31, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| **Revenues:** | | | | |
| **Financial Guarantee:** | | | | |
| Gross premiums written | $ 251,776 | $ 306,079 | $ 996,669 | $ 1,096,023 |
| Ceded premiums written | (28,155) | (37,966) | (103,496) | (99,673) |
| Net premiums written | $ 223,621 | $ 268,113 | $ 893,173 | $ 996,350 |
| Net premiums earned | $ 208,029 | $ 205,103 | $ 811,623 | $ 816,324 |
| Other credit enhancement fees | 15,360 | 12,474 | 59,760 | 50,091 |
| Net premiums earned and other credit enhancement fees | 223,389 | 217,577 | 871,383 | 866,415 |
| Net investment income | 110,540 | 96,700 | 423,885 | 378,096 |
| Net realized investment gains | 4,243 | 303 | 7,085 | 6,307 |
| Net mark-to-market (losses) gains on credit derivative contracts | (838) | 18,403 | 9,068 | 13,618 |
| Other income | 4,192 | 5,967 | 39,559 | 12,467 |
| **Financial Services:** | | | | |
| Investment income | 104,248 | 77,348 | 391,732 | 270,299 |
| Derivative products | 5,689 | 2,555 | 16,638 | 15,757 |
| Net realized investment gains (losses) | 5,388 | (2,494) | 59,255 | 2,314 |
| Net mark-to-market (losses) gains on total return swap contracts | (4,032) | 3,585 | 2,508 | 1,330 |
| Net mark-to-market (losses) gains on non-trading derivatives | (177) | (4,668) | (1,414) | 44,201 |
| **Corporate:** | | | | |
| Net investment income | 1,673 | 2,025 | 11,614 | 3,345 |
| Net realized investment gains | — | — | 791 | — |
| Total revenues | 454,315 | 417,301 | 1,832,104 | 1,614,149 |
| **Expenses:** | | | | |
| **Financial Guarantee:** | | | | |
| Loss and loss expenses | 9,598 | 15,601 | 20,004 | 149,856 |
| Underwriting and operating expenses | 33,831 | 27,855 | 133,740 | 117,701 |
| **Financial Services:** | | | | |
| Interest on investment and payment agreements | 97,280 | 68,474 | 359,904 | 239,255 |
| Operating expenses | 2,395 | 3,521 | 12,389 | 13,683 |
| Interest | 16,870 | 15,243 | 75,294 | 55,896 |
| Corporate | 9,881 | 3,703 | 20,560 | 14,994 |
| Total expenses | 169,855 | 134,397 | 621,891 | 591,385 |
| Income before income taxes | 284,460 | 282,904 | 1,210,213 | 1,022,764 |
| Provision for income taxes | 81,782 | 78,652 | 334,302 | 271,754 |
| Net income | $ 202,678 | $ 204,252 | $ 875,911 | $ 751,010 |
| Net income per share | $ 1.90 | $ 1.92 | $ 8.22 | $ 6.94 |
| Net income per diluted share | $ 1.88 | $ 1.90 | $ 8.15 | $ 6.87 |
| **Weighted average number of common shares outstanding:** | | | | |
| Basic | 106,724,069 | 106,445,909 | 106,593,409 | 108,280,281 |
| Diluted | 107,813,332 | 107,534,753 | 107,536,339 | 109,394,985 |

**Ambac Financial Group, Inc. and Subsidiaries**
**Consolidated Balance Sheets**
**December 31, 2006 and December 31, 2005**
**(Dollars in Thousands Except Share Data)**

