# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

———————— ———————————————— x

IN RE AMBAC FINANCIAL GROUP, INC.
DERIVATIVE LITIGATION

————————————————————————

This Document Relates To:

    ALL ACTIONS

———————————————————— x

Lead Case No. 08-cv-854 (SHS)

(Derivative Action)



DEMAND FOR JURY TRIAL

## VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiffs, derivatively on behalf of Ambac Financial Group, Inc. ("Ambac" and/or the "Company"), upon their personal knowledge as to those allegations concerning themselves and upon information and belief, based on, amongst other things, the investigation made by their attorneys, allege the following:

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Ambac, on behalf of the Company against certain of its officers and directors (the "Individual Defendants") seeking to remedy their violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act") that occurred between October 2005 and the present (the "Relevant Period") and that have caused substantial losses to Ambac and other damages, such as to its reputation and goodwill.

2.      Ambac is a Delaware corporation with its principal executive offices located at One State Street Plaza, New York, New York. Ambac is a holding company whose subsidiaries provide financial guarantee products and other financial services to clients in both the public and private sectors around the world. The Company and its subsidiaries operate in two segments: financial guarantees and financial services.

3.      Founded in 1971, Ambac is the original monoline insurer. Monolines insure bonds that have been issued by other entities. Ambac leveraged its triple-A financial strength rating, which it had from 1979 until recently, to guarantee the timely repayment of bond principal and interest of an issuer in the event the issuer defaults, thus allowing the debt issued to get the highest possible rating. Ambac's financial guarantee was designed to protect investors in the event of securities default.

4.      Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading guarantor of public finance and structured finance obligations, had earned triple-A financial strength ratings, the highest ratings available from the three largest rating companies: Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Ratings Services ("S&P's"), and Fitch Inc. ("Fitch"). Ambac's financial strength ratings are an essential part of Ambac Assurance's ability to provide

credit enhancement and any reductions in these ratings will have a materially adverse affect on Ambac Assurance's ability to compete in the financial guarantee business. (For ease of reading, Ambac and Ambac Assurance are referred to as though they are one in the same throughout this Verified Amended Consolidated Shareholder Derivative Complaint ("Amended Complaint")).

5.     Historically, Ambac focused its business on insuring conservative municipal bonds. In 2005, however, Ambac's then Chief Executive Officer ("CEO"), defendant Robert Genader ("Genader"), mandated that Ambac achieve net income of $1 billion a year in the near future. To achieve Genader's goal, Ambac began writing insurance on structured financial instruments including residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs").[1] RMBS are securities collateralized by pools of residential debt such as mortgages, home-equity loans and subprime mortgages. CDOs are securities backed by a variety of types of asset backed securities, including large bundles of RMBS. Both RMBS and CDOs are issued in different "tranches" or "slices," with the higher-rated tranches supposedly bearing a lower risk of default and the lower-rated tranches supposedly offering greater potential returns. By 2005, structured finance obligations, which include RMBS and CDOs, made up approximately 17% of the Company's total revenue, and 55% of the Company's domestic finance obligations.

6.     As the bottom fell out of the subprime mortgage industry following the downturn in the American housing market, RMBS and CDOs began to lose massive amounts of their value. Ambac's overexposure to the RMBS and CDO market was kept hidden from the public, however, due to the Individual Defendants causing or allowing the Company to issue improper and incomplete public statements about the extent of Ambac's exposure.

7.     The Individual Defendants repeatedly assured Ambac's investors that its mortgage-backed portfolio[2] involved far less risk than the market in general and that Ambac was not

---

[1]  Ambac directly insured RMBS and it issued credit default swaps ("CDS") as a derivative guarantee of RMBS.

[2]  The term mortgage-backed portfolio as used in this Amended Complaint means both the RMBS Ambac directly insured and its credit default swaps on CDOs.

negatively affected by the mortgage and credit crisis. For example, in November 2007, long after the subprime market had started to turn, defendant Genader insisted that Ambac's mortgage-backed portfolio "is in very good shape," that Ambac "is very solid and very safe" and that "[o]ur performance, as Ambac, is very different than the rest of the market." The Individual Defendants time and time again distinguished Ambac's portfolio from the seemingly similar securities that were plummeting in value in the market. The Individual Defendants assured the investing public that they had no need to worry because Ambac's underwriting standards were far more "rigorous" than others' standards. Even as the housing and credit crisis deepened, the Individual Defendants continued to downplay the Company's exposure.

8.     Even worse, on information and believe, Ambac lowered its underwriting standards so that it could insure the riskiest of the risky securities. Indeed, through its due diligence, it can and should be inferred that Ambac learned that the country's largest mortgage originators had systematically lowered their own lending standards. As a result, the mortgage-backed securities that Ambac was insuring had an incredibly high risk of default. Instead of avoiding these risky securities, Ambac embraced them. By June 2006, on information and belief, Ambac's Credit Risk Committee approved a fundamental change in its underwriting standards, which allowed Ambac to insure securities that, according to one Company insider, Ambac previously would not previously have "touched with a ten foot pole."

9.     By concealing the true nature of Ambac's financial state, Ambac's stock traded at artificially-inflated prices during the Relevant Period. As of May 18, 2007, Ambac's stock traded at an all-time high of $96.08 per share. During the Relevant Period, the Individual Defendants directed Ambac to repurchase nearly $579 million worth of its own shares at artificially-inflated prices. Even worse, certain of the Individual Defendants sold their personally-held Ambac common stock for gross proceeds approaching $132 million while in possession of material non-public information concerning the true exposure of the Company to subprime expense.

10.     By July 27, 2007, Defendants[3] could no longer hide Ambac's overextension into the CDO market. The Company finally was forced to disclose that Ambac was not prepared for the housing and credit market downturns. Even then, the Individual Defendants refused to cause the Company to disclose the true state of financial disarray at Ambac. Instead, the truth only leaked out piecemeal.

11.     On October 24, 2007, the Company issued a press release which revealed it had lost over $360 million in the third quarter. That loss included a previous unrealized $743 million mark-to-market loss on the Company's mortgage-backed portfolio.

12.     In late December 2007, rating agency Fitch announced that after a review of Ambac's exposure to CDOs and RMBS, the Company was $1 billion short of the extra capital required to keep its AAA rating. Fitch warned the Company that it would downgrade its rating if Ambac could not raise the required $1 billion.

13.     On January 18, 2008, Ambac announced that it would not raise the required $1 billion in capital. In response, Fitch cut Ambac's credit rating to AA.

14.     On January 22, 2008, Ambac issued a press release announcing a $3.2 billion loss due primarily to a $5.2 billion loss on the Company's credit derivative exposures. Over $1.1 billion of this loss was attributable to CDOs backed by subprime mortgages.

15.     Also in January 2008, S&P and Moody's, the other two major ratings companies, announced that they would likely downgrade Ambac's credit rating if it did not raise sufficient capital to counter its exposure to CDO risk. In response, Ambac rushed to raise $1.5 billion in capital through a public offering. In doing so, Ambac diluted its investors' holdings by nearly tripling the amount of outstanding shares. Even worse, the public offering was only a temporary fix.

16.     On April 23, 2008, Ambac reported a first quarter net loss of $1.66 billion, or $11.69 per share, in contrast to a profit of $213 million, or $2.02 per share, in the same period the year before. The $1.66 billion loss included a $940.4 million credit impairment on CDOs and a $1 billion

---

[3] "Defendants" refers collectively to the Individual Defendants and nominal defendant Ambac.

set aside to pay claims on defaulted mortgage debt. Just weeks later, Ambac announced it was writing down an additional $228 million in CDO exposure.

17.     On June 4, 2008, Moody's announced it was likely to cut Ambac's credit rating. The following day, S&P downgraded Ambac's credit rating from AAA to AA. Then, on June 20, 2008, Moody's did in fact downgrade Ambac's rating from Aaa to Aa3.

18.     On September 18, 2008, Moody's announced that it placed Ambac's credit rating on review for further downgrade and stated it was considering cutting the Company's rating by several grades.

19.     In a move confirming the Company's dismal prospects, on November 5, 2008, Moody's did in fact downgrade Ambac's credit rating by four grades, from Aa3 to Baal. According to Ambac's statement the following day, collateral payments resulting from Moody's downgrade will cause a $3.2 billion liquidity gap in Ambac's investment business.

20.     Also on November 5, 2008, Ambac announced a third quarter 2008 net loss of $2.43 billion, or a net loss of $8.45 on a per share basis.

21.     Then, on November 19, 2008, S&P downgraded Ambac's rating three grades, from AA to A. As a result, Ambac's shares fell below $1 for the first time since going public in 1991.

22.     Without a pristine credit rating from at least two of the three-major ratings agencies (which Ambac no longer has), Ambac is in serious trouble. As one independent ratings officer put it: "They have no future. They will argue otherwise but as a practical matter they don't have a future."

23.     In addition to essentially killing the business, the Individual Defendants' conduct alleged herein has also resulted in several class action lawsuits, causing further damage to Ambac. Specifically, several such lawsuits have been filed against the Company and certain of its officers for false and misleading statements concerning the Company's business and financial results related to its insurance coverage on CDO contracts, in violation of federal securities laws. These lawsuits have been consolidated and are also pending in the Southern District of New York. *See In re Ambac Financial Group, Inc. Securities Litigation*, No. 1:08-cv-00411-NRB (S.D.N.Y.) (the "Class Action"). Ambac will incur significant damages in defending the litigation.

24.     Plaintiffs are current shareholders of Ambac and were shareholders of Ambac at the time of the transactions complained of herein.  Plaintiffs bring this lawsuit in a derivative capacity to redress the harm Defendants have caused Ambac to suffer.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the Plaintiffs[4] and each defendant, and the amount in controversy exceeds $75,000.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over the state law causes of action asserted herein.

27.     This Court retains general jurisdiction over each named defendant who is a resident of New York.  Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Ambac maintains operations in New York and is traded on the New York Stock Exchange, and because the allegations contained herein are brought derivatively on behalf of Ambac, defendants' conduct was purposefully directed at New York.  Defendants' conduct arose out of New York, where Ambac maintains its corporate headquarters.  Finally, exercising jurisdiction over the named non-resident defendants is reasonable.

28.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of

---

[4] As defined *infra* in ¶27.

the transactions and wrongs complained of herein occurred in the District, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Ambac, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

29.      Plaintiff Catherine Rubery ("Rubery") is, and was at times relevant hereto, an owner and holder of Ambac common stock.  Rubery is a citizen of South Carolina.

30.      Plaintiff Marilyn Clark ("Clark") is, and was at times relevant hereto, an owner and holder of Ambac common stock.  Clark is a citizen of California.

31.      Plaintiff Earl Jordan Yaokasin ("Yaokasin") is, and was at times relevant hereto, an owner and holder of Ambac common stock.  Yaokasin is a citizen of California.

32.      Rubery, Clark, and Yaokasin are referred to collectively in this Amended Complaint as Plaintiffs.

33.      Nominal defendant Ambac is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at One State Street Plaza, New York, New York 10004.  Nominal defendant Ambac through its subsidiaries, provides financial guarantee products and other financial services to clients in the public and private sectors worldwide.

34.      Defendant Michael A. Callen ("Callen") was Ambac's Chairman of the Board and interim CEO between January 2008 and October 2008.  On October 22, 2008, Callen was removed from his position as CEO.  Callen is also an Ambac director and has been since 1991.  Callen is a member of the Audit and Risk Assessment Committee and has been since 2007.  Callen was also a member of Ambac's Audit and Risk Assessment Committee from at least 2005 to 2006.  Because of his positions, defendant Callen knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac.  During the Relevant Period, Callen participated in the issuance of improper statements, including the preparation of the improper press releases and U.S. Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts

and Ambac shareholders. Defendant Callen sold 11,750 shares of Ambac stock for $942,847 in proceeds while in possession of material non-public information. Upon information and belief, defendant Callen is a citizen of Maryland.

35.     Defendant John W. Uhlein, III ("Uhlein") is an Ambac Executive Vice President and has been since December 2003. Uhlein was also Chairman of Ambac Assurance UK Limited from 1996 to April 2005; a Managing Director from January 1996 to December 2003; and a First Vice President from September 1993 to January 1996. Because of his positions, defendant Uhlein knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Uhlein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Uhlein sold 58,924 shares of Ambac stock for $4,960,338.40 in proceeds while in possession of material non-public information. Upon information and belief, defendant Uhlein is a citizen of Connecticut.

36.     Defendant Kevin J. Doyle ("Doyle") is Ambac's Senior Vice President and General Counsel and has been since January 2005. Doyle is also Ambac's Chief Legal Officer and has been since January 2000. Doyle was Ambac's Managing Director and General Counsel from January 2000 to January 2005; Managing Director and General Counsel of the Specialized Finance Division of Ambac Assurance from January 1996 to January 2000; First Vice President and General Counsel of the Specialized Finance Division of Ambac Assurance from January 1995 to January 1996; and Vice President and Assistant General Counsel from 1991 to January 1995. Because of his positions, defendant Doyle knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Doyle participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Doyle sold 50,862 shares of Ambac stock for $4,224,441.75 in proceeds while in possession of material non-public information. Upon information and belief, defendant Doyle is a citizen of New York.

37. Defendant Gregg L. Bienstock ("Bienstock") is Ambac's Senior Vice President, Chief Administrative Officer and Employment Counsel and has been since January 2005. Bienstock was also Ambac's Managing Director, Human Resources and Employment Counsel from January 1999 to January 2005 and First Vice President, Director of Human Resources and Employment Counsel from February 1997 to January 1999. Because of his positions, defendant Bienstock knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Bienstock participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Bienstock sold 40,010 shares of Ambac stock for $3,365,990.73 in proceeds while in possession of material non-public information. Upon information and belief, Bienstock is a citizen of New York.

38. Defendant Thomas J. Gandolfo ("Gandolfo") was, until recently, an Ambac Senior Managing Director and has been since June 2005. Gandolfo was also Ambac's Senior Vice President and Chief Financial Officer from January 2003 to June 2005; Corporate Controller from July 1998 to January 2003; and Controller of Ambac's Investment Agreement Business from 1994 to July 1998. Because of his positions, defendant Gandolfo knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Gandolfo participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Gandolfo sold 25,287 shares of Ambac stock for $2,212,278.67 in proceeds while in possession of material non-public information. Upon information and belief, Gandolfo is a citizen of Connecticut.

39. Defendant Robert G. Shoback ("Shoback") is an Ambac Senior Managing Director and has been since January 2004. Shoback was also an Ambac Managing Director in the Public Finance Division from November 1998 to January 2004. Because of his positions, defendant Shoback knew, consciously disregarded, was reckless and grossly negligent in not knowing and

should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Shoback participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Shoback sold 26,358 shares of Ambac stock for $2,131,601.70 in proceeds while in possession of material non-public information. Upon information and belief, Shoback is a citizen of New Jersey.

40.     Defendant Douglas C. Renfield-Miller ("Renfield-Miller") is an Ambac Executive Vice President and has been since July 2006. Renfield-Miller is also Chairman of Ambac Assurance UK Limited and has been since April 2005. Renfield-Miller was an Ambac Senior Managing Director from January 2004 to July 2006 and a Managing Director from April 2000 to January 2004. Because of his positions, defendant Renfield-Miller knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Renfield-Miller participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Renfield-Miller received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $250,000 | $900,000 | $351,029 | $470,736 | - | $50,535 | $48,356 |
| 2005 | $250,000 | $558,750 | $498,389 | - | 25,000 | - | $20,529 |

Defendant Renfield-Miller sold 23,110 shares of Ambac stock for $1,980,837.97 in proceeds while in possession of material non-public information. Upon information and belief, Renfield-Miller is a citizen of New York.

41.     Defendant David W. Wallis ("Wallis") is Ambac's Senior Managing Director and Head of Portfolio and Market Risk Management and has been since July 2005. Wallis was also an Ambac Managing Director from July 1999 to June 2005 and a First Vice President from 1996 to July 1999. Because of his positions, defendant Wallis knew, consciously disregarded, was reckless and

grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Wallis participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Wallis received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2005 | $283,823 | $755,134 | $135,048 | 9,000 | $156,694 |

Defendant Wallis sold 14,216 shares of Ambac stock for $1,200,421.15 in proceeds while in possession of material non-public information. Upon information and belief, Wallis is a citizen of Kentucky.

42.     Defendant William T. McKinnon ("McKinnon") is Ambac's Senior Managing Director and Chief Risk Officer and has been since January 2004. McKinnon was also Ambac's Managing Director and Chief Risk Officer from February 2000 to January 2004; Managing Director and Head of Credit Risk Management for the Specialized Finance Division from October 1998 to February 2000; First Vice President in the asset-backed securities department from January 1992 to October 1998; and a First Vice President from January 1989 to January 1992. Because of his positions, defendant McKinnon knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, McKinnon participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant McKinnon received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $300,000 | $725,000 | $585,135 | $599,355 | - | $127,892 | $27,000 |
| 2005 | $300,000 | $595,000 | $340,142 | - | 12,500 | - | $22,314 |

Defendant McKinnon sold 12,895 shares of Ambac stock for $1,143,356.36 in proceeds while in possession of material non-public information. Upon information and belief, McKinnon is a citizen of New York.

43.    Defendant Sean T. Leonard ("Leonard") is Ambac's Senior Vice President and Chief Financial Officer and has been since June 2005. Because of his positions, defendant Leonard knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Leonard participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders.    Defendant Leonard received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Awards | Securities Option Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $350,000 | $575,000 | $166,667 | $145,508 | - | $32,883 | $31,500 |
| 2005 | $199,231 | $625,000 | $125,058 | - | 6,614 | - | $808 |

Upon information and belief, Leonard is a citizen of New Jersey.

44.    Defendant Jill M. Considine ("Considine") is an Ambac director and has been since 2000. Considine is also a member of Ambac's Audit and Risk Assessment Committee and has been since at least 2005. Because of her positions, defendant Considine knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Considine participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Upon information and belief, Considine is a citizen of New York.

45.    Defendant Laura S. Unger ("Unger") is an Ambac director and has been since 2002. Unger is also a member of Ambac's Audit and Risk Assessment Committee and has been since at least 2005. Because of her positions, defendant Unger knew, consciously disregarded, was reckless

and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Unger participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Upon information and belief, Unger is a citizen of New York.

46.     Defendant Thomas C. Theobald ("Theobald") is an Ambac director and has been since 2004. Theobald is also a member of Ambac's Audit and Risk Assessment Committee and has been since at least 2005. Because of his positions, defendant Theobald knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Theobald participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Upon information and belief, Theobald is a citizen of Connecticut.

47.     Defendant Henry D.G. Wallace ("Wallace") is an Ambac director and has been since 2004. Wallace is also Chairman of Ambac's Audit and Risk Assessment Committee and has been since 2007 and has been a member of the committee since at least 2005. Because of his positions, defendant Wallace knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Wallace participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Upon information and belief, defendant Wallace is a citizen of Florida.

48.     Defendant Philip Duff ("Duff") is an Ambac director and has been since 2007. Because of his position, defendant Duff knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Duff participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of

- 13 -

other statements made to the press, securities analysts and Ambac shareholders. Upon information and belief, Duff is a citizen of Connecticut.

49. Defendant Philip B. Lassiter ("Lassiter") was Ambac's Non-Executive Chairman of the Board from January 27, 2004 to July 24, 2006. Lassiter was also Ambac's Chairman of the Board and CEO from 1991 to January 2004. Because of his positions, defendant Lassiter knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Lassiter participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Lassiter sold 941,438 shares of Ambac stock for $77,532,993.23 in proceeds while in possession of material non-public information. Upon information and belief, Lassiter is a citizen of Florida.

50. Defendant Genader was Ambac's Chairman of the Board from July 2006 to January 2008. Genader was also Ambac's CEO from January 2004 to January 2008; President from January 2001 to January 2008; a director from 1992 to January 2008; Chief Operating Officer from January 2001 to January 2004; Vice Chairman from January 1998 to January 2001; and Executive Vice President from 1986 to January 1998. Because of his positions, defendant Genader knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, Genader participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant Genader received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $575,000 | $1,650,000 | $3,437,573 | $5,165,600 | - | $335,796 | $71,562 |
| 2005 | $575,000 | $900,000 | $2,000,070 | - | 110,000 | - | $63,304 |

Defendant Genader sold 360,013 shares of Ambac stock for $30,015,291.31 in proceeds while in possession of material non-public information. Upon information and belief, Genader is a citizen of Connecticut.

51.     Defendant Kathleen A. McDonough ("McDonough") was an Ambac Senior Managing Director from January 2004 to August 2007. McDonough was also Ambac's Managing Director in the Public Finance Division from January 1996 to January 2004. McDonough served Ambac in various capacities since July 1991. Because of her positions, defendant McDonough knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, McDonough participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Defendant McDonough sold 26,437 shares of Ambac stock for $2,239,603.89 in proceeds while in possession of material non-public information. Upon information and belief, McDonough is a citizen of New York.

52.     Defendant W. Grant Gregory ("Gregory") was an Ambac director from 1991 to January 2008. Gregory was also a member of the Audit and Risk Committee from at least 2005 to 2006. Because of his positions, defendant McDonough knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Ambac. During the Relevant Period, McDonough participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Ambac shareholders. Upon information and belief, Gregory is a citizen of Connecticut.

53.     The defendants identified in ¶¶34-43 and 51 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶44-50, 52 are referred to herein as the "Director Defendants." The defendants identified in ¶¶34-42, 49-51 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

54.     By reason of their positions as officers, directors and/or fiduciaries of Ambac and because of their ability to control the business and corporate affairs of Ambac, the Individual Defendants owed Ambac and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Ambac in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ambac and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

55.     Each director and officer of the Company owes to Ambac and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

56.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ambac, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Ambac, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Ambac.

57.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ambac, and was at all times acting within the course and scope of such agency.

58.     To discharge their duties, the officers and directors of Ambac were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Ambac were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Ambac conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

59.     Each member of the Audit and Risk Committee, by virtue of the Company's Audit and Risk Committee Charter, had the obligation to monitor the corporate control and risk environment of the Company. Specifically, the Audit and Risk Committee is (among other things) tasked with:

1)     Report regularly to the Board to discuss issues regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the performance and independence of the Company's independent auditors, and the performance of the internal audit function.

2)     Review with management and the independent auditors the Company's annual financial statements prior to the filing of its Form 10-K and its quarterly financial statements prior to the filing of its Form 10-Q, including

the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations". Also, the Committee shall discuss the results of the independent auditors' annual audits and quarterly reviews and any other matters required to be communicated to the Committee by the independent auditors under the standards of the Public Company Accounting Oversight Board (PCAOB).

3) Review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditors' report on (l) management's assessment and (2) the effectiveness of internal control over financial reporting.

4) Discuss the type and presentation of information to be included in the Company's earnings press releases (*paying particular attention to any use of* "*pro forma*" *or* "*adjusted*" *information not in compliance with GAAP*), as well as review any financial information and earnings guidance provided by the Company to analysts and rating agencies, provided that the Committee need not discuss in advance, in each instance, such disclosures.

5) Evaluate whether management is setting the appropriate control environment through an annual review of the Company's entity-level controls, including but not limited to their enforcement of a positive business ethics environment, the establishment of fraud monitoring and fraud prevention controls across all business and monitoring the enforcement of the Company's Code of Business Conduct.

6) Review the Company's disclosure controls and procedures policy and other steps the Company has taken to ensure that all financial and non-financial information required to be disclosed is collected, summarized, evaluated and reported within the time periods specified in the SEC's rules and forms, including receiving a quarterly report regarding any Form 8-Ks filed during the prior quarter.

7) Review annually with the Company's internal auditors and independent auditors the Company's guidelines and policies relating to risk assessment and risk management, including the identification of potential fraud risk, fraud protection and fraud detection methods.

8) Review annually with management guidelines and policies of the Company's risk management and underwriting areas, including the Company's insured book of business, derivatives business and investment portfolios and discuss other steps management has taken to monitor and control the Company's major financial risk exposures.

9) Review quarterly with the Head of the Portfolio and Market Risk Management Group, the Company's current adversely classified credit book, with particular focus on problem credits.

10) Review with the chief executive officer and chief financial officer, as appropriate, and independent auditors, periodically, the following:

- 18 -

a)  all significant deficiencies and material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors;

b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

c)  any significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses; and

d)  procedures undertaken in connection with the CEO and CFO certifications for Form lO-K and 10-Q's, including their evaluation of the Company's disclosure controls and procedures and internal controls.

(Emphasis added)

60.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ambac, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Ambac's Board during the Relevant Period.

61.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to improperly state its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

63.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow Defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Ambac and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Ambac, regarding the Individual Defendants' management of Ambac's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by Defendants throughout the Relevant Period; and (iv) allow the Individual Defendants to sell nearly $132 million of their personally held Ambac stock while in possession of material non-public information. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

64.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time the Individual Defendants caused the Company to conceal the true fact that Ambac was misrepresenting its business prospects and health.

65.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future

business prospects; and to artificially inflate the price of Ambac common stock so they could dispose of over $131 million of their personally held stock.

66.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statement. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

67.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

### A.    Ambac's Background in the Municipal Bond Insurance Industry

68.    For most of its history, Ambac only wrote insurance for municipal bonds. Unlike corporate bonds, municipal bonds have a very low rate of default. Yet the credit rating agencies had a secret practice of assigning lower ratings to municipalities and government entities in order to force them to purchase bond insurance they did not need. As a result, the ratings agencies and monocline insurers like Ambac were able to earn fees insuring bonds with little risk of default.

69.    Further, Ambac agreed to insure only those municipal bonds that had almost no risk whatsoever. Indeed, Ambac built a reputation for its "remote-loss" underwriting standard, meaning that Ambac paid on such a small amount of defaults that it was able to assume that any bond that passed its rigorous investigation and credit analysis was not going to default. As a result, by 1994, Ambac earned AAA ratings from all three major ratings agencies (S&P, Moody's and Fitch).[5]

---

[5] Technically, Ambac had earned a Aaa rating from Moody's which is the functionally equivalent of S&P's and Fitch's AAA ratings.

70.    Because Ambac effectively sold its pristine credit rating to its customers, the Company's business model depended entirely on maintaining its AAA ratings. According to a June 2005 Euromoney article, "there is no AA+ for these guys, it's AAA or nothing."

71.    In order to preserve its credit rating, Ambac was required to retain a capital cushion at, or in excess of, each agency's required amount.

72.    Investors placed tremendous importance on the ability of Ambac to maintain its history of "remote loss" insurance. Ambac's total capital was only a fraction of its total amount of insured obligations, so any marked increase in losses would place the adequacy of Ambac's capital cushion, and ultimately its AAA rating, at risk. For example, according to Ambac's first quarter 2007 Operating Supplement, while Ambac's net financial guarantees in force were a total of $819 billion as of March 31, 2007, its qualified statutory capital was only $6.6 billion, and its total claims paying resources was only $13.24 billion. This resulted in a capital ratio (based on qualified statutory capital) of 125:1, and a financial resources ratio (based on total claims paying resources) of 62:1. Since the failure of as little as 5% of Ambac's insured portfolio would be enough to wipe out Ambac's excess capital, the quality of the Company's underwriting and monitoring of its risk exposures was highly material to investors.

73.    Unfortunately for Ambac, in 2006, its municipal bond insurance business faced a fundamental risk. Specifically, Moody's told Ambac that it was going to cease the practice of assigning lower ratings to municipal bonds. In response, a senior Ambac executive wrote to Moody's ["t]his looks pretty serious to me.... This is cutting at the heart of our industry.... [W]hile we in the industry might agree with the default/loss conclusion (this is part of the basis of our success and ability to leverage as high as we are), to lay it out there like this could be very detrimental." In other words, municipalities would no longer need bond insurance meaning it was only a matter of time before Ambac's safest and surest revenue streams would slow down if not stop altogether. Thus, Ambac desperately needed to find a new source of revenue.