| | December 31, 2006 (unaudited) | | December 31, 2005 | |
|---|---|---|---|---|
| **Assets** | | | | |
| **Investments:** | | | | |
| Fixed income securities, at fair value (amortized cost of $16,484,257 in 2006 and $14,391,506 in 2005) | $ | 16,800,338 | $ | 14,734,494 |
| Fixed income securities pledged as collateral, at fair value (amortized cost of $311,546 in 2006 and $378,480 in 2005) | | 307,101 | | 371,160 |
| Short-term investments, at cost (approximates fair value) | | 311,759 | | 472,034 |
| Other (cost of $13,427 in 2006 and $13,537 in 2005) | | 14,391 | | 14,173 |
| Total investments | | 17,433,589 | | 15,591,861 |
| Cash | | 31,868 | | 27,619 |
| Securities purchased under agreements to resell | | 273,000 | | 419,000 |
| Receivable for securities sold | | 12,857 | | 2,161 |
| Investment income due and accrued | | 193,199 | | 171,331 |
| Reinsurance recoverable on paid and unpaid losses | | 3,921 | | 3,730 |
| Prepaid reinsurance | | 315,498 | | 303,383 |
| Deferred acquisition costs | | 252,115 | | 201,518 |
| Loans | | 625,422 | | 684,762 |
| Derivative assets | | 1,019,339 | | 981,068 |
| Other assets | | 107,005 | | 159,425 |
| Total assets | $ | 20,267,813 | $ | 18,545,858 |
| **Liabilities and Stockholders' Equity** | | | | |
| **Liabilities:** | | | | |
| Unearned premiums | $ | 3,037,544 | $ | 2,940,988 |
| Loss and loss expense reserve | | 220,074 | | 304,139 |
| Ceded reinsurance balances payable | | 20,084 | | 23,746 |
| Obligations under investment and payment agreements | | 8,202,590 | | 7,056,222 |
| Obligations under investment repurchase agreements | | 154,287 | | 196,568 |
| Deferred income taxes | | 278,622 | | 263,671 |
| Current income taxes | | 34,781 | | 16,726 |
| Long-term debt | | 991,804 | | 1,191,735 |
| Accrued interest payable | | 105,129 | | 99,892 |
| Derivative liabilities | | 667,066 | | 807,527 |
| Other liabilities | | 275,670 | | 250,241 |
| Payable for securities purchased | | 95,973 | | 11,641 |
| Total liabilities | | 14,083,624 | | 13,163,096 |
| **Stockholders' equity:** | | | | |
| Preferred stock | | — | | — |
| Common stock | | 1,092 | | 1,092 |
| Additional paid-in capital | | 790,168 | | 723,680 |
| Accumulated other comprehensive income | | 197,576 | | 202,312 |
| Retained earnings | | 5,454,575 | | 4,703,256 |
| Common stock held in treasury at cost | | (259,222) | | (247,578) |
| Total stockholders' equity | | 6,184,189 | | 5,382,762 |
| Total liabilities and stockholders' equity | $ | 20,267,813 | $ | 18,545,858 |
| **Number of shares outstanding (net of treasury shares)** | | 105,730,553 | | 105,639,446 |
| **Book value per share** | $ | 58.49 | $ | 50.95 |

Source: AMBAC FINANCIAL GROU, 8-K, January 31, 2007

**Ambac Assurance Corporation and Subsidiaries**
**Capitalization Table - GAAP**
**December 31, 2006 and December 31, 2005**
**(Dollars in Millions)**

The following table sets forth Ambac Assurance's consolidated capitalization as of December 31, 2006 and December 31, 2005, respectively, on the basis of accounting principles generally accepted in the United States of America.

| | December 31, 2006 | December 31, 2005 |
|---|---|---|
| | (unaudited) | |
| **Unearned premiums** | $ 3,048 | $ 2,953 |
| **Other liabilities** | 2,021 | 1,933 |
| **Total liabilities** | 5,069 | 4,886 |
| **Stockholder's equity:** | | |
| **Common stock** | 82 | 82 |
| **Additional paid-in capital** | 1,509 | 1,453 |
| **Accumulated other comprehensive income** | 142 | 137 |
| **Retained earnings** | 5,259 | 4,510 |
| **Total stockholder's equity** | 6,992 | 6,182 |
| **Total liabilities and stockholder's equity** | $ 12,061 | $ 11,068 |

Created by 10KWizard    www.10KWizard.com

Source: AMBAC FINANCIAL GROU, 8-K, January 31, 2007

# Exhibit 68

FORM 4

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden | |
| hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| CALLEN MICHAEL A | AMBAC FINANCIAL GROUP INC [ABK] | (Check all applicable) |
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X   Director          10% Owner |
| AMBAC FINANCIAL GROUP, INC., ONE STATE STREET PLAZA | 05/11/2006 | Officer (give title below)    Other (specify below) |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK      NY      10004 | | X   Form filed by One Reporting Person |
| (City)        (State)        (Zip) | | Form filed by More than One Reporting Person |

| Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/11/2006 | | M | | 3,000 | A | $ 39.56 | 20,850 | D | |
| Common Stock | 05/11/2006 | | S | | 3,000 | D | $ 83.3 | 17,850 | D | |

Source: AMBAC FINANCIAL GROU, 4, May 15, 2006

| | Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (*e.g.*, puts, calls, warrants, options, convertible securities) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Director Stock Option (Right to Buy) | $ 39.56 | 05/11/2006 | | M | | | 3,000 | 05/12/2000 | 05/12/2006 | Common Stock | 3,000 | $ 0 | 0 | D | |

**Explanation of Responses:**

Patricia Lo Cascio, Attorney-in-fact for Michael A. Callen                                    05/15/2006

** Signature of Reporting Person                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

POWER OF ATTORNEY

I, MICHAEL A. CALLEN, do hereby nominate, constitute and appoint each of
Anne Gill Kelly, Gregg L. Bienstock, Patricia LoCascio and
Stacey B. Spain, as my true and lawful agent and attorney-in-fact,
with full power and authority to act hereunder,
in his or her discretion, in my name and on my behalf as fully as I could
if I were present and acting in person, to make any and all required or
voluntary filings under Section 16(a) of the Securities Exchange Act of 1934,
as amended (the "Exchange Act"), and the applicable rules and regulations
thereunder, with the Securities and Exchange Commission, the New York Stock
Exchange, Ambac Financial Group, Inc., a Delaware corporation (the "Company"),
and any other person or entity to which such filings may be required under
Section 16(a) of the Exchange Act as a result of my service as an officer of
the Company or beneficial ownership (within the meaning of Section 16(a) of
the Exchange Act) of more than ten percent of any class of equity securities
of the Company.