**B.    Ambac Gets Caught Up in the Subprime and Credit Market Crisis**

74.    As mentioned above, there is currently a related Class Action pending against Ambac and several of the Individual Defendants. On August 25, 2008, the lead plaintiffs in that action filed

a detailed Consolidated Amended Class Action Complaint ("Class Action Complaint" or "CAC"). The Class Action Complaint includes the accounts of numerous Confidential Witnesses ("CWs") that assist in substantiating Plaintiffs' allegations of Defendants' impropri ties. Any references to CWs in this derivative amended complaint come from the Class Action Complaint.

75.     In preparing this amended complaint, Plaintiffs, by and through counsel, independently investigated and reviewed information concerning Ambac's exposure to the non-prime market, including its insurance exposure arising from CDO and credit default swap ("CDS") transactions. In connection with that independent investigation, Plaintiffs reviewed publicly available financial information concerning Ambac's non-prime-related, CDO-related and CDS-related transactions, including but not limited to, Ambac's filings with the SEC, press releases, news articles and rating agency releases.

76.     Plaintiffs, through counsel, also reviewed certain publicly available financial analyses evaluating Ambac's potential losses due to exposure to the non-prime mortgage financial markets. Plaintiffs further compared the information and conclusion contained therein to the opinions of the experts cited in the Class Action Complaint.

77.     In addition, Plaintiffs, through counsel, also conducted an independent investigation of the job positions of (and those similar to) the CWs to substantiate that the CWs would be privy to the information they assert in the Class Action Complaint, and further, spoke to numerous former Ambac employees.

78.     According to CW 1, at a company-wide meeting in 2005, defendant Genader announced that Ambac's goal was to achieve $1 billion a year in net income in the near future. Over the next two years, Genader's push for increased revenue, along with Ambac's need to diversify away from the municipal bond industry lead to Ambac's disastrous foray into mortgage-backed securities that are at the heart of the current subprime and credit market crisis.

79.     The significance of structured finance to Ambac's growth and profitability was acknowledged by Ambac's own officers. During the March 6, 2007 conference, defendant Uhlein noted that:

> Just take a look here at the diversification of our portfolio, and how it has changed over the last ten years. In less than ten years, our public finance exposures [sic] has gone from 85%

of the book to 35%. This is not due to a lack of interest in public finance, but due to the strong growth in structured finance and international. In a period of less than ten years, our insured portfolio has tripled to $519 billion.

80.    Ambac's overexposure to the mortgage-backed securities, while profitable in the short term, has lead to disastrous consequences in the long term. Ambac is on the verge of collapse with little hope of surviving the current economic meltdown.   Before explaining how Ambac got itself into this spot, a brief background of the ongoing subprime and credit market crisis follows.

### 1.    Background of the Subprime Crisis

81.    During the early and mid 2000s, a lack of supply created an inflated housing market bubble. The demand for homes, coupled with historically low interest rates, fueled a rise in home prices, which then fueled a building boom in new homes. In addition, millions of homeowners took advantage of low interest rates and their increased equity to refinance their existing mortgages.

82.    In order to take advantage of the boom, many housing lenders engaged in aggressive lending practices in order to reach the maximum number of potential homebuyers and refinancers. Many mortgage lenders abandoned their responsible underwriting criteria and originated massive volumes of subprime loans.

83.    A subprime borrower is someone with a low credit score, higher debt-to-income ratio, or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.   In an environment of appreciating home prices and low interest rates, subprime borrowers are typically able to stay current due to the rising equity in their property.   But in an environment of depreciating home prices, increasing default rates are the norm.

84.    As early as 2005, bankers and economists alike were expressing concern over the rising delinquency rates in nontraditional mortgages such as subprime mortgages, especially because the risk of delinquency would be heightened by a downturn in the housing market.   For example, on August 24, 2005, *USA Today* reported that economists and bankers were "getting nervous about the wide use of higher-risk financing, such as ... subprime mortgages for low-income home buyers." As chief economist Doug Duncan of the Mortgage Bankers Association stated in the article, easy financing helps people buy homes, but also raises foreclosure risks.

85.     Similarly, at the CPR and CDR's Prepayment and Mortgage Credit Modeling & Strategy Conference in October 2005, Freddie Mac Chief Economist Frank Nothaft stated that subprime delinquency rates remained worrisome, with subprime delinquencies as much as eight to nine times higher than prime loans.

86.     In a December 26, 2005 *Business Week* article, JPMorgan Chase & Co. estimated that risky subprime loans made up close to 9% of mortgage debt—large enough to make a downturn worse if those loans began to fail in large numbers.

87.     Governor Susan Schmidt Bies, a member of the Federal Reserve Board, gave a speech at the Financial Services Institute on February 2, 2006. In her speech, Bies noted that the Federal Reserve and other banking supervisors were concerned that then-current risk-management techniques did not fully address the level of risk in nontraditional mortgages such as subprime mortgages—a risk that would be heightened by a downturn in the housing market. Bies also stated that lenders were increasingly combining nontraditional mortgage loans with weaker mitigating controls on credit exposures.

88.     By late 2006, the signs of a housing downturn could no longer be ignored — housing sales were on the decline, interest rates had increased, and the default and delinquency rates were starting to spike. Nonetheless, lenders continued to loan money to subprime borrowers as if nothing was wrong.

89.     By early 2007, the subprime crisis had completely erupted. During the first stage of this crisis, several prominent subprime lenders including New Century Financial Corporation declared bankruptcy as liquidity dried up and the lenders found themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat. By the fall of 2008, the subprime crisis has brought down such mega lenders as Countrywide Financial Corporation ("Countrywide"), IndyMac Bank (now Indymac Federal Bank), and Washington Mutual Bank with many more teetering on the verge of collapse.

## 2.   Background of the Credit Market Crisis

90.     An RMBS is an asset backed security ("ABS") that is collateralized by a pool of residential mortgages.  To create an RMBS, an underwriter, generally an investment bank or mortgage originator, packages thousands of mortgage loans into a pool.  The arranger then sells the pool of mortgages to a trust, and the trust becomes entitled to the thousands of monthly interest and principal payments that homeowners make on the pool of mortgages.  In order to pay the underwriter for these mortgages, the trust issues and sells securities collateralized by the pool of mortgages.  The trust uses the income from the pool of mortgages to make monthly interest and principal payments to the purchasers of the securities it has issued.  RMBS are then subdivided into different classes, known as "tranches" based on their level of risk exposure.

91.     A CDO is a fixed-income investment vehicle that is structured in a similar fashion to an RMBS, except that instead of pooling mortgages, the CDO pools a variety of complex derivative securities as its underlying collateral.  Again, an underwriter, usually an investment bank, creates a trust to hold the CDO's assets and issue its securities.

92.     Like the loan originators discussed above, the underwriters of CDOs and RMBS developed a huge appetite for underwriting fees.  The underwriters similarly lowered their own standards and began bundling ultra-risky subprime mortgages into RMBS, those RMBS into CDOs and those CDOs into CDOs-squared, which is a CDO whose underlying portfolio consists primarily of other CDOs.   As the subprime mortgage market fell, so went the RMBS and CDO market as well.

93.     On October 26, 2007, Moody's cut the ratings on CDOs tied to $33 billion of subprime mortgage securities.  In some cases, CDOs with ratings as high as AAA were either cut or put on review for downgrade.

94.     On October 29, 2007, Fitch announced that it had completed a comprehensive review of its CDOs and as a result it was placing 150 transactions tied to $36.8 billion on Ratings Watch Negative, including CDOs with AAA ratings.  The following day, Fitch announced that it would be revising its entire methodology for rating CDOs and indicated that it expected to publish the new methodology the following week.

95.     On November 1, 2007, Fitch announced that due to the deterioration in the subprime market the U.S. Corporate bond downgrades hit their highest quarterly level in two years – downgrades totaled $92.1 billion in the third quarter of 2007. According to Fitch, three major ratings companies, Standard & Poor's, Moody's and Fitch, had cut ratings on approximately 7,800 bonds backed by residential mortgage backed securities sold in 2006 and had cut ratings on another 3,700 bonds sold in 2005 and 2007.

96.     The first shoe to drop in the mortgage securities market was the collapse in June 2008 of two hedge funds owned by Bear Sterns that had invested heavily in RMBS and CDOs. As the year went on, more investment banks found that the securities they thought were safe were tainted with toxic mortgages. By fall of 2008, the crisis had taken down not only Bear Stern, but also other venerable Wall Street institutions Lehman Brothers and Merrill Lynch. Even previously-considered-rocks-of-stability Fannie Mae and Freddie Mac had to be saved from collapse by the federal government.

**3.     Background of Ambac's Involvement in the RMBS and CDO Markets**

97.     Ambac played a key role in the explosion of RMBS and CDOs. Specifically, Ambac guaranteed that it would make the RMBS' CDOs' principal and interest payments if the underlying assets defaulted.

98.     In case of an RMBS, Ambac provided protection against default of the underlying mortgages in the asset pool. RMBS insurance contacts were entered into between Ambac and the issuing trust of the RMBS, not the investors in the RMBS.

99.     Ambac also insured growing amounts of second-lien RMBS. A HELOC, or home equity line of credit, is a second mortgage loan drawn against the equity in a home (*i.e.*, drawn against the difference between the value of the remaining first mortgage and the present market value of the home). Unlike a HELOC, in which the borrower can decide to borrow, pay down principal and then borrow again up to the maximum amount of the loan, a closed-end second ("CES") loan is also drawn against the value of the home in excess of any first-lien loan, but the borrower draws the entire amount upon loan issuance and cannot re-borrow after paying down principal.

100.    Payment on second-lien loans (HELOCs and CES) is directly related to the borrower's ability to pay the underlying first mortgage. And because second-liens comprise the last to be repaid, as housing prices decrease, the losses incurred on second-liens are far more severe than on first-liens. As a result, in a deteriorating market, the risk of defaults and delinquencies in HELOC and CES deals was significantly higher. Ambac's portfolios of RMBS composed of HELOCs and CES mortgages faced the increasing likelihood of losses at a time of decreasing home sales and stagnant or declining home prices.

101.    With respect to CDOs, Ambac did not enter into traditional insurance contracts but, instead, entered into CDSs. Ambac generally issued its CDSs to investors purchasing the debt of the CDO, usually an investment bank. Pursuant to the CDSs, the investment banks would pay Ambac a premium for its guarantee that the principle and interest payments due to the investment bank as a senior debt holder of the CDO would be paid.

102.    Notably, when Ambac wrote traditional insurance, it had to allocate approximately 3% of the amount insured to support its capital cushion for regulatory and rating agency purposes. However, when Ambac wrote credit default swaps against CDOs, the amount of capital it had to allocate to the transaction was lower, even if the size of the deals and premiums paid to Ambac were the same. Writing credit default swaps, therefore, could be more profitable to Ambac than traditional insurance.

103.    Ambac's portfolio of CDOs of RMBS increased exponentially in recent years. Based on a CDO exposure chart that Ambac provided in the first quarter of 2008, the Company's net exposure to CDOs with greater than 25% RMBS as the underlying collateral increased from $900 million in 2004 to approximately $29 billion as of December 31, 2007. In percentage terms, CDOs with over 25% RMBS collateral represented just 5.8% of its total domestic CDO exposure in 2004, and rose to 57.5% of the portfolio by the first quarter of 2008.

### C.    Ambac Secretly Loosens Its Own Underwriting Standards

104.    As mentioned above, in 2005, defendant Genader announced his goal of achieving $1 billion a year. According to CW 1 from the Class Action Complaint, "[t]he goal forced Ambac to take on high-premium, high-risk transactions. To meet that kind of target, you have to shoot for

white elephants." Of course, those "white elephants" were the risky RMBS and CDOs discussed above.

105.    The increased risks Ambac took on are reflected in its own public statements. According to Ambac's own disclosures, Ambac's underwriting "entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, servicer or manager." (*See, e.g.* Ambac's 2006 Form 10-K).  According to CW3, identified as a former underwriter in Ambac's RMBS group from October 2001 to February 2007, Ambac learned, during its routine due diligence visits to mortgage originators in 2005 and early 2006, that those mortgage originators were systematically lowering their underwriting standards in order to maintain profits in the face of slumping markets. Thus, according to CW3, rather than stop insuring risky RMBS, Ambac secretly lowered its own underwriting standards.  Plaintiffs have independently investigated and determined the responsibilities of an "underwriter" at Ambac to include: (i) writing financial guaranty insurance on public finance and structured finance obligations; (ii) evaluating the credit quality and marketability of the underlying credit obligation; (iii) evaluating transactions that expose the company to risks which may not be correlated to credit risk, for example, market risk, weather-related or other disasters, mortality or other property and casualty type risk characteristics and to underwrite such risks so that a substantial level of first loss protection would have to be exhausted before Ambac would become liable in respect of such risks.  Thus, an underwriter would have reason to know of these facts.

106.    The first shift towards accepting greater risk came through lowered demands for overcollateralization when HELOC deals were wrapped.  For example, according to CW 3, prior to 2006, Ambac would wrap HELOC RMBS deals only if, within a 12 month time frame, the model predicted that the RMBS would be overcollateralized by 3.5% meaning that it had a 3.5% cash cushion above anticipated cash outflows, including defaults.  This overcollaterization would be obtained through pre-payment of the HELOC loans in the first 12 months.   This 3.5% of overcollaterization served as a credit enhancement, or protection from loss, for Ambac, since there would be an additional 3.5% of collateral to offset any losses in the HELOC RMBS.

107. However, according to CW 3, by the beginning of 2006, Ambac did not require that a HELOC product include as much overcollaterization. By this time, on information and belief, as long as the model predicted that the RMBS would include overcollaterization of only 0.5%, Ambac would approve the deal. This reduction was highly material and substantially lowered the credit enhancement protection Ambac required in its HELOC deals, thereby significantly increasing the Company's risk exposure to these deals. Ambac did so in order to wrap more and more of these deals so it could generate increasing revenue and achieve Genader's $1 billion goal.

108. During this same time period, Ambac began to insure RMBS backed by loans that were structurally riskier than it had in the past, particularly closed-end second lien products. Prior to 2006, the RMBS that Ambac insured were backed by mortgages from borrowers who had owned their homes for years, so they had a history of payment on their first liens and owned equity in their homes. After 2006, however, Ambac agreed to insure increasing amounts of RMBS backed by CES mortgages issued to home purchasers who applied for a second lien *to cover the initial downpayment on their homes*, otherwise known as piggy-back loans. In other words, these home purchasers either did not have enough capital or were not willing to pay their own capital to meet the down-payment requirements of the first lien loans. Moreover, Ambac was aware that these CES loans were being originated under substandard underwriting standards. According to CW 3, the change in the underlying CES loans increased the risk level of Ambac's CES products.

109. Moreover, in June 2006, Ambac affirmatively and secretly changed the risk profile of its RMBS portfolio by altering its underwriting model so it could approve deals that would not be approved under the prior model.

110. CW 3 explained that the direct RMBS underwriting group saw many lucrative HELOC deals go to financial guarantor competitors because Ambac rejected these deals as being too risky. According to CW 3, in June 2006, Pat McCarthy, First Vice President in the Consumer Asset-Backed Securities Group, wrote a memorandum proposing a drastic change in the HELOC underwriting standards that was submitted to the Credit Risk Committee. The new standards were reviewed and were explicitly approved by all members of the Credit Risk Committee, including defendants Genader, Uhlein and Wallis.

111.    According to CW 3, the new model created by Ambac's underwriting department and approved by members of the Credit Risk Committee was designed so that riskier, lower-quality RMBS would be approved. Ambac's historical underwriting model attempted to determine the future performance of a particular RMBS through a detailed review of the characteristics of each underlying HELOC loan contained within the mortgage pool providing cash flows to the RMBS. Ambac would apply tested assumptions on a loan-by-loan basis to predict performance and assess risk. The lower quality of mortgages being originated would be identified by this pool-specific approach.

112.    In contrast to the Company's historical model, Ambac's post-June 2006 RMBS underwriting model, implemented by the start of the Relevant Period, did not look at *any* of the actual loans in the mortgage pool collateralizing the RMBS. Instead, the new model looked only at the historical cumulative default rates of the loan originators. For instance, if a pool of underlying loans was originated by Countrywide, Ambac would run its model against Countrywide's historical cumulative default rate on the type of loans being securitized, but would not look at the actual underlying loans in the pool, to determine the future performance of the RMBS.

113.    This new model's reliance on historical rates of default by originator was highly problematic. The historical default rates of loan originators could not predict the future performance of loans issued in and after mid-2006. According to CW 3, by mid-2006, Ambac knew that the originators had materially lowered their underwriting standards across the board. CW 3 stated that the new underwriting model resulted in Ambac approving high risk RMBS transactions, which would have been rejected under the prior model. Ambac never disclosed to the public that it materially changed its underwriting methodology.

114.    Further, according to CW 3, in October 2006, four months after Ambac adopted the weaker RMBS underwriting model, defendant Uhlein received a memorandum from Iain Bruce ("Bruce"), head of the Consumer Asset-Backed Securities group, who was greatly concerned about Ambac's decision to abandon their strict underwriting guidelines and insure CDOs containing even riskier RMBS as the underlying collateral.

115.    According to CW 3, who reportedly saw this memorandum on a computer screen around the time it was sent, Bruce wrote: "*Why are we willing to insure stuff in the secondary market* [*i.e.*, the CDO market] *that we would not touch with a ten foot pole in the primary market* [*i.e.*, the RMBS market]?" In other words, the RMBS collateral supporting the CDOs that Ambac guaranteed by writing credit default swaps was of such poor quality that the same RMBS could not be approved to be directly insured by Ambac.

116.    Other internal managers expressed concern over the quality of the RMBS contained within the insured CDOs. Jeff Nabi ("Nabi") was a Managing Director in Ambac's Consumer Asset-Backed Securities Group. According to CW 4, a former First Vice President who worked in Ambac's Consumer Asset-Backed Securities Group from July 2002 to April 2007, Nabi expressed concerns about Ambac's CDO exposure, complaining within Ambac that the Company's Credit Risk Committee "didn't look at and evaluate CDO exposure with the same scrutiny" as was applied to other exposures, and that the CDO deals did not face the "same degree" of stress-testing as other transactions.    Through Plaintiffs independent investigation, Plaintiffs have determined the responsibilities and likely identity of the Former First Vice President who worked in Ambac's Consumer Asset-Backed Securities Group.  These responsibilities include: (i) overseeing direct RMBS portfolio, which is composed of HELOC's, subprime, Alt A, close-end seconds and option arm loans; (ii) involvement in surveillance and loss mitigation efforts, including determining loss reserves, projecting collateral performance and overseeing risk reduction options; and (iii) managing professionals responsible for generating Ambac's direct RMBS Insurance business, including strategic planning, marketing efforts, due diligence visits, price determinations and risk tolerance levels. Thus, CW 4 would have reason to know of these facts.

117.    One reason for Ambac's acceptance of mortgage collateral in CDOs that would not even pass Ambac's lowered RMBS underwriting standards was that in late 2006 and early 2007, Ambac's CDO team was "churning out deals" for which the underwriters did not "really dig down all that deeply," according to CW 5, a former Vice President of Ambac between January 2005 and July 2007. Instead of conducting deep and detailed underwriting, the process evolved to "relying on counterparties," meaning the investment bankers who originated CDOs. When asked if Ambac's

CDO underwriters were conducting an in-depth analysis of the collateral supporting CDOs, CW 5 answered, "Were they doing that on every deal? I would say no." Through Plaintiffs independent investigation, Plaintiffs have determined the responsibilities and likely identity of the Former Vice President. These responsibilities include: (i) managing the Company's reinsurance business; (ii) reporting of ceded insurance business to senior management for external reporting and internal analysis purposes; and (iii) managing staffing and business briefings. Thus, CW 5 would have reason to know of these facts.

### D.    Ambac's Surveillance Group Skirts Its Oversight Responsibilities

118.    Despite Defendant Genader's goal of achieving $1 billion in profits in the near future, according to CW 1, Genader "didn't want to increase the company's infrastructure to achieve it."

119.    CW 2, a former Assistant Vice President who worked in Ambac's financial control group from March 2002 through August 2006 confirms that Ambac's surveillance department "was in disarray" in 2006. According to CW 2, the surveillance department was not responsive and a lot of times short-staffed" and that "there was a lot of shuffling of people in the department. A lot of people left.... They were always hiring and re-hiring."

120.    Ambac's surveillance department was supposed to actively monitor the Company's outstanding financial guarantee exposure. According to the Company's 2006 Form 10-K:

*Surveillance and Remediation*:

The Surveillance Group is responsible for monitoring outstanding financial guarantee exposures, including credit derivatives. The group's monitoring activities are designed to detect deterioration in credit quality or changes in the economic, regulatory or political environment which could adversely impact the portfolio. Active surveillance enables Ambac Assurance's Surveillance Group to track single credit migration and industry credit trends....

... The focus of the surveillance review is to assess performance, identify credit trends and recommend appropriate classifications, ratings and review periods.... Those credits that are either in default or have developed problems that eventually may lead to a claim or loss are tracked closely by the appropriate surveillance team and reported to management and Ambac's Board of Directors by preparation of an adversely classified credit listing. Relevant information, along with the plan for corrective actions and a reassessment of the credit's rating and credit classification, is reviewed with senior management in regular adversely classified credit meetings....

121.    However, rather than actively monitoring the performance of its portfolio, Ambac's surveillance group relied heavily on the work of others.  According to CW 5, the CDO surveillance group relied heavily on the published ratings by the credit rating agencies in determining whether to actually review the RMBS collateral supporting Ambac's CDO exposure.

122.    Had Ambac independently analyzed the performance of the underlying assets, it would have known that: (a) by the beginning of the Relevant Period there was a negative trend indicating rising delinquencies and default rates in the underlying collateral in the RMBS-related instruments that Ambac insured that should have been is disclosed to investors, together with its 2006 lowering of its underwriting standards; (b) the cost of the credit default swaps that Ambac issued for CDOs backed by RMBS were increasing in value, and Ambac's liabilities through these swaps should have been marked to market in significant amounts as early as February 2007; and (c) the RMBS-related instruments that Ambac insured were materially impaired much earlier than January 2008.

E.    **In Truth, Ambac's Mortgage-Based Portfolio Fared No Better than the Rest of the Market**

123.    As discussed in detail below, the Individual Defendants repeatedly assured the investors and analysts that its mortgage-based portfolio was in better shape than the market in general because Ambac's rigorous underwriting standards ensured that only high-quality RMBS-backed securities were being insured.  These statements, however, were materially false and misleading.  In reality, Ambac was witnessing in its portfolio the same deteriorating mortgage performance as the rest of the market.

124.    In order to assess the validity of the Individual Defendants' representations, lead plaintiffs in the related Class Action retained an independent expert consulting firm, whose members include economists, financial academics, experienced finance and mortgage industry specialists, chartered financial analysts, and PhDs.  Lead plaintiffs also retained another independent consultant, who formerly structured and traded RMBS and CDOs like those that Ambac insured.  The methodology and conclusions of the lead plaintiffs' experts are summarized in great detail in ¶¶ 111-133 of the Class Action Complaint, which allegations Plaintiffs incorporate in full herein under Fed. R. Civ. P. 10(c).  In short, these experts conclude that, contrary to the Individual Defendants'

representations, Ambac's mortgage-based portfolio performed exactly the same or worse than the market in general.

### F. The Individual Defendants Concealed Billions of Dollars in Mark-to-Market Write Downs from Investors

125.    Ambac was required to account for the value of its credit default swap exposures to CDOs in accordance with Statement of Financial Accounting Standards 133, entitled "Accounting for Derivative Instruments and Certain Hedging Activities" ("SFAS 133"). Specifically, SFAS 133 "requires that an entity recognize all derivatives as either assets or liabilities in the statement of financial position and measure those instruments *at fair value*." Fair value for accounting purposes is:

> The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.... The transaction to sell the asset or transfer the liability is a hypothetical transaction at the measurement date, considered from the perspective of a market participant that holds the asset or owes the liability. Therefore, the objective of a fair value measurement is to determine the price that would be received to sell the asset or paid to transfer the liability at the measurement date (an exit price).

> [F]air value is a market-based measurement, not an entity-specific measurement. Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability.

126.    Throughout the Relevant Period, Ambac failed to comply with SFAS 133 by ignoring the governing relationship between fair value and pertinent market data. Until January 16, 2008, Ambac's mark-to-market reporting bore little relationship to the actual change in value of Ambac's credit default swaps relating to its CDOs. Having shown above that the RMBS collateral in Ambac's CDO exposures performed in line with the market indices, lead plaintiffs' outside consultants proceeded to estimate the mark-to-market write-downs that Ambac should have reported for each quarter of 2007.

127.    As of March 30, 2007, Ambac had exposure to approximately $20 billion of CDS on CDOs of ABS.  As discussed above, as of this period the 40-100 TABX had declined to approximately 84% of par. Thus, by March 30, 2007, applying the above methodology, Ambac was required by GAAP and SFAS 133 to write-down at least *$2.068 billion* relating to its CDS on CDOs of ABS from 2006-2007. For that same quarter, Ambac, in violation of GAAP and SFAS 133, wrote

down a total of only \$5.124 million in total. Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported profit of \$213 million to a loss of \$1,311 million, and its earnings per diluted share would have declined from a reported profit of \$2.04 per share to a loss of \$12.53 per share.

128.    As of June 30, 2007, Ambac had exposure to approximately \$24.3 billion of CDS on CDOs of ABS. As discussed above, as of this period the 40-100 TABX had declined to approximately 69% of par. Thus, by June 30, 2007, applying the above methodology, Ambac was required by GAAP and SFAS 133 to write-down at least an additional *\$2.716 billion* relating to its CDS on CDO of ABS from 2006-2007. For that same quarter, Ambac, in violation of GAAP and SFAS 133, wrote down a total of \$56.87 million. Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported profit of \$173 million to a loss of \$1,810 million, and its earnings per diluted share would have declined from a reported profit of \$1.69 per share to a loss of \$17.65 per share.

129.    As of the end of the third quarter 2007, ending September 30, 2007, Ambac had exposure to \$26.2 billion of CDS on CDO of ABS. As discussed above, as of this period the 40-100 TABX had declined to approximately 33% of par. Thus, by September 30, 2007, applying the above methodology, Ambac was required by GAAP and SFAS 133 to write-down at least an additional *\$8.923 billion* relating to its CDS on CDO of ABS from 2006-2007. As of this point, Ambac only took a minor write-down of \$743 million in violation of GAAP and SFAS 133. Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported loss of \$361 million to a loss of \$6,314 million, and its earnings per diluted share would have declined from a reported loss of \$3.53 per share to a loss of \$61.73 per share.

130.    As of December 31, 2007, Ambac had exposure to \$28.9 billion of CDS on CDO of ABS. By this time, the 40-100 TABX had declined to approximately 18% of par. Thus, by December 31, 2007, applying the above methodology, Ambac was required by GAAP and SFAS

133 to write-down at least an additional *$3.672 billion* relating to its CDS on CDO of ABS from 2006-2007. On January 16, 2008, Ambac disclosed its first material market-to-market write-down, disclosing $5.4 billion of the required amount.

131.    In sum, for the entire year of 2007, Ambac only took a reported write-down of approximately $6.1 billion write-down on its CDO of RMBS. Ambac was required by GAAP and SFAS 133 to write-down at least $17 billion for the year end December 31, 2007 relating to its CDS on CDO of ABS from 2006-2007. Moreover, had Ambac's financial statements for the year ended December 31, 2007, properly accounted for the mark-to-market write-down, Ambac's reported net earnings for the year would have declined from a reported loss of $3.24 billion to a loss of $10.45 billion, and its earnings per diluted share would have declined from a reported loss of $31.56 per share to a loss of $101.57 per share.

### G.    Ambac's Future, or Lack Thereof

132.    On January 18, 2008, S&P and Moody's put Ambac's credit rating on review for downgrade. S&P and Moody's indicated that they would downgrade Ambac's credit rating from AAA to AA if Ambac did not raise sufficient capital to cover its CDO-exposure risk.

133.    Wall Street analysts hoped Ambac could broker a bank bailout much like the one Bear Stearns received in order to stay solvent. At a minimum, analysts expected Ambac to raise $2.5 billion in order to save its credit ratings. Ambac disappointed analysts on both accounts.