I hereby consent to, ratify and confirm all that each said attorney-in-fact
shall do or cause to be done by virtue of this Power of Attorney.  I hereby
acknowledge that each attorney-in-fact, in serving in such capacity at my
request, is not assuming, nor is the Company assuming, any of my
responsibilities to comply with Section 16 of the Exchange Act.

This Power of Attorney shall remain in full force and effect from this
date forward for so long as I am an officer or director of the Company
and for such time thereafter as may be necessary to make any such filings or
until revoked or modified by me.  I hereby revoke all prior powers of
attorney relating to the foregoing acts.

IN WITNESS WHEREOF, I have hereunto signed my name this 16th day of
July, 2005.

/s/ Michael A. Callen
MICHAEL A. CALLEN

_____

Created by 10KWizard   www.10KWizard.com

Exhibit 69

FORM 4

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden | |
| hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | |
|---|---|---|---|---|
| CALLEN MICHAEL A | AMBAC FINANCIAL GROUP INC [ABK] | X Director | | 10% Owner |
| (Last)          (First)          (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | Officer (give title below) | | Other (specify below) |
| AMBAC FINANCIAL GROUP, INC., ONE STATE STREET PLAZA | 04/27/2007 | | | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | | |
| NEW YORK          NY          10004 | | X Form filed by One Reporting Person | | |
| (City)          (State)          (Zip) | | Form filed by More than One Reporting Person | | |

| Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/27/2007 | | M | | 3,750 | A | $ 30.35 | 21,678 | D | |
| Common Stock | 04/27/2007 | | S | | 500 | D | $ 92.65 | 21,178 | D | |
| Common Stock | 04/27/2007 | | S | | 750 | D | $ 92.64 | 20,428 | D | |
| Common Stock | 04/27/2007 | | S | | 200 | D | $ 92.63 | 20,228 | D | |
| Common Stock | 04/27/2007 | | S | | 2,300 | D | $ 92.62 | 17,928 | D | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**<br>(*e.g.*, puts, calls, warrants, options, convertible securities) | | | | | | | | | | | | | |
| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Director Stock Option (Right to Buy) | $ 30.35 | 04/27/2007 | | M | | | 3,750 | 05/10/2001 | 05/08/2007 | Common Stock | 3,750 | $ 0 | 0 | D | |

**Explanation of Responses:**

Stacey Spain, Attorney in Fact for Michael A. Callen    04/30/2007

\*\* Signature of Reporting Person                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

POWER OF ATTORNEY

I, MICHAEL A. CALLEN, do hereby nominate, constitute and appoint each of
Anne Gill Kelly, Gregg L. Bienstock, Patricia LoCascio and
Stacey B. Spain, as my true and lawful agent and attorney-in-fact,
with full power and authority to act hereunder,
in his or her discretion, in my name and on my behalf as fully as I could
if I were present and acting in person, to make any and all required or
voluntary filings under Section 16(a) of the Securities Exchange Act of 1934,
as amended (the "Exchange Act"), and the applicable rules and regulations
thereunder, with the Securities and Exchange Commission, the New York Stock
Exchange, Ambac Financial Group, Inc., a Delaware corporation (the "Company"),
and any other person or entity to which such filings may be required under
Section 16(a) of the Exchange Act as a result of my service as an officer of
the Company or beneficial ownership (within the meaning of Section 16(a) of
the Exchange Act) of more than ten percent of any class of equity securities
of the Company.

I hereby consent to, ratify and confirm all that each said attorney-in-fact
shall do or cause to be done by virtue of this Power of Attorney.  I hereby
acknowledge that each attorney-in-fact, in serving in such capacity at my
request, is not assuming, nor is the Company assuming, any of my
responsibilities to comply with Section 16 of the Exchange Act.

This Power of Attorney shall remain in full force and effect from this
date forward for so long as I am an officer or director of the Company
and for such time thereafter as may be necessary to make any such filings or
until revoked or modified by me.  I hereby revoke all prior powers of
attorney relating to the foregoing acts.

IN WITNESS WHEREOF, I have hereunto signed my name this 16th day of
July, 2005.

/s/ Michael A. Callen
MICHAEL A. CALLEN

_____
Created by 10KWizard   www.10KWizard.com

Source: AMBAC FINANCIAL GROU, 4, April 30, 2007