134.    On March 5, 2008, Ambac announced it would raise only $1.5 billion through a public offering. The following day, Ambac sold 171.1 million shares of new common stock at $6.75 a share for a total of $1.25 billion. It also issued $250 million of equity units. This public offering severely diluted the investments of Ambac's shareholders by nearly tripling the number of outstanding Ambac shares.

135.    As a result of the public offering, Ambac's stock price jumped $2.08, or 28%, to $9.50 per share. It also allowed Ambac to maintain its AAA ratings with S&P and Moody's. Appearing on Bloomberg Television, defendant Callen said "the AAA is now solid." In truth, the public offering was just a band-aid fix.

136.    On April 23, 2008, Ambac announced it lost $1.66 billion in first quarter 2008 after

losing $1.73 billion on credit derivatives. According to the press release reporting this loss:

> Ambac Financial Group, Inc. Announces First Quarter Net Loss of $1,660.3 Million
>
> First Quarter Net Loss Per Share of $11.69 Reflects Mortgage-related Losses
>
> NEW YORK, April 23, 2008−Ambac Financial Group, Inc. (NYSE: ABK) (Ambac) today announced a first quarter 2008 net loss of $1,660.3 million, or a net loss of $11.69 on a per share basis. This compares to first quarter 2007 net income of $213.3 million, or net income per diluted share of $2.02. *The decrease is primarily due to non-cash, mark-to-market losses on credit derivative exposures amounting to $1,725.2 million in the first quarter 2008 driven by the continued disruption in the global credit markets impacting the fair value of Ambac's derivatives exposures during the quarter. The decrease was also caused in part by the current quarter's loss provision on Ambac's financial guarantee direct exposures to mortgage-related securities which amounted to $1,042.8 million,* as well as by other than temporary impairment charges on certain investment securities within the financial services investment portfolio.

137.    Despite these poor financial figures, defendant Callen moved to calm investors'

nerves, reassuring them that Ambac would come out safely on the other side. Specifically, the April

23, 2008 press release stated:

> Commenting on the financial results, Mr. Callen, noted, "The housing market crisis continues to disrupt the global credit markets and our credit derivatives and direct mortgage portfolios were severely impacted once again. *While we realize that these are disappointing credit results, we continue to believe that the capital raise and strategic business actions taken during the quarter will enable us to get beyond this credit market.* The capital that we raised during the quarter in the midst of a very difficult market plus capital generated from the reduction in net par exposure helped bring our claims-paying resources to approximately $16.0 billion as of March 31, 2008. *We currently exceed S&P's AAA target level of capital by a comfortable margin and we expect to meet our goal of exceeding Moody's Aaa target level of capital in the second quarter.* Importantly, we generated positive operating cash flow during the quarter." Mr. Callen continued, "Our team of professionals is working hard on restoring market faith in the Ambac brand and we have recently started to see some business come our way in the municipal markets. *We feel strongly that our highly qualified professionals worldwide, our significant size and scale, and our expertise in select market sectors will result in new business opportunities.*"

138.    Investors were not buying it though. On this news, Ambac shares sank 42.6% to

close at $3.46. Commenting on Ambac's financial results, one analyst told Reuters: "What a

disaster."

139.    Just weeks later, Ambac announced even more bad news. On May 28, 2008, Ambac reported $228 million of write downs during April 2008 on derivative-based guarantees the Company sold on CDOs. Ambac's shares again plummeted to a then all tim e low of $2.22 per share.

140.    As if things were not bad enough, Ambac received crippling news just a few days later.  On June 4, 2008, Moody's announced it had placed Ambac on review for a possible downgrade of its Aaa rating.  According to Moody's "[t]oday's action reflects Moody's concerns regarding Ambac's overall flexibility, as well as possible increased expected and stress loss projections among its mortgage-related risk exposures.  Moody's noted that the most likely outcome of the ratings review would be a downgrade, with Ambac's insurance financial strength rating likely to remain in the Aa rating category.

141.    The next day, S&P announced it was in fact lowering its ratings on Ambac from AAA to AA. It also placed Ambac on credit watch negative, meaning Ambac's rating might be cut again within the following 90 days.

142.    On June 20, 2008, Moody's did in fact cut Ambac's Aaa rating three notches to "Aa3," the fourth highest investment grade, citing Ambac's impaired ability to raise capital and write new business.

143.    On September 18, 2008, Moody's announced it was considering downgrading Ambac's rating by several additional grades based on its revised projections for likely losses from residential mortgaged-backed securities issued from 2005 through 2007. "Because ... Ambac ... [is] meaningfully exposed to the risk of U.S. subprime mortgages and other residential mortgage products, the revised assumptions are expected to have a significant impact on the firm[']s capital positions and multi-notch downgrades are possible," Moody's said in a statement.

144.    On November 5, 2008, Moody's did in fact downgrade Ambac's credit rating by four grades, from Aa3 to Baal.  That same day, Ambac announced a third quarter 2008 net loss of $2.43 billion, or a net loss of $8.45 on a per share basis.

145.    Just a couple of weeks later, on November 19, 2008, S&P downgraded Ambac's rating three grades, from AA to A.

146.   As a result of Ambac's downgrades, the Company's shares fell below $1 for the first time since going public in 1991.

147.   Mo·eover, as a further result of the downgrades, Ambac is now in "run-off mode." That's where an insurer collects payments and pays claims on existing policies, but writes no new business. According to Sean Egan, chief ratings officer at Egan-Jones Ratings, a rating agency that's paid by investors rather than issuers: "They have no future. They will argue otherwise but as a practical matter they don't have a future."

## DEFENDANTS FALSE AND MISLEADING STATEMENTS

148.   As explained above, during the Relevant Period, the Individual Defendants knew or were reckless in not knowing that: (1) mortgage originators had lowered their standards for underwriting residential mortgages that were being included in a wide range of RMBS; (2) Ambac itself had changed its underwriting policies in a way that allowed it to assume riskier RMBS exposures than would have been allowed under the pre-existing policies; (3) housing and credit market conditions de·eriorated severely; (4) the RMBS collateral that Ambac insured directly and that supported Ambac's derivative CDO exposures was deteriorating in near lockstep with the rest of the residential-mortgage-securities market; (5) Ambac violated GAAP by not properly taking mark-to-market writedowns on its CDO portfolio and by not taking adequate loss reserves on its RMBS portfolio; and (6) as a result of the above, Ambac's public reports were materially false and misleading.

### A.   2006 Third Quarter Statements

#### 1.   The October 25, 2006 Press Release and Conference Call

149.   On October 25, 2006, Ambac issued a press release announcing its third quarter 2006 financial results. In the press release, defendant Genader asserted: "We are currently witnessing a solid level of deal inquiries and opportunities.... We remain steadfast in judiciously allocating our capital to transactions that enable us to continue to deliver superior returns."

150.   During the conference call that day, defendant Leonard highlighted Ambac's conservatism in assuming mortgage-related exposures, stating that Ambac was "very selective in that sector" and that "our CDO portfolio, when we look at structured credit with MBS, we're also very

cautious about mezzanine-type securities that come out of mortgage-backed securitizations. So, we are taking a cautious position for underwriting reasons, but also the availability of profitable transactions is not as great as it has been in the past."

151.    These statements were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.    In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶55-59; 76-79).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

### 2.    The Third Quarter 2006 Form 10-Q

152.    On November 8, 2006, Ambac issued its Form 10-Q for the quarter ended September 30, 2006 (the "3Q:06 Form 10-Q"). The 3Q:06 Form 10-Q was signed by defendant Leonard and included as exhibits Sarbanes-Oxley Certifications (the "Sarbanes-Oxley Certifications") signed by defendants Genader and Leonard certifying, *inter alia*, that they had reviewed the 3Q:06 Form 10-Q and, to their knowledge: (i) the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and (ii) the financial statements and other financial information included in the report fairly presented, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the report.

153.    The 3Q:06 Form 10-Q described Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits as follows:

Active surveillance of the insured portfolio enables Ambac's Surveillance Group to track credit migration of insured obligations from period to period and prepare an adversely classified credit listing. The active credit reserve is established only for adversely classified credits. The criteria for an exposure to be included on the adversely classified credit listing includes ... ***underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed***

*securitizations*), problems with the servicer of the underlying collateral *and other adverse economic events or trends*.... (Emphasis added.)

154. The 3Q:06 Form 10-Q disclosed that Ambac took active credit reserves based on, among other things, Ambac's information regarding "historical default information" and "internally developed loss severities."

155. The 3Q:06 Form 10-Q stated that "we note that the mortgage-backed and home equity ultimate [loss] severities have been better than or equal to our current severity assumption." With respect to CDO obligations, the 3Q:06 Form 10-Q stated that "Ambac considers the unique attributes of the underlying collateral and transaction."

156. The above statements were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.   In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶55-59; 76-79).

b.   Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.   As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

d.   Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants[6] knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

### B.   2006 Fourth Quarter Statements

#### 1.   January 31, 2007 Press Release and Conference Call

157. On January 31, 2007, Ambac issued a press release announcing its fourth quarter 2006 financial results. The press release disclosed that Ambac's total revenues were $454.3 million, and net income for the quarter was $202.7 million, or $1.88 per diluted share. Ambac's loss and loss

---

[6] The "Exchange Act Defendants" are the Director Defendants and defendants Leonard and Genader.

expense reserve was $220.1 million, a decrease from $304.1 million at the end of the prior year. During Ambac's conference call that day, defendant Leonard responded to questions about worsening trends reported in the mortgage sector by assuring investors that "from a surveillance perspective, we consider that and look for those types of trends, obviously trying to identify those early ... but those are things that we specifically look for in the surveillance function."

158.    The January 31, 2007 press release also reported a net mark-to-market loss on financial guarantee credit derivative contracts in the fourth quarter of $838,000 and a net mark-to-market gain of $9.1 million for the year 2006.

159.    Investors and market analysts relied upon and responded favorably to Ambac's statements. A January 31, 2007, Morgan Stanley report "continue[d] to recommend investors build a position in the ABK shares" and noted that Ambac had "lower credit losses." A February 8, 2007 Citigroup report commented favorably on the fourth quarter results and a meeting with Ambac senior management, in which defendant Genader "emphasized that the portfolio cannot be measured in average terms because the financial guarantee model is predicated on zero-loss underwriting." Based on comments from Managing Director Tom Gandolfo, Citibank also wrote that Ambac's "[d]ue diligence has been key to low losses.... Not only does Ambac review the deal closely, but also is careful only to work with established CDO managers," and that keys to Ambac's success were its favorable "structure, access to collateral and good financial controls and financial resources."

160.    The above statements by the Individual Defendants were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.    In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶55-59; 76-79).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

d.     Either Ambac conducted the surveillance it claimed, and the Individual Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

### 2.     The 2006 Form 10-K

161.     On March 1, 2007, Ambac filed with the SEC its Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K"), which was signed by defendants Leonard and Genader. The 2006 Form 10-K included Sarbanes-Oxley Certifications making the same representations as set forth in ¶150 above. The 2006 Form 10-K represented that Ambac's "Consolidated Financial Statements have been prepared in conformity with U.S. generally accepted accounting principles using management's best estimates and judgment."

162.     Ambac's 2006 Form 10-K reported the same loss and loss expense reserves, net earnings and net earnings per share, as reported in the January 31, 2007 press release, as set forth in ¶154, *infra*. The 2006 Form 10-K reported net mark-to-market losses of $838,000 on financial guarantee credit derivative contracts for the fourth quarter and a gain of $9.1 million for the year. Regarding its mark-to-market process, the 2006 Form 10-K disclosed:

> Ambac's exposure to derivative instruments ... are accounted for at fair value under SFAS 133[]. Fair value is determined based upon market quotes from independent sources, when available. When independent quotes are not available, fair value is determined using valuation models.... For derivatives that trade in less liquid markets, such as credit derivatives on synthetic collateralized debt obligations ... a proprietary model is used because such instruments tend to be more complex and pricing information is not readily available in the market.

163.     With respect to the underwriting of structured finance products, the 2006 Form 10-K represented that "the amount and quality of asset coverage required is *determined by the historical performance of the underlying asset type* or the transaction's specific underlying assets." (Emphasis added.) The 2006 Form 10-K also stated that, as part of the underwriting process, Ambac performed due diligence on its loan originators, a process that "*often entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, services or manager*." (Emphasis added.)

164.     In describing Ambac's "active surveillance" of its exposures, the 2006 Form 10-K stated as follows:

The Surveillance Group is responsible for monitoring outstanding financial guarantee exposures, including credit derivatives. The group's monitoring activities are designed to detect deterioration in credit quality or changes in the economic, regulatory or political environment which could adversely impact the portfolio. Active surveillance enables Ambac Assurance's Surveillance Group to track single credit migration and industry credit trends...

... The focus of the surveillance review is to assess performance, identify credit trends and recommend appropriate classifications, ratings and review periods.... Those credits that are either in default or have developed problems that eventually may lead to a claim or loss are tracked closely by the appropriate surveillance team and reported to management and Ambac's Board of Directors by preparation of an adversely classified credit listing. Relevant information, along with the plan for corrective actions and a reassessment of the credit's rating and credit classification, is reviewed with senior management in regular adversely classified credit meetings....

Surveillance for collateral dependent transactions focuses on review of the asset and servicer performance as well as transaction cash flows.

165.     The 2006 Form 10-K stated, inter alia, that "[t]he criteria for an exposure to be included on the adversely classified credit listing includes ... underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed securitizations), problems with the servicer of the underlying collateral and other adverse economic events or trends...." The 2006 Form 10-K also stated that "mortgage-backed and home equity ultimate [loss] severities have been less than or equal to our current severity assumption." With respect to CDO obligations, the 2006 Form 10-K stated that "Ambac considers the unique attributes of the underlying collateral and transaction" and that "Ambac's exposure to CDOs in its classified portfolio is currently limited."

166.     The above statements were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

   a.     In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (See CAC ¶¶55-59; 76-79).

   b.     Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (See CAC ¶¶76-91).

   c.     As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics. (See CAC ¶¶111-133).

- 45 -

d.    Either Ambac conducted the surveillance it claimed, and the Individual Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

e.    After the date of the close of the 2006 financial period but prior to the issuance of the 2006 Form 10-K, Ambac's CDO portfolio experienced an undisclosed mark-to-market decline, disclosure of which was a subsequent event necessary to prevent these financial statements from being misleading. (*See* CAC ¶¶134-145).

167.   The 2006 Form 10-K also contained a "Risk Factors" section, which was materially false and misleading because certain of the risks identified in the 2006 Form 10-K had already materialized, a fact not disclosed to investors.   In addition, certain material risks known to the Individual Defendants were omitted from the 2006 Form 10-K.

168.   Under the heading: "We are subject to credit risk throughout our businesses, including large single risks and correlated risks," the 2006 Form 10-K stated that:

We are exposed to the risk that issuers of debt which we have insured (or with respect to which we have written credit derivatives) ... may default on their financial obligations, whether as the result of insolvency, lack of liquidity, operational failure or other reasons.... Such credit risks may be in the form of ... losses in respect of different, but correlated, credit exposures.

169.   The 2006 Form 10-K also included a risk factor entitled: "General economic conditions can adversely affect our business results and prospects." This risk factor spoke generically about how general market conditions could lead to losses for the Company. Another risk factor, under the heading "Changes in prevailing interest rate levels could adversely impact our business results and prospects," stated that:

Additionally, increasing interest rates could lead to increased credit stress on consumer asset-backed transactions in our insured portfolio (as the securitized assets supporting a portion of these exposures are floating rate consumer obligations); slower prepayment speeds and resulting "extension risk" relative to such consumer asset-backed transactions in our insured portfolio....

170.   The above three "risk factors" were materially false and misleading because, as the Individual Defendants knew or recklessly disregarded: (a) Ambac's lowering of underwriting standards in its RMBS portfolios had already resulted in negative trends in delinquencies and other key performance metrics and had increased the expectation that "issuers of debt" that Ambac insured "may default" due to the failure of their underlying collateral; (b) Ambac's changed underwriting

policies increased the likelihood of highly correlated defaults in Ambac's RMBS exposures; and (c) interest rates had already increased while housing prices had declined, thereby increasing the expectation of defaults in Ambac's RMBS exposures.

171.    The 2006 Form 10-K included a risk factor stating that "[o]ur risk management policies and practices may not anticipate unforeseen risks and/or the magnitude of potential for loss as the result of foreseen risks." This risk factor stated that Ambac's "underwriting policies and practices ... are based in part on models reflecting historical factors, *e.g.* default rates and severity of loss experience. These policies and practices may not may not insulate us from risks that are unforeseen and which have unanticipated loss severity."

172.    This risk disclosure was materially false and misleading because the Individual Defendants knew or recklessly disregarded that reliance on "historical" default rates and severity assumptions for underwriting purposes would likely result in increased exposure to inherently riskier products. Specifically, as the Individual Defendants knew or recklessly disregarded, mortgage underwriters had loosened their historical lending standards and Ambac had relaxed its historical RMBS underwriting standards.

173.    The 2006 Form 10-K omitted any credit risk factor directly addressing Ambac's RMBS and CDO backed by RMBS exposures. This omission was material, as Ambac effectively admitted on January 25, 2008, when it issued a Form 8-K in which Ambac "revised certain risk factors it previously disclosed in its Form 10-K for the year ended December 31, 2006." Among those "revised" risk factors was the following *new* risk disclosure, entitled, "We are subject to credit risk related to residential mortgage backed securities and CDOs of ABS":

> We have insured, and written credit default swaps ("CDS") with respect to, RMBS and CDOs of ABS and are thus exposed to credit risk associated with those asset classes. Performance of these transactions can be adversely affected by general economic conditions, including recession, rising unemployment rates, declining house prices and unavailability of consumer credit; mortgage product attributes, such as interest rate adjustments and balloon payment obligations; financial difficulty experienced by mortgage servicers; and, particularly in the case of CDOs of ABS, transaction-specific factors such as the lack of control of the underlying collateral security which can result in a senior creditor determining to liquidate underlying assets to the disadvantage of mezzanine and subordinated creditors and disputes between creditors with respect to the interpretation of legal documents governing the particular transaction.

Transactions within Ambac Assurance's insured RMBS and CDO portfolios also may be downgraded, placed on watch or subject to other actions by the three rating agencies that have granted Ambac Assurance its triple-A claims-paying ratings. Such ratings or other actions could require Ambac Assurance to maintain a material amount of additional capital to support the exposures it has insured. This could cause us to:

- have to raise additional capital, if available, on terms and conditions that may be unfavorable;

- curtail the production of new business; or

- pay to reinsure or otherwise transfer certain of its risk exposure.

174.    The failure to disclose the above risk in Ambac's 2006 Form 10-K was material. Further, the above risk disclosure was entirely based on information known and available to the Individual Defendants when the 2006 Form 10-K was issued.

### 3.    The March 6, 2007 AIFA Conference

175.    On March 6, 2007, defendant Uhlein gave a presentation at an Association of Independent Financial Advisors ("AIFA") conference.  Uhlein stated that "[t]he deals we ensure must meet Ambac's strict underwriting standards. They must be investment grade and structured to allow us to actively surveil the transaction, we get monthly, quarterly reports on all the transactions that we guarantee." Defendant Uhlein also highlighted that while Ambac's business mix may have changed, its corporate focus had not: "[o]ur core corporate objective this [sic] has been very consistent year-to-year, we will continue to strive to excel in all aspects of risk underwriting, structuring, and surveillance."  Uhlein reiterated that "we have maintained the same conservative standards over the years" and that:

> our participation in [the] subprime market has dropped significantly over the last three years. The deals we have done … are performing satisfactorily. We get monthly downloads on all of our deals and actively surveil, and monitor the performance of all our mortgage originators.

176.    Uhlein's remarks were materially false and misleading because Uhlein misrepresented and/or failed to disclose that:

a.    In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶76-77).

b.      Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.      As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

d.      Either Ambac conducted the surveillance Uhlein claimed, and the Individual Defendants knew of but did not disclose these negative trends, or Uhlein misrepresented Ambac's surveillance process. (*See* CAC ¶¶97-105).

#### 4. The 2006 Annual Report

177.    On or about March 30, 2007, Ambac issued its 2006 Annual Report, which included Ambac's 2006 Form 10-K. Defendant Genader stated in a letter to shareholders contained in the Annual Report that Ambac has "a dedication to disciplined pricing, risk management and strategic growth" and "strategically pursue[s] our business, seeking market and sector opportunities where our expertise is highly valued and appropriately priced."

178.    With respect to Ambac's structured finance business, defendant Genader stated that "[i]t is important to remember that we participate in this market by providing our guarantee at the triple-A portion of the capital structure, ensuring strong credit quality while generating excellent risk-adjusted returns." Genader added that "[t]here is little doubt that the U.S. mortgage market is under stress, and we cautiously view this business. Since 2004, we have significantly pulled back on our level of MBS writings, especially in the sub-prime sector. However, opportunities still exist, and we have used our breadth of market knowledge to pinpoint attractive opportunities." Genader also stated that investors should "*[r]est assured that we will continue to be disciplined and rigorous in our scrutiny of this asset class*." (Emphasis added.)

179.    The above statements, including the incorporated Form 10-K, were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.      In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶55-59; 76-79).

b.      Ambac lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.      After the date of the close of the 2006 financial period but prior to the
        issuance of the 2006 Form 10-K, Ambac's CDO portfolio experienced an
        undisclosed mark-to-market decline, disclosure of which was a subsequent
        event necessary to prevent these financial statements from being misleading.
        (*See* CAC ¶¶134-145).

d.      While Genader stated that Ambac was reducing its subprime RMBS
        exposures, Ambac concealed from the market the comparable risks
        associated with the Company's exposure to high risk CDOs backed by
        RMBS, which as of this time was $20 billion. (*See* CAC ¶141)

C.      **2007 First Quarter Statements**

        1.      **The April 25, 2007 Press Release and Conference Call**

180.    On April 25, 2007, Ambac issued a press release announcing its first quarter 2007
financial results. The press release disclosed that Ambac's total revenues were $461.8 million, and
net income for the quarter was $213.3 million, or $2.02 per diluted share. Financial Guarantee net
mark-to-market losses on credit derivatives contracts were $5.124 million. Ambac's loss and loss
expense reserve was $231.3 million, a modest increase from $220.1 million at the end of the prior
year. Defendant Genader stated that "recent evidence of credit spread widening in the mortgage
related asset classes should lead to increased demand for our core financial guarantee product,
provided of course, that wider spreads continue to prevail." The press release also stated that
"[d]uring the quarter, Ambac benefited from increased writings in utilities, structured insurance and
pooled debt obligations (CDOs)" and that "Ambac remains focused on achieving the best risk-rated
returns and will remain disciplined until pricing in this product is commensurate with the level of
risk."

181.    During the Ambac conference call that day, defendant Leonard discussed "the
subprime and mid prime sectors of MBS, as well as CDOs containing large components of this asset
type" and claimed that "[w]e will continue to be selective in the nature of the business we write, and
are obviously hopeful that this pricing trend will continue." Leonard added that "[w]e will continue
to maintain discipline and seek to underwrite those transactions where our superior financial
strength, experience and reputation in the market is most valued."

182.    During the question and answer session of the call, Leonard stated that Ambac had
"very current information – information, pool information up through the end of March, so very

current," and that Ambac was "able to analyze that on a very current basis and look for trends of the underlying performance." Based on this supposed "current" monitoring, Leonard asserted that "[w]e just haven't seen – certainly not significant deterioration, as you can tell from the comments I made on below investment-grade.... We're just not seeing deterioration up through March that wasn't expected."

183.    Investors and analysts relied upon these material statements. Banc of America on April 26, 2007 maintained its "Buy" rating on the stock, stating that Ambac "is entering a *sweet spot* as signs of further gradual credit spread widening are emerging and exposure to areas of concern – namely subprime and Alt-A – are limited." (Emphasis in original.) Citigroup commended Ambac for its "[s]elective MBS writings," noting that Ambac "continue[s] to minimize subprime writings" and that Ambac's RMBS exposure was "very well contained and selected."

184.    The above statements by the Individual Defendants were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.    In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶76-77).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

d.    Either Ambac conducted the surveillance it claimed, and the Individual Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

e.    Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS. Had Ambac's financial statements for the quarterly period ended March 31, 2007 properly accounted for the mark-to-market write-down of $2.068 billion, Ambac's reported net earnings would have declined from a reported profit of $213 million to a loss of $1.311 billion, and its earnings per diluted share would have declined from a reported profit of $2.04 per share to a loss of $12.53 per share. (*See* CAC ¶¶134-145, 141).

- 51 -

## 2.    The First Quarter 2007 Form 10-Q

185.    On May 10 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended March 31, 2007 (the "1Q:07 Form 10-Q"). The 1Q:07 Form 10-Q was signed by defendant Leonard and included as exhibits Sarbanes-Oxley Certifications signed by defendants Genader and Leonard that made the representations set forth at ¶142, *supra*.

186.    The 1Q:07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP. The 1Q:07 Form 10-Q also reported the same loss and loss expense reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the April 25, 2007 press release, as set forth in ¶170, *supra*. The 1Q:07 Form 10-Q disclosed that net mark-to-market losses on credit derivative contracts for the three months ended March 31, 2007 were ($5.1) million, compared to net mark-to-market gains of $2.0 million in the three months ended March 31, 2006.

187.    The 1Q:07 Form 10-Q repeated the statements quoted at ¶¶142-144, *supra*, regarding: (a) Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits, including determining whether there was "underperformance of the underlying collateral"; (b) the process by which an active credit reserve is established; and (c) RMBS and CDO "loss severity assumptions."

188.    The 1Q:07 Form 10-Q also repeated the statement made in the 2006 Form 10-K, quoted at ¶168, *supra*, about Ambac's use of proprietary valuation models.

189.    The above statements were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

   a.    In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶55-59; 76-79).

   b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

   c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

d.   Either Ambac conducted the surveillance it claimed, and the Individual Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

e.   Ambac's "proprietary model" to mark its CDO exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices. (*See* CAC ¶¶111-127).

f.   Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, based on the failure to properly mark-to-market the true value of its CDO-related exposures.   Had Ambac's financial statements for the quarterly period ended March 31, 2007 properly accounted for the mark-to-market write-down of $2.068 billion, Ambac's reported net earnings would have declined from a reported profit of $213 million to a loss of $1.311 billion, and its earnings per diluted share would have declined from a reported profit of $2.04 per share to a loss of $12.53 per share. (*See* CAC ¶¶134-145, 141).

### 3.   The June 12, 2007 KBW Mortgage Finance Conference

190.   On June 12, 2007, defendant Uhlein gave a presentation at a KBW Mortgage Finance

Conference, defendant Uhlein answered questions about how RMBS weakness could affect Ambac.

He discussed the newest CDS that Ambac wrote in early 2007 and concluded his remarks by stating:

[F]rom Ambac's perspective, it's really there's two things. It's the new business size and obviously our book of business and speaking really from the MBS side and as I said, I think we've *been pretty conservative and so we are very comfortable with our current book of business, even in this environment*. So I think the focus from our perspective is to the extent there is a little turmoil in the market, to be honest, that's actually a good thing for financial guarantors, so we are hoping to participate more in the market going forward. (Emphasis added.)

191.   The above statement was materially false and misleading because defendant Uhlein

misrepresented and/or failed to disclose that:

a.   In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶55-59; 76-79).

b.   Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.   As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

d.    Based on these negative trends it was misleading for Uhlein to state that Ambac was "comfortable" with its current "book of business." Either Ambac conducted the surveillance it claimed, and Uhlein knew of these negative trends, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

**D.    Second Quarter 2007 Statements**

     **1.    The July 25, 2007 Press Release and Conference Call**

192.    On July 25, 2007, Ambac issued a press release announcing its second quarter 2007 financial results. Ambac reported second quarter net income of $173.0 million, or $1.67 per diluted share. Financial guarantee net mark-to-market losses on credit derivative contracts were $56.9 million, and Ambac's loss and loss expense reserve was $255.8 million, a slight increase from $231.3 million at the end of the prior quarter. The press release attributed the minor mark-to-market write-down to unfavorable market pricing of CDOs containing subprime RMBS collateral.

193.    The press release disclosed that Ambac's Active Credit Reserve "increased by $14.9 million during the quarter, from $188.8 million at March 31, 2007, to $203.7 million at June 30, 2007," which was "driven primarily by increases in reserves on certain credits primarily within the transportation sector of the U.S. public finance portfolio and to a lesser extent within the non-subprime RMBS sector of the structured finance portfolio...."

194.    In the press release, defendant Genader highlighted that "[o]ur *rigorous and proven approach* enabled us to deliver positive results despite the turmoil in the sub-prime mortgage market" and that "*in the unlikely event of default* we pay scheduled principal and interest, thereby minimizing liquidity risk." (Emphasis added.) Genader also stated that Ambac's "disciplined execution" of its approach would allow it "to benefit from the improving business conditions we see, with wider spreads, enhanced credit terms and increased demand for our valuable financial guarantee products."

195.    On July 25, 2007, Ambac held a conference call chaired by defendant Leonard, who reiterated the "unlikely event of default" on any CDO exposures. Leonard attributed the $56.9 million mark-to-market decline to the "lack of liquidity in CDOs of ABS" in the market, and highlighted that "*[o]n these transactions, as with all of our CDO exposure, Ambac expects that mark-to-market adjustments in either direction will reverse through the income statement over*

*time as the transactions move towards maturity.*" (Emphasis added.) Defendant Leonard also stated that Ambac had been "conservative" in its underwriting, that "our strongest writings were in CDOs of ABS where we have been cautious and selective..." and that "Ambac remains diligent in structuring of transactions, particularly in those asset classes where demand for our product is improving."

196.    Similarly, Senior Managing Director Gandolfo emphasized that Ambac "does not underwrite based solely on the deal's public rating" and that "[w]e believe our credit-risk analysis goes far beyond that which a typical CDO investor would perform." Gandolfo stated that Ambac puts each deal through a "rigorous review process," including "a rigorous review of the CDO manager" a "detailed assessment of the triggers and control rights embedded in the CDO" and a "detailed review and re-rating of the underlying RMBS collateral in the deal," including a base case and stress case model.

197.    Gandolfo further stated that reference to the ABX and TABX indices in marking Ambac's CDO exposures to market was misplaced:

> I look at the same indexes that you look at. It is really hard, right now, to know how much of that spread widening is fundamental and how much is technical....
>
> *What we do is, when we look at our deals, we don't feel we underwrite the market.*
>
> (Emphasis added.)

198.    With respect to Ambac's RMBS book, defendant Leonard disclosed internal rating downgrades of pre-2004 transactions, highlighting that investors should take comfort by Ambac's ability to track the performance of underlying collateral on a monthly basis and stated that "over the entire portfolio, we are not seeing" increased stress. "I think that's largely due to selectivity" and the supposedly safer nature of the collateral Ambac insured, Leonard explained.

199.    The Individual Defendants' statements were highly material and relied upon by investors and market analysts. For example, a July 25, 2007 Morgan Stanley report highlighted that "[t]he company's in-depth discussion on the conference call about how it protects itself against CDO losses and the favorable outlook for new business seemed to go a long way toward alleviating investor concerns..." The next day, a Deutsche Bank report emphasized that Ambac has a

"*[r]igorous CDO underwriting process*" and that "***Ambac is not the market***" (emphasis in original).

With regard to the latter point, the report added:

> If we assume that its underwriting was done properly, its credit performance should not reflect the average or fall even close to the average. Historically, that has been true as Ambac's paid claims has totaled only 2.6 basis points of the par that it has insured. We do not believe this time is different with CDOs and the RMBS market.... Given Ambac's strict underwriting standards, risk assessment skills, and small exposure relative to the overall market, we believe Ambac will not suffer from credit losses.

200.    The above statements by the Individual Defendants were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.    In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶55-59; 76-79).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

d.    Either Ambac conducted the surveillance it claimed, and the Individual Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

e.    Contrary to Gandolfo's statement that Ambac does not "underwrite the market," in fact, the collateral underlying Ambac's exposures deteriorated in line with the collateral comprising the pertinent market indices. (*See* CAC ¶¶111-133).

f.    Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS. Had Ambac's financial statements for the quarterly period ended June 30, 2007 properly accounted for the mark-to-market write-down of $2.716 billion, Ambac's reported net earnings would have declined from a reported profit of $173 million to a loss of $1.810 billion, and its earnings per diluted share would have declined from a reported profit of $1.69 per share to a loss of $17.65 per share. (*See* CAC ¶¶134-145, 142).

### 2.    The Second Quarter 2007 Form 10-Q

201.    On August 9, 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended June 30, 2007 (the "2Q:07 Form 10-Q"). The 2Q:07 Form 10-Q was signed by defendant Leonard and included as exhibits Sarbanes-Oxley Certifications signed by defendants Genader and Leonard that made the representations set forth at ¶142, *supra*.

202.    The 2Q:07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP. The 2Q:07 Form 10-Q reported the same loss and loss expense reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the July 25, 2007 press release, as set forth in ¶182.

203.    The 2Q:07 Form 10-Q repeated the statements quoted at ¶¶142-144, *supra*, regarding: (a) Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits, including determining whether there was "underperformance of the underlying collateral; (b) the process by which an active credit reserve is established; and (c) RMBS and CDO "loss severity assumptions."

204.    The 2Q:07 Form 10-Q repeated the statements made in the 2006 Form 10-K quoted at ¶168, *supra* about the use of proprietary valuation models. The 2Q:07 Form 10-Q stated that the previously disclosed net mark-to-market loss on credit derivative contracts for the quarter of $56.9 million was "related to collateralized debt obligations of asset-backed securitizations ("CDO of ABS") containing sub-prime mortgage-backed securities as collateral."

205.    Notably, the 2Q:07 Form 10-Q disclosed that Ambac's $26.3 billion of exposures to CDOs of high-grade RMBS "have underlying collateral that consist of 39% subprime RMBS, 36% RMBS and 13% mezzanine CDO exposures" and surprised the market by stating that "we have noted a continued widening of credit spreads across the derivative portfolio, particularly CDO of ABS and collateralized loan obligations, resulting in additional mark-to-market losses." The market reaction was immediate, with Ambac's shares declining $2.00 within minutes of the filing of the Form 10-Q. Ambac's stock price closed at $69.50, a decline of $2.90 per share from the August 8 closing price of $72.40 per share. Ambac stock continued to decline in the following days, closing at $66.14 on August 10, 2007 and $56.00 by August 15, 2007.

206.     Analysts continued to accept and react positively to Ambac's statements. An August 15, 2007 Citigroup analyst report discussed a meeting that day with management and noted that the "conservative" management team "appears very comfortable that losses will be minimal." An August 23, 2007 Piper Jaffrey analyst report, which commented on a recent Ambac web disclosure on its CDO underwriting, listed "key takeaways" from the disclosure, including that Ambac engaged in "a highly regimented process for underwriting CDO of ABS transactions," which involved a "dedicated team of underwriters," with "all transaction risk and return modeling" performed by a separate and "dedicated group of professionals in Risk Analysis and Reporting." Piper Jaffrey also highlighted Ambac's "*review of the underlying collateral*, analytic modeling of case and stress case scenarios, Sr. Credit Committee processes and legal review." (Emphasis added.) The Piper Jaffrey report noted, however, that in the end, only Ambac had access to the information needed to accurately assess the quality of its exposures and investors were left to trust Ambac's internal models and representations about its processes: "*Despite any analyst or investor's best attempt, the information flow on a deal by deal basis simply can not be granular enough to come to any real conclusion about these very protections, let alone knowing whether or not they exist in any specific deal.*" (Emphasis added).

207.     The above statements by the Individual Defendants were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.     In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* CAC ¶¶55-59; 76-79).

b.     Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.     As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

e.     Either Ambac conducted the surveillance it claimed, and the Individual Defendants knew of these negative trends, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

f.     Ambac's "proprietary model" to mark its CDS exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices. (*See* CAC ¶¶111-127).

g.  Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS. Had Ambac's financial statements for the quarterly period ended June 30, 2007 properly accounted for the mark-to-market write-down of $2.716 billion, Ambac's reported net earnings would have declined from a reported profit of $173 million to a loss of $1.810 billion, and its earnings per diluted share would have declined from a reported profit of $1.69 per share to a loss of $17.65 per share. (See CAC ¶¶134-145, 142).

## E.  Third Quarter 2007 Statements

### 1.  The October 10, 2007 Press Release

208.  After the close of the market on October 10, 2007, Ambac issued a press release announcing its "Estimate of Unrealized Market-to-Market Loss on Its Credit Derivative Portfolio" for the third quarter. The press release sought to assure the market that any mark-to-market write-downs were contained and did not represent ultimate losses, but merely were caused by liquidity issues that would not affect Ambac, and that Ambac remained confident about its structured finance exposure. The press release disclosed that Ambac expected to take a $743 million loss on its credit derivative portfolio and that Ambac "[e]xpected to report" a "loss provision of approximately $20 million" for the quarter. Ambac expected to report a loss of $3.43 per diluted share.

209.  The press release quoted defendant Genader as stating that despite "the turmoil in the structured finance markets," which resulted in the mark-to-market loss, "I remain confident in our underwriting abilities, credit standards and the transactions we have insured." The press release also quoted Defendant Leonard, stating that "Ambac does not view the current adjustments as predictive of future claims.... Indeed, the average internal credit rating of our derivative portfolio is AA+ at September 30, 2007 and based on our recent analysis of the portfolio, management believes that the potential for material paid claims is very low." Investors and analysts credited these statements. On October 11, 2007, Ambac's stock price rose $2.84, from $67.73 to $70.57.

210.  The financial commentary on Ambac's October 10, 2007, disclosures was favorable. An October 11, 2007 Dow Jones article attributed the increase in Ambac's stock price to the press release "calm[ing] concerns about the impact of the mortgage crisis on the company," and an October 11, 2007 Morgan Stanley report concluded that, "'[w]hile the size of the mark [to market]

may cause a negative short-term market reaction, it does not change our fundamental view of the company." An October 11, 2007 Banc of America analyst report stated: "[w]e view Ambac's pre-announcement as a net positive," adding that "*[i]t all comes down to underwriting standards and the bond insurers have a long and strong track record of high-quality underwriting with minimal losses as a percentage of par outstanding*." (Emphasis added.)

211.    The above statements by the Individual Defendants were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.      Defendant Genader omitted that Ambac had lowered its own underwriting standards in order to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and that the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. (*See* CAC ¶¶76-91, 111-133).

b.      Contrary to defendant Leonard's statements, the reported mark-to-market write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDS portfolio at that time, which would have reflected underlying collateral deterioration. (*See* CAC ¶¶134-145).

c.      The widening of credit spreads and better pricing in mortgage-backed structured finance reflected growing risk and expected losses on RMBS-related instruments. The widening spreads in fact indicated that the value of Ambac's pre-existing RMBS-related exposure was significantly declining, which would result in a mark-to-market loss and increased impairments and loss reserves in Ambac's financial statements. (*See* CAC ¶¶134-145, 259-307).

d.      Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS. Had Ambac's financial statements for the quarterly period ended September 30, 2007 properly accounted for the mark-to-market write-down of $8.923 billion, Ambac's reported net earnings would have declined from a reported loss of $361 million to a loss of $6.314 billion, and its earnings per diluted share would have declined from a reported loss of $3.53 per share to a loss of $61.73 per share. (*See* CAC ¶¶134-145, 143.)

## 2.    The October 24, 2007 Press Release and Conference Call

212.    On October 24, 2007, Ambac issued a press release announcing its third quarter 2007 financial results. Ambac reported a third quarter net loss of $360.6 million, or $3.51 per diluted share, which it attributed to the previously announced $743 million loss on credit derivative

exposures. Ambac's loss and loss expense reserve was $278.7 million, an increase from $255.8 million at the end of the prior quarter. The press release made several new disclosures, including that Ambac's case basis credit reserves increased from $59.8 million from $47.3 million at June 30, 2007 to $107.1 million at September 30, 2007, and that the increase "relates primarily to two RMBS transactions that are underperforming original expectations."

213.    During Ambac's conference call that day, Leonard again assured the investment community that Ambac's mark-to-market losses were transitory and did not represent a likelihood of future claims. Leonard added, "[s]ince all of our credit derivative transactions are performing and are rated internally above investment grade, no adjustment to operating earnings is considered necessary." Defendant Leonard reiterated that the mark-to-market write-down "*does not translate into expectations for claim payments*" and that "*we do not expect to pay any claims*." (Emphasis added.)

214.    Defendant Leonard then explained that the $59.8 million increase in case base reserves was "primarily due to two recent HELOC transactions that are clearly underperforming our original expectations, and as a result, have been internally rated below investment grade." To allay investor concerns regarding Ambac's direct RMBS portfolio, defendant Wallis assured investors that the two HELOCs were "idiosyncratic" in terms of their structure and "very poor performance," which "led to the very early loss."

215.    Defendant Leonard reinforced Ambac's carefully crafted image of being safer than the market, holding higher quality exposures, and being able to weather the storm already hitting big banks which held some of the same RMBS securities Ambac was insuring and which served as Ambac's CDS counterparties. Leonard highlighted that Ambac's "below investment grade exposures remained flat during the quarter at $4.7 billion; were less than 1% of our total portfolio" and that "even under these stressful conditions, most of our transactions are performing; remain rated within the investment grade category.... As always, we will continue to actively monitor these transactions, closely analyzing collateral performance and then consider structural protections available to us."

216.    Defendant Wallis also stated that, while Ambac did not expect "the tail event that we're seeing today" "the good news is, and it is good news is that the portfolio can withstand that."

Even as to the CDO mezzanine deals for which Ambac issued CDS, Wallis assured that those deals retained an investment grade rating and that "[w]e are not in the habit of putting investment grade ratings on worthless securities."

217.    Analysts accepted Ambac's statements about the performance of its CDO and RMBS exposures. For example, Banc of America on October 24, 2007 issued a report entitled, "In Our View, It'll Be Worth the Ride." The report accepted Ambac's assurance that its portfolio should not be compared to the weak securities in the marketplace, reiterating the Company's mantra: "*Underwriting discipline is the key to the divergence we expect to see between the performance of Ambac's insured portfolio and the continued deterioration in the general marketplace.*" (Emphasis added.) A Fox-Pitt report dated October 24, 2007 highlighted that "[t]he company indicated" that the two HELOC deals driving the increased loss reserves "were uncharacteristic of other deals" and "[t]he Company stated that there are no other deals like these." A William Blair analyst report concluded that the reserves for the two HELOC transactions were not "indicative of any specific problems within the HELOC segment."

218.    The above statements by the Individual Defendants were designed to assure the market that Ambac's RMBS-related direct and derivative exposures remained safe. Many investors and analysts credited these statements which were false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

    a.    Ambac had lowered its underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and that the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics which were so severe as to require substantially higher loss reserves and mark-to-market write-downs. (*See* CAC ¶¶76-91, 111-145, 259-307). Accordingly, Wallis's statement that the two downgraded deals were "idiosyncratic" is false because those deals actually reflected a broad sample of the portfolio.

    b.    Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of these negative trends but did not disclose them, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

    c.    Ambac's "proprietary model" to mark its CDS exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices. (*See* CAC ¶¶111-127).

d.   Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS. Had Ambac's financial statements for the quarterly period ended September 30, 2007 properly accounted for the mark-to-market write-down of $8.923 billion, Ambac's reported net earnings would have declined from a reported loss of $361 million to a loss of $6,314 billion, and its earnings per diluted share would have declined from a reported loss of $3.53 per share to a loss of $61.73 per share. (*See* CAC ¶¶134-145, 143)

### 3.   The November 1, 2007 CNBC Interview

219.   On November 1, 2007, defendant Genader gave an interview on the floor of the New York Stock Exchange that was broadcast on CNBC. Genader stated that:

First of all, we use our own ratings, and so we rate the transactions. All of them are Triple A. And how we actually dig into them is that we drill down. In the case of some of our transactions we will look at 15,000 individual [Cusips], we will then project current rates of loss, and future rates. We are very comfortable with that portfolio and our detailed analysis that we update every single month.

220.   Defendant Genader also reassured the market that "there clearly is a disconnect between the value of our portfolio, which is in very good shape, versus what has happened in the stock price in the last couple of months;" that "[o]ur company is very solid and very safe;" and that Ambac's "stock price is definitely too low." Genader also stated that Ambac engages in "good selection and the initial underwriting" and "[g]ood modeling to ensure that you are dealing with the best possible issuers." Defendant Genader insisted that "[o]ur performance, as Ambac, is very different than the rest of the market."

221.   The above statements were false and misleading because Genader misrepresented and/or failed to disclose that:

a.   After Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics which were so severe as to require substantially higher reserves. (*See* CAC ¶¶76-91, 111-145, 259-307).

b.   Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of these negative trends but did not disclose them, or Ambac misrepresented its surveillance process. (*See* CAC ¶¶97-105).

c.     Ambac's proprietary model used to mark its CDO exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices. (*See* CAC ¶¶111-127).

### 4.     The November 6, 2007 Press Release

222.   On November 2, 2007, Morgan Stanley issued a report that lowered the firm's ratings on the financial guarantee industry to "in-line" from "attractive" and raised concerns that additional losses at Ambac could force the Company to raise capital to protect its triple-A rating. The report openly questioned whether Ambac should be placing greater reliance on the ABX and TABX indices when marking its own CDS exposures.

223.   Ambac attempted to refute the report in an extraordinary press release on November 6, 2007. The press release disputed the analyst's contention that Ambac's reported mark-to-market losses were too low compared to Merrill Lynch's recently disclosed write-downs on seemingly similar CDO exposures, stating, *inter alia,* that "[s]everal differences may exist between exposures contained in Ambac's portfolio and an investment bank's portfolio and therefore may influence the estimated mark of the different portfolios." These differences could include exposure to different vintages of mortgages, "the amount of first loss subordination and credit migration triggers present in a structure," and that "Ambac CDS contracts do not include collateral posting provisions, and are generally limited to payment shortfalls of interest and principal," which "have significant value, particularly in difficult markets." As to its mark-to-market valuation, Ambac also stated:

Ambac believes that only through rigorous analytics of the actual transaction and its attributes and protections, as well as performance to date and expected future performance of underlying collateral, will one obtain meaningful information on the potential for actual losses.

224.   The above statements were materially false and misleading because, irrespective of Ambac's claims of potential differences between its and a typical investment banks' CDO exposures, in fact, the performance of the collateral in Ambac's CDO exposures was closely following the performance of the general market. Ambac's CDO exposures were not performing better, as Ambac suggested, but in fact were deteriorating just as rapidly. Accordingly, Ambac's mark-to-market losses were much higher than the losses it had reported at this time. (*See* ¶¶125-137). Ambac's statements were also false and misleading because, while Ambac suggested that "an unrealized loss

may not result in an increased expectation of loss," in fact, Ambac's CDO exposures were deteriorating at a rate at which realized losses were virtually certain.

225.    The November 6, 2007 press release disputed the analyst's ass'rtion that "[w]e are increasing our CDO loss expectations for both Ambac and MBIA to reflect an updated tally of various market opinions about cumulative sub prime losses." The press release responded that:

> It appears that the "various market opinions" referred to in the analyst's report relate to the 2006 and early 2007 vintage sub prime. *It also appears that he is assuming that the Ambac ABS CDO book will reflect the performance of the ABX index of 2006 and 2007 vintage sub prime collateral and ignores the actual vintage diversification and asset quality triggers inherent in Ambac's book.* (Emphasis added.)

226.    This statement was materially false and misleading because, as set forth at ¶¶111-127, irrespective of Ambac's claims of potential differences between the collateral underlying its CDO exposures and that underlying the ABX indices, in fact, the collateral in Ambac's CDO exposures was closely following the performance of the pertinent ABX indices' RMBS collateral. Accordingly, Ambac was required to take larger mark-to-market write-downs than it had to date. (*See* ¶¶125-137).

227.    Ambac concluded its release by stating that "we have a rigorous and current review and rating process in place and we will react quickly as projected collateral performance changes."

228.    This statement was materially false and misleading because Ambac had already seen significant collateral deterioration in its RMBS and CDO exposure but had not reacted accordingly or disclosed that deterioration.

### 5.    The November 7, 2007 Conference Call

229.    On November 7, 2007, Ambac held a public senior management conference call. The purpose of the call was to correct what defendant Genader described as "a significant and painful [stock price] drop in the last few weeks that has been caused by a number of misperceptions about the industry in general and misperceptions about Ambac specifically.... I hope to be able to calm the stories and restore the faith in the credit underwriting skills and surveillance and remediation capabilities that this Company has displayed for more than 35 years." These "misperceptions" were, *inter alia*, that: (1) "mark-to-market equals real losses," (2) "Ambac's insured portfolio mirrors the

ABX," (3) "rating agencies are about to downgrade" Ambac, and that (4) Ambac's "$14 billion capital is inadequate." Genader also stated that "Ambac underwrites to withstand stretched market conditions," and that he was "pleased with the results of our most recent drill-down analysis of our CDO squared portfolio" and "[o]ur track record of risk taking has been proven."

230.     Defendant Leonard added that an "unrealized mark-to-market on an investment grade credit is not expected to result in a loss." Defendant Wallis stated that Ambac was "giving our HELOC and closed-end second portfolios particular scrutiny," and that the reserves Ambac took in the third quarter "encompass what we believe to be reasonable whole-life estimates of potential future claims, principally with regard to investment bank shelf HELOC transactions." Wallis also assured investors that there were only "limited cases where we are experiencing issues such as those referenced above," and that "[w]e will continue to take timely and appropriate internal rating and reserving actions as future performance and analysis dictates."

231.     The above statements by the Individual Defendants were false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.      After mortgage originators lowered their underwriting standards, Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. This deterioration was so severe as to require substantially higher loss reserves and mark-to-market write-downs. (*See* CAC ¶¶76-91, 111-145, 259-307).

b.      Leonard's insistence that reported mark-to-market losses did not indicate realized losses omitted that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices. (*See* CAC ¶¶111-127).

c.      Wallis's assurances about Ambac's HELOC and CES exposures falsely omitted that the weaker characteristics and poor performance extended far beyond the two deals giving rise to the disclosed reserve increases. (*See* CAC ¶¶128-133, 293-307).

d.      Ambac's CDO exposures were deteriorating rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time. (*See* CAC ¶¶134-145).

e.      Due to the real and dramatic deterioration in the underlying assets of Ambac's RMBS-related portfolio, Ambac's $14 billion capital was inadequate and,

accordingly, Ambac was in danger of losing and ultimately did lose its AAA rating from all three rating agencies. (*See* CAC ¶¶111-145, 259-307.)

### 6.    The Third Quarter 2007 Form 10-Q

232.    On November 9, 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended September 30 2007 (the "3Q:07 Form 10-Q"). The 3Q:07 Form 10-Q was signed by defendant Leonard and included as exhibits Sarbanes-Oxley Certifications signed by defendants Genader and Leonard that made the representations set forth at ¶142, *supra*.

233.    The 3Q:07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP. The 3Q:07 Form 10-Q reported the same reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the October 24, 2007 press release, as set forth in ¶202.

234.    The 3Q:07 Form 10-Q disclosed active credit reserves of $166.7 million and case base reserves of $822.1 million at September 30, 2007, with the increase in case base reserves attributed to the default of several mortgage-backed transactions. Like Ambac's prior Form 10-Q's, the 3Q:07 Form 10-Q touted Ambac's establishment of active credit reserves using "historical default information" and "internally developed loss severity assumptions", and Ambac's "active surveillance" to identify "adversely classified" credits quoted. The 3Q:07 Form 10-Q also repeated the statements in the 2Q:07 Form 10-Q that (1) "Loss severity estimates are based upon available evidence" and (2) "Ambac's exposure to CDOs in its classified credit portfolio is currently limited."

235.    The above statements were materially false and misleading for the reasons set forth in ¶216, above.

### 7.    The November 13, 2007 Form 8-K

236.    On November 13, 2007, Ambac filed with the SEC a Form 8-K that contained "Frequently Asked Questions" ("FAQs") that were originally posted on Ambac's website on November 9, 2007. The FAQs represented that:

> Ambac does not rely on the agencies in either approving transactions or assigning internal ratings to the deals it approves. *We conduct our own independent analysis of each transaction and the transaction is reviewed by one of our respective Senior Credit Committees pursuant to our credit process and policies.* The Committee also evaluates the recommended rating for the transaction at that time. Closed transactions

are analyzed by our Portfolio Risk Management Group; and our original internal ratings are confirmed or revised, as appropriate. (Emphasis added.)

237. The FAQs also stated that, "absent any real credit losses, any MTM adjustments will reverse over time" and that "[i]n fact, Ambac is not a proxy for the mortgage market: we are not a mortgage guarantor, *we did not wrap any of the deals on the ABX index* and we have wrapped only a fraction of the hundreds of deals that have been downgraded by S&P, Moody's and Fitch." With respect to Ambac's RMBS underwriting, the FAQs represented that Ambac's subprime RMBS exposure "has steadily decreased ... [as] a result of Ambac having been very selective in underwriting new direct RMBS exposure in the last two years." (Emphasis added.)

238. The FAQs also represented that "[o]f the $18.2bn of HELOC and Closed End Seconds, over 91% ha[ve] performed within our expectations and [are] currently rated by AMBAC at or above the assigned ratings given at the time the transactions closed" and that "Ambac believes that the risk of loss [for its mezzanine CDO exposures] remains at an investment grade level."

239. The above statements were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a. After mortgage originators lowered their underwriting standards, Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. This deterioration was so severe as to require substantially higher loss reserves and mark-to-market write-downs. (*See* CAC ¶¶71-91, 111-145, 259-307.)

b. Notwithstanding Ambac's claim that it "did not wrap any of the deals on the ABX index," in fact, about two-thirds of those deals were included in Ambac's CDO exposures. (*See* CAC ¶121.)

c. Ambac's insistence that reported mark-to-market losses did not indicate realized losses omitted that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices. Ambac's CDO exposures were deteriorating rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time. (*See* CAC ¶¶111-127, 134-145.)

d. Ambac's HELOC and closed-end second portfolios in fact were experiencing substantial deterioration, and the problems in those portfolios were not limited as Ambac suggested. Nor had Ambac engaged in the "very selective underwriting" of its RMBS direct exposures that it claimed. (*See* CAC ¶¶76-91, 128-133.)

e.    Either Ambac conducted the surveillance it claimed, and the Individual
      Defendants knew of these negative trends, or Ambac misrepresented its
      surveillance process. (*See* CAC ¶¶97-105.)

### 8.    The November 27, 2007 Banc of America Conference

240.    On November 27, 2007, defendants Leonard and Wallis spoke at a Banc of America

Bond Insurance Mini-Conference.  Leonard stated that Ambac's "business model is investment grade

underwriting."

241.    Defendant Wallis was also asked "What's going on in the high-yield collateralized

CDOs? ... And are you going to disclose anything about what you're seeing there?" In response,

Wallis reassured investors that "*they're performing just fine. We're not anticipating losses in that*

*portfolio.*" (Emphasis added.) He also reassured investors that, with respect to CDOs, "in relation to

the physical payment of cash ... we don't anticipate that."

242.    The above statements were materially false and misleading because the Individual

Defendants misrepresented and/or failed to disclose that:

a.    Ambac had lowered its own underwriting standards to allow it to accept
      greater risk characteristics in various second-lien RMBS exposures and in
      CDOs backed by RMBS. (*See* CAC ¶¶76-91.)

b.    As a result of Ambac's lower underwriting standards, the collateral
      supporting Ambac's RMBS-exposures and CDOs backed by RMBS showed
      negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-
      133.)

c.    While Wallis stated that Ambac would make no payments on its high grade
      CDO exposures, in fact, the underlying RMBS collateral in Ambac's CDO
      exposures was deteriorating at a rate at which actual losses were likely. (*See*
      CAC ¶¶111-127, 134-145.)

### 9.    The November 28, 2007 Friedman Billings Conference

243.    On November 28, 2007, defendant Genader gave a presentation at a Friedman

Billings Capital Markets Investor Conference. Defendant Genader stated that "mark-to-market" is an

issue that does not impact Ambac's business operations. He also stated that "[o]ur transactions do not

replicate the ABX Index," and that "this [the ABX] is not Ambac.'" With respect to the performance

of Ambac's HELOC portfolios, Genader stated that "[w]eve learned that the bank-originated shelves

perform better than the investment-bank originated shelves," and that "[o]ur two deals that we took reserves on were investment-bank shelves in the HELOC sector."

244.   The above statements were materially false and misleading because Genader misrepresented and/or failed to disclose that:

a.   The performance of the collateral in Ambac's CDO exposures was closely following the performance of the general market indices; Ambac's CDO exposures were not performing better, as Ambac was suggesting, but in fact, were deteriorating just as rapidly; and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time. (*See* CAC ¶¶111-127, 134-145.)

b.   Ambac's RMBS-related portfolio experienced significant deterioration requiring massive mark-to-market losses and increased reserves, and the weak underwriting characteristics and deterioration evident in Ambac's RMBS portfolio went far beyond the two HELOC investment bank transactions identified to date. (*See* CAC ¶¶111-145, 259-307.)

## F.   Fourth Quarter 2007 Statements

### 1.   The December 27, 2007 Form 8-K

245.   On December 27, 2007, Ambac filed with the SEC a Form 8-K that contained "Frequently Asked Questions" that were originally posted on Ambac's website on December 20 and 26, 2007. The FAQs included the same statements that were made in Ambac's November 13, 2007 FAQs quoted in ¶¶234-235 regarding, in part, Ambac's underwriting and surveillance activities; Ambac's mark-to-market adjustments; Ambac not being "a 'proxy for the mortgage market;'" and Ambac's "selective" RMBS underwriting. Ambac also asserted that it

does not rely on the agencies in either approving transactions or assigning internal ratings to the deals it approves. We conduct our own independent analysis of each transaction and the transaction is reviewed by one of our respective Senior Credit Committees pursuant to our credit process and policies. The Committee also evaluates the recommended rating for the transaction at that time. Closed transactions are analyzed by our Portfolio Risk Management Group; and our original internal ratings are confirmed or revised, as appropriate.

246.   The above statements were materially false and misleading for the same reasons set forth in ¶234.

### 2.   The January 16, 2008 Press Release

247.   On January 16, 2008, Ambac issued a press release in which it announced, *inter alia*, that it was cutting its dividend, had replaced defendant Genader with Callen as interim CEO, and

estimated a $5.4 billion mark-to-market loss on its credit derivative portfolio for the quarter, including a $1.1 billion credit impairment. The press release also stated that Ambac expected to report a net loss "of up to $32.83" for the quarter.

248.    The press release disclosed that the loss was due to Ambac's "fourth quarter fair value review of its outstanding credit derivative contracts," and that, outside of the $1.1 billion credit impairment charge taken by Ambac, "*Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims* and that, in the absence of further credit impairment, the cumulative marks would be expected to reverse over the remaining life of the insured transactions." (Emphasis added.) The press release also disclosed that Ambac expected to report a $143 million pre-tax loss provision "relates primarily to underperforming home equity line of credit and closed-end second lien RMBS securitizations."

249.    The press release was materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.      The performance of the collateral in Ambac's CDO exposures was closely following the performance of the general market indices; Ambac's CDO exposures were not performing better, as Ambac was suggesting, but in fact were deteriorating just as rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time. (*See* CAC ¶¶111-127, 134-145.)

b.      The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS- backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly. (*See* CAC ¶¶134-145, 259-307.)

c.      Ambac's reported write-down as of December 31, 2007, of only $5.4 billion, was materially lower than an appropriate write-down based upon the actual performance of Ambac's CDS portfolio at that time, which would have reflected underlying collateral deterioration. Thus, for the entire year of 2007, Ambac only took a total of approximately $6.1 billion write-down on its CDO of RMBS. Ambac was required by GAAP and SFAS 133 to write-down at least $17 billion for the year end December 31, 2007 relating to its CDS on CDO of ABS from 2006-2007. Had Ambac's financial statements for the year ended December 31, 2007 properly accounted for the mark-to-market write-down, Ambac's reported net earnings for the year would have declined from a reported loss of $3.24 billion to a loss of $10.45 billion, and its earnings per

diluted share would have declined from a reported loss of up to $32.83 per share to a loss of $101.57 per share. (*See* CAC ¶¶134-145, 145.)

d.     Due to the undisclosed dramatic deterioration in the underlying assets of Ambac's direct RMBS exposure, Ambac's reserves for the quarter were materially understated, and Ambac's net assets and liabilities, income and income per share were materially overstated. (*See* CAC ¶¶128-133, 293-307.)

### 3.     The January 22, 2008 Press Release and Conference Call

250.     On January 22, 2008, Ambac issued a press release announcing its fourth quarter 2007 financial results. For the quarter, Ambac reported a net loss of $3.25 billion, or $31.85 per share. Financial guarantee net mark-to-market losses on credit derivatives contracts were $5.2 billion, including an estimated credit impairment of $1.1 billion. Ambac's loss and loss expense reserve was $484.3 million, an increase from $255.8 million at the end of the prior quarter.

251.     The press release quoted Callen, Ambac's CEO after Genader's resignation, stating that "[w]e view the current perceptions of Ambac's business by both the market and ratings agencies as underestimating Ambac's strengths and future potential" and that "we believe that Ambac can realize new business opportunities in our core markets and through reinsurance while we strengthen our capital position further to maintain our triple-A ratings under S&P and Moody's and seek to regain it under Fitch." The press release also stated that "management remains confident that Ambac's capital position and claims paying ability remain strong. Management is equally confident in Ambac's insured portfolio and the Company's ability to support policyholder liabilities."

252.     The press release disclosed that Ambac's Active Credit Reserves "increased by $196.7 million during the quarter, from $166.7 million at September 30, 2007 to $363.4 million at December 31, 2007," and that "[t]he increase was driven by unfavorable credit activity within the home equity line of credit and closed-end second lien RMBS portfolio, partially offset by favorable credit activity within the public finance portfolio."

253.     During Ambac's conference call that day, Callen stated that "[t]he loss estimates incorporated into Ambac's stock price today and loss assumptions supporting various models cited in the market are very disparate and drastic; and personally, I cannot find the logic underlying these assumptions." Also, defendant Leonard continued to assure the market that: "Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future

- 72 -

claims, and that in the absence of further credit impairment, that the cumulative marks would be expected to reverse over the remaining life of the insured transactions."   In response to an analyst question, defendant Leonard also stated that Ambac had "obviously analyzed the portfolio very thoroughly" and that "while we do have some impairment and that has been a confidence type issue, we are confident in what we have done."

254.     The above statements were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.      Contrary to Callen's statements that the current market perceptions were "underestimating Ambac's strengths and future potential" and that Ambac could "strengthen our capital position further to maintain our triple-A ratings," in fact, Ambac was in a precarious financial position. The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS- backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly. (See CAC ¶¶111-145, 259-307).

b.      Callen's critique of the "loss assumptions" supporting various models cited in the market hid the breadth of the actual deterioration of the collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS. (See CAC ¶¶111-145, 259-307).

c.      The reported write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDO exposure at that time, which would have reflected underlying collateral deterioration. (See CAC ¶¶134-145). Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time. (See CAC ¶¶111-145, 259-307).

### 4.     Ambac's 2007 Form 10-K

255.     On February 29, 2008, Ambac filed with the SEC its Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K").   The 2007 Form 10-K was signed by defendant Leonard and included as exhibits Sarbanes-Oxley Certifications signed by defendant Leonard. These Certifications made the identical representations set forth at ¶142, *supra*. The 2007 Form 10-K also contained the same representation that the Consolidated Financial Statement were prepared in accordance with GAAP as in the 2006 Form 10-K.

256.    The 2007 Form 10-K reported the same reserves, mark-to-market adjustments, credit impairment, net earnings and net earnings per share, as reported in the January 22, 2008 press release, as set forth in ¶240, *supra.*

257.    The above statements because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.     The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly. (*See* CAC ¶¶111-145, 259-307).

b.     After mortgage originators lowered their underwriting standards, Ambac lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* CAC ¶¶76-91).

c.     As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS showed severely negative trends in delinquencies and other key metrics. (*See* CAC ¶¶111-133).

d.     The reported write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDO portfolio at that time, which would have reflected underlying collateral deterioration (*See* CAC ¶¶ 134-145, *supra*). Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time. (*See* CAC ¶¶134-145, 259-307).

e.     Ambac's financial statements for the year ended December 31, 2007 violated GAAP by materially misstating Ambac's assets and liabilities, net income and income per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on its direct RMBS exposures. Instead of reporting a loss of $3.24 billion, Ambac should have reported a loss of $10.45 billion for the year 2007. (*See* CAC ¶¶134-145, 145).

### 5.    The March 14, 2008 Chairman's Letter

258.    On March 14, 2008, Ambac issued a letter by Callen to Ambac's "policyholders, clients, shareholders and friends." The letter represented that:

Ambac has over $15 billion of claims-paying resources, sufficient to meet Moody's and S&P's criteria to retain a triple-A rating. Additionally, our capital base will build further as other judicious capital strengthening actions are implemented.

- 74 -

259.    The letter also asserted that:

*Loss projections that you read and hear about are simply that - projections. They are based on limited data and the numbers that get the headlines are stress case losses, not expected losses.* We remain confident that Ambac will weather the storm. With over $15 billion in claims-paying resources behind all we do, no investor in an Ambac-insured security should worry that they will miss a principal or interest payment.

*Ambac never considered a "bailout." Bailouts are for firms that are facing insolvency....*

*Lost amidst all the noise and market volatility is the simple fact that most of Ambac's insurance portfolio is performing strongly. The issues in Ambac's portfolio arise largely from four transactions, the "CDO-squareds," that account for the vast majority of our potential losses.* (Emphasis added.)

260.    These statements were materially false and misleading because the Individual Defendants misrepresented and/or failed to disclose that:

a.      Contrary to Callen's statements that Ambac had sufficient claims-paying resources "sufficient to retain a triple-A rating" and that Ambac was not facing "insolvency," Ambac in fact was in a precarious financial position. The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly. (*See* CAC ¶¶134-145, 259-307).

b.      Ambac's insurance portfolio was not "performing strongly" and the "issues" were not confined to four CDOs. As Ambac later conceded on its April 23, 2008 conference call and thereafter, the "issues" spilled over to numerous closed-end seconds and HELOC transactions – on which Ambac began incurring substantial reserves – as well as Ambac's "high-grade" CDOs backed by RMBS. (*See* CAC ¶¶111-145, 259-307).

## THE INDIVIDUAL DEFENDANTS ALSO CAUSE AMBAC TO ISSUE SECURITIES OFFERINGS CONTAINING FALSE AND MISLEADING INFORMATION

261.    Between October 2006 and April 2008, Ambac completed three securities offerings, which are identified below. The registration statements and prospectuses Ambac filed with the SEC pursuant to these offerings contained many of the false and misleading SEC filings and press releases discussed in detail above.

## A.    February 2007 DISCS Offering

262.    On February 6, 2007, Ambac filed with the SEC a post-effective amendment to an automatic shelf registration on Form S-3, dated February 16, 2006 ("Post-Effective Amendment No. 1"), in connection with the February 2007 Directly-Issued Subordinated Capital Securities ("DISCS") Offering ("February 2007 DISCS Offering").

263.    On February 7, 2007, Ambac filed with the SEC a prospectus supplement whereby Ambac offered $400 million of DISCS, which are unsecured subordinated debt instruments (together with Post-Effective Amendment No. 1, hereinafter referred to as the "DISCS Registration Statement/Prospectus"). The DISCS were priced at 99.335% of their par face value, for a total price to the public of $397.34 million. After underwriting commissions, Ambac realized approximately $393 million. At the close of trading on July 25, 2008, the DISCS were priced at $26.35.

264.    The DISCS Registration Statement/Prospectus incorporated by reference certain documents which, as set forth hereafter, contained misrepresentations and/or omissions of material fact, including: Ambac's Form 10-Q for the quarter ended September 30, 2006 and Ambac's Form 8-Ks filed on October 25, 2006 and January 31, 2007.

## B.    March 2008 Equity Units Offering

265.    On January 16, 2008, Ambac filed with the SEC a post-effective amendment to an automatic shelf registration statement on Form S-3, dated February 16, 2006 ("Post-Effective Amendment No. 2").

266.    On March 6, 2008, Ambac filed with the SEC a prospectus supplement in connection with the offering of 5,000,000 equity units (the "Equity Units") at $50.00 per Equity Unit ("March 2008 Equity Units Offering"). The Equity Units were trading at $34.50 at the close of trading on August 21, 2008.

267.    The Post-Effective Amendment No. 2 and prospectus supplement (the "Equity Units Registration Statement/Prospectus") incorporated by reference certain documents which, as set forth hereafter, contained misrepresentations and/or omissions of material fact, including: Ambac's annual reports on Form 10-K for the fiscal years ended December 31, 2006 and December 31, 2007, Ambac's Form 10-Qs for the quarters ended March 31, 2007, June 30, 2007 and September 30, 2007,

and Ambac's Form 8-Ks filed on January 31, 2007, April 25, 2007, July 25, 2007, October 24, 2007, January 16, 2008 and January 22, 2008 which, as set forth hereafter, contained misrepresentations and omissions of material fact.

268.    The March 2008 Equity Units Offering raised approximately $250 million. After underwriting commissions, Ambac realized approximately $242.5 million.

## C.    March 2008 Common Stock Offering

269.    On March 6, 2008, Ambac filed with the SEC a prospectus supplement related to a shelf registration statement in connection with the offering of 171,111,112 shares of common stock at $6.75, plus an additional 25,666,667 shares of common stock in over-allotment options (the "Common Stock Prospectus"; together with Post-Effective Amendment No. 2, the "Common Stock Registration Statement/Prospectus"). Ambac's common stock was trading at $4.93 at the close of trading on August 21, 2008.

270.    The Common Stock Registration Statement/Prospectus incorporated by reference Ambac's annual report on Form 10-K for the fiscal years ended December 31, 2006 and December 31, 2007, Ambac's Form 10-Q for the quarters ended March 31, 2007, June 30, 2007 and September 30, 2007, and Ambac's Form 8-Ks filed on January 31, 2007, April 25, 2007, July 25, 2007, October 24, 2007, January 16, 2008 and January 22, 2008 which, as set forth hereafter, contained misrepresentations and omissions of material fact.

271.    The March 2008 Common Stock Offering raised approximately $1.15 billion. After underwriting commissions, Ambac realized approximately $1.09 billion.

272.    The March 2008 Equity Units Offering and the March 2008 Common Stock Offering are together referred to as the "March 2008 Offerings."

## THE IMPROPER BUYBACK

273.    During the Relevant Period, while Ambac's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $837 million worth of Ambac's shares at an average price of approximately $86.36 per share, which is nearly 60 times higher than Ambac's current share price of approximately $1.44 per share, while selling their own Ambac stock holdings at an average price of $82.92 per share during the Relevant

Period. On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's exposure to the subprime mortgage lending and credit crises. While Ambac was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

274.   The Company has acknowledged since October 2005 that the market for CDOs was tough. For example, in the Company's October 19, 2005 press release detailing its financial results for the third quarter of 2005, Ambac's former CEO, defendant Genader, noted that the Company's operating results were "pretty good considering the tight credit spreads and increased market competition." In a July 26, 2006 press release announcing second quarter 2006 results, defendant Genader again recognized the "suboptimal business environment," a tacit acknowledgment of the beginning of the subprime market meltdown. In a press release for the fourth quarter 2006 financial results, defendant Genader noted that the Company's results were acceptable "[d]espite one of the most difficult business environments the industry has faced in many years."

275.   Despite the admittedly tough market, the entire Board authorized and implemented two different stock repurchases. On May 3, 2005, the Board authorized a stock repurchase of up to 6 million shares, bringing the total repurchase authorization at that time to 18 million shares. The Individual Defendants then caused the Company to waste $329 million repurchasing 4.6 million shares. The Board authorized an additional repurchase of 6 million shares in October 2006, despite knowledge of difficulties in the industry leading to the subprime meltdown. The Individual Defendants then caused the Company to repurchase 5.8 million shares over the next eighteen months – as the Company was disintegrating before their very eyes. Most egregiously, Defendants authorized the Company to spend over $355 million repurchasing nearly 4 million shares at an average price of $93.87 in February 2007, the same month that the subprime market crashed with news of bankruptcies and skyrocketing mortgage default rates. The Insider Selling Defendants, particularly defendants Bienstock, Doyle, Gandolfo, Genader, Lassiter, McDonough, McKinnon, Renfield-Miller, Shoback, Uhlein and Wallis fared significantly better, selling over $20 million in personally held stock that same month. Even worse, the Individual Defendants continued to cause the Company to repurchase over $93 million in stock between March and August 2007 at massively

inflated prices. During this period, the Insider Selling Defendants dumped another $13 million in stock. The sellers included defendant Callen, who sold over $347,000 stock, and defendant Grenader, the former chairman of the Board and CEO, who disposed of nearly $10.2 million in stock. These massive stock repurchases and selling off personal stock took place all while the nation's largest subprime lender, New Century Corporation, filed for bankruptcy, and lender Countrywide and hedge funds throughout the country, most notably Bear Stearns, collapsed.

### DAMAGES TO AMBAC CAUSED BY THE INDIVIDUAL DEFENDANTS

276.    As a result of the Individual Defendants' improprieties, Ambac disseminated improper statements concerning its business prospects as alleged above. These improper statements have devastated Ambac's credibility as reflected by the Company's $9.379 billion market capitalization loss.

277.    Further, as a direct and proximate result of the Individual Defendants' action, Ambac has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

    (a)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Ambac;

    (b)    costs incurred from the $579 million that the Company spent repurchasing its own stock; and

    (c)    costs incurred from defending itself against securities lawsuits filed against the Company.

278.    Moreover, these actions have irreparably damaged Ambac's corporate image and goodwill. For at least the foreseeable future, Ambac will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Ambac's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### INSIDER SELLING

279.    The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect. They also knew that the misstatements would create an inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information

to sell their personally held stock for considerably more than they were worth. Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Ambac's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BIENSTOCK | 10/31/2005 | 185 | $70.71 | $13,081.35 |
| | 10/31/2005 | 400 | $70.72 | $28,288.00 |
| | 10/31/2005 | 200 | $70.73 | $14,146.00 |
| | 10/31/2005 | 100 | $70.74 | $7,074.00 |
| | 10/31/2005 | 300 | $70.78 | $21,234.00 |
| | 10/31/2005 | 2,900 | $70.79 | $205,291.00 |
| | 10/31/2005 | 200 | $70.80 | $14,160.00 |
| | 11/15/2005 | 3,015 | $75.75 | $228,386.25 |
| | 11/22/2005 | 1,039 | $76.13 | $79,099.07 |
| | 2/1/2006 | 393 | $76.83 | $30,194.19 |
| | 2/1/2006 | 130 | $76.83 | $9,987.90 |
| | 2/1/2006 | 2 | $76.83 | $153.66 |
| | 3/20/2006 | 2,000 | $81.50 | $163,000.00 |
| | 3/20/2006 | 2,200 | $81.51 | $179,322.00 |
| | 3/20/2006 | 1,500 | $81.52 | $122,280.00 |
| | 3/20/2006 | 793 | $81.54 | $64,661.22 |
| | 3/20/2006 | 400 | $81.55 | $32,620.00 |
| | 8/30/2006 | 100 | $87.19 | $8,719.00 |
| | 8/30/2006 | 5,900 | $87.20 | $514,480.00 |
| | 8/30/2006 | 1,900 | $87.21 | $165,699.00 |
| | 8/30/2006 | 1,000 | $87.22 | $87,220.00 |
| | 8/30/2006 | 900 | $87.23 | $78,507.00 |
| | 8/30/2006 | 200 | $87.24 | $17,448.00 |
| | 12/18/2006 | 500 | $90.03 | $45,015.00 |
| | 12/18/2006 | 800 | $90.05 | $72,040.00 |
| | 12/18/2006 | 500 | $90.06 | $45,030.00 |
| | 12/18/2006 | 500 | $90.07 | $45,035.00 |
| | 12/18/2006 | 1,000 | $90.08 | $90,080.00 |
| | 12/18/2006 | 800 | $90.09 | $72,072.00 |
| | 12/18/2006 | 900 | $90.10 | $81,090.00 |
| | 12/18/2006 | 300 | $90.11 | $27,033.00 |
| | 12/18/2006 | 1,900 | $90.13 | $171,247.00 |
| | 12/18/2006 | 1,500 | $90.15 | $135,225.00 |
| | 12/18/2006 | 400 | $90.17 | $36,068.00 |
| | 12/18/2006 | 1,600 | $90.18 | $144,288.00 |
| | 12/18/2006 | 200 | $90.19 | $18,038.00 |
| | 12/18/2006 | 1,100 | $90.20 | $99,220.00 |
| | 2/2/2007 | 1,406 | $88.53 | $124,473.18 |
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/2/2007 | 284 | $88.53 | $25,142.52 |
| | 2/2/2007 | 95 | $88.53 | $8,410.35 |
| | | 40,010 | | $3,365,990.73 |
| | | | | |

| CALLEN | 10/21/2005 | 5,000 | $69.12 | $345,600.00 |
|---|---|---|---|---|
|  | 5/11/2006 | 3,000 | $83.30 | $249,900.00 |
|  | 4/27/2007 | 2,300 | $92.62 | $213,026.00 |
|  | 4/27/2007 | 200 | $92.63 | $18,526.00 |
|  | 4/27/2007 | 750 | $92.64 | $69,480.00 |
|  | 4/27/2007 | 500 | $92.65 | $46,325.00 |
|  |  | 11,750 |  | $942,857.00 |
|  |  |  |  |  |
| DOYLE | 11/2/2005 | 12,910 | $74.70 | $964,377.00 |
|  | 1/27/2006 | 181 | $76.64 | $13,871.84 |
|  | 3/16/2006 | 4,900 | $80.50 | $394,450.00 |
|  | 3/16/2006 | 500 | $80.51 | $40,255.00 |
|  | 3/16/2006 | 100 | $80.53 | $8,053.00 |
|  | 3/16/2006 | 100 | $80.55 | $8,055.00 |
|  | 3/16/2006 | 2,000 | $80.56 | $161,120.00 |
|  | 3/16/2006 | 600 | $80.57 | $48,342.00 |
|  | 3/16/2006 | 100 | $80.60 | $8,060.00 |
|  | 3/16/2006 | 100 | $80.61 | $8,061.00 |
|  | 3/16/2006 | 200 | $80.66 | $16,132.00 |
|  | 3/16/2006 | 3,900 | $80.67 | $314,613.00 |
|  | 3/16/2006 | 500 | $80.68 | $40,340.00 |
|  | 3/16/2006 | 1,208 | $80.69 | $97,473.52 |
|  | 3/16/2006 | 900 | $80.71 | $72,639.00 |
|  | 3/16/2006 | 2,900 | $80.79 | $234,291.00 |
|  | 2/2/2007 | 1,101 | $88.53 | $97,471.53 |
|  | 2/2/2007 | 481 | $88.53 | $42,582.93 |
|  | 2/2/2007 | 181 | $88.53 | $16,023.93 |
|  | 2/16/2007 | 300 | $90.43 | $27,129.00 |
|  | 2/16/2007 | 400 | $90.44 | $36,176.00 |
|  | 2/16/2007 | 900 | $90.45 | $81,405.00 |
|  | 2/16/2007 | 100 | $90.46 | $9,046.00 |
|  | 2/16/2007 | 200 | $90.49 | $18,098.00 |
|  | 2/16/2007 | 700 | $90.50 | $63,350.00 |
|  | 2/16/2007 | 400 | $90.51 | $36,204.00 |
|  | 2/16/2007 | 800 | $90.52 | $72,416.00 |
|  | 2/16/2007 | 600 | $90.53 | $54,318.00 |
|  | 2/16/2007 | 200 | $90.55 | $18,110.00 |
|  | 2/16/2007 | 200 | $90.59 | $18,118.00 |
|  | 2/16/2007 | 100 | $90.60 | $9,060.00 |
|  | 2/16/2007 | 300 | $90.63 | $27,189.00 |
|  | 2/16/2007 | 100 | $90.64 | $9,064.00 |
|  | 2/16/2007 | 100 | $90.71 | $9,071.00 |
|  | 2/16/2007 | 400 | $90.72 | $36,288.00 |
|  | 2/16/2007 | 200 | $90.81 | $18,162.00 |
|  | 2/16/2007 | 100 | $91.01 | $9,101.00 |
|  | 2/16/2007 | 1,000 | $91.02 | $91,020.00 |
|  | 2/16/2007 | 300 | $91.03 | $27,309.00 |
|  | 2/16/2007 | 300 | $91.04 | $27,312.00 |
|  | 2/16/2007 | 400 | $91.05 | $36,420.00 |
|  | 2/16/2007 | 500 | $91.06 | $45,530.00 |
|  | 2/16/2007 | 400 | $91.08 | $36,432.00 |

| | 2/16/2007 | 300 | $91.09 | $27,327.00 |
|---|---|---|---|---|
| | 2/16/2007 | 200 | $91.10 | $18,220.00 |
| | 2/16/2007 | 300 | $91.11 | $27,333.00 |
| | 2/16/2007 | 100 | $91.12 | $9,112.00 |
| | 2/16/2007 | 100 | $91.13 | $9,113.00 |
| | 2/16/2007 | 200 | $91.15 | $18,230.00 |
| | 2/16/2007 | 200 | $91.17 | $18,234.00 |
| | 2/16/2007 | 200 | $91.18 | $18,236.00 |
| | 2/16/2007 | 200 | $91.19 | $18,238.00 |
| | 2/16/2007 | 700 | $91.20 | $63,840.00 |
| | 2/16/2007 | 400 | $91.21 | $36,484.00 |
| | 2/16/2007 | 700 | $91.22 | $63,854.00 |
| | 2/16/2007 | 300 | $91.23 | $27,369.00 |
| | 2/16/2007 | 300 | $91.24 | $27,372.00 |
| | 2/16/2007 | 1,400 | $91.25 | $127,750.00 |
| | 2/16/2007 | 300 | $91.26 | $27,378.00 |
| | 2/16/2007 | 300 | $91.27 | $27,381.00 |
| | 2/16/2007 | 300 | $91.29 | $27,387.00 |
| | 2/16/2007 | 200 | $91.30 | $18,260.00 |
| | 2/16/2007 | 200 | $91.31 | $18,262.00 |
| | 2/16/2007 | 200 | $91.32 | $18,264.00 |
| | 2/16/2007 | 100 | $91.33 | $9,133.00 |
| | 2/16/2007 | 300 | $91.36 | $27,408.00 |
| | 2/16/2007 | 100 | $91.38 | $9,138.00 |
| | 2/16/2007 | 200 | $91.41 | $18,282.00 |
| | 2/16/2007 | 200 | $91.42 | $18,284.00 |
| | 2/16/2007 | 100 | $91.43 | $9,143.00 |
| | 2/16/2007 | 100 | $91.45 | $9,145.00 |
| | 2/16/2007 | 100 | $91.46 | $9,146.00 |
| | 2/16/2007 | 100 | $91.47 | $9,147.00 |
| | 2/16/2007 | 100 | $91.49 | $9,149.00 |
| | 2/16/2007 | 100 | $91.50 | $9,150.00 |
| | 2/16/2007 | 100 | $91.52 | $9,152.00 |
| | 2/16/2007 | 100 | $91.53 | $9,153.00 |
| | 2/16/2007 | 200 | $94.14 | $18,828.00 |
| | | 50,862 | | $4,224,441.75 |
| | | | | |
| **GANDOLFO** | 1/27/2006 | 294 | $76.64 | $22,532.16 |
| | 5/3/2006 | 225 | $82.75 | $18,618.75 |
| | 5/3/2006 | 1,700 | $82.76 | $140,692.00 |
| | 5/3/2006 | 1,200 | $82.77 | $99,324.00 |
| | 5/3/2006 | 400 | $82.78 | $33,112.00 |
| | 5/3/2006 | 800 | $82.79 | $66,232.00 |
| | 5/3/2006 | 1,100 | $82.80 | $91,080.00 |
| | 5/3/2006 | 200 | $82.81 | $16,562.00 |
| | 2/2/2007 | 1,977 | $88.53 | $175,023.81 |
| | 2/2/2007 | 1,215 | $88.53 | $107,563.95 |
| | 2/2/2007 | 176 | $88.53 | $15,581.28 |
| | 2/9/2007 | 2,000 | $89.05 | $178,100.00 |
| | 2/9/2007 | 900 | $89.06 | $80,154.00 |
| | 2/9/2007 | 1,400 | $89.07 | $124,698.00 |

| | | | |
|---|---|---|---|
| | 2/9/2007 | 400 | $89.08 | $35,632.00 |
| | 2/9/2007 | 900 | $89.09 | $80,181.00 |
| | 2/9/2007 | 500 | $89.10 | $44,550.00 |
| | 2/9/2007 | 800 | $89.11 | $71,288.00 |
| | 2/9/2007 | 700 | $89.12 | $62,384.00 |
| | 2/9/2007 | 928 | $89.13 | $82,712.64 |
| | 2/9/2007 | 1,472 | $89.14 | $131,214.08 |
| | 2/9/2007 | 1,100 | $89.15 | $98,065.00 |
| | 2/9/2007 | 1,300 | $89.16 | $115,908.00 |
| | 2/9/2007 | 1,800 | $89.17 | $160,506.00 |
| | 2/9/2007 | 700 | $89.18 | $62,426.00 |
| | 2/9/2007 | 100 | $89.19 | $8,919.00 |
| | 2/9/2007 | 300 | $89.20 | $26,760.00 |
| | 2/9/2007 | 200 | $89.21 | $17,842.00 |
| | 2/9/2007 | 100 | $89.22 | $8,922.00 |
| | 2/9/2007 | 100 | $89.23 | $8,923.00 |
| | 2/9/2007 | 300 | $89.24 | $26,772.00 |
| | | 25,287 | | $2,212,278.67 |
| | | | | |
| GENADER | 11/2/2005 | 64,100 | $74.25 | $4,759,425.00 |
| | 11/2/2005 | 1,600 | $74.26 | $118,816.00 |
| | 11/2/2005 | 6,300 | $74.27 | $467,901.00 |
| | 11/2/2005 | 9,300 | $74.50 | $692,850.00 |
| | 11/2/2005 | 2,700 | $74.75 | $201,825.00 |
| | 11/2/2005 | 500 | $74.76 | $37,380.00 |
| | 11/2/2005 | 5,500 | $74.77 | $411,235.00 |
| | 12/12/2005 | 26,952 | $76.87 | $2,071,800.24 |
| | 12/14/2005 | 100 | $77.79 | $7,779.00 |
| | 12/14/2005 | 800 | $77.81 | $62,248.00 |
| | 12/14/2005 | 100 | $77.82 | $7,782.00 |
| | 12/14/2005 | 100 | $77.84 | $7,784.00 |
| | 12/14/2005 | 600 | $77.86 | $46,716.00 |
| | 12/14/2005 | 500 | $77.87 | $38,935.00 |
| | 12/14/2005 | 3,200 | $77.88 | $249,216.00 |
| | 12/14/2005 | 200 | $77.88 | $15,576.00 |
| | 12/14/2005 | 100 | $77.88 | $7,788.00 |
| | 12/14/2005 | 100 | $77.88 | $7,788.00 |
| | 12/14/2005 | 200 | $77.89 | $15,578.00 |
| | 12/14/2005 | 100 | $77.89 | $7,789.00 |
| | 12/14/2005 | 100 | $77.89 | $7,789.00 |
| | 12/14/2005 | 400 | $77.90 | $31,160.00 |
| | 12/14/2005 | 200 | $77.90 | $15,580.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 600 | $77.91 | $46,746.00 |
| | 12/14/2005 | 200 | $77.91 | $15,582.00 |
| | 12/14/2005 | 200 | $77.91 | $15,582.00 |
| | 12/14/2005 | 100 | $77.91 | $7,791.00 |
| | 12/14/2005 | 100 | $77.91 | $7,791.00 |

- 83 -

| | 12/14/2005 | 2,200 | $77.92 | $171,424.00 |
|---|---|---|---|---|
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 100 | $77.92 | $7,792.00 |
| | 12/14/2005 | 100 | $77.92 | $7,792.00 |
| | 12/14/2005 | 300 | $77.93 | $23,379.00 |
| | 12/14/2005 | 700 | $77.94 | $54,558.00 |
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 500 | $77.94 | $38,970.00 |
| | 12/14/2005 | 300 | $77.94 | $23,382.00 |
| | 12/14/2005 | 300 | $77.94 | $23,382.00 |
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 2,100 | $77.95 | $163,695.00 |
| | 12/14/2005 | 100 | $77.95 | $7,795.00 |
| | 12/14/2005 | 400 | $77.95 | $31,180.00 |
| | 12/14/2005 | 100 | $77.95 | $7,795.00 |
| | 12/14/2005 | 200 | $77.96 | $15,592.00 |
| | 12/14/2005 | 400 | $77.97 | $31,188.00 |
| | 12/14/2005 | 100 | $77.97 | $7,797.00 |
| | 12/14/2005 | 2,000 | $77.98 | $155,960.00 |
| | 12/14/2005 | 300 | $77.98 | $23,394.00 |
| | 12/14/2005 | 200 | $77.98 | $15,596.00 |
| | 12/14/2005 | 100 | $77.98 | $7,798.00 |
| | 12/14/2005 | 900 | $77.99 | $70,191.00 |
| | 12/14/2005 | 100 | $77.99 | $7,799.00 |
| | 12/14/2005 | 1,700 | $78.00 | $132,600.00 |
| | 12/14/2005 | 200 | $78.00 | $15,600.00 |
| | 12/14/2005 | 100 | $78.00 | $7,800.00 |
| | 12/14/2005 | 200 | $78.01 | $15,602.00 |
| | 12/14/2005 | 100 | $78.01 | $7,801.00 |
| | 12/14/2005 | 1,500 | $78.02 | $117,030.00 |
| | 12/14/2005 | 500 | $78.02 | $39,010.00 |
| | 12/14/2005 | 300 | $78.02 | $23,406.00 |
| | 12/14/2005 | 100 | $78.02 | $7,802.00 |
| | 12/14/2005 | 200 | $78.03 | $15,606.00 |
| | 12/14/2005 | 100 | $78.04 | $7,804.00 |
| | 12/14/2005 | 500 | $78.05 | $39,025.00 |
| | 12/14/2005 | 400 | $78.05 | $31,220.00 |
| | 12/14/2005 | 100 | $78.05 | $7,805.00 |
| | 12/14/2005 | 100 | $78.05 | $7,805.00 |
| | 12/14/2005 | 900 | $78.06 | $70,254.00 |
| | 12/14/2005 | 100 | $78.06 | $7,806.00 |
| | 12/14/2005 | 300 | $78.07 | $23,421.00 |
| | 12/14/2005 | 100 | $78.07 | $7,807.00 |
| | 12/14/2005 | 400 | $78.08 | $31,232.00 |
| | 12/14/2005 | 300 | $78.09 | $23,427.00 |
| | 12/14/2005 | 100 | $78.10 | $7,810.00 |
| | 12/14/2005 | 200 | $78.11 | $15,622.00 |
| | 12/14/2005 | 200 | $78.12 | $15,624.00 |

| | 12/14/2005 | 900 | $78.13 | $70,317.00 |
|---|---|---|---|---|
| | 12/14/2005 | 800 | $78.13 | $62,504.00 |
| | 12/14/2005 | 100 | $78.15 | $7,815.00 |
| | 12/14/2005 | 2,538 | $78.18 | $198,420.84 |
| | 12/14/2005 | 100 | $78.19 | $7,819.00 |
| | 12/14/2005 | 800 | $78.20 | $62,560.00 |
| | 12/14/2005 | 700 | $78.21 | $54,747.00 |
| | 12/14/2005 | 300 | $78.23 | $23,469.00 |
| | 1/27/2006 | 578 | $76.64 | $44,297.92 |
| | 1/27/2006 | 540 | $76.64 | $41,385.60 |
| | 1/27/2006 | 531 | $76.64 | $40,695.84 |
| | 3/14/2006 | 1,800 | $79.23 | $142,614.00 |
| | 3/14/2006 | 200 | $79.24 | $15,848.00 |
| | 3/14/2006 | 120 | $79.36 | $9,523.20 |
| | 5/9/2006 | 8,161 | $82.76 | $675,404.36 |
| | 5/9/2006 | 2,477 | $82.76 | $204,996.52 |
| | 5/10/2006 | 1,500 | $83.00 | $124,500.00 |
| | 5/10/2006 | 100 | $83.01 | $8,301.00 |
| | 5/10/2006 | 3,200 | $83.02 | $265,564.00 |
| | 5/10/2006 | 500 | $83.03 | $41,515.00 |
| | 5/10/2006 | 4,000 | $83.04 | $332,160.00 |
| | 5/10/2006 | 800 | $83.05 | $66,440.00 |
| | 5/10/2006 | 2,084 | $83.06 | $173,097.04 |
| | 5/10/2006 | 1,500 | $83.07 | $124,605.00 |
| | 5/10/2006 | 300 | $83.08 | $24,924.00 |
| | 5/10/2006 | 500 | $83.10 | $41,550.00 |
| | 8/23/2006 | 24,600 | $85.40 | $2,100,840.00 |
| | 8/23/2006 | 3,600 | $85.41 | $307,476.00 |
| | 8/23/2006 | 4,000 | $85.42 | $341,680.00 |
| | 8/23/2006 | 2,200 | $85.43 | $187,946.00 |
| | 8/23/2006 | 2,500 | $85.44 | $213,600.00 |
| | 8/23/2006 | 1,700 | $85.45 | $145,265.00 |
| | 8/23/2006 | 2,700 | $85.46 | $230,742.00 |
| | 8/23/2006 | 2,500 | $85.47 | $213,675.00 |
| | 8/23/2006 | 3,100 | $85.48 | $264,988.00 |
| | 8/23/2006 | 2,300 | $85.49 | $196,627.00 |
| | 8/23/2006 | 6,600 | $85.50 | $564,300.00 |
| | 8/23/2006 | 1,800 | $85.51 | $153,918.00 |
| | 8/23/2006 | 500 | $85.53 | $42,765.00 |
| | 8/23/2006 | 358 | $85.55 | $30,626.90 |
| | 2/2/2007 | 1,673 | $88.53 | $148,110.69 |
| | 2/2/2007 | 633 | $88.53 | $56,039.49 |
| | 2/2/2007 | 626 | $88.53 | $55,419.78 |
| | 2/2/2007 | 593 | $88.53 | $52,498.29 |
| | 2/2/2007 | 582 | $88.53 | $51,524.46 |
| | 2/2/2007 | 535 | $88.53 | $47,363.55 |
| | 2/15/2007 | 1,787 | $91.00 | $162,617.00 |
| | 2/15/2007 | 100 | $91.01 | $9,101.00 |
| | 2/15/2007 | 200 | $91.02 | $18,204.00 |
| | 2/15/2007 | 345 | $91.03 | $31,405.35 |
| | 2/15/2007 | 300 | $91.04 | $27,312.00 |

| | 2/15/2007 | 100 | $91.05 | $9,105.00 |
|---|---|---|---|---|
| | 2/15/2007 | 200 | $91.07 | $18,214.00 |
| | 2/15/2007 | 92 | $91.09 | $8,380.28 |
| | 2/15/2007 | 8 | $91.12 | $728.96 |
| | 2/15/2007 | 200 | $91.13 | $18,226.00 |
| | 2/15/2007 | 400 | $91.16 | $36,464.00 |
| | 2/15/2007 | 100 | $91.17 | $9,117.00 |
| | 2/15/2007 | 200 | $91.20 | $18,240.00 |
| | 2/15/2007 | 100 | $91.23 | $9,123.00 |
| | 2/15/2007 | 100 | $91.24 | $9,124.00 |
| | 2/15/2007 | 400 | $91.25 | $36,500.00 |
| | 2/15/2007 | 200 | $91.28 | $18,256.00 |
| | 2/15/2007 | 100 | $91.30 | $9,130.00 |
| | 2/15/2007 | 200 | $91.31 | $18,262.00 |
| | 2/15/2007 | 200 | $91.34 | $18,268.00 |
| | 4/27/2007 | 10,800 | $92.60 | $1,000,080.00 |
| | 4/27/2007 | 1,500 | $92.61 | $138,915.00 |
| | 4/27/2007 | 4,100 | $92.62 | $379,742.00 |
| | 4/27/2007 | 4,000 | $92.63 | $370,520.00 |
| | 4/27/2007 | 400 | $92.64 | $37,056.00 |
| | 4/27/2007 | 11,600 | $92.65 | $1,074,740.00 |
| | 4/27/2007 | 100 | $92.66 | $9,266.00 |
| | 4/27/2007 | 200 | $92.67 | $18,534.00 |
| | 4/27/2007 | 5,400 | $92.68 | $500,472.00 |
| | 4/27/2007 | 300 | $92.69 | $27,807.00 |
| | 4/27/2007 | 19,500 | $92.70 | $1,807,650.00 |
| | 4/27/2007 | 3,500 | $92.71 | $324,485.00 |
| | 4/27/2007 | 4,400 | $92.72 | $407,968.00 |
| | 4/27/2007 | 7,200 | $92.74 | $667,728.00 |
| | 4/27/2007 | 12,500 | $92.75 | $1,159,375.00 |
| | 4/27/2007 | 200 | $92.76 | $18,552.00 |
| | 4/27/2007 | 100 | $92.77 | $9,277.00 |
| | 4/27/2007 | 2,000 | $92.78 | $185,560.00 |
| | 4/27/2007 | 15,300 | $92.80 | $1,419,840.00 |
| | 4/27/2007 | 6,700 | $92.82 | $621,894.00 |
| | 4/27/2007 | 200 | $92.85 | $18,570.00 |
| | | 360,013 | | $30,015,291.31 |
| | | | | |
| **LASSITER** | 11/7/2005 | 1,100 | $74.25 | $81,675.00 |
| | 11/7/2005 | 1,100 | $74.26 | $81,686.00 |
| | 11/7/2005 | 700 | $74.28 | $51,996.00 |
| | 11/7/2005 | 1,200 | $74.29 | $89,148.00 |
| | 11/7/2005 | 5,200 | $74.30 | $386,360.00 |
| | 11/7/2005 | 900 | $74.31 | $66,879.00 |
| | 11/7/2005 | 1,500 | $74.32 | $111,480.00 |
| | 11/7/2005 | 600 | $74.33 | $44,598.00 |
| | 11/7/2005 | 2,700 | $74.34 | $200,718.00 |
| | 11/7/2005 | 200 | $74.35 | $14,870.00 |
| | 11/7/2005 | 1,700 | $74.36 | $126,412.00 |
| | 11/7/2005 | 1,500 | $74.37 | $111,555.00 |
| | 11/7/2005 | 3,200 | $74.38 | $238,016.00 |

| | 11/7/2005 | 1,800 | $74.39 | $133,902.00 |
|---|---|---|---|---|
| | 11/7/2005 | 2,400 | $74.40 | $178,560.00 |
| | 11/7/2005 | 2,800 | $74.41 | $208,348.00 |
| | 11/7/2005 | 1,900 | $74.42 | $141,398.00 |
| | 11/7/2005 | 300 | $74.43 | $22,329.00 |
| | 11/7/2005 | 1,322 | $74.44 | $98,409.68 |
| | 11/7/2005 | 500 | $74.45 | $37,225.00 |
| | 11/7/2005 | 3,678 | $74.46 | $273,863.88 |
| | 11/7/2005 | 3,300 | $74.47 | $245,751.00 |
| | 11/7/2005 | 2,800 | $74.48 | $208,544.00 |
| | 11/7/2005 | 700 | $74.49 | $52,143.00 |
| | 11/7/2005 | 6,929 | $74.50 | $516,210.50 |
| | 11/7/2005 | 2,100 | $74.51 | $156,471.00 |
| | 11/7/2005 | 3,772 | $74.52 | $281,089.44 |
| | 11/7/2005 | 1,600 | $74.53 | $119,248.00 |
| | 11/7/2005 | 700 | $74.54 | $52,178.00 |
| | 11/7/2005 | 1,500 | $74.55 | $111,825.00 |
| | 11/7/2005 | 2,900 | $74.56 | $216,224.00 |
| | 11/7/2005 | 500 | $74.57 | $37,285.00 |
| | 11/7/2005 | 1,000 | $74.58 | $74,580.00 |
| | 11/7/2005 | 200 | $74.59 | $14,918.00 |
| | 11/7/2005 | 400 | $74.60 | $29,840.00 |
| | 11/7/2005 | 200 | $74.61 | $14,922.00 |
| | 11/7/2005 | 100 | $74.62 | $7,462.00 |
| | 11/7/2005 | 600 | $74.63 | $44,778.00 |
| | 11/7/2005 | 600 | $74.66 | $44,796.00 |
| | 11/7/2005 | 1,900 | $74.67 | $141,873.00 |
| | 11/7/2005 | 200 | $74.68 | $14,936.00 |
| | 11/7/2005 | 200 | $74.69 | $14,938.00 |
| | 11/7/2005 | 4,700 | $74.70 | $351,090.00 |
| | 11/7/2005 | 700 | $74.71 | $52,297.00 |
| | 11/7/2005 | 1,100 | $74.72 | $82,192.00 |
| | 11/7/2005 | 1,800 | $74.73 | $134,514.00 |
| | 11/7/2005 | 7,800 | $74.74 | $582,972.00 |
| | 11/7/2005 | 7,700 | $74.75 | $575,575.00 |
| | 11/7/2005 | 2,700 | $74.77 | $201,879.00 |
| | 12/19/2005 | 7,000 | $77.90 | $545,300.00 |
| | 12/19/2005 | 4,600 | $77.91 | $358,386.00 |
| | 12/19/2005 | 200 | $77.92 | $15,584.00 |
| | 12/19/2005 | 17,395 | $78.00 | $1,356,810.00 |
| | 12/19/2005 | 400 | $78.01 | $31,204.00 |
| | 12/19/2005 | 1,700 | $78.02 | $132,634.00 |
| | 12/19/2005 | 300 | $78.03 | $23,409.00 |
| | 12/19/2005 | 400 | $78.04 | $31,216.00 |
| | 12/19/2005 | 200 | $78.05 | $15,610.00 |
| | 12/19/2005 | 300 | $78.06 | $23,418.00 |
| | 1/30/2006 | 142,984 | $76.63 | $10,956,863.92 |
| | 7/31/2006 | 177,650 | $82.93 | $14,732,514.50 |
| | 7/31/2006 | 66,005 | $82.93 | $5,473,794.65 |
| | 7/31/2006 | 31,689 | $82.93 | $2,627,968.77 |
| | 7/31/2006 | 5,131 | $82.93 | $425,513.83 |

- 87 -

| | 9/12/2006 | 4,600 | $84.90 | $390,540.00 |
|---|---|---|---|---|
| | 9/12/2006 | 3,100 | $84.91 | $263,221.00 |
| | 9/12/2006 | 500 | $84.92 | $42,460.00 |
| | 9/12/2006 | 900 | $84.93 | $76,437.00 |
| | 9/12/2006 | 100 | $84.95 | $8,495.00 |
| | 9/12/2006 | 3,000 | $84.97 | $254,910.00 |
| | 9/12/2006 | 3,400 | $85.00 | $289,000.00 |
| | 9/12/2006 | 4,000 | $85.01 | $340,040.00 |
| | 9/12/2006 | 200 | $85.03 | $17,006.00 |
| | 9/12/2006 | 500 | $85.04 | $42,520.00 |
| | 9/12/2006 | 6,400 | $85.05 | $544,320.00 |
| | 9/12/2006 | 800 | $85.06 | $68,048.00 |
| | 9/12/2006 | 200 | $85.08 | $17,016.00 |
| | 9/12/2006 | 425 | $85.09 | $36,163.25 |
| | 9/12/2006 | 4,400 | $85.10 | $374,440.00 |
| | 9/12/2006 | 4,175 | $85.11 | $355,334.25 |
| | 9/12/2006 | 1,800 | $85.12 | $153,216.00 |
| | 9/12/2006 | 2,200 | $85.13 | $187,286.00 |
| | 9/12/2006 | 1,600 | $85.14 | $136,224.00 |
| | 9/12/2006 | 200 | $85.15 | $17,030.00 |
| | 9/12/2006 | 3,300 | $85.18 | $281,094.00 |
| | 9/12/2006 | 3,300 | $85.20 | $281,160.00 |
| | 9/12/2006 | 300 | $85.21 | $25,563.00 |
| | 9/13/2006 | 600 | $84.38 | $50,628.00 |
| | 9/13/2006 | 200 | $84.39 | $16,878.00 |
| | 9/13/2006 | 800 | $84.40 | $67,520.00 |
| | 9/13/2006 | 700 | $84.41 | $59,087.00 |
| | 9/13/2006 | 600 | $84.42 | $50,652.00 |
| | 9/13/2006 | 300 | $84.43 | $25,329.00 |
| | 9/13/2006 | 1,100 | $84.44 | $92,884.00 |
| | 9/13/2006 | 200 | $84.45 | $16,890.00 |
| | 9/13/2006 | 400 | $84.46 | $33,784.00 |
| | 9/13/2006 | 3,100 | $84.47 | $261,857.00 |
| | 9/13/2006 | 600 | $84.48 | $50,688.00 |
| | 9/13/2006 | 4,000 | $84.49 | $337,960.00 |
| | 9/13/2006 | 4,100 | $84.50 | $346,450.00 |
| | 9/13/2006 | 4,200 | $84.51 | $354,942.00 |
| | 9/13/2006 | 4,700 | $84.52 | $397,244.00 |
| | 9/13/2006 | 2,600 | $84.53 | $219,778.00 |
| | 9/13/2006 | 1,700 | $84.54 | $143,718.00 |
| | 9/13/2006 | 2,200 | $84.55 | $186,010.00 |
| | 9/13/2006 | 1,400 | $84.56 | $118,384.00 |
| | 9/13/2006 | 300 | $84.57 | $25,371.00 |
| | 9/13/2006 | 1,300 | $84.58 | $109,954.00 |
| | 9/13/2006 | 1,800 | $84.59 | $152,262.00 |
| | 9/13/2006 | 700 | $84.60 | $59,220.00 |
| | 9/13/2006 | 1,200 | $84.61 | $101,532.00 |
| | 9/13/2006 | 1,300 | $84.62 | $110,006.00 |
| | 9/13/2006 | 1,000 | $84.63 | $84,630.00 |
| | 9/13/2006 | 2,100 | $84.64 | $177,744.00 |
| | 9/13/2006 | 800 | $84.65 | $67,720.00 |

| | | | |
|---|---|---|---|
| 9/13/2006 | 1,100 | $84.66 | $93,126.00 |
| 9/13/2006 | 200 | $84.68 | $16,936.00 |
| 9/13/2006 | 1,100 | $84.69 | $93,159.00 |
| 9/13/2006 | 1,800 | $84.70 | $152,460.00 |
| 9/13/2006 | 500 | $84.71 | $42,355.00 |
| 9/13/2006 | 800 | $84.72 | $67,776.00 |
| 9/13/2006 | 300 | $84.73 | $25,419.00 |
| 9/13/2006 | 800 | $84.74 | $67,792.00 |
| 9/13/2006 | 900 | $84.80 | $76,320.00 |
| 9/13/2006 | 300 | $84.81 | $25,443.00 |
| 9/13/2006 | 300 | $84.82 | $25,446.00 |
| 9/13/2006 | 900 | $84.83 | $76,347.00 |
| 9/13/2006 | 300 | $84.88 | $25,454.00 |
| 9/13/2006 | 600 | $84.90 | $50,940.00 |
| 9/13/2006 | 300 | $84.92 | $25,476.00 |
| 9/13/2006 | 300 | $85.01 | $25,503.00 |
| 9/13/2006 | 300 | $85.02 | $25,506.00 |
| 9/13/2006 | 300 | $85.06 | $25,518.00 |
| 9/13/2006 | 300 | $85.07 | $25,521.00 |
| 9/13/2006 | 300 | $85.10 | $25,530.00 |
| 9/13/2006 | 300 | $85.11 | $25,533.00 |
| 9/13/2006 | 300 | $85.12 | $25,536.00 |
| 9/13/2006 | 900 | $85.13 | $76,617.00 |
| 9/13/2006 | 300 | $85.14 | $25,542.00 |
| 9/13/2006 | 200 | $85.15 | $17,030.00 |
| 9/13/2006 | 100 | $85.15 | $8,515.00 |
| 9/13/2006 | 300 | $85.18 | $25,554.00 |
| 9/13/2006 | 300 | $85.20 | $25,560.00 |
| 9/13/2006 | 300 | $85.21 | $25,563.00 |
| 9/13/2006 | 1,500 | $85.22 | $127,830.00 |
| 9/13/2006 | 300 | $85.23 | $25,569.00 |
| 9/13/2006 | 1,500 | $85.24 | $127,860.00 |
| 9/13/2006 | 600 | $85.25 | $51,150.00 |
| 9/13/2006 | 300 | $85.26 | $25,578.00 |
| 9/13/2006 | 300 | $85.26 | $25,578.00 |
| 9/13/2006 | 300 | $85.28 | $25,584.00 |
| 9/13/2006 | 900 | $85.30 | $76,770.00 |
| 9/13/2006 | 1,500 | $85.31 | $127,965.00 |
| 9/13/2006 | 900 | $85.33 | $76,797.00 |
| 9/13/2006 | 600 | $85.34 | $51,204.00 |
| 9/13/2006 | 1,800 | $85.35 | $153,630.00 |
| 9/13/2006 | 300 | $85.36 | $25,608.00 |
| 9/13/2006 | 1,800 | $85.37 | $153,666.00 |
| 9/13/2006 | 1,500 | $85.38 | $128,070.00 |
| 9/13/2006 | 600 | $85.39 | $51,234.00 |
| 9/13/2006 | 1,100 | $85.40 | $93,940.00 |
| 9/13/2006 | 800 | $85.41 | $68,328.00 |
| 9/13/2006 | 900 | $85.42 | $76,878.00 |
| 9/13/2006 | 1,000 | $85.43 | $85,430.00 |
| 9/13/2006 | 1,400 | $85.44 | $119,616.00 |
| 9/13/2006 | 300 | $85.45 | $25,635.00 |

| | 9/13/2006 | 1,100 | $85.46 | $94,006.00 |
|---|---|---|---|---|
| | 9/13/2006 | 300 | $85.48 | $25,644.00 |
| | 9/13/2006 | 300 | $85.50 | $25,650.00 |
| | 11/14/2006 | 500 | $83.46 | $41,730.00 |
| | 11/14/2006 | 10,700 | $83.47 | $893,129.00 |
| | 11/14/2006 | 800 | $83.48 | $66,784.00 |
| | 11/14/2006 | 16,100 | $83.49 | $1,344,189.00 |
| | 11/14/2006 | 25,700 | $83.50 | $2,145,950.00 |
| | 11/14/2006 | 1,800 | $83.51 | $150,318.00 |
| | 11/14/2006 | 200 | $83.52 | $16,704.00 |
| | 11/14/2006 | 17,400 | $83.53 | $1,453,422.00 |
| | 11/14/2006 | 2,000 | $83.54 | $167,080.00 |
| | 11/14/2006 | 36,700 | $83.55 | $3,066,285.00 |
| | 11/14/2006 | 200 | $83.56 | $16,712.00 |
| | 11/14/2006 | 7,500 | $83.57 | $626,775.00 |
| | 11/14/2006 | 5,300 | $83.58 | $442,974.00 |
| | 11/14/2006 | 100 | $83.59 | $8,359.00 |
| | 2/2/2007 | 21,320 | $88.53 | $1,887,459.60 |
| | 2/21/2007 | 5,600 | $90.40 | $506,240.00 |
| | 2/21/2007 | 2,500 | $90.40 | $226,000.00 |
| | 2/21/2007 | 2,000 | $90.40 | $180,800.00 |
| | 2/21/2007 | 1,600 | $90.40 | $144,640.00 |
| | 2/21/2007 | 1,600 | $90.40 | $144,640.00 |
| | 2/21/2007 | 800 | $90.40 | $72,320.00 |
| | 2/21/2007 | 700 | $90.40 | $63,280.00 |
| | 2/21/2007 | 700 | $90.40 | $63,280.00 |
| | 2/21/2007 | 600 | $90.40 | $54,240.00 |
| | 2/21/2007 | 450 | $90.40 | $40,680.00 |
| | 2/21/2007 | 300 | $90.40 | $27,120.00 |
| | 2/21/2007 | 100 | $90.40 | $9,040.00 |
| | 2/21/2007 | 600 | $90.41 | $54,246.00 |
| | 2/21/2007 | 300 | $90.41 | $27,123.00 |
| | 2/21/2007 | 200 | $90.41 | $18,082.00 |
| | 2/21/2007 | 200 | $90.41 | $18,082.00 |
| | 2/21/2007 | 100 | $90.41 | $9,041.00 |
| | 2/21/2007 | 1,100 | $90.42 | $99,462.00 |
| | 2/21/2007 | 100 | $90.42 | $9,042.00 |
| | 2/21/2007 | 100 | $90.42 | $9,042.00 |
| | 2/21/2007 | 100 | $90.42 | $9,042.00 |
| | 2/21/2007 | 600 | $90.43 | $54,258.00 |
| | 2/21/2007 | 200 | $90.43 | $18,086.00 |
| | 2/21/2007 | 200 | $90.43 | $18,086.00 |
| | 2/21/2007 | 300 | $90.44 | $27,132.00 |
| | 2/21/2007 | 200 | $90.44 | $18,088.00 |
| | 2/21/2007 | 200 | $90.44 | $18,088.00 |
| | 2/21/2007 | 700 | $90.45 | $63,315.00 |
| | 2/21/2007 | 400 | $90.45 | $36,180.00 |
| | 2/21/2007 | 400 | $90.45 | $36,180.00 |
| | 2/21/2007 | 400 | $90.45 | $36,180.00 |
| | 2/21/2007 | 200 | $90.45 | $18,090.00 |
| | 2/21/2007 | 100 | $90.45 | $9,045.00 |

| | | | |
|---|---|---|---|
| 2/21/2007 | 700 | $90.46 | $63,322.00 |
| 2/21/2007 | 200 | $90.46 | $18,092.00 |
| 2/21/2007 | 100 | $90.46 | $9,046.00 |
| 2/21/2007 | 100 | $90.46 | $9,046.00 |
| 2/21/2007 | 100 | $90.47 | $9,047.00 |
| 2/21/2007 | 100 | $90.49 | $9,049.00 |
| 2/21/2007 | 1,650 | $90.75 | $149,737.50 |
| 2/21/2007 | 1,400 | $90.75 | $127,050.00 |
| 2/21/2007 | 600 | $90.75 | $54,450.00 |
| 2/21/2007 | 500 | $90.75 | $45,375.00 |
| 2/21/2007 | 400 | $90.75 | $36,300.00 |
| 2/21/2007 | 345 | $90.75 | $31,308.75 |
| 2/21/2007 | 300 | $90.75 | $27,225.00 |
| 2/21/2007 | 200 | $90.75 | $18,150.00 |
| 2/21/2007 | 100 | $90.75 | $9,075.00 |
| 2/21/2007 | 600 | $90.76 | $54,456.00 |
| 2/21/2007 | 600 | $90.76 | $54,456.00 |
| 2/21/2007 | 300 | $90.77 | $27,231.00 |
| 2/21/2007 | 100 | $90.77 | $9,077.00 |
| 2/21/2007 | 100 | $90.77 | $9,077.00 |
| 2/21/2007 | 100 | $90.77 | $9,077.00 |
| 2/21/2007 | 700 | $90.78 | $63,546.00 |
| 2/21/2007 | 600 | $90.78 | $54,468.00 |
| 2/21/2007 | 400 | $90.78 | $36,312.00 |
| 2/21/2007 | 300 | $90.78 | $27,234.00 |
| 2/21/2007 | 200 | $90.78 | $18,156.00 |
| 2/21/2007 | 100 | $90.78 | $9,078.00 |
| 2/21/2007 | 200 | $90.79 | $18,158.00 |
| 2/21/2007 | 100 | $90.79 | $9,079.00 |
| 2/21/2007 | 500 | $90.81 | $45,405.00 |
| 2/21/2007 | 755 | $90.82 | $68,569.10 |
| 2/21/2007 | 100 | $90.84 | $9,084.00 |
| 2/21/2007 | 100 | $90.86 | $9,086.00 |
| 2/21/2007 | 300 | $90.87 | $27,261.00 |
| 2/21/2007 | 100 | $90.89 | $9,089.00 |
| 2/21/2007 | 400 | $90.90 | $36,360.00 |
| 2/21/2007 | 300 | $90.90 | $27,270.00 |
| 2/21/2007 | 100 | $90.91 | $9,091.00 |
| 2/21/2007 | 100 | $90.91 | $9,091.00 |
| 2/21/2007 | 600 | $90.92 | $54,552.00 |
| 2/21/2007 | 200 | $90.92 | $18,184.00 |
| 2/21/2007 | 500 | $90.93 | $45,465.00 |
| 2/21/2007 | 200 | $90.93 | $18,186.00 |
| 2/21/2007 | 200 | $90.94 | $18,188.00 |
| 2/21/2007 | 400 | $90.95 | $36,380.00 |
| 2/21/2007 | 200 | $90.95 | $18,190.00 |
| 2/21/2007 | 400 | $90.97 | $36,388.00 |
| 2/21/2007 | 200 | $90.98 | $18,196.00 |
| 2/21/2007 | 200 | $90.98 | $18,196.00 |
| 2/21/2007 | 100 | $90.98 | $9,098.00 |
| 2/21/2007 | 100 | $90.98 | $9,098.00 |

| | | | | |
|---|---|---|---|---|
| | 2/21/2007 | 3,000 | $91.00 | $273,000.00 |
| | 2/21/2007 | 800 | $91.00 | $72,800.00 |
| | 2/21/2007 | 100 | $91.00 | $9,100.00 |
| | 2/21/2007 | 100 | $91.03 | $9,103.00 |
| | 2/21/2007 | 400 | $91.06 | $36,424.00 |
| | 2/21/2007 | 200 | $91.07 | $18,214.00 |
| | 2/21/2007 | 200 | $91.08 | $18,216.00 |
| | 2/21/2007 | 100 | $91.08 | $9,108.00 |
| | 2/21/2007 | 600 | $91.10 | $54,660.00 |
| | 2/21/2007 | 300 | $91.10 | $27,330.00 |
| | 2/21/2007 | 100 | $91.13 | $9,113.00 |
| | 2/21/2007 | 100 | $91.15 | $9,115.00 |
| | 2/21/2007 | 400 | $91.25 | $36,500.00 |
| | 2/22/2007 | 3,000 | $90.40 | $271,200.00 |
| | 2/22/2007 | 2,800 | $90.40 | $253,120.00 |
| | 2/22/2007 | 2,500 | $90.40 | $226,000.00 |
| | 2/22/2007 | 2,200 | $90.40 | $198,880.00 |
| | 2/22/2007 | 1,900 | $90.40 | $171,760.00 |
| | 2/22/2007 | 1,200 | $90.40 | $108,480.00 |
| | 2/22/2007 | 1,100 | $90.40 | $99,440.00 |
| | 2/22/2007 | 700 | $90.40 | $63,280.00 |
| | 2/22/2007 | 500 | $90.40 | $45,200.00 |
| | 2/22/2007 | 200 | $90.40 | $18,080.00 |
| | 2/22/2007 | 200 | $90.40 | $18,080.00 |
| | 2/22/2007 | 100 | $90.40 | $9,040.00 |
| | 2/22/2007 | 400 | $90.41 | $36,164.00 |
| | 2/22/2007 | 300 | $90.41 | $27,123.00 |
| | 2/22/2007 | 100 | $90.41 | $9,041.00 |
| | 2/22/2007 | 700 | $90.42 | $63,294.00 |
| | 2/22/2007 | 700 | $90.42 | $63,294.00 |
| | 2/22/2007 | 400 | $90.42 | $36,168.00 |
| | 2/22/2007 | 400 | $90.42 | $36,168.00 |
| | 2/22/2007 | 300 | $90.42 | $27,126.00 |
| | 2/22/2007 | 300 | $90.42 | $27,126.00 |
| | 2/22/2007 | 200 | $90.42 | $18,084.00 |
| | 2/22/2007 | 100 | $90.42 | $9,042.00 |
| | 2/22/2007 | 800 | $90.43 | $72,344.00 |
| | 2/22/2007 | 700 | $90.43 | $63,301.00 |
| | 2/22/2007 | 400 | $90.43 | $36,172.00 |
| | 2/22/2007 | 200 | $90.43 | $18,086.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 900 | $90.44 | $81,396.00 |
| | 2/22/2007 | 800 | $90.44 | $72,352.00 |
| | 2/22/2007 | 600 | $90.44 | $54,264.00 |
| | 2/22/2007 | 400 | $90.44 | $36,176.00 |
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |
| | 2/22/2007 | 300 | $90.44 | $27,132.00 |
| | 2/22/2007 | 300 | $90.44 | $27,132.00 |
| | 2/22/2007 | 300 | $90.44 | $27,132.00 |

| | Date | Qty | Price | Total |
|---|---|---|---|---|
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 500 | $90.45 | $45,225.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 200 | $90.45 | $18,090.00 |
| | 2/22/2007 | 200 | $90.45 | $18,090.00 |
| | 2/22/2007 | 100 | $90.45 | $9,045.00 |
| | 2/22/2007 | 100 | $90.45 | $9,045.00 |
| | 2/22/2007 | 500 | $90.46 | $45,230.00 |
| | 2/22/2007 | 300 | $90.46 | $27,138.00 |
| | 2/22/2007 | 200 | $90.46 | $18,092.00 |
| | 2/22/2007 | 500 | $90.47 | $45,235.00 |
| | 2/22/2007 | 400 | $90.47 | $36,168.00 |
| | 2/22/2007 | 163 | $90.47 | $14,746.61 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 300 | $90.48 | $27,144.00 |
| | 2/22/2007 | 300 | $90.48 | $27,144.00 |
| | 2/22/2007 | 200 | $90.48 | $18,096.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 900 | $90.49 | $81,441.00 |
| | 2/22/2007 | 800 | $90.49 | $72,392.00 |
| | 2/22/2007 | 800 | $90.49 | $72,392.00 |
| | 2/22/2007 | 700 | $90.49 | $63,343.00 |
| | 2/22/2007 | 500 | $90.49 | $45,245.00 |
| | 2/22/2007 | 300 | $90.49 | $27,147.00 |
| | 2/22/2007 | 300 | $90.49 | $27,147.00 |
| | 2/22/2007 | 200 | $90.49 | $18,098.00 |
| | 2/22/2007 | 200 | $90.49 | $18,098.00 |
| | 2/22/2007 | 100 | $90.49 | $9,049.00 |
| | 2/22/2007 | 1,100 | $90.50 | $99,550.00 |
| | 2/22/2007 | 900 | $90.50 | $81,450.00 |
| | 2/22/2007 | 700 | $90.50 | $63,350.00 |
| | 2/22/2007 | 600 | $90.50 | $54,300.00 |
| | 2/22/2007 | 200 | $90.50 | $18,100.00 |
| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
| | 2/22/2007 | 200 | $90.50 | $18,100.00 |

| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
|---|---|---|---|---|
| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
| | 2/22/2007 | 200 | $90.51 | $18,102.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 400 | $90.52 | $36,208.00 |
| | 2/22/2007 | 200 | $90.52 | $18,104.00 |
| | 2/22/2007 | 200 | $90.52 | $18,104.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 400 | $90.53 | $36,212.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 1,800 | $90.54 | $162,972.00 |
| | 2/22/2007 | 1,100 | $90.54 | $99,594.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 600 | $90.54 | $54,324.00 |
| | 2/22/2007 | 300 | $90.54 | $27,162.00 |
| | 2/22/2007 | 300 | $90.54 | $27,162.00 |
| | 2/22/2007 | 200 | $90.54 | $18,108.00 |
| | 2/22/2007 | 200 | $90.54 | $18,108.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 200 | $90.56 | $18,112.00 |
| | 2/22/2007 | 100 | $90.56 | $9,056.00 |
| | 2/22/2007 | 100 | $90.58 | $9,058.00 |
| | 2/22/2007 | 300 | $90.59 | $27,177.00 |
| | 2/22/2007 | 100 | $90.59 | $9,059.00 |
| | 2/22/2007 | 100 | $90.60 | $9,060.00 |
| | 2/22/2007 | 600 | $90.60 | $54,360.00 |
| | 2/22/2007 | 200 | $90.61 | $18,122.00 |
| | 2/22/2007 | 600 | $90.62 | $54,372.00 |
| | 2/22/2007 | 500 | $90.62 | $45,310.00 |
| | 2/22/2007 | 300 | $90.62 | $27,186.00 |
| | 2/22/2007 | 300 | $90.62 | $27,186.00 |
| | 2/22/2007 | 200 | $90.62 | $18,124.00 |
| | 2/22/2007 | 200 | $90.62 | $18,124.00 |
| | 2/22/2007 | 100 | $90.62 | $9,062.00 |

| | | | | |
|---|---|---|---|---|
| | 2/22/2007 | 500 | $90.63 | $45,315.00 |
| | 2/22/2007 | 400 | $90.63 | $36,252.00 |
| | 2/22/2007 | 300 | $90.63 | $27,189.00 |
| | 2/22/2007 | 200 | $90.63 | $18,126.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 400 | $90.64 | $36,256.00 |
| | 2/22/2007 | 400 | $90.64 | $36,256.00 |
| | 2/22/2007 | 200 | $90.64 | $18,128.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |
| | 2/22/2007 | 500 | $90.65 | $45,325.00 |
| | 2/22/2007 | 300 | $90.65 | $27,195.00 |
| | 2/22/2007 | 200 | $90.65 | $18,130.00 |
| | 2/22/2007 | 100 | $90.65 | $9,065.00 |
| | 2/22/2007 | 300 | $90.65 | $27,195.00 |
| | 2/22/2007 | 100 | $90.65 | $9,065.00 |
| | 2/22/2007 | 300 | $90.66 | $27,198.00 |
| | 2/22/2007 | 200 | $90.66 | $18,132.00 |
| | 2/22/2007 | 100 | $90.66 | $9,066.00 |
| | 2/22/2007 | 1,000 | $90.67 | $90,670.00 |
| | 2/22/2007 | 500 | $90.67 | $45,335.00 |
| | 2/22/2007 | 400 | $90.67 | $36,268.00 |
| | 2/22/2007 | 300 | $90.67 | $27,201.00 |
| | 2/22/2007 | 200 | $90.67 | $18,134.00 |
| | 2/22/2007 | 100 | $90.67 | $9,067.00 |
| | 2/22/2007 | 100 | $90.67 | $9,067.00 |
| | 2/22/2007 | 500 | $90.68 | $45,340.00 |
| | 2/22/2007 | 200 | $90.68 | $18,136.00 |
| | 2/22/2007 | 200 | $90.68 | $18,136.00 |
| | 2/22/2007 | 300 | $90.70 | $27,210.00 |
| | 2/22/2007 | 100 | $90.70 | $9,070.00 |
| | 2/22/2007 | 100 | $90.70 | $9,070.00 |
| | 2/22/2007 | 400 | $90.71 | $36,284.00 |
| | 2/22/2007 | 100 | $90.72 | $9,072.00 |
| | 2/22/2007 | 100 | $90.74 | $9,074.00 |
| | | 941,438 | | $77,532,993.23 |
| | | | | |
| **MCDONOUGH** | 11/11/2005 | 2,332 | $75.69 | $176,509.08 |
| | 3/23/2006 | 3,100 | $79.36 | $246,016.00 |
| | 3/23/2006 | 300 | $79.37 | $23,811.00 |
| | 3/23/2006 | 1,400 | $79.38 | $111,132.00 |
| | 3/23/2006 | 600 | $79.39 | $47,634.00 |
| | 3/23/2006 | 100 | $79.40 | $7,940.00 |
| | 3/23/2006 | 200 | $79.41 | $15,882.00 |
| | 3/23/2006 | 1,600 | $79.42 | $127,072.00 |
| | 3/23/2006 | 600 | $79.43 | $47,658.00 |
| | 3/23/2006 | 1,000 | $79.44 | $79,440.00 |
| | 3/23/2006 | 800 | $79.45 | $63,560.00 |

| | 3/23/2006 | 100 | $79.51 | $7,951.00 |
|---|---|---|---|---|
| | 3/23/2006 | 200 | $79.58 | $15,916.00 |
| | 3/23/2006 | 1,100 | $79.62 | $87,582.00 |
| | 3/23/2006 | 100 | $79.61 | $7,961.00 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/16/2007 | 600 | $91.02 | $54,612.00 |
| | 2/16/2007 | 100 | $91.04 | $9,104.00 |
| | 2/16/2007 | 200 | $91.05 | $18,210.00 |
| | 2/16/2007 | 900 | $91.06 | $81,954.00 |
| | 2/16/2007 | 300 | $91.07 | $27,321.00 |
| | 2/16/2007 | 100 | $91.09 | $9,109.00 |
| | 2/16/2007 | 100 | $91.10 | $9,110.00 |
| | 2/16/2007 | 100 | $91.12 | $9,112.00 |
| | 2/16/2007 | 200 | $91.15 | $18,230.00 |
| | 2/16/2007 | 200 | $91.17 | $18,234.00 |
| | 2/16/2007 | 200 | $91.18 | $18,236.00 |
| | 2/16/2007 | 100 | $91.19 | $9,119.00 |
| | 2/16/2007 | 400 | $91.20 | $36,480.00 |
| | 2/16/2007 | 1,000 | $91.22 | $91,220.00 |
| | 2/16/2007 | 200 | $91.23 | $18,246.00 |
| | 2/16/2007 | 200 | $91.24 | $18,248.00 |
| | 2/16/2007 | 584 | $91.25 | $53,290.00 |
| | 2/16/2007 | 216 | $91.26 | $19,712.16 |
| | 2/16/2007 | 1,300 | $91.27 | $118,651.00 |
| | 2/16/2007 | 800 | $91.28 | $73,024.00 |
| | 2/16/2007 | 1,600 | $91.29 | $146,064.00 |
| | 2/16/2007 | 700 | $91.30 | $63,910.00 |
| | 2/16/2007 | 300 | $91.31 | $27,393.00 |
| | 2/16/2007 | 100 | $91.32 | $9,132.00 |
| | 2/16/2007 | 100 | $91.33 | $9,133.00 |
| | 2/16/2007 | 100 | $91.36 | $9,136.00 |
| | 2/16/2007 | 100 | $91.38 | $9,138.00 |
| | 2/16/2007 | 100 | $91.40 | $9,140.00 |
| | 2/16/2007 | 200 | $91.43 | $18,286.00 |
| | 2/16/2007 | 100 | $91.46 | $9,146.00 |
| | 2/16/2007 | 100 | $91.47 | $9,147.00 |
| | 2/16/2007 | 100 | $91.49 | $9,149.00 |
| | 2/16/2007 | 100 | $91.59 | $9,159.00 |
| | | 26,437 | | $2,239,603.89 |
| | | | | |
| **MCKINNON** | 1/27/2006 | 226 | $76.64 | $17,320.64 |
| | 1/27/2006 | 197 | $76.64 | $15,098.08 |
| | 1/27/2006 | 78 | $76.64 | $5,977.92 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 759 | $88.53 | $67,194.27 |
| | 2/2/2007 | 257 | $88.53 | $22,752.21 |
| | 2/2/2007 | 208 | $88.53 | $18,414.24 |
| | 2/2/2007 | 174 | $88.53 | $15,404.22 |
| | 2/2/2007 | 163 | $88.53 | $14,430.39 |
| | 2/2/2007 | 67 | $88.53 | $5,931.51 |

| | 2/15/2007 | 100 | $91.00 | $9,100.00 |
|---|---|---|---|---|
| | 2/15/2007 | 1,054 | $91.01 | $95,924.54 |
| | 2/15/2007 | 810 | $91.02 | $73,726.20 |
| | 2/15/2007 | 3,386 | $91.03 | $308,227.58 |
| | 2/15/2007 | 1,505 | $91.04 | $137,015.20 |
| | 2/15/2007 | 538 | $91.05 | $48,984.90 |
| | 2/15/2007 | 519 | $91.06 | $47,260.14 |
| | 2/15/2007 | 219 | $91.07 | $19,944.33 |
| | 2/15/2007 | 19 | $91.08 | $1,730.52 |
| | 2/15/2007 | 100 | $91.10 | $9,110.00 |
| | 7/23/2007 | 1,579 | $80.34 | $126,856.86 |
| | | 12,895 | | $1,143,356.36 |
| | | | | |
| **RENFIELD MILLER** | 3/15/2006 | 5,580 | $79.50 | $443,610.00 |
| | 7/28/2006 | 8,240 | $83.16 | $685,238.40 |
| | 2/2/2007 | 1,232 | $88.53 | $109,068.96 |
| | 2/2/2007 | 609 | $88.53 | $53,914.77 |
| | 5/1/2007 | 500 | $92.22 | $46,110.00 |
| | 5/1/2007 | 100 | $92.23 | $9,223.00 |
| | 5/1/2007 | 400 | $92.24 | $36,896.00 |
| | 5/1/2007 | 200 | $92.27 | $18,454.00 |
| | 5/1/2007 | 700 | $92.30 | $64,610.00 |
| | 5/1/2007 | 100 | $92.38 | $9,238.00 |
| | 5/1/2007 | 100 | $92.39 | $9,239.00 |
| | 5/1/2007 | 200 | $92.44 | $18,488.00 |
| | 5/1/2007 | 1,800 | $92.46 | $166,428.00 |
| | 5/1/2007 | 700 | $92.47 | $64,729.00 |
| | 5/1/2007 | 700 | $92.48 | $64,736.00 |
| | 5/1/2007 | 900 | $92.49 | $83,241.00 |
| | 5/1/2007 | 500 | $92.50 | $46,250.00 |
| | 5/1/2007 | 200 | $92.51 | $18,502.00 |
| | 5/4/2007 | 349 | $94.16 | $32,861.84 |
| | | 23,110 | | $1,980,837.97 |
| | | | | |
| **SHOBACK** | 11/23/2005 | 545 | $77.40 | $42,183.00 |
| | 11/23/2005 | 5,606 | $77.54 | $434,689.24 |
| | 11/23/2005 | 5,606 | $77.54 | $434,689.24 |
| | 12/16/2005 | 2,000 | $77.58 | $155,160.00 |
| | 12/16/2005 | 1,300 | $77.60 | $100,880.00 |
| | 12/16/2005 | 488 | $77.64 | $37,888.32 |
| | 12/23/2005 | 419 | $78.41 | $32,853.79 |
| | 1/27/2006 | 71 | $76.64 | $5,441.44 |
| | 8/28/2006 | 5,800 | $85.82 | $497,756.00 |
| | 8/28/2006 | 275 | $85.92 | $23,628.00 |
| | 9/7/2006 | 172 | $84.59 | $14,549.48 |
| | 11/27/2006 | 796 | $83.57 | $66,521.72 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 469 | $88.53 | $41,520.57 |
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/2/2007 | 315 | $88.53 | $27,886.95 |
| | 2/2/2007 | 190 | $88.53 | $16,820.70 |

| | | | | |
|---|---|---|---|---|
| | 2/2/2007 | 173 | $88.53 | $15,315.69 |
| | 2/2/2007 | 48 | $88.53 | $4,249.44 |
| | 5/29/2007 | 450 | $91.86 | $41,337.00 |
| | 6/6/2007 | 1 | $88.15 | $88.15 |
| | 9/7/2007 | 229 | $60.08 | $13,758.32 |
| | | 26,358 | | $2,131,601.70 |
| | | | | |
| **UHLEIN** | 11/11/2005 | 9,482 | $75.50 | $715,891.00 |
| | 12/19/2005 | 6,497 | $77.76 | $505,206.72 |
| | 1/27/2006 | 1,765 | $76.64 | $135,269.60 |
| | 3/20/2006 | 3,800 | $81.90 | $311,220.00 |
| | 3/20/2006 | 200 | $81.92 | $16,384.00 |
| | 8/24/2006 | 3,100 | $85.50 | $265,050.00 |
| | 8/24/2006 | 300 | $85.51 | $25,653.00 |
| | 8/24/2006 | 900 | $85.52 | $76,968.00 |
| | 8/24/2006 | 100 | $85.53 | $8,553.00 |
| | 8/24/2006 | 400 | $85.54 | $34,216.00 |
| | 8/24/2006 | 1,400 | $85.55 | $119,770.00 |
| | 8/24/2006 | 900 | $85.58 | $77,022.00 |
| | 8/24/2006 | 200 | $85.59 | $17,118.00 |
| | 8/24/2006 | 400 | $85.60 | $34,240.00 |
| | 8/24/2006 | 300 | $85.61 | $25,683.00 |
| | 8/24/2006 | 400 | $85.62 | $34,248.00 |
| | 8/24/2006 | 289 | $85.65 | $24,752.85 |
| | 8/25/2006 | 100 | $85.33 | $8,533.00 |
| | 8/25/2006 | 100 | $85.34 | $8,534.00 |
| | 8/25/2006 | 100 | $85.35 | $8,535.00 |
| | 8/25/2006 | 2,100 | $85.36 | $179,256.00 |
| | 8/25/2006 | 500 | $85.38 | $42,690.00 |
| | 8/25/2006 | 200 | $85.40 | $17,080.00 |
| | 8/25/2006 | 100 | $85.43 | $8,543.00 |
| | 8/25/2006 | 1,700 | $85.44 | $145,248.00 |
| | 8/25/2006 | 1,900 | $85.47 | $162,393.00 |
| | 8/25/2006 | 100 | $85.48 | $8,548.00 |
| | 8/25/2006 | 200 | $85.49 | $17,098.00 |
| | 8/25/2006 | 3,400 | $85.50 | $290,700.00 |
| | 8/25/2006 | 300 | $85.51 | $25,653.00 |
| | 8/25/2006 | 200 | $85.52 | $17,104.00 |
| | 8/25/2006 | 100 | $85.53 | $8,553.00 |
| | 8/25/2006 | 200 | $85.54 | $17,108.00 |
| | 2/2/2007 | 4,037 | $88.53 | $357,395.61 |
| | 2/2/2007 | 1,885 | $88.53 | $166,879.05 |
| | 2/2/2007 | 828 | $88.53 | $73,302.84 |
| | 2/2/2007 | 441 | $88.53 | $39,041.73 |
| | 4/27/2007 | 1,000 | $93.05 | $93,050.00 |
| | 4/27/2007 | 800 | $93.06 | $74,448.00 |
| | 4/27/2007 | 700 | $93.07 | $65,149.00 |
| | 4/27/2007 | 400 | $93.08 | $37,232.00 |
| | 4/27/2007 | 700 | $93.09 | $65,163.00 |
| | 4/27/2007 | 5,600 | $93.10 | $521,360.00 |
| | 4/27/2007 | 800 | $93.12 | $74,496.00 |

| | | 58,924 | | $4,960,338.40 |
|---|---|---|---|---|
| | | | | |
| **WALLIS** | 11/22/2005 | 5,300 | $75.85 | $402,005.00 |
| | 11/22/2005 | 1,431 | $75.98 | $108,727.38 |
| | 2/2/2007 | 710 | $88.53 | $62,856.30 |
| | 2/2/2007 | 321 | $88.53 | $28,418.13 |
| | 4/27/2007 | 1,300 | $92.70 | $120,510.00 |
| | 4/27/2007 | 1,754 | $92.71 | $162,613.34 |
| | 4/27/2007 | 2,000 | $92.72 | $185,440.00 |
| | 4/27/2007 | 1,300 | $92.75 | $120,575.00 |
| | 4/27/2007 | 100 | $92.76 | $9,276.00 |
| | | 14,216 | | $1,200,421.15 |
| | | | | |
| **TOTAL:** | | 1,591,300 | | $131,950,012.16 |

280.    The Insider Selling Defendants stock trades were highly suspicious in amount. Although all of the Insider Selling Defendants had worked at Ambac for no less than 8 years and as much as 21 years, the Individual Defendants sold a significant portion of their Ambac stock during the Relevant Period:

(a)    Defendant Bienstock has been employed by Ambac for over 11 years. During the Relevant Period, he sold 54.81% of this total ownership for $3,365,990.73;

(b)    Defendant Callen has been employed by Ambac for over 16 years. During the Relevant Period, he sold 39.59% of his total ownership for $942,857.00;

(c)    Defendant Doyle has been employed by Ambac for over 16 years. During the Relevant Period, he sold 64.79% of his total ownership for $4,224,441.75;

(d)    Defendant Gandalfo has been employed by Ambac for over 13 years. During the Relevant Period, he sold 47.29% of his total ownership for $2,212,278.67;

(e)    Defendant Genader was employed by Ambac for over 21 years. During the Relevant Period, he sold 40.55% of his total ownership for $30,015,291.31;

(f)    Defendant Lassiter was employed by Ambac for over 14 years. During the Relevant Period, he sold 91.95% of his total ownership for $77,532,993.23;

(g)    Defendant McDonough has been employed by Ambac for over 9 years. During the Relevant Period, she sold 51.76% of her total ownership for $2,239,603.89;

(h)    Defendant McKinnon has been employed by Ambac for over 8 years. During the Relevant Period, he sold 30.95% of his total ownership for $1,143,356.36;

(i)    Defendant Renfield-Miller has been employed by Ambac for over 8 years. During the Relevant Period, he sold 30.51% of his total ownership for $1,980,837.97;

(j)    Defendant Shoback has been employed by Ambac for over 16 years. During the Relevant Period, he sold 39.49% of his total ownership for $2,131,601.70;

(k)    Defendant Uhlein has been employed by Ambac for over 15 years. During the Relevant Period, he sold 40.82% of his total ownership for $4,960,338.40;

(l)    Defendant Wallis has been employed by Ambac for over 12 years. During the Relevant Period, he sold 35.00% of his total ownership for $1,200,421.15.

281.    It is not a coincidence that, at the same time the Insider Selling Defendants were issuing false statements about Ambac's exposure to the subprime market, they were dumping the majority of their Ambac stock. The Insider Selling Defendants wanted to be sure that, unlike the rest of Ambac's shareholders, they were not stuck holding the bag when Ambac's overexposure to the subprime market inevitably reared its ugly head.

## DERIVATIVE ALLEGATIONS

282.    Plaintiffs bring this action derivatively in the right and for the benefit of Ambac to redress injuries suffered, and to be suffered, by Ambac as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by Individual Defendants. Ambac is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

283.    Plaintiffs will adequately and fairly represent the interests of Ambac in enforcing and prosecuting its rights.

284.    Plaintiffs are and were owners of the stock of Ambac during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

285.    Plaintiffs have not made any demand on shareholders of Ambac to institute this action since such demand would be a futile and useless act for the following reasons:

(a)      Ambac is a publicly held company with over 100 million shares outstanding, and thousands of shareholders;

(b)      making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      making demand on all shareholders would force Plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## DEMAND ALLEGATIONS

286.   When Plaintiffs first filed this case, the Board of Ambac consisted of the following six individual defendants: Callen, Considine, Duff, Theobald, Unger and Wallace. Plaintiffs did not make a demand on Ambac's Board before instituting this action because the wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of their fiduciary duties, including lack of due care and oversight. Those acts include:

(a)      allowing Ambac to markedly shift the focus of its business from insuring conservative municipal bonds to insuring risky mortgage-based securities without adequately reserving for the inevitable losses that would befall the Company when the real-estate boom ended;

(b)      allowing Ambac to lower its own underwriting standards so that it could insure risky mortgage-based securities that it previously would not have touched "with a ten foot pole";

(c)      failing to ensure that Ambac had adequate infrastructure in place to conduct sufficient due diligence on the collateral backing the securities that Ambac was insuring;

(d)      issuing and approving numerous false and misleading statements that misrepresented or concealed Ambac's overexposure to the subprime market;

(e)      taking steps to keep the price of Ambac's stock inflated by initiating two share repurchase programs that forced Ambac to buy back shares at inflated prices; and

(f)      allowing Company insiders to unload more than 1.5 million shares of Ambac stock for proceeds in excess of $131 million while in possession of materially false and misleading information.

A.  **Demand Is Excused Because the Board's Failure to Exercise Its Duty of Oversight Over Ambac's Business Practices Has Exposed the Company to Increased Risks and Has Harmed Its Financial Condition and Prospects**

287.  The Board created an environment in which management was given *carte blanche* to change the Company's business strategy to insuring extremely risky mortgage-based securities. The Board did so without addressing the attendant risks inherent in doing so. These acts have led to Ambac suffering substantial economic losses and reduction of its previously pristine credit ratings.

288.  As discussed more fully above, the Board allowed senior management to shift the Company's focus away from its core business of insuring safe municipal bonds to insuring mortgage-based securities backed by risky non-traditional loans without properly reserving for the losses that would inevitably incur if, and when, the heady days of the real-estate market ended. As a result, Ambac currently lacks the capital cushion required by each of the three major credit rating agencies and, accordingly, each agency has significantly downgraded Ambac's credit rating.

B.  **Demand Is Excused Because the Board Consciously or Recklessly Allowed Ambac to Lower Its Underwriting Standards**

289.  The Board failed to fulfill its oversight role by allowing Ambac to lower its underwriting standards in order to drive short term profits without regard to long-term risks. According to Ambac's 2006 Form 10-K, Ambac's "Surveillance Group is responsible for monitoring outstanding financial guarantee exposures, including credit derivatives. The group's monitoring activities are designed to detect deterioration in credit quality or changes in the economic, regulatory or political environment which could adversely impact the portfolio." The surveillance team reports "to management *and Ambac's Board of Directors....*"

290.  Further, defendants Callen, Considine, Theobald, Unger and Wallace all served on the Board's Audit and Risk Assessment Committee during the Relevant Period. Each member of the Audit and Risk Committee, by virtue of the Company's Audit and Risk Committee Charter, had the obligation to monitor the corporate control and risk environment of the Company. According to the Company's March 1, 2007 10-K, "[t]he Audit and Risk Committee of the Board of Directors ... meets regularly with financial and risk management ... to review the work and procedures of each." In addition, Ambac considers Considine, Theobald, and Wallace "financial experts."

291.     Thus, Ambac's Board, and particularly defendants Callen, Considine, Theobald, Unger and Wallace knew, or were reckless in not knowing, about the following red flags:

(a)     As a result of Ambac's due diligence visits to mortgage originators, Ambac learned in 2005 and early 2006 that the underwriting standards of the mortgage originators were being systematically lowered in order to maintain profits in the face of a slumping market.

(b)     By the beginning of 2006, Ambac required underlying HELOC products to include over-collateralization of only 0.5% as opposed to the 3.5% it previously required.

(c)     After 2006, Ambac agreed to insure increasing amounts of RMBS backed by CES mortgages issued to home purchasers who applied for piggy-back loans — even though Ambac was aware that these CES loans were being originated under substandard underwriting standards.

(d)     In June 2006, Ambac's Credit Risk Committee changed the risk profile of Ambac's RMBS portfolio by allowing Ambac's underwriters to look only at the historical cumulative default rates of the underlying lenders as opposed to the default rates of the actual loans collateralizing the RMBS that Ambac was insuring.

(e)     In October 2006, on information and belief, the head of Ambac's Consumer Asset backed Securities group, Bruce, sent a memo to defendant Uhlein stating: "Why are we willing to insure stuff in the secondary market [*i.e.*, the CDO market] that we would not touch with a ten foot pole in the primary market [*i.e.*, the RMBS market]".

(f)     Nabi, a Managing Director in Ambac's Consumer Asset-Backed Securities Group expressed concerns about Ambac's CDO exposure, complaining within Ambac that the Company's Credit Risk Committee "didn't look at and evaluate CDO exposure with the same scrutiny" as was applied to other exposures, and that the CDO deals did not face the "same degree" of stress-testing as other transactions.

(g)     Ambac's CDO team was "churning out deals" without conducting an in-depth analysis of the collateral supporting the CDOs.

(h)     As early as Summer 2005, economists were expressing concerns about, and the media was reporting, wide-spread cracks in the housing market. By late 2006, serious problems with the housing market — including the fact that housing sales were on the decline, interest rates

had increased, and the default and delinquency rates were starting to spike — were readily apparent. Nonetheless, mortgage originators continued to loan money to subprime borrowers and Ambac continued insuring RMBS and CDOs backed by toxic mortgages.

## C.   Demand Is Excused Based on the Board's Failure to Implement the Infrastructure Necessary to Monitor the Quality of the Securities Ambac Was Insuring

292.   The Board, and in particular the members of Ambac's Audit & Risk Committee, had a duty to ensure that Ambac had sufficient infrastructure in place to ensure that the loans collateralizing the securities that Ambac was insuring were of high quality. The Director Defendants breached this duty by, amongst other things:

(a)   allowing Ambac's surveillance department in 2006 to be "in disarray," "a lot of times short-staffed" and constantly having turnover of employees; and

(b)   allowing Ambac's CDO team to "rely[] on counterparties" (*i.e.*, the investment bankers who originated CDOs) rather than conducting their own in-depth analysis of the collateral supporting the CDOs Ambac was insuring.

## D.   Demand Is Excused Because Members of the Board Face a Substantial Threat of Personal Liability for Issuing False and Misleading Financial Statements

293.   The Director Defendants by their fiduciary duties of care, good faith and loyalty owe to Ambac a duty to ensure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

294.   Further, on behalf of each of the Director Defendants, defendant Leonard signed, through powers of attorney, one or more of the following documents: (1) the DISC Registration Statement/Prospectus; (2) Equity Units Registration Statement/Prospectus; and/or (3) Common Stock Registration Statement/Prospectus. Each of these documents incorporate by reference many of the false and misleading SEC filings and press releases discussed in ¶¶148-272 above. Thus, each of the Director Defendants faces a real and substantial threat of personal liability such that they are not disinterested with respect to this action.

295.    Indeed, each of the Director Defendants is named as a defendant in the related Class
Action.  As such, it is unlikely they would authorize this lawsuit because discovery in this lawsuit
will reveal information proving their culpability for disseminating false and misleading statements to
the investing public.

### E.    Demand Is Excused Because Several Defendants Face a Substantial Threat of Personal Liability for Approving the Stock Repurchase Programs

296.    Defendants Callen, Considine, Theobald, Unger and Wallace as members of the
Board during the Relevant Period authorized the repurchases of nearly $579 million worth of the
Company's shares at artificially inflated prices.  Ambac repurchased these shares under two stock
repurchase programs that the Board authorized during May 2005 and October 2006.  Since October
2005, the Company was aware that the subprime market was experiencing severe declines.  Thus,
the Board's decisions to authorize the stock repurchases were not the product of valid business
judgment.  Among other things, the Board failed to properly discuss or consider Ambac's exposure
to the subprime mortgage credit market crises and continued to authorize the Company to repurchase
shares as the mortgage market crumbled around them.  Accordingly demand is futile with respect to
defendants Callen, Considine, Theobald, Unger and Wallace.

### F.    Demand Is Excused Because the Board Faces a Substantial Threat of Personal Liability for Allowing Defendant Callen and Other Insiders to Engage in Insider Trading

297.    As a result of his access to and review of internal corporate documents; conversations
and connections with other corporate officers, employees and directors; and attendance at
management and Board meetings, defendant Callen knew the adverse, non-public information
regarding Ambac's true business prospects.  While in possession of this material, adverse, non-public
information regarding the Company, Callen sold 11,750 shares of Ambac stock for $942,857 in
proceeds.  Because Callen received a personal financial benefit from the challenged insider trading
transactions, Callen is interested.  Moreover, Callen faces a sufficiently substantial threat of liability
for his breach of fiduciary duties for insider selling.  Since Callen breached his fiduciary duties and
is interested, any demand upon him is futile.

298.    Further, as set forth above, many members of Ambac's management also engaged in
insider trading.  The Director Defendants breached their fiduciary duties by failing to prevent Callen

and the Insider Selling Defendants from selling more than 1.5 million shares of Ambac's stock for proceeds in excess of $131 million.

## LOSS CAUSATION

299.    The Exchange Act Defendants' unlawful conduct alleged herein directly caused the losses incurred by the Company. Throughout the Relevant Period, the prices of Ambac common stock and other securities were artificially inflated as a direct result of the Exchange Act Defendants' false and misleading statements and omissions. The false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts and the investing public. The Company's true condition became known by investors and the market through a series of partial corrective disclosures. By making contemporaneous misstatements, the Company and its management mitigated the impact of those corrective discloses and prevented the full truth about Ambac from being revealed at once.

300.    When the true facts became known and/or the materialization of the risks that had been fraudulently concealed by the Exchange Act Defendants occurred, the price of Ambac common stock and other securities declined precipitously as the artificial inflation was removed from the market price of these securities, causing substantial damage to the Company. Examples of specific dates of adverse disclosures and corresponding declines in the price of Ambac securities are set forth below.

### A.    Ambac's October 24, 2007 Disclosures

301.    On October 24, 2007, Ambac disclosed, for the first time, a $60 million increase in case loss reserves on two HELOC deals of recent vintage. The rapid deterioration of these deals called into question the company's statements about the quality of its underwriting and surveillance. During its conference call that day, Ambac also disclosed that it had internally downgraded four additional CDOs - three high-grade CDOs (to AA) and a mezzanine CDO (to BBB). This was the first internal downgrade disclosed by Ambac on its high-grade CDO exposures.

302.    In response to the October 24, 2007 conference call and announcements, Ambac's stock price fell 9% and 14% on October 24 and 25, 2007, respectively. The abnormal dollar declines on those days are approximately $4.90 and $7.05 respectively.

303.    An October 24, 2007 report by analyst Ken Zerbe of Morgan Stanley entitled

"Disconnect Between Management Comments and Market Perception is Widening" highlighted the

"new news" to come out of Ambac's disclosures as follows:

> Another significant data point, in our view, was the downgrade of four CDO of ABS transactions totaling nearly $4.0 billion of exposure....
>
> Our concern is that we do not know if this is the beginning of a downward trend in its CDO ratings or if Ambac has truly stress tested its portfolio such that further internal downgrades are unlikely.  But that seems to be the $64,000 questions – is Ambac being conservative enough?
>
> * * *
>
> Oddly enough, one of the more relevant data points cam not from the Company but from Merrill Lynch, which reported very significant write-downs in its CDO portfolio.  Write-downs at Merrill Lynch, which totaled $7.9 billion, ranged from 19% on its high-grade CDO exposures to 57% on its CDO-squared exposures.  This is relevant because Ambac's mark-to-market losses of $743 million totaled roughly 2.5% of CDO of ABS book, which consists of high-grade, mezzanine and mezzanine CDO-squared deals.

As to the increased reserves for two recent HELOC deals, Zerbe wrote:

> "We were a little disappointed with the large increase in case loss reserves in the quarter.... The transactions (vintage 2006 and 2007 were originally rated BBB, but now carry a below investment grade rating."  Regarding on of the downgraded HELOC transactions, Morgan Stanley was *surprised that Ambac would agree to insure such a transaction*....  One transaction was a 'no OC [i.e., overcollateralization] down deal' according to management....  [T]he initial losses more than overwhelmed what little structural protection there was in the deal, resulting in early losses to Ambac.  While we should take encouragement that Ambac is exposed to very few, if any more of these deals, *we cannot help but wonder why the company would agree to insure such a transaction in the first place.*  (Emphasis added.)

304.    Nonetheless, other analysts, including analysts from William Blair and Fox Pitt

Kelton Cochran, were satisfied with Ambac's explanation that the two HELOC deals were

"idiosyncratic" and did not reflect Ambac's overall RMBS portfolio.

### B.    Ambac's January 16, 2008 Disclosures

305.    On January 16, 2008, Ambac announced a staggering $5.4 billion in mark-to-market

write-downs, including over $1 billion of credit impairments on its credit default swap CDO

exposures, and $143 million in loss reserves in its direct insurance RMBS exposure. Ambac also

announced that its CEO, defendant Genader, was resigning, effective immediately and that it was cutting its dividend by 67% in order to preserve capital.

306.    Ambac's stock price plummeted *38.65%* on the news, from a closing price of $21.14 on January 15, 2008, to a closing price of $12.97.  These announcements caught Wall Street by surprise, as noted by *The New York Times* on January 19, 2008:

> Ambac, which had won clean bills of health from rating agencies a month ago, surprised Wall Street on Wednesday by writing down its insurance portfolio by $5.4 billion and ousting its chief executive, Robert J. Genader, after he and the board disagreed over whether the company should raise more capital.

> While much of the write-down was the result of declining market value of its contracts, the company admitted that an estimated $1.1 billion represented credit losses on which, over time, it would have to pay claims, something that the credit ratings firms had not anticipated.

307.    Following Ambac's January 16, 2008 announcement, analysts expressed their surprise and concerns. The next day, several analysts downgraded Ambac stock in light of the stunning losses, and S&P issued a revised report regarding losses expected at the various bond insurers. Ambac's stock price declined *another 52%*, closing at $6.24 on extremely high trading volume of almost 63 million shares.

308.    Moody's also put Ambac on review for a possible downgrade, "citing the much higher than expected losses and the abrupt retirement of the company's chairman and CEO." (Friedman Billings Analyst Report, "Moody's Offers Another Blow to SBK – Lowering Price Target," January 17, 2008.)

309.    On January 18, following Ambac's abandonment of its capital-raising plan, Ambac became the first bond insurer to lose its AAA rating when Fitch downgraded the Company.

## C.    Ambac's April 23, 2008 Disclosure

310.    On April 23, 2008, as Ambac announced a net loss of $1.66 billion, driven primarily by an impairment of $1.045 billion of HELOC and CES deals, and by further mark-to-market loss of $1.725 billion on Ambac's CDS exposures. Defendant Leonard stated in a conference call that "on some exposures, a few deals ... *losses could reach as high possibly as 80%*." (Emphasis added.) The market recognized the true deterioration of the underlying second lien exposures, and finally was able to link lower quality underlying collateral to Ambac's massive losses.  As reported by *Dow*

- 108 -

*Jones,* "Ambac's stock fell 43% to $3.46 Wednesday after it stunned investors with a $1.66 billion net loss, nearly eight times worse than Wall Street had expected. The loss was driven by bigger write-downs related to complex securities backed by mortgages, with surprisil g weakness in securities backed by home equity lines of credit and second-lien loans." CreditSights analyst Robert Haines remarked that Ambac's announcement "sparked concerns that the company's AAA credit rating wasn't as safe as investors thought. Just when you thought things are getting aback to normal, there are these horrible numbers."

311.    The *Wall Street Journal* noted that "[i]nvestors sold off shares of Ambac Financial Group Inc., convinced that the bond insurer's worse-than-expected earnings report could cripple the company's ability to issue new insurance policies." *Fortune* noted that Ambac's RMBS-related losses were "noteworthy because the company has previously contended that mark-to-market losses reflect the overwrought market environment and may be reversed in future periods. Ambac makes no such claim about credit impairment."

312.    Subsequent disclosures confirmed the weak characteristics of the second lien portfolio. For example, Ambac later explained, in a May 22, 2008 Second Lien RMBS Update, that the poorly performing closed-end seconds were "piggy-back" transactions with "high concentrations of purchase and stated doc loans." In other words, the loans supporting Ambac's RMBS exposures had been used by home buyers to cover their down payment and often covered the first 10-20% of home equity to disappear in a market downturn. With one exception (which was a late 2005 transaction), all of the "Below Investment Grade" closed end second transactions took place in the 2006-2007 period. Additionally, Ambac Executive Vice President, Douglas Reinfield-Miller further conceded at a June 4, 2008 KBW conference that these recent vintage closed-end second transactions "essentially [were] where people were leveraging to make 100% - *leveraging their down payment on a house*." (Emphasis added.) Ambac's Reinfield-Miller also explained that the poorly performing HELOC transactions "do not have a lot of credit protection." (Emphasis added.)

313.    After reaching a closing high of $96.08 on May 18, 2008, the corrective disclosures alleged herein and any others that may be learned through discovery, caused Ambac's stock to decline to below $1.05 until its trading was temporarily halted on July 2, 2008. The price declines

- 109 -

directly and proximately resulting from the above discussed disclosures were not caused by industry news, randomness, or by Ambac-related information unrelated to the alleged fraud. Each of the above referenced disclosures partially corrected the false and misleading information previously available to the market by the Exchange Act Defendants' wrongful course of conduct.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

314.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.

315.    First, none of the statements complained of herein was a forward-looking statement. Rather they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements of reported financial results and underwriting, surveillance and accounting practices. Given the then-existing facts contradicting the Exchange Act Defendants' statements, the generalized risk disclosures made by Ambac, including those regarding the Company's underwriting, surveillance, mark-to-market accounting, loss reserves, and/or financial condition, were not sufficient to insulate the Exchange Act Defendants from liability for the statements they made because those statements were materially misstated when made. Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

316.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted the Exchange Act Defendants' statements regarding the Company's underwriting, surveillance and accounting practices, and its purported compliance with GAAP.

317.    To the extent that the statutory safe harbor may apply to any of these false statements alleged herein, the Exchange Act Defendants are liable for those false forward-looking statements because at the time each of those statements were made the speaker actually knew the statement was

false or the statement was authorized and/or approved by an executive officer of Ambac who actually knew that those statements were false when made.

## RELIANCE – FRAUD ON THE MARKET DOCTRINE

318.    At all relevant times the market for Ambac's securities was an efficient market for the following reasons, among others:

a.    The Company's securities were actively traded on the New York Stock Exchange, a highly efficient market;

b.    As a regulated issuer, the Company filed periodic public reports with the SEC;

c.    Ambac was followed by numerous securities analysts, who issued a significant number of reports on Ambac during the Class Period; and

d.    Ambac communicated with public investors via established market communication mechanisms, including the regular issuance of press releases through the business wire news service, and conference calls with analysts and investors.

319.    As a result, the market for Ambac's securities promptly digested current information with respect to Ambac from all publicly available sources and reflected such information in the price of the Company's securities. Thus, a presumption of reliance applies.

## COUNT I

### Derivatively Against the Director Defendants and Defendants Leonard and Genader for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

320.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

321.    During the Relevant Period, the Director Defendants and defendants Leonard and Genader disseminated or approved public statements that improperly portrayed Ambac's business prospects, growth and margins. The Director Defendants and defendants Leonard and Genader knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

322.    The Insider Selling Defendants also sold nearly $132 million worth of shares of Ambac's common stock at inflated prices during the Relevant Period while in possession of material non-public information. These defendants misappropriated Ambac's proprietary information and

violated their so-called "abstain or disclose" duties under the federal securities laws when they sold stock without disclosing the information alleged to have been concealed herein.

323.    At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Ambac's business prospects, especially concerning the Company's exposure to the subprime mortgage and credit market crises, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Leonard were causing Ambac to repurchase nearly $579 million worth of its own stock on the open market at an average inflated price of approximately $86.36 per share, which is approximately 60 times higher than its current share price of $1.44 per share.

324.    As such, the Director Defendants and defendants Leonard and Genader violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

   (a)    employed devices, schemes and artifices to defraud;

   (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Ambac and others in connection with their purchases of Ambac common stock during the Relevant Period.

325.    As a result of the Director Defendants' and defendants Leonard's and Genader's misconduct, Ambac has and will suffer damages in that it paid artificially inflated prices for common stock purchased on the open market. Ambac would not have purchased common stock at the prices it paid, had the market previously been aware that the market price of Ambac's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Ambac suffered damages in connection with its purchases of Ambac common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendants Leonard and Genader are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against All Individual Defendants for Breach of Fiduciary Duty

326.    Plaintiffs incorporate by reference and reallege each and every allega tion contained above, as though fully set forth herein.

327.    The Individual Defendants owed and owe Ambac fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the highest obligation of good faith, fair dealing, loyalty and due care.

328.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

329.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and health.  The Individual Defendants also had actual or constructive knowledge that they were improperly causing Ambac to repurchase over $578 million of its own stock at artificially inflated prices.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

330.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Ambac has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

331.    Plaintiffs, on behalf of Ambac, have no adequate remedy at law.

## COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

332.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

333.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Ambac common stock on the basis of such information.

334.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset

belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Ambac common stock.

335.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Ambac common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

336.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### COUNT IV

### Against All Individual Defendants for Breach of Fiduciary Duty for Abuse of Control

337.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

338.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ambac, for which they are legally responsible. In particular, the Individual Defendants abused their positions of authority by causing or allowing Ambac to issue statements that improperly portrayed Ambac's business prospects.

339.   As a direct and proximate result of the Individual Defendants' abuse of control, Ambac has sustained significant damages. These damages include, but are not limited to, Ambac's severe loss of market credibility as reflected in its $9.379 billion market capitalization loss and $578 million paid to repurchase the Company's stock.

340.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

341.   Plaintiffs, on behalf of Ambac, have no adequate remedy at law.

### COUNT V

### Against All Individual Defendants for Breach of Fiduciary Duty for Gross Mismanagement

342.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

343.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ambac in a manner consistent with the operations of a publicly held corporation.

344.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ambac has sustained significant damages in excess of hundreds of millions of dollars.

345.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

346.    Plaintiffs, on behalf of Ambac, have no adequate remedy at law.

### COUNT VI

### Against All Individual Defendants for Waste of Corporate Assets

347.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

348.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $578 million to repurchase the Company' stock and paying bonuses to certain of its executive officers.

349.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

350.    Plaintiffs, on behalf of Ambac, have no adequate remedy at law.

### COUNT VII

### Against All Individual Defendants for Unjust Enrichment

351.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

352.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Ambac.

353.    Plaintiffs, as shareholders and representatives of Ambac, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Director Defendants and defendant Leonard are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Ambac damages;

C.    Directing Ambac to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect   and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Ambac to nominate at least three candidates for election to the Board;

3.    a proposal to ensure the accuracy of the qualifications of Ambac's directors, executives and other employees;

4.    a proposal to control insider selling;

5.    a proposal to ensure that Ambac prudently expends funds in stock repurchase programs;

6.    a proposal to better manage and disclose Ambac's credit risks; and

7.    appropriately test and then strengthen the internal audit and control functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that Plaintiffs on behalf of Ambac have an effective remedy;

E.      Awarding to Ambac restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: December 17, 2008

LAW OFFICES OF THOMAS G. AMON
THOMAS G. AMON

_____
THOMAS G. AMON

250 West 57th Street, Suite 1316
New York, New York 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427

MURRAY, FRANK & SAILER LLP
MARVIN L. FRANK
JACQUELINE SAILER
BRIAN P. MURRAY
275 Madison Avenue
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

Liaison Counsel for Plaintiffs

ROBBINS UMEDA & FINK, LLP
JEFFREY P. FINK
FELIPE A. ARROYO
MARK A. GOLOVACH
JULIA M. WILLIAMS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

JOHNSON BOTTINI, LP
FRANK J. JOHNSON
BRETT M. WEAVER
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 233-5535

Co-Lead Counsel for Plaintiffs

## VERIFICATION

I, Earl Jordan Yaokasin, have read the Ambac Financial Group, Inc. Verified Amended Consolidated Shareholder Derivative Complaint and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____ 12 | 17 / 08 _____

_____

EARL JORDAN YAOKASIN

## VERIFICATION

I, Marilyn Clark, have read the In re Ambac Financial Group, Inc. Verified Amended Shareholder Derivative Complaint and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief. Furthermore, I am a current Ambac Financial Group, Inc. shareholder and intend to remain a shareholder throughout this litigation. I have also retained competent counsel and intend to vigorously litigate this action.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _12-17-08_

MARILYN CLARK